No. 24-880

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————

CENTER FOR INVESTIGATIVE REPORTING and WILL EVANS,

Plaintiffs-Appellees,

v.

UNITED STATES DEPARTMENT OF LABOR,

Defendant-Appellant.

———————————

On Appeal from the United States District Court
for the Northern District of California

———————————

## BRIEF FOR APPELLANT

———————————

*Of Counsel:*

SEEMA NANDA
*Solicitor of Labor*

EMILY S. WHITTEN
*Attorney*

*United States Department of Labor*

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

ISMAIL J. RAMSEY
*United States Attorney*

PAMELA JOHANN
*Assistant United States Attorney*

MARK B. STERN
JOSHUA M. KOPPEL
*Attorneys, Appellate Staff*
*Civil Division, Room 7212*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-4820*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................iii

INTRODUCTION .............................................................................1

STATEMENT OF JURISDICTION ...................................................3

STATEMENT OF THE ISSUES.........................................................4

PERTINENT STATUTES ..................................................................4

STATEMENT OF THE CASE ............................................................4

    A.    Statutory Background.........................................................4

    B.    Factual Background ............................................................8

    C.    Prior Proceedings...............................................................9

SUMMARY OF ARGUMENT.........................................................13

STANDARD OF REVIEW ...............................................................17

ARGUMENT ...................................................................................18

I.    EEO-1 REPORTS CONTAIN COMMERCIAL INFORMATION WITHIN THE MEANING OF FOIA EXEMPTION 4 .......................................................18

    A.    EEO-1 Data Is Commercial Information....................................19

    B.    The District Court Erred By Requiring The Department Of Labor To Show That The EEO-1 Data Was Commercially Valuable ............................................................29

    C.    EEO-1 Reports Contain Commercial Information Even Under The District Court's Erroneous Standard....................................35

II.    IF THE DISTRICT COURT DETERMINES ON REMAND THAT THE EEO-1 REPORTS FALL WITHIN FOIA EXEMPTION 4, THE TRADE SECRETS ACT WILL PROHIBIT THEIR DISCLOSURE .......................................................38

CONCLUSION .................................................................................................................. 44

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                                 **Page(s)**

*American Civil Liberties Union of N. Cal. v. U.S. Dep't of Justice*,
    880 F.3d 473 (9th Cir. 2018) ...................................................................3

*Animal Legal Def. Fund v. U.S. Food & Drug Admin.*,
    836 F.3d 987 (9th Cir. 2016) ......................................................... 17, 37

*Baker & Hostetler LLP v. U.S. Dep't of Commerce*,
    473 F.3d 312 (D.C. Cir. 2006) ................................................................20

*Center for Investigative Reporting v. U.S. Dep't of Labor*,
    424 F. Supp. 3d 771 (N.D. Cal. 2019) ...............................................10

*Chrysler Corp. v. Brown*,
    441 U.S. 281 (1979) .................................................................................5

*Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice*,
    58 F.4th 1255 (D.C. Cir. 2023) ...............................................19, 33, 34

*Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice*,
    No. 19-cv-3626, 2024 WL 1406550 (D.D.C. Mar. 31, 2024) .....................34

*CNA Fin. Corp. v. Donovan*,
    830 F.2d 1132 (D.C. Cir. 1987) ............................................................39

*Food Mktg. Inst. v. Argus Leader Media*,
    588 U.S. 427 (2019) ......................................... 2, 16, 18, 19, 31, 32, 33, 41, 42

*General Motors Corp. v. Marshall*,
    654 F.2d 294 (4th Cir. 1981) .................................................................40

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*,
    530 U.S. 1 (2000) ...................................................................................42

*John Doe Agency v. John Doe Corp.*,
    493 U.S. 146 (1989) ...............................................................................18

*Lamie v. U.S. Tr.,*
    540 U.S. 526 (2004) ................................................................42

*Maricopa Audubon Soc'y v. U.S. Forest Serv.,*
    108 F.3d 1082 (9th Cir. 1997) ...............................................32

*McClellan Ecological Seepage Situation v. Carlucci,*
    835 F.2d 1282 (9th Cir. 1987) .................................14, 19, 21

*National Labor Relations Bd. v. Sears, Roebuck & Co.,*
    421 U.S. 132 (1975) ................................................................18

*National Parks & Conservation Ass'n v. Morton,*
    498 F.2d 765 (D.C. Cir. 1974) ...............................................31

*Pacific Architects & Eng'rs Inc. v. U.S. Dep't of State,*
    906 F.2d 1345 (9th Cir. 1990) ......................................... 5, 40

*Public Citizen Health Research Grp. v. FDA,*
    704 F.2d 1280 (D.C. Cir. 1983) .............................................20

*Sears Roebuck & Co. v. General Servs. Admin.,*
    509 F.2d 527 (D.C. Cir. 1974) .................................................7

*Steele, In re*
    799 F.2d 461 (9th Cir. 1986) ...................................................3

*Synopsys, Inc. v. U.S. Dep't of Labor,*
    Nos. 20-16414, 20-16416, 2022 WL 1501094 (9th Cir. May 12, 2022) ......................40

*Watkins v. U.S. Bureau of Customs & Border Prot.,*
    643 F.3d 1189 (9th Cir. 2011) ...............................................19

**Statutes:**

FOIA Improvement Act of 2016,
    Pub. L. No. 114-185, 130 Stat. 538 .........................................4

Freedom of Information Act,
    5 U.S.C. § 552(a)(3)(A) ............................................................4
    5 U.S.C. § 552(a)(8)(A) ..........................................................38

5 U.S.C. § 552(a)(8)(A)(i) ................................................................5
5 U.S.C. § 552(a)(8)(A)(i)(I) .........................................................43
5 U.S.C. § 552(a)(8)(A)(i)(II) ................................................... 5, 43
5 U.S.C. § 552(b) ............................................................................4
5 U.S.C. § 552(b)(3) ......................................................................39
5 U.S.C. § 552(b)(4) ................................................1, 4, 13-14, 18

Trade Secrets Act,
  18 U.S.C. § 1905 ....................................3, 5, 17, 39, 40, 41

28 U.S.C. § 1291 ............................................................................3

28 U.S.C. § 1292(a)(1) ...................................................................3

28 U.S.C. § 1331 ............................................................................3

42 U.S.C. § 2000e-8(c) ..................................................................6

42 U.S.C. § 2000e-8(e) ..................................................................7

**Regulations:**

29 C.F.R. § 70.26 ...........................................................................8

29 C.F.R. § 70.26(c)–(e) .................................................................8

29 C.F.R. § 70.26(f) ........................................................................8

29 C.F.R. § 1602.7 ..........................................................................6

41 C.F.R. § 60-1.7(a)(1) ..................................................................6

**Legislative Materials:**

H. Rep. No. 89-1497 (1966) ...................................................18, 20

S. Rep. No. 89-813 (1965) ......................................................20, 33

S. Rep. No. 114-4 (2015) ...........................................................5, 38

**Other Authorities:**

*Commercial*, Black's Law Dictionary (rev. 4th ed. 1968) .....................................................19

*Commercial*, Webster's Third New International Dictionary (1966) ................................19

*Confidential*, Black's Law Dictionary (3d ed. 1933) ..........................................................41

*Confidential*, Funk & Wagnalls New Standard Dictionary of the
    English Language (1946) ....................................................................................41

*Data*, Funk & Wagnalls New Standard Dictionary of the
    English Language (1946) ....................................................................................41

*Datum*, Funk & Wagnalls New Standard Dictionary of the
    English Language (1946) ....................................................................................41

52 Fed. Reg. 23,781 (June 25, 1987) ..........................................................................8

81 Fed. Reg. 45,479 (July 14, 2016) ....................................................................... 6, 7

87 Fed. Reg. 51,145 (Aug. 19, 2022) ..........................................................................9

87 Fed. Reg. 67,907 (Nov. 10, 2022) ..........................................................................6

*Statistical*, Funk & Wagnalls New Standard Dictionary of the
    English Language (1946) ....................................................................................40

*Statistics*, Funk & Wagnalls New Standard Dictionary of the
    English Language (1946) ....................................................................................40

## INTRODUCTION

Most federal contractors with at least 50 employees must submit to the Department of Labor a form commonly known as an EEO-1 report. That report provides a statement of the contractor's total number of employees, as well as the number of its employees in each of 10 job categories, broken down by race/ethnicity and sex.

Plaintiffs filed a Freedom of Information Act (FOIA) request seeking the data from EEO-1 reports filed by all federal contractors from 2016 through 2020. The Department of Labor provided notice of the request to federal contractors, and approximately 4,800 contractors objected to the disclosure of their reports. After reviewing those objections, the Department of Labor concluded that the EEO-1 data of the objecting contractors is exempt from disclosure under FOIA Exemption 4, which covers "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4).

Plaintiffs filed suit, and the district court ordered the Department of Labor to produce the EEO-1 data, holding that the reports do not contain commercial information and therefore are not covered by FOIA Exemption 4. In reaching that conclusion, the court stated that the EEO-1 data is not "commercially valuable" and would not provide competitors "commercial insight" into the operations of federal contractors because the data is "broad and non-specific," does not include other

"financial metrics" of contractors' operations or staffing strategies, and "would probably be stale by the time it was disclosed."  1-ER-7–9.

The district court's decision misapprehends the scope of Exemption 4.  The court asked whether the EEO-1 data is commercially valuable and whether its release would provide competitors with commercial gain, but the text of Exemption 4 provides no basis for such requirements.  A company's headcount, allocation of personnel across job categories, and workforce demographic data are commercial information because they relate to the company's capacity to produce goods or services and to engage in commerce, the company's staffing strategies and organizational structure, and the company's success in hiring a diverse workforce. Whether or not competitors profit by release of the data is immaterial.

The district court's reasoning is also at odds with the Supreme Court's analysis in *Food Marketing Institute v. Argus Leader Media*, 588 U.S. 427, 435–440 (2019), which rejected the view, previously adopted by nearly every circuit, that information is not "confidential" within the meaning of FOIA Exemption 4 unless its disclosure would cause substantial competitive harm to the business that provided the information. The Court in *Argus Leader* held that it would be improper to graft an atextual requirement onto the statute to limit the reach of the exemption.  The district court's decision here committed that very error, however, by imposing a competitive-harm requirement through the commercial-information prong of Exemption 4 and again narrowing the ambit of the exemption.

2

The district court similarly erred in holding that EEO-1 data is not "confidential statistical data" within the meaning of the Trade Secrets Act, 18 U.S.C. § 1905. The court rejected the Department of Labor's understanding of that statute's application to the data at issue, stating without significant elaboration that it was not convinced that the statute "is simply governed by the plain meaning of [its] terms." 1-ER-11.

The decision below fails to construe the terms of FOIA and the Trade Secrets Act in accordance with the ordinary meaning of the statutory text. The Court should reverse the decision of the district court, hold that EEO-1 data is commercial information within the meaning of FOIA Exemption 4 and statistical data within the meaning of the Trade Secrets Act, and remand for a decision on whether the reports at issue are confidential.

## STATEMENT OF JURISDICTION

The district court had jurisdiction pursuant to 28 U.S.C. § 1331. On December 22, 2023, the district court entered an interlocutory order requiring the Department of Labor to produce certain documents. The United States filed a notice of appeal on February 15, 2024. 4-ER-633. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1291 and 1292(a)(1). *See American Civil Liberties Union of N. Cal. v. U.S. Dep't of Justice*, 880 F.3d 473, 480 n.3 (9th Cir. 2018); *In re Steele*, 799 F.2d 461, 464–465 (9th Cir. 1986).

3

## STATEMENT OF THE ISSUES

1. Whether federal contractors' EEO-1 reports—which provide information about the contractors' total employee headcount, allocation of personnel across job categories, and workforce demographic data—contain "commercial … information" within the meaning of FOIA Exemption 4, 5 U.S.C. § 552(b)(4).

2. Whether, assuming the EEO-1 reports are exempt from mandatory disclosure under FOIA Exemption 4, the Trade Secrets Act prohibits the Department of Labor from disclosing those reports.

## PERTINENT STATUTES

Pertinent statutes are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory Background

1. Under the Freedom of Information Act, a federal agency must generally make agency records available to "any person" who has submitted a "request for [such] records." 5 U.S.C. § 552(a)(3)(A). FOIA "does not apply," however, to records that fall within the scope of its exemptions. *Id.* § 552(b). As relevant here, Exemption 4 covers "trade secrets and commercial or financial information obtained from a person and privileged or confidential." *Id.* § 552(b)(4). Under the FOIA Improvement Act of 2016, Pub. L. No. 114-185, 130 Stat. 538, even if requested records fall within one of the exemptions identified in Section 552(b), an agency may withhold those records only if (1) "the agency reasonably foresees that disclosure

4

would harm an interest protected by an exemption described in" Section 552(b), or

(2) "disclosure is prohibited by law." 5 U.S.C. § 552(a)(8)(A)(i).

In some cases, the Trade Secrets Act serves as a substantive basis to prohibit disclosure of information requested pursuant to FOIA. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 317–318 (1979); *Pacific Architects & Eng'rs Inc. v. U.S. Dep't of State*, 906 F.2d 1345, 1347 (9th Cir. 1990). Thus, if requested information falls within one of FOIA's exemptions and is covered by the Trade Secrets Act, then disclosure is prohibited by law and withholding is authorized under the FOIA Improvement Act. *See* 5 U.S.C. § 552(a)(8)(A)(i)(II); *see also* S. Rep. No. 114-4, at 8 & n.11 (2015). The Trade Secrets Act makes it a criminal offense for any officer or employee of the United States to disclose, "in any manner or to any extent not authorized by law," "any information" received by reason of any "report or record made to or filed with" the agency employing the officer or employee, where that "information concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or association." 18 U.S.C. § 1905.

2. This case involves a FOIA request for data submitted by federal contractors to the Department of Labor on Standard Form 100, more commonly known as an EEO-1 report. Companies subject to the EEO-1 reporting requirement use that form to report the total number of employees at the company, broken down by race

5

or ethnicity, sex, and job category.  *See* 3-ER-278–279 (sample EEO-1 form).  A Type

2 EEO-1 report (now referred to as a "consolidated" report, *see* 87 Fed. Reg. 67,907,

67,910 n.26 (Nov. 10, 2022)) is used by companies with more than one establishment,

or place of business, and provides data for all of the company's employees across all

of its establishments.  *See* 3-ER-278; 3-ER-340.

Since 1978, the Department of Labor has required most federal contractors

that have at least 50 employees to annually submit an EEO-1 report.  41 C.F.R.

§ 60-1.7(a)(1).  The Department's Office of Federal Contract Compliance Programs

(OFCCP) uses the reports to evaluate contractors' compliance with Executive Order

11,246, which prohibits employment discrimination by federal contractors and

requires contractors to take affirmative action to ensure equal employment

opportunity.  The same form is used by the Equal Employment Opportunity

Commission (EEOC), which, pursuant to Title VII of the Civil Rights Act of 1964,

requires employers with 100 or more employees to file an EEO-1 report whether or

not they are federal contractors.  29 C.F.R. § 1602.7; *see also* 42 U.S.C. § 2000e-8(c)

(providing statutory authority for the EEOC's requirement).

To avoid duplication of efforts and reduce the administrative burden on

companies, the EEOC and the Department of Labor created the Joint Reporting

Committee to administer the EEO-1 reporting system as a single data collection to

meet the needs of both agencies.  *See* 81 Fed. Reg. 45,479, 45,481 (July 14, 2016).  In

practice, all companies that are required to submit an EEO-1 report submit the report

to the EEOC, which collects and reconciles the data, and then provides the Department of Labor the report data for those entities that self-identified or are otherwise identified as federal contractors subject to OFCCP's jurisdiction. 3-ER-266.

As part of the data collection, the Joint Reporting Committee assures all EEO-1 filers that their reports will be kept confidential to the maximum extent permitted by law. *See* 3-ER-340–341; 81 Fed. Reg. at 45,491 ("Recognizing that employers are concerned … about the confidentiality of their business data …, the EEOC and OFCCP have committed to vigorously guarding its privacy and confidentiality …."). Title VII makes it a criminal offense for any officer or employee of the EEOC to "make public in any manner whatever" any information that the Commission collects pursuant to its authority under Section 2000e-8—including EEO-1 reports—unless a Title VII proceeding has been instituted involving such information. 42 U.S.C. § 2000e-8(e). Although some courts have held that that provision does not apply to EEO-1 reports collected pursuant to OFCCP's authority, *see Sears Roebuck & Co. v. General Servs. Admin.*, 509 F.2d 527, 529 (D.C. Cir. 1974) (per curiam), the Department of Labor assures contractors that it "will protect the confidentiality of EEO-1 data to the maximum extent possible consistent with FOIA and the Trade Secrets Act," 3-ER-341; *see also* 81 Fed. Reg. at 45,491 ("OFCCP ensures the confidentiality of contractor data to the maximum extent permissible by law.").

In addition, in compliance with Executive Order 12,600's requirement of pre-disclosure notification for confidential commercial information, 52 Fed. Reg. 23,781 (June 25, 1987), and pursuant to the Department of Labor's implementing regulations, 29 C.F.R. § 70.26, the Department has a longstanding practice of providing federal contractors notice and an opportunity to object before releasing any EEO-1 reports in response to a FOIA request.  3-ER-269; 3-ER-341; 29 C.F.R. § 70.26(c)–(e).  If a contractor objects to the release of its information, the Office of Federal Contract Compliance Programs evaluates the grounds for the objection and makes a final determination as to whether the objection is valid.  3-ER-269; 29 C.F.R. § 70.26(f).  The Department of Labor will not release the EEO-1 report unless it determines that the report is not exempt from disclosure.  *See* 3-ER-269–270.

## B.    Factual Background

Between 2019 and 2022, plaintiffs, The Center for Investigative Reporting and Will Evans, submitted four FOIA requests (later consolidated into a single request) to the Department of Labor seeking disclosure of all Type 2 EEO-1 reports submitted by all federal contractors from 2016 through 2020.  1-ER-3; 4-ER-543–545.  The consolidated request covered more than 75,000 EEO-1 reports filed by more than 24,000 contractors.  1-ER-3; 3-ER-405.

The Department of Labor notified federal contractors of plaintiffs' FOIA requests and provided them an opportunity to object, consistent with the Department's obligations under Executive Order 12,600 and 29 C.F.R. § 70.26.  *See*

8

3-ER-404–409.  In August 2022, the Department published a notice in the Federal Register informing all contractors that a FOIA request from plaintiffs had been submitted for all Type 2 EEO-1 report data for the years 2016 through 2020 and establishing a process for contractors to object to disclosure of their data.  87 Fed. Reg. 51,145 (Aug. 19, 2022).  The Department also provided contractors notice through postings on its website, e-mails sent to contractors through its GovDelivery listserv, letters sent by USPS mail, and individual emails sent to thousands of affected contractors.  3-ER-405–409.

In April 2023, the Department of Labor released the EEO-1 data of all non-objecting contractors.  1-ER-3; 3-ER-409–410.  This release included data from more than 56,000 reports filed by more than 19,000 contractors.  The Department of Labor received objections from 4,796 federal contractors, corresponding to almost 17,000 EEO-1 reports.  1-ER-3; 3-ER-411.  After reviewing those objections, the Department of Labor concurred that the data from 16,755 of those reports was appropriately withheld from release under FOIA Exemption 4.  3-ER-411.

## C.    Prior Proceedings

Plaintiffs filed this suit in November 2022, seeking the release of all requested records.  4-ER-536–549.  At a case-management conference, the district court directed the Department of Labor to select six representative objecting contractors to be the subject of bellwether cross-motions for summary judgment to evaluate whether

9

the requested EEO-1 data is exempt from disclosure under FOIA.  *See* 4-ER-639 (April 13, 2023, minute entry); Dkt. No. 27.

On the day the Department was scheduled to file its motion, one of the bellwether contractors informed the government that it would no longer participate in that role.  *See* 1-ER-3.  The remaining bellwether objectors were (1) Allied Universal, the nation's largest provider of security guards and related services, 3-ER-364; (2) NMR Consulting, a small consulting business providing information-technology, infrastructure, and procurement services to the government and commercial entities, 3-ER-389; (3) Brandenburg Industrial Service Co., a demolition and environmental-remediation firm, 3-ER-375; (4) DHL Global Business Services, a logistics, shipping, and supply-chain-management company, 3-ER-381–382; and (5) NorthShore University Health System, a community-based healthcare system located in the suburbs of Chicago, 3-ER-528–529.  1-ER-3.

On December 22, 2023, the district court entered an order granting in part and denying in part the parties' cross-motions for summary judgment.  1-ER-14.  The court first ruled that plaintiffs cannot maintain a claim of offensive collateral estoppel against the government based on an earlier ruling in *Center for Investigative Reporting v. U.S. Department of Labor*, 424 F. Supp. 3d 771 (N.D. Cal. 2019), in which a district court held that the Department of Labor was required to disclose to the plaintiffs the Type 2 EEO-1 data from 2016 for 10 identified companies.  1-ER-5.

The district court next held that the requested EEO-1 data does not fall within Exemption 4 of FOIA because the reports are not "commercial in nature for the purpose of" that exemption. 1-ER-9. The court reasoned that although "EEO-1 reports … reveal commercially valuable information 'by proxy,'" the reports "do not relate operational or financial information in a direct way." 1-ER-7. The court stated that EEO-1 reports "cannot … yield any commercial insight that is specific to the operations of the federal contractor" because the form identifies the number of employees in "broadly sweeping categories." 1-ER-7. The court likewise held that "diversity data" is not commercial because, "[l]ike names or birthdays, the demographic background of employees does not speak to the commercial contributions of a company's workforce." 1-ER-9. The district court acknowledged that one bellwether objector, Allied Universal, had provided some basis for concluding that its EEO-1 reports reveal the workforce structure of the company. Allied Universal explained that an observer could discern the company's staffing strategy by looking at the ratio of security-guard positions to client-support positions. 1-ER-8. The court declared, however, that Allied Universal was "over-stating the contents of and the potential findings one could make using the EEO-1 report" because that report does not include other important financial metrics such as "how many hours a security guard worked at a customer's site and the negotiated 'bill rate.'" 1-ER-8.

The court also rejected the Department of Labor's view that disclosing five years' worth of information may reveal insight into a contractor's operations that may not be revealed by any single EEO-1 report. 1-ER-9. The court reasoned that because it had found that there was no "commercial gain to be found in the headcount or demographic data within the EEO-1 report, so too" there is no "compounded effect by releasing five years' worth of data to plaintiffs." 1-ER-9. The court also stated that because it had been "almost four years" since plaintiffs' most recent FOIA request, the EEO-1 data "would probably be stale by the time it was disclosed." 1-ER-9.

Having concluded that the EEO-1 reports "are not commercial in nature" and thus do not fall within FOIA Exemption 4, the court stated that it need not decide whether the information in the reports is confidential, 1-ER-10, or whether the FOIA Improvement Act applies to require the disclosure of otherwise exempt material, 1-ER-11–12.

The district court nonetheless went on to hold that the Trade Secrets Act does not prohibit disclosure of the EEO-1 reports as "confidential statistical data." 1-ER-11. The court stated that the Department of Labor's contention that the Act's scope "is simply governed by the plain meaning of the terms[] is made without any substantive support from caselaw and could possibly render the language of the Act meaningless." 1-ER-11. The court did not, however, offer its own construction of the statutory term.

12

The district court next found that the Department of Labor "did not provide plaintiffs with a timely determination" of their FOIA requests, but stated that it would not be appropriate to grant plaintiffs' request for declaratory judgment in light of the large scope of plaintiffs' requests and the Department's task of "producing five years' worth of EEO-1 data, notifying 25,000 entities, and processing thousands of objections." 1-ER-13. Finally, the court held that there were genuine issues of material fact with regard to plaintiffs' allegation that the Department incorrectly withheld the EEO-1 reports of 621 entities that were not federal contractors subject to OFCCP's jurisdiction at the time of the reports. 1-ER-13.

The district court ordered the Department of Labor to produce withheld EEO-1 reports. 1-ER-14.[1] The Department of Labor moved for a stay of the disclosure order pending appeal. As of the date this brief was filed, the district court had issued a temporary stay pending resolution of the Department's motion. 2-ER-16.

## SUMMARY OF ARGUMENT

I. A. Exemption 4 of FOIA encompasses "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5

---

[1] It is not clear whether the district court's disclosure order requires the Department to produce only the EEO-1 reports of the five bellwether objectors, or the reports of all federal contractors (not including the reports of the 621 entities who were not subject to OFCCP's jurisdiction at the time they submitted their reports). The precise scope of the order is not necessary to a decision on this appeal.

13

U.S.C. § 552(b)(4). As this Court has previously explained, in common usage, "[i]nformation is commercial if it relates to commerce, trade, or profit." *McClellan Ecological Seepage Situation v. Carlucci*, 835 F.2d 1282, 1285 (9th Cir. 1987). The information contained in EEO-1 reports falls within this ordinary understanding of "commercial."

First, a company's workforce is a core commercial asset because the quantity of goods or services that a company is able to produce is tied to the size of its workforce. A federal contractor's total headcount is thus commercial information because it reflects the company's ability to produce the goods and services that the company sells for profit.

Second, a company's allocation of personnel across job categories reflects how an employer has staffed areas of its business to maximize efficiencies, operations, and profit and to minimize unnecessary expenses. The information reflects, for example, how many sales workers an employer needs to sell its products or services and how many managers the company needs to oversee its staff. The personnel-allocation data contained in EEO-1 reports is thus commercial information because it describes a company's organizational structure and profit-maximization strategy as it relates to the company's workforce.

Third, research shows that diversity in a company's workforce creates a competitive advantage for firms in the areas of resource acquisition, market access, innovation, and strategic flexibility, among others. Companies therefore establish

14

diversity goals and track their progress toward meeting those goals in furtherance of their commercial endeavors. The demographic information in EEO-1 reports reflects federal contractors' success in recruiting and maintaining a diverse workforce. The workforce demographic data is thus commercial information because it reflects a company's performance in an area relevant to its ability to successfully engage in commerce.

Fourth, EEO-1 reports from multiple years reveal changes and trends in each of the areas just mentioned: employee headcount, allocation of personnel, and employee diversity. These trends reflect a company's growth or contraction and may reveal its planning for expected growth or developments in the industry. For example, a company's predictions about which of its products will be in demand in the coming years may lead it to expand a particular part of its workforce. And a company's prediction that its products will become harder to sell in the future may lead it to cut its production staff or to add sales workers. Thus, while even a single EEO-1 report contains commercial data, a collection of EEO-1 reports over multiple years reveals additional commercial information about federal contractors.

B. Instead of applying the ordinary meaning of "commercial," the district court asked instead whether the information in the EEO-1 reports is commercially valuable, whether disclosure of that information would provide competitors with commercial insight or commercial gain, and whether that information is now stale. Exemption 4 is not limited to commercially valuable or timely information, and the

15

district court's standard finds no basis in the text of the statute. The court's error is underscored by the Supreme Court's analysis in *Food Marketing Institute v. Argus Leader Media*, 588 U.S. 427 (2019), in which the Court rejected the argument that information cannot be deemed confidential under FOIA Exemption 4 unless disclosing it is likely to result in substantial competitive harm to the business that provided the information. The district court's reasoning would reimpose a similar competitive-harm standard under the commercial-information prong of the exemption.

C. Even assuming that the district court applied the correct statutory standard, the court erred in holding that EEO-1 reports are not commercially valuable. The declarations of experts and federal contractors demonstrate that the public release of contractors' EEO-1 data would provide competitors with sensitive information about the contractors' human-resources systems, would allow competitors to learn from contractors' successes, would reveal contractors' business strategies, and could be used to expose contractors to reputational harm. The district court thus erred in granting summary judgment to plaintiffs, even under the standard that it mistakenly employed.

This Court should hold that EEO-1 reports contain commercial information, reverse the decision below, and remand for a determination of whether the EEO-1 data of the objecting contractors is confidential, an issue that the district court did not reach in light of its conclusion that the reports do not contain commercial information.

16

II. The district court also erred in its discussion of the Trade Secrets Act. The Trade Secrets Act is not an independent basis for withholding records that are not protected by a FOIA exemption. It is relevant here because of its interaction with the FOIA Improvement Act, which may require disclosure of records covered by a FOIA exemption unless disclosure would result in reasonably foreseeable harm or if disclosure is prohibited by another statute. In this case, assuming that the EEO-1 data at issue is confidential and thus fits within FOIA Exemption 4, the Trade Secrets Act prohibits the disclosure of that information.

The EEO-1 data of objecting contractors plainly falls within the scope of the Trade Secrets Act as "confidential statistical data," 18 U.S.C. § 1905. The term "statistical data" means a set of numerical facts, especially when pertaining to a body of people. The term thus encompasses the information contained in EEO-1 reports, which consist of numerical facts pertaining to the workforce of federal contractors. Furthermore, if the district court concludes on remand that the EEO-1 data is confidential for purposes of FOIA Exemption 4, then it is also confidential within the meaning of the Trade Secrets Act.

## STANDARD OF REVIEW

The district court's summary-judgment order is reviewed de novo. *Animal Legal Def. Fund v. U.S. Food & Drug Admin.*, 836 F.3d 987, 990 (9th Cir. 2016) (en banc) (per curiam).

17

## ARGUMENT

### I.  EEO-1 Reports Contain Commercial Information Within The Meaning Of FOIA Exemption 4

The Freedom of Information Act was intended to strike "a workable balance between the right of the public to know and the need of the Government to keep information in confidence." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (quoting H. Rep. No. 89-1497, at 6 (1966)).  Under FOIA, an agency record must generally be disclosed "unless it falls within one of the Act's nine exemptions." *National Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 136 (1975).  "FOIA expressly recognizes that important interests are served by its exemptions, and those exemptions are as much a part of FOIA's purposes and policies as the statute's disclosure requirement." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 439 (2019) (alterations, citations, and quotation marks omitted).

Exemption 4 of FOIA covers "trade secrets and commercial or financial information obtained from a person and privileged or confidential."  5 U.S.C. § 552(b)(4).  There is no dispute that the EEO-1 reports at issue in this litigation were "obtained from a person," *id.*, and the district court did not reach the question whether the information contained in those reports is confidential, 1-ER-10.  Accordingly, the question presented on this appeal is whether the EEO-1 data is "commercial … information," 5 U.S.C. § 552(b)(4).

18

### A.    EEO-1 Data Is Commercial Information

1.  The term "commercial" in FOIA Exemption 4 must be interpreted according to "that term's 'ordinary, contemporary, common meaning' … when Congress enacted FOIA in 1966." *Argus Leader*, 588 U.S. at 433–434; *see also Watkins v. U.S. Bureau of Customs & Border Prot.*, 643 F.3d 1189, 1194 (9th Cir. 2011) ("The terms 'commercial or financial' are given their ordinary meanings."), *abrogated on other grounds by Argus Leader*, 588 U.S. 427.  The ordinary meaning of the adjective "commercial" is "of, in, or relating to commerce" or "having profit as the primary aim." *Commercial*, Webster's Third New International Dictionary 456 (1966); *see also Commercial*, Black's Law Dictionary 337 (rev. 4th ed. 1968) ("Relating to or connected with trade and traffic or commerce in general.").  "Commerce," in turn, is defined as "the exchange or buying and selling of commodities." *Commerce*, Webster's Third New International Dictionary 456 (1966); *see also Commerce*, Black's Law Dictionary 336 (rev. 4th ed. 1968) ("The exchange of goods, productions, or property of any kind.").  These definitions comport with this Court's observation that "[i]nformation is commercial if it relates to commerce, trade, or profit." *McClellan Ecological Seepage Situation v. Carlucci*, 835 F.2d 1282, 1285 (9th Cir. 1987) (interpreting a separate provision of FOIA).  The D.C. Circuit has likewise explained that "in ordinary parlance, information is commercial if it pertains to the exchange of goods or services or the making of a profit." *Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice*, 58 F.4th 1255, 1263 (D.C. Cir. 2023).

19

In enacting FOIA, Congress explained that Exemption 4 "is necessary to protect the confidentiality of information which is obtained by the Government through questionnaires or other inquiries, but which would customarily not be released to the public by the person from whom it was obtained." S. Rep. No. 89-813, at 9 (1965). The information covered by the exemption "include[s]," for example, "business sales statistics, inventories, customer lists, and manufacturing processes." *Id.*; *see also* H.R. Rep. No. 89-1497, at 10 (similar). Furthermore, Exemption 4 "is *not* confined only to records that 'reveal basic commercial operations or relate to the income-producing aspects of a business,'" but "reaches more broadly." *Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 319 (D.C. Cir. 2006) (Kavanaugh, J.) (alteration omitted). Courts have held that the term "commercial … information" in Exemption 4 also covers, *inter alia*, health and safety data that medical-device manufacturers submitted to the Food and Drug Administration, *Public Citizen Health Research Grp. v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983), and letters describing the commercial strengths and weaknesses of the U.S. lumber industry, *Baker & Hostetler*, 473 F.3d at 319–320.

2. The information contained in EEO-1 reports falls well within this definition of "commercial."

a. First, an EEO-1 report reveals the submitting company's employee headcount. *See* 3-ER-279 (requiring companies to provide their total number of employees). Human capital is a core commercial resource, and a company's employee

20

headcount "is a key indicator of the human resources a company has at its disposal in pursuing its business objectives." 2-ER-176 (declaration of Patrick F. McKay, Professor of Management, College of Business, East Carolina University). Data identifying the number of individuals a company employs thus reflects the company's ability to produce the goods and services that the company sells for profit, much as a statement of the company's inventory would. Simply put, a company with more employees will tend to have the ability to produce or trade more goods or services than a smaller company in the same industry. *See* 2-ER-176–177 (explaining that an "understaffed" company "has too few employees to effectively provide goods and services," whereas "an overstaffed company has a stockpile of talent that it can deploy to cover sudden increases in business and/or engage in research and development activities designed to produce new products and services"). A company's headcount data thus "relates to commerce, trade, or profit," *McClellan Ecological Seepage Situation*, 835 F.2d at 1285, because it indicates a company's ability to engage in such endeavors.

The submissions of Allied Universal illustrate the relationship between a company's headcount and its capacity to produce goods or services. That company's business "is almost entirely focused on staffing." 3-ER-365. "Allied Universal's primary 'product' is the staff it employs and mobilizes to provide security guard services at thousands of locations across the United States." 3-ER-365. The company's "ability to supply its product" is thus "a direct function of the number of security guards it employs." 3-ER-365. Allied Universal's headcount "represents its

core commercial asset and provides the basis for its overall revenue and profitability as a business concern." 3-ER-365.

NMR Consulting likewise explained that the "quantity of services" that it provides "is directly tied to the size of its workforce." 3-ER-390. "[T]he number and type of employees directly reflects the amount and type of services" the company "can provide at any given time." 3-ER-390. Furthermore, the company "closely tracks these numbers as part of its commercial operations so that it has the ability to compete for and perform contracts." 3-ER-390. In other words, NMR Consulting's headcount indicates the company's ability to perform a new or prospective contract with the current staff or its need to hire additional employees in order to perform additional work.

b. Second, an EEO-1 report contains commercial information because it describes a company's allocation of personnel across job categories. The report requires federal contractors to break down their employee headcount into 10 job categories: executive/senior level officials and managers, first/mid-level officials and managers, professionals, technicians, sales workers, administrative support workers, craft workers, operatives, laborers and helpers, and service workers. 3-ER-279; *see also* 3-ER-348–351 (providing definitions and examples for each job category). This information describes "how an employer has deliberately staffed areas of its business to maximize efficiencies, operations, and profit, and to minimize unnecessary expenses." 2-ER-78. Among other things, an EEO-1 report identifies how many

executives and senior-level officials a company employs versus those classified as first-
or mid-level managers; how many managers are employed versus the number of non-
managers; and how many sales workers an employer maintains to generate revenue.
2-ER-78.

For example, Allied Universal explained that its security guards, who constitute
a large majority of its employee headcount total, are classified as service workers.
3-ER-365–366. The company's administrative support workers, managers, and
executives "reflect Allied Universal's employment costs that are attributable to either
client support operations or overhead." 3-ER-366. Allied Universal's ability to staff
these positions "in an efficient and strategic manner directly impacts on its
profitability and staffing methodologies," and the company "constantly monitor[s]" its
ratio of security guards to client support or overhead positions. 3-ER-366; *see also*
1-ER-8 (district court acknowledging that Allied Universal's "EEO-1 report reveals
the workforce structure of [the] company").

NorthShore University Health System explained that its EEO-1 reports "not
only detail the overall headcount year-over-year, but also reveal NorthShore's strategic
structuring of its workforce at each level and how that has changed over time."
3-ER-529. How the health system "structures its workforce is part of its strategic
business plan." 3-ER-529. For example, "[t]he ratio of Executives to Managers to
Professionals to Technicians to Service Workers" shows how the company has
"stratif[ied] its workforce to be successful and profitable." 3-ER-529; *see also*

3-ER-382 ("The Type 2 EEO-1 Reports provide a detailed breakdown" of DHL's

workforce, showing, for example, "how many Executive/Senior Level Officials and

Managers are required to oversee DHL's business functions…. The way DHL

organizes its workforce year over year is a direct result of its substantial effort and

innovation in devising ways to make the company run effectively with the changing

times.").

The allocation of a company's employees across job categories thus represents

a company's human-resources strategy and decisions, 2-ER-176–177, and the

"amount and type of services" that the company "can provide at any given time,"

3-ER-390. Data regarding this allocation is commercial information because it

represents a company's strategy and ability to engage in trade and commerce in a

manner that maximizes profit and minimizes employment-related overhead costs.

c. Third, the EEO-1 reports contain information on the sexual and racial

makeup of a company's workforce. *See* 3-ER-279 (requiring contractors to report the

number of employees by sex and race/ethnicity). Research shows that diversity in a

company's workforce creates a "competitive advantage for firms through a greater

capacity for resource acquisition, market access, innovation[,] and strategic flexibility."

2-ER-224 (declaration of Quinetta Roberson, Professor of Management and

Psychology, Michigan State University). Diverse firms are better able to attract and

retain talented employees and compete for customers in certain markets. 2-ER-224.

Studies show that sexual and racial diversity in a company's workforce is "correlated

24

with a range of firm performance outcomes, including employee productivity, revenues, earnings, returns[,] and relative productivity compared to competitors." 2-ER-226; *see* 3-ER-366 (explaining that Allied Universal "has spent a tremendous amount of time and resources … to recruit and advance women candidates into upper-level positions," and that the company "views such efforts as critical to its growth, its ability to enter and succeed in emerging markets, and critical to its overall performance and strategic business planning"); 3-ER-383 ("Having a diverse workforce is beneficial to DHL's commercial success, as it enhances the diversity of thought and perspectives in the organization, helps boost innovation, and leads to the attraction, recruitment, and retention of more diverse employees in the future."); 3-ER-391 ("[A] diverse workforce allows [a company] to be more responsive to customers," "boosts innovation[,] and ensures consideration of different perspectives.").

Companies thus "collect and track diversity data to realize its inherent commercial value."  2-ER-225.  Indeed, plaintiffs' expert acknowledged that "many firms use diversity data in designing and managing aspects of their internal operations," including "setting recruitment goals under affirmative action plans; estimating the potential adverse impact on employee diversity of a proposed layoff or reorganization; and awarding bonuses, raises, and promotions to managers who have excelled in hiring and retaining employees from under-represented backgrounds." 2-ER-126; *see also* 2-ER-227 (explaining that companies use workforce demographic

25

data as a "measurement analytic for workforce goal setting and planning" and to monitor the effectiveness of their human-resources efforts, including staffing, performance management, compensation, engagement, and retention); 3-ER-366 (stating that Allied Universal "tracks and monitors its headcounts of women and minority employees across different job types and levels," even "separate and apart from any requirement arising from EEO-1 reporting obligations," and "considers this data to be key to its commercial success"). The workforce demographic data in EEO-1 reports is thus commercial because "it relates to recruitment and retention" and is used by companies' management "to determine areas of opportunity to increase diversity" so the company can "leverage the[] advantages" of a diverse workforce to maximize its ability to engage in trade and commerce for profit. 3-ER-391.

d. Fourth, because federal contractors are required to file EEO-1 reports each year and plaintiffs have requested five years' worth of data, the requested information reveals changes and trends in each of the areas discussed above: employee headcount, allocation of personnel, and employee diversity. Such information reflects a company's growth or contraction, as well as its planning for expected growth or trends in the industry. *See* 2-ER-176–177.

For example, NorthShore University Health System explains that it "has undergone significant growth since 2016," and its EEO-1 data shows the extent of the healthcare system's overall increase in headcount as well as the job categories in which the majority of the growth occurred. 3-ER-531; *see also* 3-ER-529

("NorthShore's EEO-1 Reports from 2016 to 2020 show a significant change in the composition of its workforce and in the proportion of leadership to employees."). NorthShore also explained that it had acquired a hospital in 2020 and that comparing the company's EEO-1 reports from 2019 and 2020 would reveal information about what types of employees were acquired and how the company's workforce was structured before and after the acquisition. 3-ER-531–532. Similarly, DHL explained that, between 2016 and 2020, it experienced year-over-year growth of up to 35% and experienced a decrease in headcount by more than 15%. 3-ER-385. The requested EEO-1 reports would "reveal the job categories that experienced the most change from year to year, providing insight into DHL's business strategies and allocation of resources." 3-ER-385.

For small contractors, like NMR Consulting, fluctuations in total employees and the number of employees within certain job categories reflect a company's staffing decisions on contracts. 3-ER-390. In many years, NMR Consulting receives only one government contract, and any meaningful change in employee data during such a period could be fairly attributed to the new contract award. 3-ER-390. The EEO-1 reports thus indicate how many employees NMR Consulting is using to staff the contract. 3-ER-390; *see also* 3-ER-379 (explaining that Brandenburg Industrial Service's EEO-1 reports would reveal "when and how Brandenburg increased its headcount, and in what job categories, for significant projects that may have been publicly announced by Brandenburg at the time").

27

Data showing changes in employee headcount over time can also be used to discern a company's projections about future trends in its industry. *See* 3-ER-270–271. For example, data showing that a company has recently expanded its workforce may indicate that it foresees increasing demand. Likewise, a decrease in a company's headcount in a particular job category may indicate that the company foresees weakening demand, and an increase in the headcount of sales employees may indicate that the company thinks it will have to work harder in the future to sell its products.

EEO-1 data from multiple years can also reveal federal contractors' success (or lack thereof) in increasing employee diversity over time. For example, Allied Universal explained that its EEO-1 data would "reveal [its] successes in the critically competitive area of female and minority recruitment and advancement." 3-ER-372.

The trends in a company's employment data thus hold independent commercial significance because they reveal the company's past growth or contraction and shifts in its workforce allocation and can provide insight into the company's projections about the future. While even a single year's EEO-1 report contains commercial information, therefore, a collection of multiple years' reports contains additional commercial information related to federal contractors' production, trade, and profits.

28

**B.  The District Court Erred By Requiring The Department Of Labor To Show That The EEO-1 Data Was Commercially Valuable**

Instead of applying the ordinary meaning of "commercial," the district court mistakenly asked whether the information in EEO-1 reports is "commercially valuable," and, in particular, whether the information would be commercially valuable to competitors.  1-ER-7.  For example, while plaintiffs conceded that there is an "obvious, definitional relationship between a company's workforce data and the company's commercial data," the district court nevertheless accepted plaintiffs' contention that the workforce information contained in the EEO-1 reports is not "commercial" because it is too "non-specific" to "yield any commercial insight" or be "commercially valuable."  1-ER-7; *see also* 1-ER-9 (finding that there is no "commercial gain to be found" in the EEO-1 data).

But Exemption 4 is not limited to "commercially valuable" information or information that "yield[s] … commercial insight"—it applies to "commercial information" more generally, as long as it is also privileged or confidential.  Nor is Exemption 4 limited to information deemed sufficiently "specific."  There should be no doubt, for example, that a statement of a candy company's inventory is commercial information, even if that information is presented in non-specific categories such as "chocolate," "sour," and "fruit-flavored," and thus would yield less "commercial insight" about the company than an inventory itemized at the individual-candy level.  Just as an inventory grouped into non-specific product categories would

29

be commercial information, so is a company's headcount grouped into non-specific job categories commercial information.

The district court's error is underscored by its analysis of declarations submitted by Allied Universal. The court acknowledged that the company had "provided a non-conclusory basis for establishing that the EEO-1 report reveals the workforce structure of [the] company" because "its staffing strategies would be revealed by looking at the ratio of security guards to non-security guards." 1-ER-8. The court nevertheless concluded that "the potential findings" a competitor "could make using the EEO-1 report" were "over-stat[ed]" because the EEO-1 reports do not disclose additional metrics relevant to Allied Universal's profit margin—specifically, how many hours security guards worked at a customer's site, the negotiated bill rate, and staffing costs. 1-ER-8. But nothing in the language of Exemption 4 suggests that data falls outside its scope simply because it may be incomplete as a measure of a company's productive capacity or strategy, because its release would allow competitors to make only limited "findings," or because the public could gain greater insight if the requested information were paired with additional commercial information.

For the same reasons, the court erred in concluding that the reports fall outside the scope of Exemption 4 because the data would likely be "stale" by the time it is revealed. 1-ER-9. Commercial information does not become non-commercial information because it has become less relevant to competitors. A company may

30

choose not to maintain the confidentiality of commercial information that has become stale, and at that point, the information would fall outside of Exemption 4 because it would no longer be confidential, but the information would still remain commercial in character.

The district court's focus on whether the EEO-1 data would be valuable to others is also inconsistent with the Supreme Court's analysis in *Argus Leader*, where the Court rejected the argument that "information can never be deemed confidential" under FOIA Exemption 4 "unless disclosing it is likely to result in 'substantial competitive harm' to the business that provided it." 588 U.S. at 430. In imposing such a requirement, courts of appeals had reasoned that non-disclosure should be "justified by the legislative purpose which underlies" Exemption 4. *Id.* at 436 (quoting *National Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 767 (D.C. Cir. 1974)). The Supreme Court rejected that reliance on purported legislative intent, emphasizing that "the rules of statutory interpretation" require "a careful examination of the ordinary meaning and structure of the law itself." *Id.* The Court explained that when Congress enacted FOIA, the "term 'confidential' meant …, as it does now, 'private' or 'secret.'" *Id.* at 434. "Notably lacking from dictionary definitions, early case law, or any other usual source that might shed light on the statute's ordinary meaning is any mention of the 'substantial competitive harm' requirement …." *Id.* at 435.

The plaintiff in *Argus Leader* tried to "salvage" the court of appeals' interpretation of the word "confidential" by connecting that term to the phrase

31

"commercial … information." *See* 588 U.S. at 438. But the Supreme Court rejected that argument, too, because, even taking the statutory phrasing as a whole— "commercial or financial information [that is] privileged or confidential"—the Court found "no treatise or case decided before Exemption 4's adoption" that assigned to those terms a competitive-harm requirement. *Id.* (alteration in original).

The district court's mode of analysis in this case imposes a standard similar to the one the Supreme Court rejected in *Argus Leader* in examining the confidentiality element. The term "commercial information" does not imply a commercial-value or competitive-harm requirement any more than does the term "confidential," nor is that meaning obtained by putting the terms together, *see Argus Leader*, 588 U.S. at 438. The district court here showed the same "casual disregard of the rules of statutory interpretation" and disregard of the statutory text that the Supreme Court disapproved of in *Argus Leader*, 588 U.S. at 436.

The district court's statement that FOIA's exemptions "must be narrowly construed in light of FOIA's dominant objective of disclosure, not secrecy," 1-ER-4 (quoting *Maricopa Audubon Soc'y v. U.S. Forest Serv.*, 108 F.3d 1082, 1085 (9th Cir. 1997)), is similarly at odds with *Argus Leader*, which discounted the plaintiff's "belie[f]" that "FOIA exemptions should be narrowly construed," 588 U.S. at 439. The Supreme Court explained that FOIA's exemptions serve "important interests," including (as relevant here) "providing private parties with sufficient assurances about the treatment of their proprietary information so they will cooperate in federal

32

programs and supply the government with information vital to its work." *Id.* at 439–440 (quotation marks omitted). The Court emphasized that courts "have no license" to give FOIA's "exemptions anything but a fair reading." *Id.* at 439 (alteration and quotation marks omitted). Thus, where an exemption uses a broad term such as "commercial," courts must apply the ordinary meaning of that term, *id.* at 436, and not a narrowing construction. And the Court explained that under the "fair"—not narrow—reading of the text that is required, it is not "proper[]" to "arbitrarily constrict" Exemption 4 "by adding limitations found nowhere in its terms." *Id.* at 439 (emphasis and quotation marks omitted).

The district court cited *Citizens for Responsibility & Ethics in Washington*, 58 F.4th at 1263, for the proposition that "Exemption 4 is designed … 'to shield from public release intrinsically valuable business information such as "business sales statistics, inventories, customer lists, and manufacturing processes."'" 1-ER-6–7. That case involved a request for the disclosure of the names of contractors involved in the government's procurement of lethal-injection drugs—a very different context than the one presented here. 58 F.4th at 1262–1263. In describing the scope of Exemption 4, the D.C. Circuit quoted a Senate Report that provided a non-exclusive list of some of the types of information that would be covered by Exemption 4. *See* S. Rep. No. 89-813, at 9. But the Senate Report does not state that the exemption is intended only to cover "*intrinsically valuable* business information," *Citizens for Responsibility & Ethics in Washington*, 58 F.4th at 1263 (emphasis added); that was a

33

phrase added by the D.C. Circuit without explanation.  Furthermore, the remainder of the D.C. Circuit's decision in fact rejects the notion that whether material falls within the scope of Exemption 4 depends on whether the information is valuable or whether its disclosure would cause commercial harm.  The court thus rejected the district court's reliance on evidence that disclosure of the contractors' names would cause the contractors commercial harm, and it remanded for the government to submit new information relevant to "whether the contractors' names in and of themselves are commercial or noncommercial, not whether the names might reveal the existence of a contract likely to attract public scrutiny."  *Id.* at 1268–1269.  The court explained that "withheld information must be commercial in and of itself to qualify for withholding under Exemption 4; that disclosure might cause commercial repercussions does not suffice to show that information is 'commercial' under Exemption 4."  *Id.* at 1268. Thus, *Citizens for Responsibility & Ethics in Washington* confirmed that a demonstration that disclosure of the requested information would cause commercial harm—or that the information itself is commercially valuable—is *not* a prerequisite for finding that information falls within the scope of Exemption 4, and the case thus provides no support for the test applied by the district court.  *See also Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice*, No. 19-cv-3626, 2024 WL 1406550, at *3–5 (D.D.C. Mar. 31, 2024) (concluding on remand that the identity of the contractors was commercial information).

C.   **EEO-1 Reports Contain Commercial Information Even Under The District Court's Erroneous Standard**

A determination that information is commercially valuable may confirm that the information is commercial in nature, but it is not necessary to a finding that information is commercial.  Nevertheless, even assuming that the district court was correct in concluding otherwise, the record unequivocally demonstrates that EEO-1 data is commercially valuable and that its disclosure could cause federal contractors competitive harm.

The Department of Labor's expert declarations explained that the public release of contractors' EEO-1 data would provide competitors with sensitive information about contractors' human-resources-management systems and allow competitors to learn from and duplicate contractors' successes.  *See* 2-ER-179–180. The contractors themselves confirmed that competitors could use their EEO-1 data "to identify how many employees are needed in each occupational category[] to run [the contractor's] business successfully, profitably[,] and efficiently."  3-ER-379.  For example, Allied Universal's EEO-1 data would "reveal how [the company] balances its profit center employees with its client support and overhead-related employment costs," and these "ratios provide[] a key metric whereby a competitor could easily ascertain or estimate Allied Universal's confidential internal business structures and cost information."  3-ER-371–372; *see also* 3-ER-385 ("If made public, other companies and competitors could use the EEO-1 Report information as a guideline

35

for their staffing strategies, thereby depriving DHL of the competitive advantage it has cultivated.").

As explained above, the EEO-1 data can also reveal the job categories where a federal contractor is investing in additional personnel and where it is reducing personnel. 2-ER-79. Paired with other sources of available information and a competitor's own knowledge of the industry, this information can provide insight into the contractor's confidential business growth or development plans. 2-ER-79; *see* 3-ER-379 (releasing Brandenburg's EEO-1 data would "disclose patterns and notable changes within the Company, and provide valuable insights into the direction of Brandenburg's business strategy").

Furthermore, by combining the number of sales employees with performance or revenue data, which may be publicly available elsewhere (such as in shareholder reports), a competitor could determine approximate revenue generated per sales worker. 2-ER-78. The disclosure of these types of information would "effectively create[] an intra-industry penalty that would be borne as a result of [federal contractors'] decision to do business with the federal government." 3-ER-371.

Employee demographic data could also be used by competitors and others, such as advocacy groups and media outlets, to paint a negative picture of the employer and "expose the organization to reputational harm." 2-ER-79. In particular, this reputational harm "can manifest as long-term damage to revenue[ and] employee engagement and retention, and facilitate diversity poaching efforts from

competitors." 2-ER-79; *see also* 2-ER-76–79 (explaining that the release of EEO-1 data could hamper federal contractors' recruitment); 3-ER-386 ("[C]ompetitors or other critics could use DHL's EEO-1 Reports to infer or accuse DHL of not engaging in sufficient affirmative action and diversity, equity and inclusion ('DEI') efforts by referencing certain job categories that may—on their face—lack diversity…. Unwarranted and unfounded criticism of DHL's DEI efforts could negatively impact its efforts to recruit and retain a diverse workforce and harm its relationships with its customers ….").

The declarations submitted by the Department of Labor provide additional detail about these and other types of harm that federal contractors would suffer from the release of their EEO-1 data. *See* 2-ER-63–64; 2-ER-69–70; 2-ER-78–79; 2-ER-84–91; 2-ER-92–95; 2-ER-97–105; 2-ER-173–180; 2-ER-228–231; 3-ER-270–272; 3-ER-371–373; 3-ER-376–380; 3-ER-384–387; 3-ER-389–391; 3-ER-394–395; 3-ER-529–534. Accordingly, even if the district court were correct to ask whether the EEO-1 data is commercially valuable or whether it would provide federal contractors' competitors with an opportunity for competitive gain, the court still would have erred by granting plaintiffs summary judgment on the issue. *See Animal Legal Def. Fund v. U.S. Food & Drug Admin.*, 836 F.3d 987, 989–990 (9th Cir. 2016) (en banc) (per curiam) (explaining that even in a FOIA case, summary judgment may be granted only when there are no disputed issues of material fact).

*     *     *

In sum, the Court should reverse the decision below, hold that the requested EEO-1 data is commercial information, and remand for the district court to determine whether the data is confidential and thus exempt from mandatory disclosure under FOIA Exemption 4.

## II. IF THE DISTRICT COURT DETERMINES ON REMAND THAT THE EEO-1 REPORTS FALL WITHIN FOIA EXEMPTION 4, THE TRADE SECRETS ACT WILL PROHIBIT THEIR DISCLOSURE

If the EEO-1 data falls within the scope of FOIA Exemption 4, then the Trade Secrets Act prohibits the disclosure of those records. As an initial matter, however, it is important to clarify the relevance of the Trade Secrets Act to this case.

A. The Trade Secrets Act does not extend the reach of Exemption 4 and is not an alternative basis for withholding records requested under FOIA. The Trade Secrets Act is relevant here because of its interaction with the FOIA Improvement Act of 2016, which provides that records that fall within a FOIA exemption may be withheld only if "the agency reasonably foresees that disclosure would harm an interest protected by" one of FOIA's exemptions or "disclosure is prohibited by law." 5 U.S.C. § 552(a)(8)(A). The Trade Secrets Act is a statute that prohibits disclosure, and therefore would permit an agency to withhold records that fall within a FOIA exemption irrespective of a finding of foreseeable harm. *See* S. Rep. No. 114-4, at 8 & n.11 (citing the Trade Secrets Act as an example of a "law outside the four corners of FOIA" that would prohibit disclosure without regard to the foreseeable-harm standard).

38

The district court appears to have misunderstood the role of the Trade Secrets Act in the statutory scheme. As discussed, the Trade Secrets Act is relevant here only if the court first concludes that the reports at issue are covered by Exemption 4. The government has not urged that the Trade Secrets Act would provide an independent basis for withholding the records under FOIA Exemption 3, which excepts records "specifically exempted from disclosure by statute." 5 U.S.C. § 552(b)(3); *see CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1137–1143 (D.C. Cir. 1987) (holding that "the Trade Secrets Act does not, by virtue of Exemption 3, erect a disclosure bar that is impervious to the mandate of FOIA"). Accordingly, because the district court mistakenly concluded that EEO-1 reports did not fall within FOIA Exemption 4, it had no reason to address the application of the Trade Secrets Act at all. Because the district court addressed that Act and misinterpreted it, however, this Court should correct the district court's error so that the Act can be applied correctly on remand.

B. The EEO-1 reports at issue here fall within the scope of the Trade Secrets Act. That Act prohibits the unauthorized disclosure of "any information" received through any "report or record made to or filed with" the government, where that information "concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person" or company. 18 U.S.C. § 1905.

This Court had long held that "the scope of [the Trade Secrets Act] and exemption (4) of the FOIA are[] the same[] or[] coextensive," *Pacific Architects & Eng'rs Inc. v. U.S. Dep't of State*, 906 F.2d 1345, 1347 (9th Cir. 1990) (alterations and quotation marks omitted) (quoting *General Motors Corp. v. Marshall*, 654 F.2d 294, 297 (4th Cir. 1981)), but the Court has more recently recognized a question about the continued validity of that holding, *see Synopsys, Inc. v. U.S. Dep't of Labor*, Nos. 20-16414, 20-16416, 2022 WL 1501094, at *4 n.3 (9th Cir. May 12, 2022) (recognizing "the possibility that the Supreme Court expanded the scope of Exemption 4 in [*Argus Leader*] such that that exemption is now broader in scope than the Trade Secrets Act."). The Court need not answer that question in this case or otherwise define the outer limits of the Trade Secrets Act, however, because the Act certainly covers the EEO-1 reports at issue here.

The EEO-1 reports contain "confidential statistical data," 18 U.S.C. § 1905, about a federal contractor's workforce. When the Trade Secrets Act was enacted, the term "statistical" meant "consisting of or exhibiting statistics." *Statistical*, Funk & Wagnalls New Standard Dictionary of the English Language 2371 (1946). "Statistics," in turn, meant "[n]umerical facts, collectively, pertaining to a body of things, especially when systematically gathered by direct enumeration and collated; specif[ically], such facts relating to a numerous body of people, as of a nation, state, or social organization." *Statistics*, Funk & Wagnalls New Standard Dictionary of the English Language, *supra*, at 2371. "Data" meant "[a] fact, number, or quantity supposed to be

40

given or known in order to solve some problem or reach some conclusion." *Datum*, Funk & Wagnalls New Standard Dictionary of the English Language, *supra*, at 655; *see also Data*, Funk & Wagnalls New Standard Dictionary of the English Language, *supra*, at 655 ("Plural of DATUM."). These definitions plainly encompass the information contained in EEO-1 reports, which consists of numerical facts pertaining to the workforce of federal contractors. *See* 4-ER-538 (complaint alleging that the withheld EEO-1 reports contain "data" and "statistics of federal contractors").

Furthermore, if the district court holds on remand that the EEO-1 reports are confidential under *Argus Leader* and thus are covered by FOIA Exemption 4, they are also "confidential" within the meaning of the Trade Secrets Act, 18 U.S.C. § 1905. At the time the Trade Secrets Act was enacted in 1948, the term "confidential" meant substantively the same thing it did when FOIA was enacted in 1966. *Compare Confidential*, Funk & Wagnalls New Standard Dictionary of the English Language 554 (1946) ("Given or imparted as a secret or in confidence; secret"), *and Confidential*, Black's Law Dictionary 394 (3d ed. 1933) ("intended to be held in confidence or kept secret"), *with Argus Leader*, 588 U.S. at 434 (providing dictionary definitions for the term "confidential" as used in FOIA Exemption 4). Furthermore, there is no more reason to read a competitive-harm limitation into that term in the Trade Secrets Act than there was to read such a limitation into the same term in FOIA Exemption 4. The term "confidential" in the Trade Secrets Act should thus be construed in the

41

same way that the Supreme Court construed that term in FOIA Exemption 4 in *Argus Leader.*

The district court stated that it was not convinced by the Department of Labor's "contention that 'confidential statistical data' under the Trade Secrets Act is simply governed by the plain meaning of the terms." 1-ER-11. The court erred by rejecting a plain-meaning interpretation of that statute. "In statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself." *Argus Leader*, 588 U.S. at 436. And when, as in this case, "the statute's language is plain, the sole function of the courts … is to enforce it according to its terms." *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000)).

Contrary to the district court's suggestion, the government's construction of the Trade Secrets Act does not "render the language of the Act meaningless," 1-ER-11. The government's construction makes it unlawful for a federal employee to disclose without authorization a certain set of information, according to the statute's plain terms.

\*     \*     \*

The Court should remand to the district court with instructions that if the EEO-1 reports fall within FOIA Exemption 4, then disclosure is prohibited by the

42

Trade Secrets Act and withholding is permitted under the FOIA Improvement Act, 5

U.S.C. § 552(a)(8)(A)(i)(II).[2]

---

[2] In the district court, the Department of Labor argued in the alternative that the Department may withhold the EEO-1 reports under the FOIA Improvement Act because disclosure "would harm an interest protected by" Exemption 4, 5 U.S.C. § 552(a)(8)(A)(i)(I). Because the district court did not address that argument in its summary-judgment order, the Department does not raise it on appeal. However, the district court would need to address the issue on remand if this Court holds that the EEO-1 reports are covered by FOIA Exemption 4 (if they are confidential) but not the Trade Secrets Act.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

*Of Counsel:*

SEEMA NANDA
  *Solicitor of Labor*

EMILY S. WHITTEN
  *Attorney*

  *United States Department of Labor*

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney
  General*

ISMAIL J. RAMSEY
  *United States Attorney*

PAMELA JOHANN
  *Assistant United States Attorney*

MARK B. STERN

 *s/ Joshua M. Koppel*
JOSHUA M. KOPPEL
  *Attorneys, Appellate Staff
  Civil Division, Room 7212
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 514-4820
  joshua.m.koppel@usdoj.gov*

May 2024

44

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, appellant states that it knows of no related case pending in this Court.

*s/ Joshua M. Koppel*
Joshua M. Koppel

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Ninth Circuit Rule 21-1 because it contains 10,177 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Joshua M. Koppel*
Joshua M. Koppel

**ADDENDUM**

# TABLE OF CONTENTS

5 U.S.C. § 552...................................................................................................A1

18 U.S.C. § 1905 .............................................................................................A4

**5 U.S.C. § 552**

**§ 552. Public information; agency rules, opinions, orders, records, and proceedings**

(a) Each agency shall make available to the public information as follows:

* * *

(3)  (A) Except with respect to the records made available under paragraphs (1) and (2) of this subsection, and except as provided in subparagraph (E), each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person.

* * *

(8)  (A) An agency shall--

(i) withhold information under this section only if--

(I) the agency reasonably foresees that disclosure would harm an interest protected by an exemption described in subsection (b); or

(II) disclosure is prohibited by law; and

(ii)  (I) consider whether partial disclosure of information is possible whenever the agency determines that a full disclosure of a requested record is not possible; and

(II) take reasonable steps necessary to segregate and release nonexempt information; and

(B) Nothing in this paragraph requires disclosure of information that is otherwise prohibited from disclosure by law, or otherwise exempted from disclosure under subsection (b)(3).

(b) This section does not apply to matters that are--

(1) (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order;

(2) related solely to the internal personnel rules and practices of an agency;

(3) specifically exempted from disclosure by statute (other than section 552b of this title), if that statute--

(A) (i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or

(ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and

(B) if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph.

(4) trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(5) inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency, provided that the deliberative process privilege shall not apply to records created 25 years or more before the date on which the records were requested;

(6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

(7) records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, (B) would deprive a person of a right to a fair trial or an impartial adjudication, (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual;

(8) contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

(9) geological and geophysical information and data, including maps, concerning wells.

Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection.  The amount of information deleted, and the exemption under which the deletion is made, shall be indicated on the released portion of the record, unless

A2

including that indication would harm an interest protected by the exemption in this subsection under which the deletion is made. If technically feasible, the amount of the information deleted, and the exemption under which the deletion is made, shall be indicated at the place in the record where such deletion is made.

* * *

**18 U.S.C. § 1905**

### § 1905. Disclosure of confidential information generally

Whoever, being an officer or employee of the United States or of any department or agency thereof, any person acting on behalf of the Federal Housing Finance Agency, or agent of the Department of Justice as defined in the Antitrust Civil Process Act (15 U.S.C. 1311-1314), or being an employee of a private sector organization who is or was assigned to an agency under chapter 37 of title 5, publishes, divulges, discloses, or makes known in any manner or to any extent not authorized by law any information coming to him in the course of his employment or official duties or by reason of any examination or investigation made by, or return, report or record made to or filed with, such department or agency or officer or employee thereof, which information concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or association; or permits any income return or copy thereof or any book containing any abstract or particulars thereof to be seen or examined by any person except as provided by law; shall be fined under this title, or imprisoned not more than one year, or both; and shall be removed from office or employment.

A4