No. 24-880

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

CENTER FOR INVESTIGATIVE REPORTING and WILL EVANS,

Plaintiffs-Appellees,

v.

UNITED STATES DEPARTMENT OF LABOR,

Defendant-Appellant.

_____

On Appeal from the United States District Court
for the Northern District of California

_____

## EXCERPTS OF RECORD
## VOLUME 2 OF 4

_____

*Of Counsel:*

SEEMA NANDA
*Solicitor of Labor*

EMILY S. WHITTEN
*Attorney*

*United States Department of Labor*

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

ISMAIL J. RAMSEY
*United States Attorney*

PAMELA JOHANN
*Assistant United States Attorney*

MARK B. STERN
JOSHUA M. KOPPEL
*Attorneys, Appellate Staff*
*Civil Division, Room 7212*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-4820*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CENTER FOR INVESTIGATIVE
REPORTING, et al.,

        Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
LABOR,

        Defendant.

No.  22-cv-07182-WHA

**ORDER TEMPORARILY STAYING
ORDER TO PRODUCE PENDING
FURTHER BRIEFING**

In light of defendant's motion to stay the production of EEO-1 reports (Dkt. No. 58), this order **TEMPORARILY STAYS** the production of the reports pending response by plaintiff and further ruling.  Plaintiff shall have until **FEBRUARY 23, 2024, AT NOON** to file a response to defendant's motion.  An order will likely be issued based on the briefing to resolve the matter.

    **IT IS SO ORDERED.**

Dated:  February 16, 2024.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

THE CENTER FOR INVESTIGATIVE
REPORTING and WILL EVANS,

        Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
LABOR,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 22-cv-07182-WHA

**SUPPLEMENTAL DECLARATION OF
KELECHI AHAGHOTU IN SUPPORT OF
DEFENDANT UNITED STATES
DEPARTMENT OF LABOR'S MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION
TO CROSS-MOTION**

I, Kelechi Ahaghotu, declare as follows:

    1.     I am currently employed as the Branch Chief of Information Services for The Office of Federal Contract Compliance Programs ("OFCCP") with the United States Department of Labor ("DOL" or "Defendant"). The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

    2.     The purpose of this supplemental declaration is to provide the Court with information regarding DOL's process for verifying the contractor and reporting status of entities potentially subject to Plaintiffs' FOIA request for 2016-2020 EEO-1 reports. This declaration consists of: (1) an explanation of OFCCP's jurisdictional responsibilities and regulatory standards, and what comprises an OFCCP agency record; (2) an explanation of the steps taken to verify the federal contractor status of entities to determine whether they were subject to the FOIA request; (3) sample notices that were sent for the two categories of contractor status determinations; and (4) an explanation of additional processing of Plaintiffs' FOIA request that has occurred since August 18, 2023.

**I.     OFCCP DPO RESPONSIBILITIES; FEDERAL CONTRACTOR JURISDICTIONAL AND REGULATORY STANDARDS**

3.      The EEO-1 report is a mandatory annual data collection.  To efficiently implement the data collection, EEOC and OFCCP jointly developed the EEO-1 form and created the Joint Reporting Committee (JRC) to administer the EEO-1 reporting system in a manner that establishes a single data collection to meet the differing statistical needs of both agencies. The EEO-1 data collection is thus a joint initiative of EEOC and OFCCP, *see* 41 C.F.R. § 60-1.7(a)(1), but EEOC is the agency that administers the EEO-1 report and is functionally responsible for collecting the data through a submission portal accessed through the EEOC website, EEOC Data Collection, https://www.eeocdata.org (last visited November 9, 2023).

4.      OFCCP retains joint ownership with the EEOC of federal contractor and subcontractor EEO-1 Reports that meet the OFCCP EEO-1 jurisdictional parameters and regulatory thresholds for reporting to OFCCP outlined below.  EEO-1 Reports that do not meet the OFCCP EEO-1 reporting parameters and standards are solely EEOC records.

5.      The OFCCP Department of Program Operations (DPO) determines whether OFCCP has jurisdiction over entities and therefore whether entities are subject to EEO-1 reporting requirements; manages the Functional Affirmative Action Program; develops and monitors OFCCP's annual Operating Plan; and conducts various Quality Assurance activities and special studies to improve enforcement operations.

6.      DPO receives EEO-1 data from EEOC at least a year after the reports are filed, and after EEOC has had the opportunity to check the data for errors and assemble it for transmittal to OFCCP via the Equal Employment Data System (EEDS) database.  The EEO–1 reports are stored in EEDS and can be found in a desktop application within OFCCP.  EEDS is designed to provide information to OFCCP staff on the EEO characteristics of the Supply and Service contractor universe.

7.      EEOC's transmission to DPO includes some records for establishments that are not subject to OFCCP EEO-1 reporting requirements and therefore are not OFCCP records.  In accordance with 41 C.F.R. § 60-1.7(a), only certain federal contractors are required to provide EEO-1 reports to OFCCP.  As relevant here, the EEO-1 reporting requirement applies to all prime contractors and

1    subcontractors that (1) have 50 or more employees and (2) a contract or subcontract for $50,000 or

2    more.  DPO makes jurisdictional and reporting requirement determinations before any further use or

3    transmission of these records, as further explained beginning in Paragraph 11 below.[1]

4        8.    EEOC and OFCCP rely on the submitters in the first instance to self-report whether they

5    are subject to the OFCCP EEO-1 reporting requirement. They do this by checking a "yes" or "no" box

6    in response to Question 3 in Section C of their EEO-1 report filing, which asks whether the company or

7    any of its establishments (a) have 50 or more employees; (b) are prime contractors or first-tier

8    subcontractors and have a contract, subcontract, or purchase order amounting to $50,000 or more.

9        9.    For the purposes of fulfilling FOIA requests for EEO-1 data, DPO provides EEO-1

10   federal contractor and subcontractor data on an as-needed basis, pulling the subset of data requested by

11   OFCCP's Division of Management and Administrative Programs (DMAP) FOIA Office from the EEDS

12   database into an Excel spreadsheet, for efficiency in production.  As noted above, some of the EEO-1

13   reports in the EEDS database do not correspond to establishments that are subject to OFCCP EEO-1

14   reporting requirements.  Therefore, one of DPO's responsibilities is verifying an entity's federal

15   contractor and EEO-1 reporting status when the entity questions it.

16      10.    While EEOC and OFCCP rely on the submitters to self-report their EEO-1 reporting

17   status, errors do occur.  Some entities, for example, erroneously check "yes" instead or "no" to Question

18   C3.  If there is a question regarding an entity's federal contractor or EEO-1 reporting status, DPO

19   resolves it through a process outlined below and in section II.

20      11.    For DPO to verify a company's federal contractor and reporting status, DPO must first

21   determine whether the company is under OFCCP's jurisdiction,[2] and if so, whether it meets OFCCP's

22

23          [1]The process of transmitting records changed after transmittal of the 2017 EEO-1 Report data.

24   For data pertaining to 2016 and 2017, EEOC transmitted all EEOC EEO-1 Reports collected by the JRC
     to DPO.  While EEOC requires all employers with 100 or more employees, regardless of contractor

25   status, to file EEO-1 reports, *see* 29 C.F.R. § 1602.7, only a portion of those reports contain federal
     contractor or subcontractor data and thus fall within OFCCP's jurisdiction and regulations. Beginning

26   with the 2018 data, EEOC has provided to DPO only the EEO-1 Reports for entities that had answered
     "yes" to Question C3 on their EEO-1 report filing, Regardless of whether they were transmitted to DPO,

27   EEO-1 reports that do not fall within OFCCP's jurisdiction and regulations are solely EEOC records,
     and not DOL records.

28          [2] Pursuant to 41 C,F,R, § 60-1.5(a)(1), entities with federal contracts and/or subcontracts of
     $10,000 or less in a 12-month period are exempt from all OFCCP regulatory obligations, and thus are

1    regulatory threshold for EEO-1 data submission as set forth in 41 C.F.R. § 60-1.7(a) and described

2    above.

3           12.      As described above, entities with federal contracts of less than $50,000 and/or that have

4    less than 50 employees are not required by OFCCP regulations to file EEO-1 Reports.  In circumstances

5    in which an entity files an EEO-1 Report and erroneously indicates it is a federal contractor subject to

6    EEO-1 reporting requirements, but later challenges its contractor status and is determined by DPO not to

7    meet the OFCCP EEO-1 filing requirement threshold, the Report falls only under the EEOC filing

8    requirements, and is an EEOC, rather than OFCCP, record. Likewise, if an entity that has challenged its

9    federal contractor status does not have a qualifying federal contract (wherein the entity has 50 or more

10    employees and the federal contract is for $50,000 or more) for the EEO-1 filing year, it is not

11    categorized as a federal contractor or subcontractor for that filing year, it is not subject to OFCCP EEO-

12    1 reporting, and any EEO-1 Report for that year is not an OFCCP record.

13           13.      As stated by the EEOC when it addressed the confidentiality of EEO-1 data in its *Federal*

14    *Register* notices regarding the proposed pay data collection, "OFCCP obtains [EEO-1 reports for federal

15    contractors and subcontractors (contractors)] pursuant to its own legal authority under E.O. 11246 and

16    its implementing regulations […] With respect to companies that are not federal contractors or

17    subcontractors under OFCCP's jurisdiction, the confidentiality provision of Section 709(e) [42 U.S.C. §

18    2000e-8(e)] applies. OFCCP will refer all such FOIA requests for EEO-1 data to the EEOC for a

19    response. The EEOC, in turn, is subject to Title VII confidentiality and cannot disclose any of its EEO-1

20    data to the public, except in an aggregated format that protects the confidentiality of each employer's

21    information. Any FOIA request by a member of the public for such disaggregated EEO-1 data will be

22    denied by the EEOC under Exemption 3 of the FOIA." *See* Final PRA Comment Request, 81 Fed. Reg.

23    at 45491–92; First PRA Comment Request, 81 Fed. Reg. at 5118.

24           14.      Accordingly, for entities that do not meet the OFCCP jurisdictional requirements and

25    EEO-1 reporting thresholds described above, OFCCP has no legal authority to collect their EEO-1

26    Reports, and their EEO-1 data belongs solely to EEOC. Those entities are subject to the specific

27

28    not within OFCCP's jurisdiction.

SUPPLEMENTAL DECLARATION OF KELECHI AHAGHOTU
No. 22-cv-07182-WHA          4     ER-20

1   statutory language at Section 709(c) Title VII of the Civil Rights Act of 1964 that prohibits EEOC from

2   releasing EEO-1 data.

3   **II.      DETERMINATION OF FEDERAL CONTRACTOR OR SUBCONTRACTOR STATUS**

4           15.      Records responsive to the consolidated FOIA requests consist of the consolidated (Type

5   2) EEO-1 reports for all federal contractors for the years 2016 through 2020.

6           16.      On June 8, 2022, OFCCP's DMAP FOIA Office requested the EEO-1 data for reporting

7   years 2016-2020 from OFCCP's DPO.  DPO extracted data for companies that answered "yes" to

8   Question C3 on their EEO-1 report filing.  *See also* 41 C.F.R. § 60-1.7(a). The relevant EEO-1 reporting

9   data was exported from the EEDS database in Excel format.  DPO provided results of the search on June

10  10, 2023. *See* Ahaghotu Decl., Ex. Q.

11          17.      Pursuant to Executive Order 12600 and the U.S. Department of Labor FOIA regulations

12  at 29 CFR § 70.26, OFCCP is required to notify third-party submitters of confidential commercial

13  information whenever it "has reason to believe that the information requested under the FOIA may be

14  protected from disclosure under Exemption 4, but has not yet determined whether the information is

15  protected from disclosure under that exemption or any other applicable exemption."[3] The regulation

16  requires that the submitters be provided a reasonable time to respond to the notice. *Id*. OFCCP therefore

17  provides submitters with the opportunity to present objections to the disclosure of the requested EEO-1

18  data on the grounds that specific information contained therein is exempt from mandatory disclosure,

19  such as under Exemption 4 of the FOIA. 5 U.S.C. § 522 (b)(4).  Exemption 4 protects "...trade secrets

20  and commercial or financial information obtained from a person [that is] privileged or confidential." *Id*.

21          18.      DOL regulations promulgated to implement the requirements of Executive Order 12,600

22  provide that, when voluminous material that may be commercial or confidential in nature is sought by a

23  FOIA requester, Department agencies must notify private entities by "posting and publishing the notice

24  in a place reasonably calculated to accomplish notification."[4] OFCCP has met and exceeded this

25  _____

26      [3] *See* Ronald Reagan, Executive Order 12600--Predisclosure notification procedures for
    confidential commercial information, June 23, 1987, https://www.archives.gov/federal-
27  register/codification/executive-order/12600.html; 29 CFR § 70.26, Confidential Commercial
    Information.

28      [4] Executive Order 12,600 (1987); 29 C.F.R. § 70.26(j).

SUPPLEMENTAL DECLARATION OF KELECHI AHAGHOTU
No. 22-cv-07182-WHA                          5         ER-21

1   requirement through its numerous actions during this process to notify submitters in locations

2   reasonably calculated to provide them with notice of the Request, including multiple postings on its

3   website, publication in the Federal Register, distribution to hundreds of thousands of relevant

4   stakeholders through its GovDelivery listserv, notification by USPS mail, and repeated individual notice

5   through emails to thousands of affected contractors.  In addition, OFCCP has addressed contractor

6   concerns regarding the deadline for objections by providing multiple extensions to that deadline and by

7   allowing late-filed objections for good cause. *See* Ahaghotu Decl., Ex. Q, Sec. III.

8       19.    As part of the objection responses, OFCCP received responses from over 700 entities that

9   claimed not to be federal contractors.  Categories of claims from these entities included: (1) the entity

10  erroneously marked "yes" to Question C3 instead of no; (2) general claims that the entity is not a federal

11  contractor, *e.g.*, because the entity receives federal grants but is not a covered contractor. See Attach A.

12  OFCCP undertook an initial sorting and processing of the objections to prepare a list of entities that had

13  not objected, and a list of entities that claimed not to be federal contractors during all or some of the

14  reporting period from 2016-2020.

15      20.    OFCCP separated the compiled list of those claiming not to be federal contractors into

16  batches and requested DPO verify their contractor status. The batches were sent DPO at intervals on the

17  following dates:

18          a.    January 25, 2023 (First Wave); Results returned January 26, 2023. *See* Attach B.

19          b.    March 12, 2023 (Second Wave); Results returned on March 30, 2023. *See* Attach

20              C.

21          c.    April 17, 2023 (Third Wave); Results returned on May 9, 2023. *See* Attach D

22      21.    For entities that claimed they were not federal contractors notwithstanding their answer to

23  Question C3 on their EEO-1 report filing, DPO undertook a search and verification process to determine

24  whether these entities had qualifying federal contracts for the EEO-1 filing year in question.  If an entity

25  did not have a qualifying federal contract for the EEO-1 filing year, it would not be considered a federal

26  contractor or subcontractor for that filing year.

27      22.    DPO performed the verification process by searching the Federal System for Award

28  Management (SAM) to match the contractor's name, address, and unique entity ID (UEI) if available,

and to check the company's current registration status. If the UEI was available it was used to search the

company's contract data in the Federal Procurement Data System FPDS.  If a contract was not found, a

search was conducted using Dun & Bradstreet (D&B).   In D&B, DPO verified the company name,

address, any trade names, and its UEI, if available.  DPO then checked the company's stand-alone[5] or

family status. If the information showed that the company is a stand-alone, a search was conducted in

USASpending for any contracts or sub-awards. If the information showed that the company is within a

family tree[6] and had an associated contract[7], DPO checked Federal Procurement Data System (FPDS)

for any associated contracts.

23.     DPO used the information procured in its searches to determine whether each entity met

the OFCCP regulatory thresholds to be a federal contractor or subcontractor with EEO-1 reporting

requirements.

24.     Results of the contractor status determinations are shown in the chart below:

| Year(s) | Total Objections to Federal Contractor Status | Determined Not to be a Federal Contractor | Determined to be a Federal Contractor |
|---|---|---|---|
| **2016** | 331 | 261 | 70 |
| **2017** | 356 | 293 | 63 |
| **2018** | 444 | 379 | 65 |
| **2019** | 267 | 206 | 61 |
| **2020** | 255 | 195 | 60 |
| **Totals** | **1,653 reports 717 contractors** | **1,334 reports 621 contractors** | **319 reports 96 contractors** |

25.     In sum, we received objections for 1,653 reports from 717 unique federal contractors.

1,334 reports, corresponding to 621 unique federal contractors, were determined to be not subject to the

EEO-1 reporting requirement.  319 reports, corresponding to 96 unique federal contractors, were found

---

[5] Stand-Alone Businesses – these are companies which have no corporate linkage relationships established.

[6] Family tree reflects the ownership relationships between different companies within a corporate family structure. The corporate "family tree" includes any entity that is directly linked through ownership of more than 50% (parent/subsidiary relationships, headquarters/branch relationships).

[7] Associate Contract means a contractual arrangement between a Contractor and an Associated Contractor for the performance of part of the work on the Project.

SUPPLEMENTAL DECLARATION OF KELECHI AHAGHOTU
No. 22-cv-07182-WHA                    7      ER-23

1  to be subject to the EEO-reporting requirement.

2  **III.    NOTICES REGARDING CONTRACTOR STATUS AND SUBSEQUENT PROCESSING**

3        26.    Upon receipt of federal contractor status determinations from DPO, notices were sent via

4  email to entities notifying them their contractor status. If an entity was determined to be a federal

5  contractor, it was given an opportunity to object to the release of their data for the specified reporting

6  year(s).  If it was determined not to be a federal contractor, it was notified that its data was not subject to

7  the FOIA request and therefore would not be released.  See Attach E.

8        27.    OFCCP has continued to process responsive records and provides herein updated

9  processing data that reflects actions taken after the filing of DOL's Motion for Summary Judgment on

10  August 18, 2023.  In total, OFCCP received objections from 4,796 unique federal contractors,

11  corresponding to 16,832 EEO-1 Reports.  During continued processing, OFCCP has adjusted this

12  number to reflect changes in status due to, e.g., an entity being found not to be a federal contractor. As

13  of August 18, 2023, the adjusted total was 4,757 objections.

14        28.    During OFCCP's review of objections, it was discovered that additional contractors were

15  inadvertently marked as having submitted an objection, but no objection was found in OFCCP's

16  records.[8]  Notices were sent to the entities giving them an opportunity to object; entities that objected

17  were added to the number of overall objectors.  OFCCP completed its initial evaluation of those

18  objections on July 5, 2023. Following its review, OFCCP further adjusted the number of total objectors

19  after it concluded that the data from 4,762 unique contractors (a change of 5 from the previous

20  declaration), corresponding to 16,775 EEO-1 reports (a change of 20 from the previous declaration), was

21  appropriately withheld from release under Exemption 4.

22        29.    OFCCP has withheld 16,775 EEO-1 reports based on its evaluation that these records are

23  exempt under Exemption 4 of FOIA. To date, OFCCP has released 56,491 EEO-1 Reports

24  corresponding to 19,310 federal contractors, and as of January 5, 2024, will have released 56,634 EEO-1

25  Reports corresponding to 19,352 federal contractors.

26

27  ───────────────

28        [8] This was most likely due to entities having similar names or OFCCP later finding that an entity
had changed names and unit numbers.

SUPPLEMENTAL DECLARATION OF KELECHI AHAGHOTU
No. 22-cv-07182-WHA                          8        ER-24

30.     This projected release number will include 143 EEO-1 Reports of 42 entities not previously included in the total objector numbers reported in the August 18, 2023 Ahaghotu Declaration, as they had not been added to the objector data set pending DPO review of contractor status. These entities fall within 96 contractors who were found to be federal contractors after being referred to DPO. *See* ¶ 24.  These 42 entities comprise the portion of the 96 contractors that did not respond substantively to the Exemption 4 inquiry in OFCCP's notice of their confirmed federal contractor status, but did respond to object to the release of their EEO-1 data on the basis that they were not federal contractors. OFCCP conducted a jurisdiction analysis, and the entities were determined to be federal contractors and given an opportunity to submit an objection based on their confirmed contractor status. The data of these 42 entities who did not submit objections by the final deadlines provided in OFCCP's notices will be released by January 5, 2024.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct hereto.  Executed this 13th day of November, 2023.

_____
KELECHI AHAGHOTU
Branch Chief of Information Services
Office of Federal Contract Compliance Programs
U.S. Department of Labor
200 Constitution Ave., NW
Washington, DC 20210

Attachment A



Hill, Farrer & Burrill LLP
One California Plaza
300 S. Grand Avenue, 37th Floor
Los Angeles, CA 90071-3147

Main:  213.620.0460
Fax:  213.624.4840
Direct:  213.621.0812
Email:  jbowles@hillfarrer.com
hillfarrer.com

August 26, 2022

**VIA EMAIL:** **OFCCPSubmitterResponse@dol.gov**

Ms. Candice Spalding
Deputy Director
Division of Management and Administrative Programs
Office of Federal Contract Compliance Programs
200 Constitution Avenue NW, Room C-3325
Washington, DC 20210

**Re:  Rain Bird Corporation's Objection to Disclosure of EEO-1 Reports**

Dear Ms. Spalding:

Our law firm represents Rain Bird Corporation, whose corporate headquarters is located at 970 W. Sierra Madre Avenue, Azusa, CA 90712.

Rain Bird objects to the disclosure of its annual EEO-1 Reports in response to the FOIA request of Will Evans of CIR.  Rain Bird is not a Federal government contractor or subcontractor and has not been such during the period of the FOIA request.  In two of the reporting years (2019 and 2020) Rain Bird mistakenly answered "yes" to Question 3, asking if it was a government contractor or subcontractor.  Rain Bird requests that the EEO-1 reports for those years be amended to show that Rain Bird is not and has not been a Federal government contractor or subcontractor.

Because Rain Bird is not a Federal government contractor or subcontractor, its EEO-1 forms are not subject to the FOIA request of CIR which requested EEO-1 Reports for "federal contractors, including first-tier subcontractors."  As such Rain Bird objects to disclosure of its EEO-1 Reports, because Rain Bird is not a Federal contractor and its EEO-1 report is not being requested in the subject FOIA request.

Furthermore, Rain Bird objects to disclosure of the EEO-1 Report under FOIA Exemption 4, because the EEO-1 Reports contain confidential trade secret or commercial financial information.  Rain Bird answers the questions posed in the OFCCP's August 19, 2022 Notice concerning this FOIA request as follows:

**1. What specific information from the EEO-1 Report does the contractor consider to be a trade secret or commercial or financial information?**

As noted above, Rain Bird is not a Federal government contractor.  All of the information on the EEO-1 Report is a trade secret and confidential commercial and financial information.  This includes the number and categories of Rain Bird's employees.  Rain Bird is a closely held family corporation and does not disclose this information to anyone outside the corporation

Rain Bird's Objection
Page 2

except to the EEOC pursuant to the requirements of applicable law. Even within the Company
only four persons are provided this information and that is on a need to know basis. Competitors
could use this information to determine Rain Bird's size, sales volume, cost structure, labor
expenses and other confidential and valuable financial information about the Company which the
Company maintains in confidence.

## 2. What facts support the contractor's belief that this information is commercial or financial in nature?

Please see the Response to Question 1, above. In addition, the number and categories of
employees is important commercial and financial information that Rain Bird does not disclose
publicly or even privately within the Company, except to four individuals on a need to know
basis. For example, the number of sales workers would give competitors information about the
size of the Company's sales force. The number of professionals would provide competitors with
information about the Company's engineering staff and research and development endeavors.
The total number of employees would provide competitors with information on Rain Bird's labor
costs. This information would also provide the public with a rough idea of the size of the
Company and its financial condition, which would create security risks for the executives and
shareholders of this closely held corporation.

## 3. Does the contractor customarily keep the requested information private or closely-held? What steps have been taken by the contractor to protect the confidentiality of the requested data, and to whom has it been disclosed?

Yes. Rain Bird keeps the EEO-1 Report information private and closely-held. Please see
Responses to Questions 1 and 2, above. Rain Bird has maintained the EEO-1 Report information
in complete confidence. Other than providing the EEO-1 Report to the EEOC, as required by
applicable law, Rain Bird has not shared this data with anyone outside the Company. Within the
Company only four executives are privy to this information. The Chief Executive Officer, Vice
President of Human Resources, Compensation and Benefits Manager, and the Chief Financial
Officer are the only persons with access to the information. The information is maintained in
password protected computer files.

## 4. What steps have been taken by the contractor to protect the confidentiality of the requested data, and to whom has it been disclosed.

See Response to Questions 1-3, above. In addition, Rain Bird has protected the
confidentiality of the requested data by maintaining it in password protected private computer
files available only to the four Company executives listed above. Rain Bird has only shared the
data with the EEOC as required by applicable law.

Rain Bird's Objection
Page 3

**5. Does the employer contend that the government provided express or implied assurance of confidentiality? If no, were there express or implied indications at the time the information was submitted that the government would publicly disclose the information?**

As discussed above, Rain Bird is not a Federal government contractor or subcontractor. Rain Bird submitted the information to the EEOC as required by applicable law for private employers with more than 100 employees. The information should not have been provided to the OFCCP, because Rain Bird is not a contractor. The assurance provided expressly by applicable law is that OFCCP has jurisdiction over Federal contractors and subcontractors, not over private employers who are not contractors. In addition, the instant FOIA request does not request EEO-Reports for non-contractors, so there is an express requirement in FOIA that information that is not requested in a FOIA request will not be disclosed.

**6. How would disclosure of this information harm an interest of the employer protected by Exemption 4 (such as by causing foreseeable harm to the employer's economic or business interests?**

See Response to Questions 1-5 above. In addition, Rain Bird's competitors could use the information in the EEO-1 Report to determine Rain Bird's financial and cost structure, overhead, labor costs, sales strategy, research and development costs and strategy, and other private business information about Rain Bird. The disclosure of the size and financial structure of this family-owned business could lead to safety and security risks for the family ownership and executives of Rain Bird.

**Conclusion**

Based on the foregoing, Rain Bird requests that the OFCCP not disclose Rain Bird's EEO-1 Reports. The FOIA request does not request them, because Rain Bird is not a Federal contractor. Furthermore, the EEO-1 Reports are confidential trade secrets and financial data the disclosure of which would harm Rain Bird.

Very truly yours,

JAMES A. BOWLES
OF
HILL, FARRER & BURRILL LLP

JAB

ER-29



**Office of the General Counsel**

**Andrew E. Rice**
*Associate General Counsel*

Mount Sinai Health System
One Gustave L. Levy Place, Box 1099
New York, NY 10029

Tel: 212-659-8105
Fax: 212-348-2230
andrew.rice@mountsinai.org

October 19, 2022

<u>**BY OFCCP PORTAL**</u>

To Whom It May Concern:

Mount Sinai Health System, located at 1 Gustave L. Levy Place, New York, NY 10029, EEO-1 Company Number ET80260, respectfully objects to the release of our EEO-1 Type 2 reports as requested by the Center for Investigative Reporting.  First, Mount Sinai Health System[1] (or predecessor names) and the entities within the system are not federal contractors subject to OFCCP jurisdiction since the OFCCP removed TRICARE providers from the scope of its authority.  Only the Icahn School of Medicine at Mount Sinai has federal contracts, and the school's demographic information is reported through IPEDS, not through the EEO-1 reports.  Second, even if the agency erroneously identifies Mount Sinai Health System as a federal contractor, we have always believed that the requested information is confidential under Exemption 4 of the Freedom of Information Act (FOIA).

As an initial matter, neither Mount Sinai Health System nor any of the entities reported in the EEO-1 reports are federal contractors. Any EEO-1 report from any year that identified Mount Sinai Health System as a federal contractor was mistakenly identified that way due to misunderstanding of the TRICARE national interest exemption.  Mount Sinai Health System does support Tricare, but as OFCCP has stated, the national interest exemption removed TRICARE providers from OFCCP's authority and releases TRICARE providers from having to comply with laws and regulations administered by OFCCP.  The OFCCP's guidance notes that the exemption is in the national interest because it will improve uniformed service members' and veterans' access to medical care and provide greater uniformity, certainty, and notice for health care providers participating in TRICARE.  Mount Sinai Health System holds no other federal contracts, and to release the Type 2 report of the Mount Sinai Health System would be releasing data that is not applicable to the FOIA request which seeks *federal contractor* EEO-1 Type 2 reports.

Further, the information requested falls squarely within the FOIA exemption 4, as it is sensitive commercial information.  If Mount Sinai Health System's competitors obtain its EEO-1 reports, they will be able to identify not just demographic trends, but also general business trends.  The

---

[1] The Mount Sinai Health System is an integrated health care system providing exceptional medical care to our local and global communities. Encompassing the Icahn School of Medicine at Mount Sinai and eight hospital campuses in the New York metropolitan area, as well as a large, regional ambulatory footprint, Mount Sinai is internationally acclaimed for its excellence in research, patient care, and education across a range of specialties. The Mount Sinai Health System was created from the combination of the Mount Sinai Medical Center and Continuum Health Partners, which both agreed unanimously to combine the two entities in July 2013.

way Mount Sinai Health System staffs its various hospitals is based on a variety of strategic factors, which may be gleaned by the year-to-year overall trends in the various EEO-1 categories by competitors in the highly competitive markets we serve.  For this and other reasons, Mount Sinai Health System does not release or promote its demographic information except where required by law and under an expectation of confidentiality.  The information is also segregated from other data with limited access rights for those who pull data for required government reporting.

It is, and always have been our understanding with the agencies that the EEO-1 data is to be used by the EEOC in aggregate form and by the OFCCP only for audit purposes, and that it is otherwise confidential.  This understanding was perfectly justified, as OFCCP noted in its August 19, 2022 notice in the Federal Register notifying contractors of the FOIA request:

> Section 709(e) of Title VII of the Civil Rights Act of 1964 imposes criminal penalties and makes it unlawful for any officer or employee of EEOC from making public the employment data derived from any of its compliance surveys prior to the institution of any proceeding under EEOC's authority involving such information.

For all of the foregoing reasons, we respectfully object to the release of the EEO-1 Type 2 reports because Mount Sinai Health System is not a federal contractor and, alternatively, request that the Type 2 reports not be released to any party and maintained confidential as prescribed by Exemption 4 of FOIA.

Thank you for your consideration.

Sincerely,

/s/ Andrew E. Rice
Andrew E. Rice
Associate General Counsel
Mount Sinai Health System

| From: | Goldstein, David |
|---|---|
| To: | OFCCP Submitter Response |
| Subject: | RE: Cox Enterprises Letter to Deputy Director Spalding re FOIA Disclosure Notice |
| Date: | Tuesday, August 30, 2022 4:43:08 PM |
| Attachments: | image001.png |
| | image002.png |

**CAUTION: This email originated from outside of the Department of Labor. Do not click (select) links or open attachments unless you recognize the sender and know the content is safe. Report suspicious emails through the "Report Phishing" button on your email toolbar.**

Thank you for your message below.  Unfortunately, it is not an acceptable response.

Before producing data in response to a FOIA request, OFCCP is required to provide notice to submitters of information adequately describing the confidential commercial information requested or including copies of the requested records or record portions containing the information.  29 C.F.R. §70.26.

OFCCP's response fails to satisfy the requirements of  §70.26 in that CEI has not been provided with information sufficient to permit a determination as to whether its data is being included in the proposed disclosure.

First, as a non-government contractor that has found itself erroneously included on OFCCP scheduling lists in the past, CEI is very reasonably concerned that OFCCP could be planning to produce its data based on the agency's prior mistaken identification of CEI as a federal contractor.  Merely reviewing its own prior EEO-1 filings is not going to provide sufficient assurances as to what OFCCP may do.

Second, I know from my own experience representing employers in connection with prior FOIA requests, that OFCCP has made errors in the past when attempting to identify data responsive to such requests and would have disclosed protected information had the employer not had an opportunity to review the actual proposed disclosure and raise objections based on its review of the actual data that OFCCP was proposing to disclose.  There is every reason to believe that these same types of errors will be made in connection with the pending FOIA request.  OFCCP has an obligation to adopt a process that will reasonably protect employees and employers from the publication of their

protected confidential information.  This is particularly important because mistakes made in this process cannot be adequately remedied after the fact.

Finally, because of the way in which the EEO-1 reporting system is set up, a "yes" answer to question 3 cannot be relied upon to determine whether a filing entity is a federal contractor.  If any entity in an enterprise is a federal contractor, the Type 2 report may indicate that the answer to question 3 is "yes" even if the only entity with a federal contract is a single independently operating company which represents a miniscule fraction of the workforce that is counted as part of the Type 2 Report.  Moreover, it is not uncommon for employers to mistakenly answer "yes" to question 3.  Since employers understand their EEO-1 reports to be protected from public disclosure by statute, answering "yes" to question 3 does not relieve OFCCP of its obligation to treat this information as confidential.

For these reasons, CEI again requests a copy of any of its data that OFCCP is proposing to produce in response to the CIR FOIA request.

In the meantime, CEI continues to object to the disclosure of its EEO-1 data.  Because CEI is not a government contractor, its data is not within the scope of this FOIA request.  In addition, OFCCP does not have legal authority to publish EEO-1 data for a non-government contractor.  CEI also objects to the disclosure based on Exemption 4.

Thank you for your attention to this matter.

Very truly yours,

David

**David Goldstein**
Shareholder
612.313.7611 direct, 952.255.9295 mobile, 612.677.3815 fax
DGoldstein@littler.com

Pronouns: He/Him



Fueled by ingenuity. Inspired by you.

Labor & Employment Law Solutions | Local Everywhere

1300 IDS CENTER, 80 South 8th Street, Minneapolis, MN 55402-2136

**From:** OFCCP Submitter Response <OFCCPSubmitterResponse@dol.gov>
**Sent:** Tuesday, August 30, 2022 10:40 AM
**To:** Goldstein, David <DGoldstein@littler.com>
**Subject:** RE: Cox Enterprises Letter to Deputy Director Spalding re FOIA Disclosure Notice

**[EXTERNAL E-MAIL]**

Dear Mr. Goldstein,

We encourage contractors inquiring if their company is subject to the request by the Center of Investigative Reporting (CIR) to review their EEO-1 reports.

Please refer to this EEOC link https://eeocdata.org/pdfs/Single-Establishment%20Data%20File%20Upload%20User's%20Guide.pdf which gives companies an overview and examples of what fields are included in their report. If a company has filed EEO-1 Reports in the past, the EEO-1 Component 1 Reports from 2016-2020 are available in the EEO-1 Online Filing System. From the Company Dashboard, click on Historic Data (Prior EEO-1 Reports) to download prior year reports. https://www.eeocdata.org/eeo1/signin

OFCCP's regulations require federal contractors and first-tier subcontractors that are covered by Executive Order 11246 and that have 50 or more employees to file the EEO-1 Report. If submitters answered yes to "Question 3", the box confirming to be a federal contractor, and filed between the years requested in the FOIA, then their data is subject to the request.

Please let us know if you have any further questions.

Cordially,

OFCCP FOIA Team

---

**From:** Goldstein, David <DGoldstein@littler.com>
**Sent:** Monday, August 29, 2022 5:37 PM
**To:** OFCCP Submitter Response <OFCCPSubmitterResponse@dol.gov>
**Subject:** Cox Enterprises Letter to Deputy Director Spalding re FOIA Disclosure Notice

**CAUTION: This email originated from outside of the Department of Labor. Do not click (select) links or open attachments unless you recognize the sender and know the content is safe. Report suspicious emails through the "Report Phishing" button on your email toolbar.**

ER-34

As set forth in the attached letter, Cox Enterprises, Inc. (CEI) requests a copy
of the data (if any) that OFCCP is proposing to produce in response to the CIR
FOIA request; objects to the disclosure of its confidential information; and
requests an extension of time in which to provide a more formal statement of its
objections pending OFCCP's identification of any data that it proposes to
disclose.

Very truly yours,

David Goldstein

**David Goldstein**
Shareholder
612.313.7611 direct, 952.255.9295 mobile, 612.677.3815 fax
DGoldstein@littler.com

Pronouns: He/Him



**Fueled by ingenuity. Inspired by you.**

Labor & Employment Law Solutions | Local Everywhere
1300 IDS CENTER, 80 South 8th Street, Minneapolis, MN 55402-2136

--------------------------
This email may contain confidential and privileged material for the sole use of the intended
recipient(s). Any review, use, distribution or disclosure by others is strictly prohibited. If you
are not the intended recipient (or authorized to receive for the recipient), please contact the
sender by reply email and delete all copies of this message.

Littler Mendelson, P.C. is part of the international legal practice Littler Global, which operates
worldwide through a number of separate legal entities. Please visit www.littler.com for more
information.

| | |
|---|---|
| **From:** | MENNONA Jenna (RIC-US) |
| **To:** | OFCCP Submitter Response |
| **Cc:** | EHLE Theresa (RIC-US) |
| **Subject:** | Objection to Publication of EEO-1 Reports |
| **Date:** | Wednesday, October 19, 2022 4:01:53 PM |

---

> **CAUTION: This email originated from outside of the Department of Labor. Do not click (select) links or open attachments unless you recognize the sender and know the content is safe. Report suspicious emails through the "Report Phishing" button on your email toolbar.**

Good afternoon,

I am Legal Counsel for Richemont North America, Inc., and I am writing to object to the publication of Richemont's EEO-1 reports.  Richemont North America, Inc. (Company # 7802223) is not and was not a federal contractor or first-tier subcontractor.  However, for one year in the period covered for potential disclosure (2018), we made an administrative error and mistakenly marked "yes", instead of "no," on the EEO-1 report in response to Question 3, which requests the filer to identify that status.  Consequently, the company should not have been included in the population of federal contractors or first-tier subcontractors whose Type 2 consolidated EEO-1 reports are subject to disclosure pursuant to the Center for Investigative Reporting Freedom of Information Act request, and we object to any proposed disclosure of the 2018 Type 2 consolidated report.  Now that the need for a correction to our report has been identified, we would appreciate your assistance in opening the EEO-1 portal for us to make the correction or to providing confirmation to us that the correction has been made by the EEOC or the Joint Reporting Commission.  Please contact the company's point of contact Yash Koradia at yash.koradia@richemont.com or the certifying official, Isabelle Andre at Isabelle.andre@richemont.com for any questions or to confirm the correction has been made.

Kindly confirm receipt of this message, and please reach out if you need anything further.

Best,
Jenna Mennona


Jenna Mennona
Legal Counsel | Richemont Americas

**At Richemont, We Craft The Future**

---

645 Fifth Avenue, Olympic Tower | New York NY 10022 | USA
(direct) +12128912380
(email) jenna.mennona@richemont.com

© 2022 Richemont North America, Inc.. All Rights Reserved

ER-36

The information contained in this e-mail message is confidential - please do not cross-post. This communication is intended for the use of the addressee(s) only. If you are not the intended recipient, you are hereby notified that any review, reliance, disclosure, distribution or copying of this communication may be prohibited by law and might constitute a breach of confidence. If you have received this communication in error, please notify us immediately and delete it and all copies (including attachments) from your system.

# HAYNES BOONE

March 31, 2023

*Via E-mail*

FOIA Officer
National FOIA Office
Office of Federal Contract Compliance Programs
U.S. Department of Labor
Division of Management and Administrative Programs
200 Constitution Avenue, N.W., Suite C3325
Washington, D.C. 20210
OFCCPSubmitterResponse@dol.gov
OFCCP-FOIA-EEO1-Questions@dol.gov

> Re:    **Freedom of Information Act Request**
>         **Société Générale**
>         **CO # H096166**

Dear FOIA Officer:

This Firm represents Société Générale ("**SG**"). SG recently learned that the Department of Labor's Office of Federal Contract Compliance Programs ("**OFCCP**") received a Freedom of Information Act request (the "**Request**") for all Type 2 Consolidated Employer Information Reports, Standard Form 100, filed by federal contractors from 2016-2020 ("**EEO-1 Reports**"). SG subsequently learned that EEO-1 Reports submitted by SG were subject to the Request.

On March 2, 2023, SG filed objections to the Request pursuant to Exemption 4 of FOIA because SG's EEO-1 Reports contain confidential commercial information about SG's business. We write to supplement SG's objections to the Request on jurisdictional grounds, as SG is not a Covered Contractor subject to the Request. This supplement is supported by the declaration of Gary S. Prish, attached hereto.

Pursuant to the notice published by OFCCP in the Federal Register, Will Evans of CIR submitted a request for "[a] spreadsheet of all consolidated (Type 2) EEO-1 reports for all federal contractors for 2016." CIR subsequently amended this request multiple times, most recently on June 2, 2022, to include Type 2 EEO-1 reports for all federal contractors, including first-tier subcontractors, from 2016-2020 ("**Covered Contractors**").

As discussed herein, SG is not a Covered Contractor and therefore its EEO-1 Reports are not responsive to the Request. OFCCP's regulations define a government contract as "any agreement or modification thereof between any contracting agency and any person for the

---

**Haynes and Boone, LLP**  |  600 Congress Avenue | Suite 1300 | Austin, TX 78701
                              T: 512.867.8400 | haynesboone.com

# HAYNES BOONE



purchase, sale or use of personal property or nonpersonal services." *See* 41 C.F.R. §§ 60-1.3; 60-300.2; 60-741.2. The term "nonpersonal services" as used in the regulations "includes, but is not limited to, the following services: Utilities, construction, transportation, research, insurance, and fund depository." *Id.*

SG is not aware of any federal contracts or subcontracts between SG and any other entity that might make any EEO-1 Reports submitted by SG to the Joint Reporting Committee between 2016-2020 responsive to the Request. SG has been unable to locate any relevant contracts through the federal procurement data system.

SG and its affiliates in the United States offer financial solutions to their investor and corporate clients. SG provides corporate and investment banking services, including securities and derivatives brokerage, investment banking, advisory services, execution and prime brokerage. However, SG is not a financial institution with federal share or deposit insurance. SG does not serve as a depository of federal government funds in any amount. Nor is SG a financial institution which is an issuing and paying agent for U.S. savings bonds and savings notes.

SG has reviewed its employer information reports for EEO-1 submissions from 2016-2020 that provide the data for the EEO-1 Reports. Upon investigation, SG discovered that question C-3 in its 2016-2019 employer information reports was mistakenly answered "Yes."[1]  This was an error, as SG is not a covered government contractor and was not a covered government contractor when these EEO-1 Reports were submitted.

Unfortunately, the EEO-1 reporting windows for these reports has closed, and SG is unable to make appropriate changes to its submissions. To correct any confusion, SG changed its answer to question C-3 to "No" on its subsequently filed  EEO-1 reports in 2020 and 2021 and will do so going forward, absent a change in its status, which is not anticipated.

For the reasons above and those stated in its prior objection, SG objects to the release of the SG Information. We trust that the foregoing clearly demonstrates that the SG Information is not releasable, and we hereby request that the OFCCP so decide.

If you desire further information, please do not hesitate to contact me.

---

[1] Question C-3 to the EEO-1 asks: "Does the company or any of its establishments (a) have 50 or more employees AND (b) is not exempt as provided by 41 CFR 60-1.5 AND either (1) is a prime government contractor or first-tier subcontractor, and has a contract, subcontract, or purchase order amounting to $50,000 or more, or (2) serves as a depository of Government funds in any amount or is a financial institution which is an issuing and paying agent for U.S. Savings Bonds and Savings Notes?"

# HAYNES BOONE



Very truly yours,

Adam H. Sencenbaugh
Haynes and Boone, LLP
Direct Phone Number: (512) 867-8489
adam.sencenbaugh@haynesboone.com

4869-6693-3594

In Re:                                        §
                                              §
**Société Générale**                          §
                                              §
**FOIA Request from CIR**                      §
                                              §
                                              §

## <u>SUPPLEMENTAL DECLARATION OF GARY S. PRISH</u>

1.      My name is Gary S. Prish. I currently serve as Director and Counsel for Société
Générale and its affiliated companies in the United States (together "*SG*"). I have personal
knowledge as to the facts stated herein, and they are true and correct.

2.      This supplemental declaration is given in support of SG's objections to the release
of Type 2 Consolidated Employer Information Reports, Standard Form 100 (EEO-1 Reports) SG
submitted to the Joint Reporting Committee (collectively, the "*SG Information*"). SG
understands that the SG Information is subject a Freedom of Information Act request submitted
to the Office of Federal Contract Compliance Programs ("*OFCCP*") by the Center for
Investigative Reporting (the "*FOIA Request*").

3.      On March 2, 2023, SG filed objections to the FOIA Request pursuant to
Exemption 4 of FOIA because the EEO-1 Reports contain confidential commercial information
about SG's business.

4.      Prior to being notified about the FOIA Request, SG was unaware that OFCCP
believed SG was a government contractor subject to OFCCP jurisdiction.  Following receipt of
this notice, SG investigated why it was identified by OFCCP as a government contractor subject
to the FOIA Request.

5.      I am not aware of any federal contracts or subcontracts between SG and any other
entity that might make any EEO-1 Reports submitted by SG to the Joint Reporting Committee

responsive to the FOIA Request. SG has been unable to locate any relevant contracts in the federal procurement data system.

6.      SG's divisions in the United States offer financial solutions to SG's corporate clients. SG provides corporate and investment banking services, including securities, derivatives brokerage, investment banking, advisory services, execution and prime brokerage.

7.      SG is not a financial institution with federal share and deposit insurance. SG does not serve as a depository of federal government funds in any amount. Nor is SG a financial institution which is an issuing and paying agent for U.S. savings bonds and savings notes.

8.      SG has reviewed its employer information reports for EEO-1 submissions from 2016-2020 that provide the underlying data for the EEO-1 Reports. Upon investigation, SG discovered that question C-3 in its 2016-2019 employer information reports was mistakenly answered "Yes." This was an error, as SG is not a covered government contractor and was not a covered government contractor when these EEO-1's were submitted.

9.      SG objects to the disclosure of its confidential, private, and proprietary EEO-1 Reports.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 31st day of March, 2023.

Gary S. Prish
Société Générale

Attachment B

| From: | ██████ – OFCCP |
|---|---|
| To: | ██████ – OFCCP |
| Cc: | ██████ – OFCCP; ██████ – OFCCP |
| Subject: | CIR FOIA - Jurisdiction Question |
| Date: | Wednesday, January 25, 2023 12:32:01 PM |
| Attachments: | 2016_QuestionFederalContractor.xlsx |
| | 2017_QuestionFederalContractor.xlsx |
| | 2018_QuestionFederalContractor.xlsx |
| | 2019_QuestionFederalContractor.xlsx |
| | 2020_QuestionFederalContractor.xlsx |

Hi Harvey,

I want to start off by thanking you and Mike for your willingness to help us with separating out the data. We actually were able to separate it out ourselves so we went ahead and did it. But thanks again for making yourselves available to us.

Attached please find the contractors that argued they were not federal contractors during the respective years. You may find the same contractor in multiple years' data but we need to know whether they were contractors in each of those years that they show up in the spreadsheet. I created a column and ask for your team to indicate with a Yes or No whether they are a federal contractor. You can wait until you are finished with all five years before sending the information back to us.

Please let us know if you have any questions or concerns.

Thanks,

██████
Division of Management and Administrative Programs
U.S. Department of Labor, OFCCP
200 Constitution Avenue, NW
Room ██████
Washington, DC  20210
Direct:  202.693.██
Mobile:  ██████



Attachment C

| | |
|---|---|
| **From:** | ██████████ - OFCCP |
| **To:** | ██████ - OFCCP |
| **Cc:** | ██████ - OFCCP; ██████ - OFCCP; ██████ OFCCP; ██████ - OFCCP |
| **Subject:** | RE: CIR FOIA - Jurisdiction Question |
| **Date:** | Thursday, March 30, 2023 3:55:55 PM |
| **Attachments:** | Consolidated QuestionFederalContractor_2nd Wave Master.xlsx |

Please see attached FOIA research.


██████████████

Scheduling and Jurisdiction Branch Chief

U.S. Department of Labor

Division of Program Operations | Office of Federal Contract Compliance Programs

Tel.  (202)██████ | ██████████████ @dol.gov


**From:** ██████████ - OFCCP <██████████████
**Sent:** Sunday, March 12, 2023 8:26 AM
**To:** ██████████ - OFCCP ██████████ @dol.gov>
**Cc:** ██████ OFCCP <██████████ @dol.gov>; ██████████ OFCCP
<██████████ @dol.gov>; ██████████ OFCCP <██████████ @dol.gov>; ██████ -
OFCCP <██████████ @dol.gov>
**Subject:** RE: CIR FOIA - Jurisdiction Question


Hi ██████,

Here is a second wave of claims from contractors that they are not federal contractors for the CIR
FOIA case. Could DPO do the same analysis as before with this new list of contractors? I consolidated
the data into one file with each year on a separate sheet.

Please let me know if you have any questions.

Thank you for your assistance!


██████████████

202.693 ████


**From:** ██████████ - OFCCP <██████████████ @dol.gov>
**Sent:** Thursday, January 26, 2023 1:47 PM
**To:** ██████████ - OFCCP <██████████ @dol.gov>
**Cc:** ██████████ - OFCCP ██████████ @dol.gov>; ██████████ - OFCCP
<██████████ @dol.gov>; ██████████ - OFCCP <██████████ @dol.gov>; ██████ -
OFCCP <██████████ @dol.gov>

ER-46

**Subject:** FW: CIR FOIA - Jurisdiction Question

Hi ,

Forwarding the completed request since Harvey is OOO today.

---

**From:** ███████████ - OFCCP ███████████ @dol.gov>
**Sent:** Wednesday, January 25, 2023 3:17 PM
**To:** ███████████ - OFCCP <███████████ @dol.gov>
**Cc:** ███████████ - OFCCP <███████████ @dol.gov>
**Subject:** RE: CIR FOIA - Jurisdiction Question

Attached are the completed worksheets. We used $50k as a contract threshold.



---

**From:** ███████████ - OFCCP <███████████ @dol.gov>
**Sent:** Wednesday, January 25, 2023 12:31 PM
**To:** ███████████ OFCCP <███████████ @dol.gov>
**Cc:** ███████████ - OFCCP <███████████ @dol.gov>; ███████████ OFCCP
<███████████ @dol.gov>
**Subject:** CIR FOIA - Jurisdiction Question

Hi ███████,

I want to start off by thanking you and Mike for your willingness to help us with separating out the data. We actually were able to separate it out ourselves so we went ahead and did it. But thanks again for making yourselves available to us.

Attached please find the contractors that argued they were not federal contractors during the respective years. You may find the same contractor in multiple years' data but we need to know whether they were contractors in each of those years that they show up in the spreadsheet. I created a column and ask for your team to indicate with a Yes or No whether they are a federal contractor. You can wait until you are finished with all five years before sending the information back to us.

Please let us know if you have any questions or concerns.

Thanks,

███████████████████
Division of Management and Administrative Programs
U.S. Department of Labor, OFCCP
200 Constitution Avenue, NW
Room ███████████

Washington, DC  20210
Direct: ███████████
████████████

# Attachment D



**From:** ███████ - OFCCP
**To:** ███ - OFCCP
**Cc:** █████ - OFCCP; ██████ OFCCP; ████████ OFCCP; ████████ - OFCCP
**Subject:** RE: CIR FOIA - Jurisdiction Question
**Date:** Monday, April 17, 2023 12:52:28 PM
**Attachments:** Consolidated QuestionFederalContractor_3rdWave.xlsx

Hi ████,

Attached please find Batch #3 and we anticipate this to be the last batch for your jurisdiction determinations.

2016 – 140
2017 – 170
2018 – 219
2019 – 120
2020 – 116
Total – 765

Please let us know if you need anything else.

Thanks,

███████████

202.693 ████

**From:** ██████████ - OFCCP <E████████@dol.gov>
**Sent:** Tuesday, April 11, 2023 3:22 PM
**To:** █████████ - OFCCP ████████@dol.gov>
**Cc** ████████ - OFCCP <████████@dol.gov>; ████████ - OFCCP <███████@dol.gov>; ████████ - OFCCP <█████████@dol.gov>; ████ - OFCCP ███████@dol.gov>
**Subject:** RE: CIR FOIA - Jurisdiction Question

I'll be out of office next week, so if you can send the data to ████ JRT can get started. Thanks!

**From:** ███████ - OFCCP <S███████@dol.gov>
**Sent:** Tuesday, April 11, 2023 9:04 AM
**To:** ████████ - OFCCP ████████@dol.gov>
**Cc:** ████████ U - OFCCP ████████@dol.gov>; ████████ - OFCCP <███████@dol.gov>; ████ OFCCP █████@dol.gov>; ████ - OFCCP ████████@dol.gov>
**Subject:** RE: CIR FOIA - Jurisdiction Question

ER-50

Thank you all for help with this! This is exactly what we needed. We anticipate sending you our last batch on Monday (4/17).



202.693 █████

---

**From:** ████████████████ OFCCP <████████████ @dol.gov>
**Sent:** Thursday, March 30, 2023 3:54 PM
**To:** ████████████ OFCCP ████████████ @dol.gov>
**Cc:** ████████████ OFCCP ████████████ @dol.gov>; ████████████ OFCCP
<████████████ @dol.gov>; ████████ - OFCCP ████████████ @dol.gov>; ████████████ -
OFCCP <████████████ @dol.gov>
**Subject:** RE: CIR FOIA - Jurisdiction Question

Please see attached FOIA research.



U.S. Department of Labor
Division of Program Operations | Office of Federal Contract Compliance Programs
Tel.  (████████ | ████████████ @dol.gov

---

**From:** ████████████ OFCCP <████████████ @dol.gov>
**Sent:** Sunday, March 12, 2023 8:26 AM
**To:** ████████████ OFCCP <F███████████ @dol.gov>
**Cc:** ████████████ - OFCCP ████████████ @dol.gov>; ████████ - OFCCP
<████████████ @dol.gov>; ████████████ OFCCP <████████████ @dol.gov>; ████████████ -
OFCCP <████████████ @dol.gov>
**Subject:** RE: CIR FOIA - Jurisdiction Question

Hi ████████

Here is a second wave of claims from contractors that they are not federal contractors for the CIR FOIA case. Could DPO do the same analysis as before with this new list of contractors? I consolidated the data into one file with each year on a separate sheet.

Please let me know if you have any questions.

Thank you for your assistance!



202.693 ███



**From:** ███████████ - OFCCP <E██████████████@dol.gov>
**Sent:** Thursday, January 26, 2023 1:47 PM
**To:** ██████████ - OFCCP <S██████████@dol.gov>
**Cc:** ██████████ - OFCCP <██████████@dol.gov>; ████ █████ - OFCCP
███████████@dol.gov>; ███████████ - OFCCP <███████████@dol.gov>; ███████████
OFCCP <███████████@dol.gov>
**Subject:** FW: CIR FOIA - Jurisdiction Question

Hi ███████

Forwarding the completed request since Harvey is OOO today.



**From:** ███████████ - OFCCP <N██████████@dol.gov>
**Sent:** Wednesday, January 25, 2023 3:17 PM
**To:** ██████████ - OFCCP <██████████@dol.gov>
**Cc:** ███████████ OFCCP <███████████@dol.gov>
**Subject:** RE: CIR FOIA - Jurisdiction Question

Attached are the completed worksheets. We used $50k as a contract threshold.

████████

**From:** ███████████ - OFCCP <S██████████@dol.gov>
**Sent:** Wednesday, January 25, 2023 12:31 PM
**To:** ██████████ - OFCCP <████████ol.gov>
**Cc:** ███████████ OFCCP ███████████@dol.gov>; ███████████ - OFCCP
███████████@dol.gov>
**Subject:** CIR FOIA - Jurisdiction Question

Hi ███████

I want to start off by thanking you and Mike for your willingness to help us with separating out the
data. We actually were able to separate it out ourselves so we went ahead and did it. But thanks
again for making yourselves available to us.

Attached please find the contractors that argued they were not federal contractors during the
respective years. You may find the same contractor in multiple years' data but we need to know
whether they were contractors in each of those years that they show up in the spreadsheet. I
created a column and ask for your team to indicate with a Yes or No whether they are a federal
contractor. You can wait until you are finished with all five years before sending the information
back to us.

Please let us know if you have any questions or concerns.

Thanks,

███████████████

Division of Management and Administrative Programs
U.S. Department of Labor, OFCCP
200 Constitution Avenue, NW
Room ████████████
Washington, DC  20210
Direct:  202 ██████████
███████████████



# Attachment E

| | |
|---|---|
| **From:** | OFCCP FOIA EEO1 Questions |
| **To:** | "Bryn Edwards" |
| **Subject:** | Federal Contractor Status Confirmed |
| **Date:** | Friday, March 17, 2023 3:56:00 PM |
| **Attachments:** | image001.png |

Good afternoon,

The Office of Federal Contract Compliance Programs (OFCCP) is contacting you regarding the FOIA request submitted by the Center for Investigative Reporting (CIR) for Type 2 EEO-1 data for reporting years 2016-2020. OFCCP has reviewed your objection on the basis that your entity was not a federal contractor, and therefore, should not be subject to the CIR FOIA request. OFCCP has verified and confirmed that the below entity was not a federal contractor during the reporting years listed. The Type 2 EEO-1 data for the entity below will not be disclosed in response to the CIR FOIA request and no further action is needed.

COMPANY NAME: **CANDID COLOR SYSTEMS**
UNIT NUMBER: **R57920**
REPORTING YEAR(S) FOR WHICH OFCCP HAS DATA: **2017, 2018**

If you have questions, please contact our helpdesk at 1-800-397-6251 or email us at **OFCCP-FOIA-EEO1-Questions@dol.gov**.

Cordially,

OFCCP FOIA Team

---

**From:** Bryn Edwards <Bryn.Edwards@candid.com>
**Sent:** Wednesday, November 23, 2022 11:34 AM
**To:** OFCCP FOIA EEO1 Questions <OFCCP-FOIA-EEO1-Questions@dol.gov>
**Subject:** Request Info re: EEO-1 Report

**CAUTION: This email originated from outside of the Department of Labor. Do not click (select) links or open attachments unless you recognize the sender and know the content is safe. Report suspicious emails through the "Report Phishing" button on your email toolbar.**

Hello —

I received an email regarding EEO-1 data, and am wondering if we have already submitted this?  If not, is there a template that I can grab somewhere to get this done?

ER-55

My company is Candid Color Systems in Oklahoma.  73-1090957985.  We are not federal contractors but I understand we still need to submit this report.  Thank you for whatever help/guidance you can give.

Best,

*Bryn Edwards*
Human Resources
Candid Color Systems, Inc.
405/328-7191 office
405/501-1548 mobile
bryn.edwards@candid.com



**From:** OFCCP FOIA EEO1 Questions
**To:** "Josh Cross"
**Subject:** RE: Analytik Jena US LLC - Objects to Release of EEO-1 Type 2 Data Release
**Date:** Wednesday, May 10, 2023 11:33:00 AM
**Attachments:** Analytik Jena US LLC.pdf

Good morning,

The Office of Federal Contract Compliance Programs (OFCCP) has confirmed your status as a federal contractor during the reporting years subject to the CIR FOIA request. Please see the attached correspondence for more details on your contractor status as well as action that may be needed.

Cordially,

OFCCP FOIA Office

---

**From:** Josh Cross <Josh.Cross@us.analytik-jena.com>
**Sent:** Friday, March 3, 2023 5:45 PM
**To:** OFCCP FOIA EEO1 Questions <OFCCP-FOIA-EEO1-Questions@dol.gov>
**Subject:** Analytik Jena US LLC - Objects to Release of EEO-1 Type 2 Data Release

> **CAUTION: This email originated from outside of the Department of Labor. Do not click (select) links or open attachments unless you recognize the sender and know the content is safe. Report suspicious emails through the "Report Phishing" button on your email toolbar.**

Good Afternoon,

Analytik Jena US LLC wishes to assert EEO-1 Type 2 Data should not be released. We have previously objected to the release of our data.

1.  Our addresses:
    a.  2066 W 11th St, Upland, CA 91786
    b.  3 Highwood Drive, Suite 103. Tewksbury, MA 01876
    c.  100 Cummings Center suite 234-n, Beverly, MA 01915
2.  X400936, HW53465
3.  no other entities associated with our organization

Best regards,
Josh Cross

Analytik Jena US LLC **|** HR Generalist **|**
2066 W. 11th Street **|** Upland, CA 91786 **|** USA **|**
Mobile: 1-909-372-5962 **|** HR Fax: +1-909-461-4514 **|**
Josh.Cross@us.analytik-jena.com **|** http://us.analytik-jena.us **|**



**U.S. Department of Labor**    Office of Federal Contract Compliance Programs
200 Constitution Avenue, N.W.
Washington, DC 20210



May 10, 2023

## Federal Contractor Status Verified

The Office of Federal Contract Compliance Programs (OFCCP) is contacting you regarding the FOIA request submitted by the Center for Investigative Reporting (CIR) for Type 2 EEO-1 data for reporting years 2016-2020. OFCCP has reviewed your assertion that your organization is not a federal contractor. However, OFCCP has verified that Analytik Jena US LLC, was a federal contractor during the reporting years listed below, and therefore, subject to the CIR FOIA request. For any years during the request period that Analytik Jena US LLC was not a federal contractor, data from any such years will be excluded from the CIR FOIA request, and no further action is needed.

OFCCP based its determination on your organization answering "yes" for Question C3 on the EEO-1 Form for each of the reporting years below indicating that your organization or any of its establishments (a) had 50 or more employees; (b) were prime contractors or first-tier subcontractors; (c) had a contract, subcontract, or purchase order amounting to $50,000 or more during the reporting year(s) in question; and (d) was not exempt as provided under 41 CFR 60-1.5, or served as depositories of Government funds in any amount, or were financial institutions serving as issuing and payment agents for U.S. Savings Bonds and savings notes. Additionally, our jurisdiction team confirmed that your entity had qualifying federal contracts during the reporting years in question.

Our records reflect:

Company Name: **Analytik Jena US LLC**
Unit Number: **X40093**
EEO-1 Form Response to Question C3: Yes
Contract Number(s) and Contract Start and End Dates[1]: **68HE0B20P0336 (July 6, 2020 to September 30, 2024)**
Reporting Years for which OFCCP has data: **2020**
Reporting Years Excluded from Disclosure Due to Non-Contractor Status: **None**

**As a result, OFCCP is providing your organization an opportunity to object to the disclosure of Type 2 EEO-1 data identified above as subject to disclosure.**

**Submitting an Objection**

---

[1] This is not an exhaustive list of all federal contracts, but rather a list of some contracts that establish contractor status during the request period. There may be additional contracts during the reporting period that would also establish jurisdiction.

1

ER-59

Objections submitted must include the contractor's name, address, unit number, contact information for the contractor (or its representative), and should, at minimum, address the following questions in detail so that OFCCP may evaluate the objection to determine whether the information should be withheld or disclosed pursuant to FOIA Exemption 4:

1. What specific information from the Type 2 EEO-1 Report does the contractor consider to be a trade secret or commercial or financial information?

2. What facts support the contractor's belief that this information is commercial or financial in nature?

3. Does the contractor customarily keep the requested information private or closely held? What steps have been taken by the contractor to protect the confidentiality of the requested data, and to whom has it been disclosed?

4. Does the contractor contend that OFCCP provided an express or implied assurance of confidentiality? If no, were there express or implied indications at the time the information was submitted that the government would publicly disclose the information?

5. How would disclosure of this information harm an interest of the contractor protected by Exemption 4 (such as by causing foreseeable harm to the contractor's economic or business interests)?

All responses must be received by **June 2, 2023**, at 11:59 p.m. EST, via this email address: **OFCCP-FOIA-EEO1-Questions@dol.gov**. If OFCCP does not receive a written objection by the deadline, the agency will conclude that your entity has no objection to disclosure and will, as required by FOIA, begin the process of disclosing your Type 2 EEO-1 Report data to CIR. Because we have received three or more requests for the same information, FOIA requires that we post the data released to CIR on our website at https://www.dol.gov/agencies/ofccp/foia/library/Employment-Information-Reports.

If you have questions, please contact our helpdesk: 1-800-397-6251 or email: **OFCCP-FOIA-EEO1-Questions@dol.gov**.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE CENTER FOR INVESTIGATIVE REPORTING and WILL EVANS, | ) Case No. 22-cv-07182-WHA ) |
| Plaintiffs, | ) **SUPPLEMENTAL DECLARATION OF JACK** |
| v. | ) **JASINOWSKI IN SUPPORT OF DEFENDANT** ) **DEPARTMENT OF LABOR'S MOTION FOR** ) **SUMMARY JUDGMENT** |
| UNITED STATES DEPARTMENT OF LABOR, | ) ) |
| Defendant. | ) ) |

I, Jack Jasinowski, state as follows:

1.      In support of the United States Department of Labor's Motion for Summary Judgment in the above captioned matter, with personal knowledge of the matters below and competent to testify, I submit the following Supplemental Declaration.

2.      Brandenburg has a business credit file with Dun & Bradstreet (D&B) and annually shares Company financial information with D&B for Brandenburg's business credit score and rating.

3.      I have reviewed the twenty-three page OneStop Report for Brandenburg Industrial Service Company ("OneStop Report") provided by D&B Hoovers that is referenced in Paragraph 28 of Marc Bendick Jr.'s Declaration ("Bendick Declaration") in Opposition to Defendant's Motion for Summary Judgment and In Support of Plaintiffs' Cross Motion for Summary Judgment.

4.      The OneStop report includes accurate Company financial information provided by Brandenburg on pages 3 and 14 (*e.g.*, Brandenburg's "Sales" and "Total Assets").

5.      The majority of the remaining Company information included in the OneStop Report was not provided to D&B by Brandenburg and is not accurate.

6.      Paragraph 28 of the Bendick Declaration states that the OneStop Report includes "counts of employees at the firm's three separate operating locations (more detailed information than the

---

DECLARATION OF JACK JASINOWSKI IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
No. 22-cv-07182-WHA                          1          ER-61

1  company-wide employment total in its Type 2 Consolidated EEO-1 Report)."  However, the OneStop

2  Report does not, in fact, include employee counts at three Brandenburg locations, nor is that information

3  that Brandenburg has shared with D&B.  Instead, Page 3 of the Report purports to list the number of

4  employees at the headquarters location only (and the stated number is not correct).  Page 3 of the

5  OneStop Report also states that Brandenburg has 750 "Total" employees, which also is not accurate.  As

6  noted in Paragraph 3 of my previous declaration, Brandenburg has more than 800 union and non-union

7  employees, nationwide.

8          7.          Paragraph 28 of the Bendick Declaration states that the OneStop Report includes "an

9  organization chart for the firm identifying which departments worked on which product lines." To the

10  contrary, the OneStop Report does not include an organizational chart or any "department" information,

11  and that is not information that Brandenburg has shared with D&B.  The "Corporate Family"

12  information listed on page 12 of the OneStop Report does not reflect Brandenburg's seven locations, as

13  accurately reflected on its website (https://www.brandenburg.com/Location.aspx). Further, Brandenburg

14  does not have any "product lines."

15          8.          Paragraph 28 of the Bendick Declaration states that the OneStop Report includes "names,

16  job titles, locations, telephone numbers, and recently-verified email addresses for 124 key employees,"

17  which is also not accurate.  Pages 6-10 of the OneStop Report display 25 "Site Contacts" with contact

18  information, however, 10 of the individuals listed (40%) are not current Brandenburg employees.

19  Further, the individuals listed on pages 6-10 of the OneStop Report are not considered Brandenburg's

20  "key employees."

21          9.          Paragraph 28 of the Bendick Declaration states that the OneStop Report includes "lists of

22  the firm's closest competitors classified by location, size, and product line."  Pages 18-22 purport to

23  include a list of Brandenburg's "Closest Industry Peers," but none of the twenty-five listed companies is

24  a competitor of Brandenburg.

25          10.          Finally, other inaccurate information contained in the OneStop Report includes that

26  Brandenburg's industry is "Waste Management" and its "Plant/Facility Size" is 13,362 square feet

27  (OneStop Report, pgs. 3, 4). Both statements are not accurate and are not information Brandenburg

28  supplied to D&B.  Brandenburg is not in the "Waste Management" industry.  As noted in Paragraph 5 of

DECLARATION OF JACK JASINOWSKI IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
No. 22-cv-07182-WHA                              2          ER-62

Case 3:22-cv-07182-WHA   Document 43-1   Filed 11/13/23   Page 3 of 4

1    my previous declaration, Brandenburg specializes in demolition and environmental remediation, which

2    includes asbestos abatement, hazardous material removal, soil remediation, asset recovery, and site

3    preparation.

4        11.    In sum, other than the summary financial information Brandenburg supplied to D&B, the

5    OneStop Report does not contain accurate information and does not contain information that

6    Brandenburg supplied to D&B.  Regardless, even if the information was accurate, the OneStop Report

7    does not include the sensitive, commercially valuable information contained in Brandenburg's EEO-1

8    Reports that the Company seeks to protect.

9        12.    Contrary to the Bendick Declaration, the OneStop Report does not contain "more detailed

10   information than the company-wide employment total in its Type 2 Consolidated EEO-1 Report."  First,

11   the OneStop Report does not include *any details* on the specific structure of Brandenburg's workforce.

12   Rather, the OneStop Report simply lists twenty-five "Site Contacts" with their purported job titles, all

13   listed with the same "Elmhurst, Illinois" office location and general office phone number ("312-326-

14   5800").  Further, as noted above, ten of the individuals listed are not current Brandenburg employees

15   and the individuals listed are not considered Brandenburg's "key employees."

16       13.    By contrast, Brandenburg's Type 2 EEO-1 Reports provide a detailed breakdown of how

17   Brandenburg stratified its 800+ employee workforce, including how many leaders ("Executive/Sr

18   Officials & Managers" and "First/Mid Officials & Managers" EEO Categories) are required to oversee

19   Brandenburg's business functions, and how many employees in the other EEO-1 Occupational

20   Categories (Professionals, Technicians, Sales Workers, Administrative Support Workers, Craft Workers,

21   Operatives, Laborers and Helpers, and Service Workers) are required for Brandenburg to operate at peak

22   efficiency and effectiveness.  In Brandenburg's industry, the EEO-1 stratification of its workforce would

23   be illuminative to competitors, because the EEO-1 categories correspond to fundamentally discrete

24   aspects of Brandenburg's operations (e.g., employees engaged in sales ("Sales Workers" EEO Category)

25   versus those that are out in the field servicing clients ("Craft Workers," "Operatives," "Laborers &

26   Helpers," "Technicians" and "Service Workers" EEO Categories).  The OneStop Report does not

27   contain any of this sensitive, confidential information.

28       14.    Second, the OneStop Report does not include any information on Brandenburg's staffing

DECLARATION OF JACK JASINOWSKI IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
No. 22-cv-07182-WHA                  3      ER-63

1   and workforce trends.  Disclosure of Brandenburg's year-over-year EEO-1 Reports from 2016-2020

2   would reveal the Company's staffing strategies and business evolution.  The organization-wide

3   employment numbers contained in the Type 2 EEO-1 Reports specifically reflect Brandenburg's

4   judgment as to how it can best allocate its workforce to have a well-run, profitable, and efficient

5   business, and adjust to changing economic conditions, over the course of five years.

6           15.     For example, Brandenburg's EEO-1 Reports reveal its ratio of Professionals (e.g.,

7   engineers) to trade employees (e.g., Craft Workers, Operatives, Service Workers and Laborers &

8   Helpers), and the overall ratio of its Officials and Managers to those Professionals and trade employees.

9   This year-over-year information -- when compared to Brandenburg's publicly available financial

10  information through D&B -- would provide commercially valuable information to Brandenburg's

11  competitors regarding the optimal employee ratios for financial success and growth.

12          16.     In sum, disclosure of Brandenburg's EEO-1 Reports would provide information that is

13  not otherwise publicly available and could readily cause foreseeable harm to Brandenburg's economic

14  and business interests, by allowing competitors to analyze the Company's workforce trends over a five

15  year period.

16

17          I declare under penalty of perjury under the laws of the United States that the foregoing is true

18  and correct.

19          Executed this 8th day of November, 2023, at Elmhurst, Illinois.

20

21          _Jack Jasinowski_____
            JACK JASINOWSKI

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| THE CENTER FOR INVESTIGATIVE REPORTING and WILL EVANS, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 3:22-CV-07182-WHA |
| UNITED STATES DEPARTMENT OF LABOR, | ) ) ) | **Declaration of Barbara L. Moskowitz** |
| Defendant. | ) ) ) | |

## DECLARATION OF BARBARA L. MOSKOWITZ

I, Barbara Moskowitz, state as follows:

1.      I submit this declaration in support of the United States Department of Labor's ("DOL" or "Defendant") Reply to Plaintiffs' Opposition to Defendants' Motion for Summary Judgment in the above captioned matter.  I have personal knowledge of the following facts and I could competently testify.

2.      I am the Director of The Institute for Workplace Equality, and my responsibilities include the continued provision of critical updates on federal contractor obligations and the expansion of The Institute's programs and services to assist employers in complying with their legal workplace obligations.  I work closely with employer members as well as The Institute's Co-founders, Counsel, the Advisory Board, and national Faculty.  I am also a Co-Chair of the Colorado Industry Liaison Group, as well as a Co-Chair for the Sponsorship Committee for Industry Liaison Group National Conferences.  I have extensive experience and expertise in human resources and legal compliance matters prior to the Director position.  Before to joining The Institute, I was an AVP and compliance consultant for Wells Fargo's Regulatory Compliance

ER-65

Risk Management team.  During my 21 years with Wells Fargo, I also managed the Affirmative

Action & EEO program, including related OFCCP audits and corporate management reviews,

and held several HR positions, including an HR controls compliance consultant and an HR

Generalist.  I graduated from the University of Denver with an M.S. in HR Strategic

Management and HR Employment Relations, and from the University of Colorado with a B.A.

in Sociology.  In my capacity as Director of The Institute, I have knowledge and insight into how

employers handle their EEO-1 Reports.

3.      The Institute is a national non-profit employer association based in Washington,

D.C.  The Institute's mission includes the education of federal contractors regarding their

affirmative action, diversity, and equal employment opportunity responsibilities.  Members of

The Institute are senior corporate leaders in EEO compliance, compensation, legal, and staffing

functions who represent many of the nation's largest and most sophisticated federal contractors.

The Institute's Faculty are recognized as leading practitioners in the field.

4.      There are currently forty-four Institute corporate members coming from a wide

range of industries including finance, tech, manufacturing, hospitality, defense, pharmaceutical,

health care, higher education, insurance, energy, food and beverage and commercial outsourcing.

As part of their membership, these organizations share information and concerns with The

Institute and with other members on EEO compliance, compensation, legal and staffing.

5.      As part of my responsibilities at Wells Fargo, I was familiar with the collection

and submission of data for EEOC's EEO-1 Report.  As Director of The Institute, I have held

discussions with Institute members in our meetings as to their practices with respect to

confidential employee data.  We have specifically discussed whether and why they plan to

publish their EEO-1 Reports prospectively.  All of The Institute's members are required to file

EEO-1 Reports as they are either federal contractors, have more than 100 employees or both. Only those members who are federal contractors are subject to this lawsuit as any release of EEO-1 Reports by EEOC would subject the individual who released them to criminal penalties.[1]

6.     As Director of The Institute, I raised the issue of the release of EEO-1 Reports with our Advisory Board and with our members.  Based on those conversations it is clear that some of our members are now releasing some or part of the data on their EEO-1 Reports.  Other Institute members have not released their data for various reasons discussed in Paragraph 12 below.  The wide variety of approaches taken by federal contractors to releasing their EEO-1 Reports reinforces that whether, how, and when the confidential EEO-1 Reports should be released is an individualized decision, based on factors specific to each company, and varies based on the facts and circumstances of each individual federal contractor.

7.     It is important to understand that federal contractors, including those Institute members who are federal contractors, come from every part of the economy and represent every type of industry with different customs, concerns and experience.

8.     As a former Human Resources professional and as Director of The Institute, I am aware that corporations treat all individualized human resources data as confidential, limiting the number of individuals who have access to such data.  Additionally, aggregated data regarding the demographic composition of the workforce, such as that in the EEO-1 Reports, is generally maintained even more securely with fewer employees having the ability to access that data.[2]

---

[1] Section 709(e) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-8(e), as amended (Title VII).

[2] In fact, the limited access to race/ethnicity and gender data even internally in corporations continues to be a bone of contention between corporate compliance groups and their Diversity, Equity & Inclusion (DEI) colleagues who prefer broader access to this data.

9.      Historically, all corporations, including Institute members, did not publicly release their EEO-1 Report or the data contained in those reports.  We have seen some changes in recent years.  Now, although most companies still do not disclose their EEO-1 data, some companies, and particularly some larger, public-facing companies, have released some form of this information, and in some cases the full EEO-1 Report themselves, as explained in the following paragraphs.

10.      After George Floyd's murder in 2020, large public corporations including some Institute members were pressured by shareholder proposals from activist shareholders, including the City Comptroller of New York City, and some agreed to publish their EEO-1 Reports prospectively.[3]  It is my understanding that without this pressure, many would not have published their EEO-1 Reports.

11.      Although the pressure from institutional investors and shareholder proposals has increased the number of corporations releasing EEO-1 data prospectively, which corporations disclose EEO-1 Reports varies widely by industry.[4]  While tech companies and utility companies are most likely to release demographic data including EEO-1 Reports, industries in Basic Resources (such as oil and gas) and Telecommunications are less likely to release such data.

12.      I understand from Institute members who have not released their EEO-1 Reports that they have not done so because they consider the information provided to the EEOC to be confidential and because they believe the data could be used by others to the companies'

---

[3] One Diversity Initiative Companies Aren't Backtracking On, *Bloomberg Law News*, Sept. 25, 2023.
[4] *See* Just Capital Report, January 19, 2021, cited in Declaration of Marc Bendick, https://justcapital.com/news/a-small-fraction-of-corporations-share-diversity-data-but-disclosure-is-rapidly-on-the-rise/ ("EEO-1 Report disclosure is heavily concentrated among companies in the technology industry, where 24 companies make up nearly half of all disclosures").

competitive disadvantage.  Specifically, since this FOIA request would release five years of EEO-1 data from which competitors could determine business trends, Institute members are concerned that the workforce numbers in different positions would reveal confidential internal operational decisions as to staffing; that EEO-1 data diversity numbers could be misconstrued harming recruiting and performance; and that having to releasing the confidential data could hurt employee relations because it will break the commitment to keep this data confidential.

13.     Many corporations which have released EEO-1-type data have done so through percentages, not actual numbers.  The specific counts of employees in the EEO-1 Reports by EEO-1 Job Category and demographics provide more information about a company's workforce than percentages of workforce frequently included when reporting diversity numbers.  The specific numbers in the EEO-1 Report are more commercially sensitive than the diversity percentages most companies report publicly.  For example, the counts of the number of employees in the EEO-1 can be used to calculate ratios between the ten EEO-1 Job categories and provide insights into the relative size of the salesforce versus the company overall, or the ratio of Managers to Professionals which can be an indicator of the management span of control and provide insight into the cost structure of a business. This is why many employers in general, and Institute members in particular, publish only percentages of certain workforce demographics. Similarly, year over year changes in the counts of employees by EEO-1 Job Category provide sensitive information about changes in staffing/cost structure.

14.     The importance of this distinction between the employee counts in an EEO-1 report and the percentages used by most employers is recognized by the Global Reporting Initiative (GRI).  They are the provider of the world's most widely used sustainability disclosure standards which cover topics that range from biodiversity to tax, waste to emissions, diversity

and equality to health and safety.  As such, GRI reporting is the enabler for transparency and dialogue between companies and their stakeholders.[5]  The GRI 405-1 standard specifically calls for the use of percentages of employees instead of counts.[6]  The use of percentages strikes an appropriate balance between disclosing the demographic composition of the workforce while enabling employers to keep confidential precise counts of employees by EEO-1 Job Category which are commercially sensitive.

15.     As a general matter, Institute members who voluntarily released their EEO-1 Reports in full, including those who have done so in response to shareholder and other external pressure, are careful to provide context to the data, as the raw data can be misinterpreted in ways harmful to their business.  The raw data in EEO-1 Reports can be misleading and without proper context and understanding of a variety of complex market conditions can be misconstrued to paint an inaccurate picture of a company's diversity efforts.  The raw data can also be misleading because availability based on race and gender can be very different depending on where the company is located.  In addition, any analysis of EEO-1 Reports could misrepresent the actual diversity of the members' workforce. This is another reason that the GRI standards described in Paragraph 14 suggest the use of percentages by employee category rather than the counts by EEO-1 Job Category.

16.     Our members have made it clear that they provide the EEO-1 data to EEOC under the expectation that the data will be protected as confidential under Title VII and FOIA's Exemption 4.  Currently, our Institute members submit their EEO-1 Report directly to the EEOC

---

[5] More information on the GRI is available at: https://www.globalreporting.org/.
[6] GRI is the Global Reporting Initiative and 405-1 is the global standard for ESG reporting which can be viewed here on page 6.

through its portal.[7]  The EEOC then shares the collected data for federal contractors subject to

OFCCP jurisdiction directly with OFCCP.  Former OFCCP Director and current Institute Faculty

member Craig Leen who signed the most recent Memorandum of Understanding among EEOC,

the Department of Labor, and the Department of Justice ("MOU")[8] has told The Institute that he

believes the confidentiality provisions in Section 5 in the MOU strengthen the agency's

obligations to protect the EEO-1 data.  This position is reinforced by the FAQ on how to handle

the confidentiality of EEO-1 data which requires the agency to determine whether Exemption 4

of FOIA will apply to federal contractors' EEO-1 Reports on a case-by-case basis.[9]

17.     The Institute members who expected the EEO-1 data to be kept confidential were

surprised and dismayed that their EEO-1 Reports could be made public without an individualized

assessment of the facts and circumstances specific to each company.  They consider the efforts of

CIR to access all federal contractors' EEO-1 Reports as though FOIA Exemption 4 does not exist

as an "end-run" around the requirements of both the Civil Rights Act of 1964 and FOIA.

18.     The efforts of CIR to eliminate the ability of federal contractors to protect their

EEO-1 Reports from being released under FOIA Exemption 4 places federal contractors at a

substantially significant competitive disadvantage as compared to their competitors which are

not federal contractors.

---

[7] This is a change from the process cited in *Sears Roebuck & Co. v. Gen. Servs. Admin*, 509 F. 2d
527, 529 (D.C. Cir. 1974) when the data was collected under Executive Order 11246 as OFCCP
no longer collects the EEO-1 Report jointly with OFCCP but rather receives the data from EEOC
after EEOC collects it.  *See* EEOC website at https://www.eeocdata.org/eeo.
[8] *See* 2020 Memorandum of Understanding among US Department of Labor, the Equal
Employment Opportunity Commission and the Department of Justice,
https://www.eeoc.gov/memorandum-understanding-among-us-department-labor-equal-
employment-opportunity-commission-and-us.
[9] OFCCP FOIA FAQ 6--How does OFCCP determine to release or withhold EEO-1 data,
https://www.dol.gov/agencies/ofccp/faqs/foia#Q6.

19.     In response to CIR's FOIA requests for contractors' 2016-2020 EEO-1 Reports, some of the Institute members did not submit formal objections to OFCCP, as discussed in Paragraph 21 below.  Many Institute members did object, however.  Even some of the corporations that have agreed to release certain diversity data prospectively, including in some cases their EEO-1 Reports, objected to the release of their EEO-1 Reports in response to CIR's FOIA request as the request is for five years of data, which will provide competitors and others with trend data that could be commercially harmful.

20.     The Institute members who decided not to object to the release of their EEO-1 Reports customarily keep this information confidential.  Nevertheless, they made the decision not to object to the release for a number of different reasons.  Many cited the expense in challenging the release while others have explained that they did not receive notice of the requests in time to submit objections.  These non-objectors do not consider themselves to have released their reports voluntarily.

21.     The trend toward voluntary disclosure of diversity information, as discussed in Paragraphs 10 to 14 above, now appears to be slowing, with recent developments in the legal climate (including the *Students For Fair Admissions* case) and public opinion.  Based on these developments, including the litigation against corporate diversity, equity and inclusion programs, Institute members are increasingly concerned about public scrutiny and litigation over their attempts to increase and maintain diversity.[10]  Even those Institute members who previously

---

[10] For example, one of the most active conservative groups—Steven Miller led AFL -- has filed complaints seeking to have the EEOC investigate companies' alleged discriminatory DEI programs.  Although the complaints are not public, AFL reports that it has filed complaints against Activision/Blizzard, Alaska Air, Anheuser-Busch, DICK'S Sporting Goods, The Hershey Company, The Kellogg Company, Lyft, Major League Baseball, Mars, McDonald's Corporation, Morgan Stanley, Nordstrom, Inc., Salesforce, Starbucks, Unilever, and Yum! Brands.  Additionally, Advocacy groups, including the American Civil Rights Project ("ACRP"), have

agreed to release their EEO-1 Report (or did not object to the release of the reports) are concerned about the consequences of this release. Those Institute members who have not released their EEO-1 Reports are even more concerned about the potential harm that could result from the public availability of this raw data.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 10th day of November, 2023, at 4:00 PM Central.

_Barb L. Moskowitz_

_____

---

sent threat letters to corporations and their boards, claiming that the legal risk associated with DEI programs threatens stockholders' value. ACRP has publicly announced that it sent letters to the boards of American Airlines, Coca-Cola, Levi Strauss & Co., Lowe's, McDonald's, Novartis AG, and Pfizer.

1

2

3                   UNITED STATES DISTRICT COURT

4                  NORTHERN DISTRICT OF CALIFORNIA

5

6   THE CENTER FOR INVESTIGATIVE          )  Case No. 22-cv-07182-WHA
    REPORTING and WILL EVANS,             )
7                                         )
              Plaintiffs,                 )  **DECLARATION OF THE CENTER FOR**
8                                         )  **WORKPLACE COMPLIANCE IN SUPPORT**
        v.                                )  **OF DEFENDANT DEPARTMENT OF LABOR'S**
9                                         )  **OPPOSITION TO CROSS-MOTION FOR**
    UNITED STATES DEPARTMENT OF           )  **SUMMARY JUDGMENT**
10  LABOR,                                )
                                          )
11            Defendant.                  )
                                          )
12  _____)

13

14      I, Danny E. Petrella, state as follows:

15      1.      I serve as Senior Vice President, Compliance, and Assistant General Counsel to the

16  Center for Workplace Compliance ("CWC"). I submit this declaration on behalf of CWC in support of

17  the United States Department of Labor's Opposition to Cross-Motion for Summary Judgment in the

18  above-captioned matter. I have personal knowledge of the following facts and if called to testify, I could

19  and would competently testify thereto.

20      Professional Background

21      2.      I serve as an elected officer to the Center for Workplace Compliance, formerly known as

22  the Equal Employment Advisory Counsel. I am also an attorney and partner with the law firm NT Lakis,

23  LLP. My practice focuses on leveraging both legal and practical experiences to develop solutions to the

24  daily challenges employers face under a myriad of labor and employment laws, with a particular

25  emphasis on the nondiscrimination and affirmative action requirements enforced by the Labor

26  Department's Office of Federal Contractor Compliance Programs ("OFCCP"). I have 18 years of

27  professional experience counseling and representing employers on matters before the OFCCP, the Equal

28  Employment Opportunity Commission ("EEOC"), the National Labor Relations Board, and many other

1  federal, state, and local workplace regulatory and enforcement agencies. This experience includes

2  providing regular advice and counsel regarding compliance with the Employer Information ("EEO-1")

3  Report.

4       <u>The Center for Workplace Compliance</u>

5       3.     Founded in 1976, the Center for Workplace Compliance ("CWC") is the nation's leading

6  nonprofit association of employers dedicated exclusively to helping its members develop practical and

7  effective programs for ensuring compliance with fair employment and other workplace requirements.

8  CWC's membership includes approximately 200 major U.S. employers, collectively providing

9  employment to millions of workers.

10       4.     CWC's directors and officers include many of industry's leading experts in the fields of

11  fair employment, workplace compliance, and risk management. Their combined experience gives CWC

12  a unique depth of understanding of the practical, as well as legal, considerations relevant to the proper

13  interpretation and application of workplace rules and regulations.

14       5.     All CWC member companies are employers subject to the federal employment

15  nondiscrimination statutes enforced by the EEOC and are required to file EEO-1 Reports each year. The

16  vast majority are also federal contractors subject to the nondiscrimination and affirmative action

17  obligations imposed by Executive Order 11246, the Rehabilitation Act of 1973, and the Vietnam Era

18  Veterans' Readjustment Assistance Act, and their implementing regulations.

19       6.     CWC has a long track record of working closely with the EEOC to ensure that the EEO-1

20  Report maintains its relevance and utility to both the Commission and the employers who must file it.

21  Indeed, over the years, CWC has many times been the only organization to submit public comments in

22  response to the EEOC's invitations for stakeholder input on the burdens and utility of the EEO-1 Report

23  under the Paperwork Reduction Act (*See, e.g.*, the supporting documents maintained by the Office of

24  Management and Budget related to EEOC's <u>2014</u>, <u>2011</u>, and <u>2009</u> information collection requests for

25  approval of the EEO-1 Report.). And, for more than three decades, we have regularly communicated

26  less formally with Commission staff in an attempt to resolve practical concerns regarding the EEO-1

27  reporting process in ways that facilitated timely and compliant reporting.

28       7.     The overwhelming majority of CWC's membership consist of employers that are subject

DECLARATION OF THE CENTER FOR WORKPLACE COMPLIANCE
No. 22-cv-07182-WHA        2    ER-75

1   to the Freedom of Information Act ("FOIA") request from Will Evans and the Center for Investigative

2   Reporting (CIR) seeking "all Type 2 Consolidated Employer Information Reports, Standard Form 100

3   (EEO–1 Report), filed by federal contractors from 2016–2020," and were informed of this matter

4   following the OFCCP's August 19, 2022 *Notice of Request Under the Freedom of Information Action*

5   *Act for Federal Contractors' Type 2 Consolidated EEO-1 Report Data* (87 Fed. Reg. 51,145).

6        8.     Dozens of CWC member employers filed objections with OFCCP in response to the

7   above-referenced FOIA request. And yet, dozens of other CWC member employers elected *not to file an*

8   *objection*, and their EEO-1 data have since been released by the OFCCP. Having engaged in detailed

9   discussions with both groups of employers over the past year, CWC is uniquely qualified to comment on

10   this matter, and we feel that the court can benefit from understanding the varying perspectives within

11   each of these employer groups.

12        <u>Employers Whose Data Have Been Released</u>

13        9.     As a threshold matter, we respectfully disagree with the notion offered by the Plaintiffs

14   that "industry standard is to disclose EEO-1 data" (Plaintiffs' Cross-Motion, Dkt. No. 39 at 23). First,

15   federal contractors do not reflect a single "industry," but rather are a group of employers diverse in size,

16   function, and geography, spanning multiple industries within the North American Industry Classification

17   System ("NAICS"). Indeed, the EEO-1 dataset released by the OFCCP thus far in this litigation reveals

18   employers identified in over eight hundred (800) unique NAICS designations.

19        10.     Second, we disagree with Plaintiffs' assumption that "customary practices" can be

20   inferred from the fact that some employers reveal their diversity data while others did not file an

21   objection with OFCCP. Employers that did not file an objection with the OFCCP in the instant matter

22   did so for a variety of reasons.

23        11.     For example, some employers (a minority, even among our membership of large

24   employers) already release their consolidated "Type 2" EEO-1 Reports each year, at times voluntarily,

25   and other times in response to increasing pressure from shareholders, advocacy groups, and media

26   entities.

27        12.     Employers who disclose their consolidated EEO-1 Reports often do so while providing

28   additional context to the data in those reports, such as part of a larger discussion regarding the

1    company's diversity challenges and successes, and by contrasting their data against the aggregate EEO-1

2    data of their respective industries. Providing this context takes employers time and often considerable

3    resources that are not enjoyed by all employers.

4         13.    In releasing these reports, employers often redact sensitive information, such as the

5    personal contact information of the employer's certifying official, and small headcounts that could be

6    used to identify the race, ethnicity, and gender of at least some individual employees. This is particularly

7    true in all instances where a specific "cell" on an EEO-1 Report – that is, a specific race, ethnicity,

8    gender, and EEO-1 job category – displays a small number such as one (1) or two (2). In these cases,

9    anyone reviewing the disclosed information would be able to identify confidential race, ethnicity, and

10   gender information of employees simply by cross-referencing other publicly available information about

11   these employees' jobs, such as information that is available on social media sites.

12        14.    Other employers do not release the headcount for each job group and demographic

13   category, but instead provide the percentage of employees that are included within each category as a

14   way of mitigating the harm of releasing the precise headcount from each category.

15        15.    Still, prior to the instant litigation, a larger group of employers did not—and still do

16   not—release their consolidated EEO-1 reports. Yet some of these employers declined to file an

17   objection with OFCCP because they were concerned how such objections, if disclosed, might be used to

18   cast the organization in a negative light, invite scrutiny by Plaintiffs, and expose the organization to

19   unjustified reputational harm.

20        16.    Other employers did not raise an objection due to the time, expense, and distraction of

21   participating in litigation.

22        17.    Yet another group of employers simply were not aware of the instant litigation and the

23   underlying FOIA request and learned of this matter only after their data had been made public by

24   OFCCP.

25        18.    The motivations of these employers, both big and small, vary wildly and one should not

26   presume that the inactions of one group of employers—in this case, those that failed to file an objection

27   under FOIA—have anything to do with the employers that elected to exercise their rights under the

28   Freedom of Information Act.

1    <u>Employers That Filed FOIA Objections</u>

2    19.    Employers that filed a FOIA objection with OFCCP did so because they believe that the

3    EEO-1 Reports reflect and contain confidential commercial information, which are exempt from

4    disclosure pursuant to FOIA Exemption 4 as set forth at 5 U.S.C. § 552(b)(4). Additionally, they expect

5    that the release of these data, particularly without context and over a period of several years, may harm

6    their commercial or financial interests.

7    <u>The EEO-1 Reports Contain Commercial Information</u>

8    20.    The EEO-1 Reports, and the data contained therein, reveal information about the nature,

9    character, structure, and operations of an organization's business. EEO-1 Reports reflect the exact

10   number of employees by race, ethnicity, and sex in each of the ten (10) EEO-1 job categories as of a

11   specific point in time each year. These data disclose information about an employer's staffing strategies,

12   including, importantly, the ratios between and among EEO-1 job categories.

13   21.    While the EEO-1 job categories have been described by some as "general," the fact

14   remains that the EEO-1 job classification system remains one of the *only* classification systems that

15   links employers both within and across industries. Indeed, because of its standardization, employers

16   regularly use this classification system in assessing their own staffing patterns and demographics,

17   particularly as they fare against aggregate benchmarks published by the EEOC each year.

18   22.    Once disclosed, the headcount information in the EEO-1 for any one individual year

19   identifies how an employer has deliberately staffed areas of its business to maximize efficiencies,

20   operations, and profit, and to minimize unnecessary expenses. This includes, for example: how many

21   Executive and Senior Level Officials and Managers employed versus those classified as a First/Mid-

22   Level Official and Managers; how many First/Mid-Level Officials and Managers employed versus the

23   headcounts these individuals manage in each of the remaining eight (8) non-management EEO-1 job

24   categories; and how many Sales Workers an employer maintains to generate revenue, which in

25   combination with other available financial information could be used to calculate approximate revenue

26   generated per Sales Worker. Furthermore, within a given industry, the data reveals staffing patterns in

27   those EEO-1 job categories that are critical, and in some cases unique, to sensitive areas of an

28   employer's business.

23. Moreover, the composition of an employer's workforce, and the demographics of that workforce is inherently "commercial." Employers regularly use this information to generate representational benchmarks, to assist in recruiting, and to allow management to determine areas of opportunity to increase diversity. Increased diversity in turn ensures the consideration of different perspectives and permits the employer to meaningfully serve its customers.

### Employers Protect These Data to Prevent Competitive Harm

24. As noted earlier, once disclosed, the data described above would allow an employer's competitors to gain a competitive advantage by identifying how an employer has deliberately staffed segments of its business to maximize efficiencies, operations, and profit, and minimize unnecessary expenses.

25. The harm caused by release of these data in any given year is only compounded when the data for multiple consecutive years are disclosed, as is the case with the Plaintiff's request in this case. Releasing these data over multiple consecutive years allows competitors to discern additional information about year-over-year changes to staffing and structure, including the nature and frequency of changes resulting from highly confidential business plans.

26. Furthermore, competitors will be able gain a competitive advantage from determining those job categories where a competitor has invested or is investing in additional personnel or, conversely, has reduced or is reducing personnel. Especially paired with other sources of available information and a competitor's own knowledge of the industry, this provides insight into a competitor's confidential business growth or development plans.

27. Finally, employer demographic data, once released, can also be used by competitors, advocacy groups, and media outlets to paint a negative picture of the employer and expose the organization to reputational harm. This is often accomplished by "cherry picking" key demographics without important context such as workforce trends, availability benchmarks, and market constraints. This has real and concrete economic implications. Scrutiny of demographic data can lead to consumer boycotts and threats of (or actual) litigation. Over time, reputational harm can manifest as long-term damage to revenue, employee engagement and retention, and facilitate diversity poaching efforts from competitors.

<u>Employers Customarily and Actually Regard Their EEO-1 Reports as Confidential</u>

28.     Employee demographic data, in particular their race, ethnicity, and sex of individual employees, are among the most confidential information maintained by employers. Indeed, these data, alongside other confidential information such as one's status as an individual with disability and other medical records, are typically kept confidential and inaccessible to all but a small number of an employer's staff who must have access to these sensitive data pursuant to their job responsibilities—notably, those responsible for compliance with federal reporting requirements.

29.     The tabulated race, ethnicity, and sex information contained in EEO-1 Reports and data are retrieved, processed, and submitted to the EEOC by an even smaller number of employees, and these tabulated reports and data typically reside on servers with access limited to only authorized employees. In turn, EEOC-provided security credentials (username and password) to access and file EEO-1 Reports and Data are shared only with those individuals whose services are necessary for ensuring compliance with EEO-1 requirements.

30.     So too, does the EEOC designate this information as confidential, whose regulations provide that employers should maintain "a permanent record as to the racial or ethnic identity of an individual for purpose of completing the [EEO-1 Report] only where the employer keeps such records separately from the employee's basic personnel form or other records available to those responsible for personnel decisions, *e.g.*, as part of an automatic data processing system in the payroll department." 29 C.F.R. § 1602.13.

<u>Employers Submit EEO-1 Reports to the Government with Express and Implied Assurances of Confidentiality</u>

31.     Employers file their EEO-1 Reports directly with the EEOC based on the assurance of confidentiality provided under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-8(e), which states that "It shall be unlawful for any officer or employee of the Commission to make public in any manner whatever any information obtained by the Commission pursuant to its authority under this section prior to the institution of any proceeding under this subchapter involving such information. Any officer or employee of the Commission who shall make public in any manner whatever any information in violation of this subsection shall be guilty of a misdemeanor and upon

1   conviction thereof, shall be fined not more than $1,000, or imprisoned not more than one year."

2       32.     This provision makes clear that were an employee of the EEOC to disclose, in the

3   absence of an "investigation" under Section 2000e-8(e), any of the EEO-1 Reports or Data now being

4   sought by the Plaintiff, such employee would be guilty of a misdemeanor and subject to fine or

5   imprisonment. This explicit assurance of confidentiality is an essential part of the overall recordkeeping

6   and reporting scheme established by the EEOC. It should not be voided or violated by OFCCP through

7   the disclosure under FOIA of the very data that the EEOC is prohibited by law from disclosing.

8       33.     With this framework in mind, employers collect from their employees the sensitive race,

9   ethnicity, and sex data required for the EEO-1 Report based on similar assurances of confidentiality. For

10  example, the EEOC's EEO-1 Instruction Booklet states that employers should collect these data with the

11  promise of confidentiality, offered through the following statement: "The employer is subject to certain

12  governmental recordkeeping and reporting requirements for the administration of civil rights laws and

13  regulations. In order to comply with these laws, the employer invites employees to voluntarily self-

14  identify their race or ethnicity. Submission of this information is voluntary and refusal to provide it will

15  not subject you to any adverse treatment. The information obtained will be kept confidential and may

16  only be used in accordance with the provisions of applicable laws, executive orders, and regulations,

17  including those that require the information to be summarized and reported to the federal government

18  for civil rights enforcement. When reported, data will not identify any specific individual."

19      34.     Employers routinely follow the EEOC's instructions and include similar if not identical

20  statements to the sample language provided by the EEOC, to assure employees that any data reported to

21  the federal government "will not identify any specific individual."

22      35.     Moreover, these concerns are precisely why the EEOC has implemented strict disclosure

23  criteria to limit even the publication of aggregated EEO-1 Reports and Data that comprise reports from

24  multiple employers for multiple physical locations. For example, the EEOC's Job Patterns For

25  Minorities And Women In Private Industry (EEO-1) website states as follows: "The confidentiality

26  provision which governs release of these data (Section 709 (e) of Title VII of the Civil Rights Act of

27  1964, as amended by the Equal Employment Opportunity Act of 1972) prohibits release of individually

28  identifiable information. Data in aggregated format for major geographic areas and by industry group for

DECLARATION OF THE CENTER FOR WORKPLACE COMPLIANCE
No. 22-cv-07182-WHA                    8      ER-81

1   private employers (EEO-1) are available. The following tables are national aggregations by those

2   industries with the greatest employment. With the release of EEOC data from 2016 forward, new

3   disclosure criteria were implemented and applied at all aggregate types to ensure the protection of

4   identifiable information of our survey respondents and maintain EEOC's commitment to protect the data

5   confidentiality. Participation rates and certain industry aggregates are no longer published due to

6   disclosure limitation rules."

7        36.     The EEOC's implementation and application of disclosure criteria for EEO-1 Reports

8   reinforces the express assurance set forth above that EEO-1 Submitting companies understand that

9   reports and data are confidential and will be treated as such by any and all federal agencies that come

10   into possession of those EEO-1 Reports and Data, including OFCCP. It would be incongruous, indeed

11   absurd, and contrary to the expectations of submitting companies, for one of the two federal civil rights

12   enforcement agencies responsible for administering the EEO-1 Report to freely disclose under FOIA the

13   very same data and information that the other federal civil rights enforcement agency responsible for

14   administering the EEO-1 Report is prohibited by statute from disclosing.

15        I declare under penalty of perjury under the laws of the United States that the foregoing is true

16   and correct.

17        Executed this 10th day of November, 2023, at Washington, D.C.

18

19

20                           _____

21                           Danny E. Petrella

22

23

24

25

26

27

28

1

2          UNITED STATES DISTRICT COURT

3          NORTHERN DISTRICT OF CALIFORNIA

4

5  THE CENTER FOR INVESTIGATIVE          ) Case No. 22-cv-07182-WHA
   REPORTING and WILL EVANS,            )
6                                        )
          Plaintiffs,                    ) **DECLARATION OF QUINETTA M.**
7                                        ) **ROBERSON, Ph.D., IN SUPPORT OF**
      v.                                 ) **DEFENDANT DEPARTMENT OF LABOR'S**
8                                        ) **MOTION FOR SUMMARY JUDGMENT**
   UNITED STATES DEPARTMENT OF           )
9  LABOR,                                )
                                         )
10         Defendant.                    )
                                         )
11 _____)

12         I, Quinetta M. Roberson, Ph.D., state as follows:

13         1.      My name is Quinetta M. Roberson. Having provided an expert declaration in the case of

14 Center for Investigative Reporting v. U.S. Department of Labor (Document 34-2, filed 8/18/23), I was

15 asked by the Assistant United States Attorney, Deputy Civil Chief of the Northern District of California,

16 on behalf of the U.S. Department of Labor, to respond to the declaration of Marc Bendick, Jr., Ph.D. in

17 opposition to defendant's motion for summary judgment and in support of plaintiffs' cross motion for

18 summary judgment (hereafter, "Bendick's Declaration").

19         2.      I was asked to offer my thoughts on accuracy of the analyses offered and principal

20 conclusions drawn regarding commercially-valuable information contained in or derivable from Federal

21 contractors' Type 2 Consolidated EEO-1 records, confidential personal information contained in or

22 derivable from those records, and foreseeable harm likely to result from public release of those records.

23 EEO-1 reports. Although Dr. Bendick agrees in his Declaration that many firms use diversity data in

24 designing and managing aspects of their internal operations (see Paragraph 33), he attempts to debate the

25 commercial value and confidentiality of information contained in EEO-1 Type 2 Consolidated Records.

26 Yet, much of his debate is either unsupported or imprecise. This declaration offers my best scientific

27 judgment of the accuracy and appropriateness of the claims made in Dr. Bendick's Declaration.

28

1    3.      In Paragraph 8, Dr. Bendick indicates that "to economists, other business analysts, and

2    business managers, commercially-valuable information takes one of three forms": managerial

3    information, financial information, and trade secrets. He defines the former, managerial information, as

4    that which "concerns internal management of revenue-producing aspects of a firm – for example, sales

5    costs, profit margins, resource allocation, and strategic plan for different parts of its operations or

6    different products." Although this is a definition of managerial accounting and how it helps managerial

7    decision-making as stated by the Institute of Management Accountants[1], Dr. Bendick ignores that the

8    types of information included in EEO-1 are used in the development of diversity strategic plans and

9    therefore, constitutes managerial information in this important regard. For example, in the Diversity,

10   Equity and Inclusion Strategic Plan (2022-2025) for the Federal Reserve System, a stated strategy for

11   attracting highly qualified and diverse slates of applicants and candidates is to "Use data from annual

12   diversity and EEO reports to support divisions in the development of action plans with relevant and

13   measurable results to address underrepresented workforce demographics in major job families".[2]

14   Similarly, research suggests that EEO-1 data can be considered an indicator of a firm's diversity

15   commitment, as organizational leaders who work with and evaluate such data are positioned to address

16   staffing and compensation patterns.[3] As HR costs directly related to bringing goods and services to

17   market are incorporated into sales costs and subsequently, influence profit margins, diversity data may

18   be considered managerial information. Thus, while there might be certain broad business decisions

19   where diversity data are not relevant, there are many for which they are both commercially relevant and

20   valuable

21   4.      In Paragraph 11, Dr. Bendick assumes that "economists, other business analysts and

22   business managers do not generally consider such broad descriptive workforce data to be commercially

23   valuable managerial or financial information" based on what is described as "a widespread complaint

24

25   [1] Institute of Management Accountants (IMA) (2008), Definition of Management
     Accounting, Montvale, NJ.

26

27   [2] https://www.federalreserve.gov/publications/files/distrategicplan_202211.pdf

28   [3] Graham, M. E., Belliveau, M. A., & Hotchkiss, J. L. (2017). The View at the Top or Signing at
     the Bottom? Workplace Diversity Responsibility and Women's Representation in Management. *ILR
     Review*, *70*(1), 223-258.

SUPPLEMENTAL DECLARATION OF QUINETTA ROBERSON
No. 22-cv-07182-WHA                        2        ER-84

1  among corporate executives and managers with profit-and-loss responsibility that HR reports

2  chronically provide nothing of value to them". However, he makes this claim based on a 2005 *Fast*

3  *Company* article that speaks to the competence of human resource departments in handling

4  "administrivia" yet their inability to take on the more "strategic role of raising the reputational and

5  intellectual capital of the company".[4]  This research, on which Dr. Bendick relies, is outdated as

6  contemporary scholarly and practitioner research shows HR to be a core operational function and

7  demonstrates the evolution and strategic value of the HR function.[5] As noted in a recent Forbes article,

8  "over the past few years, the role of the chief human resources officer has been thrust to the forefront as

9  an invaluable company asset."[6]

10    5.    Dr. Bendick also generalizes the tenets of the 2005 *Fast Company* article to the diversity

11  function, which is not referenced by the authors. Further, the diversity function is distinguished from the

12  HR function in current organizational structures.[7]

13    6.    Dr. Bendick opines that EEO-1 reports are regarded only as a compliance requirement

14  and are considered "so uninformative for business purposes that they are not generally even consulted in

15  operational or financial decision-making (see Paragraph 12). However, this is a generalized assertion

16  that is unsupported by research. He also takes a very narrow view of business purposes and decision-

17  making, one that does not acknowledge the business case for or business value of diversity.[8] Further,

18  this perspective is at odds with his work which suggests a business case for diversity and inclusion[9] as

19

20    [4] Erroneously referenced in Bendick's Declaration as *Fast Company*, December 19, 2007, the correct citation is: Hammonds, K. H. (2005, August). Why we hate HR. *Fast Company*, 97, 40-47.

21    [5] Storey, J., Ulrich, D., & Wright, P.M. (2019). *Strategic Human Resource Management: A Research Overview* (Routledge). Komm, A., Pollner, F., Schaninger, B. & Sikka, S. (2021, March 12). The new

22  possible: How HR can help build the organization of the future. *McKinsey & Company*: https://www.mckinsey.com/capabilities/people-and-organizational-performance/our-insights/the-new-

23  possible-how-hr-can-help-build-the-organization-of-the-future
    [6] Majercsik, E. (2023, September 5). The evolution and future of the HR leader. Forbes:

24  https://www.forbes.com/sites/forbeshumanresourcescouncil/2023/09/05/the-evolution-and-future-of-the-hr-leader/?sh=47b0d0a3596f

25    [7] Shi, W., Pathak, S., Song, L. J., & Hoskisson, R. E. (2018) The adoption of chief diversity officers among S&P 500 firms: Institutional, resource dependence, and upper echelons accounts. *Human*

26  *Resource Management*, 57: 83–96.

27    [8] Eswaran, V. (2019, April 29). The business case for diversity in the workplace is now overwhelming. *World Economic Forum*: https://www.weforum.org/agenda/2019/04/business-case-for-

28  diversity-in-the-workplace/
    [9] Bendick, M., Egan, M. L., & Lanier, L. (2010). The business case for diversity and the perverse

SUPPLEMENTAL DECLARATION OF QUINETTA ROBERSON
No. 22-cv-07182-WHA                          3        ER-85

1   well as statements later in his declaration (see Paragraph 33). Thus, even if the forms themselves are not

2   circulated, they contain information that is used by firms as part of their commercial operations.

3        7.        Dr. Bendick draws attention to an increase in the number of U.S. employers that release

4   their EEO-1 report data annually – from 4% in 2020 to 11% in 2021 – and interprets the increase in such

5   reporting as evidence of "management's judgment that these data contain nothing confidential of

6   commercial relevance." It is important to note that this statistic reveals that 89% of the 1,000 largest

7   firms nationwide were not revealing their data by the end of 2021 and therefore, suggests that the vast

8   majority of these companies did feel that the information should be kept confidential. In addition, Dr.

9   Bendick's perspective ignores several contextual factors that may have influenced disclosure. One such

10  factor is the relevant time period over which the increase in disclosure occurred, as many organizations

11  made a commitment to greater transparency in the composition of their workforces with the murder of

12  George Floyd and accompanying social protests in 2020.[10] Another factor is stakeholder pressures, as

13  one of the articles referenced by Dr. Bendick also notes that investor and advocate groups have pushed

14  for diversity data disclosure in an effort to hold companies accountable for these commitments.[11] There

15  are also variations in disclosure according to industry. Because decisions to disclose EEO-1 report data

16  are not made in a vacuum, it cannot be inferred from disclosure statistics provide evidence of

17  "management's judgment that these data contain nothing confidential of commercial relevance", as

18  concluded by Dr. Bendick.

19       8.        The *Just Capital* article that Dr. Bendick references also notes that not all of the

20  disclosing companies released their EEO-1 reports. Instead, some published a modified version of the

21  report, which presents percentages instead of counts, features select job categories, alters or condenses

22  the job categories listed, or omits job categories altogether.

23

24  _____

     practice of matching employees to customers. *Personnel Review*, 39, 468-486.

25       [10] Green, J. (2023, September 25). There's one diversity initiative companies aren't likely to
     backtrack on. Bloomberg: https://www.bloomberg.com/news/articles/2023-09-25/transparency-is-one-
26   workplace-diversity-effort-that-companies-won-t-backtrack-on?embedded-checkout=true

27       [11] Vaghul, K. (2021, January 19). A small fraction of corporations share diversity data, but
     disclosure is rapidly on the rise. *Just Capital*: https://justcapital.com/news/a-small-fraction-of-
28   corporations-share-diversity-data-but-disclosure-is-rapidly-on-the-
     rise/#:~:text=As%20of%20January%202021%2C%20only,by%2027%20from%20December%202019.

1       9.     In Paragraphs 14-23, Dr. Bendick elaborates on three assumed characteristics of the data

2    in EEO-1 reports that make such reports "essentially worthless" (see Paragraph 16). The first assumed

3    characteristic is that EEO-1 records "provide data on broad categories of employees that are not possible

4    to relate to specific commercial activities" (see Paragraph 18). Dr. Bendick overlooks the specificity of

5    such information relative to representation. Information on the representation of various groups at each

6    level may be used by a company to benchmark the effectiveness of its approach to diversity

7    management relative to competitors. Similarly, while companies may not be able to infer information

8    about specific geographic location (see Paragraph 20), employment data across levels from the EEO-1

9    reports may be used to do comparative workforce planning against those with whom they share a labor

10    market. Data from EEO-1 reports, alone and in combination with other reports, have also been used by

11    investors to assess the effectiveness of a company's human capital management program and to

12    determine the economic value of firms.[12] Therefore, it represents useful information to competitors and

13    other stakeholders.

14       10.    The second assumed characteristic is that the data in EEO-1 reports are "retrospective

15    and old" and unrevealing of "anything useful about a firm's current capabilities or future intentions" in

16    today's "fast-moving world of business" (see Paragraph 21-22). Although Dr. Bendick conceptualizes

17    data that is two or more years old as unrevealing of "anything useful about a firm's current capabilities

18    or future intentions", this two-year benchmark is unsupported. The 1995 *MIT Sloan Management*

19    *Review* article references actually focuses on the time horizon in which U.S. companies expect to realize

20    gains from capital expenditures rather than on the timeframe for data usefulness. Similarly, the

21    *International Journal of Production Economics* article referenced focuses on different planning horizons

22    for optimizing supply chain decisions rather than on the age or utility of information.

23       11.    In his argument about the usefulness of data in EEO-1 reports, Dr. Bendick also supposes

24    that workforce diversity is not a capability-creating resource for a firm. Yet, my research and that of

25    others identifies a subset of capabilities through which firms can extract benefits from diversity,

26

27

28

---

[12] As You Sow and Whistle Stop Capital (2022). *Workplace Diversity and Financial Performance: An Analysis of Equal Employment Opportunity (EEO-1) Data*: https://www.asyousow.org/report-page/workplace-diversity-and-financial-performance.

including market access, innovation, and strategic flexibility.[13] Dr. Bendick's opinion also ignores the value of workforce composition data over time, which can used to determine goal progress in staffing, retention or other aspects of workforce planning. Further, while composition data itself may be useful for identifying a problem, the examination of such data over time can help to identify problems in employee-management processes, such as staffing, performance management and promotion.[14]

12.     The third assumed characteristic of EEO-1 reports are that they are "incomplete as measures of a firm's productivity capacity or strategic intentions" (see Paragraph 23). While it is accurate that firms cannot gain insight into the qualitative nature of competitors' "production capacity or expertise" based on their EEO-1 reports, it is inexact to assume that such reports do not provide information on a firm's human capital and its diversity resources at different levels. Dr. Bendick uses an example of a package delivery company interested in assessing the volume of packages a competitor can process and makes the point that an EEO-1 report "would not reflect the competitor's possible subcontracting or teaming with other package delivery services for the services of delivery vehicles and their drivers (see Paragraph 24). Yet, an EEO-1 report would reflect the diversity of the competitor's workforce and subsequently, signal its attractiveness for "team agreements, alliances, partnerships or subcontracts with other firms", which is how Dr. Bendick's argues that strategic moves occur (see Paragraph 23).

13.     In Section V of his declaration, Dr. Bendick poses a question as to "why would firms bother with implausible analyses and far-fetched interpretations of EEO-1 reports when more relevant, more accurate answers are available faster and cheaper elsewhere?" (see Paragraph 26). To illustrate this question, he offers a hypothetical example of a hospital chain interested in gaining insight into "the expansion intentions or actions of its possible competitor" and lists a range of sources of such

---

[13] Declaration of Quinetta Roberson, Ph.D., Document 34-2, filed 8/18/23. Roberson, Q. M., Holmes, O. H. & Perry, J. L. (2017). Transforming Research on Diversity and Firm Performance: A Dynamic Capabilities Perspective. *Academy of Management Annals*, 11, 189-216. Cox Jr., T., & Blake, S. (1991). Managing cultural diversity: Implications for organizational competitiveness. *Academy of Management Executive*, *5*, 45–56.

[14] Williams, J. C., & Dolkas, J. (2022, March-April). Data-driven diversity. *Harvard Business Review*.

SUPPLEMENTAL DECLARATION OF QUINETTA ROBERSON
No. 22-cv-07182-WHA                    6          ER-88

1  information (see Paragraph 27). While he is correct in that the sources listed may be useful for garnering

2  such information, he ignores the appropriateness of these sources for workforce diversity data.

3  Specifically, although most of these sources do not provide diversity-related information, those that do

4  offer resources for creating equitable and inclusive systems rather than supply diversity data.[15] He also

5  provides a personal example of accessing firm information from Dun and Bradstreet Hoovers (see

6  Paragraph 28), although none of the information obtained was diversity-related data. Thus, his

7  assumption that there are other viable sources of information other than EEO-1 reports is unsupported.

8      14.    In Paragraphs 30-31, Dr. Bendick contests Dr. Patrick McKay's contention that data from

9  EEO-1 reports could be used by firms to poach talent from their competitors and offers alternate sources

10  of information "to determine if a competitor's workforce is ripe for employee poaching."[16] Specifically,

11  he references various job and recruiting sites on which current and former employees can review

12  companies. However, as reviewers are anonymous, voluntarily provide reviews, and have the option of

13  self-identifying along several dimensions, including race/ethnicity, gender, sexual orientation, disability,

14  caregiver status and veteran status, such platforms are not representative of the composition of a firm's

15  workforce but of those who provide reviews. Consequently, the diversity data from such sources are

16  incomplete and potentially misleading.

17      15.    Dr. Bendick also contests my contention that data contained in EEO-1 reports are used

18  by firms in designing and managing aspects of their internal operations and argues that such data "are

19  almost always too broad, too old, and inappropriately structured to relate to the specific internal

20  operations that a firm would need to plan, estimate, or reward" (see Paragraph 33). Yet, there is

21  published scholarly research that shows EEO-1 reports to be useful for uncovering trends in labor

22  segregation, locating such segregation across contexts, and combining with other organizational data to

23  develop diversity-related policies, practices, and interventions.[17]

24

25  [15] Dun & Bradstreet Supplier Diversity Data: https://www.dnb.com/products/third-party-risk/supplier-diversity-data.html. Health Equity Action Library: https://www.aha.org/heal.

26  [16] Declaration of Partick F. McKay, Ph.D., Document 34-1, filed 8/18/2023

27  [17] Kalev, A., Dobbin, F., & Kelly, E. (2006). Best Practices or Best Guesses? Assessing the Efficacy of Corporate Affirmative Action and Diversity Policies. *American Sociological Review, 71*(4), 589–617. Kurtulus, F.A. (2016), The Impact of Affirmative Action on the Employment of Minorities

28  and Women: A Longitudinal Analysis Using Three Decades of EEO-1 Filings. *Journal of Policy Analysis and Management*, 35: 34-66. Kurtulus, F. A., & Tomaskovic-Devey, D. (2012). Do Female

16.     In disputing the commercial value of EEO-1 reports, Dr. Bendick references "firms large enough to employ specialized HR staff" (see Paragraph 12), which is a limiting factor given that many firms – particularly those smaller in size – do not have specialized HR staff.  As EEO-1 reports provide data that can be used for the development of diversity policies and practices (e.g., establishing staffing goals, developing attribution interventions, self-auditing potential areas of inequity, etc.), especially for firms without the resources to assign report management specialized staff, they represent more than "a necessary cost of doing business." Dr. Bendick also assumes that firms would elect to utilize data from other reports compiled by "HR data analysts" and from the company's "Human Resource Information System (see Paragraph 34)", although this presupposition derives from a limited set of firms that would have the financial resources available for such HR investments.

17.     Dr. Bendick argues that I confuse "EEO-1 reports themselves with the race/ethnicity/gender data underlying those reports" (see Paragraph 35) or "the value of data on workforce diversity with the value of workforce diversity itself" (see Footnote 43). While I note and provide evidence of the value of workforce diversity, I also note and provide evidence of how data on workforce diversity at different levels of firms are used for organizational decision-making. These separate values are also based on distinguishable logics of the commercial value of a firm's workforce (i.e., the business case for diversity) and the commercial value of information on a firm's workforce (i.e., the business case for diversity metrics).[18] More importantly, however, is that such evidence indicates the commercial value of EEO-1 data rather than its commerciality and value relative to other sources.

18.     In Paragraphs 37-42, Dr. Bendick argues that "if an outside observer seeks the race/ethnicity/gender of a person she or he has never met, information from which to infer the person's race/ethnicity/gender can frequently be obtained from a variety of non-confidential sources other than

---

Top Managers Help Women to Advance? A Panel Study Using EEO-1 Records. *The ANNALS of the American Academy of Political and Social Science*, *639*(1), 173-197. Robinson, C. L., Taylor, T., Tomaskovic-Devey, D., Zimmer, C., & Irvin, M. W. (2005). Studying Race or Ethnic and Sex Segregation at the Establishment Level: Methodological Issues and Substantive Opportunities Using EEO-1 Reports. *Work and Occupations*, *32*(1), 5-38.

[18] Buttner, E. H., & Tullar, W. L. (2018). A representative organizational diversity metric: A dashboard measure for executive action. *Equality, Diversity and Inclusion: An International Journal,* 37, 219-232.

1   EEO-1 reports" and provides three very specific examples of firms that post employees' names, pictures

2   and other personal information on their website. Yet, this argument only holds *if* the company provides

3   such information. Many organizations do not disclose workforce demographic information (either

4   individualized or in composite form) for several reasons. In addition to some state-level restrictions on

5   employers' use of individuals' personal information (including photos and/or other likenesses for

6   commercial purposes without prior consent), employees may also have concerns about experiencing bias

7   or discrimination based on physical appearance.[19] If such information is not publicly disclosed, EEO-1

8   reports may reveal the demographic membership of employees – particularly those at levels of the firm

9   where they are underrepresented and thus, easily identified.

10      19.     In addition, as research has also shown that photos, including user social media profile

11   images, are by themselves not enough to be a reliable source for inferring demographic information[20],

12   the data contained in EEO-1 reports would supplement in the disclosure of such personal information

13   even if photographs were available.

14          I declare under penalty of perjury that the foregoing is true and correct.

15   Executed this 13th day of November, 2023, at East Lansing, Michigan.

16

17                                          QUINETTA ROBERSON, PhD.

18

19

20

21

22

23

24

25

26   [19] SHRM: *Can an employer use employees' photographs for marketing purposes such as a company web site or promotional materials?* Can an employer use employees' photographs for marketing purposes such as a company web site or promotional literature? (shrm.org)

27   [20] Jung, S.G., An, J., Kwak, H., Salminen, J. & Jansen, B.J. (2017). Inferring social media users'

28   demographics from profile pictures: A Face++ analysis on Twitter users. In *Proceedings of The 17th International Conference on Electronic Business* (pp. 140-145). ICEB, Dubai, UAE, December 4-8.

SUPPLEMENTAL DECLARATION OF QUINETTA ROBERSON
No. 22-cv-07182-WHA                    9        ER-91

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

THE CENTER FOR INVESTIGATIVE
REPORTING and WILL EVANS,

      Plaintiffs,

      v.

UNITED STATES DEPARTMENT OF
LABOR,

      Defendant.

Case No. 22-cv-07182-WHA

**SUPPLEMENTAL DECLARATION OF
HELENE BAXTER IN SUPPORT OF
DEFENDANT DEPARTMENT OF LABOR'S
OPPOSITION TO PLAINTIFFS' MOTION**

I, Helene Baxter, state as follows:

1.    I am Vice President, Corporate Employment Counsel for Universal Services of America, LP d/b/a Allied Universal Security Services ("Allied Universal").  I submit this supplemental declaration in support of the United States Department of Labor's ("DOL's") Opposition to Plaintiffs' Cross-Motion for Summary Judgment in the above-captioned matter.  I have personal knowledge of the following facts and if called to testify, I could and would competently testify thereto.

2.    In my first Declaration in Support of Defendant's Motion for Summary Judgment, I explained why Allied Universal considers the information summarized in the EEO-1 reports, including Allied Universal's headcount numbers in different job categories, adjustments to those headcounts year-to-year, ratios between security guard positions (EEO-1 category 9) and client support and management positions, to be core commercial information.  These staffing metrics are constantly monitored, analyzed, and adjusted by Allied Universal management.

3.    Moreover, the data incorporated within Allied Universal's EEO-1 Type 2 reporting is commercially valuable to the Company because it is critical to its profitability and success. This is due in part to the fact that the disclosure of totals for Allied Universal's EEO-1 job category 9, "Service Workers," would mean the disclosure of Allied Universal's headcount for this critical job category. Security guard positions (falling within EEO-1 job category 9, "Service Worker") are those that directly

1   produce the vast majority of Allied Universal's revenue. Comparing this total with the totals associated

2   with Allied Universal's employment of administrators (EEO-1 job category 6, "Administrative

3   Support"), managers (EEO-1 job category 2, "First/Mid. Officials & Managers"), and executives (EEO-

4   1 job category 1, "Executive/Sr. Officials & Managers") would provide competitors with inside,

5   confidential information both on Allied Universal's total guard capacity, and also on the ratios Allied

6   Universal maintains between security guard positions and client support and overhead positions, which

7   constitutes key commercial information in light of Allied Universal's business model.

8       4.    I am aware that Plaintiffs claim that this information may not be valuable because it is

9   "broad and non-specific." This is not the case for Allied Universal. The EEO-1 reports contain specific

10  information about the most critical job categories within the companies. In particular, as described

11  above, EEO-1 Category 9 indicates fairly precisely the quantity of Allied Universal's core commercial

12  asset—its security guards.

13      5.    Allied Universal's concerns regarding the disclosure of its EEO-1 Type 2 data are

14  specific to its industry and business model. These concerns may be distinct from employers in many

15  other industries, who do not have their profit capacity and potential so directly tied to the employee

16  population of a single EEO-1 job category, or to the interplay between a single category and other

17  categories.

18      6.    Further, Allied Universal's concerns regarding the disclosure of its EEO-1 Type 2 data

19  are unique even within its industry (security guard services). Allied Universal is by far the largest

20  private security guard provider in the United States. Given this position, Allied Universal's practices,

21  staffing strategies, and standards influence and drive the practices, strategies, and standards of the U.S.

22  security guard provider market as a whole. Allied Universal maintains its continued competitive

23  advantage in this industry via its innovation with respect to its staffing and business models.

24  Competitors are hungry for any additional information they can acquire about Allied Universal's

25  headcount and staffing strategies in an effort to emulate or reverse engineer its successful operational

26  framework. As such, the disclosure of Allied Universal's EEO-1 Type 2 data would result in a unique

27  and specific impact to the Company that would be different from the potential impact to employers in

28  other industries as well as to other employers within its own industry who do not maintain the influential

SUPPLEMENTAL DECLARATION OF HELENE BAXTER
No. 22-cv-07182-WHA        2    ER-93

1  role maintained by Allied Universal.

2       7.      I am aware that Plaintiffs claim that the EEO-1 numbers may be inaccurate or incomplete

3  because they only count employees, and an employers' staff may include independent contractors or

4  subcontractors. In the case of Allied Universal, this is far from being the case. While the specific totals

5  are kept confidential as discussed in my prior Declaration, Allied Universal employs hundreds of

6  thousands of individuals in security guard positions across the United States. Of the total number of

7  security guard positions currently maintained by Allied Universal within the United States, fewer than

8  250 individuals work in such roles as a subcontractor for Allied Universal. In other words, of Allied

9  Universal's total United States security guard staff, fewer than one thousandth of one percent of such

10 staff are treated as non-employee contractors. These very few and limited roles generally involve highly

11 unique or specialized situation where a traditional employment relationship is not feasible. In all other

12 cases, Allied Universal strives to treat security guards as traditional employees. Accordingly, it is not the

13 case that Allied Universal's EEO-1 numbers are inaccurate indicators of its staffing capabilities.

14      8.      I am also aware that the Plaintiff has alleged that Allied Universal's Environmental,

15 Social and Governance ("ESG") publications disclose or reveal information that would be contained

16 within its EEO-1 Type 2 reporting. This is simply not true. I am familiar with Allied Universal's most

17 recent report, "ESG Report 2022," wherein Allied Universal's ESG highlights and initiatives are

18 outlined. This document does note that Allied Universal is the "third largest employer in North

19 America" and the "seventh largest employer in the world." This report notes the total number of Allied

20 employees worldwide and the total percentage (not number) of female employees and female managers

21 in 2021 and 2022. However, none of these data points provide specific totals for Allied Universal's

22 United States employees by job category or race/ethnicity, as is detailed in Allied Universal's EEO-1

23 Type 2 reports.  That is confidential information that Allied Universal does not disclose.  A copy of

24 Allied Universal's ESG Report 2022 is attached as Exhibit A.

25      9.      I am aware the Plaintiff alleges that Allied Universal features profiles of certain executive

26 employees on its website. On this point, Allied Universal does provide public profiles of its North

27 America Executive Leadership Team at https://www.aus.com/about-us/our-people/north-america-

28 executive-leadership-team. Notably, the executives listed on this website are not exclusively those

SUPPLEMENTAL DECLARATION OF HELENE BAXTER
No. 22-cv-07182-WHA                                3      ER-94

1    working in or over the United States, as the individuals listed also cover areas such as Canada and

2    Mexico. The executives listed on this page include 12 Regional Presidents, eight (8) Business Unit

3    Presidents, and seven (7) Functional Leaders. The information provided for each individual includes a

4    photograph, name, job title, and background information on the individual's role, skills, and/or career

5    experience. These profiles do not provide statements or information for the purpose of confirming the

6    sex or race/ethnicity of any of the executives.

7           10.    The above-described information that Allied Universal provides regarding its North

8    America Executive Leadership Team is specifically focused on the highest-ranking and most public-

9    facing leadership roles within the Company. This information is intended to convey a sense of

10   accountability and confidence to Allied Universal's customers, employees, and to the public. This

11   information is not intended to tout, publicize, or disclose specific demographic information about any

12   particular executive or about Allied Universal's executive and management staff as a whole.

13          11.    Further, it should be noted that such profiles are provided for only a very limited subset

14   of Allied Universal's upper management employees. As discussed herein and in my prior Declaration in

15   this matter, Allied Universal seeks to keep its EEO-1 Type 2 data, which would disclose the number of

16   individuals listed in EEO-1 job category 1 ("Executive/Senior Level Officials and Managers"),

17   confidential. Allied Universal's policy of keeping such information confidential is in no way materially

18   compromised by the publication of the above-noted 27 executive profiles. This is because the executives

19   that are publicly profiled by Allied Universal represent far less than one percent of the total number of

20   individuals employed by Allied Universal in its EEO-1 job category 1. Even where the 27 publicly

21   profiled executives are compared to the smaller subset of those employees listed as "Executive"

22   employees in job category 1.2a of Allied Universal's EEO-1 report, the 27 employees comprise a very

23   small percentage of this total. As such, given the fact that such executive profile information is limited

24   to the highest-ranking Allied Universal officials and given that this information in no way reveals any

25   remotely substantial aspect of Allied Universal's EEO-1 job category 1 totals, the publication of this

26   information does not provide headcount information and in no way impacts Allied Universal's treatment

27   of its EEO-1 Type 2 information as valuable and confidential commercial information.

28          I declare under penalty of perjury under the laws of the United States that the foregoing is true

SUPPLEMENTAL DECLARATION OF HELENE BAXTER
No. 22-cv-07182-WHA                                    4        ER-95

1    and correct.

2        Executed this _____ day of November, 2023, at Palm Beach County, Florida.

3

4                                                        _____

5                                        HELENE BAXTER

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| THE CENTER FOR INVESTIGATIVE REPORTING and WILL EVANS, | ) Case No. 22-cv-07182-WHA<br>)<br>) |
| Plaintiffs, | ) **SUPPLEMENTAL DECLARATION OF**<br>) **PATRICK F. McKAY, Ph.D., IN OPPOSITION** |
| v. | ) **TO PLAINTIFFS' CROSS-MOTION FOR**<br>) **SUMMARY JUDGMENT AND IN SUPPORT OF** |
| UNITED STATES DEPARTMENT OF LABOR, | ) **DEFENDANT'S MOTION (CORRECTED)[1]**<br>)<br>) |
| Defendant. | )<br>) |
| _____ | ) |

I, Patrick F. McKay, Ph.D., state as follows:

1.      This declaration supplements my initial declaration submitted in support of the Department of Labor's motion for summary judgment and addresses points raised in Plaintiffs' cross-motion for summary judgment and the declarations of Dr. Mark Bendick ("Bendick Declaration") and Jamillah Bowman Williams ("Bowman Williams Declaration") on issues relating to the use and value of EEO-1 data and the potential commercial harms to reporting firms should it be publicly released.

2.      The Bendick Declaration argues that workforce data and "HR Reports" are not commercially valuable to organizational functioning.  As a human resource management (HRM) scholar, practitioner, and educator for nearly 25 years, I can say that such a characterization of the HRM function in organizations is inaccurate.

3.      First, the Bendick Declaration speaks generally of "HR reports."  The data in EEO-1 reports contain detailed human resource management ("HRM") data.  HRM involves an organization's effort to acquire, deploy, and retain a qualified workforce, thus allowing a firm to pursue and achieve its strategic objectives. A key component of the HRM system is a company's employee headcount,

---

[1] This corrected filing contains an attachment with references that had been inadvertently omitted from the original filing, Dkt. No. 43-4, and does not contain any other changes to that submission.

1  particularly among those in its core workforce (i.e., employees who are central to a company's

2  production of goods and services such as engineers in an engineering firm), as well as the requisite

3  number of support staff (e.g., administrative personnel, management, etc.) across the occupational

4  categories of its workforce. Employee headcount is a pivotal metric as it represents the human resources

5  a company has at its disposal in pursuing its business objectives (Noe et al., 2022).

6      4.      Failure to monitor the employee headcount effectively can result in employee shortages

7  or surpluses, both of which are damaging to a firm's bottom line (through reduced product

8  generation/service provision and unnecessary labor expenditures, respectively).  For example, a retailer

9  must forecast the number of qualified sales associates it must have deployed on the sales floor to ensure

10 that it provides the requisite quality of customer service, product availability, etc. to sustain the business.

11 Likewise, the retail company must have sufficient headcounts of support staff such as cashiers and

12 product stockers, all needed to build a store workforce that maximizes company revenue, customer

13 service, and repeat business. Companies that have a greater number of qualified workers tend to have

14 higher labor productivity than firms that have a lower number of qualified workers (Della Torre et al.,

15 2018).

16     5.      Moreover, an important function in human resource management is human resource

17 planning, which is undertaken to determine if a company has a sufficient quality and quantity of labor in

18 a year to produce goods and provide services central to an organization's operation. HR planning is part

19 of a firm's overall HRM strategy. Strategic plans consist of short-term (1-2 years) or long-term planning

20 cycles (3-5 years). Consequently, a company's monitoring of employee headcount is not a singular

21 event, but part of a company's overall HRM strategy to ensure that it has the necessary human talent to

22 conduct its business effectively over time. Thus, it is a company imperative, and a central human

23 resource management responsibility, to monitor employee headcounts in terms of sufficient quality and

24 quantity of labor, maintain the optimal ratio of management to labor, and be responsive to needed

25 headcount adjustments to enable a firm to operate effectively, capture market value, and maximum

26 returns to shareholders.

27     6.      The Bendick Declaration states at Paragraph 8 that "To economists, other business

28 analysts, and business managers, commercially-valuable information takes one of three forms:" financial

1  information, trade secrets, and "managerial information," which he describes as "internal management

2  of revenue-producing aspects of a firm -- for example, sales, costs, profit margins, resource allocation,

3  and strategic plans for different parts of its operations or different products."  Staffing activities involve

4  the allocation of human resources, which falls within "resource allocation," which Dr. Bendick concedes

5  is part of managerial information.  And the other parts of "managerial information" that he cites are

6  strongly dependent upon the employee headcounts necessary for a company to function effectively

7  enough to drive revenues, profits, strategic plans for product/business expansion, and other strategic

8  initiatives.

9         7.    In fact, in my business school classes, I teach budding HRM practitioners and managers

10  that company strategic planning is prefaced on product/service demand and the employee headcounts

11  necessary to execute strategic objectives such as meeting desired profit margins, capturing a product

12  market, etc. I teach an HR planning case study that has students compute employee headcount needs

13  (using Markov analysis, a labor need forecasting technique) based upon various forms of employee

14  movements (i.e., promotions, demotions, quitting, etc.) from one year to the next. The employee

15  movements affect the number of employees available to serve in a series of job categories. The

16  identified gaps in employment (e.g., a shortage of 150 sales staff) become hiring targets for the

17  upcoming fiscal year. The assignment aptly demonstrates the commercial importance of managing

18  employee headcount to the effective operation of a business.

19         8.    Dr. Bendick claims that EEO-1 reports do not provide commercially valuable

20  operational, financial, or trade secret information *as commonly understood by economists, other*

21  *business analysts, and business managers*. These professional specialties (and Dr. Bendick's expertise)

22  are outside the area of human resource management. Dr. Bowman Williams, who states that EEO-1 data

23  does not constitute "commercial information," is a lawyer and sociologist with no apparent expertise in

24  HRM.  As a human resource management scholar and practitioner, I strongly disagree with Dr. Bowman

25  Williams's assertion and Dr. Bendick's position that EEO-1 reports are not commercially valuable. This

26  is inconsistent with the scholarship and commonly accepted understanding in my field.

27         9.    First, HRM systems are far from irrelevant to business operations as shown by decades of

28  research on the positive linkage between human resource management system functioning and

SUPPLEMENTAL DECLARATION OF PATRICK McKAY
No. 22-cv-07182-WHA         3     ER-99

1    organizational performance (Combs et al, 2006; Huselid, 1995; Jiang et al., 2012). In response to the

2    impact of HRM on company performance, HRM professionals are no longer viewed as merely support

3    personnel, but key members of the C-suite in most major organizations. On November 8, 2023, Jacqui

4    Canney, Chief People Officer at ServiceNow, authored an article chronicling the "6 Key Realities for

5    HR Leaders in 2024" in ***Human Resource Executive*** (https://hrexecutive.com/6-key-realities-for-hr-

6    leaders-in-2024/). She cited a recent Accenture report which stated that, "89% of CEOs say the CHRO

7    (Chief Human Resource Officer) should play a central role in driving long-term profitable growth."

8    Issues highlighted in the article include HR leaders' responsibilities to (1) drive business growth using

9    talent, (2) confront the growing mental health crisis, (3) teach employees how to leverage generative

10   artificial intelligence capabilities, (4) speed progress on diversity, equity, and inclusion, (5) shift toward

11   skills-based organizations, and (6) learn how to manage in an unpredictable political climate. These

12   broad issues are a far cry from the support functions of administering compensation and benefits plans

13   or hosting onboarding sessions for new employees. More importantly, the responsibilities speak to the

14   central role that effective human resource management plays in the success of a business. In fact, a

15   quick survey of my own LinkedIn professional contacts list includes HRM practitioners who serve as

16   the Senior Vice-President and Chief of Human Capital Management (at WIRB-Copernicus Group),

17   Vice-President of Human Resources (at Regeneron), Senior Director of Human Resources (at Generac

18   Power Systems), Director of Global Talent Management (at Hyster-Yale Group), and Chief People and

19   Diversity Officer (at the AMC television network) to name a few. These officers are among the highest-

20   ranking executives in the companies named. Overall, HRM systems are highly integral to business

21   operations and corporate performance since the achievement of organizational strategic objectives

22   depends upon the successful acquisition and retention of labor that is sufficient in quantity and quality.

23       10.    Second, HRM system effectiveness is directly tied to a company's bottom-line (Huselid,

24   1995; Jiang et al., 2012). EEO-1 reports provide data that can be used as a reasonable indicator of a

25   company's employee headcounts in key roles, as HRM professionals can easily surmise which of the 10

26   occupational categories contains a firm's core workforce. This is valuable information for a competitor

27   trying to determine the effectiveness of a company's HRM system. The potential for commercial

28   damage from the release of EEO-1 reports does not come from the precise accuracy of such data with

SUPPLEMENTAL DECLARATION OF PATRICK McKAY
No. 22-cv-07182-WHA                    4        ER-100

1    respect to a company's HRM system, but its access alone. The mere presence of the data provides

2    additional information to competing firms trying to decipher how a firm manages its human resources.

3    The 10 occupational categories provide meaningful insight into a company's headcounts for a

4    company's internal divisions. Furthermore, competing firms can pair such data, which is not publicly

5    available, with company information that is available (e.g., Glassdoor surveys, corporate financial

6    performance) to estimate the relationship between workforce occupational composition (from the EEO-1

7    reports) and corporate outcomes. Even if the information does not precisely detail all specific corporate

8    divisions and job titles, providing access to such internal company information provides information that

9    is not otherwise available and potentially undermines fair commercial market competition between

10   firms.

11        11.    Third, EEO-1 reports provide racial-ethnic and gender demographic information that job

12   seekers are likely to interpret as symbolic of a company's stance on diversity. This information has an

13   impact on recruiting efforts, although as I explained in my initial declaration, racial-ethnic and gender

14   demographic information does not predict how strongly a company supports workforce diversity

15   (McKay, Avery, & Morris, 2008). Thus, companies with low racial-ethnic and gender diversity as

16   revealed in their EEO-1 reports may be unfairly disadvantaged in recruiting applicants from these

17   respective demographic subgroups.

18        12.    Some companies, including, for example, smaller companies, or companies without

19   "specialized HR staff," use the EEO-1 reports themselves for business purposes to track their

20   demographic representation, changes, and trends.  Others may use the demographic data contained in

21   those reports but not the reports themselves.  But my point of contention regarding the public release of

22   company EEO-1 reports is not a matter of whether companies utilize them internally for operational

23   purposes. The problem is that competing companies can consult an organization's EEO-1 reports for

24   insight into how a firm distributes its employees across the 10 occupational categories. Any additional

25   information regarding a firm's employee headcount offers incremental information about that

26   company's HRM system. Again, the harm does not depend on accuracy but access, and there is no

27   overriding reason why a company's competitors should have access to how the company's personnel are

28   distributed across occupational categories.

SUPPLEMENTAL DECLARATION OF PATRICK McKAY
No. 22-cv-07182-WHA                         5       ER-101

13.     This is especially problematic as the FOIA request involves five years of EEO-1 reports, which offer insights into a company's headcount trends across multiple years. The movement of employees across or out of jobs provides a window into how well (or poorly) a company's HRM system is functioning (Noe et al., 2022). Although Dr. Bendick is correct in noting that employee movement out of job categories does not directly measure an organization's employee turnover rates, the movements can be easily interpreted as a proxy for employee movement out of positions, whether for turnover, downsizing, or other reasons. Employee movements that result in loss of human talent from firms (i.e., turnover and downsizing) have negative financial and operational implications for an organization (Della Torre et al., 2018; Guthrie & Dutta, 2008). This provides information that a competitor would not otherwise have, and that can be used to draw conclusions about a company's HRM effectiveness, both by itself and especially when paired with other data.  Thus, I am of the strong opinion that the release of this information could cause competitive harm to companies.

14.     Paragraph 13 of the Bendick Declaration states, "A substantial -- and growing -- number of U.S. employers now voluntarily release their EEO-1 report data annually, typically in their corporate annual report, in a separate annual diversity report, or on their website. According to one survey, this was the practice among 11% of the 1,000 largest firms nationwide in 2021, up from 4% the year before." A significant takeaway from the above statement is that even in 2021, following the George Floyd murder and pressure on companies to increase their diversity, the vast majority -- 89% -- of the 1,000 largest firms in the U.S. did not release their EEO-1 form data.

15.     For the companies that release their data, Dr. Bendick assumes that they do so willingly rather than as a response to market and/or public or other pressures. The fact that some companies are willing (or pressured) to report EEO-1 workforce demographic information does not mean that they do not consider this information to be sensitive. Also, it does not preclude the potential for commercial harm due to unjustified negative implications for recruiting underrepresented minorities and women, as well as reputational harm, which can directly affect a company's bottom line.  The economic impact of "reputation," whether deserved or undeserved, is real.  Roberson and Park (2007) reported that companies who were named to Fortune magazine's top-50 list for diversity (a reputational rating) had higher financial performance than Fortune 100 companies who failed to make the Fortune list over a

1    five-year period (1998-2003). In contrast, Wright, Ferris, Hiller, and Kroll (1995) showed when
2    companies lost employment discrimination lawsuits, they suffered subsequent reductions in their stock
3    prices.

4    16.    Contrary to Paragraphs 18-20 of the Bendick Declaration, EEO-1 reports are not as broad
5    and non-specific as he suggests. First, HRM professionals can easily infer the EEO-1 occupational
6    category within which a company's core workforce is classified. For example, it would not require much
7    guesswork to determine that the Vice-President of Human Resources would be classified as EEO-1
8    category "Executive/Senior-Level Officials and Managers." Similarly, for an engineering firm, its
9    engineers would likely be classified within the "Technicians" occupational category, while its
10   manufacturing plant staff would be classified as "Operatives."  Second, many of the categories are quite
11   specific and provide meaningful information. Thus, comparing the EEO-1 categories of "First/Mid-
12   Level Officials and Managers" with others can provide insight into the proportion of direct supervisors
13   relative to core personnel such as engineers or manufacturing employees from the engineering firm
14   example. Third, in many companies, including smaller companies, these categories can be quite
15   revealing. Imagine a 50-person company wherein it would be very informative to know how the
16   employees are distributed across the ten categories. Fourth, the fact that the EEO-1 reports cannot
17   provide all the information that might be useful doesn't mean that it can't provide any useful
18   information to a competitor. In Bendick's specific example, a competitor might not be able to isolate
19   chemical engineers from other types of engineers for a large petrochemical manufacturer, but it would
20   provide other information.  Knowing that a competitor is increasing its engineering headcount would be
21   valuable to a competitor even if it doesn't know the precise type of engineers.  A competing firm would
22   also find it informative to know the relative proportion of engineers to other employees as means of
23   deducing how the firm distributes its core employees to non-core, support employees, especially if the
24   focal firm is highly successful relative to its peers.  It is not uncommon for firms to attempt to mimic the
25   strategy of their successful rivals. Thus, the release of EEO-1 data could offer insights into competitor's
26   workforce profile for other companies to potentially duplicate.

27   17.    Dr. Bendick states that EEO-1 reports are "incomplete as measures of a firm's productive
28   capacity or strategic intentions" because many companies rely on temporary or contract workers in

1    addition to the full- and part-time employees counted in the reports. Dr. Bendick rightfully

2    acknowledges that companies often deploy contingent workers (e.g., contractors, temporary employees,

3    etc.) to fulfill their human resource requirements. However, the bulk of HR planning is undertaken with

4    respect to core personnel who perform the job functions that are central to a company's business (Noe et

5    al., 2022). In fact, short-term employees are often released upon the completion of project-based work,

6    thus suggesting they are not an integral part of a company's central HR planning. Furthermore, high-

7    commitment HR practices such as investments in training and development, advancement opportunities,

8    compensation and benefits are targeted toward core workers instead of temporary personnel. The point

9    of high-commitment HR practices is to retain a long-term, qualified core workforce to ensure that a

10    company has sufficient quality and quantity of workers to provide a company's products and services in

11    support of a company's strategic objectives (Lepak & Snell, 1999).  Therefore, the numbers of actual,

12    full-time employees reported in the EEO-1 reports communicates valuable HRM data in which a

13    competitor would be keenly interested.

14        18.     Thus, Dr. Bendick's point about companies' usage of temporary personnel does not

15    invalidate EEO-1 report data as indicative of a firm's workforce composition. Again, the nature of a

16    firm's business allows an astute HRM professional to infer the occupational category within which its

17    core personnel are classified, thus offering insight (albeit imperfect) into how a firm mobilizes its

18    personnel. Again, the fact that the information may be incomplete—and doesn't provide all the

19    information that could be useful—doesn't mean that it can't provide any useful information to a

20    competitor.  In a commercial market environment, any incremental information that provides this sort of

21    information can be used by competitors for their advantage.  Competing firms should not be allowed

22    public access to such information, particularly across 5 years of EEO-1 data.

23        19.     Dr. Bendick takes issue in Paragraph 30 with my opinion about the use of EEO-1 reports

24    to calculate a firm's turnover rates. The point I am making, however, is not that competing companies

25    could perfectly estimate a firm's turnover rates from EEO-1 data. A firm could estimate the movement

26    of employees out of (or across) the various EEO-1 job categories from 5-years of EEO-1 reports. Again,

27    this movement offers some insight into how employees are being deployed in an organization, with

28    reductions in the proportion of employees in a occupational category signaling (potentially) labor losses.

1    This pattern of labor losses is even more telling if it occurs across five years of EEO-1 reports, which

2    indicates a poor-functioning HRM system (and potential loss of company market share).

3           20.    Dr. Bendick's point about EEO-1 retrospective reports being not useful because they are

4    outdated is erroneous. HRM practice guidelines suggest companies' usage of short-term (1-2 years)

5    and/or long-term (3-5 years) HR planning (Noe et al., 2022). Accordingly, a firm that uses longer HR

6    planning horizons may be managing its current employee headcounts based upon retrospective estimates

7    of company HR requirements (i.e., the quality and quality of employees needed to provide company

8    products and services). Thus, the EEO-1 report data for firms that operate according to long-term HR

9    planning may still be relevant despite the retrospective nature of EEO-1 data reporting.

10          21.    Dr. Bowman Williams argues that EEO-1 should be publicly available to protect equal

11   employment opportunity. Whether public dissemination of diversity data might serve this purpose, the

12   research illustrates, starkly, that companies should not be forced to disclose the raw data in their EEO-1

13   reports. Such information must be handled judiciously because it is very easy to overinterpret

14   organizational racial-ethnic and gender demographic information without the requisite context provided.

15   For instance, the exhibits attached to the Baranetsky declaration (see Exhibit Y, Dkt. No. 39-1) offer

16   keen insight into how technology companies' workforce racial-ethnic and gender demographic

17   representation has been wholly overinterpreted as indicative of racial-ethnic and gender bias,

18   respectively. What the exhibits fail to mention is that Blacks, Hispanics, and women are woefully

19   underrepresented in science, technical, engineering, and mathematics (STEM) fields (Porter & Serra,

20   2020; Wynn & Correll, 2018). Yet, the EEO-1 reports are used to lay the burden of racial-ethnic

21   minority and female representation in STEM fields at the feet of employing organizations. Instead, as

22   Jonathan Kozol so eloquently articulated in his 1991 book "Savage Inequalities," racial-ethnic (and

23   likely gender due to gender stereotyping) inequalities in educational quality and opportunities in public

24   schools are huge drivers of minority and female underrepresentation in STEM fields due to academic

25   under-preparation in compulsory K-12 education. In fact, raw data about a company's racial-ethnic and

26   gender diversity has a weak relation to a firm's actual climate for diversity in organizations (Kossek,

27   Zonia, & Young, 2006; McKay, Avery, & Morris, 2008).

28

SUPPLEMENTAL DECLARATION OF PATRICK McKAY
No. 22-cv-07182-WHA                      9        ER-105

1    22.    By contrast, a company with "impressive" diversity numbers may ill-serve the

2    communities that Title VII and EO 11246 were meant to protect. Anecdotally, I am aware of a large

3    manufacturer that contracts with the U.S. government (and with whom I performed employment

4    testing/assessment consulting work). The company engaged in annual 'minority hiring blitzes' to ensure

5    that they had sufficient racial-ethnic diversity in their workforce for federal contractor compliance. Yet,

6    owing to the firm's unfavorable climate for diversity, the turnover rate for its Black personnel was

7    200%! Such practices explain why McKay and Avery (2005) warned companies that diversity

8    recruitment could backfire to the extent that firms misrepresent their work climates as more supportive

9    of diversity to minority recruits than is the actual case.

10    23.    Racial-ethnic and gender diversity in organizations is affected by contextual features far

11    outside the control of any focal organization (e.g., underrepresentation of women and minorities in

12    certain occupations, related disparities in educational attainment, etc.), as opposed to seemingly vague

13    inferences of purposeful racial-ethnic and/or gender discrimination in hiring implied by low racial-ethnic

14    and/or gender diversity in a company's workforce. Consequently, requiring organizations to publicly

15    release their EEO-1 reports could undermine their ability to offer equal employment opportunities to

16    historically underrepresented minorities and women, in direct contradiction of the principles upon which

17    EEO-1 reporting is based.

18    Conclusion

19    24.    Based upon my research and practice in the human resource management domain, it is

20    my opinion that Dr. Bendick's conclusion that the public release of companies' EEO-1 reports has no

21    potential for commercial harm to reporting firms is incorrect. The reports have the potential for helping

22    competing firms to learn how a firm manages its employee headcounts. This is especially problematic

23    since HRM professionals can easily infer the EEO-1 occupational category within which a company's

24    core workforce is classified. Such data may be paired with publicly available corporate data to assess the

25    relationship between a company's employment profile (across the 10 occupational categories) and

26    corporate performance indicators (e.g., revenues, profits, customer satisfaction metrics, etc.).

27    Furthermore, five-year EEO-1 reports will allow competing firms to estimate the patterns of employee

28    movement in and out of the 10 occupational categories, with reductions in force as indicative of poor

SUPPLEMENTAL DECLARATION OF PATRICK McKAY
No. 22-cv-07182-WHA                    10        ER-106

1   HRM system functioning—because firms do not reduce their workforces in response to successful

2   corporate performance. Finally, the public release of company EEO-1 reports could unfairly

3   disadvantage companies that possess low racial-ethnic and/or gender diversity. Erroneously, the lay

4   public may infer that companies lacking racial-ethnic and gender diversity as inhospitable to members of

5   these demographic groups. However, research (including my own) and anecdotal company practice

6   examples suggest that workforce diversity is virtually unrelated to how strongly a firm values diversity

7   (McKay et al., 2008). Nonetheless, low-diversity firms may experience difficulties in recruiting women

8   and minorities if EEO-1 reports are made public despite their potential desire to increase its workforce

9   diversity. Ultimately, this undermines the principles upon which EEO-1 reporting is based, ensuring

10  equal employment opportunity regardless of demographic group membership.

11          I declare under penalty of perjury that the foregoing is true and correct.

12  Executed this 13th day of November, 2023, at Kinston, North Carolina.

13                                          *Patrick F. McKay*

14                                          PATRICK F. McKAY, PhD.

SUPPLEMENTAL DECLARATION OF PATRICK McKAY
No. 22-cv-07182-WHA                          11      ER-107

# Attachment

# References

Avery, D. R. (2003). Reactions to diversity in recruitment advertising - Are differences black and white? *Journal of Applied Psychology, 88,* 672-679.

Combs, J., Liu, Y., Hall, A., & Ketchen, D. (2006). How much do high-performance work practices matter? A meta-analysis of their effects on organizational performance. *Personnel Psychology, 59,* 501-528.

Della Torre, E., Zatzick, C. D., Sikora, D., & Solari, L. (2018). Workforce churning, human capital disruption, and organizational performance in different technological contexts. *Human Resource Management Journal, 28,* 112-127.

DePatie, T. P., Sachdeva, A., Shahani-Denning, C., Grossman, R., & Nolan, K. P. (2022). Enhancing the representation of women: How gender diversity signals and acknowledgment affect attraction to men-dominated professions. *Personnel Assessment and Decisions, 8,* 37-59.

Guthrie, J. P., & Datta, D. K. (2008). Dumb and dumber: The impact of downsizing on firm performance as moderated by industry conditions. *Organization Science, 19,* 108-123.

Huselid, M. A. (1995). The impact of human resource management practices on turnover, productivity, and corporate financial performance. *Academy of Management Journal, 38,* 635-672.

Jiang, K., Lepak, D. P., Hu, J., & Baer, J. C. (2012). How does human resource management influence organizational outcomes? A meta-analytic investigation of mediating mechanisms. *Academy of Management Journal, 55,* 1264-1294.

Kossek, E. E., Zonia, S. C., & Young, W. (1996). The limitations of organizational demography: Can diversity climate be enhanced in the absence of teamwork? In M. N. Ruderman, M. W. Hughes-James, & S. E. Jackson (Eds.), *Selected research on work team diversity* (pp. 121-154). Washington, DC: American Psychological Association.

Kozol, J. (1991). *Savage inequalities*: *Children in America's schools*. New York: Harper Perennial.

Lepak, D. P., & Snell, S. A. (1999). The human resource architecture: Toward a theory of human resource allocation and development. *Academy of Management Review, 54,* 31-48.

McKay, P. F. (forthcoming). Targeted recruitment of racial-ethnic minorities: A research review. In J. Slaughter, D. G. Allen, & S. Highhouse (Eds.), *Essentials of employee recruitment: Individual and organizational perspectives*. New York: Routledge.

McKay, P. F., & Avery, D. R. Warning! Diversity recruitment can backfire. *Journal of Management Inquiry, 14,* 330-336.

McKay, P. F., Avery, D. R., & Morris, M. A. 2008. Mean racial-ethnic differences in work performance: The moderating role of diversity climate. **Personnel Psychology**, *61,* 349-374.

Noe, R. A., Hollenbeck, J. R., Gerhart, B., & Wright, P. M. (2022). **Fundamentals of human resource management** (9th edition). New York, NY: McGraw-Hill.

Porter, C., & Serra D. (2020). Gender differences in the choice of major: The importance of female role models. **American Economics Journal: Applied Economics**, *12,* 226-254.

Roberson, Q. M., & Park, H. J. (2007). Examining the link between diversity and firm performance: The effects of diversity reputation and leader racial diversity. **Group & Organization Management**, *32,* 548-568

Walker, H. J., Feild, H. S., Berneth, J. B., & Becton, J. B. (2012). Diversity cuse on recruitment website: Investigating the effects on job seekers' information processing. **Journal of Applied Psychology**, *97,* 214-244.

Wright, P., Ferris, S. P., Hiller, J. S., & Kroll, M. (1995). Competitiveness through management of diversity: Effects on stock price valuation. **Academy of Management Journal**, *38*, 272–287.

Wynn, A. T., & Correll, S. J. (2018). Puncturing the pipeline: Do technology companies alienate women in recruiting sessions? **Social Studies of Science**, *48,* 149-164

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE CENTER FOR INVESTIGATIVE REPORTING and WILL EVANS, | Case No. 21-cv-09613-SK |
| Plaintiffs, | **DECLARATION OF MARC BENDICK, JR., PH.D. IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFFS' CROSS MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| UNITED STATES DEPARTMENT OF LABOR, | |
| Defendant. | Date: December 14, 2023<br>Time: 8:00 AM<br>Judge: Hon. William Alsup |

In opposition to defendant's Motion for Summary Judgment and in support of plaintiffs' Cross Motion for Summary Judgement, I, Marc Bendick, Jr., Ph.D., submit the following declaration in the above-captioned case. This declaration is based on my personal knowledge of the matters below, and I am competent to testify.

## I. <u>Introduction</u>

1.     Attachment A provides my professional resume. I am an employment economist and co-founder of Bendick and Egan Economic Consultants, Inc. I earned a Ph.D. in economics from the University of Wisconsin and have engaged in the practice of economics, specializing in

employment and related issues, for more than 40 years. I work primarily as a researcher and am the widely-cited author of 142 scholarly publications including articles in peer-reviewed journals, books, book chapters, and Congressional testimony. Concurrently, I have been a consultant for major employers such as Macy's Department Stores, Ford Motor Co., Johns Hopkins Hospitals, IBM, the Michigan Civil Service Commission, National Institutes of Health, and The World Bank.

2.     My work has included analyses for litigation in which I have examined virtually every aspect of employer HR practices and their relationships to business operations. Attachment B lists 217 cases in which I have been involved, sometimes on behalf of employees, sometimes employers, and occasionally as a neutral party. I have been accepted as an expert in 40 federal district courts and 11 state courts or other tribunals.

3.     Since 1995, I have repeatedly analyzed EEO-1 data, for the OFCCP,[1] EEOC,[2] state Fair Employment Practice Agencies,[3] the Ford Foundation,[4] employee groups,[5] and employers.

---

[1] E.g., Marc Bendick Jr., et al., *The Availability of Women, Racial Minorities, and Hispanics for On-Site Construction Employment* (2011); Marc Bendick, Jr., *Collecting Earnings Data to Guide OFCCP Compensation Compliance Reviews: A Proposed Design (2013).*

[2] E.g., Marc Bendick, Jr., "Setting Industry-Level Priorities for EEOC Enforcement." *Testimony, Equal Employment Opportunity Commission Hearings on the Strategic Enforcement Plan* (2012); Marc Bendick, Jr. et al., *Likely Investigative Subjects Identified through "Outlier" Analysis of EEO-1 Data* (2000).

[3] E.g., Marc Bendick, Jr. et al., *Likely Investigative Subjects Identified from EEO-1 Reports of California Employers* (2020).

[4] E.g., Marc Bendick, Jr., et al., *Employment Discrimination Against Women and Minorities in Georgia* (1999); Marc Bendick, Jr., et al., *Gender Occupational Segregation: An Analysis of Employers' EEO-1 Reports* (2000).

[5] E.g., Marc Bendick, Jr., et al, *Research Perspectives on Race and Employment in the Advertising Industry* (2009).

This work has appeared as expert testimony in litigation,[6] been used to train HR staff,[7] reported in news media,[8] and cited by academic scholars.[9]

4.    Because of the public policy importance of the issues in this case, this declaration is being provided *pro bono,* without compensation.

## II. Summary of My Opinions

5.    In this declaration, I discuss three issues raised in *The Center for Investigative Reporting and Will Evans v. United States Department of Labor*:[10] (1) commercially-valuable information contained in or derivable from Federal contractors' Type 2 Consolidated EE0-1 records for 2016-2020; (2) confidential personal information contained in or derivable from those records; and (3) foreseeable harm likely to result from public release of those records.

6.    Based on the analyses in this declaration,[11] I have reached six principal conclusions:

---

[6] E.g., Declaration of Marc Bendick, Jr., Ph.D. in *Ellis v. Costo,* U.S. District Court for the Northern District of California C-04-3341MHP (2006); Declaration of Marc Bendick, Jr., Ph.D. in *EEOC v. Mavis Discount Tire, Inc. et al,* U.S. District Court for the Southern District of New York, 12-CV-0741 (JGK) (GWG).

[7] E.g., Marc Bendick, Jr., "Using EEO-1 Data to Analyze Allegations of Employment Discrimination," *Presentation to the Section on Labor and Employment Law, American Bar Association* (2000).

[8] E.g., Stuart Ellis, "A Lawyer's Call for Greater Black Presence in [Advertising] Agencies," *New York Times* (Jan. 8, 2009).

[9] E.g., National Academy of Sciences, *Collecting Compensation Data from Employers* (2012); Myrtle Bell and Joy Leopold, *Diversity in Organizations* (Cengage, 4th Edition, 2022).

[10] See Complaint for Injunctive Relief, Center for Investigative Reporting and Will Evan v. United States Department of Labor, Case 3:22-cv-07182, document 1, filed 11/15/22 (hereafter, "*Complaint*"); Answer to Complaint of Defendant United States Department of Labor, Document 16, filed 1/18/23 (hereafter, "*Answer to Complaint*"); and Declaration of Kelechi Ahaghotu, Document 35, filed 8/18/2023 (hereafter, "*Ahaghotu Declaration*").

[11] In developing these opinions, I have applied modes of analysis, computational procedures, information sources, and standards of care identical to or comparable to those I use in my scholarly research, and I apply theories, models, concepts, reasoning, assumptions, estimates, and calculations that command general acceptance among my professional peers. I hold the opinions I present to a reasonable degree of scientific certainty.

The documents and data available to me or relied on by me are identified in this document's text, footnotes, and attachments. My work is based on information currently available to me. If additional material becomes available, I would like the opportunity to update my analyses as appropriate.

a.   EEO-1 Type 2 Consolidated Records provide six specific pieces of workforce information about the reporting firm.   These six pieces themselves are not commercially-valuable operational, financial, or trade secret information as these terms are commonly understood by economists, other business analysts, and business managers. *See Section III below.*

b.   These same six pieces of information do not relate to operational, financial, or trade secret information in ways that would indirectly reveal commercially-valuable operational, financial, or trade secret information. *See Section IV below.*

c.   If the EEO-1 Type 2 Consolidated Records at issue in this case were publicly released, parties seeking commercially-valuable operational, financial, or trade secret information would generally ignore them and instead rely on readily-available alternative sources offering information that is more detailed, timely, complete, and relevant. For commercial purposes, these EEO-1 reports are commonly considered essentially useless. *See Section V below.*

d.   Because public release of the records at issue in this case would not reveal commercially-valuable information, economists, other business analysts, and business managers would generally not reasonably forsee any commercial harm to the firms filing those reports. *See Section VI below.*

e.   Public release of the EEO-1 records at issue in this case would rarely if ever provide race/ethnic gender information on any individual not already available from other sources. Nor could they not reveal any other kind of confidential personal information. *See Section VII below.*

f.   Because public release of these records would rarely if ever reveal confidential personal information, economists, other business analysts, and business managers would generally not reasonably forsee any harm to individuals covered in these reports. *See Section VIII below.*

7.   The remainder of this declaration sets forth the basis for these six opinions.

### III.  Is the Information in EEO-1 Reports Commercially Valuable?

8.      To economists, other business analysts, and business managers, commercially-valuable information takes one of three forms: (1) *managerial information* concerns internal management of revenue-producing aspects of a firm -- for example, sales, costs, profit margins, resource allocation, and strategic plans for different parts of its operations or different products.[12] (2) *Financial information* refers to the firm's assets, liabilities, owner equity, revenues, or expenses quantified in money terms.[13] (3) *Trade secrets* consist of "information -- commonly a customer list, business plan, or manufacturing process -- that the firm possessing the information wants to conceal from its competitors in order to prevent them from duplicating it."[14] Commercially-valuable information may concern tangible aspects of a firm's operations, such as its investment in new plants and equipment, or intangible one, such as the firm's investment in research and development or its purchase of reputational goodwill through a merger or acquisition.[15]

9.  The records at issue in this case -- five years of Federal contractors' Type 2 Consolidated EEO-1 reports -- contain exactly six types of information:[16]

---

[12] According to the Institute for Managerial Accounting (www.imanet.org), "management accounting [involves]…partnering in management decision making…and assist[s] management in the formulation and implementation of an organization's strategy." A similar definition is available in essentially any standard textbook on managerial accounting, for example, Jerry Weygandt, Paul Kimmel, and Jill Mitchell, *Managerial Accounting: Tools for Business Decision Making* (Wiley, 9th edition 2023).

[13] See the Master Glossary provided by the Financial Accounting Standard Board (FASB) for its statement of Generally Accepted Accounting Principles (GAAP), at https://asc.fasb.org. A similar definition is available in essentially any standard textbook on financial accounting, for example, Jerry Weygandt, Paul Kimmel, and Jill Mitchell, *Financial Accounting* (Wiley, 12th edition 2023).

[14] David Friedman, William Lander, and Richard A. Posner, "Some Economics of Trade Secret Law," *Journal of Economic Perspectives* 5 (Winter 1991), p. 61. A similar definition is provided in, for example, Sandy Klasa et al., "Protection of Trade Secrets and Capital Structure Decisions," *Journal of Financial Economics* 128 (3, May 2018), p. 266.

[15] Ann Wyatt, "What Financial and Non-Financial Information on Intangibles is Value-Relevant? A Review of the Evidence," *Accounting and Business Research* 38 (2008), p. 217.

[16] See EEOC, Standard Form 100, Instruction Booklet Rev. January 2006, Employer Information Report EEO-1 (hereafter *'EEO-1 Instructions"),* at Declaration of Michelle Hodge, Document 34-3, filed 8/18/2023 (hereafter, *"Hodge Declaration"),* Exhibit D; and Consolidated Type 2 EEO-1 Reports for Federal contractors (releases 1 and 2) at https://www.dol.gov/agencies/ofccp/foia/library/ Employment-Information-Reports.

(1)   The company's total number of employees.

(2)   The number of company employees in 10 broad occupational categories (for example, "professionals," "craft workers," and "service workers").

(3)   The number of employees in each of those categories by race/ethnicity and gender.

(4)   How total employment at the company changed from year to year in recent years.

(5)   How the distribution of the company's workforce by those 10 categories changed from year to year in recent years.

(6)   How the race/ethnic and gender composition of employees in these categories changed from year to year in recent years.

10.   None of these six items constitutes managerial information, financial information, or trade secrets as defined in paragraph 8.   It is clear on their face that they do not report sale revenues, costs, expenses, profit margins, strategic plans, assets, liabilities, owner equity, customer lists, manufacturing processes, investment in R&D, mergers and acquisitions, or similar topics.

11.   Instead, the six items simply provide a broad "snapshot" of the firm's workforce at specific points in time. Economists, other business, analysts, and business managers do not generally consider such broad descriptive workforce data to be commercial ly-valuable managerial or financial information or trade secrets.   In fact, it is a widespread complaint among corporate executives and managers with profit-and-loss responsibility that such HR reports chronically provide nothing of value to them,[17] while, correspondingly, HR specialists chronically complain that these executives and managers treat their work as irrelevant.[18]

---

The only substantive information in EEO-1 reports other than these six items is the industry, as defined by the North American Industrial Classification System (NAICS), in which the firm has filed the report. However, this categorization essentially universally conveys less (and sometimes misleading) information about the firm's products and services than is readily available from other sources, usually including the firms' own marketing materials.  For example, bellwether firm NMR Consulting (see footnote 27 below) files its EEO-1 reports in the generic catchall industry "Administrative Management and General Management Consulting Services" (NAICS code 541611), while the firm's own website (https://www.nmrconsulting.com) more informatively details the firm's services as: IT facilities engineering, IT procurement, data management, data analytics, process automation, software development, biometric security, and IT training.

[17] For example, in a typical article titled "Why We Hate HR," (*Fast Company*, December 19, 2007), business analyst Keith R. Hammands wrote:

After close to 20 years of hopeful rhetoric about becoming "strategic partners" with a "seat at the table" where the business decisions that matter are made, most human-resource

12.     Employers filing EEO-1 reports typically regard those reports as nothing more than a necessary cost of doing business, to be completed solely because they are legally required. They consider the reports so uninformative for business purposes that they are not generally even consulted in operational or financial decision-making. Firms large enough to employ specialized HR staff inevitably assign the task of completing the reports to that staff and do not circulate the completed reports among managers with operational or financial responsibilities. In short, the standard practice among these employers concerning their EEO-1 reports is, "File 'em and forget 'em."

13.   A substantial -- and growing -- number of U.S. employers now voluntarily release their EEO-1 report data annually, typically in their corporate annual report, in a separate annual diversity report, or on their website.  According to one survey, this was the practice among 11% of the 1,000 largest firms nationwide in 2021, up from 4% the year before.[19] These public releases provide further evidence of managements' judgment that these data contain nothing confidential of commercial relevance. That absence is what makes public release of these data a safe way to respond to growing demands from stockholders and others for public release of information on firms' workforce diversity. [20]

---

professionals aren't nearly there. They have no seat, and the table is locked inside a conference room to which they have no key….The human-resource trade long ago proved itself, at best, a necessary evil.

[18] See, for example, Veronica Hope-Hailey et al., "A Chameleon Function? HR in the '90s," *Human Resource Management Journal* 7 (July 1997), pp. 5-18; David Ulrich, "The Twenty-First-Century HR Organization," *Human Resource Management* 47 (November 2008), pp. 829-850.

[19] Ashley Marchand Orme, "Big Companies Are Already Collecting Important Data on Workforce Diversity. More of Them Need to Make it Public." *Fortune* (February 9, 2022).  The releasing firms include 50 of the 100 largest publicly-traded firms. About half are in high technology, while others are broadly distributed across public utilities, finance, consumer services, manufacturing, and other sectors (Leslie Norton, "50 of the 100 Largest U.S. Public Companies Agree to Release Key Diversity Data," *Barrons*, December 7, 2020; Kavya Vaghul, "A Small Fraction of Corporations Share Diversity Data, But Disclosure is Rapidly on the Rise, *Just Capital*, January 19, 2021).

[20] Such public release of EEO-1 reports is part of a broader trend among U.S. corporations of publicly reporting broad summary workforce information, either voluntarily or under government mandates. Some observers see this as an evolving "new normal" standard practice in corporate governance (e.g., Arlon Fung, Mary Graham, and David Weil, *Full Disclosure, The Perils and Promise of Transparency*, Cambridge University Press, 2007).

BENDICK DECL. IN SUPP. OF
OPP. & CROSS MOT. SUMM. J

## IV. **Can EEO-1 Reports Indirectly Reveal Commercially-Valuable Information?**

14. A more complex question is whether, despite themselves containing only workforce data, the six pieces of information in EEO-1 reports can be interpreted or analyzed to *indirectly* reveal commercially-valuable managerial information, financial information, or trade secrets. The defendant repeatedly claims that they can. Specifically:

> Defendant's *Bellwether Motion* states, "The headcount and workforce composition data contained in the EEO-1 reports both reveal 'basic commercial operations' and are directly 'related to the income-producing aspects' of the submitting companies. These are human resource management metrics that are a central component of every organization's operational framework."[21]

> Defendant's declarant Michele Hodge states that "release of the objectors' data would cause…competitors gaining knowledge of business plans that companies have invested substantial resources in developing, refining, and implementing to gain competitive advantage."[22]

> Defendant's declarant Dr. McKay states that "release of companies' EEO-1 workforce data poses several commercial disadvantages to firms. These include allowing competing firms to see a company's employee headcount, calculate the company's turnover rate, poach its employees, and estimate headcount-company performance relationships."[23]

---

One example of mandated release is expansion of "10-K" annual reporting requirements for publicly traded firms by the Securities and Exchange Commission (SEC). Until 2020, the SEC only required firms to report the total size of their workforce. Starting in 2020, firms are required to disclose information about their "human capital" (their workforce and its capabilities) to the extent that this information "is material to understanding the listed company's business." Although it is yet unclear what these new requirements entail, they could be interpreted to include information on the race and gender composition of the firm's workforce (G. Pandit, "First Look at the Human Capital Disclosures on Form 10-K," *The CPA Journal* (August/September 2021).

An example of non-mandated release is firms' disclosure of summary information about the race/gender composition of their workforce in "corporate social responsibility" (CSR) reports. The basic principle of CSR is that a business has responsibilities to the society and environment in which it operates, not only to its stockholders. Accordingly, it is appropriate for firms to publicly report business outcomes in terms of a "triple bottom line" – not only profits but also "planet" (the environment) and "people" (including its workforce). As of 2019, 90% of the 500 largest publicly-traded U.S. firms issued some form of CSR report annually, up from only 20% in 2011 ("What is a CSR Report & Why Is It Important?" *Harvard Business School Online Business Insights*, downloaded 10/11/2023 from https://online.hbs.edu).

[21] Department of Labor's Bellwether Motion for Summary Judgment, Document 34, filed 8/18/23 (hereafter, "*Bellwether Motion*"), p. 9.

[22] *Hodge Declaration*, paragraph 19.

[23] Declaration of Partick F. McKay, Ph.D., Document 34-1, filed 8/18/2023 (hereafter, "*McKay Declaration*"), paragraph 14.

Defendant's declarant Dr. Roberson states, "With demonstrated relationships between the composition of organizational resources and indicators of firm financial performance, including profitability, market share, and valuation, [EEO-1]…information may be considered financial in nature."[24]

Defendant's declarant Helene Baxter states that bellwether firm Allied Universal "considers its EEO-1 Type 2 reports…to be commercial information given their significant relationship to Allied Universal's business model, profitability, and strategic planning."[25]

Defendant's declarant Jack Jasinowski states that for bellwether firm Brandenberg, "The Type 2 EEO-1 Reports disclose…staffing levels, which is commercially-valuable…information." [26]

Defendant's declarant Josh Barcon states that at bellwether firm DHL, "The organizational structure of DHL is private, commercially valuable information that reveals the staffing levels DHL has determined are necessary to maintain and grow the business." [27]

Defendant's declarant Karen Sobieski states that for bellwether firm NMR Consulting, "The EEO-1 Reports have commercial value to companies in government information technology industries, like NMR, and is used by our company for commercial purposes."[28]

15.   A firm's workforce data are undoubtedly "related to" the firm's commercial and financial data in one obvious, essentially definitional sense:  Every firm needs to have a workforce

---

[24] Declaration of Quinetta M. Roberson, Ph.D., Document 34-2, filed 8/18/23 (hereafter, "*Roberson Declaration*"), paragraph 19.

[25] Declaration of Helene Baxter, Document 34-4, filed 8/18/23 (hereafter, "*Baxter Declaration*"), paragraph 7.  This declaration concerns Allied Universal Security Services (hereafter, "*Allied Universal*"), which it describes as "the nation's largest provider of [private] security guards and related services." The firm's North American operations are headquartered in Irvine CA, apparently has about 300,000 employees, and appears likely to report in the Security Guards and Patrol Services industry (NAICS code 561612).

[26] Declaration of Jack Jasinowski, Document 34-5, filed 8/18/23 (hereafter, "*Jasinowski Declaration*"), paragraph 13.  This declaration concerns Brandenberg Industrial Service Co., (hereafter, "*Brandenberg*"), which it describes as "one of the nation's premier firms specializing in [construction] demolition and environmental remediation." The firm is headquartered in Chicago, apparently has about 800 employees, and appears likely to report in the Remediation Services industry (NAICS code 562910).

[27] Declaration of Josh Barcon, Document 34-6, filed 8/18/23 (hereafter, "*Barcon Declaration*"), paragraph 7.  This declaration concerns DHL Global Business Services (hereafter, "*DHL*"), which it describes as "the leading global brand in the logistics services industry." In the U.S., the firm is headquartered in Plantation, FL, apparently has about 110,000 employees, and appears likely to report in the Couriers and Express Delivery Services industry (NAICS code 492110).

[28] Declaration of Karen Sobieski, Document 34-7, Filed 8/18/23 (hereafter, "*Sobieski Declaration*"), paragraph 8. This document concerns Network Management Resources, Inc. (hereafter, "*NMR Consulting*"), which it describes as "a service disabled veteran owned small business providing information technology, infrastructure and procurement services…almost exclusively in the federal sector."  The firm is headquartered in Huntsville, AL, apparently has about 125 employees, and, according to the NAICS Association (www.naics.com), reports in the Administrative Management and General Management Consulting Services industry (NAICS code 541611).

1   if it is to have any commercial operations or financial results.  It is self-evident that without any

2   workforce, the firm could not operate.

3   16.   A more meaningful question is whether these six data items relate to operational and

4   financial information in *direct, relevant, reliable,* and *interpretable ways* that reveal commercially-

5   valuable information *by proxy*. The answer is that they do not. As a proxy source of commercially-

6   valuable information, the six items of data in Consolidated Type 2 EEO-1 records for Federal

7   contractors are *essentially worthless*.

8   17.   Four characteristics of Consolidated Type 2 EEO-1 reports undermine their use as a

9   proxy source of commercially-valuable information.

10   18.   The first characteristic is that the data in EEO-1 reports are *broad and non-specific*.

11   For information to be commercially valuable, almost inevitably it needs to be identifiable for

12   narrow, specific aspects of a firm's operations -- for example, a specific product line, production

13   facility, marketing strategy, or merger or acquisition.  In contrast, EEO-1 Consolidated Type 2

14   records provide data on broad categories of employees that are not possible to relate to specific

15   commercial activities.

16   19.   For instance, hypothetically suppose that a petrochemical manufacturer wants to infer

17   whether a competitor is expanding its production capacity for a particular chemical product by

18   looking in the competitor's EEO-1 report to see if the number of chemical engineers is

19   unexpectedly high or rapidly increasing. This would not be possible because the narrowest

20   category in which EEO-1 report place chemical engineers is "Professionals," within which it is

21   impossible to isolate chemical engineers from other types of engineers as well as other

22   professionals such as chemists, accountants, lawyers, HR staff, logistics specialists, and purchasing

23   agents.[29]

24   20.   The FOIA requests at issue in this case seek only "Type 2 Consolidated" records.

25   "Type 2" reports means the reporting firms have multiple offices or plants, while "consolidated"

26   means reports providing only total numbers for all these locations combined.  For example,

27

28   [29] *EEO-1 Instructions,* Appendix 5.

1   hypothetically suppose that an advertising agency wants to infer whether a competitor is expanding

2   its political lobbying services by looking at the number of employees reported in the competitor's

3   EEO-1 report for its Washington, DC office.  This would not be possible because the Consolidated

4   Type 2 records merge together employees at all the competitor's offices nation-wide.

5        21.   The second limiting characteristic of EEO-1 reports is the data are *retrospective and old*

6   -- describing the past, and particularly the past that, in the fast-moving world of business, is the

7   distant past.  Commercially-valuable information is inherently about either the present or the future

8   -- where does a firm stands now, and where is it trying to position itself in the near-term (such as

9   the current year) and long-term (such as the next 5-10 years).[30]  The first two FOIA requests at

10   issue in this case was submitted in 2019 for data from 2016 and 2017, and a subsequent request

11   was submitted in 2022 for data from 2019 and 2018.[31]  If data requests for 2016-20209 data were

12   fulfilled in the current year -- 2023 -- the data provided would be approximately three to seven

13   years old.[32]

14        22.    In the business world, data even two years old seldom reveal anything useful about

15   a firm's current capabilities or future intentions. For example, hypothetically suppose that a

16   hospital chain operating hospitals in Georgia wants to know if a hospital chain currently operating

17   only in Florida intends to become a competitor by operating local hospitals in Georgia.  All that

18   EEO-1 data from several years ago could possibly reveal is whether the Florida chain had already

---

[30] See, for example, James Poterba and Lawrence Summers, "A CEO Survey of U.S. Companies' Time Horizons and Hurdle Rates," *MIT Sloan Management Review* 37 (Fall 1995), p. 43; and Ashkan Negahban and Mohammad Dehghanimohammadabadi, "Optimizing the Supply Chain Configuration and Production-Sales Policies for New Products Over Multiple Time Horizons," *International Journal of Production Economics* 196 (February 2018), pp. 150-162.

[31] *Complaint*, paragraphs 37, 38, and 54.

[32] Historically, it takes the EEOC (the agency which manages EEO-1 data for itself and the OFCCP) about two years to receive, clean, and organize the hundreds of thousands of EEO-1 reports it receives each year from both Federal contractors and other firms. Accordingly, these is an inevitable lag of several years between firms' reports and the availability of data in useable form.  For example, on September 8, 2023, I checked the website where EEOC posts highly aggregated summaries of EEO-1 data (www.eeoc.gov/jobs/job-patterns-minorities-and-women-private -industry-eeo-1#explore).  On that date, the latest EEO-1 data presented was from 2021.

-10-

been operating in Georgia for several years, not whether it is doing so in the present, let alone whether it plans to start doing so in the future.

23. The third limiting characteristic of EEO-1 reports is that they are *incomplete* as measures of a firm's productive capacity or strategic intentions. The EEO-1 report instructions mandate that the reports count only the firm's own employees, both full time and part time.[33] In the business world of the 21st Century, firms implementing a commercial initiative often rely on many different types of workers other than those two categories to get its work done. Many firms use temporary workers hired through staffing agencies, employees on short-term contracts, or non-employee consultants to supplement their own full-time and part-time workforce, especially when making a strategic move requiring rapid or flexible expansion or staff with skills different from current employees.[34] In addition, they often make such moves through teaming agreements, alliances, partnerships, or subcontracts with other firms.[35] Thus, if a firm tries to infer from a competitor's EEO-1 reports that firm's production capacity or expertise by looking at that firm's work force in isolation, it risks being seriously mislead.

24. For example, suppose hypothetically that a package delivery company wants to assess the volume of packages a competitor can process. It might attempt to do so by examining EEO-1 data on the number of package sorters and delivery drivers the competitor employs in the most recent EEO-1 report, and perhaps how rapidly that number had expanded from prior years. But those data would fail to reflect the competitor's hiring of temporary package sorters through

---

[33] *Instructions*, especially Appendix 1. Employees who are "permanently leased" are also included, while independent insurance agents are excluded.

[34] See David Weil, *The Fissured Workplace* (Harvard University Press, 2014), and Bushan Sethi, "6 Strategies to Maximize Success with Your Growing Contingent Workforce," *Human Resource Executive* (June 23, 2022) at www.hrexecutive.com)

[35] See, for example, Scott Masten, "The Organization of Production: Evidence from the Aerospace Industry," *Journal of Law and Economics* 27 (October 1984); Dries Faems et al., "Toward an Integrative Perspective on Alliance Governance: Connecting Contract Design, Trust Dynamics, and Contract Application," *Academy of Management Journal* 51 (November 2017); and S. Tadelis, "Complexity, Flexibility, and the Make-or-Buy Decision," *American Economic Review* 92 (May 2002), pp. 433-437.

1   staffing agencies,[36] particularly to handle the Christmas rush season which falls between the

2   summer "snapshot" dates on which firms base their EEO-1 reports.  Equally, it would not reflect

3   the competitor's possible subcontracting or teaming with other package delivery services for the

4   services of delivery vehicles and their drivers.[37]

5       25.  Typically, each of these three limitations accompanies and reinforces the other

6   limitations.  For example, in the hypothetical examples of the petrochemical manufacturer

7   (paragraph 19) and the advertising agency (paragraph 20), the commercial value of EEO-1 data is

8   undermined not only by lack of specificity but also by obsolescence and incompleteness; that of the

9   hospital chain (paragraph 22) is undermined not only by obsolescence but also by lack of

10  specificity and incompleteness; and that of the package delivery service (paragraph 24) is

11  undermined not only by incompleteness but by lack of specificity and obsolescence.

12

13      **V.  Better Sources of Commercially-Valuable Information**

14      26.  Ultimately, the most important characteristic rendering EEO-1 Type 2 Consolidated

15  reports essentially worthless as a source of commercially-valuable information is that they are

16  almost never the best source of such information.  In the internet-based information age of the 21st

17  Century, business firms typically enjoy as little privacy as individuals do.  On essentially any

18  commercial question, there are multiple, readily available sources of operational and financial

19  information about a firm.  One source estimates the revenues in 2023 of the "business intelligence

20  industry" -- the industry providing and analyzing internal and external data for use by operational

21  staff and corporate decision-makers -- at $26.8 billion.[38]  Why would firms bother with implausible

22  analyses and far-fetched interpretations of EEO-1 reports when more relevant, more accurate

23  answers are available faster and cheaper elsewhere?

24

25  [36] Marc Bendick, Jr., and Eli Cohn, "Race Discrimination and Segregation in Manufacturing Jobs: Evidence from Matched-Pair Testing of Staffing Agencies." *Social Science Journal* (2021).

26

27  [37] For example, according to the U.S. Postal Service (www.fact.usps.com), both UPS and FEDEX subcontract with it to deliver hundreds of millions of ground packages annually.

28  [38]www.mordorintelligence.com.

-12-

27.     Consider, for example, the hypothetical example of the hospital chain in paragraph 22. That firm might seek commercially-valuable information about the expansion intentions or actions of its possible competitor from a large range of sources.  These include:

- online news media that focus on their industry -- for example, *AHA Today* (American Hospital Association, www.aha.org); *Georgia Health Care News* (www.gha.org); *Becker's Hospital Review* (beckershopsitalreview.com), *Hospital and Health Care Management* (www.hhcmglobal.com), and *Kaiser Health News* (www.kffhealthnews.org).

- Fee-based commercial providers of detailed operational and financial data on specific firms -- for example, Dun and Bradstreet Hoovers (www.dnb.com) and Bloomberg (www.bloomberg.com).

- Regulatory bodies -- in this example, the Joint Commission on Hospital Accreditation (www.jointcommission.org) -- which often provide detailed operational and financial information for firms under their jurisdiction.

- Whether for-profit or non-profit, the competitor hospital chain is likely to publish an annual report, and these often include statements of strategic plans.  Hospitals often also issue public announcements or press releases about current operations or future intentions.

28.     It might be assumed that, while such information might be available for large, publicly-traded Federal contractors, small privately owned firms would be largely shielded from having their information exposed.  To test this hypothesis, on September 11, 2023, I worked with staff at Dun and Bradstreet Hoovers (see paragraph 27) to seek information on bellwether firm Brandenberg Industries. Within minutes, this information source had provided me with a 23 page report which included: (1) counts of employees at the firm's three separate operating locations (more detailed information than the company-wide employment total in its Type 2 Consolidated EEO-1 report); (2) an organization chart for the firm identifying which departments worked on which product lines; (3) recent coverage in the news media; (4) names, job titles, locations, telephone numbers, and recently-verified email addresses for 124 key employees; (5) financial data and other indicators suggesting the company's stability and capacity for growth; and (6) lists of the firm's closest competitors classified by location, size, and product line.  In this example, all this information was obtained essentially instantaneously for a privately-owned firm with fewer than 1,00 employees (see footnote 25).

29.     Here is a second example.  Paragraph 14 above quotes Professor McKay's statement that "release of companies' EEO-1 workforce data poses…commercial disadvantages to

firms….[that] include allowing competing firms to…calculate the company's turnover rate [and] poach its employees." Professor McKay further explains that a high turnover rate might signal that employees of a firm are unhappy with their current employer and therefore particularly open to offers of alternative employment.[39]

30.  Dr. McKay's contention is incorrect in several ways, the most important of which is that it is mathematically impossible to compute a firm's turnover rates from its EEO-1 data.[40]  But suppose hypothetically that turnover rates could be computed from those records.  Any insights they would provide would be at least several years out of date and therefore not necessarily an accurate measure of current employees' attitudes.  Moreover, the rates would be for broad categories of employees (such as all professionals), whereas a competing firm would normally be interested in poaching employees with qualifications fitting specific job vacancies it is trying to fill (e.g., senior chemical engineers with experience in oil refinery operations).

31.  Where might the petrochemical manufacturers look instead to determine if a competitor's workforce is ripe for employee poaching?

- For insights into whether employes at a particular company are generally happy with that employer, the information-seeking firm might start with Glassdoor (www.glassdoor.com), a widely-consulted website which tabulates and publishes ratings for individual companies by current and former employees.  For larger employers, these ratings are provided for subsets of employees, and the data in the ratings are weighted by their recency to maximize relevance to the present. This site also provides ratings on specific aspects of employees' work situations such as "work-life balance."

- The competitiveness of salaries a firm offers could also be scrutinized to determine how open to alternative employment a firm's employees might be. Glassdoor (see previous bullet point) reports salary levels for specific job titles at specific companies. In addition, current job vacancy listings for a company can be found online at sites such as Indeed.com, ZipRecruiter.com. and Monster.com, and these postings often include salary ranges.[41]

---

[39] *McKay Declaration,* paragraphs 14 and 18.

[40] To compute a turnover rate from data for two years requires data which separates changes in total employment between the years into (1) employees hired, (2) employees terminating, and (3) employees employed in both years.  EEO-1 reports provide only the total number of employees each year. See, for example, Randy Ilg, "Analyzing CPS Data Using Gross Flows," *Monthly Labor Review* (September 2005), pp. 10-18.

[41] Many employers voluntarily state salary ranges in their job postings.  In addition, eight states, five cities, and one county now mandate that such information be included (see "U.S. Pay Transparency Laws," at www.paycheckanalytics.com).

-14-

- To move from general information on the company to identifying individual employees of a company who might be promising targets for recruitment, the petrochemical company could turn to LinkedIn (www.linkedin.com), a prominent website on which workers post resume-like self-descriptions typically stating their current position and employer, education, work history, and special skills. This site can be searched to identify persons employed at a specific company, and then those persons' job titles, work experience, and other information can be reviewed to identify, for example, senior-level chemical engineers with experience at oil refineries.

32.   Here is a third example.  Professor Roberson states in her declaration:[42]

Diversity data are used internally by firms for business purposes – specifically, to monitor human resource management effectiveness, many organizations use diversity metrics, such as that contained in EEO-1 reports, as a measurement analytic for workforce goal setting and planning.

33.   Dr. Roberson is correct that many firms use diversity data in designing and managing aspects of their internal operations.  Examples of these uses include: setting recruitment goals under affirmative action plans; estimating the potential adverse impact on employee diversity of a proposed layoff or reorganization; and awarding bonuses, raises, and promotions to managers who have excelled in hiring and retaining employees from under-represented backgrounds.  However, she is incorrect in implying that the diversity data they put to such uses are EEO-1 reports. As Paragraphs 18-20 above discussed, EEO-1 reports -- particularly Type 2 Consolidated Reports from earlier years -- are almost always too broad, too old, and inappropriately structured to relate to the specific internal operations that a firm would need to plan, estimate, or reward.

34.   Instead of consulting EEO-1 reports, employers typically direct the HR data analysts who prepare the EEO-1 reports to prepare *other reports* tailored to decisions that are being made. Both the EEO-1 reports and these other reports are typically derived from the same source, the company's Human Resource Information System (HRIS). However, they would be prepared separately and designed to serve very different information needs.  For instance, to allocate diversity-based bonuses, raises, and promotions to managers responsible for specific departments, firms would commission their EEO-1 staff to tabulate the race/ethnic/gender composition of its workforce department by department.  To set recruiting goals to implement affirmative action

---

[42] *Roberson Declaration* paragraph 21.

plans, data would be assembled for specific job titles. To estimate potential adverse impacts of layoffs, special analyses would be tailored to the exact timing and scope of the layoff being contemplated.

35. In short, Dr. Roberson confuses *EEO-1 reports themselves* with the *race/ethnicity/ gender data* underlying those reports.[43] Only Type 2 Consolidated EEO-1 reports themselves are at issue in this litigation. There are no FOIA requests for the underlying, detailed data or any non EEO-1 reports derived from those data.

## VI.  Foreseeable Harm to Firms from Releasing EEO-1 Reports

36. Economists, other business analysts, and business managers would forsee potential commercial harm to a firm whose records are publicly released if those records are likely to reveal commercially-valuable managerial data, financial data, or trade secrets. Section III documents that Federal contractors' Type 2 Consolidated EEO-1 reports do not directly provide such information; Section IV demonstrates that these reports cannot effectively be analyzed to reveal such information by proxy; and Section V illustrates that it is unlikely that anyone would even try to derive such information from these reports because of the ready availability of better alternative sources of information. Accordingly, economists, other business analysts, and business managers generally would not reasonably foresee that public release of such records is likely to impose commercial harm on Federal contractor firms.

## VII.  Can EEO-1 Reports Reveal Confidential Personal Information?

37. It is clear on their face that EEO-1 records do not contain, and therefore cannot reveal, data on multiple potentially sensitive or confidential personal characteristics about individual

---

[43] A similar confusion infects other aspects of the *Roberson Declaration*. Dr. Roberson presents an extended discussion (for example, in her paragraphs 8, 9, 10, 16, 18, and 20) of scholarly research documenting how workforce diversity adds value to firms. Her discussion here is largely correct. She also states -- again correctly -- that EEO-1 data was used in some of this research. But then she incorrectly implies that those two statements together mean that an individual company would find its own EEO-1 reports to add managerial value. This implication not only confuses a particular report with the data underlying those reports. It also confuses the value of *data on workforce diversity* with the value of *workforce diversity itself.*

employees -- for instance, age, disability, religion, family status, gender orientation, political affiliation, or criminal record.  These characteristics are nowhere addressed in these reports.

38.   The only personal information these records contain is employees' race/ethnicity/gender.  On these characteristics, Type 2 Consolidated EEO-1 reports provide only anonymous numerical counts and do not list, name, or otherwise identify individual employees included in those counts, let alone report race/ethnicity/gender for individual employees.  Accordingly, these records do not explicitly reveal information about the race/gender and gender of any individual.

39.   In Type 2 Consolidated EEO-1 reports filed by most Federal contractors, it is impossible to infer the race/ethnicity or gender of individual employees reported in most job categories because of the large number of individuals reported.  For example, defendant's bellwether firm Allied Universal has about 300,000 employees nation-wide,[44] including many tens of thousands of those workers who are security guards presumably reported in the EEO-1 job category of Service Workers.[45]  In that circumstance, it is extraordinarily unlikely that the number of Service Workers in even one of the less common race/ethnicity/gender categories (e.g., Native American females) would be small enough to identify any individual security guard.

40.   The only common circumstance in which it is even conceivable that EEO-1 data could identify the race/ethnicity/gender of any employee occurs when only a very small number of employees are reported in a job category.  Federal contractors with as few as 50 employees are required to file EEO-1 reports, and it is plausible to imagine that a firm of that small size might report, say, only five employees as Executives/Senior Level Officials and Managers.  Suppose hypothetically that such a firm's EEO-1 data reported one of those five as an Asian woman and the

---

[44] See footnote 24.

[45] I say "presumably" because, although Section 5 of the *EEO Instructions* provides both definitions and examples to guide assignment of types of employees to the 10 EEO-1 job categories, analysts of EEO-1 data have seen many instances in which reporting firms have not followed these rules.  One example from my own experience involves supermarket employees with the job title "Salad Bar Managers." These hourly employees' sole job duties of cleaning and stocking their store's salad bars clearly placed them in the category of Service Workers.  However, one supermarket chain categorized them as First/Mid-Level Officials and Managers to artificially inflate its number of women managers.

other four as White men.  An outside observer who knows those five individuals could reasonably identify which one is the Asian woman.  Attribution of race/ethnicity/gender from observation of a person's appearance is the same procedure employers are permitted to use in collecting data for EEO-1 reports.[46]

41.  But that identification would not necessarily mean that EEO-1 data had revealed personal information not already publicly known from non EEO-1 sources.  If the outside observer is familiar with the five individuals face-to-face, that observer could, *with no EEO-1 data*, independently identify that a person is an Asian woman by direct observation of her physical appearance, perhaps combined with other observable characteristics such as the person's accent or first or last names.

42.  Alternatively, if an outside observer seeks the race/ethnicity/gender of a person she or he has never met, information from which to infer the person's race/ethnicity/gender can frequently be obtained from a variety of non-confidential sources other than EEO-1 reports.  In particular:

- Some employers post employees' names, pictures, and other personal information on the firms' websites. This practice most often applies to higher-level executives.[47] For example, the website of bellwether firm Allied Universal provides names, pictures, and short biographies of its CEO and 12 members of its North American Executive Leadership Team.[48] From these materials, an outside observer could reasonably attribute a race/ethnicity/gender to each of these individuals.

- Other firms extend online publication of the names and pictures to a broader range of employees, such as mid-level managers and professionals, and sometimes even their entire staff.  For example, the website of the nationally-prominent law firm Jones Day offers names and pictures for all its attorneys, both partners and associates,[49] while the website of the tax accounting firm TaxComp provides names and pictures of all 15 members of its staff including clerical employees.[50]

---

[46] Section 4 of the *EEO-1 Instructions* states that the race/ethnicity gender category assigned to individual employees may be based on either the employee's voluntary self-identification or "observer identification."

[47] Significantly, these persons are likely to be reported in the EEO-1 job category of Executives and Senior Managers and Officials, which is the category most likely to contain small numbers of employees to make possible release of confidential information even conceivable (see paragraphs 39 and 40).  This coinciding circumstance makes disclosure of individuals' race/ethnicity/gender via EEO-1 reports even less likely.

[48] https://www.aus/ceo-biography and https://www.aus.com/about-us/our-people/.

[49] https://www.jonesday.com/en/lawyers/.

[50] https://www.taxcomp.net/about-us/meet-the-team/.

-18 -

- Some employees -- particularly those in senior managerial or professional positions -- make public appearances, receive coverage in the news media (especially the "trade press" covering their industry or profession), or otherwise have their physical appearance and other information publicly exposed.  Such information is typically easy to find using search engines such as Google, Google Scholar, or Google Image.

- Additional images revealing the physical appearance of employees in any EEO-1 job category may be exposed in news media coverage of those individuals in non-work contexts or in voluntary postings of images on internet sites that are not work-focused such as Facebook, Tik Tok, or match.com.

- Many members of the labor force seek to build their professional networks and advance their careers by posting extensive about themselves on business- and employment-focused social media platforms. The best known example, LinkedIn,[51] posts such information for some 500 million individuals worldwide.  These postings commonly include photographs of the person, along with other information that may suggest the person's race/ethnicity/gender such as first and last name, colleges attended, or volunteer activities.

### VIII.  Foreseeable Harm to Individuals from Releasing EEO-1 Reports

43.      Section VII has documented that the only employee personal data even conceivably discernable from Type 2 Consolidated EEO-1 reports for Federal contractors is employees' race/gender/ethnicity; that revelation of such data is only conceivable in the limited circumstance of a very small number of people being reported in the same race/gender/ethnicity group in the same job group; and that for employees in that circumstance, a wide range of non EEO-1 sources are likely to reveal, or have already revealed, those employee's race/ethnicity/gender. Accordingly, because public release of these EEO-1 reports is extremely unlikely to newly reveal confidential personal information, economists, other business analysts, and business managers would generally not reasonably forsee any harm to individuals covered in these reports.

---

[51] See paragraph 31 above.

BENDICK DECL. IN SUPP. OF
OPP. & CROSS MOT. SUMM. J

1            * * * * * * * * * *

2

3          I declare under penalty of perjury of the laws of the United States of America that the

4    foregoing is true and correct to the best of my knowledge and belief.

5

6          Executed on October 13, 2023 at Alexandria VA.

7

8                                    _____

9                                          Marc Bendick, Jr., Ph.D.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# ATTACHMENT A

**RESUME**

**MARC BENDICK, JR.**

___

**Dr. Bendick is an employment economist and nationally-recognized researcher specializing in public and private initiatives to enhance mainstream opportunities for traditionally-excluded individuals, families, businesses, and communities. For additional information, visit http://www.bendickegan.com or the entry for Marc Bendick, Jr. in Wikipedia.**

___

### ADDRESS

marc@bendickegan.com
**319 Prince Street**                                                    www.bendickegan.com
**Alexandria, VA 22314 USA**                                          **(202) 746-8268**

### CAREER CHRONOLOGY

**Bendick and Egan Economic Consultants, Inc.**, Alexandria, VA (1984 - 2023)

> Co-founder and Co-Principal in a firm providing economic, business, and social science analysis to the public, private, international, and non-profit sectors.

**The Urban Institute**, Washington, DC (1975 - 1984)

> Senior Research Associate and Program Manager leading needs assessment, program evaluation, and policy analysis studies under government and foundation sponsorship.

**University of Bristol**, Great Britain (1980)

> Visiting Associate Professor, School for Policy Studies.

**Nika Corporation**, Chicago (1973 - 1974)

> Urban development project planner and financial analyst.

**McDonnell Douglas Corporation**, Los Angeles (1968 - 1970)

> Staff economist and management analyst.

### EDUCATION

**Ph.D.**    Economics/Public Policy, University of Wisconsin, 1975 (with distinction)

**M.S.**    Economics/Management Science, University of Wisconsin, 1972

**B.A.**    Economics/Social Psychology, University of California, Berkeley, 1968 (with honors)

## PROFESSIONAL ACTIVITIES

**Consultant/contractor to public agencies** including City of Alexandria VA (Alexandria Fire Department, Alexandria Fund for Human Services); City of Atlanta; City of Chicago; California Department of Fair Employment & Housing; Congressional Government Accountability Office; Congressional Office of Technology Assessment; City of Detroit; District of Columbia Commission on Vocational Education; District of Columbia Commission on Social Services; City of Flint, MI; Mayoral Transition Team for the District of Columbia; Illinois Prairie State 2000 Authority; City of Miami; Michigan Civil Service Commission; New Jersey Office of the Public Advocate; New York City Commission on Human Rights; New York State Office of the Solicitor General; New York State Office of the Attorney General Civil Rights Bureau; Ohio Bureau of Employment Services; City of Pontiac, MI; City of Seattle Office of Civil Rights; City of Southfield, MI; U.S. Community Services Administration; U.S. Economic Development Administration; U.S. Environmental Protection Agency; U.S. Equal Employment Opportunity Commission; U.S. Food and Nutrition Service; U.S. Department of Health and Human Services; U.S. Department of Housing and Urban Development; U.S. Department of Justice; U.S. Department of Labor Office of Contract Compliance Programs; U.S. Department of Labor Office of Disability Employment Programs; U.S. Department of Labor Women's Bureau; U.S. National Commission for Employment Policy; U.S. National Institutes of Health Office of Equity, Diversity, and Inclusion; U.S. National Skills Standards Board; U.S. National Science Foundation,

**Consultant/grantee for non-profit and research organizations** including Abt Associates, Aetna Foundation, American Association of Retired Persons, American Bar Association Commission on Women in the Profession, American Civil Liberties Union, American Public Human Services Association, Annie E. Casey Foundation, Brody & Weiser, Carnegie Corporation, Center for Frontline Retail, Chase Bank Foundation, Cleveland Foundation, Committee for Economic Development, Committee on Strategies against Chronic Poverty, Community Development Research Center, Disability Rights New York, Economic Development Assistance Consortium, Educational Testing Service, Employment Justice Research Center, Fair Employment Council of Greater Washington, Ford Foundation, German Marshall Fund of the United States, Grantmakers Concerned with Immigrants and Refugees, Greater Washington Research Center, Heinz Awards, Hewlett Foundation, Housing for All (Denver), The Impact Fund, In for 13, Institute for Women's Policy Research, Interstate Conference of Employment Security Agencies, Job Opportunities Task Force (Baltimore), Jobs for District of Columbia Graduates, JP Morgan Chase Foundation, Justice Catalyst, Lawyers' Committee for Civil Rights under Law, Legal Services Corporation, MacArthur Foundation, Make the Road New York, Manpower Demonstration Research Corporation, Metlife Foundation, Charles Stewart Mott Foundation, NAACP Legal Defense Fund, National Academy of Public Administration, National Commission on Testing and Public Policy, National Center for Occupational Readjustment, National Employment Law Project, National League of Cities, National Planning Association, National Wildlife Federation, OMNI Institute, Organization of Women in International Trade, Organization Resources Counselors, Pelavin Associates, Primerica Foundation, Restaurant Opportunities Center of New York (ROC-NY) and Restaurant Opportunity Center United (ROC-U), Retail Action Project, Rider Pool Foundation, Rockefeller Foundation, Russell Sage Foundation, Sloan Foundation, Worker Rights Consortium, and Youngstown-Warren Regional Growth Association.

**Consultant to employers, employer associations, and employee associations** including American Express Corporation, Blue Cross/Blue Shield of Michigan, Center for Creative Practices, Control Data Corporation, Dupont Corporation, Equitable Life Assurance, Economic Systems Inc., Ford Motor Company/Visteon, Georgetown Day School, IBM, International Monetary Fund, Iron Reinforced Rodmen, Johns Hopkins Hospital and Health Systems, Macy's Department Stores, NewsGuild of New York, Orient Express Hotels, Royal Ahold NV/Giant Foods, Southern California Edison, Southern Wines and Spirits, U.S. Foodservice, World Bank Group, and Zenith National Insurance.

**Consultant to international and multinational organizations** including U.S. Agency for International Development, Australian Bureau of Labour Market Research, Australian Institute for Multicultural Affairs, Center for American Studies-Fudan University (China), Commission of the European Union, International Finance Corporation, International Monetary Fund, International Institute of Management-Berlin,

2

International Labour Organisation, Japanese Institute for Research Advancement, Organisation for Economic Cooperation and Development, UN Persons of African Descent, and the World Bank.

**Media source** quoted or appearing in AARP Bulletin, ABC World News, Advertising Age, Adweek, American Bar Association Perspective, Arkansas Gazette, Associated Press, Atlanta Journal-Constitution, Atlantic, Augusta (GA) Chronicle, Austin Chronicle, Baltimore Sun, Beaumont (TX) Enterprise, BET.com, Black Enterprise, BNet Business Network, Bloomberg Business Week, BBC News, BBC Panorama, Business and Human Rights Resource Centre, BNA Union Labor Report, Boston Globe, Center for Investigative Reporting/Reveal, Chicago Crusader, Christian Science Monitor, Class Action Litigation Report, CNN, CNNMoney.com, Congressional Digest, Congressional Quarterly, Corporate Board Member Magazine, Corporate Social Responsibility Data Network, Crain's New York Business, D Magazine (Dallas), Daily Beast, Daily Labor Report, Dallas Channel 8 (ABC), Deseret News, Detroit Free Press, Diversity Digest, DiversityInc, Diversity Officer Magazine, Employment Discrimination Report, Epoch Times, Fast Company, fireengineering.com, Fortune, Fox News, The Guardian (UK), Health Planning Reports, Houston Chronicle, HUDuser.org, Huffington Post, Inc., Institute for Social Entrepreneurs, Journal of Commerce, Journal of Housing, Lear's, the Linda Chavez Program, Los Angeles Times, McNeil-Lehrer News Hour, Mainstreet.com, Management Review, mediabistro.com, Memphis Commercial Appeal, Milwaukee Journal, Ms. Magazine, MSNBC, The Nation, Nation's Cities, National Civic Review, National Journal, National Public Radio, NBC Nightly News, New York, New York Post, New York Times, NPR Marketplace, NYTimes.com, Newsday, Newsweek, NY1, Occupational Health Safety, Phoenix Focus, Poverty and Race Research Action Council Newsletter, Public Affairs Information Service Bulletin, The Public Interest, racismreview.com, Restaurant News, Reuters, Revista University Sao Paulo (Brazil), San Francisco Chronicle, San Gabriel Valley News, San Jose Mercury News, Seattle Post-Intelligencer, Social Care Online, SHRM Online, Time, Times Higher Education, the Today Show, Tolerance.org, Training and Development Journal, United Press International, Univision, Urban Futures Information Exchange, Urban Outlook, USA Today, U.S. News and World Report, Voice of America, Wall Street Journal, Washington Business Journal, Washington Post, WBZ, WFUV, Which Way L.A, Women's Wear Daily, workforceanswers.com, Workforce Management, Working Papers, and WorkCite.

**Guest lecturer** at colleges and universities including American, Brandeis, Brown, Columbia, Cornell, Florida State, Franklin and Marshall, George Mason, George Washington, Georgetown, Johns Hopkins, Maryland, Missouri, New School for Social Research, North Texas, Princeton, Southern California, West Virginia, and Wisconsin. Non-faculty member of Ph.D. dissertation committees: Devah Pager, University of Wisconsin, 2002; Lauren Brown, Brandeis University, 2008.

**International** researcher and consultant with experience in Australia, Belgium, Commonwealth of the Northern Mariana Islands, Denmark, Finland, France, Germany, Ghana, Great Britain, Ireland, Jamaica, the Netherlands, New Zealand, Senegal, Switzerland, and Sweden.

**Member** (past or current): Alexandria VA Human Rights Commission (Commissioner, 2022-   ); National Academy of Sciences/National Research Council Committee on Methods for Collecting Pay Information; Board of Directors, Workplace Fairness, Inc.; Board of Directors and Treasurer, U.S. Committee to the International Council on Social Welfare; Board of Trustees, World Neighbors, Inc.; Program Advisory Committee, Equal Rights Center, Washington DC;[1] Board of Directors, Jobs for District of Columbia Graduates; Advisory Panel on Cities and Technology, Congressional Office of Technology Assessment; Advisory Panel on Dislocated Workers, Congressional Office of Technology Assessment; Employment Law Task Force; National Community Reinvestment Coalition; Academy of Management; American Economic Association; Society of Labor Economists; Association for Public Policy and Management (Equity & Inclusion Fellowship Committee); Council for Urban Economic Development; Industrial Relations Research Association; International Association for Diversity Management; International Association of Professionals in Employment Security; International Society of Diversity and Inclusion Professionals;; National Association for Forensic Economics; National Committee on Pay Equity; National Council on Public History (Committee on Inclusion, Diversity, Equity, and Accessibility, 2023-  ); Phi Beta Kappa; Social Psychology Network; Society for Human Resource Management (Senior Professional in

---

[1] Received the Equal Rights Center's Impact for Equality Award, January 2022.

Human Resources, Special Expertise Panel on Workforce Diversity; Taskforce on Diversity and Inclusion Standards); Society of Government Economists; Society for the Psychological Study of Social Issues; Unite the Park.org (Range of Light National Monument], Advisory Board).

**Speaker** before professional and general audiences including Academy of State and Local Government, AFL-CIO Meany Center for Labor Studies, All-African Conference on Housing and Urban Development (Senegal), American Academy of Arts and Sciences, American Association of Schools of Teacher Education, American Bar Association Section on Labor and Employment Law, ACLU National Leadership Conference, American Economic Association, American Human Services Association, American Psychological Association, Association for Global Business, Association of Providers of Employment and Training, Association for Public Policy and Management, Bar Association of San Francisco, Brookings Institution, Business Coalition for Education Reform, Business Development and Retention Council (Kansas City), Center for Strategic Analysis of the Office of the Prime Minister (France), Chase Manhattan Bank Community Development Group, Commission of the European Union (Brussels), Community Matters Forum (Florida), Congressional Research Service, Corporation for Enterprise Development, Council of State Governments, Council on Foundations, Cultural Contact Working Group, Department of Defense Workshop on Outplacement, DC Agenda, District of Columbia City-Wide Education Conference, District of Columbia Committee on Public Education, District of Columbia Department of Human Services, Diversity Best Practices, Equal Employment Trial Practice Institute, European Centre for Social Welfare Research and Training (Switzerland), Family Impact Seminar, Federal Reserve Bank of Boston, Florida Bar Association, Forty Plus, Georgia Rural Urban Summit, Grantmakers in Health, Greater London Enterprise (UK), Greater Washington Board of Trade, House of Representatives Republican Conference, Institute on the Urban Economy (France), In for 13, International Association of Fire Chiefs, International Association of Personnel in Employment Security, Interstate Conference of Employment Security Agencies, International Association of Women in Fire and Emergency Services, International Downtown Association, International Youth Employment Conference (New Zealand), Jobs for the Future, Job Opportunities Task Force (Baltimore), Johannesburg (South Africa) Regional Development Initiative, Labor Institute of Public Affairs, League of Women Voters, Manpower Demonstration Research Corporation, Metropolitan Washington Council of Governments, Milwaukee Economic Development Summit, Minority Business Legal Defense and  Education Fund, National Alliance of Business, NAACP Legal Defense Fund Training Institute, National Association for Welfare Research and Statistics, National Association of Black MBAs, National Association of Protective and Advocacy Systems, National Center for Research on Vocational Education, National Center for Neighborhood Enterprise, National Conference on Social Welfare, National Conference of State Legislatures, National Cooperative Bank, National Council for Employment Policy, National Council of La Raza, National Employment Law Institute, National Institute of Education, National League of Cities, National Science Foundation Social Behavioral and Economic Sciences Directorate, National Task Force on Tradeswomen Issues, National Urban Coalition, New York Restaurant Industry Summit, Northeast-Midwest Institute, Organization for Economic Cooperation and Development (Paris), ORIGIN (Organizational and Institutional Gender Information Network), Passaic County (NJ) Economic Development Authority, President's National Equal Pay Enforcement Task Force, Prince Georges County (MD) Planning Department, Program on Community Problem Solving, Public Education Network, Seattle-King County Workforce Development Council, Social Policy Association (UK), Society of Government Economists, Society for Human Resource Management, Society for Industrial and Organizational Psychology, Society for the Psychological Study of Social Issues, Southern Economic Association, Swedish National Labor Market Board, United Way of America, U.S. Chamber of Commerce, U.S. Department of Labor Women's Bureau, U.S. Equal Employment Opportunity Commission, U.S. Conference of Mayors, U.S. Information Agency, U.S. State Department International Information Program (Warsaw Embassy), and Vermont Department of Social Welfare.

**Expert witness** or consulting expert in more than 200 federal and state court cases concerning race, ethnicity, gender, age, disability, sexual orientation, and other discrimination in employment; patterns of employment and earnings; the employment implications of business development; and interpretation of social science data. According to search engines such as Westlaw, this work has been cited in 44 Federal court opinions and 109 law review articles or legal treatises.

**Research reviewer/journal referee**, <u>Academy of Management Learning and Education</u>;  <u>Administration in Social Work</u>; <u>Administrative Sciences</u>;  <u>American Journal of Psychotherapy</u>; <u>Analyses of Social Issues and Public Policy (ASAP)</u>; <u>Behavioral Sciences</u>; Cornell Industrial and Labor Relations Press; <u>Disability Studies Quarterly</u>; <u>Economic Development Quarterly</u>; <u>European Journal of Management Issues</u>; <u>European Sociological Review</u>; <u>Government & Policy</u>; <u>The Gerontologist</u>; <u>HealthCare</u>; Institute for Research on Poverty, University of Wisconsin; <u>International Journal of Diversity in Communities, Organisations and Nations</u>; *<u>International Journal of Environmental Research and Public Health</u>*; *<u>Journal of Aging and Social Policy</u>*; *<u>Journal of Community and Applied Social Psychology</u>*; *<u>Journal of Ethnic and Migration Studies</u>*, *<u>Journal of Forensic Economics</u>*; *<u>Journal of Policy Analysis and Management</u>*; *<u>Journal of Social Issues</u>* *(editorial board, 2022-    )*; *<u>Journal of Social Policy</u>*; *<u>Journal of Regional Science</u>*; *<u>Land Economics</u>*; *National Association of Forensic Economics; National Commission on Testing and Public Policy; National Science Foundation; <u>National Tax Journal</u>; Nuffield Foundation; Praeger Publishers; <u>Research on Aging</u>; <u>Sage Open</u>; Sloan Foundation; <u>Sex Roles</u>; <u>Social Science Journal</u>; <u>Social Service Review</u>; <u>Social Sciences</u>; <u>Societies</u>; <u>Sociological Perspectives</u>;* Springer Publishing; *<u>State and Local Government Review</u>*, and University of Wisconsin Press.

September 2023

# PROFESSIONAL PUBLICATIONS

***(Google Scholar and other search engines report that these publications have been cited by other researchers and analysts more than 5,000 times)***

## <u>2016 -</u>

142.  ***Economic Report: Range of Light National Monument***. Alexandria, VA: Bendick and Egan Economic Consultants, Inc., for <u>Unitetheparks.org</u>, 2023.

141.  "Race Discrimination and Segregation in Manufacturing Jobs: Evidence from Matched-Pair Testing of Staffing Agencies." ***Social Science Journal*** (2021) (with Elias Cohn).[2]

140.  "The Global Advertising Workforce: Who is Excluded and Why it Matters." Presentation at the ***Second Biennial Race in the Marketplace Forum***, June 2019 (with Mary Lou Egan).

139.  "Increasing Minority Employment: Are You Ready to Recruit?" ***Employment Relations Today*** (July 2018), pp. 1-5 (with Mary Lou Egan).[3]

138.  "Making it Count: Discrimination Auditing and the Activist Scholar Tradition." In: S. M. Gaddis (ed.). ***Audit Studies: Behind the Scenes with Theory, Method, and Nuance*** (Springer, 2018), pp. 45-62 (with Frances Cherry).

137.  ***Compliance with the Fair Chance Act: An Exploratory Testing Study***. New York: Commission on Human Rights, 2017.

---

[2] An earlier version appeared as *Opening the Door: Ending Racial Discrimination in Industrial Temp Hiring through Innovative Enforcement*.  New York: Partners for Dignity and Rights, 2021.

[3] An earlier version of this paper was presented at the Workshop on Attracting and Retaining U.S. Minorities, World Bank, Washington, DC, November 2010.

136.   "Employment Discrimination Against Persons with Disabilities: Evidence from Match Pair Testing," *International Journal of Diversity in Organizations, Communities, and Nations: Annual Review* 17 (1, 2017), pp. 11-25.[4]

135.   *Pathways to Equity, Narrowing the Wage Gap by Improving Women's Access to Good Middle-Skill Jobs* Washington: Institute for Women's Policy Research, 2016. (with Ariane Hegewisch, Barbara Gault, and Heidi Hartmann).

## 2011 - 2015

134.   "Using Information Regulation to Enhance Workplace Diversity, Inclusion and Fairness." *Argumenta Oeconomica Cracoviensia* 10 (2015), pp. 59-77 (with Mary Lou Egan).[5]

133.   "What Research Tells us about Women in Firefighting" **Testimony, City Council of the City of New York**, December 13, 2013.

132.   "Professionalizing Diversity and Inclusion Practice:  Should Voluntary Standards be the Chicken or the Egg?" *Industrial and Organizational Psychology: Perspectives on Science and Practice* 6 (2013), pp. 193-205 (with Rosemary Hayes-Thomas).[6]

131.   "Availability Estimates for Women and Why They Matter**." Presentation, AFL-CIO Third Annual Conference on Women in the Trade**s, Sacramento, April 2013.

130.   "Setting Industry-Level Priorities for EEOC Enforcement." **Testimony, Equal Employment Opportunity Commission Hearings on the Strategic Enforcement Plan**, July 2012.

129.   "Making Invisible Difference Visible in Measuring Inclusion." **Presentation at the George Mason University Conference on Diversity; Practice and Research,** June 2012.

128.   "Developing the Research Base for Controlling Bias in Hiring." *Journal of Social Issues* 68 (2012), pp. 238-263 (with Ana Nunes).

127.   *The Availability of Women, Racial Minorities, and Hispanics for On-Site Construction Employment.* Alexandria, VA: Bendick and Egan Economic Consultants, Inc. for the U.S. Department of Labor, 2011 (with M. Egan, J. Miller & L. Lanier).

126.   "Research Evidence on Disparate Treatment in Hiring.**" Testimony, U.S. Equal Employment Opportunity Commission Hearings on Discrimination in Hiring**, June 2011.

## 2006 - 2010

125.    "Employment Discrimination in Upscale Restaurants: Evidence from Paired Comparison Testing." *Social Science Journal* 47 (2010), pp. 802-818 (with Rekha Rodriguez and Sarumathi Jayaraman).[7]

---

[4] An earlier version of this paper was presented at the International Conference on Diversity in Organizations, Communities, and Nations, Toronto, July 2017.

[5] An earlier version of this paper was presented at the 13th International Human Resource Management Conference, Krakow, Poland, June 2014.

[6] An earlier version of this paper was presented as the Society for Industrial and Organizational Psychology Annual Conference, San Diego, April 2012.

124.    "The Business Case for Diversity and the Perverse Practice of Matching Employees to Customers." *Personnel Review* 39 (4, 2010), pp. 468-486 (with Mary Lou Egan and Louis Lanier).[8]

123.    "Taking the Heat, Gender Discrimination in Firefighting." **Journal of Gender, Social Policy and the Law** 17 (2010), pp. 705-749. (with Amanda Dupree, Richard Ugelow, et al.).

122.    **Transgender Need Not Apply: Gender Identity Job Discrimination in New York City's Retail Sector** New York: Make the Road New York, 2009 (with Chase Madar et al.).

121.    "Using Situation Testing to Document Employment Discrimination Against Persons with Psychiatric Disabilities." **Employee Relations Law Journal** 35 (Winter, 2009), pp. 40-60 (with Amir Tal, Galia Moran, and Dan-Olof Rooth).[9]

120.    "France's Mandatory 'Triple Bottom Line' Reporting: Promoting Sustainable Development through Informational Regulation," **International Journal of Environmental, Cultural, Economic, and Social Sustainability** 7 (5, 2009), pp. 27-47 (with Mary Lou Egan, Fabrice Mauleon, and Dominique Wolff).[10]

119.    **Research Perspectives on Race and Employment in the Advertising Industry** (Washington: Bendick and Egan Economic Consultants, Inc., 2009) (with Mary Lou Egan).

118.    "Manage Employer Inclusion, not Workforce Diversity!" **Presentation to the Society for Human Resource Management Annual Diversity Conference, Atlanta, October 2008** (with Mary Lou Egan).

117.    "Combining Multicultural Management and Diversity into One Course on Cultural Competence," **Academy of Management Learning and Education** 7 (September 2008), pp. 387-393 (with Mary Lou Egan).

116.    "Enhancing Women's Inclusion in Firefighting in the USA," **International Journal of Diversity in Communities, Organisations, and Nations** 8, 2 (2008), pp. 189-208 (with Denise Hulett, Sheila Thomas, and Francine Moccio).[11]

115.    "Measuring Inclusion in the Workplace: A Somewhat Economics Perspective," **Presentation to the National Science Foundation Social Economic and Behavioral Sciences Directorate, June 2008** (with Mary Lou Egan).

114.    "Measuring Inclusion in the Workplace," **Presentation to the American Psychological Association National Conference, San Francisco, August 2007** (with Mary Lou Egan).

---

[7] Portions of this paper also appear in **The Great Service Divide, Occupational Segregation and Inequality in the New York City Restaurant Industry** (New York: Restaurant Opportunity Center of New York and the New York City Restaurant Industry Coalition, 2009).

[8] An earlier version was presented at the 10th International Human Resource Management Conference, Santa Fe, NM, 2009.

[9] An earlier version was presented at the Fourth International Stigma Conference, London, 2009.

[10] Earlier versions were presented at the Second International Conference of the International Center for Corporate Accountability, New York, June 2007, and at the 25th Annual Research Conference, Association for Public Policy and Management, 2003.

[11] Alternative versions appeared as **A National Report Card on Women in Firefighting** (International Association of Women in Fire and Emergency Services, April 2008), and "A Fair Shake," **Fire Chief** (April 2008), pp. 36-40.

113.    "Situation Testing for Employment Discrimination in the United States of America," **Horizons Strategiques** 5 (July 2007), pp. 17-39.

112.    "How Can the EEOC Effectively Promote Employer Efforts to Hire the Best Employees and Avoid Discrimination?" **Testimony, Equal Employment Opportunity Commission Hearings on the E-RACE (Eliminate Racism and Colorism in Employment) Initiative**, February 2007.


## 2000 - 2005

111.    "Behavioral Science, Workforce Diversity Management, and Employment Litigation: Implications for Employment Testing," **Presentations to the Monash University Conference on Field Experiments on Discrimination in Markets,** Prato, Italy, July 2005 (with Ana Nunes and Mary Lou Egan).

110.    "Using Paired Comparison Testing to Develop a Social Psychology of Civil Rights," **Presentation to the Annual Conference of the Society for the Psychological Study of Social Issues, June 2004**.

109.    "Workforce Diversity Initiatives of US Multinational Corporations in Europe," **Thunderbird International Business Review** 45 (November-December 2003), pp. 701-727 (with Mary Lou Egan).[12]

108.    "The Emerging Job Market on the Internet," **Proceedings of the 7th Conference on International Human Resource Management, Limerick, Ireland, June 2003** (with Lauren E. Brown).

107.    "Beyond Simple Counts: A New Approach to Measuring and Monitoring Workforce Diversity," **Proceedings of the 7th Conference on International Human Resource Management, Limerick, Ireland, June 2003** (with Mary Lou Egan and John J. Miller).

106.    "US Firms' Evaluation of Employee Qualifications in International Business Careers." **International Journal of Human Resource Management** 13 (February 2002), pp. 76-88 (with Mary Lou Egan and John Miller).

105.    "Diversity Training: From Anti-Discrimination Compliance to Organization Development." **Human Resource Planning** 24 (2, 2001), pp. 10-25 (with Mary Lou Egan and Suzanne Lofhjelm.[13]

104.    "Using EEO-1 Data to Analyze Allegations of Employment Discrimination," **Presentation to the Section on Labor and Employment Law, American Bar Association**, July 2000.

103.    "Changing Workplace Cultures to Reduce Employment Discrimination." **Presentation to the Conference on Low Wage Workers in the New Economy**, Washington, DC May 2000.

102.    **Gender Occupational Segregation: An Analysis of Employers' EEO-1 Report**s. Newark, NJ: Employment Discrimination Project, Rutgers Law School (with Alfred W. Blumrosen, John J. Miller, and Ruth Blumrosen), 2000.


## 1995 - 1999

101.    **Surmounting Five Barriers to Business Participation**. Presentation to the Urban Institute/Department of Labor Conference on Workforce Development, May 1999. Washington: Bendick & Egan Economic Consultants, Inc., 1999.

---

[12]Reprinted in **Value Creation through Diversity** (Philadelphia: Wharton School of the University of Pennsylvania, 2002) and **Executive Reference Book** (Hyderabad: Institute of Chartered Financial Analysts of India, 2003).

[13]Awarded Walker Prize for Best Published Research in 2001, Human Resource Planning Society.

100.   **Welfare Reform and Beyond: Making Work *Work*.** New York: Committee for Economic Development, 2000 (with others).

99.   "No Foot in the Door: An Experimental Study of Employment Discrimination Against Older Workers." **Journal of Aging and Social Policy** 10 (4, 1999), pp. 5-23) (with Lauren Brown and Kennington Wall).[14]

98.   "Adding Testing to the Nation's Portfolio of Information on Employment Discrimination." In Michael Fix and Margery Turner (eds), **A National Report Card on Discrimination in America: The Role of Testing**. Washington: The Urban Institute, 1999, pp. 47-68.

97.   **Employment Discrimination Against Women and Minorities in Georgia**. Newark, NJ: Employment Discrimination Project, Rutgers Law School, 1999 (with Alfred W. Blumrosen, John J. Miller, and Ruth Blumrosen).

96.   **The Documentation and Evaluation of Anti-Discrimination Training in the United States.** Geneva: International Labour Office, 1998 (with Mary Lou Egan and Suzanne Lofhjelm).

95.   **Employment Discrimination Against Women in Washington State, 1997**. Newark, NJ: Employment Discrimination Project, Rutgers Law School, 1998 (with Alfred W. Blumrosen, John J. Miller, and Ruth Blumrosen).

94.   **Access, Diversity and Civil Rights Issues in the Development of Skills Standards.** Washington: National Skills Standards Board, 1997.

93.   **Connecting Inner-City Youth to the World of Work.** New York: Committee for Economic Development, 1997 (with others).

92.   "Employment Discrimination Against Older Workers: An Experimental Study of Hiring Practices." **Journal of Aging and Social Policy** 8 (4, 1996), pp. 25-46 (with Charles Jackson and J. Horacio Romero).

91.   **State of Michigan Equal Employment Opportunity Review**. Lansing: Civil Service Commission of the State of Michigan, 1996 (with Peter Robertson and Alfred W. Blumrosen).

90.   **Employment Practices and Employment Discrimination: A Bibliography Combining Economic, Managerial, and Behavioral Science Research.** Washington: Fair Employment Council of Greater Washington, Inc., second edition 1996.

89.   "Linking Learning and Earning." **Economic Development Quarterly** 10 (August 1996), pp. 217-223.

88.   **Discrimination Against Racial/Ethnic Minorities in Access to Employment in the United States**. Geneva: International Labour Office, 1996.

87.   "Employee Ownership and Participation Enhance Economic Development in Low-Opportunity Communities." **Journal of Community Practice** 2 (Winter 1995), pp. 61-85 (with Mary Lou Egan).

86.   "Making the Federal Government an Effective Partner in Community Revitalization." **Testimony**, Committee on Small Business, United States Senate, October 19, 1995.

85.   **Rebuilding Inner-City Communities:   A New Approach to the Nation's Urban Crisis.** New York: Committee for Economic Development, 1995 (with others).

84.   "Research Evidence on Discrimination and Affirmative Action in Employment." **Testimony**, Committee on the Judiciary, California State Assembly, May 4, 1995.[15]

---

[14]Cited in *Reeves v. Sanderson Plumbing Products, Inc.*, U.S. Supreme Court, 99-536, pp. 10-11.

**1990 - 1994**

83.   "The Case against a Misdirected Federal Neighborhood Strategy." **Environment and Planning C: Government and Policy** 12 (1994), pp. 490-493 (with Terra Geiger).

82.   "Measuring Employment Discrimination through Controlled Experiments." **Review of Black Political Economy** 23 (Summer 1994), pp. 25-48 (with Charles Jackson and Victor Reinoso).[16]

81.   "International Business Careers in the United States: Salaries, Advancement, and Male-Female Differences." **International Journal of Human Resource Management** 5 (February 1994), pp. 33-50 (with Mary Lou Egan).

80.   "Use of Testing in Civil Rights Enforcement." in Michael Fix and Raymond Struyk (eds.), **Clear and Convincing Evidence: Measurement of Discrimination in America**.  Washington, D.C.: Urban Institute Press, 1993: 345-376 (with Roderic Boggs and Joseph Sellers).

79.   "Linking Business Development and Community Development in Inner Cities." **Journal of Planning Literature** 8 (August 1993), pp. 3-19 (with Mary Lou Egan).

78.   "Racial and Ethnic Discrimination in Restaurant Franchising." **Testimony**, Committee on Small Business, U.S. House of Representatives, June 30, 1993 (with Kerry Scanlon).

77.   **EEO Testing Manual**. Washington: Fair Employment Council of Greater Washington, 1993 (with others).

76.   "Goal Setting." in **Opportunity Denied! A Study of Racial and Sexual Discrimination Related to Government Procurement in New York State**.  New York: New York State Department of Economic Development, 1992.

75.   "Designing an Effective Re-employment Program for Dislocated Workers." **Testimony**, Committee on Ways and Means, U.S. House of Representatives, April 30, 1992.

74.   **Getting a Job is a Job: A Curriculum for High School**. Washington: Fair Employment Council of Greater Washington, 1992 (with others).

73.    **Linking Learning with Earning: The Report of the Commission on Vocational Education**. Washington: District of Columbia Public Schools, 1992 (with others).

72.   "Discrimination Against Latino Job Applicants: A Controlled Experiment." **Human Resource Management** 30 (Winter 1991), pp.  469-484 (with Charles Jackson, Victor Reinoso, and Laura Hodges).[17]

---

[15]Reprinted in **Employee Advocate Supplement** 41(Fall 1995): 30-50; Stuart Nagel (ed.), **Research in Public Policy Analysis, Volume 9** (Greenwich, CT: JAI Press, 1998); **International Journal of Public Administration** 22 (8): 1213-1240; **International Journal of Economic Development** 2 (2): 256-274; and Stuart Nagel (ed.), **Diverse Perspectives on Peace, Prosperity, and Democracy** (Nova Publishers, 2002).

[16]Reprinted in **Discrimination and Affirmative Action: Are There Any Facts Out There?** (Sacramento: California State Legislature, 1995); James Stewart (ed.), **African-Americans in Post-Industrial Labor Markets** (New Brunswick, NJ: Transaction Books, 1997); and Fred L. Pincus & Howard J. Ehrlich (eds.), **Race and Ethnic Conflict: Contending Views on Prejudice, Discrimination, and Ethnoviolence** (Boulder: Westview Press, 1998).

[17]Reprinted in John Kromkowski (ed.), **Race and Ethnic Relations** (Guilford, CT: Dushkin Publishing, 1993), pp. 86-93, and **Discrimination and Affirmative Action: Are There Any Facts Out There?** (Sacramento: California State Legislature, 1995).

71. **Managing Greater Washington's Changing Work Force: Keys to Productivity and Profit**. Washington: Greater Washington Research Center, 1991 (with Mary Lou Egan).

70. "Should Labor Market Analyses Recognize that Blacks and Other Minorities are Disproportionately Omitted from Census Counts?  in **Papers of the 1990 Training Conference**. New York: NAACP Legal Defense & Education Fund, 1990 (with Daniel Edelman).

69. "Upgrade Training in Other Industrial Nations." in Michael Kane and Ann Meltzer, **Upgrade Training for Employed Workers**. Washington: Pelavin Associates for the U.S. Department of Labor, 1990 (with Mary Lou Egan).

68. "Financing Exports: What is the State Role?" in Richard D. Bingham, Edward W. Hill, and Sammis White (eds.), **Financing Economic Development**. Newberry Park, CA: Sage Publications, 1990: 222-240 (with Mary Lou Egan).

67. "The <u>Croson</u> Decision Mandates that Setaside Programs be Tools of Business Development." **George Mason University Civil Rights Law Journal** 1 (Spring 1990): 87-104.[18]

### 1985 - 1989

66. "Welfare to Work: The Research Basis for a Program Emphasizing the Employer Side of the Labor Market." **Proceedings of the National Workshop on Welfare Research and Statistics**.  Washington: National Association for Welfare Research and Statistics, 1989.

65. **Building a Job Service for the Year 2000: Innovative State Practices.**  Washington: Interstate Conference of Employment Security Agencies, 1989.

64. **Auditing Race Discrimination in Employment: A Research Design**. Washington: The Urban Institute, 1989.

63. "Privatizing the Delivery of Social Welfare Services: An Idea to be Taken Seriously." in Sheila Kamerman and Alfred J. Kahn (eds.), **Privatization and the Welfare State**.  Princeton: Princeton University Press, 1989, pp. 97-120.

62. "Matching Workers and Job Opportunities: What Role for the Federal-State Employment Service?" in D.L. Bawden and Felicity Skidmore (eds.), **Rethinking Employment Policy**.  Washington, DC: Urban Institute Press, 1989: 81-108.

61. **Jobs: Employment Opportunities in the Washington Area for Persons with Limited Employment Qualifications.**  Washington: Greater Washington Research Center, 1988 (with Mary Lou Egan).

60. "Alternative Uses of Unemployment Compensation: Self-Employment Allowances." **Testimony**, Committee on Ways and Means, U.S. House of Representatives, December 14, 1987 (with Mary Lou Egan).

59. "Promoting Employer-Provided Worker Reskilling: Lessons from a Tax Credit System in France." **Testimony**, Joint Economic Committee, U.S. Congress, October 29, 1987 (with Mary Lou Egan).

58. "Transfer Payment Diversion for Small Business Development: British and French Experience." **Industrial and Labor Relations Review** 40 (July 1987): 528-542 (with Mary Lou Egan).[19]

---

[18]Also presented as **Testimony**, **Committee on the Judiciary, U.S. House of Representatives**, November 30, 1989.

[19]Reprinted as **The New Entrepreneurs.**  London: Centre for Employment Initiatives, 1988.

57.   "Enhancing Employment Opportunities for Minority and Disadvantaged Youth." in Ray Rist (ed.), **Policy Studies Review Annual, Volume 8**. New Brunswick, N.J.: Transaction Books, 1987: 452-466.

56.   "Look Who's Becoming an Entrepreneur." **Across the Board** 24 (January 1987): 52-54 (with Mary Lou Egan).

55.   **The Human Resources Component of an Economic Revitalization Strategy for the Mahoning Valley.** Youngstown, Ohio: Regional Growth Association, 1987.

54.   "Targeting Benefit Payments in the British Welfare State." in Jerome McKinney and Michael Johnston (eds.) **Fraud, Waste, and Abuse in Government**. Philadelphia: Institute for the Study of Human Issues, 1986: 49-59.

53.   "Enterprise Zones and Inner City Economic Revitalization." in George Peterson (ed.) **Reagan and the Cities.** Washington:Urban Institute Press, 1986: 97-130 (with David W. Rasmussen).

52.   "The Role of Small Business Entrepreneurship in Urban Economic Development," in Marc Lipsitz (ed.), **Revitalizing Our Cities**. Washington: National Center for Neighborhood Enterprise, 1986: 48-52.

51.   "The Rural-Urban Dimension in National Economic Development." **Journal of Developing Areas** 20 (January 1986): 203-222 (with Mary Lou Egan).[20]

50.   **A Program to Address the Employment Consequences of Acid Rain Control.** Washington: National Wildlife Federation, 1985.

49.   "Housing Assistance Shifts from Construction to Vouchers." **Journal of the American Planning Association** 8 (September 1985): 475- 476.

48.   "The Role of Retraining in the Reemployment of Trade-Displaced Workers." **Testimony**, Committee on Finance, U.S. Senate, September 17, 1985.

47.   "Research Evidence on the Cost-Effectiveness of the Job Corps." **Testimony**, Committee on Government Operations, U.S. House of Representatives, May 23, 1985.

46.   "Improved Program Administration Can Benefit both Recipients and Oregon Taxpayers." **Testimony**, Committee on Human Resources and the Aging, Oregon House of Representatives, March 1985.

45.   "Private Sector Initiatives or Public-Private Partnerships?" in Lester A. Salamon and Michael Lund (eds.) **The Reagan Presidency and the Governing of America.** Washington: Urban Institute Press, 1985: 455-479 (with P. Levinson).

44.   **The Role of Publicly-Sponsored Export Trading Companies in the Relief of Unemployment and Regional Economic Distress.** Washington: Bendick & Egan Economic Consultants, Inc., 1985 (with Mary Lou Egan).

## 1980 - 1984

43.   "Worker Mobility in Response to a Plant Closure." in Richard Swigart (ed.) **Managing Plant Closures and Occupational Readjustment**.  Washington: National Center for Occupational Readjustment, 1984: 47-59.

42.   "Privatization of Public Services: Recent Experience." in Harvey Brooks et al. (eds.) **Public-Private Partnership**. Cambridge, MA: Ballinger, 1984: 153-171.[21]

---

[20]Reprinted in **Problemes Politiques et Sociaux** 572 (November 27, 1987), pp. 25-27.

41.   "Dislocated Workers and Midcareer Retraining in Other Industrial Nations." in Kevin Hollenbeck et al. (eds.) **Displaced Workers: Implications for Education and Training Institutions**. Columbus, Ohio: National Center for Research in Vocational Education, 1984: 189-208.[22]

40.   "A Methodology for Selecting Economic Development Incentives." **Growth and Change** 15 (January 1984): 18-25 (with David W. Rasmussen and Larry C. Ledebur).

39.   "Federal Tax Incentives, Federal Expenditures, and Inner City Economic Revitalization." **Testimony**, Committee on Ways and Means, U.S. House of Representatives, November 1983 (with David W. Rasmussen).

38.   **Reinvesting in Employment and Training Programs: A Portfolio of Innovative Federal Initiatives**.  The Urban Institute, 1983.

37.   **How's Business in the Reagan Era?**  Washington: The Urban Institute, 1983 with Phyllis M. Levinson).

36.   "Employment and Training Programs to Reduce Structural Unemployment." **Testimony**, Joint Economic Committee, U.S. Congress, September, 1983.[23]

35.   "America's Implicit Industrial Policy." **Testimony**, Committee on Banking, U.S. House of Representatives, June 1983.

34.   "Government's Role in the Job Transitions of America's Displaced Workers." **Testimony**, Committee on the Budget, U.S. House of Representatives, June 1983.[24]

33.   "Reemploying Displaced Workers: Five Strategies for Pennsylvania." **Testimony**, House of Representatives' Committee on Appropriations, Legislature of the Commonwealth of Pennsylvania, March 1983.

32.   "The Swedish 'Active Labor Market' System for Reemploying Displaced Workers." **Journal of Health and Human Resources Administration** 6 (Fall 1983): 209-224.

31.   **Employment and Training Programs for Migrant and Refugee Youth: Lesson from the United Statesd Experience.  Washington:**  The Urban Institute, 1983 (with Manuel De La Puente).

30.   "Lessons for Future Social Experiments." in Joseph Friedman and Daniel Weinberg (eds.) **The Great Housing Experiments**. Beverly Hills, Ca.: Russell Sage, 1983: 258-265 (with Raymond J. Struyk).

29.   "The Role of Public Programs and Private Markets in Reemploying Displaced Workers." **Policy Studies Review** 2 (May 1983): 715-733.

28.   "Vouchers versus Income versus Services: An American Experiment in Housing Policy." **Journal of Social Policy** 11 (July 1982): 365-377.

---

[21]Reprinted in J. Steven Ott, Albert C. Hyde, and Jay M. Shafritz (eds.), **Public Management: The Essential Readings** (Chicago: Nelson-Hall Publishers, 1991).

[22]Reprinted in Ray Rist (ed.) **Finding Work: Cross-National Perspectives on Employment and Training.** London: Falmer Press, 1986: 159-172.

[23]Reprinted in Ray Rist (ed.), **Policy Studies Review Annual, Volume 7**. New Brunswick, NJ: Transaction Books, 1985: 359-378; and in **The Entrepreneurial Economy** 3 (August 1984): 8-9.

[24]Reprinted in Terry F. Buss et al. (eds.) **Revitalizing the American Economy**. New York: Praeger Publishers, 1986: 158-175.

27. "Recent Research in the United States on Social Problems Common to Industrial Societies." in **Trends in Policy Research in the United States and Europe.** Tokyo: National Institute for Research Advancement, 1982: 247-511.

26. "Evaluating State Economic Development Incentives from a Firm's Perspective." **Business Economics** 17 (May 1982): 23-29 (with David W. Rasmussen and Larry C. Ledebur).

25. "Employment, Training, and Economic Development." in John R. Palmer and Isabel V. Sawhill (eds.) **The Reagan Experiment**. Washington: Urban Institute Press, 1982: 247-269.

24. "Providing Industrial Jobs in the Inner City." **Business** 32 (January - March 1982): 2-9 (with Mary Lou Egan).[25]

23. "Enterprise Zones: Area Targeting is the Key to the Job Generation Process." **Testimony**, Committee on Finance, U.S. Senate, April 1982 (with David W. Rasmussen).[26]

22. Plant Closure and Worker Layoff Procedures in the United States. Washington, DC: The Urban Institute, 1981.

21. "Enterprise Zones: A Land Banking Approach." **Testimony**, Senate Minority Task Force on Economic Development, Legislature of the State of New York, September 1981.[27]

20. **A Federal Entrepreneur? Industrial Policy and American Economic Revitalization.** Washington: The Urban Institute, 1981.

19. **Public-Private Partnerships for Urban Development, Preconditions and Payoffs**. Washington, DC: U.S. Department of Housing and Urban Development, 1981 (with Raymond J. Struyk and James Zais).

18. "National Industrial Policy and Economically-Distressed Communities." **Policy Studies Journal** 10 (December 1981): 220-234 (with Larry C. Ledebur). [28]

17. "Workers Dislocated by Economic Change: Do They Need Federal Employment and Training Assistance?" in **The Federal Interest in Employment and Training**. Washington: National Commission For Employment Policy, 1981: 175-226 (with Judith Radlinski Devine).[29]

16. **Housing Vouchers for the Poor: Lessons from a National Experiment**. Washington: Urban Institute Press, 1981 (editor, with Raymond J. Struyk).

15. "Failure to Enroll in Public Assistance Programs." **Social Work** 25 (July 1980): 268-274.

14. "Quality Control in a Federal-State Public Assistance Program." **Administration in Social Work** 4 (Spring 1980): 7-20.

---

[25]Reprinted in **Economic Development Commentary** 5 (January 1981): 13-16.

[26]Reprinted in **Congressional Quarterly** 64 (May 1982): 145-147.

[27]Reprinted in **Economic Development Commentary** 6 (Summer 1982): 11-13.

[28]Reprinted in F. Stevens Redburn and Terry H. Buss (eds.) **Public Policies for Distressed Communities**. Lexington, MA: D.C. Heath, 1982: 3-14.

[29]Reprinted in **The Entrepreneurial Economy** 1 (December 1982): 10-11.

## 1970 – 1979

13.  "A Management Analysis Process for Public Assistance Quality Control." in **Welfare Research and Statistics**. Washington: Department of Health, Education, and Welfare, 1979.

12.  **The Anatomy of AFDC Errors.** Washington: Urban Institute Press, 1978 (with Abe Lavine and Toby H. Campbell).

11.  Improving Measures of Economic Well Being [Review]." **Social Service Review** 52 (June 1978): 315-316.

10.  "The Literacy of Welfare Clients." **Social Service Review** 52 (March 1978): 56-68 (with Mario Cantu).

9.   "WIC and the Paradox of In-Kind Transfers." **Public Finance Quarterly** 6 (July 1978): 359-80.

8.   "Management Training for Public Welfare Agencies." **Administration in Social Work** 1 (Winter 1977): 359-67 (with Mary Lou Egan).

7.    "Cost-Effective Actions for Reducing AFDC Eligibility and Payment Errors." **Testimony**, Committee on Government Operations, U.S. House of Representatives, October 1977.

6.    **Income-Conditioned Programs and their Clients.** Washington: Urban Institute Press, 1977 (with D. Lee Bawden).

5.   "Education as a Three-Sector Industry." in B. A. Weisbrod. **The Voluntary Non-Profit Sector: An Economic Analysis**. Lexington, MA: D.C. Heath, 1977: 101-142.

4.   **Toward Efficiency and Effectiveness in the WIC Delivery System**. Washington: Urban Institute Press, 1976 (with Toby H. Campbell, D. Lee Bawden, and Melvin Jones).

3.   "Designing Circuit-Breaker Property Tax Relief." **National Tax Journal** 27 (March 1974): 19-28.[30]

2.   "Reforming the Homestead Credit for Property Tax Relief." **Testimony**, Joint Finance Committee, Wisconsin State Legislature, February 1974.

1.    **Linear Programming Tools for Aircraft Systems Analysis**. Long Beach, CA: McDonnell Douglas Corporation, 1970.

---

[30]Awarded Harold M. Groves Prize for Excellence in Public Finance Research, 1974.

# ATTACHMENT B

**MARC BENDICK, JR., Ph.D.**

**CASES AND PROJECTS IN LITIGATION SUPPORT**

**September 2023**

## I. CASES IN WHICH A FEDERAL COURT
## ACCEPTED BENDICK AS AN EXPERT[1]

[217]  Adams et al. v. Brookshire Grocery Company (U.S. District Court for the Eastern District of Texas, Tyler Division, 6:98-CV-00462)

Expert testimony via reports concerning gender patterns in promotion, assignment, and compensation of retail sales employees.  Client: Rod Tanner and Associates, Fort Worth, TX, representing plaintiffs

[216]  Alcarez v. Block (U.S. District Court for the Eastern District of California, C.A. S-82-298-RAR)

Expert testimony before a judge via declaration concerning the demographic characteristics of low-income persons.  Client: California Rural Legal Assistance, San Francisco, CA, representing plaintiffs.

[215]  Anderson v. Douglas **&** Lomason Co.  (U.S. District Court for the Northern District of Mississippi, C.A. DC 85-160-LS-0)

Expert testimony before a judge concerning racial patterns in employment in a manufacturing company. Client: Lawyers' Committee for Civil Rights under Law, Washington, DC, representing plaintiffs.

[214]  Appleton et al. v. Deloite, Touche (U.S. District Court for the Middle District of Tennessee, No, C-95-0483)

Expert testimony via deposition and reports concerning race patterns in the hiring, promotion, assignment, and compensation of professional and administrative employees.  Client: Lieff, Cabraser, Heimann & Bernstein, San Francisco, representing plaintiffs.

[213]  Armstrong et al. v. Ford Motor Company and Visteon Corporation (U.S. District Court for the Middle District of  Tennessee, Nashville Division, 3-01-0012)

Design and implementation of a post-settlement monitoring system concerning race patterns in the employment of salaried employees. Client:  Visteon Corporation/ Ford Motor Co., Detroit, MI, on behalf of both plaintiffs and defendants.

[212]  Baker et al v. City of Detroit (U.S. District Court for the Eastern District of Michigan, 1979)

Expert testimony via a report before a judge concerning racial patterns in promotions in a police department. Client:  Law Department, City of Detroit, MI, representing defendants.

[211]  Berger et al. v. United Ironworkers Reinforced Rodmen (U.S. District Court for the District of Columbia, C.A. 75-1743)

---

[1] Court stated that he was qualified as an expert, allowed him to present an opinion, explicitly cited his evidence in a decision, or appeared to rely on his evidence in a decision.

1

Expert testimony before a magistrate concerning the economic loss associated with racial patterns in admission to a construction craft union. Client: Washington Lawyers' Committee for Civil Rights with Patton Boggs & Blow, Washington, DC, representing plaintiffs.

[210]   Brionez et al. v. U.S. Department of Agriculture (U.S. District Court for the Northern District of California, C 01 3969CW)

Expert testimony before a special master and a judge via a report concerning the employment of Hispanics in the United States Forest Service. Client: Mexican American Legal Defense and Education Fund, Inc. San Francisco, representing plaintiffs.

[209]   Bush et al. v. Ruth's Chris Steak House, Inc. (U.S. District Court for the District of Columbia, C 1:10-cv-01721-RBW)

Expert testimony via deposition and reports concerning gender patterns in promotion, assignment, compensation, discipline, and termination of administrative and managerial employees. Client: Mehri & Skalet, PLLC, Washington, DC, representing plaintiffs.

[208]   Butler et al. v. Home Depot, Inc. and Frank et al. v. Home Depot, Inc. (U.S. District Court for the Northern District of California, C 94 - 4335 (SI) and C 95 -2182 (SI))

Expert testimony via deposition and reports concerning gender patterns in the hiring, promotion, assignment, and compensation of retail sales employees. Client: Lieff, Cabraser, Heimann & Bernstein, San Francisco, representing plaintiffs.

[207]   Clark et al. v. Anna's Linen Company et al. (U. S. District Court for the Northern District of California, C05-02670)

Expert testimony via deposition and reports concerning gender patterns in the employment of retail employees. Client: Goldstein, Demchak, Baller, Borgen & Dardarian, Oakland, CA, representing plaintiffs.

[206]   Coleman v. Best (U.S. District Court for the District of Maryland, C.A. H85-1828)

Expert testimony before a jury concerning the economic loss associated with the death of a blue collar worker. Client: Kiersh and Buckman, Washington, DC, representing plaintiffs.

[205]   Detroit Police Officers' Association v. Young (U.S. District Court for the Eastern District of Michigan, Southern Division, C.A. 74-71838)

Expert testimony via deposition and reports concerning racial and gender patterns in employment in a police department. Client: Law Department, City of Detroit, MI, representing defendants.

[204]   Dukes et al. v. Wal-Mart Stores, Inc. (U.S. District Court for the Northern District of California, No. C-01-2252 MJJ)

Expert testimony via deposition and reports concerning gender patterns in the employment of retail managers. Client: The Impact Fund, Oakland, CA, representing plaintiffs.

[203]   Easterling et al. v. Connecticut Department of Corrections (U.S. District Court for the District of Connecticut, Civil Action 3:08-cv-0826 (JCH))

2

Consultation and data analysis concerning economic damages to female job applicants adversely affected by a physical abilities test.  Client: Outten & Golden, New York, representing plaintiffs.

[202]  <u>EEOC v. Francis Parker School</u> (U.S. District Court for the Northern District of Illinois, Eastern Division, C 91 4674)

Expert testimony via a report concerning age patterns in the employment of secondary school faculty.  Client: U.S. Equal Employment Opportunity Commission, Chicago, District Office, representing          plaintiffs.

[201]  <u>EEOC v. Walgreen Co.</u> (U.S. District Court for the Southern District of Illinois, 07-172).

Expert testimony via deposition and reports concerning racial patterns in hiring, promoting, and assigning managerial and professional employees in a large retail chain. Client:  U.S. Equal Employment Opportunity Commission, St.  Louis office, representing plaintiffs.

[200]  <u>Ellis et al. v. Costco</u>  (U.S. District Court for the Northern District of California, C.A. 04 3341 MHP)

Expert testimony via deposition and reports concerning gender patterns in employment among retail employees.  Client:  The Impact Fund, Berkeley, CA, representing plaintiffs.

[199]  <u>Foggs v. Block</u> (U. S. District Court for the District of Massachusetts, C.A. 81-0365-F)

Expert testimony via deposition concerning the demographic characteristics of low-income persons. Client: Western Massachusetts Legal Services, Springfield, MA, representing plaintiffs.

[198]   <u>Zollicoffer et al. v. Gold Standard Baking, Inc. and Personnel Staffing Group</u> (U.S. District Court for the Northern District of Illinois, Eastern Division, C.A. 13 C 1524)

Expert testimony via reports and deposition concerning employment referrals and employment of unskilled manufacturing workers.  Client: Cohen, Milstein, Sellers & Toll, Washington, DC, representing plaintiffs.

[197]  <u>Guerrero v. California Department of Corrections</u>  (U. S. District Court for the Northern District of California, C 13-05671 WHA)

Expert testimony before a judge concerning national origin patterns in employment restrictions on persons who previously used a false Social Security number.  Client: Employment Law Center-Legal Aid Society, San Francisco, representing plaintiff.

[196]  <u>Haynes et. al. v. Shoney's Inc. et al</u>. (U. S. District Court for the Northern District of Florida, Penascola Division, C.A. 89-3093-WEA).

Expert testimony before a judge concerning racial patterns in the employment of  restaurant workers.  Client: NAACP Legal Defense Fund, New York, representing plaintiffs.

[195]   <u>Houser et al.  v. Prtizker</u> (U.S. District Court for the Southern District of New York, 10 CIV-3105-FM)

Expert testimony via deposition and reports concerning the race/ethnic patterns in the employment of enumerators for the 2010 Census.  Client:  Outten & Golden LLP, New York, representing Plaintiffs.

[194]  <u>Kraszewski v. State Farm Insurance Co</u>. (U.S. District Court for the Northern District of California, C 79-1261 TEH)

Expert testimony via deposition and reports concerning gender patterns in the employment of professional sales agents.  Client: Saperstein, Goldstein, Demchak & Baller, Oakland, CA, representing plaintiffs.

3

[193] <u>Lewis et al. v. City of Chicago</u> (U.S. District Court for the Northern District of Illinois, Eastern Division, 98 C 5596)

Expert testimony before a judge concerning racial patterns in the hiring of fire fighter and economic damages associated with those patterns. Client: Chicago Lawyers' Committee for Civil Rights under Law, representing plaintiffs.

[192] <u>Middleton et al v. City of Flint et al</u> (U.S. District Court for the Eastern District of Michigan, Southern Division - Flint, C.A. 90-CV40148-FL)

Expert testimony via reports concerning racial patterns in employment in a police department. Client: Keller, Thoma, Schwarze, Schwarze, DuBay & Katz, Detroit, MI, representing defendants.

[191] <u>NAACP v. Detroit</u> (U.S. District Court for the Eastern District of Michigan, Southern Division, C.A. 80-73693)

Expert testimony before a judge concerning racial patterns in employment in a police department. Client: Law Department, City of Detroit, MI, representing defendants.

[190] <u>Nelson and Armstrong et. al. V. Wal-Mart Stores, Inc. et al.</u> (U.S. District Court for the Eastern District of Arkansas, Eastern Division, Case 2:04-cv-00171-WRW)

Expert testimony via reports concerning racial patterns in employment of truck drivers by a large retail firm. Daubert motion to exclude was denied. Client: Cauley, Bowman, Carney & Williams, P.L.L.C., Little Rock, AR, representing plaintiffs.

[189] <u>Pearce v. Griffin Bell</u> (U.S. District Court for the District of Columbia, C.A. 86-0008)

Expert testimony before a jury on the economic loss associated with separation from employment of a corporate manager. Client: Milliken, Van Susteren, and Canan, P.C., Washington, DC, representing plaintiff.

[188] <u>Pegues v. Mississippi State Employment Service</u> (U.S. District Court for the Northern District of Mississippi, C.A. DC 72-4-LS)

Expert testimony before a judge concerning racial and gender patterns in referrals by a state employment service. Client: Lawyers' Committee for Civil Rights under Law, Washington, DC, representing plaintiffs.

[187] <u>Peterson and Olson et al. v. Seagate Technologies et al.</u> (U.S. District Court for the District of Minnesota, C.A. 84 Civil 07-2502 MJD/AJB)

Expert testimony via deposition and reports concerning age patterns in a layoff in a high tech firm. Client: Bertelson Law Offices, Minneapolis, MN, Dorene R. Sarnoski Law Office, Minneapolis, MN, and AARP, Washington, DC representing plaintiffs.

[186] <u>Pines v. State Farm Insurance</u> (U.S. District Court for the Central District of California, C.A. SACU 89-63/AHS)

Expert testimony via reports concerning age patterns in the employment of professional sales agents. Client: American Association of Retired Persons, Washington, DC, representing plaintiffs.

[185] <u>Satchell et al. v. Fedex Express</u> (U.S. District Court for the Northern District of California, C-03-2659 SI)

Expert testimony via deposition and reports concerning race/ethnic patterns in the employment of manual workers and supervisors in a package delivery service. Client: Lieff, Cabraser, Heimann & Bernstein, San Francisco, representing plaintiffs

4

[184]   <u>Shores et al. v. Publix Super Markets, Inc</u>. (U.S. District Court for the Middle District of Florida, Tampa Division, C.A. 95-1162-CIV-T-25E).

Expert testimony via deposition and reports concerning gender patterns in employment in the retail industry. Client: Saperstein, Goldstein, Demchak & Baller, Oakland, CA, representing plaintiffs.

[183]   <u>Tucker et al. v, Walgreen Company</u> (U.S. District Court for the Southern District of Illinois, East St. Louis Division, cv.  05-00440-GPM CJP)

Expert testimony via deposition and reports concerning racial patterns in hiring, promoting, and assigning managerial and professional employees in a large retail chain. Client: Goldstein, Demchak, Baller Borgen & Dardarian, Oakland, CA, representing plaintiffs.

[182]   <u>United States v. City of Miami</u> (U.S. District Court for the Southern District of Florida, C. A. 75-3096-CIV-KEHOE)

Expert testimony before a judge concerning race, sex, and national origin patterns in hiring and promotions in a fire department.  Client: City Attorney for the City of Miami, FL, representing defendants.

[181]   <u>United States v. Commonwealth of the Northern Mariana Islands</u> (U.S. District Court for the Northern Mariana Islands, C.A. 92-0016)

Expert testimony via deposition and reports concerning national origin patterns in the promotion and compensation of public school teachers. Client: Civil Rights Division, U.S. Department of Justice, Washington, D.C., representing complainants.

[180]   <u>Walker v. Prince Georges County</u> (U.S. District Court for the District of Maryland, C.A. Y86-3446)

Expert testimony before a jury concerning the economic loss associated with the death of a blue collar worker/ small business owner.  Client:  Milliken, Van Susteren & Canan, P.C., Washington, DC, representing plaintiffs.

[179]   <u>Williams v. New Orleans</u> (U.S. District Court for the Eastern District of Louisiana, C.A. 73-629)

Expert testimony before a judge concerning racial patterns in hiring and promotion in a large police department.  Client: NAACP Legal Defense Fund, New York, representing plaintiffs.

[178]   <u>Workman v. J.R. Simplot Company, Inc.</u> (U. S. District Court for the District of Idaho, C.A. CIV 91-0105 S EJL)

Expert testimony via deposition and reports concerning gender patterns in employment and wages in a manufacturing firm.  Client: Givens, Pursley & Huntley, Boise, ID, representing plaintiffs.


## II.  CASES IN WHICH A STATE COURT OR OTHER TRIBUNAL ACCEPTED BENDICK AS AN EXPERT[2]

[177]   <u>Ball v. Blue Cross Blue Shield of Michigan</u> (Circuit Court for Wayne County, Michigan, C.A. 04-411518-CD)

Expert testimony before an arbitration tribunal concerning the separation from employment of an executive. Client: Plunkett & Cooney, P.C., Detroit, MI, representing defendant.

---

[2] For a definition, see footnote 1.

5

[176]   Blackwell v. Administrator, General Services Administration (EEOC 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X)

Expert testimony before an EEOC hearing examiner concerning racial patterns in promotions in a large federal agency.  Client: Yablonski, Both & Edelman, Washington, DC, representing plaintiff.

[175]   Dysert v. Westinghouse Electric, Inc. (Court of Common Pleas of Philadelphia County, Pennsylvania, Number 2572, July Term 1988)

Expert testimony before a jury concerning the economic loss associated with separation from employment of a professional employee.  Client:  Bernabei & Katz, Washington, D.C., representing plaintiff.

[174]   Jock et al. v. Sterling Jewelers, Inc. (American Arbitration Association Case 11 160 00655 08)

Consultation and data analysis concerning gender patterns in assignment, promotion and compensation of retail sales and sales management employees. Client: Cohen Milstein Hausfeld & Toll, Washington, DC, representing plaintiffs.

[173]   Lee v. District of Columbia (Superior Court of the District of Columbia, C.A. 13578-83)

Expert testimony before a jury via deposition concerning the economic loss associated with the death of a homemaker/ parent.  Client: Milliken, Van Susteren, and Canan, P.C., Washington, DC, representing plaintiffs.

[172]   McDowell v. District of Columbia (Superior Court of the District of Columbia, C.A. 8665-84)

Expert testimony before a jury concerning the economic loss associated with the death of a blue collar worker. Client: Milliken, Van Susteren, and Canan, P.C., Washington, DC, representing plaintiffs.

[171]   OFCCP v. Packaging Corporation of America (U. S. Department of Labor, Office of Federal Contract Compliance Programs, Case 92-OFC-15)

Expert testimony via reports concerning gender patterns in hiring in a manufacturing plant.  Client:  Office of the Solicitor, U.S. Department of Labor, representing plaintiffs.

[170]   Pontiac, Michigan Public Safety Departments (1988, 1990, 1995)

Consultation, data analysis, and presentation before a Michigan Act 312 arbitration panel concerning race patterns in employment in police and fire departments.  Client: Department of Law, City of Pontiac, MI, representing potential defendants.

[169]   Hill v. Administrator, General Services Administration (EEOC 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).

Expert testimony before an administrative law judge concerning racial patterns in promotions in a large federal agency.  Client: Yablonski, Both & Edelman, Washington, DC, representing plaintiff.

[168]   Sondel et al. v. Northwest Airlines (District Court for Dakota County, Minnesota, Case CO-92-8193)

Expert testimony before a judge concerning gender patterns and economic losses associated with limitation of employment opportunities for service personnel.  Client: Saperstein, Goldstein, Demchak & Baller, Oakland, CA., representing plaintiffs.

[167]   Stepakoff v. University of Maryland (Circuit Court for Prince George's County, Maryland, CA 92-17117)

6

Expert testimony before a jury concerning the economic loss associated with interruption of professional education. Client: Bernabei & Katz, Washington, DC, representing plaintiff.

### III. OTHER CASES

[166]  [firm name confidential] (no litigation pending)

Consultation and data analysis concerning patterns in compensation of lawyers in a large law firm. Client: Katz, Marshall & Banks, Washington, DC, representing a potential plaintiff.

[165]  [firm name confidential] (no litigation pending)

Consultation and data analysis concerning race patterns in employment of sales and marketing professionals in a high technology firm. Client: Mehri & Skalet, Washington, DC, representing plaintiffs.

[164]  [firm name confidential] (no litigation pending)

Consultation and data analysis concerning race patterns in employment of sales and marketing professionals in a financial services firm. Client: Mehri & Skalet, Washington, DC, representing plaintiffs.

[163]  [firm name confidential] (no litigation pending)

Consultation and data analysis concerning race patterns in employment among professional employees in a financial services firm. Client: Asian Pacific American Legal Center, Los Angeles, representing plaintiffs.

[162]  Adams and Allard v. Indiana Bell Telephone Co. and Ameritech (U.S. District Court for the Southern District of Indiana, C.A. IP93-420c and C.A.s IP93-1341C through 1346C)

Consultation and data analysis concerning age patterns in employment by a telecommunications company. Client: Rose and Rose, Washington, D.C., representing plaintiffs.

[161]  Alberto et al. v. City of Miami (U.S. District Court for the Southern District of Florida, C. A. 95-1111-CIV-MARCUS)

Consultation and data analysis concerning race, sex, and national origin patterns in hiring and promotions in a police department. Client: City Attorney for the City of Miami, FL, representing defendants.

[160]  Allen v. Blue Cross/Blue Shield of Michigan (Circuit Court for Wayne County, Michigan, C.A. 90-00-3011 CZ)

Consultation and data analysis concerning the separation from employment of a professional employee. Client: Office of the General Counsel, Blue Cross/Blue Shield of Michigan, Detroit, MI, representing defendant.

[159]  Alvarado et al. v. Nestle Food Co. (U. S. District Court for the District of Idaho, CIV 94-0248-S-EJL)

Consultation and data analysis concerning ethnic patterns in promotions within a manufacturing plant. Client: Givens, Pursley & Huntley, Boise, Idaho, representing plaintiffs.

[158]  Appolon et al. v. University of Miami (U. S. District Court for the Southern District of Florida, Miami Division, 1:10-cv-24166-CIV-Ungaro/Simonton)

Consultation and data analysis concerning the effect of credit checks on racial and ethnic minority job applicants for administrative jobs. Client: Outten & Golden, New York, representing plaintiffs.

7

[157]   Arnold v. The Kroger Co. (Circuit Court for Wayne County, Michigan)

Consultation and data analysis concerning age patterns in the employment of corporate managers.  Client: Keller, Thoma, Schwarze, Schwarze, DuBay & Katz, P.C., representing defendant.

[156]   Artis v. John Deere (EEOC Charge 550-2008-0016N)

Consultation and data analysis concerning gender patterns in the employment of customer service representatives.  Client: The Impact Fund, Berkeley, CA, representing plaintiffs.

[155]   Bell et al v. Lockheed Martin  (U.S. District Court for the District of New Jersey, C.A. 08-6292)

Consultation and data analysis concerning gender patterns in the promotion, assignment, and compensation of professional and managerial employees.  Client: Console Law Offices, Philadelphia, PA, representing plaintiffs.

[154]   Barcume v. Flint (U.S. District Court for the Eastern District of Michigan, C.A. 84-8066)

Consultation and data analysis concerning race and gender patterns in employment in a police department. Client: Office of the City Attorney, City of Flint, MI, representing defendant.

[153]   Barnes et al. v. Canadian National/Illinois Central Railroad (U.S. District Court for the Northern District of Illinois,  Eastern Division, 04-C1249)

Consultation and data analysis concerning racial patterns in promotions to first-level supervisors among transportation workers.  Client: Wiggins, Childs, Quinn & Pantazis, Birmingham, AL, representing plaintiffs.

[152]   Barnett et al. v Wal-Mart Stores, Inc. (Superior Court for the State of Washington, County of King, No. 03-2-15301-0 SEA)

Consultation and data analysis concerning compensation of hourly retail employees. Client: Lieff, Cabraser, Heimann  & Bernstein, LLP, San Francisco, CA, representing plaintiffs.

[151]   Barrow et al. v. Georgia Pacific Corporation (U.S. District Court for the Southern  District of Alabama, Southern Division, Civil Action 01-0141-BH-M)

Consultation and data analysis concerning racial patterns in the assignment and promotion of manufacturing employees. Client: Taylor, Martino & Hedge, PC, Mobile, AL, representing plaintiffs.

[150]   Bergmann et al. v. University of Maryland (U.S. District Court for the District of Maryland, C.A. H85-446, H86-445 consolidated)

Consultation and data analysis concerning gender patterns in the employment of university faculty.  Client: Zwerdling, Paul, Leibig, Kahn & Thompson, Washington, DC, representing plaintiffs.

[149]   Bogle v. Burroughs (Circuit Court for Wayne County, Michigan, 86-634866-CZ)

Consultation and data analysis concerning age patterns in the employment of corporate middle managers. Client: Schureman, Frakes, Glass & Wulfmeier, Detroit, MI, representing plaintiff.

[148]   Borders and Woolbright et al. v. Wal-Mart Stores, Inc. (U.S. District Court for the Southern District of Illinois, C.V.00506-MJR-DGW.

Consultation and data analysis concerning employment practices relating to pregnant employees in a large retail chain. Maehri & Skalet, PLLLC, representing plaintiffs

[147]  <u>Bouman et al. v. Baca</u>  (U.S. District Court for the Central District of California, C.V. 80-1341 – RMT)

Consultation and data analysis concerning gender patterns in the employment of uniformed officers in a large urban police department.  Client: Dennis M. Harley, A Law Corporation, Pasadena, CA, presenting plaintiffs.

[146]  <u>Bowman v. Blue Care Network and Blue Cross Blue Shield of Michigan</u>  (U.S. District Court for the Eastern District of Michigan, Southern Division, 2:06-cv-14165)

Consultation and data analysis concerning the economic loss associated with termination of a supervisory office employee.   Client: Office of the General Counsel, Blue Cross Blue Shield of Michigan, representing defendants.

[145]  <u>Brienza v. United Press International, et al.</u> (U.S. District Court for the District of Columbia, C.A. 90-2925)

Consultation and data analysis concerning the economic loss associated with separation from employment of a journalist.  Client: Bernabei & Katz, Washington, DC, representing plaintiff.

[144]  <u>Broadnax v. General Electric Company</u> (U.S. District Court for the District of Massachusetts, C.A. 00-11033-WGY)

Consultation and data analysis concerning racial patterns in employment at a large manufacturing firm.  Client: Rosenfeld & Associates, Boston, representing plaintiff.

[143]  <u>Brooks v. Blue Cross Blue Shield of Michigan</u> (U.S. District Court for the Eastern District of Michigan, Southern Division, 2:08-CV10621)

Consultation and data analysis concerning promotion of a mid-level manager.  Client:  Office of the General Counsel, Blue Cross Blue Shield of Michigan, Detroit, MI, representing defendant.

[142]  <u>Brown et al. v. Pro Football, Inc. et al.</u> (U.S. District Court for the District of Columbia, C.A. 90-1071)

Consultation and data analysis concerning the economic loss associated with monopolistic practices in the compensation of professional athletes.  Client: Yablonski, Both & Edelman, Washington, DC, representing plaintiffs.

[141]  <u>Brown et al. v. Sacramento Regional Transit District</u>  (U.S. District Court for the Northern District of California)

Consultation and preparation of a declaration concerning the job relatedness of job requirements for first-level supervisors.  Client: The Impact Fund, Berkeley, CA, representing plaintiffs.

[140]  <u>Bryant v. Blue Cross Blue Shield of Michigan</u> (American Arbitration Association, 54 160 00242 09)

Consultation and data analysis concerning economic damages associated with discharge of an administrative employee.  Client: Office of the General Counsel, Blue Cross Blue Shield of Michigan, representing defendant.

[139]  <u>Byrd et al. v. Sprint</u> (Circuit Court of Jackson County, MO, at Independence, Case No. CV92-018979)

9

Consultation and data analysis concerning economic losses associated with failure to comply with compensation agreements with independent sales agents.  Client: Saperstein, Goldstein, Demchak & Baller, Oakland, CA, representing plaintiffs.

[138]   California Department of Fair Employment and Housing  v. Equity Residential Properties

Consultation and data analysis concerning racial patterns among residents of apartment complexes. Client: California Department of Fair Employment and Housing, Sacramento, representing plaintiffs.

[137]   California Department of Fair Employment and Housing  v. Airbandb.  California Department of Fair Employment and Housing Cases 574743-231889 and 574743-231624.

Consultation and data analysis concerning racial patterns in provision of short-term housing.  Client: California Department of Fair Employment and Housing, Sacramento, representing plaintiffs.

[136] California Department of Fair Employment and Housing  v. Lawrence Livermore Laboratory  (no litigation)

Consultation and data analysis concerning racial patterns in the hiring, assignment, and promotion of technical and professional employees.   Client: California Department of Fair Employment and Housing, Sacramento, representing plaintiffs.

[135]   Campbell et al v. Amtrak (U.S. District Court for the District of Columbia, Civil Action 1:99CV02979 (EGS))

Consultation and data analysis concerning racial patterns in the hiring, assignment, promotion, and compensation of transportation employees. Client: Wiggins, Childs, Quinn & Pantazes, P.C., Washington, DC, representing plaintiffs.

[134]   Carstarphen v. Georgia Pacific Corporation (U.S. District Court for the Northern District of Georgia, Atlanta Division, Civil Action 1:01-CV-1654, WBH)

Consultation and data analysis concerning racial patterns in the assignment, promotion, and compensation of manufacturing employees. Client: McCleave & Denson, LLC, Mobile, AL, representing plaintiffs.

[133]    Carter et al. v. United Parcel Service of America, Inc. (U.S. District Court for the Northern District of California, C-97-01590)

Consultation and data analysis concerning racial patterns in the assignment, promotion, and compensation of hourly employees. Client: Lieff, Cabraser, Heimann & Bernstien, San Francisco, CA, representing plaintiffs.

[132]   Carter and Phillips et al. v. Wells Fargo Advisors et al. [Wachovia Bank] (U.S. District Court for the District of Columbia, 1:09-cv-01752-CKK0

Consultation and data analysis concerning gender patterns in employment among professional employees in a financial services firm.  Client: Mehri & Skalet, Washington, DC, representing plaintiffs.

[131]   City of Burlington v. Dague et al. (U.S. Supreme Court, 91-810)

Consultation and analysis concerning the role of risk in the earnings of professional workers.  Client: Saperstein, Goldstein, Demchak & Baller, Oakland, CA, representing respondent (plaintiff).

[130]   City of Chicago Minority Purchasing Ordinance (1990).

**10**

Consultation and data analysis concerning public programs to promote minority and women-owned business enterprises.  Client: Mayor's Panel of Minority and Women-Owned Business, City of Chicago, IL, representing potential defendants.

[129]   City of Detroit Executive Order 22 (1988).

Consultation and data analysis concerning public programs to promote minority employment in the construction industry.  Client: Law Department, City of Detroit, MI representing potential defendants.

[128]   Clark v. Blue Cross/Blue Shield of Michigan (U.S. District Court for the Eastern District of Michigan, CV-13609-JCO-RSW)

Consultation and data analysis concerning the separation from employment of a technical employee.  Client: Office of the General Counsel, Blue Cross/Blue Shield of Michigan, Detroit, MI, representing defendant.

[127]   Coalition for Economic Equity et al. v. Pete Wilson et al (U.S. District Court for the Northern District of California, C-96-4024-TEH)

Consultation and data analysis concerning the role of affirmative action in employment of women and minorities.  Client: ACLU Foundation of Southern California, Los Angeles, CA, representing plaintiffs.

[126]   Cook et. al. v. Billington et al. (U.S. District Court for the District of Columbia, C.A. 82-0400 (NHJ/PJA)

Consultation and data analysis concerning racial patterns in promotions in a large federal government agency.  Client: Washington Lawyers Committee for Civil Rights and Urban Affairs and Arent Fox Kintner Plotkin & Kahn, representing plaintiffs.

[125]   Cote et al. v. Wal-Mart (U.S. District Court for the District of Massachusetts, C.A. 1:15-CV-12945 (WGY)

Consultation and data analysis concerning economic damages associated with denial of health insurance coverage for same-sex partners.  Client: Washington Lawyers Committee for Civil Rights and Urban Affairs, representing plaintiffs

[124]   Danies v. MCI Worldcom Network Services, Inc (U.S. District Court for the District of Maryland, Northern Division, C.A. WMN - 00 –CV-3046)

Consultation and data analysis concerning economic damages experienced by a technical worker as a consequence of termination of his employment. Client: Thomas Gagliardo, Esq., Silver Spring, MD, representing plaintiff.

[123]   Davis et al v. Shaw Industries, Inc.  (U.S. District Court for the Middle District of Georgia, Albany Division, C.A. 03-CV-139)

Consultation and data analysis concerning racial patterns in promotions and other employment outrcomes in a manufacturing firm.  Client:  Wiggins, Childs, Quinn & Pantazis, P.C., Washington DC, representing plaintiffs.

[122]   Dixon v. Recruit U.S.A., Inc. et al. (U.S. District Court for the Northern District of California, C 91-0347-JPV)

Consultation, data analysis, and deposition testimony concerning the economic loss associated with racial patterns in referrals by an employment referral agency. Client: Employment Law Center, San Francisco, CA, representing plaintiffs.

[121]   Donaldson et al. v. Microsoft Corp. (U.S. District Court for the Western District of Washington, C00-1684P)

11

Consultation and data analysis concerning patterns of compensation for male and female employees. Client: Cohen, Milstein, Hausfeld & Toll, PLLC, Washington, DC, representing plaintiffs.

[120]  Duling et al. V. Gristede's Operating Corp (U.S. District Court for the Southern District of New York, 06 Civ. 10197 (LTS)/(BHP))

Consultation and data analysis concerning gender patterns in hiring, promotions, and compensation. Client: Outten & Golden, LLP, New York, representing plaintiffs.

[119]  Dunn v. Blue Cross Blue Shield of Michigan (American Arbitration Association, 54-160-01677-08-02 LAVA-R)

Consultation and data analysis concerning separation from employment of a mid-level manager. Client: Office of the General Counsel, Blue Cross Blue Shield of Michigan, representing defendant.

[118]  EEOC v. Allstate Insurance Company (U.S. District Court for the Eastern District of Missouri Eastern Division, C.A. 4:04CV01359 ERW)

Consultation and data analysis concerning rehiring policies and damages associated with separation from employment of older insurance sales agents. Client: U.S. Equal Employment Opportunity Commission, St. Louis Office, representing plaintiffs.

[117]  EEOC v. Hamtramck (U.S. District Court for the Eastern District of Michigan, C.A. 81-71353)

Consultation and data analysis concerning the economic loss associated with separation from employment of fire fighters. Client: U.S. Equal Employment Opportunity Commission, Detroit Office, representing plaintiffs.

[116]  EEOC and Davis et al. v. J & R Baker Farms (U.S. District Court for the Middle District of Georgia, Valdosta Division, C.A. 7:11-cv-136-HL)

Consultation and data analysis concerning employment patterns of U.S. and foreign agricultural workers. Client: Georgia Legal Services Program, Atlanta, GA, representing plaintiff-intervenors.

[115]  EEOC v. McCormick & Schmick (EEOC Commissioner's Charge 550-2006002139)

Consultation and data analysis concerning racial patterns in employment in a restaurant chain. Client: U.S. Equal Employment Opportunity Commission, San Francisco Office, representing plaintiffs.

[114]  EEOC v. Mach Mining, LLC (U.S. District Court for the Southern District of Illinois, 11-879-JPG/PMF)

Consultation and data analysis concerning gender patterns in employment in a coal mine. Client: U.S. Equal Employment Opportunity Commission, Chicago Office, representing plaintiffs.

[113]  EEOC v. Mavis Discount Tire, Inc. et al. (U.S. District Court for the Southern District of New York, 12-CV-0741 (JGK) (GWG)

Consultation and data analysis concerning gender patterns in employment in an auto services chain. Client: U.S. Equal Employment Opportunity Commission, New York Office, representing plaintiffs.

[112]  EEOC v. United Air Lines, Inc. (U.S. District Court for the Northern District of California, C.A. 84-0560).

Consultation and data analysis concerning gender patterns in employment among skilled technicians. Client: U.S. Equal Employment Opportunity Commission, San Francisco Office, representing plaintiffs.

**12**

[111] <u>Fair Employment Council of Greater Washington et al. v. BMC Marketing Trading as Snelling & Snelling Personnel Consultants</u> (U.S. District Court for the District of Columbia, C.A. 91 - 0989)

Analysis through employment "testers" of racial patterns in the placement activities of an employment referral agency. Client:  Washington Lawyers' Committee for Civil Rights under Law with Arnold & Porter, Washington, DC, representing plaintiffs.

[110] <u>Fair Employment Council of Greater Washington et al. v. Gale S. Molovinski Trading as Executive Suite</u> (Superior Court for the District of Columbia. C.A. 91-CA07202)

Analysis through employment "testers" concerning gender patterns in the placement activities of an employment referral agency. Client: Washington Lawyers' Committee for Civil Rights under Law with Reed Smith Shaw & McClay, Washington, DC, representing plaintiffs.

[109] <u>Field v. Philadelphia Electric Co.</u> (Court of Common Pleas of York County, Pennsylvania, 87-SU-0254-01)

Consultation and analysis concerning the economic loss associated with separation from employment of a skilled technician.  Client: Bernabei & Katz, Washington, DC, representing plaintiff.

[108] <u>Fogle v. U.S. General Accounting Office</u> (EEOC 091-80X0055)

Consultation and data analysis concerning the economic loss associated with racial patterns in the employment of professional employees in a public agency.  Client: Washington Lawyers' Committee for Civil Rights under Law, Washington, DC, representing plaintiffs.

[107] <u>Fowler v. McCrory Stores</u> (Circuit Court for Montgomery County, Maryland, C.A. 23-098)

Consultation and data analysis concerning the economic loss associated with separation from employment of a mid-level corporate manager.  Client:  NAACP Legal Defense Fund, Washington, DC, representing plaintiff.

[106] <u>Freed v. Georgetown University</u> (Superior Court of the District of Columbia, C.A. 89-CA12859)

Consultation and data analysis concerning the economic loss associated with separation from employment of a medical research scientist.  Client: Bernabei & Katz, Washington, DC, representing plaintiff.

[105] <u>Fulcher et al. v. 24 Hour Fitness USA, Inc.</u> (Superior Court of the State of California for Alameda County, 10524911)

Consultation and data analysis concerning race, ethnic, and gender patterns in promotions and compensation in health and fitness clubs.  Client: Lewis, Feinberg, Lee, Renaker & Jackson, P.C., Oakland, CA., representing plaintiffs.

[104] <u>Giant Food. Inc.</u> (no litigation filed)

Consultation and data analysis concerning race and gender patterns in the employment of retail sales employees. Client: Venable, Baetjer, Howard & Civiletti, LLP, representing potential defendants.

[103] <u>Gonzalez et al. v. Abercrombie & Fitch Stores, Inc.</u> (U. S. District Court for the Northern District of California, San Francisco/Oakland Division, 03-2817 SI0)

Consultation and data analysis concerning racial and ethnicity patterns in the retail employees.  Client: Lieff, Cabraser, Heimann & Bernstein, San Francisco, representing plaintiffs.

13

[102] <u>Gonzalez et al. v. Local 52, International Alliance of Theatrical Stage Employees et al.</u> (U. S. District Court for the Eastern District of New York, 2:14-cv-03407)

Consultation and data analysis concerning ethnicity patterns in admission to a craft union. Client: Levy Ratner P.C., representing plaintiff.

[101] <u>Goshton v. Arva Overton and Blue Cross/Blue Shield of Michigan</u> (Circuit Court for Wayne County, Michigan, 08-105466-CZ)

Consultation and data analysis concerning the separation from employment of an administrative employee. Client: Office of the General Counsel, Blue Cross/Blue Shield of Michigan, Detroit, MI, representing defendant.

[100] <u>Gutierrez  and Morgan, et al. v. Johnson & Johnson</u> (U. S. District Court for the District of  New Jersey, C.A. 01-5302)

Consultation and data analysis concerning racial and ethnicity patterns in the employment of professional workers.  Client: Mehri & Skalet, PLLC, Washington, DC, representing plaintiffs.

[99] <u>Hardie v. National Collegiate Athletic Association (NCAA) et al.</u> (U. S. District Court for the Southern District of California, 13CV0346 W – DHB)

Consultation and data analysis concerning racial patterns in criminal records.  Client: Lawyers' Committee for Civil Rights under Law, Washington, DC, and Morrison & Foerster LLP, representing plaintiff.

[98] <u>Harris et al. v. Medical Transportation Management, Inc.</u> (U. S. District Court for the District of Columbia, case 1:17-cv-01371)

Consultation and data analysis concerning financial adequacy of payments for minimum wage transportation drivers.  Client: Cohen, Milstein, Sellers & Toll, Washington, DC, representing plaintiffs.

[97] <u>Heatherly v. University of Alabama</u> (U. S. District Court for the Northern District of Alabama, Western Division, C.A. 7:16-cv-00275-RDP)

Consultation and data analysis concerning gender discrimination in the compensation of a senior administrative employee.   Client: Haynes & Haynes, P.C. Birmingham, AL, representing plaintiff.

[96] <u>Hensel et al. v. Noll Printing Co., Inc.</u> (U. S. District Court for the Northern District of Indiana, Fort Wayne Division, C.A. F91-00292)

Consultation and data analysis concerning age patterns in the termination from employment of skilled manufacturing workers. Client: Rose and Rose, Washington, D.C., representing plaintiffs.

[95] <u>Hinson v. Blue Cross Blue Shield of Michigan</u> (Circuit Court for Wayne County, Michigan, 09-006726-CD)

Consultation and data analysis concerning economic damages associated with discharge of a customer service employee.  Client: Office of the General Counsel, Blue Cross Blue Shield of Michigan, representing defendant.

[94] <u>Hioutakos v. Simplex Grinnell</u> (Third District Court, State of New Jersey, 2:10-cv-04505-DMC-JAD)

Consultation and data analysis concerning payment of prevailing wages to employees working on public contracts.   Client: Mehri & Skalet, Washington, DC, representing plaintiffs.

14

[93]   Hogle v. Accident Fund Insurance Company of America. (District Court for the County of Ingram, Michigan, Case 06-131-CL)

Consultation and data analysis concerning damages associated from employment of a corporate manager. Client: Office of the General Counsel, Blue Cross Blue Shield of Michigan, representing defendant.

[92]   Holloway et al. v. Best Buy Co., Inc.  (U. S. District Court for the Northern District of California, San Francisco/Oakland Division, 05-5056 MEJ)

Consultation and data analysis concerning gender and race patterns in the employment of retail employees. Client:  Lieff, Cabraser, Heimann & Bernstein, San Francisco, CA, representing plaintiffs.

[91]   Hubbard v. Wal-Mart et al. (U. S. District Court for the Northern District of Ohio, Western Division, 07-CV-3169)

Consultation and data analysis concerning gender and race patterns in the employment of retail managers. Client:  Law Office of J. Baron, Toledo, Ohio, representing plaintiff.

[90]   Hudson et al. v. First Transit  (U. S. District Court for the Northern District of California, C10-03158-WHA)

Consultation and data analysis concerning race and national origin patterns in the effect of criminal convictions on the hiring of transportation employees.  Client: Goldstein, Demchak, Baller, Borgen & Dardarian, Oakland, CA, representing plaintiffs.

[89]   Johnson v. Blue Cross Blue Shield of Michigan  (arbitration)

Consultation and data analysis concerning the economic consequences of termination for a professional employee.  Client:  Office of the General Counsel, Blue Cross Blue Shield of Michigan, representing defendant.

[88]   Jones et al. v. Ford Motor Co. (U.S. District Court for the District of Minnesota, C. F. 3-93-370)

Consultation and data analysis concerning race patterns in the hiring, promotion, assignment, and compensation of professional employees. Client: Sprenger & Lang, Washington, D.C., representing plaintiffs.

[87]   Joyner et al. v. Archers Daniel Midland  (U.S. District Court for the Central District of Illinois, Urbana Division, Civil Action 03-2177 (MPM))

Consultation and data analysis concerning racial patterns in employment in the promotion and pay of manufacturing workers.  Client: Wiggins, Childs, Quinn & Pantazis, PC, Washington, DC, representing plaintiffs.

[86]   Kaden v. Macalaster College (U.S. District Court for the District of Minnesota, case not filed)

Consultation and data analysis concerning the economic loss associated with separation from employment of an athletic coach.  Client: Robins, Kaplan, Miller & Ciresi, L.L.P., Minneapolis, MN, representing plaintiff.

[85]   [Keo] Ratha et al v. Phatthana Seafood Co, Ltd. et al.  (U.S. District Court for the Central District of California, Western Division, Case 2:16-cv-04271)

Consultation and data analysis concerning financial benefits to the employer and economic damages to the plaintiffs from human trafficking practices in food processing.  Client: Cohen, Milstein, Sellers & Toll, Washington DC, representing plaintiffs.

[84]   Kujan v. The Kroger Co. (Circuit Court for Wayne County, Michigan, C.A. 92-210725CZ)

15

Consultation and data analysis concerning age patterns in the employment of corporate managers.  Client: Keller, Thoma, Schwarze, Schwarze, DuBay & Katz, P.C., representing defendant.

[83]  Labor Committee for NAACP, Front Royal, VA v. Laborers' International Union of North America, Local 69 (EEOC 033 810402)

Consultation and data analysis concerning racial patterns in job assignments allocated by a construction craft union.  Client: Washington Lawyers' Committee for Civil Rights with Arent Fox Kintner Plotkin & Kahn, Washington, DC, representing plaintiffs.

[82]  Lewis and Powell et al. v. Pitney Bowes, Inc. (EEOC)

Consultation and data analysis concerning racial patterns in the assignment of industrial sales workers. Client: Mehri & Skalet PLLC, Washington, DC, representing plaintiffs.

[81]  Little et al. v. Washington Metropolitan Transit Authority et al. (U.S. District Court for the District of Columbia, C. A. 1:14-cv-01289-RMC)

Consultation and data analysis concerning economic damages accruing to un-hired and terminated transportation workers.  Client: Washington Lawyers' Committee for Civil Rights and Urban Affairs, Washington, DC, and NAACP Legal Defense Fund, New York, representing plaintiffs.

[80]  City of Los Angeles v. County of Los Angeles (Superior Court for the County of Los Angeles, C.A. 655-274)

Consultation and data analysis concerning the demographic characteristics of homeless persons.  Client: Western Center on Law and Poverty, Los Angeles, CA, representing plaintiffs.

[79]  Lucas et al. v. Ferrara Candy Company et al. (U.S. District Court for the Northern District of Illinois, Eastern Division, C.A. 13 C 1525)
Consultation and data analysis concerning employment referrals and employment of unskilled manufacturing workers.  Client: Cohen, Milstein, Sellers & Toll, Washington, DC, representing plaintiffs.

[78]  Lucas et al. v. Vee Pak, Inc. et al. (U.S. District Court for the Northern District of Illinois, Eastern Division, C.A. 12 C 9672)

Consultation and data analysis concerning employment referrals and employment of unskilled manufacturing workers.  Client: Cohen, Milstein, Sellers & Toll, Washington, DC, representing plaintiffs.

[77]  Lucas et al. v. Kmart Corp (U.S. District Court for the District of Colorado, C.A. 99-K-1923)

Consultation and data analysis concerning access to retail services by persons in wheelchairs.  Client: Fox and Robertson, P.C., Denver, CO, representing plaintiffs.

[76]  Maliniak v. City of Tucson (U.S. District Court for the District of Arizona, Tucson Division, CV 07-125 TUC JMR)

Consultation and data analysis concerning on-the-job harassment of a female firefighter. Client: Jenne S. Forbes, Esq., Tucson, AZ, representing plaintiff.

[75]  McCrossan v. Sutton (Federal District Court for New Mexico, CV 95-6556-HB)

16

Consultation and data analysis concerning the utilization of minority and disadvantaged owned businesses on federally-funded construction projects.  Client: Civil Rights Division, U.S. Department of Justice, Washington, D.C., representing defendant.

[74]  McReynolds et al. v. Merrill Lynch (Federal District Court for Northern District of Illinois, Eastern Division, 1:2008cv06105).

Consultation and data analysis concerning racial patterns in the employment of financial services professional employees.  Client: Stowell and Friedman, Ltd., Chicago, IL, representing plaintiffs.

[73]  Marcus v. Stevens (Illinois Human Rights Commission, Charge 1989CF3102)

Consultation and data analysis concerning racial and obesity patterns in referrals by an employment placement agency.  Client:  Legal Assistance Foundation of Chicago, Chicago, representing plaintiff.

[72]  Martinez v. Pomona College (Superior Court of Los Angeles County, BC518863)

Consultation and data analysis concerning the separation from employment of a college professor.  Client: Mexican American Legal Defense and Education Funds, Inc., representing plaintiff.

[71]  Mates Food System, Inc. v. Hardee's Food System, Inc. (U.S. District Court for the Eastern District of North Carolina, C.A. 93-451-CIV-5-F)

Consultation and data analysis concerning racial patterns in the award and management of fast food franchises. Client: Smallwood and Associates, Windsor, N.C., representing plaintiff.

[70]  Matthews v. Johnson and Johnson (EEOC, 2004)

Consultation and data analysis concerning racial adverse impact in the use of credit histories as an employment criterion.   Client: Outten and Golden, New York, NY, representing plaintiff.

[69]  Mayfield v. Thornburgh (EEOC 033-085-x5214, Baltimore District Office)

Consultation and data analysis concerning racial patterns in employment among clerical employees in a public agency.  Client: Washington Lawyers' Committee for Civil Rights under Law with Sidley and Austin, Washington, DC, representing plaintiffs.

[68]  Michigan Civil Service Affirmative Action Plan (1994, 2006)

Consultation and data analysis concerning the design of an affirmative action plan covering administrative and public safety employees.  Client: Civil Service Commission of the State of Michigan, representing potential defendants.

[67]  Milwaukee Brotherhood of Firefighters v. City of Milwaukee (EEOC Charge 260970100)

Consultation and data analysis concerning the economic loss associated with racial patterns in the employment of employees in a public agency.  Client: Hall, Charne Burce and Olsen, PC, Milwaukee, representing plaintiffs.

[66]  Mitchell et al. v. Metropolitan Life Insurance Company, Inc. (U.S. District Court for the Southern District of New York, 01 CIV 2112 (WHP)

Consultation and data analysis concerning gender patterns in employment in a large life insurance company. Client:  Saperstein, Goldstein, Demchak & Baller, Oakland, CA, representing plaintiffs.

17

[65]  <u>Moeller et al. v. Taco Bell Corporation</u>  (U.S. District Court for the Northern District of California, C 02-5849 MJJ)
Consultation and data analysis concerning economic damages arising from inaccessibility of restaurant services to persons in wheelchairs.  Client: Fox & Robertson, P.C., Denver, CO, representing plaintiffs.

[64]  <u>Moody v. Blue Cross Blue Shield of Michigan</u> (Circuit Court for Wayne County, Michigan, 09-007926-NZ)

Consultation and data analysis concerning economic damages associated with discharge of a clerical employee. Client: Office of the General Counsel, Blue Cross Blue Shield of Michigan, representing defendant.

[63]  <u>Morgan v. Federal Home Loan Mortgage Corporation</u> (U.S. District Court for the District of Columbia, C.A. 1: 98CV01397 (ESH)

Consultation and data analysis concerning racial patterns in employment among professional employees in a financial services firm. Client: Lieff, Cabraser, Heimann & Bernstein, LLP, San Francisco, representing plaintiffs.

[62]  <u>Morgan Stanley</u> (no litigation pending)

Consultation and data analysis concerning racial patterns in employment among professional employees in a financial services firm. Client: Asian Pacific Americans Legal Center of Southern Caliufornia, Los Angeles, representing plaintiffs.

[61]  <u>Morris v. Communications Satellite Corp.</u> (U.S. District Court for the District of Columbia, C.A. 88-3480)

Consultation and data analysis concerning the economic loss associated with separation from employment of a skilled technician.  Client:  Yablonski, Both & Edelman, Washington, DC, representing plaintiff.

[60]  <u>Munchus v. Friedman Billings Ramsey & Co., Inc</u>. (Financial Industry Regulatory Authority 08163, 2009)

Consultation and data analysis concerning the separation from employment of a highly-paid financial services sales employee.  Client: Bernabei & Wachtel, PLLC, Washington, DC, representing defendant.

[59]  <u>Murphy-Clay  v. Blue Cross/Blue Shield of Michigan</u> (Circuit Court for Wayne County, Michigan, No. 97- 701244- CZ)

Consultation and data analysis concerning the separation from employment of an administrative employee. Client: Office of the General Counsel, Blue Cross/Blue Shield of Michigan, Detroit, MI, representing defendant.

[58]  <u>Murphy-Taylor  and United States v. Queen Ann's County,  MD et al</u>. (U.S. District Court for the District of Mayland , 1:12-cv-02521-ELH)

Consultation and data analysis concerning economic damages associated with separation from employment of a police officer. Client: Civil Rights Division, U.S. Department of Justice, Washington, DC, representing plaintiff-intervenor.

[57]  <u>NAACP, et al. v. Imperial Irrigation District, et al.</u> (U.S. District Court for the Southern District of California, Civ. 70-0302GT)

Consultation and data analysis concerning racial patterns in employment at a public utility company.  Client: Employment Law Center, San Francisco, CA, representing plaintiffs.

**18**

[56]   New Era Cap Co., Inc (2008)

Consultation and data analysis concerning race and gender patterns in compensation and promotions in a manufacturing distribution center.   Client: Workers Rights Consortium, Washington DC, a third-party investigator.

[55]   New York State Procurement Setasides (1991)

Consultation and data analysis concerning public programs to promote the development of minority and women-owned business enterprises. Client: Office of the Solicitor General, State of New York, representing potential defendants.

[54]   O'Bannon et al. v. Friedman's Jewelers, Inc. (United States District Court for the District of Maryland, Southern Division)

Consultation and data analysis concerning racial patterns in employment in a retail chain.  Client: Goldstein, Demchak, Baller, Borgen & Dardarian, Oakland CA, representing plaintiffs.

[53]   Ochoa et al. v. Mcdonald's Corporation et al. (United States District Court for the Northern District of California, No. 3:14-cv-02098-JD)

Consultation and data analysis concerning uncompensated work by low-wage restaurant employees.  Client: Altschuler Berzon, LLP, San Francisco, representing plaintiffs.

[52]   Oldham v. Blue Cross/Blue Shield of Michigan (Circuit Court for Wayne County, Michigan, No. 94-407474 ND)

Consultation and data analysis concerning the separation from employment of a clerical employee.  Client: Office of the General Counsel, Blue Cross/Blue Shield of Michigan, Detroit, MI, representing defendant.

[51]   O'Neal v. City of New Albany (U.S. District Court for the Southern District of Indiana, C.A. NA 90-90C)

Consultation and data analysis concerning racial patterns in employment in a police department.  Client: Lynch, Cox, Gilman & Mahan, Louisville, KY, representing plaintiff.

[50]   OFCCP v. Elim Care Center

Consultation and data analysis concerning racial patterns in hiring health care employees. Client: Regional Solicitor's Office, U.S. Department of Labor, representing plaintiff.

[49]   Osborne v. Blue Cross/Blue Shield of Michigan (U.S. District Court for the Eastern District of Michigan, 08-11195)

Consultation and data analysis concerning the separation from employment of an administrative worker.  Client: Office of the General Counsel, Blue Cross/Blue Shield of Michigan, Detroit, MI, representing defendant.

[48]   Phipps et al. v. Wal-Mart Stores, Inc. (U.S. District Court for the Middle District of Tennessee, No. 3:12-cv-1009)

Consultation and data analysis concerning gender patterns in the employment and compensation of retail employees.  Client:  Cohen Milstein Sellers & Toll, Washington, DC, representing plaintiffs.

[47]   Perry  v. New York Health and Racquet Club (U.S. District Court for the Southern District of New York, C.A. 84 Civ. 3610 and 85 Civ. 4606)

19

Consultation and data analysis concerning racial patterns in the employment of service workers.  Client: Hill, Betts, and Nash, New York, NY, representing plaintiffs.

[46] Piasecki .v. Blue Cross/Blue Shield of Michigan (Circuit Court for Wayne County, Michigan, No. 97-728747-NZ)

Consultation and data analysis concerning the separation from employment of a professional employee. Client: Office of the General Counsel, Blue Cross/Blue Shield of Michigan, Detroit, MI, representing defendant.

[45]   Pierre et al. v. Debby's Staffing Services, Inc. (U.S. District Court for the Southern District of Iowa, Central Division, Case 3:15-CV-00089

Consultation and data analysis concerning racial patterns in referrals by an employment staffing agency. Client: Newkirk Zwagerman, Des Moines, IA, representing plaintiffs.

[44] Pike and Thomas v. Lucent Technologies, Inc. (U.S. District Court for the Northern District of Georgia, Atlanta Division, C.A. 1:00-CV-1406-RWS)

Consultation and data analysis concerning the economic damages associated with layoffs of older, professional employees.  Client: Greene, Buckley, Jones & McQueen, Atlanta, Georgia, representing plaintiffs.

[43] Quintero v. Temporaries, Inc. et al. (Superior Court of the State of California, San Francisco County, C.A. 895-675)

Consultation and data analysis concerning racial patterns in referrals by a private employment placement agency.  Client: Employment Law Center, San Francisco, CA, representing plaintiffs.

[42] Rabin et al. v. Price Waterhouse Coopers LLP  (U.S. District Court for the Northern District of California, San Francisco Division, Case 3:16-cv-02276)

Consultation and data analysis concerning age patterns in hiring by a professional services firm. Client: Outten & Golden, New York, representing plaintiffs.

[41] Raskin v. Wyatt (U.S. District Court for the Southern District of New York, C.A. 94-CIVIL-2314)

Consultation and data analysis concerning age patterns in employment by a professional services firm. Client: Rose and Rose, Washington, DC, representing plaintiff.

[40] Ricci v. DeStefano (U.S. Supreme Court, Docket 07-1428)

Consultation and data analysis concerning racial patterns among employees of fire departments. Client: NAACP Legal Defense and Education Fund, New York, representing defendants.

[39] Rice et al. v. Southern California Edison Company (U.S. District Court for the Central District of California, Case 94-6353-JMI (JRx))

Consultation and data analysis concerning racial patterns among employees of a large public utility company and diversity management programs affecting these patterns.   Client: Saperstein, Goldstein, Demchak & Baller, Oakland, CA, representing plaintiffs.

[38]  Ridgeway et al. v. Denny's Inc. (U.S. District Court for the Northern District of California, C.A. C-93-20202).

Consultation and data analysis concerning racial patterns among restaurant customers.  Client: Saperstein, Goldstein, Demchak & Baller, Oakland, CA, representing plaintiffs.

20

[37] <u>Rodriguez et al. v. Merrill Lynch et al.</u> (Superior Court of New Jersey, Law Division: Hudson County, Docket l-5905-98)

Consultation and data analysis concerning employment patterns of low-skill immigrant workers alleging sexual harassment and employment discrimination. Client: Arenson, Dittmar & Karban, New York, representing plaintiffs.

[36] <u>City of San Francisco Minority Purchasing Ordinance</u> (1989)

Consultation and data analysis concerning public programs to promote minority and women-owned business enterprises. Client: Lawyers' Committee for Urban Affairs, San Francisco, CA, representing potential defendants.

[35] <u>Saephan v. Oakland Unified School District</u> (U.S. District Court for the Northern District of California, C-06-4428 JCS)

Consultation and data analysis concerning the effect of English language requirements on race/ethnic patterns of employment among service workers. Client: Employment Law Center of the Legal Aid Society, San Francisco, representing plaintiff.

[34] <u>Salazar et al. v. McDonalds et al.</u> (U.S. District Court for the Northern District of California, 3:14-CV-02096-RS)

Consultation and data analysis concerning uncompensated work by low-wage restaurant employees. Client: Altschuler Berzon, LLP, San Francisco, representing plaintiffs.

[33] <u>Scott v. Eastman Chemical Company</u> (U.S. District Court for the Eastern District of Tennessee at Greenville, No. 2:03-cv-311)

Consultation and data analysis concerning gender patterns in employment in a manufacturing firm. Client: Jennifer B. Morton, Esq., Knoxville, TN, representing plaintiff.

[32] <u>Second Chance, Inc. v. Bell South Telecommunications, Inc.</u> (Circuit Court of Calhoun Co., AL, C.V. 92-417)

Consultation and data analysis concerning the economic loss suffered by an non-profit organization experiencing a business interruption. Client: Floyd, Keener, Cusimano & Roberts, Gadsden, AL, representing plaintiffs.

[31] <u>Segar et al. v. Meese et al</u> (U.S. District Court for the District of Columbia, C.A. 77-0081)

Consultation and data analysis concerning the economic loss associated with racial patterns in employment in a large federal government agency. Client: Washington Lawyers' Committee for Civil Rights under Law with Wilmer, Cutler & Pickering, Washington, D.C., representing plaintiffs.

[30] <u>Serrano et al. v. Cintas Corporation.</u> (U.S. District Court for the Eastern District of Michigan, Southern Division, File 04-cv-40132)

Consultation and data analysis concerning gender patterns in the employment of sales service representatives. Client: Lieff, Cabraser, Heimann & Bernstein, San Francisco, CA, representing plaintiffs..

[29] <u>Siri v. City of Dallas, et al.</u> (District Court for Dallas County, Texas. Cause 09-04875)

**21**

Consultation and data analysis concerning gender patterns in employment and workforce diversity management issues in a large fire department.  Client: Herman Sargent, Bates, LLP, Dallas, TX, representing plaintiff.

[28]   Slonim v. The Kroger Co. (Circuit Court for Wayne County, Michigan, C.A. 94-423190)

Consultation and data analysis concerning age patterns in the employment of corporate managers.  Client: Keller, Thoma, Schwarze, Schwarze, DuBay & Katz, P.C., representing defendant.

[27]   Smikle et al. v.  Coca-Cola Enterprises, Inc. (U. S. District Court for the District of New Jersey, C.A. 03W431(MLC))

Consultation and data analysis concerning racial patterns in the employment of route sales employees.  Client: Joseph, Greenwald & Laake, Greenbelt, MD, representing plaintiffs.

[26]   Sneed v. District of Columbia Department of Corrections (Superior Court of the District of Columbia).

Consultation and data analysis concerning the economic loss associated with separation from employment of a public employee.  Client: Dolkhart and Zavos, Washington, DC, representing plaintiff.

[25]   Sova v. Northrup Grumman v. Information Technology Inc. (American Arbitration Association 74 160 00535 08 (LMT))

Consultation and data analysis concerning the economic loss associated with separation from employment of a professional employee.  Client: Gary M. Gilbert & Associates, Silver Spring, MD, representing claimant.

[24]   City of Southfield Affirmative Action Plan (1991)

Consultation and data analysis concerning the design of an affirmative action plan covering administrative and public safety employees.  Client: City of Southfield, MI, representing potential defendants.

[23]   Stoner v. George Washington University Hospital (Superior Court of the District of Columbia, C.A. 88-CA 05433).

Consultation and data analysis concerning the economic loss associated with the death of a clerical worker.  Client: Debevoise and Plimpton, New York, representing plaintiff.

[22]   Terrell v. U.S. Pipe and Foundry (U.S. District Court for the Northern District of Alabama, C.A. 72-P-0887-S) Consultation and data analysis concerning the economic loss associated with racial patterns in employment in a manufacturing firm.  Client: NAACP Legal Defense Fund, Washington, DC, representing plaintiffs.

[21]   Thomas et al. v. City of St. Paul  (U. S. District Court for the District of Minnesota, Third Division,  C.A. 04-5101 JMR/FLN)

Consultation and data analyses concerning racial patterns in public contracting.   Client: Lawyers' Committee for Civil Rights under Law, Washington, DC, representing plaintiffs.

[20]   Thomas v. Plusquellic (U. S. District Court for the Northern District of Ohio, Eastern Division, C.A. CV73-478)

Consultation and data analyses concerning racial patterns in employment in police and fire departments. Client: Lawyers' Committee for Civil Rights under Law, Washington, DC, representing plaintiffs.

[19]   Tolbert v. Bessemer (U. S. District Court for the Northern District of Alabama, C.A. 83P-3050S).

22

ER-168

Consultation and data analysis concerning the impact on the demographic characteristics of residents of annexations to a city.  Client: NAACP Legal Defense Fund, Washington, DC, representing plaintiffs.

[18] Torres et al. v. Gristede's et al.  (U.S. District Court for the Southern District of New York, 4 CIV 3316 (RMB) (AJP))

Consultation and data analysis concerning compensation practices violating the Fair Labor Standards Act.  Client: Outten & Golden LLP, New York, NY, representing plaintiffs.

[17] Tykocki and Tycocki v. Blue Cross Blue Shield of Michigan (Circuit Court for Wayne County, Michigan, C.A. 91-107456)

Consultation and data analysis concerning age patterns associated with separation from employment of a professional employee.  Client: Office of the General Counsel, Blue Cross/Blue Shield of Michigan, Detroit, MI, representing defendants.

[16] United Building and Construction Trades Council v. Camden(Supreme Court of the State of New Jersey, Docket A-79, September term 1981)

Consultation and data analysis concerning the employment and economic development impacts of requirements to employ city residents as a condition of receiving construction contracts.  Client: New Jersey Office of the Public Advocate, Trenton, NJ, representing defendants.

[15]   United States v. Becker C.P.A. Review (U.S. District Court for the District of Columbia, CV-92-2879 (TFH))

Consultation and data analysis concerning the economic loss associated with delays in obtaining professional licensing.  Client: Civil Rights Division, U.S. Department of Justice, Washington, D.C., representing plaintiff.

[14]   Vandell et al. v. Chevron (Superior Court of the State of California, City and County of San Francisco, No. 945302)

Consultation and data analysis concerning gender patterns in employment and compensation in an industrial firm.  Client: Ryu, Dickey & Larkin, Oakland, CA, representing plaintiffs.

[13]   Vasquez et al. v. USM & Dollar Stores, et al. (Superior Court for Alameda County, CA RG136 3:2006:cv00963)

Consultation and data analysis concerning financial adequacy of payments for minimum wage janitorial workers.        Client: Chavez & Gertler LLP, Mill Valley, CA, representing plaintiffs.

[12]   Vedachalam et al. v. Tata American International Corp. (U.S. District Court for the Northern District of California,  3:2006:cv00963)

Consultation and data analysis concerning prevailing wage determinations for information technology professionals.  Client: Lieff, Cabraser, Heimann & Bernstein, LLP, representing plaintiffs.

[11]   Villarreal v. R.J. Reynolds Tobacco Co., Inc.   (Petition for Writ of Certiorari, U.S. Supreme Court)

Party to *amicus* brief by labor economists and social scientists discussing age discrimination in hiring.  Client: Altschuler Berzon, LLP, representing plaintiff-petitioner.

[10]   Helen Watts v. City of Dallas et al. (District Court for Dallas County, Texas, Cause 08-13000).

Consultation and data analysis concerning gender patterns in employment and workforce diversity management issues in a large fire department.  Client: Law Offices of Aaron Ramirez, Dallas, TX, representing plaintiff.

23

[9]   Wachovia Financial Services (no litigation filed)

      Consultation and data analysis concerning race patterns in employment among professional employees in a financial services firm.  Client: Mehri & Skalet, Washington, DC, representing plaintiffs.

[8]   Marcus Washington v. William Morris Endeavor Entertainment (American Arbitration Association Case 13 160 01426 12)

      Consultation and data analysis concerning economic damages associated with race-based employment practices and the separation from employment of a professional employee.  Client: Marcus Washington, *pro se* plaintiff, New York, NY, representing plaintiff.

[7]   Wegher v. Blue Cross/Blue Shield of Michigan (Circuit Court for Wayne County, Michigan, 06-613799-CZ)

      Consultation and data analysis concerning the separation from employment of a temporary worker. Client: Office of the General Counsel, Blue Cross/Blue Shield of Michigan, Detroit, MI, representing defendant.

[6]   Wiggins v. PSSC (American Arbitration Association Arbitration)

      Consultation and data analysis concerning economic damages experienced by a terminated administrative employees.   Client: Law Offices of Frank Jackson, Esq., Detroit, MI, representing plaintiff.

[5]   Williams et al. v. Well Fargo Bank (Iowa District Court for Polk County, LACL 131387)

      Consultation and data analysis concerning racial patterns in criminal records background check for financial services employees.  Client: Goldstein, Borgen, Dardarian & Ho, San Francisco, representing plaintiffs.

[4]   Wren et al. v. RGIS Inventory Specialists (U.S. District Court for the Northern District of California, C 06-05778 JCS and C 07-0032 JCS)

      Consultation and data analysis concerning employee compensation for travel time to a work sites.  Client: Schneider and Wallace, San Francisco, CA, representing plaintiffs.

[3]   Wynne et al. v. McCormick & Schmick's (U.S. District Court for the Northern District of California, C 06 3153 CW)

      Consultation and data analysis concerning race/ethnic patterns in employment of service workers.   Client: Lieff, Cabraser, Heimann & Bernstein, LLP, representing plaintiffs.

[2]   Yang v. Blue Cross Blue Shield of Michigan (Circuit Court for Wayne County, Michigan, C.A. 95-514482 CZ)

      Consultation and data analysis concerning the separation from employment of a professional employee. Client: Office of the General Counsel, Blue Cross/Blue Shield of Michigan, Detroit, MI, representing defendant.

[1]   Zuniga et al. v. Bernalillo County et al (U.S. District Court for the District of New Mexico, Civil No. 1:11-cv-00877, RHS/LAM)

      Consultation and data analysis concerning gender patterns in hiring, promotion, and compensation of salaried civil servants. Client: Moody & Warner, PC, Albuquerque, NM, representing plaintiffs.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| THE CENTER FOR INVESTIGATIVE REPORTING and WILL EVANS, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF LABOR, <br><br> Defendant. | Case No. 22-cv-07182-WHA <br><br> **DECLARATION OF PATRICK F. McKAY, Ph.D., IN SUPPORT OF DEFENDANT DEPARTMENT OF LABOR'S MOTION FOR SUMMARY JUDGMENT** |

I, Patrick F. McKay, Ph.D., state as follows:

I.      **Qualifications**

1.      My name is Patrick F. McKay. I am a Professor of Management at the College of Business, East Carolina University.  I have been asked by the United States Attorney's Office for the Northern District of California to provide an expert declaration in the case of *Center for Investigative Reporting v. U.S. Department of Labor*, No. 22-cv-07182-WHA, on issues relating to the use and value of EEO-1 data and the potential commercial harms to reporting firms should it be publicly released.

2.      I earned my PhD in Industrial-Organizational (I-O) Psychology from the University of Akron in 1999. I am a member of the Society for Industrial and Organizational Psychology, Academy of Management, and the Personnel/Human Resources Research Group. In 2013, I was recognized as a Fellow of the Society for Industrial and Organizational Psychology, a distinction given to researchers and practitioners who have made landmark contributions to the field of I-O Psychology. In addition, I have nearly 30 years of human resource consulting experience, completing projects such as test development and validation, test administration, statistical data analysis, and providing litigation support

to client companies. Moreover, I have provided professional development workshops, research talks, and keynote addresses to organizations and colleges/universities that include L'Oreal USA, Nestle Health Sciences, Andersen Windows, The US Navy, New Jersey Labor and Employment Relations Association (LERA), American Physical Therapists Association, Risk Management Society, Columbia University, Wharton School of Business at the University of Pennsylvania, Cornell University, Emory University, University of Chicago, Vanderbilt University, Texas A&M University, Virginia Polytechnic & State University, Indiana University, University of South Carolina, Baruch College, University of Texas-Arlington, Oregon State University, George Mason University, University of Konstanz (Germany), and others.

3.      I have taught in the organizational behavior and human resource management (OBHRM) domain, at the undergraduate, masters, and doctoral levels, for over 26 years. Subjects that I have taught of relevance to my declaration include Diversity in Organizations, Data-Based Decision-Making (a master's level statistics course), Human Resource Management, Industrial Psychology, Micro-Foundations in Human Resource Management Seminar, Multivariate Statistics, Organizational Behavior, Organizational Staffing, Thus, I have vast expertise in workforce diversity, human resource management, organizational behavior, recruitment, research methodology, statistical data analysis, and employee turnover. In addition, I conduct research on these topics and I have published 40 peer-reviewed articles in respected research journals such as the *Journal of Applied Psychology*, *Journal of Management*, *Organizational Behavior and Human Decision Processes*, *Organization Science*, and *Personnel Psychology*, and has published 11 invited book chapters and/or journal articles. Moreover, as evidence of the quality of my scholarship, I have received research awards from the Academy of Management's Gender and Diversity in Organizations Division including the 2007 *Dorothy Harlow Distinguished Paper Award* and the 2009 *Saroj Parasuraman Outstanding Publication Award*. An additional marker of my stature in the OBHRM domain is my appointment to serve as Associate Editor for the *Personnel Psychology* (2017-2020) and *International Journal of Human Resource Management* (2014-2016). Currently, I am an Associate Editor for the *Journal of Management*. The above expertise and qualifications render me a credible source of information regarding the potential commercial harms to companies required to publicly release their EEO-1 workforce data.

4.      Details of my qualifications are provided in my curriculum vitae, attached as Exhibit A.

5.      I am being compensated at my usual rate of $200 per hour for my services in connection with this matter.

## II.      Scope of Work

6.      I was asked to provide opinions on the information contained in EEO-1 reports and the potential commercial harms to organizations that can result from the public release of their EEO-1 workforce data. As I outline below, the primary harms that could result from release of the EEO-1 data include hampered employee recruitment and signaling of human resource management effectiveness to competitors. In the following sections, I define the basic concepts involved in each category of harm, and present evidence to substantiate the potential for commercial harm to firms whose EEO-1 workforce information is publicized.

### *Hampered Employee Recruitment*

7.      Human resource management (HRM) involves an organization's effort to acquire, deploy, and retain a qualified workforce, thus allowing a firm to pursue and achieve its strategic objectives. A key component of a company's HRM system is recruitment, or the process of generating potential applicants' interest in job openings, persuading them to apply, maintaining their interest in the job, and convincing to accept the job if offered (Barber, 1998; Breaugh, 2013).[1] Job seekers, the targets of a company's recruitment efforts, are motivated to secure jobs with companies who fit with their qualifications, needs, and values.

8.      Because job seekers often lack complete information about companies and job openings, they look to organizational characteristics as signals of what a company is like as an employer (Rynes et al., 1991). Such signals include the behavior of organizational recruiters at a job fair, the advertised duties of a job, and the extent of workforce demographic diversity depicted in photos on a company website. The latter characteristic, demographic diversity, refers to extent that company's workforce contains a variety of racial-ethnic, gender, age, and other demographic groups (Harrison & Klein, 2007).

[1] Full citations for all references cited herein are listed in Exhibit B to this Declaration.

9.      Organizational research has shown that potential job applicants make inferences about organizations based upon their workforce diversity (Avery et al., 2013; Walker et al., 2012). This is especially true for firms who target racial-ethnic minority and female applicant groups, as members of these groups are especially attuned to extent of diversity among a company's employees. Women and minority job seekers infer that a company is more amenable to diversity and less likely to discriminate against them if its workforce is diverse in terms of race-ethnicity and gender (McKay, forthcoming). Accordingly, research has shown that women and minorities, and Whites who express a desire to interact with others different from themselves, are more likely to pursue employment with organizations with more- versus less-diverse workforces (Avery, 2003; Avery et al. 2004; DePatie et al., 2022; Kroeper et al., 2022; Walker et al., 2012).

10.      Based upon the above, I believe that it is reasonably foreseeable that disclosure of companies' EEO-1 reports will both harm their commercial interests and set back their diversity efforts. Such reporting will undermine the recruitment success of companies whose reports show evidence of low diversity among racial-ethnic minorities and women. This is likely because as noted above minority and female job seekers use the extent of racial-ethnic and gender diversity, respectively, as a signal of an organization's stance on workforce diversity (Avery, 2003; DePatie et al., 2022; Walker et al., 2012). However, as I expound upon later, this assumption is erroneous as there is little relationship between the extent of racial-ethnic and gender diversity and an organization's climate for diversity. Owing to the above assumption, potential minority and female job applicants will be less likely to apply to companies whose EEO-1 report data shows low racial-ethnic and gender diversity, respectively. This is especially troubling owing to the requirement that firms provide five (5) years of EEO-1 data. Notably, this harm is problematic to the affected firms for a number of reasons.

11.      First, workforce diversity is associated with enhanced performance in organizations with strategic initiatives aligned with diversity (e.g., innovation; Richard et al., 2004) and have a work climate that is supportive of diversity (Gonzalez & DeNisi, 2009). In fact, my colleagues and I have a body of work showing that business units that highly value diversity (e.g., maintain favorable diversity climates) enjoy higher employee sales performance (McKay et al., 2008), sales growth (McKay et al., 2009), and customer satisfaction ratings (McKay et al, 2011). Key contextual factors such as a

1    company's strategy and climate for diversity are not borne out in raw EEO-1 data, which could result in

2    misconceptions about a company's stance on diversity and harm their recruitment success.

3          12.    Second, company's representation of racial-ethnic minority and female employees in

4    occupational specialties is bound by the local/regional supply of qualified workers. Location/regional

5    labor supply represents an additional contextual feature that will not be taken into account upon the

6    public release of a company's raw EEO-1 workforce data. Consequently, readers of the data could make

7    the erroneous assumption that low racial-ethnic and/or gender representation in an occupational

8    specialty means that a company is disparaging to minorities and women, respectively; however, the

9    possibility exists that there is a low supply of workers from the occupation in the local labor market,

10   thus precluding an organization from hiring a large share of workers from such underrepresented groups.

11   As an example, nationally, Blacks and Hispanics tend to be underrepresented in professional

12   occupations relative to their White and Asian counterparts (Economic Policy Institute, 2021). Likewise,

13   Blacks, Hispanics, and women are underrepresented in science, technical, engineering, and mathematics

14   (STEM) fields as well (Porter & Serra, 2020; Wynn & Correll, 2018). A layperson viewing a company's

15   EEO-1 workforce data may reach the false conclusion that Blacks and Hispanics face barriers to

16   employment in a company's professional or technician jobs, instead of realizing that there is a relatively

17   dearth supply of Black and Hispanic professional and technical workers to hire from the labor market.

18         13.    Third, there is an erroneous assumption, including among job applicants, that racial-

19   ethnic and/or gender diversity is associated with an enhanced climate for diversity, such that a diverse

20   company is more welcoming and inclusive of traditionally underrepresented group such as women and

21   racial-ethnic minorities. Yet, research shows that there is a weak relationship between workforce

22   diversity and diversity climate (Kossek et al., 1996; McKay et al., 2008). Thus, the presentation of raw

23   EEO-1 data may unfairly damage companies with low racial-ethnic and gender diversity by dissuading

24   minority and female job seekers and others (e.g., Whites who value diversity) from applying for jobs

25   with such companies. Anecdotally, there is evidence of companies that have lost discrimination lawsuits

26   becoming champions for diversity after discrimination lawsuits and/or consent decrees (e.g., Denny's

27   and Cracker Barrel). Hence, it is highly conceivable for organizations with low diversity to have

28   targeted recruitment initiatives in place designed to improve the representation of racial-ethnic

minorities and women, and other targeted groups such as people with disabilities (McKay, forthcoming). In sum, it is my view that companies should be able to pursue diversity recruitment initiatives unencumbered by the unnecessary, and potentially misleading public reporting of their EEO-1 workforce data. Moreover, requiring companies to publicly disclose their raw EEO-1 workforce data may have the unintended effect of undermining their ability to attract and hire a diverse workforce.

***Signaling Of Human Resource Management System Effectiveness to Competitors***

14.     The public release of companies' EEO-1 workforce data poses several commercial disadvantages to firms. These include allowing competing firms to see a company's employee headcount, calculate the company's turnover rate, poach its employees, and estimate headcount–company performance relationships.

***Employee Headcount***

15.     The public release of companies' EEO-1 workforce data may adversely affect their commercial interests by providing a signal of their human resource management effectiveness to competitors. A company's *employee headcount*, particularly among those in its core workforce (i.e., employees who are central to a company's production of goods and services such as engineers in an engineering firm), is a key indicator of the human resources a company has at its disposal in pursuing its business objectives (Noe et al., 2022). Companies that have a greater number of qualified workers tend to have higher labor productivity than firms that have a lower number of qualified workers (Della Torre et al., 2018). An important function in human resource management (HRM) is human resource (HR) planning, which is undertaken to determine if a company has a sufficient quality and quantity of labor in a given year to produce goods and provide services central to an organization's operation. HR planning is part of a firm's overall HRM strategy and strategic plans consist of short-term (1-2 years) or long-term planning cycles (3-5 years). Consequently, a company's monitoring of employee headcount is not a singular event, but part of a company's overall HRM strategy to ensure that it has the necessary human talent to conduct its business effectively over time. Also, monitoring a competitor's prior staffing patterns could be useful for a company's long-term HR planning. In analysis of employee headcount data, a company is viewed as understaffed when it has too few employees to effectively provide goods and services. Alternatively, an overstaffed company has a stockpile of talent that it can deploy to cover

1  sudden increases in business and/or engage in research and development activities designed to produce

2  new products and services. Regarding the former, understaffing is a sign of HRM system ineffectiveness

3  as a company has failed to retain the labor needed to operate the business (Noe et al., 2022). Concerning

4  the latter, an overstaffed company may signal to a competing organization a ripe opportunity to recruit

5  personnel in key occupational domains (e.g., engineers) where they currently have labor shortages.

6      16.    Importantly, the public release of five (5) years of a company's EEO-1 workforce data

7  may signal to a competing company the number of workers the reporting company employs in key

8  occupational areas. In fact, the ten (10) job category functions correspond to existing sources of job

9  analytic information including the Dictionary of Occupational Titles (DOT) as well as the Occupational

10  Network (O*NET; https://www.onetonline.org/). Accordingly, a competing company can draw such

11  inferences by deducing which of the 10 job category contains a company's core workers. For an

12  engineering firm, a company could easily surmise that its engineers are counted either within the

13  professional or technician job categories. This core category analysis is easily accomplished, especially

14  for individuals who have background in job analyses, job placement, and related fields. If multi-year

15  EEO-1 workforce data shows reductions in professionals and technicians in a company, this could be

16  indicative of potential understaffing of engineers. In response, the competing firm may ramp up its

17  recruitment of engineers in an effort to produce new products and services, thus allowing it to capture a

18  greater share of the product market than the focal organization and other firms in the industry.

19      ***Turnover Rate***

20      17.    An additional indicator of a company's HRM effectiveness is its turnover rate (Noe et al.,

21  2022). *Turnover rate* refers to the percentage of employees who leave an organization in a given period,

22  usually calculated on an annual basis. Research indicates that turnover rate, as well as reductions in

23  force such as downsizing (i.e., a company's purposeful dismissal of workers due to a reduction in

24  demand for its products and services), are associated with reduced labor productivity and company

25  financial performance (Della Torre et al., 2018; Guthrie & Dutta, 2008). Publicly releasing a company's

26  EEO-1 workforce data across a five-year period will provide competing firms with the necessary data to

27  calculate the reporting company's total turnover rate, as well as that per the 10 job categories. Moreover,

28  the five-year reporting period will allow competing firms to calculate a reporting company's trend in

turnover rate over time, thus offering a useful indicator of a company's HRM system effectiveness. Owing to estimates of turnover costs equaling 93% to 200% of a leaver's yearly salary (Cascio, 2000), a company with a relatively high turnover rate over time can be considered to have a poorly-functioning human resource management system compared to a company with a lower turnover rate. In sum, high turnover is a signal of staffing problems in an organization, and poor HRM functioning has a negative influence on a company's competitive position within an industry (Jiang et al., 2012).  This non-public information would be valuable to a competitor because it provides a signal of an organization's inability to retain the talent necessary to remain competitive in its market niche. Owing to knowledge that a competitor is struggling to retain talent, a rival company assumes less risk in devising and implementing means to better attract, hire, and ultimately, stockpile key talent from the relevant labor market (e.g., pay above market wages, offer special hiring incentives, etc.). By doing so, a firm could seize competitive advantage in the market relative to other companies in its industry.

18.     Related to the turnover rate concern above, the public release of a company's EEO-1 workforce data may prompt a competing firm to recruit employees from a reporting firm with a high turnover rate. This possibility may be bolstered for firms that are suffering labor shortages in jobs key to its operation. The commercial threat to reporting firms is further amplified by the rise in organizations' use of human resource (HR) analytics systems. HR analytics systems utilize data mining (i.e., the use of software to extract text-based and/or quantitative data) to access existing company data (e.g., turnover rate) to determine whether such factors are predictive of important company outcomes such as profitability, customer satisfaction, labor productivity, etc. (Cho et al., 2023; Gelbard et al., 2018; Madhani, 2023). However, the data mining capabilities of HR analytic systems may also allow third-parties such as competing firms to scrape a company's website for information about company performance (e.g., earnings, profitability), as well as third-party websites (e.g., Market Beat; https://www.marketbeat.com/stocks/) that provide such information. (Bennett, 2017; Qin et al., 2023). Consequently, a competing company could then pair a competitor's performance data with its publicly released, corporate EEO-1 workforce information. These two sets of data could be used to conduct statistical analyses aimed at discovering possible relationships between a competitor's employee headcounts and corporate performance (as discussed further in paragraph 21 of my declaration).

19.     As an example of the potential harm to companies of data mining, Bennett (2017) reported that the LinkedIn professional networking organization sued HiQ Labs, a people analytics firm. LinkedIn accused HiQ Labs of using its Skill Mapper software (a data mining tool) to scrape the profiles of LinkedIn members whose work credentials matched HiQ Lab client organizations' job openings without authorization. The Skill Mapper software also was programmed to flag the LinkedIn profiles of individuals who were prone to leaving their jobs. The case raises an important issue with respect to data security among companies who may be required to publicly disclose five (5) years of their EEO-1 workforce data. As noted earlier, the five-year reported period allows easy calculation of a reporting company's overall turnover rate over time, as well as the rates within the 10 job categories. Furthermore, armed with data that a reporting company has a trend of high turnover, a competing firm may solicit data scraping services from a vendor of such services (or do so in-house with information technology personnel) to download all of the LinkedIn profiles of individuals within particular occupational specialties, and those possessing the desired level of work experiences, reported skills on their profile, etc. Accordingly, a competing firm may use the downloaded LinkedIn profiles to contact potential job recruits, especially those in high-demand work domains such as knowledge workers (e.g., technicians, engineers, etc.). Absent the reported EEO-1 workforce data, a competing firm would lack direct evidence that a firm is experiencing turnover problems, thus reducing the likelihood of strategic poaching of its key human resource talent.

### *Estimation of Employee Headcount–Company Performance Relationship*

20.     A final potential harm that could occur to companies that publicly report their EEO-1 workforce data is to allow competing firms to estimate employee-headcount–company performance relationships. Human resource management research has demonstrated that HRM systems differentiate firms in terms of overall company performance (Combs et al., 2006; Jiang et al., 2012). Typically, a company's HRM system operation is internal in nature, thus precluding competing companies from attempts to duplicate the HRM system of a successful organization; however, by requiring companies to public report their EEO-1 workforce data, competing organizations may use the data as means to learn the workings of a successful company's HRM system.

21.     As an example, a firm could estimate a company's employee occupational mix by calculating the proportion of workers classified within each of the 10 job categories. Then, to the extent that organizational performance data is publicly available in databases (e.g., COMPUSTAT), published reports (e.g., shareholder reports), or can be scraped from online media publications (e.g., Financial Times, Bloomberg, etc.), a competing firm could estimate statistically how the relative proportions of workers in each job category relates to company performance data such as stock share prices, earnings, sales revenue, profits, etc. Similar analyses could be examined with respect to corporate turnover rates, thus allowing a competitor firm to estimate the effects of turnover rates, overall or by job category, on corporate performance. Such analyses would be particular powerful if data are compiled for multiple companies within a particular industry across the five years of EEO-1 workforce data.

22.     In sum, the public release of companies' EEO-1 workforce data raises the possibility that competing firms may attempt to glean and mimic a firm's HRM system operation to increase their competitiveness with successful companies. In highly competitive business environments, a company's investment in building effective HRM systems is a pivotal source of competitive advantage over other companies. Thus, it is against a company's interest to allow competing firms to copy its approach to HRM, and the public release of a company's EEO-1 workforce data may assist competitor firms' effort to duplicate the HRM system of a successful organization. Ultimately, human resource management in organizations is prefaced upon an organization's unique way of managing and structure human talent, such that it distinguishes it from competitors, and allows it achieve greater success in its market environment. Thus, retaining the privacy of EEO-1 workforce data prevents a company from disclosing the details of its HRM system that is crucial to business success.

### III.     Conclusion

23.     Based upon my research and the evidence presented in my summary declaration, it is my opinion that requiring the public release of organizations' EEO-1 workforce data would be harmful to the companies and bad policy. The public release of the data will expose reporting firms to commercial harms including hampered recruitment and provide signals of a firms' human resource system effectiveness in terms of employee headcounts, turnover rates, and statistical estimation of employee headcount–company performance relationships. As such, the harms above may not only reduce

1   companies' ability to successfully recruit a demographically-diverse workforce, but also to compete

2   fairly with other companies within their industries.

3           I declare under penalty of perjury that the foregoing is true and correct.

4   Executed this ___17___ day of August, 2023, at ___Kinston, North Carolina___

5                                                   *Patrick F. McKay*

6                                                   PATRICK F. McKAY, PhD.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

**Patrick F. McKay, Ph.D.**
Professor of Management
College of Business
Bate Building, Room 3106A
East Carolina University
Greenville, NC 27858
Phone: (252) 328-1263
Email: mckaypa22@ecu.edu

## EDUCATION

Ph.D.   University of Akron, Akron, OH, May 15, 1999
Major: Industrial/Organizational Psychology
Dissertation title: *Stereotype threat and its effects on the cognitive ability test performance of African-Americans: The development of a theoretical model*.

M.A.   University of Akron, Akron, OH, December 14, 1996
Major: Industrial/Organizational Psychology
Thesis title: *A task-specific information processing test and personality: The possibility of incremental validity*?

B.S.   Fayetteville State University, Fayetteville, NC, May 12, 1993
(Magna cum Laude)
Major:  Psychology
Minor:  Sociology

## ACADEMIC APPOINTMENTS

8/22–Present   **Professor of Management**, College of Business, East Carolina University, Greenville, NC.

7/19–12/21   **Stanley and Franny Wang Professor of Human Resource Management**, Fox School of Business, Temple University, Philadelphia, PA.

7/12–7/19   **Professor of Human Resource Management**, School of Management and Labor Relations, Rutgers University, Piscataway, NJ.

7/07–7/12   **Associate Professor of Human Resource Management** (with tenure), School of Management and Labor Relations, Rutgers University, Piscataway, NJ.

8/01–7/07   **Assistant Professor of Organizations and Strategic Management** (Promoted to Associate Professor with tenure), Sheldon B. Lubar School of Business, University of Wisconsin-Milwaukee, Milwaukee, WI.

McKay
Page 2

8/99–5/01    **Assistant Professor of Psychology**, University of North Carolina at Wilmington, Department of Psychology, Wilmington, NC

**PROFESSIONAL EMPLOYMENT**

7/94–6/99    **Human Resource Consultant**, Barrett & Associates, Akron, OH.

**AWARDS AND HONORS**

**Fellow**, 2013, Society for Industrial-Organizational Psychology, Division 14 of the American Psychological Association.

This award acknowledges a scholar (or practitioner) who has made a noteworthy contribution to the field of industrial-organizational psychology.

**Saroj Parasuraman Outstanding Publication Award**, 2009, Gender and Diversity in Organizations division of the Academy of Management for the article, *Mean racial-ethnic differences in work performance: The moderating role of diversity climate* (McKay, P. F., Avery, D. R., & Morris, M. A.) published in ***Personnel Psychology***.

The award recognizes the published research article judged to have the highest potential to significantly impact understanding of gender and diversity within organizations.

**Assurant Health Research Fellow Award**, 2007, Sheldon B. Lubar School of Business, University of Wisconsin-Milwaukee

The award included two years ($11,000 per year) of summer research and travel support.

**Dorothy Harlow Distinguished Paper Award**, 2007, from the Gender and Diversity in Organizations division of the Academy of Management conference for the paper, *The interaction of subordinates' and managers' diversity climates on store unit sales performance* (McKay, P. F., Avery, D. R., and Morris, M. A.).

**Business Advisory Council Scholarly Achievement Award for Junior Faculty**, 2006, Sheldon B. Lubar School of Business, University of Wisconsin-Milwaukee ($5,000.00 honorarium received)

**Gold Star Teaching Award**, 2006 (Spring Semester), Sheldon B. Lubar School of Business, University of Wisconsin-Milwaukee

**Gold Star Teaching Award**, 2004 (Spring Semester), Sheldon B. Lubar School of Business, University of Wisconsin-Milwaukee

McKay
Page 3

## PEER-REVIEWED PUBLICATIONS AND IN-PRESS ARTICLES (asterisked names denote current or former doctoral students)

40. Avery, D. R., Rhue, L. A., & McKay, P. F. (2023). Setting the stage for success: How participation diversity can help teams leverage racioethnic diversity. *Journal of Management*, *49,* 1312–1343.

39. Holmes IV, O., *Jiang, K., Avery, D. R, McKay, P. F., Oh, I., & Tillman, C. J. (2021). A meta-analysis integrating 25 years of diversity climate research. *Journal of Management*, *47,* 1357–1382.

38. Zhang, L., Goldberg, C. B., & McKay, P. F. (2020). From new hires to their supervisors: The influence of newcomer race/ethnicity on the leader-member exchange conveyance. *Journal of Occupational and Organizational Psychology*, *93,* 767–789.

37. Hall, E. V., Avery, D. R., McKay, P. F., Blot, J. F., & Edwards, M. (2019). Composition and compensation: The moderating effect of individual and team performance on the relationship between black team member representation and salary. *Journal of Applied Psychology*, *104,* 448–463.

36. Richard, O. C., McKay, P. F., *Garg, S., & *Pushovit, S. (2019). The impact of supervisor-subordinate racial-ethnic and gender dissimilarity on mentoring quality and turnover intentions: Do positive affectivity and communal culture matter? *International Journal of Human Resource Management*, *30,* 3138–3165.

35. David, E. M., Avery, D. R., Witt, L. A., Tonidandel, S., Brown, L., McKay, P. F., & Crepeau, L. (2019). Helping misfits to commit: How justice climate attenuates the effects of personality dissimilarity on organizational commitment. *Journal of Business & Psychology*, *34,* 503–517.

34. Rubino, C., Avery, D. R., McKay, P. F., Moore, B. L., Wilson, D. C., Van Driel, M. S., Witt, L. A., & McDonald, D. P. (2018). And justice for all: How organizational justice climate deters sexual harassment. *Personnel Psychology*, *71,* 519–544.

33. *Ameri, M., Schur, L., Adya, M., *Bentley, S., McKay, P. F., & Kruse, D. (2018). The disability employment puzzle: A field experiment on employer hiring behavior. *Industrial and Labor Relations Review*, *71,* 329–364.

McKay
Page 4

32. Richard, O. C., Stewart, M. M., McKay, P. F., & Sackett, T. W. (2017). The impact of store-unit–community racial diversity congruence on business unit performance. *Journal of Management*, *43,* 2386–2403.

Study was the subject of the *NJ Biz* news article, "A diverse workforce can pay off for retailers, study finds", December 8, 2016.

31. Avery, D. R., McKay, P. F., & Volpone, S. D. (2016). Blaming the building: How venue quality influences consumer bias against stigmatized leaders. *Journal of Applied Psychology, 101,* 1111–1121.

30. Hernandez, M., Avery, D. R., Tonidandel, S., Hebl, M. R., Smith, A. N., & McKay, P. F. (2016). The role of proximal social contexts: Assessing stigma-by-association effects on leader appraisals. *Journal of Applied Psychology, 101,* 68–85.

29. Avery, D. R., McKay, P. F., Volpone, S. D., & Malka, A. (2015). Judging companies by the company they keep: A stigma-by-association approach to customer patronage. *Organizational Behavior and Human Decision Processes, 127,* 85–102.

28. David, E., Avery, D. R., Witt, L. A., & McKay, P. F. (2015). A time-lagged investigation of the impact of coworker behavior on the effects of demographic dissimilarity. *Journal of Organizational Behavior, 36,* 582–606.

27. *Jiang, K., *Hong, Y., McKay, P. F., Avery, D. R., Wilson, D. C., & Volpone, S. D. (2015). Saying "no" to sexual harassment: Enhancing employee engagement through anti-sexual harassment practices. *Human Resource Management, 54,* 1–21.

26. King, J. E., McKay, P. F., & Stewart, M. M. (2014). Religious bias and stigma: Attitudes toward working with a Muslim co-worker. *Journal of Management, Spirituality and Religion, 11,* 98–122.

25. Avery, D. R., Volpone, S. D., Stewart, R. W., Luksyte, A., Hernandez, M., McKay, P. F., & Hebl, M. R. (2013). Examining the draw of diversity: How diversity climate perceptions affect job pursuit intentions. *Human Resource Management, 52,* 175–194.

24. *Jiang, K., Liu, D., McKay, P. F., Lee, T. W., & Mitchell, T. R. (2012). When and how is job embeddedness predictive of turnover? A meta-analytic investigation. *Journal of Applied Psychology, 97,* 1077–1096.

Article was a finalist for the Academy of Management Human Resources Division's 2013 Scholarly Achievement Award.

23. Avery, D. R., McKay, P. F., & Hunter, E. M. (2012). Demography and disappearing merchandise: How older workforces influence retail shrinkage. *Journal of Organizational Behavior, 33,* 105–120.

McKay
Page 5

22. Avery, D. R., McKay, P. F., Tonidandel, S., Volpone, S. D., & Morris, M. A. (2012). Is there method to the madness? Examining how racioethnic matching influences retail store productivity. *Personnel Psychology, 65,* 167–199.

21. Avery, D. A., Volpone, S. D., McKay, P. F., King, E. B., & Wilson, D. C. (2012). Is relational demography relative? How employment status influences effects of supervisor-subordinate demographic similarity. *Journal of Business and Psychology, 27,* 83–98.

20. Volpone, S. D., Avery, D. R., & McKay, P. F. (2012). Linkages between racioethnicity, appraisal reactions, and employee engagement. *Journal of Applied Social Psychology, 42,* 252–270.

19. Stewart, R. W., Volpone, S. D., Avery, D. R., & McKay, P. F. (2011). You support diversity, but are you ethical? Examining the interactive effects of diversity and ethical climate perceptions on turnover intentions. *Journal of Business Ethics*, 100, 581–593.

18. McKay, P. F., Avery, D. R., Liao, H., & Morris, M. A. (2011). Does diversity climate lead to customer satisfaction?  It depends on the service climate and business unit demography. *Organization Science, 22,* 788–803.

17. Avery, D. R., McKay, P. F., Wilson, D. C., Volpone, S. D., & Killham, E. (2011). Does voice go flat? How tenure diminishes the impact of voice. *Human Resource Management, 50,* 147–158.

16. McKay, P. F., Avery, D. R., & Morris, M. A. (2009). A tale of two climates: Diversity climate from subordinates' and managers' perspectives and their role in store unit sales performance. *Personnel Psychology, 62,* 767–791.

   Article summarized by Madigan, J., & Giberson, T. in the "Good Science-Good Practice" Forum (2010, April), *The Industrial-Organizational Psychologist, 47,* 127–132.

15. Wilson, D. C., Moore, D. W., McKay, P. F., & Avery, D. R. (2008). Affirmative action programs for women and minorities: Expressed support affected by question order. *Public Opinion Quarterly, 72,* 514–522.

14. Tonidandel, S., Avery, D. R., Bucholtz, B., & McKay, P. F. (2008). An alternative explanation for the asymmetrical effects in relational demography research. *Personnel Psychology*, 61, 617–633.

13. McKay, P. F., Avery, D. R., & Morris, M. A. (2008). Mean racial-ethnic differences in work performance: The moderating role of diversity climate. *Personnel Psychology, 61,* 349–374.

McKay
Page 6

This article was selected for the 2009 Saroj Parasuraman Award by the Gender and Diversity in Organizations division of the Academy of Management. The award recognizes the published research article judged to have the highest potential to significantly impact understanding of gender and diversity within organizations.

The article has been the subject of two media stories:

> Minority Sales Personnel Have Better Results in Workplaces with Supportive Diversity Climates (2008, November 15). Clif Boutelle, SIOP Public Relations. Retrieved from http://www.siop.org/Media/News/minority_sales.aspx
>
> Rutgers Research: Improve Diversity and Reap Fiscal Benefit (2008, November 13). Fredda Sacharow, Rutgers University Media Relations. Retrieved from http://news.rutgers.edu/medrel/news-releases/2008/11/rutgers-research-imp-20081113

12. Avery, D. R., McKay, P. F., & Wilson, D. C. (2008). What are the odds? How demographic similarity affects the prevalence of perceived employment discrimination. *Journal of Applied Psychology*, *93,* 235–249.

11. Avery, D. R., McKay, P. F., & Wilson, D. C. (2007). Engaging the aging workforce: The relationship between perceived age similarity, satisfaction with coworkers, and employee engagement. *Journal of Applied Psychology*, *92,* 1542–1556.

10. Avery, D. R., McKay, P. F., Wilson, D. C, & Tonidandel, S. (2007). Unequal attendance: The relationships between race, organizational diversity cues, and absenteeism. *Personnel Psychology*, *60,* 875–902.

9. McKay, P. F., Avery, D. R., Tonidandel, S., Morris, M. A, Hernandez, M., & Hebl, M. (2007). Racial differences in employee retention: Are diversity climate perceptions the key? *Personnel Psychology*, *60,* 35–62.

> Article summarized by Madigan, J., & Dickson, M. W. in the "Good Science-Good Practice" Forum (2007, October), *The Industrial-Organizational Psychologist*, *45,* 67–70.
>
> Article reprinted as an Executive Summary (December, 2007) in *The Business Journal of Hispanic Research*, *1,* 108–113.
>
> Article was a finalist for the Academy of Management Human Resources Division's 2007 Scholarly Achievement Award.

8. McKay, P. F., & Avery, D. R. (2006). What has race got to do with it? Unraveling the role of racioethnicity in job seekers' reactions to site visits. *Personnel Psychology*, *59,* 395–429.

McKay
Page 7

7. McKay, P. F., & McDaniel, M. A. (2006). A re-examination of Black-White Mean differences in work performance: More data, more moderators. *Journal of Applied Psychology, 91,* 538–554.

6. Avery, D. R. & McKay, P. F. (2006). Target practice: An organizational impression management approach to attracting minority and female job applicants. *Personnel Psychology, 59,* 157–187.

    Abstracted in *HR Professional***'s** "Research Forum"

5. McKay, P. F., & Avery, D. R. (2005). Warning! Diversity recruitment could backfire. *Journal of Management Inquiry, 14,* 330–336.

4. McKay, P. F., Doverspike, D., Bowen-Hilton, D., & McKay, Q. D. (2003). The effects of demographic variables and stereotype threat on Black/White differences in cognitive ability test performance. *Journal of Business and Psychology, 18,* 1–14.

3. McKay, P. F., Doverspike, D., Bowen-Hilton, D., & Martin, Q. D. (2002). Stereotype threat effects on the Raven Advanced Progressive Matrices scores of African-Americans. *Journal of Applied Social Psychology, 32,* 767–787.

2. McKay, P. F., & Doverspike, D. (2001). African-Americans' test-taking attitudes and their effect on cognitive ability test performance: Implications for public personnel management selection practice. *Public Personnel Management, 30,* 67–75.

1. Doverspike, D., Taylor, M. A., Shultz, K. S., & McKay, P. F. (2000). Responding to the challenge of a changing workforce: Recruiting nontraditional demographic groups. *Public Personnel Management, 29,* 445–459.

## INVITED PEER-REVIEWED REVISIONS

Hall Birch, A., Avery, D. R., Gelfand, M. J., & McKay, P. F. [Title withheld to preserve blind review]. *Organization Science*.

## PAPERS UNDER FIRST REVIEW (asterisked names denote current or former doctoral students)

Gu, P., Triana, M., Richard, O. C., Avery, D. R., McKay, P. F., & Stewart, M. M. [Title withheld to preserve blind review]. *Journal of Management*.

McKay
Page 8

**WORKING PAPERS** (asterisked names denote current or former doctoral students)

McKay, P. F., Alipour, K., & Karriker, J. H.  [Title withheld to preserve blind review]. Target journal: ***Academy of Management Journal***.

McKay, P. F., & Avery, D. R. [Title withheld to preserve blind review]. Target journal: ***Journal of Management***.

McKay, P. F., Avery, D. R., *Son, E., *Rosado-Solomon, E., *Pustovit, S., & *Agolli, A. [Title withheld to preserve blind review]. Target Journal: ***Personnel Psychology***.

**RESEARCH IN PROGRESS** (asterisked names denote current or former doctoral students)

McKay, P. F., Avery, D. R., & Alipour, K. Race-ethnicity and site visits: The impact of diversity cues, social identity, and location perceptions on job choice.

Hoobler, J. M., Ragozzino, R., Blevins, D., & McKay, P. F. The effect of entrepreneur gender and race-ethnicity on investors' venture capital contributions: A study of Kickstarter.

Waldman, D., Opoku, S., Wright, P. M., & McKay, P. F. Organizational diversity strategies and their effects on business outcomes.

**NON-REFEREED ARTICLES/BOOK CHAPTERS**

McKay, P. F. (forthcoming). Targeted recruitment of racial-ethnic minorities: A research review. In J. Slaughter, D. G. Allen, & S. Highhouse (Eds.), ***Essentials of Employee Recruitment: Individual and Organizational Perspectives***. New York: Routledge.

Avery, D. R., McKay, P. F., Roberson, Q. M., & Thomas, K. M. (2023). R.E.A.L. (Racialized Experiences in Academic Life) talk: A curated conversation with four Black fellows. ***Journal of Business and Psychology***, *38,* 7–23.

McKay, P. F. (2020). Winning and losing at the same time. Invited viewpoint essay on Black Lives Matter in ***Equality, Diversity and Inclusion: An International Journal***, *39,* 761-767.

McKay, P. F., & Avery, D. R. (2015). Diversity climate in organizations: Current wisdom and domains of uncertainty. In M. R. Buckley, J. R. B. Halbesleben, & A. R. Wheeler (Eds.), ***Research in Personnel and Human Resource Management*** (pp. 191–233). Bingley, UK: Emerald Publishing.

Goldberg, C. B., & McKay, P. F. (2015). Diversity and LMX.  In T. N. Bauer & B. Erdogan (Eds.), ***Handbook of leader-member exchange*** (pp. 381-396). London, UK: Oxford University Press.

McKay
Page 9

Avery, D. R., McKay, P. F., & Volpone, S. D. (2013). Diversity staffing: Inclusive personnel recruitment and selection practices. In Q. M. Roberson (Ed.), *Handbook of diversity in the workplace* (pp. 282–299). London, UK: Oxford University Press.

Colella, A., McKay, P. F., Daniels, S., & Signal, S. (2012). Employment discrimination. In S. Koslowski (Ed.), *Oxford handbook of organizational psychology* (Vol. 2, pp. 1034–1102). London, UK: Oxford University Press.

Avery, D. R., McKay, P. F., & Roberson, Q. M. (2012). The new deal: The impact of diversity on employee psychological contracts. In L. Shore, J. Shapiro, & L. Tetrick (Eds.), *Essays in employee-organization relationships* (pp. 509–532). New York: Wiley.

Avery, D. R., & McKay, P. F. (2010). Doing diversity right: An empirically based approach to effective diversity management. In G. Hodgkinson & J. K. Ford (Eds.). *International review of industrial and organizational psychology* (pp. 227–252). London, UK: Wiley.

McKay, P. F. (2009). Perspectives on adverse impact in work performance: What we know and what we could learn more about. In J. L. Outtz (Ed.), *Adverse impact: Implications for organizational staffing and high stakes selection* (pp. 249–270). New York: Routledge.

McKay, P. F., & Davis, J. L. (2007). Traditional selection methods as resistance to diversity in organizations. In K. M. Thomas (Ed.), *Diversity resistance in organizations: Manifestations and solutions* (pp. 151–174). Boca Raton, FL: Taylor & Francis.

Avery, D. R., & McKay, P. F. (2007, April). How our similarity makes us different: A minority perspective on the community impact on work-family balance. *The Industrial-Organizational Psychologist, 45,* 85–90.

## PUBLISHED PROCEEDINGS (asterisked names denote current or former doctoral students)

Avery, D. R., Rhue, L., & McKay, P. F. (2019, August). The role of structure in the racioethnic heterogeneity-performance linkage. *Academy of Management Conference Best Papers Proceedings*.

*Pustovit, S, McKay, P. F., & Avery, D. R. (2018, August). Examining the effects of sex, relative human capital, and sex composition on voluntary turnover. *Academy of Management Conference Best Papers Proceedings*.

McKay, P. F., Avery, D. R., *Son, E., *Rosado-Solomon, E., & *Pustovit, E. (2017, August). Can cooperation help explain the diversity–business performance relationship? *Academy of Management Conference Best Papers Proceedings*.

Avery, D. R., McKay, P. F., & Volpone, S. D., (2015, August). Are Black leaders "color safe"? The impact of leader race on organizational stigma. *Academy of Management Conference Best Papers Proceedings*.

Richard, O. C., McKay, P. F., *Garg, S., & Taylor, E. C. (2012, August). Positive affectivity, clan culture, and supervisor-subordinate demographic similarity effects. *Academy of Management Conference Best Papers Proceedings*.

Richard, O. C., Stewart, M. M., McKay, P. F., & Sackett, T. (August, 2012). Employee relations-oriented diversity and store unit effectiveness: Does community matter? *Academy of Management Conference Best Papers Proceedings*.

King, J. E., Stewart, M., & McKay, P. F. (2010, August). Religiosity, religious identity, and bias toward workplace others. *Academy of Management Conference Best Papers Proceedings*.

King, J. E., Stewart, M., Williamson, I, & McKay, P. F. (2009, June). Social identity theory and religious bias toward workplace others. *Eastern Academy of Management Best Paper Proceedings*, 1140-1489. Rio de Janeiro, Brazil.

McKay, P. F., Avery, D. R., & Morris, M. A. (2007, August). The interaction of subordinates' and managers' diversity climates on store unit sales performance. *Academy of Management Conference Best Papers Proceedings*.

## CONFERENCE PRESENTATIONS (asterisked names denote current or former doctoral students)

Avery, D. R., Rhue, L., & McKay, P. F. (2019, August). The role of structure in the racioethnic heterogeneity-performance linkage.  Paper presented as part of the symposium *Race & ethnicity in organizations* at the annual Academy of Management Conference, Boston, MA.

*Pustovit, S, McKay, P. F., & Avery, D. R. (2018, August). Examining the effects of sex, relative human capital, and sex composition on voluntary turnover. Paper presented at the annual Academy of Management Conference, Chicago, IL

McKay, P. F., Avery, D. R., *Son, E., *Rosado-Solomon, E., & *Pustovit, E. (2017, August). Can cooperation help explain the diversity–business performance relationship? Manuscript presented at the annual Academy of Management Conference, Atlanta, GA.

*Rosado-Solomon, E., McKay, P. F., & Avery, D. R. (2017, April). Untangling diversity climate effects on physical well-being. Manuscript presented at the annual Society for Industrial and Organizational Psychology Conference, Orlando, FL.

*Pustovit, S., McKay, P. F., & Avery, D. R. (2017, April). Relative human capital and racioethnic disparities in voluntary turnover. Manuscript presented at the annual Society for Industrial and Organizational Psychology Conference, Orlando, FL.

Avery, D. R., Gelfand, M. J., & McKay, P. F. (2016, August). State level tightness-looseness moderates the impact of diversity climate on firm performance. Paper presented as part of the symposium, *Connecting culture and context: Insights from organizational culture theory and research*, at the annual Academy of Management Conference, Anaheim, CA.

Avery, D. R., McKay, P. F., & Volpone, S. D., (2015, August). Are Black leaders "color safe"? The impact of leader race on organizational stigma. Paper presented at the annual Academy of Management Conference, Vancouver, BC.

*Chen, Y., Fulmer, I. S., McKay, P. F., & Avery, D. R. (2015, April). Racial differences in performance-pay relationships: The role of diversity climate. Manuscript presented at the annual Society for Industrial and Organizational Psychology Conference, Philadelphia, PA.

Avery, D. R., Rubino, C., Tonidandel, S., & McKay, P. F. (2014, April). Putting diversity in context: The role of racioethnic representativeness. Manuscript presented at the annual Society for Industrial and Organizational Psychology Conference, Honolulu, HI.

David, E., Brown, L., Avery, D. R., McKay, P. F., Tonidandel, S., Crepeau, J. J., van Driel, M., McDonald, D. P., & Witt, L. A. (2013, April). Deep-level dissimilarity and emotional exhaustion: Exploring potential moderator variables. Manuscript presented at the annual Society for Industrial and Organizational Psychology Conference, Houston, TX.

Richard, O. C., Stewart, M. M., McKay, P. F., & Sackett, T. (August, 2012). Employee relations-oriented diversity and store unit effectiveness: Does community matter? Paper presented as part of the *Diversity climate* Divisional Roundtable Paper Session at the annual Academy of Management Conference, Boston, MA.

Richard, O. C., McKay, P. F., *Garg, S., & Taylor, E. C. (2012, August). Positive affectivity, clan culture, and supervisor-subordinate demographic similarity effects. Paper presented as part of the Gender and Diversity in Organization Discussion Paper session, *Diversity dimensions/ethnicity*, at the annual Academy of Management Conference, Boston, MA.

*Jiang, K., Liu, D., McKay, P. F., Lee, T. W., & Mitchell, T. R. (2012, April). When and how is job embeddedness predictive of turnover? Paper presented at the annual Society for Industrial and Organizational Psychology Conference, San Diego, CA.

Roberson, Q. M., Avery, D. R., & McKay, P. F. (2012, April). Managing diversity means managing differently: Diversity in POS. Paper presented as part of the symposium, *New directions in the employee–organization relationship for the 21st century*, at the annual Society for Industrial and Organizational Psychology Conference, San Diego, CA.

Avery, D. R., McKay, P. F., Volpone, S. D., & Malka, A. A. (2012, April). Do customers discriminate too? How stigmatized personnel influence patronage. Paper presented as part

McKay
Page 12

of the symposium, *Novel perspectives on employment discrimination*, at the annual
Society for Industrial and Organizational Psychology Conference, San Diego, CA.

McKay
Page 13

*Jiang, K., & McKay, P. F. (2010, August). Engaged employees speak up when team performance suffers. Paper presented as part of the symposium, *Speaking up and speaking out in teams*, at the annual Academy of Management Conference, Montreal, ON.

King, J. E., Stewart, M., & McKay, P. F. (2010, August). Religiosity, religious identity, and bias toward workplace others. Paper presented as part of the symposium, *Inequalities and biases in the workplace*, at the annual Academy of Management Conference, Montreal, ON.

McKay, P. F., Avery, D. R., *Jiang, K., & *Rogers, S. E. (2010, April). Diversity cues: Their influence on applicants' job acceptance intentions. Paper presented as part of the symposium, *Recruitment and adverse impact: Vocational interests, advertisements, and job acceptance*, at the annual Society for Industrial and Organizational Psychology Conference, Atlanta, GA.

Avery, D. A., Volpone, S. D., Stewarts, R. W., Luksyte, Aleksandra, Hernandez, M., McKay, P. F., & Hebl, M. R. (2010, April). The draw of diversity: Diversity climate affects job pursuit intentions. Paper presented as part of the symposium, *Diversity in a changing workplace: Policies and climate*, at the annual Society for Industrial and Organizational Psychology Conference, Atlanta, GA.

Waite, E., Avery, D. R., & McKay, P. F. (2010, April). Does diversity drive employees crazy? The relationship between organizational demographics and employee mental health. Paper presented at the meeting of the European Academy of Occupational Health Psychology, Rome, Italy.

McKay, P. F., *Hong, Y., *Jiang, K., Avery, D. R., & Wilson, D. C. (2009, August). Saying "no" to sexual harassment: Anti-sexual harassment activities and their relationships with work attitudes and psychological well-being. Paper presented as part of the symposium, *Removing the guesswork from diversity management: An analysis of diversity policies and implications*, at the annual Academy of Management Conference, Chicago, IL.

Avery, D. R., McKay, P. F., Tonidandel, S., Volpone, S. D., & Morris, M. A. (2009, August). Demographic representativeness. Paper presented as part of the symposium, *The future of diversity research: The tension between pragmatic and social justice arguments*, at the annual Academy of Management Conference, Chicago, IL.

King, J. B., Williamson, I. O., Stewart, M. M., & McKay, P. F. (2009, June). Social identity theory and religious bias toward workplace others. Manuscript presented at the annual Eastern Academy of Management-International Conference, Rio de Janeiro, Brazil.

Avery, D. R., McKay, P. F., Tonidandel, S., Volpone, S. D., & Morris, M. A. (2009, June). Demographic representativeness: Extending the business case for diversity. Manuscript presented at the Hospitality Industry Diversity Institute's "Best Practices and Research Initiatives Conference," Conrad N. Hilton College of Hotel and Restaurant Management, University of Houston, Houston, TX.

Volpone, S. D., Avery, D. R., & McKay, P. F. (2009, June). Appraising the appraisal system: Linkages between racioethnicity, appraisal reactions, and engagement. Manuscript presented at the Hospitality Industry Diversity Institute's "Best Practices and Research Initiatives Conference," Conrad N. Hilton College of Hotel and Restaurant Management, University of Houston, Houston, TX.

McKay, P. F., Avery, D. R., *Castellano, W. G., & Morris, M. A. (2009, April). Model of the perceived organizational value for diversity-voluntary turnover relationship. Manuscript presented at the annual Society for Industrial and Organizational Psychology Conference, New Orleans, LA.

Volpone, S., Avery, D. R., McKay, P. F., King, E. B., & Wilson, D. C. (2009, April). Withdrawal of full- and part-time employees: Examining supervisor-subordinate. Manuscript presented at the annual Society for Industrial and Organizational Psychology Conference, New Orleans, LA.

Avery, D. R., Volpone, S., & McKay, P. F. (2009, April). The impact of mixed messages on diversity recruitment. Manuscript presented as part of the symposium, *Evidence-based diversity management: Strategies for managing diversity organizations*, at the annual Society for Industrial and Organizational Psychology Conference, New Orleans, LA.

McKay, P. F., Avery, D. R., Liao, H., & Morris, M. A. (2008, August). Race matters even more: How minority representation moderates diversity climate effects on customer satisfaction. Manuscript presented as part of the symposium, *How and when can organizations reap the benefits of diversity? Some new questions, some new answers*, at the annual Academy of Management Conference, Anaheim, CA.

Avery, D. R., McKay, P. F., Wilson, D. C., & Volpone, S. D. (2008, August). Attenuating the effect of seniority on intent to remain: The role of perceived inclusiveness. Manuscript presented at the annual Academy of Management Conference, Anaheim, CA.

McKay, P. F., Avery, D. R., & Wilson, D. C. (2008, April). To stay or not to stay? How race moderates the community satisfaction-overall job attitudes interactive relationship with place attachment. Manuscript presented as part of the symposium, *The diversity of organizational diversity: Generalizing findings across diverse group*s, at the annual Society for Industrial and Organizational Psychology Conference, San Francisco, CA.

Avery, D. R., Volpone, S. D., & McKay, P. F. (2008, April). Engaging workforce 2000: Linkages between racioethnicity, appraisals perceptions, and engagement. Manuscript presented at the annual Society for Industrial and Organizational Psychology Conference, San Francisco, CA.

McKay, P. F., Avery, D. R., & Morris, M. A. (2007, August). The interaction of subordinates' and managers' diversity climates on store unit sales performance. Manuscript presented at the annual Academy of Management Conference, Philadelphia, PA. Manuscript received the Dorothy Harlow Distinguished Paper Award from the Gender and Diversity in Organizations division.

McKay, P. F., Avery, D. R., & Morris, M. A. (2007, August). Racial differences in employee sales performance: The moderating role of diversity climate. Manuscript presented at the annual Academy of Management Conference, Philadelphia, PA.

McKay, P. F., & Outtz, J. L. (2007, April). Institutional racial environment and racial differences in law school performance. Manuscript presented at the annual Society for Industrial and Organizational Psychology Conference, New York, NY.

Avery, D. R., McKay, P. F., & Wilson, D. C. (2007, April). How age, workgroup age composition, and satisfaction with older and younger coworkers affect employee engagement. Manuscript presented at the annual Society for Industrial and Organizational Psychology Conference, New York, NY.

Tonidandel, S., Avery, D. R., Bucholtz, B., & McKay, P. F. (2007, April). How far off is Euclidean distance? Artifacts in relational demography. Manuscript presented at the annual Society for Industrial and Organizational Psychology Conference, New York, NY.

Avery, D. R., McKay, P. F., & Wilson, D. C. (2007, April). What are the odds: How demographic similarity affects the likelihood of experiencing employment discrimination. Manuscript presented as part of the symposium, *Individual and organizational strategies for the reduction of discrimination*, at the annual Society for Industrial and Organizational Psychology Conference, New York, NY.

McKay, P. F., Avery, D. R., & Wilson, D. C. (2006, August). Perceived workplace discrimination and racial differences in positive non-work-to-work spillover. Manuscript presented at the annual Academy of Management Conference, Atlanta, GA.

McKay, P. F., Avery, D. R., Morris, M. A., Hernandez, M., & Hebl, M. R. (2006, May). Diversity climate perceptions and racial differences in managerial retention. Manuscript presented at the annual Society for Industrial and Organizational Psychology Conference, Dallas, TX.

Avery, D. R., McKay, P. F., Hernandez, M., Hebl, M. R., & Morris, M. A. (2006, May).  The draw of diversity: how diversity climates affect job pursuit. Manuscript presented at the annual Society for Industrial and Organizational Psychology Conference, Dallas, TX.

McDaniel, M. A., McKay, P. F., & Rothstein, H. R. (2006, May). Publication bias and racial effects on job performance: The elephant in the room. Manuscript presented at the symposium *Publication bias in I/O Psychology: The elephant in the room* at the annual Society for Industrial and Organizational Psychology Conference, Dallas, TX.

McDaniel, M.A., McKay, P.F., & Rothstein, H. (2005, May). Publication bias in personnel psychology: The elephant in the room. Paper presented at the Twelfth European Congress of Work and Organizational Psychology, Istanbul, Turkey.

McKay, P. F., Curtis, J. R., Snyder, D., & Satterwhite, R. (2005, April). Panel ratings of tape-recorded interview responses: Interrater reliability? Racial differences? Paper presented at the annual Society for Industrial and Organizational Psychology Conference, Los Angeles, CA.

McKay, P. F., & McDaniel, M. A.  (2005, April). Cognitive loading of criteria and racial differences in job performance. Manuscript presented at the annual Society for Industrial and Organizational Psychology Conference, Los Angeles, CA.

Avery, D. R., & McKay, P. F. (2004, August). One size doesn't fit all: An accommodative approach to targeted recruitment." Manuscript presented at the annual Academy of Management Conference, New Orleans, LA.

McKay, P. F., & McDaniel, M. A. (2003, April). A Re-examination of Black-White differences in job performance. Manuscript presented at the annual Society for Industrial and Organizational Psychology Conference, Orlando, FL.

McKay, P. F.  (2002, August). Traditional selection methods as resistance to diversity in organizations. Presented as part of the "Diversity Resistance in Organizations" symposium at the annual Academy of Management Conference, Denver, CO.

McKay, P. F., & Gonzalez, J. A. (2002, August). The reformation-recruitment-retention model for building a diverse labor force. Presented at the "Meeting Ourselves and Others: Perspectives in Diversity Research and Diversity Practices" Conference, Göteborg, Sweden.

McKay, P. F., Doverspike, D., Bowen-Hilton, D., & McKay, Q. D. (2002, April). An application of stereotype threat theory to personnel selection. Manuscript presented at the annual Society for Industrial and Organizational Psychology Conference, Toronto, Canada.

(185 of 247), Page 185 of 247   Case: 24-880, 05/09/2024, DktEntry: 9.3, Page 185 of 247
Case 3:22-cv-07182-WHA   Document 34-1   Filed 08/18/23   Page 29 of 51

McKay
Page 17

McKay, P. F., Doverspike, D., Bowen-Hilton, D., & Martin, Q. D.  (1999, April). Stereotype threat effects on the Raven's Scores of African-Americans. Manuscript presented at the annual Society for Industrial and Organizational Psychology Conference, Atlanta, GA.

## GRANTS AWARDED

**DiversityInc Foundation**. 2011. Project title: Diversity management and the competitive advantage: The linkages between human resource practices, diversity climate, and organizational performance. Award: $100,000

**National Science Foundation (NSF)**, **RU FAIR ADVANCE Mini-Grant**. 2010. Project title: The effects of diversity climate on work attitudes and retention among Rutgers University faculty. Principal investigator: Patrick F. McKay. Award: $7,250

**School of Management and Labor Relations Internal Grant**. 2009. Project title: Race and site visit reactions: Effects on organizational attraction and job pursuit intentions (Tentative title). Rutgers University. Award: $6,000.

**Summer Research Initiative**, 2000. Project title: A task-specific information processing test and conscientiousness: The possibility for incremental validity? University of North Carolina at Wilmington. Award: $3,000.00

**Charles L. Cahill Award for Faculty Research**, 2000. Project title: A task-specific information processing test and conscientiousness: The possibility for incremental validity?  University of North Carolina at Wilmington. Award: $2,500.00

## PROFESSIONAL MEMBERSHIPS

Academy of Management
Society of Industrial and Organizational Psychology
American Psychological Association
Personnel/Human Resources Research Group (PHRRG)

## PROFESSIONAL SERVICE

**Associate Editor**:

*Journal of Management* (July 2023–present)
*Personnel Psychology* (2017–2020)
*International Journal of Human Resource Management* (2014–2016)

**Editorial Board Membership**:

*Academy of Management Review* (2009–2016)
*International Journal of Human Resource Management* (2013–2014)

McKay
Page 18

*Journal of Applied Psychology* (2009–2015; 2020–2021)
*Journal of Management* (2007–2016)
*Organizational Behavior and Human Decision Processes* (2010–2016)
*Personnel Psychology* (2010–2016; 2020–2021)

**Special Feature Editorial Board Membership**:

*Journal of Applied Psychology* (2020-2021), Guest Editor, Special Issue "Racism in Organizations."

*Journal of Business and Psychology* (2011-2012), Special Feature "The 50th anniversary of the Civil Rights Act: The evolution of research, practice, and legal perspectives on employment discrimination."

**Ad hoc Reviewing**:

*Academy of Management Journal*
*Organization Science*
*Strategic Management Journal*
*Journal of International Business Studies*
*Group & Organization Management*
*British Journal of Industrial Relations*
*Human Resource Management Review*
*Human Relations*
*Psychological Bulletin*
*Personality and Social Psychology Bulletin*
*Public Opinion Quarterly*
*Journal of Managerial Psychology*
*Journal of Business Ethics*
*Journal of Business and Psychology*
*Applied Psychology: An International Review*
*Assessment*
Annual conference of the Society for Industrial-Organizational Psychology
Annual meeting of the Academy of Management

**Committees and Other Professional Organization Activities**:

2023-Present, Member, Society for Industrial-Organizational Psychology (SIOP) Fellowship Committee.

2021 (August), Panelist, "Effective Research" Human Resource Division's New Faculty Consortium, annual Academy of Management Conference (Online).

McKay
Page 19

2021 (August), Panelist, "Research in the Wild: Best Practices and Recommendations for Conducting High-Quality Field Research" Professional Development Workshop, Human Resource Division, annual Academy of Management Conference (Online).

2021 (August), Panelist, Organizational Behavior (OB) Mid-Career Professional Development Workshop, Organizational Behavior Division, annual Academy of Management Conference (Online).

2021 (April), Panelist, "Teaching Cultural Differences in Cognitive Test Scores: Challenges and Best Practices" workshop, annual Society for Industrial-Organizational Psychology Conference (Online).

2020–2021, Member, D & I Taskforce for the Society for Industrial-Organizational Psychology.

> The taskforce wrote a report entitled "Diversifying I-O Graduate Education" to provide guidance on how master's and PhD programs can increase the racial-ethnic diversity of their study populations.

2020–2021, Member, American Psychological Association's Racism Taskforce for the Industrial-Organizational Psychology Division 14.

> The taskforce drafted guidelines for organizations on how to better ensure equal employment opportunities.

2014–2019, Member, Executive Committee of the Gender and Diversity in Organizations (GDO) division of the Academy of Management
   Committee role: 2018-2019, Past Division Chair
   Committee role: 2017-2018, Division Chair
   Committee role: 2016-2017, Division Chair-Elect
   Committee role: 2015-2016, Program Chair
   Committee role: 2014-2015, Professional Development Workshop Chair

2019 (August), Discussant, *The Black experience: A multi-perspective view of Black employee experiences in the workplace*, a symposium presented at the annual Academy of Management Conference, Boston, MA

2019 (August), Panelist, *An expert panel discussion on the future of research on climates for diversity and inclusion*, Gender and Diversity in Organizations (GDO) division, annual Academy of Management Conference, Boston, MA

2019 (August), Discussant, Publishing Diversity Research Workshop, Gender and Diversity in Organizations (GDO) division, annual Academy of Management Conference, Boston, MA

McKay
Page 20

2019 (August), Panelist, *Everything you wanted to know from the chair and TPR committee about tenure*, Human Resources Division New Faculty Consortium, annual Academy of Management Conference, Boston, MA

2019 (August), Panelist, *HR Research Roundtable Forum*, Human Resources Division, annual Academy of Management Conference, Boston, MA

2019 (August), Presenter, *Constructing a publishable paper: How to frame your story* workshop at annual Management Doctoral Student Association Conference, Boston, MA

2019 (August), Presenter, *Getting tenure & beyond* workshop at annual Management Doctoral Student Association Conference, Boston, MA

2019 (April), Panelist, *Authentically different*: *Merging authenticity with diversity management* panel discussion at the annual Society for Industrial-Organizational Psychology Conference, National Harbor, MD

2018 (August), Discussant, Publishing Diversity Research Workshop, Gender and Diversity in Organizations (GDO) division, annual Academy of Management Conference, Chicago, IL

2018 (August), Panelist, *Everything you wanted to know from the chair and TPR committee about tenure*, Human Resources Division New Faculty Consortium, annual Academy of Management Conference, Chicago, IL

2018 (August), Panelist, *HR Research Roundtable Forum*, Human Resources Division, annual Academy of Management Conference, Chicago, IL

2018 (August), Presenter, *Research methods* workshop at annual Management Doctoral Student Association Conference, Chicago, IL

2018 (April), Presenter, Recruiting diversity: The potential differential impact of interviews. Paper presented in the *Recruiting diversity: The potential differential impact of interviews* symposium at the annual Society for Industrial-Organizational Psychology Conference, Chicago, IL

2018 (April), Panelist, *Collecting EEO demographic data: Measurement challenges, solutions, and opportunities* panel discussion at the annual Society for Industrial-Organizational Psychology Conference, Chicago, IL

2016 (August), Discussant, Publishing Diversity Research Workshop, Gender and Diversity in Organizations (GDO) division, annual Academy of Management Conference, Anaheim, CA

2016 (August), Panelist, *Finding successful research collaborations* workshop at Gender and Diversity in Organizations Division Doctoral Consortium, annual Academy of Management Conference, Anaheim, CA

McKay
Page 21

2016 (August), Panelist, *Responding to editors and reviewers*, Human Resources Division New Faculty Consortium, annual Academy of Management Conference, Anaheim, CA

2016 (August), Presenter, *Job search panel: What search committees are really looking for*, annual Management Doctoral Student Association Conference, Anaheim, CA

2016 (August), Presenter, *The art of constructing a publishable paper* workshop at annual Management Doctoral Student Association Conference, Anaheim, CA

2016 (August), Presenter, *Nailing the campus visit & job talk: What to do and what not to do* workshop at the annual Management Doctoral Student Association Conference, Anaheim, CA

2015 (August), Discussant, Publishing Diversity Research Workshop, Gender and Diversity in Organizations (GDO) division, annual Academy of Management Conference, Vancouver, BC

2015 (August), Presenter, *Fostering research collaborations*. Gender and Diversity in Organizations Division Doctoral Consortium, annual Academy of Management Conference, Philadelphia, PA

2015 (August), Presenter, *Mastering the fundamentals: Learning about research* workshop at the annual Management Doctoral Student Associate Conference, Philadelphia, PA

2015 (August), Presenter, *The art of publishing* workshop at the annual Management Doctoral Student Associate Conference, Philadelphia, PA

2014 (August), Presenter, *Moving forward with engagement*. Symposium presented at the annual Society for Industrial-Organizational Psychology Conference, Philadelphia, PA

2014 (August), Presenter, *Developing a scholarly profile*. Human Resource Division Middle-Stage Doctoral Student Professional Development Workshop, annual Academy of Management Conference, Philadelphia, PA

2014 (August), Discussant, Publishing Diversity Research Workshop, Gender and Diversity in Organizations (GDO) division, annual Academy of Management Conference, Philadelphia, PA

2014 (August), Participant, *Diversity and inclusion connections cafe*. Academy of Management's Diversity and Inclusion Theme Committee, annual Academy of Management Conference, Philadelphia, PA

2013 (August), Host, *Diversity and inclusion connections cafe*. Academy of Management's Diversity and Inclusion Theme Committee, annual Academy of Management Conference, Buena Vista, FL

McKay
Page 22

2013 (August), Presenter, *Diversity and inclusion in the academy: A town hall meeting*. Academy of Management's Diversity and Inclusion Theme Committee, annual Academy of Management Conference, Buena Vista, FL

2013 (August), Presenter, *How can I begin a program of research when I'm just learning about the field?* Human Resource Division Pre-Dissertation Doctoral Student Professional Development Workshop, annual Academy of Management Conference, Buena Vista, FL

2013 (August), Presenter, *Career concerns: Getting tenure, changing schools, and other things that keep us awake at night*. Human Resource Division Junior Faculty Consortium, annual Academy of Management Conference, Buena Vista, FL
2013 (August), Presenter, *Diversity and inclusion in AOM: Survey results, best practices, and action plan*. Academy of Management's Diversity and Inclusion Theme Committee, annual Academy of Management Conference, Buena Vista, FL

2013 (April), Presenter, *Master collaboration*: *Three successful academic-practitioner collaborations*. Special Event presentation, annual Society for Industrial and Organizational Psychology Conference, Houston, TX

2012 (August), Organizer, Human Resources Division Junior Faculty Consortium, annual Academy of Management Conference, Boston, MA

2012 (August), Presenter, Human Resources (HR) Division Pre-Dissertation doctoral Student Professional Development Workshop, annual Academy of Management Conference, Boston, MA

2012 (August), Discussant, Coalition for Faculty Diversity Publishing Workshop, Gender and Diversity in Organizations (GDO) division, annual Academy of Management Conference, Boston, MA

2012 (August), Panelist, *The p-factor: Pubbing gone wild, how to be crazy productive publishers*. Showcase panel discussion as part of the 16th annual conference of the PhD Project Management Doctoral Students Association, "Building and Extending Our Mission and Legacy," Boston, MA

2012 (April), Panelist, Theme Track: *Narrowing the science–practice gap for workplace discrimination*, annual Society for Industrial and Organizational Psychology Conference, San Diego, CA

2011 (August), Presenter, Human Resources (HR) Division Pre-Dissertation doctoral Student Professional Development Workshop, annual Academy of Management Conference, San Antonio, TX

2011 (August), Discussant, Coalition for Faculty Diversity Publishing Workshop, Gender and Diversity in Organizations (GDO) division, annual Academy of Management Conference, San Antonio, TX

2011–2014, Member, Executive Committee of the Human Resources (HR) Division, Academy of Management
    Committee roles:
    2013-2014, Chair, Member Communications Committee
    2012-2013, Member, Member Communications Committee
    2011-2012, Member, Member Communications Committee

2010–2014, Metrics Chair, Diversity and Inclusion Theme Committee, Academy of Management

2010 (August), Discussant, Coalition for Faculty Diversity Publishing Workshop, Gender and Diversity in Organizations (GDO) division, annual Academy of Management Conference, Montreal, ON

2010 (August), Panelist, "Moving Toward Diversity 2.0? Exploring the 'State of the Art' of Our Diversity Pedagogies" Symposium, Gender and Diversity in Organizations (GDO) division, annual Academy of Management Conference, Montreal, ON

2009–2013, Member, Executive Committee of the Gender and Diversity in Organizations (GDO) division of the Academy of Management
    Committee roles:
    2012, Chair, Student Transnational Research Award Committee
    2012, Member, Dorothy Harlow Distinguished Paper Award
    2011, Chair, Saroj Parasuraman Award Committee
    2011, Member, Sage Scholarship Committee

2009 (August), Discussant, Coalition for Faculty Diversity Publishing Workshop, Gender and Diversity in Organizations (GDO) division, annual Academy of Management Conference, Chicago, IL

2009, Member, Dorothy Harlow Distinguished Paper Award Committee, Gender and Diversity in Organizations (GDO) Division, annual Academy of Management Conference, Chicago, IL

Doing diversity right. Workshop delivered (with Derek R. Avery) during the Friday Lecture Series at the Annual Conference of the Society for Industrial and Organizational Psychology, San Francisco, CA, April 11, 2008.

2006, Member, Strategic Planning Committee, Society for Industrial-Organizational Psychology

2006–2007, Member, Executive Sub-Committee of the Committee for Ethnic-Minority Affairs, Society for Industrial-Organizational Psychology

2002, Panelist, *Finding your network doctoral consortium*, Gender and Diversity in Organizations (GDO) division, annual Academy of Management Conference, Denver, CO

McKay
Page 24

## External Tenure and Promotion Reviews

Florida International University
Georgia Institute of Technology
Temple University
Ulsan National Institute of Science and Technology (UNIST)
University of Houston
University of Memphis
Virginia Polytechnic & State University
Franklin and Marshall College

## UNIVERSITY SERVICE

**University-Level**:

2017-2019, Faculty Mentor, Program for Early Career Excellence, Rutgers University

2016–2017, Member, Rutgers University Middle States Accreditation Self-Study

2010–2011, Member, President's Council on Institutional Diversity & Equity, Rutgers University

2010–2012, Member, Graduate School Council, Rutgers University

2008, June 2–6, Rutgers University Faculty Traveling Seminar

2005–2006, Member, Search Committee, Human Resources Director, University of Wisconsin-Milwaukee

2002–2005, Member, Leadership Committee, University of Wisconsin-Milwaukee Task Force on Racioethnicity

2000–2001, Member, Faculty Senate, University of North Carolina at Wilmington

1999–2000, Member, African-American Faculty of the University of North Carolina at Wilmington, University of North Carolina at Wilmington

**School/Department-Level**:

2022-Present, Member, Professional Development Committee, College of Business, East Carolina University.

2022–Present, Member, Management Advisory Committee, College of Business, East Carolina University.

McKay
Page 25

2020–2021, Member, Fox School of Business "Faculty Return to Campus" Survey Committee, Fox School of Business, Temple University.

2020–2021, Co-chair, Diversity, Equity, and Inclusion (DEI) Council, Fox School of Business, Temple University.

2020 (Fall), Member, Promotion and Tenure Committee, Management and Information Systems (MIS) department, Fox School of Business, Temple University.

2020 (Summer), Member, Promotion and Tenure Guidelines Finishing Committee, Fox School of Business, Temple University.

2015–2019, Co-Director, Industrial Relations-Human Resources Doctoral Program, School of Management and Labor Relations, Rutgers University

2015, Chair, Human Resource Management Tenure-Track Faculty Search Committee, Human Resource Management Department, School of Management and Labor Relations, Rutgers University

2011–2014, Department Chair, Human Resource Management Department, School of Management and Labor Relations, Rutgers University

2011, Member, Assistant Professor of Human Resource Management Search Committee, Department of Human Resource Management, School of Management and Labor Relations, Rutgers University

2010–2011, Director, Industrial Relations-Human Resources Doctoral Program, School of Management and Labor Relations, Rutgers University

2009–2019, Member, Preliminary Examination Committee, School of Management and Labor Relations, Rutgers University

2009 (Fall Semester), Member, Appointment & Promotion Committee, School of Management and Labor Relations, Rutgers University

2009–2010, Member, Center for Human Resource Strategy Committee, Department of Human Resource Management, School of Management and Labor Relations, Rutgers University

2009–Present, Member, Doctoral Program Committee, Department of Human Resource Management, School of Management and Labor Relations, Rutgers University

2009–2010, Member, Assistant Professor of Human Resource Management Search Committee, Department of Human Resource Management, School of Management and Labor Relations, Rutgers University

McKay
Page 26

2008–2009, Member, Senior Lecturer Search Committee, Department of Human Resource Management, School of Management and Labor Relations, Rutgers University

2008–2009, Director, Human Resource Management Minor Degree Program, Department of Human Resource Management, School of Management and Labor Relations, Rutgers University

2008–2009, Member, Assistant Professor of Human Resource Management Search Committee, Department of Human Resource Management, School of Management and Labor Relations, Rutgers University

2008–2009, Member, Diversity and Inclusion in the Workplace Graduate Certificate Committee, School of Management and Labor Relations, Rutgers University

2008–2009, Member, Bachelor of Science in Labor Studies and Employment Relations Program's Direct Admissions Sub-Committee, School of Management and Labor Relations, Rutgers University

2008–2009, Member, PhD. Program Re-Design Sub-Committee, Department of Human Resource Management, School of Management and Labor Relations, Rutgers University

2007–2008, Member, Inclusive Organizations Institute Development Committee, School of Management and Labor Relations, Rutgers University

2004–2007, Member, Doctoral Preliminary Exam Committee, Sheldon B. Lubar School of Business, University of Wisconsin-Milwaukee

2003–2007, Member, Undergraduate Program Committee (Student Grievance Subcommittee), University of Wisconsin-Milwaukee

2002–2003, Member, Masters of Science Program Committee, University of Wisconsin-Milwaukee

2001, Committee Member, Southern Association of Colleges and Schools Self-Study, Department of Psychology, University of North Carolina at Wilmington

2001, Member, Assistant Professor of Developmental Psychology Search Committee, Department of Psychology, University of North Carolina at Wilmington

## **INVITED PRESENTATIONS AND APPEARANCES**

### **Keynote Address**

Diversity climate is key to diversity management. Keynote address given for the Society for Diversity and Inclusion Initiative's (SODI) *Convening: Sparking Innovations* Conference at the University of Chicago, Chicago, IL, September 11-12, 2018.

What is GDO's role in promoting diversity management in institutions of higher learning? Plenary address given for the Gender and Diversity in Organizations Division at the annual the Academy of Management Conference, Anaheim, CA, August 8, 2016.

Diversity climate is greater than the sum of its diversity. Invited keynote address given at the annual Workplace Diversity: Practice and Research Conference, *Changing organization cultures to increase diversity, inclusion, and performance*, School of Management, George Mason University, June 10-11, 2010.

**Invited Outside Presentations and Appearances**:

Wilting under the spotlight: The darling effect and its influence on performance success. Research presentation to the Management Department Speaker Series at the University of South Carolina, Columbia, SC, March 17, 2023.

Putting climate in context: The cascading effect of managerial cooperative climate on business-establishment financial performance in racioethnically-diverse contexts. Research presentation (online) for the Distinguished Speaker Series, Department of Management, University of Texas-Arlington, Arlington TX, May 14, 2021.

Panelist, World Trade Resource's JustTalk Series II Session 3, "Exploring the Dimensions of Diversity Through Data and People: Transforming Our WORKPLACE." May 13, 2021.

Putting climate in context: The cascading effect of managerial cooperative climate on business-establishment financial performance in racioethnically-diverse contexts. Research presentation (online) for the Industrial-Organizational Psychology Colloquium, Texas A&M University, Bryan, TX, March 12, 2021.

Race-ethnicity and the applicant-employer interface. Research presentation (online) for the James Weldon Johnson Institute's Colloquium Series on Race, College of Arts and Sciences, Emory University, Atlanta, GA, February 15, 2021.

The benefits of pro-diversity work climates. Workshop delivered (online) to the American Physical Therapists Association, December 18, 2020.

The risk of diversity mismanagement. Presentation delivered (online) to the annual RIMS the Risk Management Society conference, November 5, 2020.

Climate first: The cascading effect of managerial cooperative climate on business-unit financial performance in racioethnically-diverse contexts. Research presentation (online) for the Brown Bag Speaker Series, Industrial-Organizational Psychology doctoral program, George Mason University, Fairfax, VA, September 22, 2020.

McKay
Page 28

Overcoming social Identification: The effects of cooperation and organizational tenure on the demographic diversity-financial performance relationship. Research seminar series speaker at the College of Business, Oregon State University, Corvallis, OR, May 4, 2018.

Why can't we get along? Group/intergroup factors and diversity Management.  Diversity and inclusion workshop delivered to Andersen Windows, Inc., North Brunswick, NJ, June 27, 2018.

Managing diversity effectively. Invited presentation delivered to Nestle Health Sciences, Bridgewater, New Jersey, February 27, 2018.

Racial-ethnic differences in the performance–pay relationship: The role of diversity climate. Invited presentation delivered to University of Konstanz "Diversity Research Seminar." Konstanz, Germany, June 18, 2015.

Racial-ethnic differences in the performance–pay relationship: The role of diversity climate. Invited presentation delivered to the University of Connecticut, Industrial-Organizational Psychology department's "Brown Bag Seminar." Storrs, CT, September 19, 2014.

The business case for diversity.  Invited presentation given as part of the "Reflections on Diversity: Defining Moments" co-sponsored by the American Conference on Diversity and L'Oreal USA, L'Oreal USA New Jersey Headquarters, Berkeley Heights, NJ, June 6, 2013.

Panelist, *Caucus New Jersey with Steve Adubato* television broadcast, "Workplace Diversity." Public Broadcasting System, Fairfield, NJ, February 13, 2013.

Institutionalizing real diversity and inclusion practices for top results. Invited presentation given (with Joseph Santana of Joe Santana Consulting) at the Workplace Diversity: Practice and Research Conference, *Diversity culture and climate*, School of Management, George Mason University, Fairfax, VA, June, 23, 2012.

Diversity recruitment and retention. Invited workshop presented at "Diversity Day" training program at the Lakehurst Naval Air Station, Lakehurst, NJ, May 25, 2011.

Beyond ability: The effects of institutional context and perceived racial discrimination on racial-ethnic differences in law school performance. Invited presentation for the Human and Social Capital Seminar Series, Wharton School, University of Pennsylvania, March 24, 2011.

Recruiting and retaining a diversity faculty: The role of diversity climate. Invited workshop delivered at Raritan Valley Community College, March 2, 2010.

Making the business case for diversity. Invited presentation to Edwards, Angell, Palmer, & Dodge, LLP, February 17, 2010.

Recruiting and retaining a diversity faculty: The role of diversity climate. Invited workshop delivered at Raritan Valley Community College, October 2, 2009.

McKay
Page 29

Racial-ethnic mean differences in performance: Going beyond the "deficit hypothesis." Invited presentation to the Industrial-Organizational Psychology Club, Department of Psychology, University of Akron, May 1, 2009.

Diversity climate effects on work and organizational performance. Invited speaker for the Zicklin School of Business Department of Management's "Thursday Seminar" Series, Baruch College, November 6, 2008.

Diversity climate is greater than the sum of its diversity. Invited research presentation given for the Social and Organizational Psychology doctoral colloquium, Teacher's College, Columbia University, October 7, 2008.

It's cheaper to keep them: A model of the diversity climate perceptions-voluntary turnover relationship. Invited research presentation to the annual meeting of the Personnel/Human Resources Research Group (PHRRG), A. B. Freeman School of Business, Tulane University, February 22, 2008.

Diversity climate effects on job/firm performance. Invited research presentation to the annual meeting of the New Jersey Labor and Employment Relations Association (LERA), Sheraton Hilton Hotel, Edison, NJ, February 4, 2008.

Racial-ethnic differences in performance: The role of diversity management. Invited research presentation to the ILRHR 960 Workshop in Human Resource Studies doctoral seminar, Cornell University, School of Industrial and Labor Relations, February 23, 2007.

**Internal, University-Level Presentations and Appearances**

Wilting under the spotlight: The darling effect and its influence on performance success. Research presentation during Industrial-Organizational Psychology Brown Bag Series, East Carolina University, Greenville, NC, March 29, 2023.

Engaging race at work. Served as panelist at part of the Fox School of Business' *Research Connect* series, Temple University, October 13, 2020.

Dissecting diversity. I was interviewed on a podcast for the Fox School of Business *Catalyst* series, Temple University, June 22, 2020.

A human resource management system for diversity management. Presentation delivered during the Human Resource Management Department's *Research Seminar Series*, School of Management and Labor Relations, Rutgers University, May 5, 2015.

Navigating the maze of publishing research. Invited presentation to the Center for Urban Entrepreneurship & Economic Development, School of Business, Rutgers University, October 26, 2011.

Beyond ability: The effects of institutional context and perceived racial discrimination on racial-ethnic differences in law school performance.  Invited presentation to the Management & Global Business Seminar, School of Business, Rutgers University, October 26, 2011.

The business case for diversity. Invited presentation to Rutgers University for Faculty Advancement and Institutional Re-Imagination (RU FAIR) National Science Foundation (NSF) Advance, May 5, 2010.

Mean racial-ethnic differences in employee sales performance: The moderating role of diversity climate. Invited research presentation for the "Forum on Race and Ethnicity," sponsored by the Center for Race & Ethnicity, Rutgers University, October 5, 2007.

2005 (Fall Semester), Guest Speaker, Success Team Committee, Peer Outreach & Mentoring, "Becoming a Student" presentation, University of Wisconsin-Milwaukee.

2000 (Summer), Invited Lecture, "Preparing Now for Competition Later." Protégés and Leaders Program, Office of Campus Diversity, University of North Carolina at Wilmington.

2000, Invited Lecture, "Discussion of Careers in Psychology." Taking Your Place Institute, Marine Quest Youth Program, University of North Carolina at Wilmington.

**Internal, School/Departmental-Level Presentations and Professional Development Workshops**

A human resource management system for management. Presentation delivered for the Human Resource Management Department's *Research Seminar*, Rutgers University School of Management and Labor Relations, Rutgers University, May 4, 2015.

Recruiting and retaining a diverse workforce: The role of diversity climate. Presentation delivered to the Masters in Labor and Employment Relations Introductory Seminar, Rutgers University School of Management and Labor Relations, Rutgers University, October 14, 2014.

Recruiting and retaining a diverse workforce: The role of diversity climate. Presentation delivered to the Masters in Labor and Employment Relations Introductory Seminar, Rutgers University School of Management and Labor Relations, Rutgers University, October 8, 2013.

Diversity initiatives for HR professionals. Professional development workshop delivered for Rutgers University's Center for Management Development, Rutgers University School of Management and Labor Relations, Rutgers University, April 30, 2013.

The business case for diversity. Presentation delivered to the State Advisory Committee, School of Management and Labor Relations, Rutgers University, April 29, 2013.

McKay
Page 31

Diversity initiatives for HR professionals. Professional development workshop delivered for Rutgers University's Center for Management Development, Rutgers University School of Management and Labor Relations, Rutgers University, October 31, 2011.

Recruiting and retaining a diverse workforce: The role of diversity climate. Presentation delivered to the Masters in Labor and Employment Relations Introductory Seminar, Rutgers University School of Management and Labor Relations, Rutgers University, March 3, 2011.

Beyond ability: The effect of institutional racial environment on racial-ethnic differences in law school performance.  Invited presentation to the School of Management and Labor Relations' Research Forum, Rutgers University, September, 9, 2010.

Diversity initiatives for HR professionals. Professional development workshop delivered for Rutgers University's Center for Management Development, Rutgers University School of Management and Labor Relations, Rutgers University, December 4, 2009.

Diversity initiatives for HR professionals. Professional development workshop delivered for Rutgers University's Center for Management Development, Rutgers University School of Management and Labor Relations, Rutgers University, April 1, 2009.

Diversity climate is greater than the sum of its diversity. Invited research presentation given as part of the "Building Inclusive Organizations" symposium sponsored by the Alumni and Friends of School of Management and Labor Relations, Rutgers University, May 16, 2008.

Diverse organizations and diversity markets. Invited research presentation (with Niki T. Dickerson) delivered to the Industrial Relations/Human Resource Dialogue, School of Management and Labor Relations, Rutgers University, April 22, 2008.

Managing diversity in the workplace. Professional development workshop delivered for Rutgers University's Center for Management Development to the Ocean County Social Services Department, Toms River, NJ, March 20, 2008.

Diversity climate effects on job/firm performance. Invited research presentation to the Alumni and Friends of the School of Management and Labor Relations, Rutgers University, January, 17, 2008.

Diversity climate effects on job/firm performance. Invited research presentation to the State Advisory Council for the School of Management and Labor Relations, Rutgers University, November 15, 2007.

It's not just a numbers game: Diversity climate and its role in job/firm performance. Invited research presentation for the "Corporate Forum," sponsored by the Center for Women and Work, Rutgers University, November 2, 2007.

McKay
Page 32

2007 (Spring Semester), Delivered the "People: Our Most Important Asset" presentation during the Sheldon B Lubar School of Business's Open House, on behalf of the Bachelor's in Business Administration Human Resources Management major program, University of Wisconsin-Milwaukee.

Mean racial-ethnic differences in sales performance: The moderating role of diversity climate. Presented at the Research Seminar Series, Sheldon B. Lubar School of Business, University of Wisconsin-Milwaukee, February 16, 2007.

2006 (Spring Semester), Delivered the "People: Our Most Important Asset" presentation during the University of Wisconsin-Milwaukee, Sheldon B Lubar School of Business's Open House, on behalf of the Bachelor's in Business Administration Human Resources Management major program.

2007, 2006, 2005 Moderator, Delta Sigma Pi and Kohl's Department Stores "A Business Symposium" panel discussion, University of Wisconsin-Milwaukee.

2006, 2005, Delivered the "People: Our Most Important Asset" presentation during the, Sheldon B. Lubar School of Business's Open House, on behalf of the Bachelor's in Business Administration Human Resources Management major program, University of Wisconsin-Milwaukee.

2005 (Summer), Instructor of Human Resource Management workshop, Future Leaders Program, School of Business Administration, University of Wisconsin-Milwaukee.

Race, place, and work attitudes: The interactive effects of race and perceived quality of community amenities on workplace satisfaction? Presented at the Research Seminar Series, Sheldon B. Lubar School of Business, University of Wisconsin-Milwaukee, October 21, 2005.

Panel ratings of tape-recorded interview responses: Interrater reliability? Racial differences? Presented at the Research Seminar Series, Sheldon B. Lubar School of Business, University of Wisconsin-Milwaukee, March, 10, 2005.

A Re-examination of Black-White differences in job performance. Presented at the Masters of Human Resources Labor Relations Lunchtime Forum, Bolton Hall, University of Wisconsin-Milwaukee, December 3, 2003.

Validity of an information processing test and conscientiousness in predicting task performance. Presented at the Research Seminar Series, Sheldon B. Lubar School of Business, University of Wisconsin-Milwaukee, October 10, 2002.

## PUBLIC SERVICE

2001, Invited Lecture, "The Natural Man," The Men's Symposium, Men Teaching Other Men the Virtues of a Changing Society, Cumberland Union Free Will Baptist Church, Linden, NC

## COURSES TAUGHT

Organizational Behavior (Masters; online)
Human Resource Management (Undergraduate; online and face-to-face)
Managerial Negotiations (Undergraduate)
Organizational Staffing and Career Management (Undergraduate)
Diversity in Organizations (2015, Undergraduate summer course, Konstanz, Germany)
Micro Foundations in Human Resource Management Seminar (Doctoral)
Data-Based Decision-Making (Statistics Course; Masters)
Human Resource Strategy I (Masters)
Managing Workforce Flow (Masters)
Selected Problems: Diversity (Masters)
Staffing/Human Resources (Undergraduate and Masters)
Staffing Organizations (Masters)
Industrial Psychology (Undergraduate and Masters)
Psychological Tests and Measurement (Undergraduate)
Introduction to Psychology (Undergraduate)
Multivariate Statistics (Doctoral)

## RESEARCH AND INTERNSHIP SUPERVISION

**Doctoral Dissertations**:

Member, Dissertation Committee, Eugene Song, "The impact of changes in organizational gender diversity on employee- and organizational outcomes" Rutgers University, School of Management and Labor Relations. Successfully defended October, 2022.

Member, Dissertation Committee, Emily Rosado Solomon, "The big effects of small talk in the workplace" Rutgers University, School of Management and Labor Relations. Successfully defended April, 2019

Co-chair, Dissertation Committee, Sasha Pustovit, "Whose actions speak louder than words? The role of referents in the turnover contagion process" Rutgers University, School of Management and Labor Relations.  Successfully defended March, 2019.

Co-chair, Dissertation Committee, Sargam Garg, "Impact of HR practices and idiosyncratic deals on employee outcomes: Does employee HR practice saliency matter?" Rutgers University, School of Management and Labor Relations. Successfully defended May, 2017.

Co-chair, Dissertation Committee, Kyongji Han, "To experience is to believe: HRM experience and LMX as the antecedences of HR attribution and its consequences." Rutgers University, School of Management and Labor Relations. Successfully defended December, 2016.

McKay
Page 34

Member, Dissertation Committee, Sean E. Rogers, "Status, work design, job satisfaction, and career development: An analysis of paid and volunteer interns," Rutgers University, School of Management and Labor Relations. Successfully defended August, 2013.

Member, Dissertation Committee, Kaifeng Jiang, "Bridging the gap between reality and perception: Managers' role in shaping employees' perceptions of high performance work systems," Rutgers University, School of Management and Labor Relations.  Successfully defended April, 2013.

Member, Dissertation Committee, Mark James, "Rainbow barrier behaviors: Scale development and validation," University of Wisconsin-Milwaukee, Sheldon B. Lubar School of Business. Successfully defended August, 2009.

Member, Dissertation Committee, Jeff Vanevenhoven, "A cross cultural examination of the environment - A current taxonomy of perceived uncertainty sources," University of Wisconsin-Milwaukee Sheldon B. Lubar School of Business. Successfully defended June, 2008.

**Master's Thesis**:

2016, Chair, Emily Rosado-Solomon, "Examining the relationship between gender and well-being: The roles of diversity climate, gender identity, and family identity salience," School of Management and Labor Relations, Rutgers University. Successfully defended May, 2016.

2016, Chair, Sasha Pustovit, "Overcoming group disparities in performance and turnover and minorities: The effects of relative human capital, diversity climate, perceived voice," School of Management and Labor Relations, Rutgers University. Successfully defended May, 2016.

2015, Chair, Eugene Son, "How organization's reward strategies affect employees' job satisfaction: The mediated moderation model," School of Management and Labor Relations, Rutgers University. Successfully defended May, 2015.

2014, Member, Yan Chen, "The hidden costs of heterogeneity in HR system use," School of Management and Labor Relations, Rutgers University. Successfully defended May, 2014.

2014, Member, Mason Ameri, "The disability employment puzzle: A field experiment on employer hiring behavior," School of Management and Labor Relations, Rutgers University. Successfully defended May, 2014.

2011, Member, Sargam Garg, "HR saliency and its influence on psychological climate, job satisfaction and organizational commitment: An employee level study," School of Management and Labor Relations, Rutgers University. Successfully defended May, 2011.

2009, Committee Chair, Sean Rogers, "Is all the world of work a stage? Identity management behavior and career outcomes among demographic minority professional workers," School of Management and Labor Relations, Rutgers University. Successfully defended May, 2009.

McKay
Page 35

2009, Committee Chair, Kaifeng Jiang, "When do employees voice in teams? Moderating role of
team context: Perceived team supports, trust in leadership, employee engagement, and voice
behavior," School of Management and Labor Relations, Rutgers University. Successfully
defended May, 2009.

2001, Member, Kelli A. McAmis, "The importance of self-efficacy in substance abuse treatment:
Early treatment predictors of abstinence self-efficacy," Department of Psychology, University of
North Carolina at Wilmington. Successfully defended May, 2001.

**Graduate Independent Research Projects**:

2009, Rick Hall, "A case study: The role of the human resources organization in the Company A
and Company B merger." Masters of Human Resource Management Independent Study, Rutgers
University School of Management and Labor Relations.

2009, Stefanie Rall, "How companies increase the successfulness of their 360 degree feedback
process: A case study." Masters of Human Resource Management Independent Study, Rutgers
University School of Management and Labor Relations.

2008, Karen D'Mello, "Turnover audit: The cost of turnover." Masters of Human Resource
Management Independent Study, Rutgers University School of Management and Labor
Relations.

2008, Rashmi Bhan, "Diversity and inclusion." Masters of Human Resource Management
Independent Study, Rutgers University School of Management and Labor Relations.

2007, Barjinder Singh, "How diversity climate shapes employee behaviors: Assessing the role of
organizational attitudes, gender and race," Doctoral Independent Study Project, University of
Wisconsin-Milwaukee Sheldon B. Lubar School of Business.

2005, Mark A. Winters, "Effects of employment motivation on work attitudes," Masters
Independent Study Project, University of Wisconsin-Milwaukee Sheldon B. Lubar School of
Business.

2004, Randy A. Spahos, "Social support, person-environment fit, organizational attitudes, and
employee turnover," University of Wisconsin-Milwaukee Sheldon B. Lubar School of Business.

**Internships**

Supervised 30+ Undergraduate Human Resource Major Internships, Sheldon B. Lubar School of
Business, University of Wisconsin-Milwaukee (2001–2007).

# Exhibit B

# References

Avery, D. R. (2003). Reactions to diversity in recruitment advertising - Are differences black and white? *Journal of Applied Psychology, 88*, 672-679.

Avery, D. R., Hernandez, M., & Hebl, M. R. (2004). Who's watching the race? Racial salience in recruitment advertising. *Journal of Applied Social Psychology, 34*, 146-161.

Avery, D. R., Volpone, S. D., Stewart, R. W., Luksyte, A., Hernandez, M., McKay, P. F., & Hebl, M. M. R. (2013). Examining the draw of diversity: How diversity climate perceptions affect job-pursuit intentions. *Human Resource Management*, *52,* 175-193.

Barber, A. E. (1998). *Recruiting employees: Individual and organizational perspectives.* Thousand Oaks, CA: Sage.

Bennett, D. (2017, November 20). Big brother vs. little brother. *Bloomberg Businessweek*, 60-65.

Breaugh, J. A. (2013). Employee recruitment. *Annual Review of Psychology, 64,* 389-416.

Cascio, W. F. (2000). Managing a virtual workplace. *Academy of Management Executive, 14,* 81-90.

Cho, W., Choi, S., & Choi, H. (2023). Human resources analytics for public personnel management: Concepts, cases, and caveats. *Administrative Sciences, 13,* 41.

Combs, J., Liu, Y., Hall, A., & Ketchen, D. (2006). How much do high-performance work practices matter? A meta-analysis of their effects on organizational performance. *Personnel Psychology, 59,* 501-528.

Cox, T. H., Jr. (1994). *Cultural diversity in organizations: Theory, research, and practice*. San Francisco: Berrett-Koehler.

Della Torre, E., Zatzick, C. D., Sikora, D., & Solari, L. (2018). Workforce churning, human capital disruption, and organizational performance in different technological contexts. *Human Resource Management Journal, 28,* 112-127.

DePatie, T. P., Sachdeva, A., Shahani-Denning, C., Grossman, R., & Nolan, K. P. (2022). Enhancing the representation of women: How gender diversity signals and acknowledgment affect attraction to men-dominated professions. *Personnel Assessment and Decisions, 8,* 37-59.

Economic Policy Institute Current Population Survey Extracts, Version 1.0.15 (2021). Retrieved August 18, 2023 from https://microdata.epi.org.

Gelbard, R., Ramon-Gonen, R., Carmeli, A., Bittmann, R. M., & Talyanski, R. (2018). Sentiment analysis in organizational work: Towards an ontology of people analytics. *Expert Systems*, *35,* e122289.

Gonzalez, J. A., & DeNisi, A. S. (2009). Cross-level effects of demography and diversity climate on organizational attachment and firm effectiveness. *Journal of Organizational Behavior*, *30,* 21-40.

Guthrie, J. P., & Datta, D. K. (2008). Dumb and dumber: The impact of downsizing on firm performance as moderated by industry conditions. *Organization Science*, *19,* 108-123.

Handlesman J., Elgin, S., Estrada, M., Hays, S., Johnson, T. et al. (2022). Achieving STEM diversity: Outdated teaching methods amount to discrimination. *Science*, *376,* 1057-1059.

Harrison, D. A., & Klein, K. J. (2007). What's the difference? Diversity constructs as separation, variety, or disparity in organizations. *Academy of Management Review*, 32, 1199-1228.

Jiang, K., Lepak, D. P., Hu, J., & Baer, J. C. (2012). How does human resource management influence organizational outcomes? A meta-analytic investigation of mediating mechanisms. *Academy of Management Journal*, *55,* 1264-1294.

Joshi, A., & Roh, H. (2009). The role of context in work team diversity research: A meta-analytic review. *Academy of Management Journal*, *52,* 599-627.

Kochan, T., Berzukova, K., Ely, R., Jackson, S., Joshi, S. A., Jehn, K., & Thomas, D. (2003). The effects of diversity on business performance: Report of the Diversity Research Network. *Human Resource Management*, *42,* 3-21.

Kossek, E. E., Zonia, S. C., & Young, W. (1996). The limitations of organizational demography: Can diversity climate be enhanced in the absence of teamwork? In M. N. Ruderman, M. W. Hughes-James, & S. E. Jackson (Eds.), *Selected research on work team diversity* (pp. 121-154). Washington, DC: American Psychological Association.

Kroeper, K. M., Williams, H. E., & Murphy, M. C. (2022). Counterfeit diversity: How strategically misrepresenting gender diversity dampens organizations' perceived sincerity and elevates women's identity threat concerns. *Journal of Personality and Social Psychology: Interpersonal Relations and Group Processes*, *122,* 399-426.

Madhani, P. M. (2023). Human resource analytics: Leveraging human resources for enhancing business performance. *Compensation & Benefits Review*, *55,* 31-45.

McKay, P. F. (forthcoming). Targeted recruitment of racial-ethnic minorities: A research review. In J. Slaughter, D. G. Allen, & S. Highhouse (Eds.), *Essentials of employee recruitment: Individual and organizational perspectives*. New York: Routledge.

McKay, P. F., Avery, D. R., & Morris, M. A. 2008. Mean racial-ethnic differences in work performance: The moderating role of diversity climate. *Personnel Psychology, 61,* 349-374.

McKay, P. F., Avery, D. R., & Morris, M. A. (2009). A tale of two climates: Diversity climate from subordinates' and managers' perspectives and their role in store unit sales performance. *Personnel Psychology, 62,* 767-791.

McKay, P. F., Avery, D. R., Liao, H., & Morris, M. A. (2011). Does diversity climate lead to customer satisfaction?  It depends on the service climate and business unit demography. *Organization Science, 22,* 788-803.

Noe, R. A., Hollenbeck, J. R., Gerhart, B., & Wright, P. M. (2022). *Fundamentals of human resource management* (9th edition). New York, NY: McGraw-Hill.

Porter, C., & Serra D. (2020). Gender differences in the choice of major: The importance of female role models. *American Economics Journal: Applied Economics, 12,* 226-254.

Qin, H., Koong, K., Wen, H., & Liu, L. (2023). Mapping business analytics skillsets with industries: Empirical evidence from online job advertisements. *Journal of Business Analytics, 6,* 167-179.

Richard, O. C., Barnett, T., Dwyer, S., & Chadwick, K. (2004). Cultural diversity in management, firm performance, and the moderating role of entrepreneurial orientation dimensions. *Academy of Management Journal, 47,* 255-266.

Rynes, S. L., Bretz, R. D., & Gerhart, B. (1991). The importance of recruitment in job choice: A different way of looking. *Personnel Psychology, 44*, 487-521.

van Dijk, H., van Engen, M. L., & van Knippenberg, D. (2012). Defying conventional wisdom: meta-analytical examination of the differences between demographic and job-related diversity relationships with performance. *Organizational Behavior and Human Decision Making Processes, 119,* 38-53.

Walker, H. J., Feild, H. S., Berneth, J. B., & Becton, J. B. (2012). Diversity cuse on recruitment website: Investigating the effects on job seekers' information processing. *Journal of Applied Psychology, 97,* 214-244.

Wynn, A. T., & Correll, S. J. (2018). Puncturing the pipeline: Do technology companies alienate women in recruiting sessions? *Social Studies of Science, 48,* 149-164

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE CENTER FOR INVESTIGATIVE REPORTING and WILL EVANS, | ) Case No. 22-cv-07182-WHA ) ) |
| Plaintiffs, | ) **DECLARATION OF QUINETTA M.** ) **ROBERSON, Ph.D., IN SUPPORT OF** |
| v. | ) **DEFENDANT DEPARTMENT OF LABOR'S** ) **MOTION FOR SUMMARY JUDGMENT** |
| UNITED STATES DEPARTMENT OF LABOR, | ) ) ) |
| Defendant. | ) ) ) |
| _____ | ) |

I, Quinetta M. Roberson, Ph.D., state as follows:

## I.    Qualifications

1.    My name is Quinetta M. Roberson. I have been asked by the United States Attorney's Office for the Northern District of California, on behalf of the U.S. Department of Labor, to provide an expert declaration in the case of *Center for Investigative Reporting v. U.S. Department of Labor*, No. 22-cv-07182-WHA.

2.    As the curriculum vita in Appendix A to this declaration attests, I received my Ph.D. from University of Maryland in 1999 in management, joined the faculty of the Human Resource Studies Department in the School of Industrial and Labor Relations at Cornell University that same year, and was promoted to Associate Professor with tenure in 2005. I joined the faculty in the Management Department in the School of Business at Villanova University as a full Professor of Management and Operations in 2008 and became the Fred J. Springer Endowed Chair in Business Leadership in 2015. I then joined the faculty at Michigan State University as the John A. Hannah Distinguished Professor of Management and Psychology in 2020 and currently hold this position.

3.     Prior to obtaining my PhD, I earned a Bachelor of Science in finance and accounting from the University of Delaware and a Master of Business Administration in finance and strategic planning from the University of Pittsburgh. I also worked as a financial analyst at CoreStates Bank.

4.     As evidence of my standing in the scientific community, I have published over 40 peer-reviewed journal articles and book chapters and edited five books within the fields of management and applied psychology. While my research focuses broadly on the development of organizational capabilities and improved effectiveness through the strategic management of people, particularly diverse work teams, much of this work examines the financial impact of diversity, equity and inclusion in organizations. According to Google Scholar, my citation count is 6,306 and my h-index, which is a metric for evaluating the cumulative impact of an author's scholarly output and performance, is 24. I currently serve as Deputy Editor for the *Academy of Management Journal*, which is the top journal in its list of 50 journals used by the *Financial Times* in compiling their research rankings. I have also served as an Associate Editor for the *Journal of Applied Psychology*, which is also on the list. I am a Fellow of the Society for Industrial and Organizational Psychology, Association for Psychological Science and Academy of Management, the latter of which I also served as President. I also served as Program Director for the Science of Organizations program at the National Science Foundation.

5.     I have over 24 years of experience teaching courses and workshops globally on diversity, leadership, and talent management. Further, I regularly provide professional advice and guidance to for-profit and non-profit organizations on creating value and delivering on business strategy through diversity and inclusion. I am a two-time TEDx speaker and serve on the boards of the Michigan State University Federal Credit Union and Cinnaire Lending Corporation, including chairing the diversity committee for Cinnaire. I have filed expert reports in one employment discrimination case – Shirley Williams v. Sprint/United Management Company.

## II.    Scope of Work

6.     I was asked to comment on the information contained in EEO-1 reports. Accordingly, this declaration offers my best scientific judgement on three issues: (a) the commercial nature of EEO-1 diversity data; (b) companies' confidentiality practices regarding this information; and (c) and the potential harm of compelling the release of the data.

7.     To these ends, I discuss the findings of research that highlights diversity as a source of competitive advantage, the demonstrated economic value of diversity, firm utilization of diversity

1  metrics, and the sensitivity of diversity data. A list of the materials considered in developing this

2  declaration is attached as Appendix B.

3  **III. Diversity as a Source of Competitive Advantage**

4      8.      Research provides evidence of the benefits of diversity in organizational workgroups (see

5  Jackson, Joshi & Ehrhardt, 2003; Milliken & Martins, 1996; Williams & O'Reilly, 1998). Demographic

6  differences bring about differences in people's backgrounds, experiences and perspectives, which they

7  bring into their work. Diverse groups produce a wider variety of ideas, approaches and solutions, which

8  increases the cognitive and informational resources available to groups and subsequently, their ability

9  for critical analysis and problem-solving. In addition, the expression of alternative views in diverse

10 groups lessens the likelihood of groupthink and enhances the group's attention to its decision-making

11 processes. As a result, diversity in work teams results in more creative and higher quality decisions.

12      9.      These diversity benefits create business value for firms in various ways. Research

13 suggests that the value of diverse workforces is driven by the effects on organizational processes and

14 capabilities (Cox & Blake, 1991; Roberson, Holmes & Perry, 2017). Specifically, diversity is an

15 organizational resource that translates into a competitive advantage for firms through a greater capacity

16 for resource acquisition, market access, innovation and strategic flexibility.

17     10.      The resource acquisition argument suggests companies with effective diversity programs

18 will have an advantage in attracting, engaging and retaining talent. Empirical research supports this

19 argument by showing that diversity positively influences minority seekers' attraction and feelings of

20 compatibility to a company, and their overall image of the firm (see Perkins, Thomas & Taylor, 2000).

21 Thus, diversity is argued to enhance a firm's ability to compete in the war for talent.

22     11.      The market access argument is that diversity influences a firm's capability for entering

23 and competing in specific markets. Given the specialized wants and needs of different consumer

24 segments, workforce diversity ensures that these perspectives are represented and understood internally.

25 Thus, matching workforce diversity with that of customers and clients provides firms with an ability to

26 reach and better serve certain markets, which may subsequently improve market share and growth.

27     12.      The innovation argument suggests that because differences in knowledge, expertise and

28 experience can provide firms with useful resources for discovery, diversity can enhance a firm's

1    capability for improving upon and expanding product and service offerings in ways that are valued by

2    consumers. Accordingly, firms will be better positioned to take advantage of market opportunities that

3    result in premium pricing or increased margins. Consistent with this argument, research evidence shows

4    firms with more diverse knowledge resources to be more innovative and able to exploit such resources

5    in ways that foster research and development (Garcia-Vega, 2006; Quintana-Garcia & Benavides-

6    Velasco, 2008).

7           13.     Strategic flexibility refers to a firm's capability for sensing and responding to

8    environmental changes. It captures a capacity for adaptability, such that firms can devise ways of

9    dealing with potential and/or unexpected market threats and challenges, as well as a concurrent capacity

10   for speed, such that firms can adapt quickly to competitive changes in the market. Because diversity

11   engenders less system standardization and greater system agility, diverse firms can respond to changes

12   in their external environments more quickly and at lower costs. Some research evidence highlights

13   diversity, particularly within leadership positions, as a means of overcoming the biases and barriers that

14   generate strategic rigidity and developing decision systems for enhancing organizational

15   competitiveness (Shimizu & Hitt, 2004).

16          14.     Research describes the value in diversity in firms, which is through the unique

17   combination of knowledge, skills and competencies derived from diversity in organizational workforces

18   (Cox, Lobel & McLeod, 1991). Workforces, particularly diverse workforces, create a socially complex

19   and inimitable resource for firms that create value and may serve as a source of competitive advantage.

20   This economic value is recognized more broadly as well. For example, in a letter to Fortune 100

21   companies on July 19, 2023, 21 U.S. Attorney Generals "recognize that, for private sector employers,

22   diversity is an important, legitimate, and valid business interest, as well established by decades of research"

23   (see Appendix C). This value statement is also consistent with the identified impact of DEI on team and

24   company performance described by the World Economic Forum in its Global Parity Alliance Insight Report

25   (https://www3.weforum.org/docs/WEF_Global_Parity_Alliance_2023.pdf).

26          15.     Overall, companies collect and track diversity data to realize its inherent commercial

27   value. Specifically, such data are used to identify DEI opportunities and challenges, establish

28   accountabilities for DEI progress, benchmark such progress, and make allocation decisions. Therefore,

1  companies that gather and use diversity data are better positioned to both understand the value for

2  diversity in their particular enterprise and extract such value.

3  **IV. Demonstrated Economic Value of Diversity**

4       16.    A body of research demonstrates a relationship between diversity at different levels of

5  organizations and firm performance (see Certo, Lester, Dalton & Dalton, 2006; Joshi, Liao & Roh,

6  2011; Menz, 2012; Roberson, Holmes & Perry, 2019). Among top management and leadership teams,

7  gender and racial diversity have been found to influence a firm's revenues, returns and valuation by

8  shareholders (Ren & Wang, 2011; Roberson & Park, 2007). At the managerial level, gender and racial

9  diversity are shown to be related to employee productivity, firm returns and market share (Andrevski et

10  al., 2014; Dwyer et al., 2003; Richard et al., 2004; Shrader et al., 1997). Studies show employee gender

11  and racial diversity to be correlated with a range of firm performance outcomes, including employee

12  productivity, revenues, earnings, returns and relative productivity compared to competitors (Frink et al.,

13  2003; Gonzalez & DeNisi, 2009; Hertenian & Gudmundson, 2000; Herring, 2009; Leonard et al., 2004;

14  Richard, 2000; Richard et al., 2006).

15       17.    It should be noted that the relationship between diversity and firm performance is often

16  contextually dependent, as the nature of the relationship may be influenced by firm characteristics, such

17  as business strategy, organizational culture and diversity management (Kochan et al., 2003; Richard,

18  2000; Richard, McMillan, Chadwick & Dwyer, 2003). Research has also shown the impact of diversity

19  on firm performance to vary by industry and geographic region (see Roberson et al., 2017).

20       18.    Studies across disciplines, including management and finance, also demonstrate

21  investors' reactions to companies' corporate social responsibility (CSR) or environmental, social and

22  governance (ESG) activities. As stockholders form impressions of firms based on their demonstrated

23  social values and performance, information on firm activities in these areas has been shown to impact

24  stock prices and valuation (see McWilliams & Siegel, 2000). Specific to diversity, evidence also shows

25  an impact of firm diversity reputation, including minority representation in the workforce and at

26  different managerial levels, the rate at which minority employees are hired and how managers are held

27  accountable for minority staffing and retention, on stock price valuation (see Roberson & Park, 2007;

28  Wright, Ferris, Hiller & Kroll, 1995).

1    19.     Overall, research highlights the economic value of diversity and diversity data. With

2  demonstrated relationships between the composition of organizational workforces and indicators of firm

3  financial performance, including profitability, market share and valuation, such information may be

4  considered financial in nature.

5  **V. Firm Utilization of Diversity Metrics**

6    20.     Diversity data are used internally by firms for business purposes – specifically, to

7  monitor human resource management effectiveness, including staffing, performance management,

8  compensation, engagement and retention (see Buttner & Tullar, 2018). For example, many organizations

9  use diversity metrics, such as that contained in EEO-1 reports, as a measurement analytic for workforce

10  goal setting and planning. Such data indicate the extent to which racial/ethnic groups are represented

11  within various job categories and at different levels and thus, indicates where targeted recruitment

12  initiatives might be effective. For example, a study using data from EEO-1 compliance reports of 708

13  private-sector organizations for 1971–2002 showed that such plans increased the likelihood of White

14  women and Black men being represented in management by 9% and 4%, respectively. It is important to

15  note, however, that firms should interpret such information with caution as the results varied by

16  industry. For example, the representation of Black women in management grew in service industries but

17  declined in manufacturing sectors, such as technology and transportation; thus, highlighting the

18  contextuality and sensitivity of such information.

19    21.     Such data are also used to evaluate the effectiveness of employee staffing and

20  development strategies, particularly in certain job categories. As research demonstrates race effects on

21  the employee engagement-turnover relationship (Jones & Harter, 2005), workforce demographics can

22  provide insight into how the workplace experiences of members of different racial/ethnic groups may

23  differ. Tracking and analyzing diversity data allows firms to identify issues and processes that require

24  intervention and make data-driven decisions about how to invest resources in such interventions (Jayne

25  & Dipboye, 2004). Such metrics are useful for conducting scenario planning to explore the potential

26  return on different enterprise-wide diversity interventions and the effectiveness of talent development

27  strategies for employment categories of a firm's workforce.

28

1    22.    Another use of diversity data is the creation of accountability structures that assign

2    responsibility for addressing workplace discrimination to specific groups. For example, some firms use

3    such data to evaluate managers' performance and determine compensation based on how well diversity

4    goals have been met. Research shows such usage of diversity data to correlate positively with

5    managerial diversity , such that diversity-linked evaluations and compensation resulted in an increased

6    representation of certain demographic groups in management (Kalev, Kelly & Dobbin, 2006; Richard,

7    Roh & Pieper, 2013). Research also shows these effects to be amplified when performance and

8    compensation systems linked to diversity data are combined with organization-level accountability

9    structures. For example, a current study in the credit union industry examines the effects of establishing

10    diversity goals and collecting and tracking diversity data on firm performance (Roberson & Preston,

11    2021). The results show that aligning diversity, equity and inclusion (DEI) with business activities via

12    the development of a DEI strategic plan and establishment of a formal responsibility system for

13    coordinating and monitoring DEI efforts, such as the appointment of a Chief Diversity Officer or

14    formation of a DEI Council, help to drive performance impact.

15    23.    Overall, research shows that while diversity data can be important metrics for indicating

16    the underrepresentation of certain demographic groups within firms and establishing a baseline against

17    which progress can be measured, they are outcome metrics. To change the composition of workforces

18    (and their experiences within organizations), policies, practices and interventions for addressing the

19    particular structural and/or cultural issues within each firm need to be designed and implemented.

20    **VI.    Information Sensitivity**

21    24.    Although establishing meaningful metrics to evaluate the effectiveness of a firm's

22    diversity initiative is critical to managing diversity effectively, researchers have noted the challenges

23    associated with collecting and tracking diversity data. As a residual of the human resource function,

24    which often is considered a cost-center with little demonstrated return on investment, many

25    organizations do not collect the full scope of data required for meaningful evaluation and analysis (Jayne

26    & Dipboye, 2004). Companies also fear that the disclosure of diversity data may open firms up to legal

27    vulnerabilities by being interpreted as revealing systemic bias or discrimination.

28

DECLARATION OF QUINETTA ROBERSON IN SUPPORT OF DOL'S MOTION FOR SUMMARY JUDGMENT
No. 22-cv-07182-WHA                                    7        ER-228

25.     In the case of the information contained in EEO-1 reports, these vulnerabilities become particularly salient for several reasons. First, because information provided in the EEO-1 form is reported without context, there is the possibility for misinterpretation. For example, because firms' staffing pools are partially determined by the labor availability in their specific industry and operating regions, the diversity of such pool and subsequent workforce composition is likely to be influenced accordingly (Buttner & Tullar, 2018). While many organizations are more diverse at its lower levels, representation at higher levels may be due to the scarcity of talent within that occupational category. Ideally, the demographic distribution of employees at each level of a firm should resemble the demographic distribution of its relevant labor market. Yet, labor market availability may be influenced by the occupation, industry, or region from which talent is recruited. Thus, without taking into consideration the availability of labor within each job category listed on the EEO-1 form, the representativeness of such data may be inaccurate. Workforce composition may also be influenced by other factors, such as the nature of work, how employees view work, the specific skills needed with an organization, employees' non-work responsibilities, a firm's compensation strategy, etc. (https://www.mckinsey.com/capabilities/people-and-organizational-performance/our-insights/the-great-attrition-is-making-hiring-harder-are-you-searching-the-right-talent-pools). These  influences further limit companies' willingness to share EEO-1 and other diversity data.

26.     Second, although the EEO-1 form does not ask submitting companies to explain resource allocation across its segments, individuals can become identifiable at higher levels of the firm where they are less represented or in other job categories where there may be fewer employees (such as in smaller companies or underrepresented groups). For example, if a company reports one Hispanic female at the executive/senior officials and managers level, it would not be difficult for others (both internal and external to the firm) to identify that individual. While identification may not seem problematic, there is the potential for other firms interested in diversifying their leadership ranks to target that individual for poaching. In effect, it identifies viable talent pools and provides readily available access to potential candidates to companies that may not have a sourcing strategy. For the poaching organization, it reduces the time and resources needed to source and screen potential candidates, which accelerates the staffing process and reduces the costs of hiring. As such, it can generate a competitive advantage for that

1   organization. For the employee, there is the added challenge of being primarily valued for their

2   demographic group membership rather than for the unique knowledge, skills and abilities they

3   contribute to an organization (see Thomas & Ely; Ely & Thomas, 2001).

4          27.     Notably, demographic data is often not gathered outside of the U.S, as countries

5   experience similar concerns about collecting, tracking and interpreting information on employees across

6   racial and ethnic backgrounds. One key concern is the sensitivity of the data, especially privacy issues

7   associated with some groups disclosing their identity. It is feared that such data "may be misused to

8   maintain or deepen power relationships between majority and minority population groups", especially

9   those "who may have experience ethnic profiling, segregation, genocide and violence" and "in countries

10  where ethnicity-based data were used in the past to provide the basis for discriminatory policies"

11  (Balestra & Fleischer, 2009).Other concerns include the validity of the data, especially with variability

12  in the categorization of jobs, reporting sources and reporting time periods; and the reliability of the data,

13  especially given increases in the contingent nature of work and identity. Accordingly, international

14  standards organizations continue to debate diversity concepts, guiding principles and methodologies.

15         28.     Although some diversity data are publicly available, it should be noted that they are often

16  shared in aggregate. For example, *Fortune* magazine published an annual list of the best companies for

17  minorities based on a survey of the top 1,000 publicly traded companies plus the 200 largest privately

18  held firms in the U.S. on the representation of minorities in the workforce and at different managerial

19  levels, the rate at which minority employees are hired, and how managers are held accountable for

20  hiring, promotion and retention. The representation of Black, Hispanic, Asian and Native American

21  employees throughout firms were reported as percentages without any specification of level, job

22  category or business area.

23         29.     Some companies are willing to share their diversity data albeit in another format than that

24  included in EEO-1 reports. For example, companies use other metrics, such as annual percentage

25  changes in diversity goals, representation of underrepresented groups in recruitment pools or new hires,

26  yield from minority-serving institutions, diversity of hiring panels or employee retention across groups.

27  For those firms that are willing to share diversity information, including that contained in EEO-1

28  reports, it is often done within the context of a larger DEI initiative context (for an example, see United

1  Health Group: https://sustainability.uhg.com/reporting-data/eeo-data.html). To aid in data interpretation,

2  firms will provide additional information on talent management efforts, such as staffing, development

3  and engagement, for readers to understand the composition of their workforce and value for diversity in

4  their organization. Yet, because many organizations may not have the staff, budget or other resources

5  needed to build out a comprehensive DEI initiative or have relatively less robust DEI programs as

6  compared to companies recognized for DEI "best practices", they may be reluctant to share diversity

7  data.

8        30.    Finally, companies may fear sharing diversity data given the recent weaponization of DEI

9  initiatives. While some speculate that corporate social actions can signal a desire to achieve social or

10  environmental good (see Bansal & Kistruck, 2006; Barnett et al., 2020; Matten & Moon, 2008), others

11  see the alignment of firm practices with social issues to be antithetical to organizations' business

12  purposes (Warren, 2022). Critics of corporate social action, including diversity initiatives, have

13  reproached organizations for engaging in such efforts to merely provide the appearance of socially

14  conscious (i.e., "wokeness"). In fact, scholars, practitioners and the public have begun attacking the

15  purposes and efficacy of organizational diversity efforts (see Mirzaei, Wilkie & Siuki, 2022;

16  Vredenburg et al., 2020; Waldman & Sparr, in press). Consumer backlash, boycotts and lawsuits have

17  motivated company leaders to retreat from DEI

18  (https://www.forbes.com/sites/bryanrobinson/2023/07/01/as-supreme-court-erases-college-affirmative-

19  action-new-reports-find-companies-refusing-to-deliver-on-dei-promises/?sh=7ca4c875a85b) . As a

20  result, companies are increasingly reluctant to not only engage in diversity-related efforts but to

21  communicate a commitment to DEI, in general.

22        31.    I am being compensated at my usual rate of $550 per hour for my services in connection

23  with this matter.

24        I declare under penalty of perjury that the foregoing is true and correct.

25  Executed this 18th day of August, 2023, at East Lansing, Michigan.

26

27  QUINETTA ROBERSON, PhD.

28

# Exhibit A

APPENDIX A

**QUINETTA M. ROBERSON**
**Curriculum Vita**

Broad College of Business
Michigan State University
632 Bogue Street, Room N475
East Lansing, MI 48824
quinetta@broad.msu.edu

**ACADEMIC POSITIONS:**

| | |
|---|---|
| 2020 – present | John A. Hannah Distinguished Professor in Management and Psychology |
| | Eli Broad College of Business and College of Social Science |
| | Michigan State University |
| | |
| 2015 – 2020 | Fred J. Springer Endowed Chair in Business Leadership |
| 2008 – 2020 | Professor, Department of Management & Operations |
| | Villanova School of Business |
| | Villanova University |
| | |
| June 2012 | Visiting Professor |
| | Fundação Getulio Vargas - Escola de Administração de Empresas de São Paulo |
| | São Paulo, Brazil |
| | |
| November 2010 | Visiting Research Fellow |
| | Melbourne Business School |
| | Melbourne, Australia |
| | |
| January – June 2008 | Visiting Associate Professor, Department of Management & Organization |
| | Robert H. Smith School of Business |
| | University of Maryland at College Park |
| | |
| March – June 2006 | Visiting Professor, Institute of Organizations and Information Systems |
| | Bocconi University |
| | Milan, Italy |
| | |
| 2005 – 2008 | Associate Professor |
| 1999 – 2005 | Assistant Professor |
| | Human Resource Studies |
| | School of Industrial and Labor Relations |
| | Cornell University |

**EDUCATION:**

| | | |
|---|---|---|
| Ph.D. | 1999 | University of Maryland at College Park |
| | | Major: Organizational Behavior; Minor: Human Resource Management |
| | | |
| M.B.A. | 1993 | University of Pittsburgh |
| | | Major(s): Finance, Strategic Planning |

| B.S. | 1992 | University of Delaware |
|------|------|------------------------|
|      |      | Major: Finance; Minor: Accounting |

**AWARDS/HONORS:**

Trailblazer Award, Management Doctoral Student Association, The PhD Project, 2022
Outstanding Reviewer Award, Academy of Management Review, 2022
Fellow, Association for Psychological Science, 2021
Fellow, Academy of Management, 2020
#ThinklistAmplify, Centre for Business, Organisations and Society (CBOS), University of Bath, 2020
#Thinklist30, Centre for Business, Organisations and Society (CBOS), University of Bath, 2020
Sage Award for Scholarly Contributions, Gender and Diversity in Organizations Division, Academy of
    Management, 2020
Scientist-Practitioner Presidential Recognition, Society for Industrial and Organizational Psychology, 2019
Bright Idea Award, Stillman School of Business, Seton Hall University, 2018
Fellow, Society for Industrial and Organizational Psychology, 2016
Daniel J. O'Mara Business Faculty Award, 2015
Distinguished Doctoral Graduate, Robert H. Smith School of Business, University of Maryland, 2011
Best Paper Award, *Group and Organization Management*, 2007
Emerging Scholar, Diverse Issues in Higher Education, 2007
Faculty Research Award (with Tony Simons), School of Hotel Administration, Cornell University, 2004
General Mills Award for Innovation in Teaching, Cornell University, 2001-2002
James A. Perkins Prize for Interracial Understanding & Harmony Honorable Mention, Cornell University, 2002
Fraternity and Sorority Community Outstanding Faculty Award, Cornell University, 2001
Frank T. Paine Award for Academic Achievement, University of Maryland, 1999
Allen J. Krowe Teaching Award, University of Maryland, 1999
Student Academic Achievement Grant, University of Maryland, 1995-1999
Robert Morris Associates, Philadelphia Chapter, Best Paper Award, 1995
Beta Gamma Sigma, National Business Honor Society, 1993
Academic Scholarship, University of Pittsburgh, 1992-1993; University of Delaware, 1988-1992

**FUNDING:**

"Diversity as an Organizational Capability: A Multilevel Examination of Board Composition and Firm
    Effectiveness", National Science Foundation, $350,000, 2021-2024

**RESEARCH**

**Refereed Publications:**

Roberson, Q. M., Moore, O. A., & Bell, B. S. (In press). An active learning approach to diversity training.
    *Academy of Management Review*.

Roberson, Q., Ruggs, E., Pichler, S., & Holmes, O. (In press). LGBTQ systems: A framework and future research
    agenda. *Journal of Management*.

Roberson, Q. M., & Scott, W. (In press). Contributive justice: An invisible barrier to workplace inclusion. *Journal
    of Management*.

Avery, D. R., McKay, P. F., Roberson, Q. M., & Thomas, K. M. (2023). R.E.A.L. (Racialized experiences in
    academic life) talk: A curated conversation with four black fellows. *Journal of Business and Psychology*,
    38, 7-23.

    * Awarded a 2022 Editor Commendation, as one of the best papers published by the journal.

Roberson, Q. M. (2022). 2021 Presidential address: Meeting our moment. *Academy of Management Review*, 47, 206-209.

Roberson, Q. M., & Perry, J. L. (2022). Inclusive Leadership in Thought and Action: A Qualitative Study of Leader Perception and Behavior. *Group and Organization Management*, 47, 755-778.

Roberson, Q. M., Quigley, N., Vickers, K., & Bruck, I. (2021). Reconceptualizing leadership from a neurodiverse perspective. *Group and Organization Management,* 46(2), 399—423.

Roberson, Q. M. (2020). Access to justice as a human right, organizational entitlement, and precursor to diversity and inclusion. *Equality, Diversity, and Inclusion: An International Journal,* 20, 787-791.

Roberson, Q. M., King, E. B., & Hebl, M. (2020). Designing more effective practices to address workplace inequality. *Behavioral Science and Policy*, 6(1), 39-49.

Roberson, Q. M. (2019). Diversity in the workplace: A review, synthesis, and future research agenda. *Annual Review of Organizational Psychology and Organizational Behavior*, 6, 69-88.

Periac, F., David, A., & Roberson, Q. M. (2018). Clarifying the interplay between social innovation and sustainable development: A conceptual framework rooted in paradox management. *European Management Review*, 1(15), 19-35

Roberson, Q. M., Ryan, A. M., & Ragins, B. R. (2017). The evolution and future of diversity at work. *Journal of Applied Psychology*, 102(3), 483-499.

Roberson, Q. M., Holmes, O. H. & Perry, J. L. (2017). Transforming Research on Diversity and Firm Performance: A Dynamic Capabilities Perspective. *Academy of Management Annals*, 11(1), 189-216.

Roberson, Q. M., & Williamson, I. O. (2012). Justice in self-managing teams: The role of social networks in the emergence of procedural justice climates. *Academy of Management Journal*, 55, 685-701.

Hausknecht, J. P., Sturman, M. C., & Roberson, Q. M. (2011). Justice as a dynamic construct: Effects of individual trajectories on distal work outcomes. *Journal of Applied Psychology*, 96, 872-880.

Parks, G. P., & Roberson, Q. M. (2011). "Eighteen Million Cracks": Gender's Role in the 2008 Presidential Election. *William & Mary Journal of Women and the Law,* 17, 321-345.

Parks, G. P., & Roberson, Q. M. (2009, Winter). Michelle Obama: A contemporary analysis of race and gender discrimination through the lens of Title VII. *Hastings Women's Law Journal, 20*, 3-44.

Roberson, Q. M., Sturman, M. C., & Simons, T. L. (2007). Does the measure of dispersion matter in multilevel research? A comparison of the relative performance of dispersion indices. *Organizational Research Methods, 10*, 564-588.

Roberson, Q. M., & Park, H. J. (2007). Examining the link between diversity and firm performance: The effects of diversity reputation and leader racial diversity. *Group & Organization Management*, *32*, 548-568.

Roberson, Q. M. (2006). Are Justice Perceptions in Teams Contagious? The activation and role of sensemaking in the emergence of justice climates. *Organizational Behavior and Human Decision Processes*, 100, 177-192.

Roberson, Q. M.  (2006). A social comparison approach to justice in teams: The effects of interdependence and fairness on referent choice and justice climate strength. *Social Justice Research,* 19, 323-344.

Roberson, Q. M. (2006). Disentangling the meanings of diversity and inclusion in organizations. *Group & Organization Management, 31*, 212-236.

Roberson, Q. M., & Stevens, C. K. (2006). Making sense of diversity in the workplace: Organizational justice and language abstraction in employees' accounts of diversity-related incidents. *Journal of Applied Psychology,* 91, 379-391.

Roberson, Q. M., & Stewart, M. M. (2006). Understanding the motivational effects of procedural and informational justice in feedback processes. *British Journal of Psychology*, 97, 281-298.

Bagdadli, S., Roberson, Q. M., & Paoletti, F. (2006). The importance of organizational justice in promotion decisions. *Journal of Business and Psychology,* 21, 83-102.

Roberson, Q. M., Collins, C. J., & Oreg, S. (2005). The effects of recruitment message specificity on applicant attraction to organizations. *Journal of Business and Psychology, 19*, 319-339.

Roberson, Q., & Colquitt, J. A. (2005). Shared and configural justice: A social network model of justice in teams. *Academy of Management Review, 30*, 595-607.

Simons, T. L., & Roberson, Q. M. (2003). Why managers should care about fairness: The effects of aggregate justice perceptions on organizational outcomes. *Journal of Applied Psychology, 88*, 432-443.

Roberson, Q. M., Moye, N. A., & Locke, E. A. (1999). Identifying a missing link between participation and satisfaction: The mediating role of procedural justice perceptions.  *Journal of Applied Psychology, 84*, 585-593.

Barber, A. E., Wesson, M. J., Roberson, Q. M., & Taylor, M. S. (1999). A tale of two job markets: organizational size and its effects on hiring practices and job search behavior. *Personnel Psychology, 52*, 841-867.

**Other Publications:**

Massey, M., & Roberson, Q. M. (2022) Diversity in AI programming and the end-user experience. In King, E. B., Roberson, Q. M., & Hebl, M. R. (Eds.), *Research in Social Issues in Management: The Future of Scholarship on Race in Organizations*, Volume 3 (pp. 259-278). Information Age Publishing.

Chrobot-Mason, D., & Roberson, Q. M. (2021). Inclusive leadership (Chapter 12). In P. G. Northouse (Ed.), Leadership: Theory and Practice (9th edition, pp. 322-351). Thousand Oaks, CA: Sage.

Roberson, Q. M. (2018). Client diversity (Chapter 14). In C. R. Chaffin (Ed.), *Client Psychology*. Hoboken, NJ: John Wiley & Sons, Inc.

Roberson, Q. M. (2017). Diversity in the workplace. In S. G. Rogelberg (Ed.), *Encyclopedia of Industrial and Organizational Psychology* (2nd edition). Thousand Oaks, CA: Sage.

Avery, D. A., McKay, P. F., & Roberson, Q. M. (2012). Managing diversity means managing differently: A look at the role of racioethnicity in perceptions of organizational support. In L. M. Shore, J. A-M. Coyle-Shapiro

& L. E. Tetrick (Eds.), *Understanding the Employee-Organization Relationship: Advances in Theory and Practice*. London: Psychology Press/Taylor & Francis Group.

Roberson, Q. M. (2012). Managing diversity (Chapter 31). In S. W. J. Kozlowski (Ed)., *Oxford Handbook of Industrial and Organizational Psychology*. Oxford: Oxford University Press.

Roberson, Q. M., & Williamson, I. O. (2010). The Fairness of Difference: How Team Composition Affects the Emergence of Justice Climates. In M. A. Neale, E. A. Mannix, & E. Mullen (Eds.), *Research on Managing Groups and Teams: Fairness and Groups* (pp. 274-298). London: Emerald Publishing Group.

Roberson, Q. M., Bell, B., & Porter, S. C. (2008). The language of bias: A linguistic approach to understanding intergroup relations. In M. A. Neale, E. A. Mannix, & K. W. Phillips (Eds.), *Research on Managing Groups and Teams: Diversity in Groups* (Volume 11, pp. 267-294). London: Emerald Publishing Group.

Roberson, Q. M. (2006). Diversity in the workplace. In S. G. Rogelberg (Ed.), *Encyclopedia of Industrial and Organizational Psychology*. Thousand Oaks, CA: Sage.

Colquitt, J. A., Zapata-Phelan, C. & Roberson, Q. (2005). Justice in Teams: A Literature Review and Agenda for Future Research. In J. J. Martocchio (Ed.), *Research in Personnel and Human Resource Management* (Vol. 24, pp. 53-94). Oxford, UK: Elsevier.

Locke, E., Tirnauer, D., Roberson, Q., Goldman, B., Latham, M., & Weldon, E. (2000). The importance of the individual in an age of groupism. In M. Turner (Ed.), *Groups at Work: Advances in Theory and Research* (pp. 501-528). Hillsdale, NJ: Lawrence Erlbaum.

**Books:**

King, E. B., Roberson, Q., & Hebl, M. R. (Eds.) (2023). *Research on Social Issues in Management: The Future of Scholarship on Diversity and Inclusion in Organizations* (Volume 4). Charlotte, NC: Information Age Publishing.

King, E. B., Roberson, Q., & Hebl, M. R. (Eds) (2022). *Research on Social Issues in Management: The Future of Scholarship on Race in Organizations* (Volume 3). Charlotte, NC: Information Age Publishing.

King, E. B., Roberson, Q., & Hebl, M. R. (Eds) (2020). *Research on Social Issues in Management: Perspectives on Gender at Work* (Volume 2). Charlotte, NC: Information Age Publishing.

King, E. B., Roberson, Q., & Hebl, M. R. (Eds) (2019). *Research on Social Issues in Management: Pushing our Understanding of Diversity in Organizations* (Volume 1). Charlotte, NC: Information Age Publishing.

Roberson, Q. M. (2013). *The Oxford Handbook of Diversity and Work*. Oxford: Oxford University Press.

**Invited Presentations:**

Roberson, Q. M. The science of building better boards. Invited presentation in BroadX sponsored by the Broad College of Business at Michigan State University. (2022)

Roberson, Q. M. What inclusive leaders do differently. Invited talk in the Positive Speaker Series sponsored by the Center for Positive Organizations in the Ross School of Business at University of Michigan. (2022)

Roberson, Q. M. Inclusive scholarship as a force for good. Presentation and panel discussion at the British Academy of Management conference in Manchester, England. (2022)

Roberson, Q. M. Unpacking the business case for diversity management: Strategic practice bundles and organizational performance. Research talk at Nova School of Business and Economics in Carcavelos, Portugal. (2022)

Roberson, Q. M., Avery, D. R., & Leigh, A. Lights, camera, action: Moving beyond performative diversity management to drive change. Research talk in the "Countering the Woke Organization: Managerial and Public Policy Implications" workshop sponsored by the Institute for Human Studies at George Washington University. (2022)

Roberson, Q. M. "Cultivating connection through inclusive leadership" and "Connecting DEI to our work". Invited presentation in the Innovation and Learning Lab (LILA) in the Harvard Graduate School of Education. (2022)

Roberson, Q. M. What are diversity 'best practices'? Exploring diversity management bundles and organizational performance. Research talk in the School of Management and Industrial Relations at Rutgers University. (2022)

Roberson, Q. M. Are there actually 'best practices'? Diversity management bundles and organizational performance. Invited speaker in the Interdisciplinary Committee on Organizational Studies (ICOS) Speaker Series at the University of Michigan. (2021)

Roberson, Q. M. Leading inclusive organizations and societies. Invited keynote lecture at 2021 annual conference of the Brazilian Academy of Management (Associação Nacional de Pós-Graduação e Pesquisa em Administração)

Roberson, Q. M. Activating your diversity and inclusion capabilities in the retail industry. Invited keynote speaker for the Symposium on Diversity and Inclusion in Retail hosted by the David Sobey Centre for Innovation in Retailing and Services at Saint Mary's University. (2021)

Roberson, Q. M. What is your capacity for impact? Exploring the significance of women in leadership. Invited keynote speaker at the 2018 Erasmus Centre for Women and Organisations (ECWO) Conference in the Rotterdam School of Management at Erasmus University in Rotterdam, Netherlands. (2018)

Roberson, Q. M. Beyond diversity: Are inclusive organisations truly attainable? Invited public lecture at the London School of Economics in London, England. (2018)

Roberson, Q. M. The confusion of inclusion. Invited keynote speaker at the 2018 Leadership Excellence and Gender in Organizations Research to Practice Conference at Purdue University in West Lafayette, IN.

Roberson, Q. M. Diversity in the workplace: A review, synthesis and future research agenda. Research presentation at Brunel University in London, England. (2018)

Roberson, Q. M. The evolution and future of diversity at work: Employing a capabilities perspective. Research presentation in 2017 University of Cincinnati Business and Law Partnership Program in Cincinnati, OH.

Roberson, Q. M. Diversifying diversity: Creating an integrative agenda for the evolution of diversity as a science and practice. Research presentation at the Chaire Management et Diversité International Symposium at the Université Paris – Dauphine in Paris, FR. (2015)

Roberson, Q. M. Understanding the value of diversity in organizations: A capability-based framework of heterogeneity and firm performance. Research presentation at the 2015 Michigan State University Symposium on Multicultural Psychology in East Lansing, MI.

Roberson, Q. M. Dealing with our diverse identities: An agenda for future equality, diversity and inclusion research. Keynote presentation at the 2015 Equality, Diversity and Inclusion conference in Tel Aviv, Israel.

Roberson, Q. M. The evolution of diversity theory and research: How far we've come and where we go from here. Research colloquium in the School of Social Work at the University of Southern California in Los Angeles, CA. (2015)

Roberson, Q. M. The evolution and future of diversity at work. Research presentation at the University of Utah in Salt Lake City, UT. (2014)

Roberson, Q. M. The evolution and future of diversity at work. Research presentation at Drexel University in Philadelphia, PA. (2014)

Roberson, Q. M. Exploring compositional forms of justice climate emergence in self-managing teams. Research presentation at Rutgers University in Newark, NJ. (2013)

Roberson, Q. M. Exploring compositional forms of justice climate emergence in self-managing teams. Research presentation at Georgia Institute of Technology in Atlanta, GA. (2013)

Roberson, Q. M. Motivating homo sapien commodities to deliver value … or "human resource management. Keynote presentation at the 2013 Dutch HRM Network International Conference in Leuven, BE.

Roberson, Q. M. Multiculturalism as a capability: Understanding the organizational value of diversity. Invited presentation at the 2013 International Colloquium at the Chateau de la Bretesche in Missillac, FR.

Roberson, Q. M. Diversifying diversity: Creating an integrative agenda for the evolution of diversity as a science and practice. Invited presentation at the University of Dauphine in Paris, FR. (2013)

Roberson, Q. M. Diversifying diversity: Creating an integrative agenda for the evolution of diversity as a science and practice. Invited presentation at the University of Sussex in Brighton, UK. (2013)

Roberson, Q. M. Adopting a configural approach to the study of fairness. Invited presentation to the Work and Organizational Research Centre (WORC) at Brunel University in Uxbridge, UK. (2013)

Roberson, Q. M. Capacity building through diversity: Moving from the business case to the value proposition. Research presentation at the University of Delaware in Newark, DE. (2012)

Roberson, Q. M. Addressing the crisis within our midst: An agenda for strengthening diversity research and practice. Keynote presentation at the 2009 Equality, Diversity and Inclusion conference in Istanbul, TU.

Roberson, Q. M. Is justice contagious? Understanding the emergence of team justice climates. Research presentation at Virginia Commonwealth University in Richmond, VA. (2009)

**Conference Presentations:**

Perry, J. L., & Roberson, Q. M. Separating the effects of power and status in groups. Paper presentation at the 2015 Equality, Diversity and Inclusion conference in Tel Aviv, Israel.

Roberson, Q. M. The science of inclusion. IGNITE presentation at the 2014 Society for Industrial and Organizational Psychology conference in Honolulu, HI.

Roberson, Q. M. The ties that bind: Exploring the roles of social networks in the emergence of inclusive climates. Paper presentation at the 2013 Equality, Diversity and Inclusion conference in Athens, Greece.

Roberson, Q. M., Tekleab, A. G., Williamson, I. O. & Gill, C. Directing fairness in self-managing teams: How team leadership moderates justice climates. Symposium presentation at the 2012 Academy of Management meeting in Boston, MA.

Roberson, Q. M., Avery, D. R. & McKay, P. F. Managing diversity means managing differently: A look at the role of diversity in perceptions of organizational support. Symposium presentation at the 2012 Society for Industrial and Organizational Psychology conference in San Diego, CA.

Moore, O., Bell, B. S. & Roberson, Q. M. Evaluating the effectiveness of diversity training: A longitudinal investigation of individual and situational influences. Symposium presentation at the 2012 Society for Industrial and Organizational Psychology conference in San Diego, CA.

Roberson, Q. M. Risky business: An exploratory study of diversity practice litigation. Paper presented at the 2009 Academy of Management meeting in Chicago, IL. Presentation in symposium,

Roberson, Q. M., Kehoe, R. A., & Collins, C. J. Winning isn't everything: The relationship between diversity reputation, practices, and firm performance. Paper presented at the 2008 Academy of Management meeting in Anaheim, CA.

Duguid, M. M., Roberson, Q. M., & Richard, O. C. A social networks approach to board composition and firm performance. Paper presented at the 2007 Academy of Management meeting in Philadelphia, PA.

Rheinhardt, R. A., Collins, C. J., & Roberson, Q. M. An investigation of the relationship between organizational diversity and firm performance. Paper presented at the 2007 Academy of Management meeting in Philadelphia, PA. (Honorable mention for Emerald Best Student Paper Award presented by Gender and Diversity in Organizations Division)

Bell, B. S., & Roberson, Q. M. Diversity training research: Current perspectives and future directions. Symposium organized and chaired at the 2006 Academy of Management meeting in Atlanta, GA.

Duguid, M., Roberson, Q. M., & Richard, O. C. A social network approach to board diversity and firm performance: The role of professional, social and voluntary memberships. Paper presented at the 2006 Academy of Management meeting in Atlanta, GA.

Batt, R., Kim, S., & Roberson, Q. M. A Multi-Level Study of Demographic Diversity, Group Heterogeneity and Performance. Paper presented at the 2005 Academy of Management meeting in Honolulu, HI.

Williamson, I. O, & Roberson, Q. M. Intra-Team Network Ties and Team Justice Climates. Paper presented at the 2005 Academy of Management meeting in Honolulu, HI.

Roberson, Q. M. The Effects of Interdependence and Fairness on Justice Climate Emergence. Paper presented at the 2005 Society for Industrial and Organizational Psychology Conference in Los Angeles, CA.

Roberson, Q. M., Collins, C. J., & Yeung, S. K. Diversity Information in Recruitment Advertisements and Organizational Attraction. Paper presented at the 2005 Society for Industrial and Organizational Psychology Conference in Los Angeles, CA.

Roberson, Q. M. Is Justice Contagious? The Role of Sensemaking in Justice Climate Emergence. Paper presented at the 2004 Academy of Management meeting in New Orleans, LA.

Roberson, Q. M., & Park, H. J. Diversity Reputation and Leadership Diversity as Sources of Competitive Advantage in Organizations. Paper presented at the 2004 Academy of Management meeting in New Orleans, LA.

Simons, T. L., & Roberson, Q. M. Examining the Relationships between Unit Size, Unit Demography and Justice Climate Strength. Paper presented at the 2004 Academy of Management meeting in New Orleans, LA.

Roberson, Q. M., & Smith, D. B. Disentangling Diversity and Inclusion. Paper presented at the 2002 Society for Industrial and Organizational Psychology Conference in Toronto, Canada.

Simons, T., & Roberson, Q. M. A True Look at "Organizational Justice": The effects of aggregate justice perceptions and organizational outcomes. Paper presented at the 2001 Academy of Management meeting in Washington, DC.

Roberson, Q. M. Moving beyond Individual Justice Perceptions: Exploring fairness in multilevel contexts. Symposium chaired at the 2001 Society for Industrial and Organizational Psychology Conference in San Diego, CA.

Roberson, Q. M. The leveraging effects of team contexts on fairness perceptions and reactions. Paper presented at the 2001 Society for Industrial and Organizational Psychology Conference in San Diego, CA.

Roberson, Q. M. An Interactional Model of Diversity Climate: A Lens for Interpreting Diversity-Related Incidents in Organizations. Paper presented at the 2000 Society for Industrial and Organizational Psychology Conference in New Orleans, LA.

Stewart, M. M., & Roberson, Q. M. Decoupling Elements of Negative Feedback: Credibility, Accuracy and Interactional Justice. Paper presented at the 2000 Society for Industrial and Organizational Psychology Conference in New Orleans, LA.

Roberson, Q. M., Stevens, C. K., & McDonald-Mann, D.  An Exploratory Analysis of Employees Perceptions of Diversity-Related Incidents.  Paper presented at the 1998 Academy of Management meeting in San Diego, CA.

Moye, N. A., Roberson, Q. M., & Locke, E. A.  Insight into Participation Effects: The role of learning goals and justice perceptions. Paper presented at the 1998 Academy of Management meeting in San Diego, CA.

Barber, A. E., Wesson, M. J., Roberson, Q. M., & Taylor, M. S.  A Tale of Two Job Markets:  Comparing the hiring practices of large and small organizations.  Paper presented at the 1998 Academy of Management meeting in San Diego, CA.

Roberson, Q. M., Moye, N. A., & Locke, E. A.  Understanding the Complexity of Goal Orientation:  Performance implications beyond the two-factor model.  Paper presented at the 1998 Society for Industrial and Organizational Psychology meetings in Dallas, TX.

Stevens, C. K., McDonald-Mann, D., & Roberson, Q. M.  Recalibrating the Scales of Justice: Integrating Procedural Justice and Diversity Theory, Research and Practice.   Research Forum presented at the 1996 Academy of Management meeting in Cincinnati, OH.

**Manuscripts Under Review:**
Roberson, Q. M., Avery, D. R., & Leigh, A. Lights, Camera, Action: Moving beyond performative diversity management to driving sustainable change. Under third review at *Academy of Management Perspectives*.

Roberson, Q. M., Hoff, K., Pyram, R., & Holmes, J. A model of DEI in the career lifecycle. Revise-and-resubmit at *Journal of Vocational Behavior.*

**Work in Progress:**
Roberson, Q.M., Boora, L., & Hill, A. A comparative study of gender differences in CEO announcement narratives and the effects on stock prices.

Roberson, Q. M., Hill, A., & Wang, M. Understanding the effects of board member busyness on firm performance outcomes.

Roberson, Q. M., & Preston, M. Examining the effects of diversity, equity, and inclusion practices on credit union performance.

Roberson, Q. M., Young, H., & Zhou, C. Comparing approaches to, and perceptions of, inclusive leadership.

Awasty, N., & Roberson, Q. M. Exploring faith as a form of coping.

King, D., Stanley, L., Phetmisy, C., Massey, M., Buchanan, B., & Roberson, Q. M. An organizational resource model of employee resilience to identity threat.

Mitchell, R., Roberson, Q. M. & Briggs, C. A Comparative exploration of the purpose, operation and outcomes of employee resource groups.

Perry, J. L., & Roberson, Q. M. Understanding the enactment of inclusive leadership: Ideology, instrumentation and internalization.

<u>**WORK EXPERIENCE**</u>
- Research Fellow, Center for Excellence in Diversity, Equity and Inclusion, Filene Research Institute, 2020 – present.
- Program Officer, Science of Organizations, National Science Foundation, 2012-2013.
- Financial Analyst, Corestates Bank, Philadelphia, PA, 1993-1995.
- Consultant, Small Business Development Center, Pittsburgh, PA, 1992-1993.

## SERVICE
**Editorial:**
- *Academy of Management Journal* (Deputy Editor, 2022-2025)
- Guest Editor, Special Issue on "Understanding Racism in the Workplace, *Journal of Applied Psychology* (2021-2022)
- *Academy of Management Journal* (Editorial Board, 2020-2022)
- *Journal of Applied Psychology* (Editorial Board, 2017-2020)
- *Journal of Management* (2014-2018)
- *Journal of Applied Psychology* (Associate Editor, 2008 – 2014)
- *Personnel Psychology* (Editorial Board, 2007–2008)
- *Academy of Management Review* (Editorial Board, 2005–2008)
- *Journal of Organizational Behavior* (Editorial Board, 2003–2006)

**Professional**:
- Past President, Academy of Management, 2021-2022.
- President, Academy of Management, 2020-2021.
- President-Elect, Academy of Management, 2019-2020.
- Vice President & Program Chair, Academy of Management, 2018-2019.
- Vice President-Elect & Professional Development Workshop Chair, Academy of Management, 2017-2018.
- Member, Awards Subcommittee, Society for Industrial and Organizational Psychology, 2016-2019.
- Panelist, Decision and Risk Management Program, National Science Foundation, 2016-2020.
- Representative-at-Large, Academy of Management Board of Governors, 2013-2016.
- Invited Faculty Participant, Doctoral Consortium, Academy of Management: Conflict Management (2012), Human Resources (2004-2006), Organizational Behavior (2012) Divisions.
- Invited Faculty Participant, Junior Faculty Consortium, Academy of Management: Conflict Management (2009), Gender and Diversity in Organizations (2012) Divisions.
- Panelist, "Reject, revise, resubmit: Editors' tips for responding to journal reviews" panel discussion at the 2011 Society for Industrial and Organizational Psychology conference in Chicago, IL.
- Chair, Diversity and Inclusion Theme Committee, Academy of Management, 2010-2011.
- Past Division Chair, GDO Division, Academy of Management, 2010-2011.
- Division Chair, GDO Division, Academy of Management, 2009-2010.
- Program Chair, GDO Division, Academy of Management, 2007-2008.
- Professional Development Workshop Chair, GDO Division, Academy of Management, 2006-2007.
- Chair, Best Student Paper Committee, HR Division, Academy of Management, 2004 & 2005.
- Treasurer, Gender & Diversity in Organizations Division, Academy of Management, 2003–2006.
- Executive Committee Member, Gender & Diversity Division, Academy of Management, 2002–2003.
- Membership Committee, Society for Industrial and Organizational Psychology, 2001–2004.

**University:**
- Member, Strategic Plan Research Implementation Group, Michigan State University, 2022.
- Member, Reappointment, Promotion and Tenure Committee, Broad College of Business, Michigan State University, 2021-present
- Member, Provost's Committee on New Faculty Advancing Inclusive Excellence, Michigan State University, 2021.
- Working Group Chair, Middle States Commission on Higher Education Self-Study, Villanova University, 2019-2020.
- Member, Faculty Research Awards Committee, Villanova University, 2018.

- Member, Research Grants Task Force, Villanova School of Business, Villanova University, 2016-2020.
- Member, University Institutional Review Board (IRB), Villanova University, 2016-2018.
- Member, Faculty Rights and Responsibilities Committee, Villanova University, 2016-2018.
- Member, Faculty Congress, Villanova University, 2016-2018.
- Member, Management and Organizations Department Standing Curricular Committee, Villanova University, 2016-2017.
- Member, Executive Education Task Force, Villanova School of Business, Villanova University, 2016-present.
- Member, University Rank & Tenure Committee, Villanova University, 2013-2016.
- Member, Villanova School of Business Dean Search Committee, Villanova University, 2011-2012.
- Member, Executive MBA and Executive Education Committee, Villanova School of Business, Villanova University, 2011-present.
- Member, MBA Admissions Committee, Villanova School of Business, Villanova University, 2011-2013.
- Member, University Advancement and Communications Committee, Villanova University, 2009-2013.
- Advisor, Multicultural Business Association, Villanova School of Business, Villanova University, 2011.
- Member, Villanova School of Business Strategy Team, Villanova University, 2009.
- Chair & Member, Research Standards Committee, Villanova School of Business, Villanova University, 2008-present.
- Grant Proposal Evaluator, Institute for Social Sciences, Cornell University, 2006-2007.
- Affirmative Action and Minority Education Committee, Cornell University, 2006.
- Advisory Council, School of Industrial and Labor Relations, Cornell University, 2005 – 2008.
- Computing Committee, School of Industrial and Labor Relations, Cornell University, 2000 – 2008.
- Teaching Committee, School of Industrial and Labor Relations, Cornell University, 2001 – 2002.

**Advising:**
- Christy Dodge, Education, Cornell University (Committee Member)
- Michelle Duguid, Organizational Behavior, Cornell University (Committee Member)
- Nadav Goldschmidt, Human Resource Studies, Cornell University (Committee Member)
- Jamie Perry, Rutgers University (Committee Member)
- Shanette Porter, Social Psychology, Cornell University (Committee Member)
- Oliver Sheldon, Management, Cornell University (Committee Member)
- Sabrina Volpone, Temple University (Committee Member)
- Lauren Collier-Spruill, Organizational Psychology, Michigan State University (Committee Member)
- Connor Eichenauer, Organizational Psychology, Michigan State University (Committee Member)
- Jooyoung Kim, Management, Michigan State University (Committee Member)
- Becca Mitchell, Management. Michigan State University (Committee Member)
- Courtney Bryant, Organizational Psychology, Michigan State University (Committee Member)
- Jo Alanis, Organizational Psychology, Michigan State University (Thesis Committee Member)
- Caitlin Briggs, Organizational Psychology, Michigan State University (Committee Member)
- Sarah Kuang, Organizational Psychology, Michigan State University (Committee Member)
- William Scott, Organizational Psychology, Michigan State University (Committee Chair)
- Rachael Pyram, Organizational Psychology, Michigan State University (Committee Chair)
- Kenneth Russell, Higher, Adult and Lifelong Education (HALE), Michigan State University (Committee Member)

**Board Memberships:**
- Michigan State University Federal Credit Union (2022 – present)
- Cinnaire, Inc. (2021-present)

- Reseda Group, Michigan State University Federal Credit Union (2021-2022)
- Better Up, Inc. – Science Advisory Board (2019 - present)
- YMCA of Greater Philadelphia (2018 – 2022)
- Ketchum, Inc. – Diversity, Equity & Inclusion Advisory Board (2018-2020)
- The American College State Farm Center for Women and Financial Services (2016-2018)
- Markets Matter, Inc. (2012-2020)

**Memberships/Associations:**
- Academy of Management
- Society for Industrial/Organizational Psychology
- Association for Psychological Science
- American Psychological Association
- Society for Organizational Behavior
- Personnel and Human Resources Research Group

Revised:  August 18, 2023

# Exhibit B

## APPENDIX B

### References

Andrevski, G., Richard, O. C., Shaw, J. D. & Ferrier, W. J. (2014). Racial diversity and firm performance: The mediating role of competitive intensity. *Journal of Management, 40,* 820-844.

Balestra, C., & Fleischer, L. (2018), Diversity statistics in the OECD: How do OECD countries collect data on ethnic, racial and indigenous identity?" *OECD Statistics Working Papers*, No. 2018/09, OECD Publishing.

Bansal, T., & Kistruck, G. (2006). Seeing is (not) believing: Managing the impressions of the firm's commitment to the natural environment. *Journal of Business Ethics, 67*, 165-180.

Barnett, M., Henriques, I., & Husted, B. W. (2020). Beyond good intentions: Designing CSR initiatives for greater social impact. *Journal of Management, 46*, 937-964.

Buttner, E.H., & Tullar, W.L. (2018). A representative organizational diversity metric: a dashboard measure for executive action. *Equality, Diversity and Inclusion, 37*, 219 -232.

Certo, S. T., Lester, R. H., Dalton, C. M., & Dalton, D. R. (2006). Top management teams, strategy and financial performance: A meta-analytic examination. *Journal of Management Studies, 43*, 813-839.

Cox Jr., T., & Blake, S. (1991). Managing cultural diversity: Implications for organizational competitiveness. *Academy of Management Executive, 5*, 45–56.

Cox, T. H., Lobel, S., & McLeod, P. (1991). Effects of ethnic group cultural differences on cooperative and competitive behavior on a group task. *Academy of Management Journal, 34*, 827-847.

Dwyer, S., Richard, O. C., & Chadwick, K. (2003). Gender diversity in management and firm performance: The influence of growth orientation and organizational culture. *Journal of Business Research*, *56*, 1009-1019.

Ely, R. J., & Thomas, D. A. (2001). Cultural Diversity at Work: The Effects of Diversity Perspectives on Work Group Processes and Outcomes. *Administrative Science Quarterly*, *46*, 229–273.

Frink, D. D., Robinson, R. K., Reithel, B., Arthur, M. M., Ammeter, A. P., Ferris, G. R., Kaplan, D. M., et al. (2003). Gender demography and organization performance. *Group and Organization Management*, *28*, 127-147.

Garcia-Vega, M. (2006). Does technological diversification promote innovation? An empirical analysis for European firms. *Research Policy 35*, 230–246.

Gonzalez, J. A., & Denisi, A. S. (2009). Cross-level effects of demography and diversity climate on organizational attachment and firm effectiveness. *Journal of Organizational Behavior*, *30*, 21-40.

Hartenian, L. S., & Gudmundson, D. E. (2000). Cultural diversity in small business: Implications for firm performance. *Journal of Developmental Entrepreneurship*, *5*, 209-219.

Herring, C. (2009). Does diversity pay? Race, gender, and the business case for diversity. American Sociological Review, *74*, 208-224.

Jackson, S. E., Joshi, A., & Erhardt, N. L. (2003). Recent research on team and organizational diversity: SWOT analysis and implications. *Journal of Management, 29*, 801-830.

Jayne, M. E. A., & Dipboye, R. L. (2004). Leveraging diversity to improve business performance: Research findings and recommendations for organizations. *Human Resource Management, 43*, 409-424.

Jones, J. R., & Harter, J. K. (2005). Race Effects on the Employee Engagement-Turnover Intention Relationship. *Journal of Leadership & Organizational Studies*, *11*, 78–88.

Kalev, A., Kelly, E., & Dobbin, F. (2006). Best practices or best guesses? Assessing the efficacy of corporate affirmative action and diversity policies. *American Sociological Review, 71*, 589–617.

Kochan, T., Bezrukova, K., Ely, R., Jackson, S., Joshi, A., Jehn, K., Leonard, J., Levine, D. and Thomas, D. (2003). The effects of diversity on business performance: Report of the diversity research network. *Human Resource Management, 42*, 3-21.

Leonard, J. S., Levine, D. I., & Joshi, A. (2004). Do birds of a feather shop together? The effects on performance of employees' similarity with one another and with customers. *Journal of Organizational Behavior, 25*, 731-754.

Matten, D., & Moon, J. (2008). "Implicit" and "explicit" CSR: A conceptual framework for a comparative understanding of corporate social responsibility. *Academy of Management Review*, *33*, 404–424.

McWilliams, A., & Siegel, D. (2000). Corporate Social Responsibility and Financial
Performance: Correlation or Misspecification? *Strategic Management Journal*, *21*, 603–609.

Menz, M. (2012). Functional top management team members: A review, synthesis, and research
agenda. *Journal of Management, 38*, 45-80.

Milliken, F. J., & Martins, L. L. (1996). Searching for common threads: Understanding the
multiple effects of diversity in organizational groups. *Academy of Management Review,
21,* 402–433.

Mirzaei, A., Wilkie, D. C., & Siuki, H. (2022). Woke brand activism authenticity of the lack of it.
*Journal of Business Research, 139*, 1-12.

Quintana-Garcia, C. & Benavides-Velasco, C. A. (2008). Innovative competence, exploration
and exploitation: The influence of technological diversification. *Research Policy, 37,*
492–507.

Ren, T., & Wang, Zheng. (2011). Female participation in TMT and firm performance: Evidence
from chinese private enterprises. *Nankai Business Review International*, *2*, 140-140-157.

Richard, O. C. (2000). Racial diversity, business strategy, and firm performance: A resource-
based view. *Academy of Management Journal, 43*, 164–177.

Richard, O. C., Barnett, T., Dwyer, S., & Chadwick, K. (2004). Cultural diversity in
management, firm performance, and the moderating role of entrepreneurial orientation
dimensions. *Academy of Management Journal*, *47*, 255-266.

Richard, O. C., Ford, D., & Ismail, K. (2006). Exploring the performance effects of visible
attribute diversity: The moderating role of span of control and organizational life cycle.
*The International Journal of Human Resource Management*, *17*, 2091-2109.

Richard, O. C., McMillan, A., Chadwick, K., & Dwyer, S. (2003). Employing an innovation
strategy in racially diverse workforces: Effects on firm performance. *Group and
Organization Management*, *28*, 107–126.

Richard, O. C., Roh, H., & Pieper, J. R. (2013). The link between diversity and equality
management practice bundles and racial diversity in the managerial ranks: Does firm size
matter? *Human Resource Management, 52,* 215–242.

Roberson, Q. M., Holmes, O. H. & Perry, J. L. (2017). Transforming Research on Diversity and Firm Performance: A Dynamic Capabilities Perspective. *Academy of Management Annals, 11*, 189-216.

Roberson, Q. M., King, E. B., & Hebl, M. (2020). Designing more effective practices to address workplace inequality. *Behavioral Science and Policy, 6*, 39-49.

Roberson, Q. M., & Park, H. J. (2007). Examining the link between diversity and firm performance: The effects of diversity reputation and leader racial diversity. *Group & Organization Management*, *32*, 548-568.

Roberson, Q., & Preston, M. (2021). DEI practice bundles & credit union performance: Results from Filene's DEI practices & policies survey (Report No. 550). Madison, WI: Filene Research Institute.

Shimizu, K., & Hitt, M. A. (2004). Strategic flexibility: Organizational preparedness to reverse ineffective strategic decisions. *Academy of Management Perspectives, 18*, 44-59.

Shrader, C. B., Blackburn, V. B., & Iles, P. (1997). Women in management and firm financial performance: An exploratory study. *Journal of Managerial Issues*, *9*, 355-372.

Thomas, D. A., & Ely, R. J. (1996). Making differences matter: A new paradigm for managing diversity. *Harvard Business Review, 74*, 79-90.

Vredenburg, J., Kapitan, S., Spry, A., & Kemper, J. A. (2020). Brands taking a stand: Authentic brand activism or woke washing? *Journal of Public Policy and Marketing*, 39, 444-460.

Waldman, D. A., & Sparr, J. L. (in press) Rethinking diversity strategies: An application of paradox and positive organization behavior theories. *Academy of Management Perspectives.*

Warren, D. E. (2022). "Woke" corporations and the stigmazation of corporate social intiatives. *Business Ethics Quarterly, 32*, 169-198.

Williams, K. Y., & O'Reilly, C. A. (1998). Demography and diversity in organizations: A review of 40 years of research. *Research in Organizational Behavior, 20*, 77-140.

Wright, P., Ferris, S. P., Hiller, J. S., & Kroll, M. (1995). Competitiveness through management of diversity: Effects on stock price valuations. *Academy of Management Journal*, *38*, 272-287.

# Exhibit C



AARON D. FORD
*Attorney General*

CRAIG A. NEWBY
*First Assistant Attorney General*

CHRISTINE JONES BRADY
*Second Assistant Attorney General*

TERESA BENITEZ-THOMPSON
*Chief of Staff*

LESLIE NINO PIRO
*General Counsel*

HEIDI PARRY STERN
*Solicitor General*

STATE OF NEVADA

OFFICE OF THE ATTORNEY GENERAL

555 E. Washington Ave., Suite 3900
Las Vegas, Nevada 89101

July 19, 2023

Dear Fortune 100 CEOs,

We recently reviewed a letter sent to you by 13 state attorneys general, purporting to remind you of your obligations as an employer under federal and state law to refrain from discriminating on the basis of race. While we agree with our colleagues that "companies that engage in racial discrimination should and will face serious legal consequences," we are focused on actual unlawful discrimination, not the baseless assertion that any attempts to address racial disparity are by their very nature unlawful. We condemn the letter's tone of intimidation, which purposefully seeks to undermine efforts to reduce racial inequities in corporate America. As the chief legal officers of our states, we recognize the many benefits of a diverse population, business community, and workforce, and share a commitment to expanding opportunity for all.

We applaud the Fortune 100 for your collective efforts to address historic inequities, increase workplace diversity, and create inclusive environments.[1] These programs and policies are ethically responsible, good for business, and good for building America's workforce.[2] Importantly, these programs also comply with the spirit and the letter of state and federal law.

The letter you received from the 13 state attorneys general is intended to intimidate you into rolling back the progress many of you have made. We write to reassure you that corporate efforts to recruit diverse workforces and create inclusive work environments are legal and reduce corporate risk for claims of discrimination.[3] In fact, businesses should

---

[1] Cision PR Newswire, "New Data From Deloitte and the Alliance for Board Diversity (ABD) Reveals Continued Focus is Necessary for Fortune 500 Boards to be More Representative of the US Population," June 15, 2023, available at https://www.prnewswire.com/news-releases/new-data-from-deloitte-and-the-alliance-for-board-diversity-abd-reveals-continued-focus-is-necessary-for-fortune-500-boards-to-be-more-representative-of-the-us-population-301851560.html.

[2] Forbes, "Harnessing The Power Of Diversity For Profitability," Mach 3, 2022, available at https://www.forbes.com/sites/forbesbusinesscouncil/2022/03/03/harnessing-the-power-of-diversity-for-profitability/

[3] The U.S. Equal Employment Opportunity Commission advises that to reduce the risk of employment discrimination claims, businesses should, "[r]ecruit, hire, and promote with EEO principles in mind, by implementing practices designed to widen and diversify the pool of candidates considered for employment openings, including openings in upper level management." *See* U.S. Equal Employment Opportunity Commission, *"Best practices for employers and human resources/eeo professionals,"* available at https://www.eeoc.gov/initiatives/e-race/best-practices-employers-and-human-resourceseeo-professionals.

Page 2
July 19, 2023

double-down on diversity-focused programs because there is still much more work to be done.

## I. Corporate Diversity Programs are Lawful and Serve Important Public and Business Purposes.

Many of your companies engage in a wide variety of programs meant to provide opportunities for success for historically underrepresented communities, including women, Black/African Americans, Latinos/Hispanics, Asian Americans and Pacific Islanders, Native Americans, people who identify as LGBTQ+, and others. These programs take on many forms, but all meet important business and workforce needs.

Efforts by private sector employers to foster and support diversity and address racial inequities are even more important in the aftermath of the United States Supreme Court's recent opinion in *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, Case Nos. 20-1199, 21-707 (June 29, 2023) ("*SFFA*"). As recognized in *SFFA*, our nation's history is replete with instances of discrimination against disfavored minorities. And racial inequity is not only a problem of our country's distant past. Justice Thomas acknowledges in *SFFA* that he is "painfully aware of the social and economic ravages which have befallen my race and all who suffer discrimination[.]" *SFFA*, slip op. at 58 (Thomas, J., concurring). Justice Kavanaugh underscores that "racial discrimination still occurs and the effects of past racial discrimination still persist." *Id.* at 8 (Kavanaugh, J., concurring). Justice Jackson details historical and current racial disparities, emphasizing that "[g]ulf-sized race-based gaps exist with respect to the health, wealth, and well-being of American citizens. They were created in the distant past but have indisputably been passed down to the present day through the generations." *Id.* at 1 (Jackson, J., dissenting). Racial inequity is sadly both a problem from our nation's distant past and, as the above Justices recognize, a persistent problem today.

To be clear, *SFFA* does not directly address or govern the behavior or the initiatives of private sector businesses. *SFFA* held that two universities' admissions systems, which the Court characterized as "race-based," violated the Equal Protection Clause and Title VI of the Civil Rights Act of 1964, 42 U.S.C. sec. 2000d et seq. *SFFA*, slip op. at 8, 21. Private sector employers continue to be subject to the requirements of Title VII of the Civil Rights Act of 1964, 42 U.S.C. sec. 2000e et seq., and 42 U.S.C. sec. 1981, as they always have been.[4] It is irresponsible and misleading to suggest that *SFFA* imposes additional prohibitions on the diversity, equity, and inclusion initiatives of private employers. In fact, following *SFFA*, the U.S. Equal Employment Opportunity Commission issued a statement clarifying that, "[i]t remains lawful for employers to implement diversity, equity, inclusion,

---

[4] Congress, in Title VI, 42 U.S.C. § 2000d-3, ensured that merely receiving federal financial assistance would not incidentally render an employer subject to the commands of Title VI rather than Title VII.

Page 3
July 19, 2023

and accessibility programs that seek to ensure workers of all backgrounds are afforded equal opportunity in the workplace."[5]

**A.      Diversity, Equity, and Inclusion Efforts Remain Vital to the Well-being of Our Society, both Socially and Economically.**

As state attorneys general, we are responsible for protecting the well-being of our residents, especially those who face inequitable treatment and discrimination. Promoting diversity, equity, and inclusion is thus a top priority in our states. We also recognize that, for private sector employers, diversity is an important, legitimate, and valid business interest, as well established by decades of research.[6] Affirmative efforts by private sector businesses to diversify their workforces remain vital both morally—to address past and present discrimination—and economically—to achieve a healthy economy and productive workforce.

"[S]egregation by race was declared unconstitutional almost a century ago, but its vestiges remain . . . intertwined with the country's economic and social life." *Texas Dep't of Housing & Community Affairs v. Inclusive Communities Project, Inc.,* 576 U.S. 519, 528 (2015). As Justice Jackson explains in her dissent in *SFFA,* "[a]lthough formal race-linked legal barriers are gone, race still matters to the lived experiences of all Americans in innumerable ways." *SFFA,* slip op. at 25 (Jackson, J., dissenting). Indeed, race and racism continue to play a role in exacerbating inequities in health, housing, employment and business, and other areas of life.

Diversity initiatives in the workplace help combat these inequities. As a result of these efforts, corporate America has grown more diverse and more representative of American society. The economies of our states have likewise benefited from diversity and inclusion, as workers share their diverse beliefs, experiences, and ideas, becoming better informed, more creative, and ultimately, more productive. Diversity initiatives raise awareness of the value of collaborating with people of different cultures, backgrounds, perspectives, experiences, races, and ethnicities. They build diverse teams and a workforce that understands its customers—a business imperative. Companies' efforts to foster diversity in the workplace also help to expand markets and attract diverse talent to our states. Now more than ever, private sector employers play a crucial role in establishing and maintaining the societal and economic benefits of diversity. These are critically important business interests that help our economies thrive.

---

[5] U.S. Equal Employment Opportunity Commission, "Statement from EEOC Chair Charlotte A. Burrows on Supreme Court Ruling on College Affirmative Action Programs," June 29, 2023, available at https://www.eeoc.gov/newsroom/statement-eeoc-chair-charlotte-burrows-supreme-court-ruling-college-affirmative-action.

[6] *See, e.g, Global Parity Alliance: Diversity, Equity and Inclusion Lighthouses 2023,* World Economic Forum, https://www3.weforum.org/docs/WEF_Global_Parity_Alliance_2023.pdf.

Page 4
July 19, 2023

**B.**     ***SFFA* Does Not Prohibit, or Even Impose New Limits on, the Ability of Private Employers to Pursue Diversity, Equity, and Inclusion Initiatives.**

Properly read, *SFFA* provides no basis to conclude that a company's efforts to reach and recruit from a broad and diverse applicant pool is now prohibited. Private companies remain free to expand access to employment and contracting opportunities, subject to the same limitations under Title VII and Section 1981 that have applied to them for over half a century.

Leading companies have long set diversity-related goals and operated successful and lawful diversity, equity, and inclusion programs under the guidance of Title VII. Properly formulated and administered programs are not unconstitutional. *See, e.g., Iadimarco v. Runyon*, 190 F.3d 151, 164 (3d Cir. 1999) (finding that a memo outlining diversity goals is not prima facie evidence of discrimination and recognizing that "[a]n employer has every right to be concerned with the diversity of its workforce, and the work environment"); *Reed v. Agilent Techs, Inc.*, 174 F. Supp. 2d 176, 185-86 (D. Del. 2001) (rejecting plaintiff's contention that the defendant company's diversity policy was prima facie evidence of discrimination and stating that "evidence regarding the aspirational purpose of an employer's diversity policy, and its intent to ameliorate any underutilization of certain groups, is not sufficient" to establish a violation of Title VII). Private sector employers should continue to be aware of the demographics of their workforce and their contracting partners, and make efforts to recruit, attract, and retain diverse workforces, consistent with the strictures of Title VII and Section 1981.

**C.     Private Employers Retain Many Tools to Continue the Important Work of Diversifying Their Workforces.**

Irrespective of *SFFA*, hiring decisions made on the basis of race are prohibited under Title VII and have been for decades. Of course, consistent with Title VII, private employers can, should — and in some circumstances, *must* — identify arbitrary and unnecessary barriers to diversity, equity, and inclusion in the workplace and develop solutions to address those issues. Removing barriers does not constitute an act of racial discrimination. Companies remain free to remedy historic inequities by: (a) adjusting recruiting practices, (b) developing better retention and promotion strategies, and/or (c) furthering leadership development and accountability. Companies need not don a veil of ignorance and pretend that racial inequities do not exist.

No organization should hire an employee solely based on the individual's race. Private sector employers can and should, however, identify problems that have created racial and other disparities in the past and develop solutions to address them. Likewise, businesses can, consistent with the law, identify barriers to advancement in the employment and contracting pipelines and adjust recruiting, retention, and leadership accordingly. Such efforts are not only legal but constitute an appropriate moral and ethical response to the ongoing problem of racial inequity in our society. In short, businesses can

Page 5
July 19, 2023

improve their own bottom line and the experiences of their employees through mentoring, training, and leadership programs that include diversity, equity, and inclusion as goals. Such race-neutral programs—that improve outcomes for all—do not run afoul of the law.

In pursuing diversity efforts, we encourage businesses not to ignore the specific challenges that Black workers have faced and continue to face as the result of decades of past discrimination in many industries. Given that reality, race-neutral inclusion efforts are not properly characterized as improper "racial quotas" merely because they may lead to some benefit for Black workers. *SFFA* acknowledges that our society has a compelling interest in "remediating specific, identified instances of past discrimination that violated the Constitution or a statute." *SFFA*, slip op. at 15. Decades of discrimination in the labor market, as well as in other areas of society, have led to a massive and persistent racial wealth gap between Black and white Americans, one that remains roughly the same today as it was two years before the Civil Rights Act was passed in 1964. *See* Fed. Reserve Bank of Cleveland, "What is Behind the Persistence of the Racial Wealth Gap?" (Feb. 28, 2019).[7] Given this large and persistent wealth and income gap, race-neutral efforts to address industry barriers are likely to enhance diversity, particularly among those who have been most marginalized in the past.

### D.        Improving Diversity Makes Good Business Sense.

The diversity efforts of private sector employers remain vital to a healthy economy and productive workforce. *See, e.g,* "The Other Diversity Dividend," Harvard Business Review, July–August 2018; "Why Diverse Teams Are Smarter," Harvard Business Review, November 4, 2016; "Diverse Teams Feel Less Comfortable–and That's Why They Perform Better," Harvard Business Review, September 22, 2016. Diverse teams are not just for appearances; they make bottom-line sense for businesses. In the venture-capital world, for example, research shows that "[d]iversity significantly improves financial performance on measures such as profitable investments at the individual portfolio-company level and overall fund returns." *See id.,* "The Other Diversity Dividend."

Efforts to improve diversity, equity and inclusion have been found to further important business objectives. For instance, JPMorgan Chase found that its intern pool became more diverse after it adopted the race-neutral approach of recruiting from a larger pool of schools. The bank found that diversity was a welcome benefit of focusing recruitment on "skills . . . previous experiences . . . [and] ability to articulate . . . competencies for the role, rather than . . . assuming them based upon the school" intern candidates attended. Hugh Son, "How JPMorgan Increased the Number of Black Interns in Its Wall Street Program by Nearly Two-Thirds", CNBC, (April 9, 2021) (quoting Rob Walke, global head of campus recruiting).[8] In short, JP Morgan Chase found that using race-neutral, relevant

---

[7] Available at https://www.clevelandfed.org/newsroom-and-events/publications/economiccommentary/2019-economic-commentaries/ec-201903-what-is-behind-the-persistence-of-the-racialwealth-gap.aspx.

[8] CNBC, "How JPMorgan increased the number of Black interns in its Wall Street program by nearly two-thirds," April 9, 2021, available at https://www.cnbc.com/2021/04/09/jpmorgan-increased-the-number-of-black-interns-in-its-wall-street-program-by-nearly-two-thirds.html.

Page 6
July 19, 2023

criteria to recruit interns led to a remarkable increase in the percentage of Black and female interns selected.

## II.    Hollow Claims of Unlawful Discrimination Against White People at Fortune 100 Companies Do Not Change the Fact that Women and People of Color Continue to Face Barriers in the Workplace.

The July 13th letter claims that the existence of a few scattered articles evidences "commonplace," "overt," and "pervasive" discrimination by Fortune 100 companies against white people. We urge you not to allow these false claims to prevent you from continuing in your lawful efforts to foster diversity. The letter's attempts to equate these permissible diversity efforts with impermissible hiring quotas is a clear effort to block opportunities for women and people of color—especially Black people. Aspirational diversity goals and concerted recruitment efforts to increase the diversity of a company's workforce are not hiring quotas, which were already unlawful under Title VII of the Civil Rights Act of 1964, well before *SFFA*.

Since this nation's inception, racism has been a part of our policies, our institutions, and our communities—and businesses are no exception. Racial preferences are pervasive in both businesses and boardrooms, preferences that unequivocally and overwhelmingly favor white people, particularly white men. A 2021 Washington Post analysis of 50 of the world's most valuable companies revealed that only 8 percent had Black C-suite executives.[9] A 2023 Harvard Law School study analyzing 1,500+ executives at the 100 largest companies in the S&P 500 showed that only 23% of the C-Suite were Asian, Black, Hispanic, or Latino.[10] For too long, employment and leadership opportunities at many of your companies were reserved for white men. White men continue to dominate leadership roles in Fortune 100 companies. A 2022 report on the diversity of CEOs at Fortune 100 Companies found that only 12% were women, despite women representing more than 50% of the population of the United States; and only 14% were not white, despite more than 40% of the U.S. comprising of individuals who are not white.[11] Only 3% were Black, despite representing 14% of the U.S. population.

The impact this disparity has on women and communities of color cannot be overstated. A 2020 survey indicates that about 1 in 4 Black (24%) and Hispanic employees

---

[9] The Washington Post, "The striking race gap in corporate America," December 15, 2021, available at,  https://www.washingtonpost.com/business/interactive/2021/black-executives-american-companies/.

[10] Harvard Law School Forum on Corporate Governance, "How To Fix The C-suite Diversity Problem," February 23, 2023, available at https://corpgov.law.harvard.edu/2023/02/25/how-to-fix-the-c-suite-diversity-problem/#:~:text=The%20headline%20finding%20is%20that,in%20most%20C%2Dsuite%20positions.

[11] Cision PR Newswire, "Diversity Stagnant Among Fortune 100 Leaders Despite Belief That DE&I Is a Key Contributor to Business Success, Reveals Heidrick & Struggles' Route to the Top 2022," November 17, 2022, available at Reporthttps://www.prnewswire.com/news-releases/diversity-stagnant-among-fortune-100-leaders-despite-belief-that-dei-is-a-key-contributor-to-business-success-reveals-heidrick--struggles-route-to-the-top-2022-report-301681143.html.

Page 7
July 19, 2023

(24%) in the U.S. report having been discriminated against at work in the past year.[12]
Furthermore, 75% of the Black workers who reported being discriminated against indicated
the discrimination they experienced was based on their race or ethnicity.

### III.    The July 13th Letter Is an Attempt to Intimidate the Businesses and Workers of America—And We Will Fight Back.

The July 13th letter is disguised as providing information regarding anti-
discrimination law, but it in fact takes direct aim at efforts to broaden recruitment and
address inequities meant to break down historic barriers—efforts that are consistent with
controlling law. While the letter asks you to adhere to "race-neutral principles in your
employment and contracting practices," the only employment and contracting practices the
letter expresses concern about are those that advance opportunity for people of color. The
very fact that many of your companies have expressed support for ending historic
disparities through providing opportunities for people of color offends the authors of the
July 13th letter. And, the 13 attorneys general reserve their greatest offense for the
programs that provide opportunities for Black people.[13] We find this alarming, coming
from state attorneys general who should be champions of civil rights and racial progress.

Rest assured that we are committed to fighting against discrimination and to
expanding opportunities for all. We will vigorously oppose any attempts to intimidate or
harass businesses who engage in vital efforts to advance diversity and expand opportunities
for the nation's workforce.

Sincerely,

AARON D. FORD
*Attorney General*
*State of Nevada*

---

[12] Gallup, "One in Four Black Workers Report Discrimination at Work," January 12, 2021, available
at https://news.gallup.com/poll/328394/one-four-black-workers-report-discrimination-work.aspx.

[13] The attorneys general cite news reports that raise such alarm for them, which include the titles,
"Corporate America Looks to Hire More Black People" and "How JPMorgan Increased the Number of Black
Interns in Its Wall Street Program by Nearly Two-Thirds"; additionally, they call out Microsoft's program to
increase the number of Black-owned approved suppliers.

ER-258

Page 8
July 19, 2023

**KRIS MAYES**
*Attorney General*
*State of Arizona*

**ROB BONTA**
*Attorney General*
*State of California*

**PHILIP J. WEISER**
*Attorney General*
*State of Colorado*

**WILLIAM TONG**
*Attorney General*
*State of Connecticut*

**KATHY JENNINGS**
*Attorney General*
*State of Delaware*

**BRIAN SCHWALB**
*Attorney General*
*District of Columbia*

**ANNE LOPEZ**
*Attorney General*
*State of Hawai'i*

**KWAME RAOUL**
*Attorney General*
*State of Illinois*

Page 9
July 19, 2023

**AARON M. FREY**
*Attorney General*
*State of Maine*

**ANTHONY BROWN**
*Attorney General*
*State of Maryland*

**ANDREA CAMPBELL**
*Attorney General*
*State of Massachusetts*

**DANA NESSEL**
*Attorney General*
*State of Michigan*

**KEITH ELLISON**
*Attorney General*
*State of Minnesota*

**MATT PLATKIN**
*Attorney General*
*State of New Jersey*

**RAÚL TORREZ**
*Attorney General*
*State of New Mexico*

**LETITIA JAMES**
*Attorney General*
*State of New York*

Page 10
July 19, 2023

**ELLEN ROSENBLUM**
*Attorney General*
*State of Oregon*

**PETER NERONHA**
*Attorney General*
*State of Rhode Island*

**CHARITY CLARK**
*Attorney General*
*State of Vermont*

**BOB FERGUSON**
*Attorney General*
*State of Washington*