No. 24-880

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CENTER FOR INVESTIGATIVE REPORTING and WILL EVANS

*Plaintiffs-Appellees,*

v.

UNITED STATES DEPARTMENT OF LABOR

*Defendant-Appellant.*

On Appeal from the United States District Court for the Northern District of California, Case No. 22-cv-07182-WHA, Honorable William Alsup, Presiding

## SUPPLEMENTAL EXCERPTS OF RECORD
## VOLUME 1 OF 4

D. VICTORIA BARANETSKY
THE CENTER FOR
INVESTIGATIVE REPORTING
222 Sutter St., Ste. 200
San Francisco, CA 91608
Telephone:  (510) 982-2890
vbaranetsky@revealnews.org

THERESE Y. CANNATA
AARON R. FIELD
ZACHARY COLBETH
CANNATA, O'TOOLE & OLSON LLP
100 Pine Street, Suite 350
San Francisco, CA 94111
Telephone:  (415) 409-8900
tcannata@cofolaw.com
afield@cofolaw.com
zcolbeth@cofolaw.com

*Attorney for Plaintiff-Appellee
The Center for Investigative
Reporting*

*Attorneys for Plaintiffs-Appellees
The Center for Investigative
Reporting and Will Evans*

1  ISMAIL J. RAMSEY (CABN 189820)
United States Attorney
2  MICHELLE LO (NYRN 4325163)
Chief, Civil Division
3  PAMELA T. JOHANN (CABN 145558)
Assistant United States Attorney
4
      450 Golden Gate Avenue, Box 36045
5      San Francisco, California 94102
      Telephone: (415) 436-7025
6      Facsimile: (415) 436-7234
      pamela.johann@usdoj.gov
7
Attorneys for Defendant UNITED STATES
8  DEPARTMENT OF LABOR

D. VICTORIA BARANETSKY (SBN 311892)
THE CENTER FOR INVESTIGATIVE
REPORTING
      1400 65th Street, Suite 200
      Emeryville, CA 94608
      Telephone: (510) 982-2890
      Facsimile: (510) 849-6141
      Email: vbaranetsky@revealnews.org

Attorney for Plaintiff THE CENTER FOR
INVESTIGATIVE REPORTING

THERESE Y. CANNATA (SBN 88032)
AARON R. FIELD (SBN 310648)
ZACHARY E. COLBETH (SBN 297419)
CANNATA O'TOOLE & OLSON LLP
      100 Pine Street, Suite 350
      San Francisco, CA 94111
      Telephone: (415) 409-8900
      Facsimile: (415) 409-8904
      Email: tcannata@cofolaw.com
             afield@cofolaw.com
             zcolbeth@cofolaw.com

Attorneys for Plaintiffs
THE CENTER FOR INVESTIGATIVE
REPORTING and WILL EVANS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| THE CENTER FOR INVESTIGATIVE REPORTING and WILL EVANS,<br><br>    Plaintiffs,<br><br>  v.<br><br>UNITED STATES DEPARTMENT OF LABOR,<br><br>    Defendant. | Case No. 22-cv-07182-WHA<br><br>**JOINT STATEMENT IN RESPONSE TO COURT'S MARCH 19, 2024 ORDER (DKT. NO. 66)** |

Pursuant to the Court's Order dated March 19, 2024, Dkt. No. 66, the parties submit this Joint

Statement.

JOINT STATEMENT
No. 22-cv-07182-WHA                                            1

1          The parties respectfully submit that the Court's December 22, 2023 Order requiring the

2    Department of Labor ("DOL") to release EEO-1 reports under the Freedom of Information Act

3    ("FOIA") is immediately appealable as either a final order under 28 U.S.C. § 1291 or as an order

4    granting an injunction under 28 U.S.C. § 1292(a)(1).  *See In re Steele*, 799 F.2d 461, 465 (9th Cir. 1986)

5    ("A disclosure order in a FOIA suit is injunctive in nature" and therefore appealable under 28 U.S.C.

6    § 1292(a)(1) even if interlocutory); *ACLU v. United States Dep't of Justice*, 880 F.3d 473, 480 n.3 (9th

7    Cir. 2018) (order granting partial summary judgment to plaintiff in FOIA case is appealable under

8    Section 1291; a "'final decision' in a FOIA case [is] 'an order by the District Court requiring release of

9    documents by the Government to the plaintiff, or order denying the plaintiff's right to such release'"

10   (quoting *In re Steele*, 799 F.2d 461, 464 (9th Cir. 1986)).  In *ACLU*, the district court bifurcated the

11   FOIA request for summary judgment purposes, and the partial cross-motions for summary judgment

12   addressed only part of the request.  800 F.3d at 481 n.5.  Despite this bifurcation and the fact that part

13   of the case remained to be adjudicated by the district court, the Ninth Circuit held that it had jurisdiction

14   pursuant to 28 U.S.C. § 1291 over the government's appeal of the district court's grant of partial

15   summary judgment ordering disclosure under FOIA.

16          Accordingly, DOL's pending appeal can proceed without the need for this Court to enter final

17   judgment or to certify appeal pursuant to 28 U.S.C. § 1292(b).

18          Regarding the 621 contractors' EEO-1 reports referenced in the Court's March 19, 2024 Order,

19   Dkt. No. 66, the parties continue to disagree about whether these reports are "agency records" within the

20   meaning of FOIA.  The parties also disagree about whether the pending appeal divests this Court of

21   jurisdiction over this issue.  At this time, the parties have agreed and respectfully request that, to the

22   extent necessary, further proceedings in this Court concerning those 621 contractors' EEO-1 reports be

23   stayed until after the issuance of the Ninth Circuit's mandate in the pending appeal.[1]

24

25

26

27

28

---

[1] This stipulation is limited to the EEO-1 reports of the 621 contractors.

1 DATED:  March 26, 2024                 Respectfully submitted,

2                                        ISMAIL J. RAMSEY
                                         United States Attorney
3
                                         */s/ Pamela T. Johann*
4                                        PAMELA T. JOHANN
                                         Assistant United States Attorney
5
                                         Attorneys for Defendant
6

7 DATED:  March 26, 2024                 CANNATA O'TOOLE & OLSON

8                                        */s/ Aaron Field*
                                         AARON FIELD
9
                                         Attorneys for Plaintiffs
10

11                             **ATTESTATION**

12       I, Pamela T. Johann, hereby attest under penalty of perjury that in compliance with Civil Local

13  Rule 5-1(i)(3), I have obtained the concurrence in the filing of this document from counsel for Plaintiffs.

14                                       */s/ Pamela T. Johann*
                                         PAMELA T. JOHANN
15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT STATEMENT
No. 22-cv-07182-WHA                        3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CENTER FOR INVESTIGATIVE
REPORTING, et al.,

        Plaintiffs,

   v.

UNITED STATES DEPARTMENT OF
LABOR,

        Defendant.

No. 20-cv-07182-WHA

**ORDER TO FILE A JOINT
STATEMENT BY MARCH 26, 2024,
AT NOON**

We have the following problem. Although the Court ordered the agency to release the EEO-1 reports under FOIA and although the agency wishes to take an appeal therefrom, no final judgment has been entered by reason of the unresolved issue of whether the agency must also disclose an additional 621 EEO-1 reports that plaintiffs allege were incorrectly withheld (Dkt. No. 51 at 12).

Counsel have seemingly ignored this problem. The Court has two possible solutions. *First*, the parties could stipulate to resolve the 621 EEO-1 reports and thereby allow final judgment to be entered. *Alternatively,* the government can request permission to appeal pursuant to 28 U.S.C. § 1292(b). Possibly there are other solutions, and the Court pleads with counsel to be of assistance to the Court and solve this problem.

By **MARCH 26, 2024, AT NOON**, counsel shall file a joint statement setting forth a preferred course of action.

**IT IS SO ORDERED.**

Dated: March 19, 2024.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
Northern District of California

D. VICTORIA BARANETSKY (SBN 311892)
THE CENTER FOR INVESTIGATIVE REPORTING
1400 65th Street, Suite 200
Emeryville, CA 94608
Telephone:      (510) 982-2890
Facsimile:      (510) 849-6141
Email:          vbaranetsky@revealnews.org

Attorney for Plaintiff
THE CENTER FOR INVESTIGATIVE
REPORTING

THERESE Y. CANNATA (SBN 88032)
AARON R. FIELD (SBN 310648)
ZACHARY E. COLBETH (SBN 297419)
CANNATA O'TOOLE & OLSON LLP
100 Pine Street, Suite 350
San Francisco, CA 94111
Telephone:      (415) 409-8900
Facsimile:      (415) 409-8904
Email:          tcannata@cofolaw.com
                afield@cofolaw.com
                zcolbeth@cofolaw.com

Attorneys for Plaintiffs
THE CENTER FOR INVESTIGATIVE
REPORTING and WILL EVANS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO

| | |
|---|---|
| THE CENTER FOR INVESTIGATIVE REPORTING and WILL EVANS,<br><br>        Plaintiffs,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF LABOR,<br><br>        Defendant. | Case No. 3:22-cv-07182-WHA<br><br>**NOTICE OF ERRATA RE: DECLARATION OF AARON R. FIELD IN SUPPORT OF PLAINTIFFS' OPPOSITION TO EMERGENCY MOTION FOR STAY OF DISCLOSURE DEADLINE PENDING APPEAL BY DEPARTMENT OF LABOR** |

1    TO THE COURT, ALL PARTIES, AND ALL COUNSEL OF RECORD:

2         PLEASE TAKE NOTICE that the Declaration of Aaron R. Field in Support of Plaintiffs'

3    Opposition to Emergency Motion for Stay of Disclosure Deadline filed earlier today inadvertently

4    did not include the intended Ninth Circuit order as Exhibit A. A corrected version of the

5    Declaration that includes the intended Ninth Circuit order as Exhibit A is attached hereto as

6    **Attachment A**.

7    DATED: February 23, 2024          Respectfully submitted,

8                                       By:    */s/ Aaron R. Field*

9                                       THERESE Y. CANNATA (SBN 88032)
10                                      AARON R. FIELD (SBN 310648)
                                        ZACHARY E. COLBETH (SBN 297419)
11                                      CANNATA O'TOOLE & OLSON LLP
                                        100 Pine Street, Suite 350
12                                      San Francisco, CA 94111
                                        Telephone:      (415) 409-8900
13                                      Facsimile:      (415) 409-8904
                                        Email:          tcannata@cofolaw.com
14                                                      afield@cofolaw.com
                                                        zcolbeth@cofolaw.com
15
                                        Attorneys for Plaintiffs
16                                      THE CENTER FOR INVESTIGATIVE REPORTING
                                        and WILL EVANS
17

18

19

20

21

22

23

24

25

26

27

28

1

NOTICE OF ERRATA RE: DECLARATION OF AARON R. FIELD IN SUPPORT OF PLAINTIFFS'
OPPOSITION TO EMERGENCY MOTION FOR STAY OF DISCLOSURE DEADLINE
Case No. 3:22-cv-07182-WHA

SER-7

# ATTACHMENT A

1    D. VICTORIA BARANETSKY (SBN 311892)
THE CENTER FOR INVESTIGATIVE REPORTING
2    1400 65th Street, Suite 200
Emeryville, CA 94608
3    Telephone:    (510) 982-2890
Facsimile:    (510) 849-6141
4    Email:       vbaranetsky@revealnews.org

5    Attorney for Plaintiff
THE CENTER FOR INVESTIGATIVE
6    REPORTING

7    THERESE Y. CANNATA (SBN 88032)
AARON R. FIELD (SBN 310648)
8    ZACHARY E. COLBETH (SBN 297419)
CANNATA O'TOOLE & OLSON LLP
9    100 Pine Street, Suite 350
San Francisco, CA 94111
10    Telephone:    (415) 409-8900
Facsimile:    (415) 409-8904
11    Email:       tcannata@cofolaw.com
afield@cofolaw.com
12               zcolbeth@cofolaw.com

13    Attorneys for Plaintiffs
THE CENTER FOR INVESTIGATIVE
14    REPORTING and WILL EVANS

15

16                      UNITED STATES DISTRICT COURT

17                 NORTHERN DISTRICT OF CALIFORNIA

18                        SAN FRANCISCO

19

20    THE CENTER FOR INVESTIGATIVE        Case No. 3:22-cv-07182-WHA
REPORTING and WILL EVANS,
21                           **CORRECTED DECLARATION OF**
           Plaintiffs,           **AARON R. FIELD IN SUPPORT OF**
22                           **PLAINTIFFS' OPPOSITION TO**
      v.                   **EMERGENCY MOTION FOR STAY OF**
23                           **DISCLOSURE DEADLINE PENDING**
UNITED STATES DEPARTMENT OF        **APPEAL BY DEPARTMENT OF LABOR**
24    LABOR,

25            Defendant.

26

27

28

I, AARON R. FIELD, declare:

1.    I am a member in good standing of the State Bar of California, a Partner at the law firm Cannata O'Toole & Olson LLP, and counsel for plaintiffs The Center for Investigative Reporting and Will Evans in this matter.  I make this declaration of my own personal knowledge, and, if called as a witness, I could testify to the facts stated herein.

2.    As a courtesy and for the Court's ease of reference, attached hereto as **Exhibit A** is a true and correct copy of an October 21, 2009 order issued by the United States Court of Appeals for the Ninth Circuit on a motion for stay pending appeal by the appellants in *Electronic Frontier Foundation v. Office of the Director of National Intelligence, et al.*, No. 09-17235 (9th Cir. Oct. 21, 2009).  I obtained this copy of the Order from the federal PACER electronic records access system.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 23rd day of February, 2024 at San Francisco, California.


*/s/ Aaron R. Field*
AARON R. FIELD

CORRECTED DECLARATION OF AARON R. FIELD IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
EMERGENCY MOTION FOR STAY OF DISCLOSURE DEADLINE
Case No. 3:22-cv-07182-WHA

# EXHIBIT A

FILED

UNITED STATES COURT OF APPEALS

OCT 21 2009

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| ELECTRONIC FRONTIER FOUNDATION,<br><br>                Plaintiff - Appellee,<br><br>   v.<br><br>OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE; et al.,<br><br>                Defendants - Appellants. | No. 09-17235<br><br>D.C. Nos. 3:08-cv-01023-JSW<br>             3:08-cv-02997-JSW<br>Northern District of California,<br>San Francisco<br><br><br>ORDER |

Before:  TROTT, W. FLETCHER and RAWLINSON, Circuit Judges.

Appellants' motion for a stay pending appeal of the district court's order for disclosure of documents is granted with respect to the two categories of documents the Solicitor General has indicated she has already decided to appeal.

Appellants' motion for stay with respect to the remaining categories of documents is granted until November 9, 2009.  Appellants shall inform the court on or before November 9, 2009 whether the Solicitor General intends to pursue the appeal with respect to these categories of documents.  If the Solicitor General decides to appeal as to these categories of documents, appellants may, on or before November 9, 2009, renew their motion for stay pending appeal with respect to

AT/MOATT

these categories of documents.  If appellants renew the motion for stay, the stay

will be temporarily extended pending the court's decision on that motion for stay

pending appeal.

The court *sua sponte* expedites the briefing and calendaring of this appeal.

The opening brief is due November 16, 2009; the answering brief is due December

7, 2009; and the optional reply brief is due December 14, 2009.  No extensions of

time shall be granted absent extraordinary circumstances.

This case shall be heard the week of January 11, 2010 in San Francisco,

California, at a date to be specified as soon as practicable.

AT/MOATT                                    2                                    09-17235

D. VICTORIA BARANETSKY (SBN 311892)
THE CENTER FOR INVESTIGATIVE REPORTING
1400 65th Street, Suite 200
Emeryville, CA 94608
Telephone:     (510) 982-2890
Facsimile:     (510) 849-6141
Email:         vbaranetsky@revealnews.org

Attorney for Plaintiff
THE CENTER FOR INVESTIGATIVE
REPORTING

THERESE Y. CANNATA (SBN 88032)
AARON R. FIELD (SBN 310648)
ZACHARY E. COLBETH (SBN 297419)
CANNATA O'TOOLE & OLSON LLP
100 Pine Street, Suite 350
San Francisco, CA 94111
Telephone:     (415) 409-8900
Facsimile:     (415) 409-8904
Email:         tcannata@cofolaw.com
               afield@cofolaw.com
               zcolbeth@cofolaw.com

Attorneys for Plaintiffs
THE CENTER FOR INVESTIGATIVE
REPORTING and WILL EVANS

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO

| | |
|---|---|
| THE CENTER FOR INVESTIGATIVE REPORTING and WILL EVANS,<br><br>        Plaintiffs,<br><br>   v.<br><br>UNITED STATES DEPARTMENT OF LABOR,<br><br>        Defendant. | Case No. 3:22-cv-07182-WHA<br><br>**PLAINTIFFS' OPPOSITION TO EMERGENCY MOTION FOR STAY OF DISCLOSURE DEADLINE PENDING APPEAL BY DEPARTMENT OF LABOR** |

## I.    INTRODUCTION

In DOL's "emergency"[1] motion for stay pending appeal, DOL asks the Court to further delay DOL's deadline to disclose the EEO-1 reports at issue in this case "for the duration of" its recent appeal, *see* Dkt. No. 57, even though DOL has already improperly delayed the disclosure of these records for years. Dkt. No. 58 at 5:27-28. The Court should decline. If it does not, at a minimum, the Court should press DOJ to state whether it agrees to expedited appeal, if DOJ intends to pursue those claims. *See infra* at Section II.D.

Given DOL's history of <u>repeated delays</u> in this case, DOL's request for a further delay now is particularly problematic. As plaintiffs explained in their opening brief, "DOL's delays [throughout this case] were intentional, persistent, and extreme. CIR made its initial request in 2019. . . . DOL has since delayed at every juncture." Dkt. No. 39 at 24:13-14. Repeated delays are often met with consequences in FOIA cases. *See, e.g.*, *Ecological Rts. Found. v. FEMA*, No. 16-CV-05254-MEJ, 2017 WL 5972702, at *10 (N.D. Cal. Nov. 30, 2017) (granting declaratory relief where agency repeatedly failed to comply with FOIA's timelines). While this Court found that declaratory judgment was not appropriate here, it acknowledged DOL's repeated delays. *See* Dkt. No. 51 at 12:5-7. (". . . this order finds that defendant did not provide plaintiffs with a timely determination following the first FOIA request. For the same reason, this order finds that defendant did not provide timely determinations for the second and third FOIA requests."). Yet again, DOJ asks for delay, where timeliness is of the utmost importance.

Further, prompt access is especially important and often essential in newsgathering cases to ensure that records reach the public in time to be useful. As the Ninth Circuit recently reaffirmed, "The newsworthiness of a particular story is often fleeting. To delay or postpone disclosure undermines the benefit of public scrutiny and may have the same

---

[1] DOL's so-called "emergency" motion was necessitated by its own delays. In an Order dated December 22, 2023, the Court denied in part and granted in part the parties' cross-motions for summary judgment. Dkt. No. 51. The Court ordered DOL to "produce the remaining EEO-1 reports at issue within 28 days" of the Order. Dkt. No. 51 at 13. The parties then stipulated, and the Court ordered, to extend that deadline until February 20, 2024, the same day as DOL's deadline to appeal. Dkt. No. 53. On February 15, 2025, DOL filed a notice of appeal. Dkt. No. 57. That same day, late in the evening and just five days before its disclosure deadline, DOL filed this "emergency" motion. Dkt. No. 58.

result as complete suppression." *Courthouse News Serv. v. Planet*, 947 F.3d 581, 594 (9th Cir. 2020) (citation and quotation marks omitted); *see also Children's Earth Found. v. Nat'l Marine Fisheries Serv.*, 85 F. Supp. 3d 1074, 1090 (N.D. Cal. 2015) (Congress recognized when enacting FOIA that "excessive delay . . . is often tantamount to denial") (citation and quotation marks omitted).

Here, given DOL's repeated delays over several years (contrary to FOIA) [2] and the public interest in EEO-1 reports, *see* Dkt. No. 39-3 ¶¶ 7-23, and the fact that DOL's contention that EEO-1 reports are not "commercial" under Exemption 4 lacks merit as two judges have now recognized,[3] DOL's motion should be denied. In the alternative, if this Court is inclined order a stay, plaintiffs respectfully request that it do so consistent with Section II.D, *infra*.

## II.    ARGUMENT

### A.    LEGAL STANDARD

As a legal matter, DOL is not entitled to a stay because it has not demonstrated that a stay is warranted under the four-factor test in *Hilton v. Braunskill*, 481 U.S. 770, 778 (1987). This test turns on (1) whether the movant has made a strong showing that it is likely to succeed on the merits; (2) whether the movant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. *Id.*; *Elec. Frontier Found. v. Off. of Dir. of Nat. Intel.*, No. C 08-01023 JSW, 2009 WL 3297195, at *1-3 (N.D. Cal. Oct. 13, 2009).[4] In ruling on a motion for a stay pending appeal, courts employ " 'two interrelated legal tests' that 'represent the outer reaches of a single continuum.' " *Golden Gate Rest. Ass'n v. City and County of San Francisco*, 512 F.3d 1112, 1115 (9th Cir. 2008) (citing Lopez v. Heckler, 713 F.2d 1432, 1435 (9th Cir. 1983)). "At one end of the continuum, the moving party is required to show both a probability of success on the merits and

---

[2] The Court found some of DOL's pre-lawsuit delays unlawful in its summary judgment Order. *See* Dkt. No. 51 at 12:5-7 (". . . this order finds that defendant did not provide plaintiffs with a timely determination following the first FOIA request. For the same reason, this order finds that defendant did not provide timely determinations for the second and third FOIA requests.").

[3] *See* Dkt. No. 51 at 5:3-8:25; *Ctr. for Investigative Reporting v. Dep't of Lab.* ("*CIR I*"), 424 F. Supp. 3d 771 (N.D. Cal. 2019)

[4] Without directly addressing the district court's decision, the Ninth Circuit thereafter granted a stay pending appeal itself, even though the district court had declined to do so, but concurrently expedited the proceedings and directed the agency to confirm whether it intended to pursue appellate relief as to certain issues. *See* Declaration of Aaron R. Field in Support of Opposition to Stay ("Field Decl."), Ex. A (October 21, 2009 Order in *Elec. Frontier Found. v. ODNI*, No. 09-17235 (9th Cir.)).

the possibility of irreparable injury." *Lopez*, 713 F.2d at 1435. "At the other end of the continuum, the moving party must demonstrate that serious legal questions are raised and that the balance of hardships tips sharply in its favor." *Id.*

Additionally, in any argument related to FOIA's exemptions must account for the rule that the exemptions should be construed narrowly. *A.C.L.U. v. U.S. D.O.J.*, 880 F.3d 473, 482-83 (9th Cir. 2018). DOL bears the burden of proof under FOIA, *id.* at 483, and under the case law that governs its motion. *See Golden Gate Rest. Ass'n*, 512 F.3d at 1115-16 (to obtain a stay pending appeal, "*the moving party is required to show* both a probability of success on the merits and the possibility of irreparable injury" and "*the moving party must demonstrate* that serious legal questions are raised and that the balance of hardships tips sharply in its favor") (emphasis added). DOL has not met this burden.

DOL's contention that "stays are routinely granted in FOIA cases" incorrectly suggests it is automatically entitled to a stay pending appeal, as a matter of course and under the relevant factors, now that it has filed a notice of appeal. Not so. *See Elec. Frontier Found.*, 2009 WL 3297195, at *1-3 (district court order denying motion for stay pending appeal); *but cf. supra* at fn.4 (citing Field Decl., Ex. A). In *EFF*, "[t]he Court reviewed and explicitly rejected defendants'" argument because (1) the agency's "delay in disclosure" militated against a stay; (2) the agency's "contentions that [FOIA's exemptions] barred disclosure of the disputed documents and information" were unfounded; (3) "the Court [had] not [found] that Defendants [had] made a strong showing that they are likely to prevail on the merits of their appeal"; and (4) "the Court finds that the public interest and the balance of hardships squarely favor timely production of the requested documents." Here, the same rationale applies for every single factor.

Two leading cases cited by DOL in which stays pending appeal were granted, *John Doe Agency* and the *Ctr. for Nat'l Sec. Studies*, are plainly distinguishable. They involved law enforcement investigations, one of which related to the extraordinary circumstances involving the 9/11 terrorist attacks. *See John Doe Agency v. John Doe Corp.*, 488 U.S. 1306, 1306-07 (1989) (Marshall, J., in chambers); *Ctr. for Nat'l Sec. Studies v. DOJ*, 217 F. Supp. 2d 58, 58-59 (D.D.C. 2002). They also involved questions of law subject to more reasonable dispute than the question

3

1    at the heart of this case, whether EEO-1 reports are "commercial" under Exemption 4, which has

2    repeatedly been resolved adversely to DOL. And, despite its conclusion that stays pending appeal

3    in FOIA cases are "routine," the district court in *Ctr. For Nat'l Sec. Studies* granted a stay only

4    after explicitly noting the government's agreement to expedited proceedings on appeal.  Neither

5    case suggests that the Court lacks the discretion to decide what course is most appropriate under

6    the *Hilton* factors.  This Court should exercise its discretion in favor of plaintiffs where plaintiffs

7    have waited for years for disclosure of these non-law enforcement records, several courts have

8    permitted for the release of these records, and stays on appeal are not procedurally default.

### C.    THE *HILTON* FACTORS DEMONSTRATE DOL'S MOTION SHOULD BE DENIED

10    Here, the *Hilton* factors confirm that DOL's motion should be denied, or, at least, should

11    only be granted subject to conditions that will accommodate plaintiffs' and the public's interest in

12    access. *See Hilton*, 481 U.S. 770, 776 (1987); *Elec. Frontier Found.*, 2009 WL 3297195 at *1-3.

13    *First*, DOL's motion falls far short of meeting its burden to make a "strong showing" that

14    its appeal is likely to succeed.[5] On the contrary, DOL has not identified any major shortcomings

15    in this Court's reasoning or summary judgment Order, which indicates that its appeal is likely to

16    fail. This is especially likely where the Ninth Circuit already affirmed *CIR I*, though admittedly

17    on procedural grounds, after having been submitted extensive briefing and heard oral argument

18    on the Exemption 4 issues. *CIR I*, 424 F. Supp. 3d at 776-79, *aff'd sub. nom. Evans v. Synopsys,*

19    *Inc.*, 34 F.4th 762, 772 (9th Cir. 2022).

20    DOL's attempts to identify reasoning by the Court that might not hold up on appeal also

21    all miss the mark.

22    DOL contends that the Court's summary judgment Order erred by imposing what it calls

23    "specificity" and " 'competitive impact'  requirements" "on the commerciality analysis, requiring that

24    the information not be simply commercial in nature but that it reveal 'commercially valuable

25    information.' "  Dkt. No. 58 at 4:13-17.  The Court did not impose any such "requirements," however.

26

27    _____

[5] This Court is familiar with plaintiffs' positions on the Exemption 4 issue at the heart of this case
28    and the other issues addressed in its summary judgment Order, so plaintiffs will not restate their
positions exhaustively here. Instead, plaintiffs refer the Court to their summary judgment briefing
and declarations for a more complete presentation on the merits. *See* Dkt. Nos. 39, 39-1, 39-2, 39-
3, 49, 49-1.

Dkt. No. 51 at 6:14-24.  Instead, it carefully and correctly explained, as Dr. Bendick did, that EEO-1 reports are not, given their specific content and the evidence DOL presented in support of nondisclosure, "commercial" under Exemption 4 because, while they may "reveal commercially valuable information 'by proxy,' " they "do not relate operational or financial information in a direct way" as required to place them within the scope of Exemption 4.  Dkt. No. 51 at 6:14-24.

DOL writes that the Court focused on the "format and use of the EEO-1 report" at the expense of the "inherent nature" of the information. Dkt. No. 58 at 4:20-21. That contention is also misplaced. The Court rightly focused its reasoning on the nature of the information in EEO-1 reports, appropriately accounting for the relationship between that information and the operations and finances of the companies that submitted it. *See, e.g.*, Dkt. No. 51 at 6:14-24.

DOL states that "the Court dismissed the argument that diversity data has inherent commercial significance" and suggests that this argument was "conceded by" Dr. Bendick, plaintiffs' expert. Dkt. No. 51 at 4:28-5:1. This, again, is misplaced. The Court discussed Dr. Bendick's declaration in detail and correctly concurred with his reasoning. And, the argument about a purported "concession" by Dr. Bendick misunderstands the core issue in this case: whether EEO-1 reports are "commercial" within the meaning of Exemption 4.  For the reasons set forth in detail in plaintiffs' summary judgment briefs and Dr. Bendick's expert declaration, this Court rightly held that plaintiffs had not shown that the EEO-1 reports at issue in this case meet that standard.

DOL errantly argues that the Court was wrong what it calls a "considerable body of case law" (it only cites two district court cases for this proposition) that it contends is contrary to this Court. Dkt. No. 58 at 5:8-15 (citing *Pub. Citizen Found. v. U.S. Dep't of Labor*, No. 18-cv-00117, 2020 WL 9439355, at *7 (D.D.C. June 23, 2020) and *Sears, Roebuck & Co. v. Gen. Services Admin.*, 384 F. Supp. 996, 1005 (D.D.C. 1974)). DOL also critiques this Court for following, instead of these cases, *Getman v. NLRB*, 450 F.2d 673 (D.C. Cir. 1971). Dkt. No. 58 at 5:8-15. This argument is even further from the mark than the others. The Court was right to give more weight to a Circuit Court opinion than it did to two out-of-circuit district court decisions, one of which is not published and the other of which is more than fifty years old. Also, upon inspection,

neither case cited by DOL actually contradicts this Court's summary judgment Order. In *Public Citizen Foundation*, the requester sought access to "work-related injury and illness data," 2020 WL 9439355, at *1, which is more granular and operations-related than EEO-1 reports. Further, *Sears, Roebuck & Co.* explicitly avoided the "commercial" question at the heart of this case. 384 F. Supp. at 1005 ("Sears has made no claim of privilege aside from 'confidentiality.' Hence the issue narrows to whether the information is 'confidential' within the meaning of exemption (b)(4).") This Court was right not to spend time discussing these distinguishable, out-of-circuit district court cases in its Order.

Finally, DOL writes that the Court misread and misapplied the Trade Secrets Act. That is not so, as set forth in our summary judgment papers. In any event, the Ninth Circuit need not even reach the issue since the non-commercial nature of EEO-1 reports under Exemption 4 is dispositive.

*Second*, DOL has not shown that it will be irreparably harmed absent a stay. Indeed, because DOL has not made clear that it intends to actually pursue appellate relief, any claimed injury to its ability to obtain such relief is too speculative to show irreparable harm. *See Caribbean Marine Servs. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988) ("Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction," nor, under the preliminary injunction standard, a stay pending appeal). On the contrary, it is plaintiffs and the public who have been irreparably harmed by DOL's years of delay and obstruction and who will be further irreparably harmed for as long as DOL's delays are allowed to continue. *See Courthouse News Serv.*, 947 F.3d at 594; *Children's Earth Found.*, 85 F. Supp. 3d at 1090. This Court was correct to order disclosure and that disclosure deadline – which has been revised twice already (first by stipulation and then in response to this "emergency" motion) – should not be further delayed.

*Third*, a stay would adversely impact not only plaintiffs, but the public as a whole, which would benefit from and be best able to use the information at issue if it obtains that information sooner rather than later. *Courthouse News Serv.*, 947 F.3d at 594.

*Finally*, the public interest here favors disclosure. Indeed, there is a growing trend and recognition among companies, investors, and other stakeholders that publishing EEO-1 Reports is

in the public interest. *See* Dkt. No. 39-3 ¶¶ 7-21. Companies recognize disclosure of EEO-1

reports also builds corporate trust and helps ensure a diverse workforce, benefitting the

companies, Dkt. No. 38-1, Ex. X; news outlets and academics use EEO-1 Reports in articles to

inform the public, *id.*, Ex. Y-Z; and Congressmembers have called for greater access to EEO-1

Reports, including through FOIA, *id.*, Ex. AA, AB.

> **D. AT A MINIMUM, NO STAY SHOULD BE ORDERED ABSENT CERTAIN CONDITIONS THAT WOULD ACCOMMODATE PLAINTIFFS' AND THE PUBLIC'S INTEREST IN PROMPT ACCESS.**

At a minimum, before issuing a stay, the Court should require DOL to confirm (a)

whether the Solicitor General and DOL have formally decided to challenge this Court's

summary judgment order in the Ninth Circuit, *see* 28 U.S.C. § 516; 28 C.F.R. 0.20(b), and

did not file their Notice of Appeal merely to further extend their disclosure deadline and

continue deliberating, and (b) whether DOL will work with plaintiffs to jointly seek

expedited proceedings in this case in the Ninth Circuit, as the DOJ represented it would in

*Ctr. for Nat'l Sec. Studies*, 217 F. Supp. 2d at 58-59. Expedition is particularly important

in this case, as plaintiffs have explained. Also, if a stay is issued, all proceedings in this

case, including proceedings regarding the 621 EEO-1 reports that DOL contends are non-

responsive, Dkt. No. 51 at 12:20-28, should be stayed to ensure plaintiffs are not required

to litigate this case in this Court and the Ninth Circuit at the same time. Finally, if a stay is

issued, the Court should extend plaintiffs' time to file a motion for attorney's fees and

costs until 60 days after appellate proceedings have concluded to facilitate the meet and

confer process, Civil L.R. 54-5, and allow plaintiffs to seek fees, if necessary, in a single

motion.

## III.    CONCLUSION

For all of these reasons, DOL's motion should be denied in its entirety. In the alternative,

if the Court is inclined to grant DOL's motion, plaintiffs respectfully request that the Court also

impose the conditions set forth in Section II.D, *supra*.

DATED: February 23, 2024          Respectfully submitted,

By:  */s/ Aaron R. Field*

D. VICTORIA BARANETSKY (SBN 311892)
THE CENTER FOR INVESTIGATIVE
REPORTING
1400 65th St., Suite 200
Emeryville, CA 94608
Telephone: (510) 982-2890
Email: vbaranetsky@revealnews.org

Attorney for Plaintiff
THE CENTER FOR INVESTIGATIVE REPORTING

THERESE Y. CANNATA (SBN 88032)
AARON R. FIELD (SBN 310648)
ZACHARY E. COLBETH (SBN 297419)
CANNATA O'TOOLE & OLSON LLP
100 Pine Street, Suite 350
San Francisco, CA 94111
Telephone:      (415) 409-8900
Facsimile:      (415) 409-8904
Email:          tcannata@cofolaw.com
                afield@cofolaw.com
                zcolbeth@cofolaw.com

Attorneys for Plaintiffs
THE CENTER FOR INVESTIGATIVE REPORTING
and WILL EVANS

D. VICTORIA BARANETSKY (SBN 311892)
THE CENTER FOR INVESTIGATIVE REPORTING
1400 65th Street, Suite 200
Emeryville, CA 94608
Telephone:     (510) 982-2890
Facsimile:     (510) 849-6141
Email:         vbaranetsky@revealnews.org

Attorney for Plaintiff
THE CENTER FOR INVESTIGATIVE
REPORTING

THERESE Y. CANNATA (SBN 88032)
AARON R. FIELD (SBN 310648)
ZACHARY E. COLBETH (SBN 297419)
CANNATA O'TOOLE & OLSON LLP
100 Pine Street, Suite 350
San Francisco, CA 94111
Telephone:     (415) 409-8900
Facsimile:     (415) 409-8904
Email:         tcannata@cofolaw.com
               afield@cofolaw.com
               zcolbeth@cofolaw.com

Attorneys for Plaintiffs
THE CENTER FOR INVESTIGATIVE
REPORTING and WILL EVANS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO

| | |
|---|---|
| THE CENTER FOR INVESTIGATIVE REPORTING and WILL EVANS,<br><br>        Plaintiffs,<br><br>     v.<br><br>UNITED STATES DEPARTMENT OF LABOR,<br><br>        Defendant. | Case No. 3:22-cv-07182-WHA<br><br>**DECLARATION OF AARON R. FIELD IN SUPPORT OF PLAINTIFFS' OPPOSITION TO EMERGENCY MOTION FOR STAY OF DISCLOSURE DEADLINE PENDING APPEAL BY DEPARTMENT OF LABOR** |

I, AARON R. FIELD, declare:

1.　　I am a member in good standing of the State Bar of California, a Partner at the law firm Cannata O'Toole & Olson LLP, and counsel for plaintiffs The Center for Investigative Reporting and Will Evans in this matter.  I make this declaration of my own personal knowledge, and, if called as a witness, I could testify to the facts stated herein.

2.　　As a courtesy and for the Court's ease of reference, attached hereto as **Exhibit A** is a true and correct copy of an October 21, 2009 order issued by the United States Court of Appeals for the Ninth Circuit on a motion for stay pending appeal by the appellants in *Electronic Frontier Foundation v. Office of the Director of National Intelligence, et al.*, No. 09-17235 (9th Cir. Oct. 21, 2009).  I obtained this copy of the Order from the federal PACER electronic records access system.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 23rd day of February, 2024 at San Francisco, California.


*/s/ Aaron R. Field*
AARON R. FIELD

1

1  ISMAIL J. RAMSEY (CABN 189820)
United States Attorney
2  MICHELLE LO (NYRN 4325163)
Chief, Civil Division
3  PAMELA T. JOHANN (CABN 145558)
Assistant United States Attorney
4
       450 Golden Gate Avenue, Box 36045
5      San Francisco, California 94102
       Telephone: (415) 436-7025
6      Facsimile: (415) 436-7234
       pamela.johann@usdoj.gov
7
Attorneys for Defendant UNITED STATES
8  DEPARTMENT OF LABOR

9

10                    UNITED STATES DISTRICT COURT

11                  NORTHERN DISTRICT OF CALIFORNIA

12                      SAN FRANCISCO DIVISION

13

14  THE CENTER FOR INVESTIGATIVE          )  Case No. 22-cv-07182-WHA
    REPORTING and WILL EVANS,             )
15                                        )
             Plaintiffs,                  )  **EMERGENCY MOTION FOR STAY OF**
16                                        )  **DISCLOSURE DEADLINE PENDING APPEAL**
         v.                               )  **BY DEPARTMENT OF LABOR**
17                                        )
    UNITED STATES DEPARTMENT OF           )
18  LABOR,                                )
                                          )
19           Defendant.                   )
                                          )
20  _____)

21

22

23

24

25

26

27

28

Pursuant to Federal Rule of Civil Procedure 62(d) and (e) and Local Rule 7-11, Defendant Department of Labor ("DOL") hereby moves, on an emergency basis, for a stay of the February 20, 2024 disclosure deadline set forth in the Court's December 22, 2023 Order, Dkt. No. 51 as extended by Order dated December 28, 2024, Dkt. No. 53, pending appellate review.  DOL filed its notice of appeal today, February 15, 2024.  Dkt. No. 57.  A stay of the disclosure deadline is necessary to avoid the irreparable harm that would result to DOL from mandated disclosure pending appeal.

Because February 19, 2024, is a federal holiday and disclosure has been ordered for February 20, 2024, DOL respectfully requests a decision on this emergency motion by Friday, February 16, 2024, to give DOL the opportunity to seek an emergency motion for stay pending appeal from the Ninth Circuit pursuant to Federal Rule of Appellate Procedure 8(a)(2).  In the event this Court denies the motion for stay, DOL respectfully requests that the Court extend the disclosure date by seven days, to February 27, 2024, to permit DOL to seek a stay from the Ninth Circuit.

In anticipation of the impending disclosure deadline, counsel for DOL attempted to connect with Plaintiffs' counsel on Tuesday, February 13, 2024, to get their position regarding DOL's request for a stay pending appeal.  Plaintiffs were unwilling to stipulate to an extension of the deadline.  Following the filing of the Notice of Appeal earlier today, counsel for DOL again emailed counsel for Plaintiffs requesting that they stipulate to a stay pending appeal, or in the alternative, to an interim extension of the deadline to permit time for the Court to consider DOL's motion for a stay on a less abbreviated timeline. Plaintiffs responded that they were unwilling to stipulate to a stay at this time.

## ARGUMENT

By Order dated December 22, 2023, this Court denied in part and granted in part the parties' cross-motions for summary judgment in this Freedom of Information Act ("FOIA") case and held that the EEO-1 reports of the five bellwether federal contractors were not exempt from disclosure under Exemption 4.  The Court ordered DOL to "produce the remaining EEO-1 reports at issue within 28 days" of the Order.  Dkt. No. 51 at 13.  Pursuant to the parties' stipulation, the Court extended that deadline to February 20, 2024, the same day as the government's deadline to appeal.  Dkt. No. 53. Earlier today, DOL filed a notice of appeal.  Dkt. No. 57.  To preserve the government's right to seek appellate review and to preserve the Ninth Circuit's ability to consider the issues presented in this

appeal, DOL respectfully requests a stay of the February 20, 2024, production deadline pending appeal. A stay of the production deadline is necessary to avoid the irreparable harm that would result if the government is forced to release the documents before it has the opportunity to pursue its appellate rights.

The Court has discretion to determine whether it should stay its orders pending appeal. *See City of Oakland v. Holder*, 961 F. Supp. 2d 1005, 1012 (N.D. Cal. 2013). To make this decision, district courts consider four factors: (1) whether the movant has made a strong showing that it is likely to succeed on the merits; (2) whether the movant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987) (stay of order releasing prisoner); *Leiva–Perez v. Holder*, 640 F.3d 962, 964 (9th Cir. 2011) (stay of removal). In the Ninth Circuit, a party requesting a stay may either show "both a probability of success on the merits and the possibility of irreparable injury" or "that serious legal questions are raised and that the balance of hardships tips in its favor." *Lopez v. Heckler*, 713 F.2d 1432, 1435 (9th Cir. 1983). Here, the government will effectively be denied its right of appeal if a stay is not granted, and the matter undoubtedly presents serious legal questions. In light of this, a stay is plainly warranted.

### A.    The Government Would Suffer Irreparable Injury if a Stay is not Granted, and the Balance of Hardships Weighs in its Favor.

Once the documents have been surrendered, not only is any possible appeal moot, but the status quo can never be restored. The documents are in the public domain forever, and the breach of confidentiality caused by public release cannot be undone. That alone is irreparable harm. *See John Doe Agency v. John Doe Corp.*, 488 U.S. 1306, 1309 (1989) (Marshall, J., in chambers); *see also United States Dep't of Commerce v. Assembly of Cal.*, 501 U.S. 1272 (1991). As this Court has recognized, disclosure of confidential information "would necessarily destroy the private information, no matter the circumstance." *A.S.B.L. v. Dep't of Defense*, 411 F. Supp. 3d 824, 832 (N.D. Cal. 2019). Accordingly, "stays are routinely granted in FOIA cases." *Ctr. for Nat'l Sec. Studies v. DOJ*, 217 F. Supp. 2d 58, 58 (D.D.C. 2002) (granting stay because disclosure of detainee names would "effectively moot any appeal"), *aff'd in part, rev'd in part*, 331 F.3d 918 (D.C. Cir. 2003).[1]

---

[1] *See HHS v. Alley*, 556 U.S. 1149, 1149 (2009); *Dep't of Commerce v. Assembly of the State of*

EMERGENCY MOTION FOR STAY PENDING APPEAL
No. 22-cv-07182-WHA                                    2

As the First Circuit recognized, in the absence of a stay, the appeal will become moot, and the vital public policy interest represented by the claimed exemption will be irretrievably harmed:

> [T]he Constitution and laws entitle litigants to have their cases independently reviewed by an appellate tribunal. Meaningful review entails having the reviewing court take a fresh look at the decision of the trial court before it becomes irrevocable. Appellants' right of appeal here will become moot unless the stay is continued pending determination of the appeals. Once the documents are surrendered pursuant to the lower court's order, confidentiality will be lost for all time. The status quo could never be restored.

*Providence Journal*, 595 F.2d at 890 (emphasis added). The need to preserve the Government's right to appellate review of a disclosure order is "perhaps the most compelling justification" for the grant of a stay. *John Doe Agency*, 488 U.S. at 1309 (Marshall, J., in chambers). In this case, once the Government is forced to disclose the withheld documents to plaintiff, its right to a meaningful appeal will be lost, and the status quo cannot be restored.

The harm from compliance with the December 22, 2023 order is not only irreparable, but also significant. Important interests are protected by FOIA's exemptions, which "are as much a part of [FOIA's] purpose[s and policies] as the [statute's disclosure] requirement.'" *Food Marketing Institute v. Argus Leader Media*, 139 S. Ct. 2356, 2366 (2019) ("*Argus Leader*") (citation omitted; alterations in original). In particular, Exemption 4 is intended to protect the interests of third-party submitters whose information was collected by the government. *ASBL*, 411 F. Supp. 3d at 836. Refusing to grant a stay here would irrevocably compromise these interests without any opportunity for the Ninth Circuit's to consider whether the documents at issue should be—as the government contends—protected from disclosure by Exemption 4. On the other side of the balance, a stay would not substantially harm Plaintiffs. DOL has already disclosed the vast majority of documents that Plaintiffs sought in their FOIA requests. The stay will appropriately extend for the duration of the appeal to provide DOL a meaningful opportunity to challenge the Court's ruling.

---

*California*, 501 U.S. 1272 (1991); *DOJ v. Rosenfeld*, 501 U.S. 1227 (1991); *John Doe Agency*, 488 U.S. at 1309; *Islamic Shura Council of S. Cal. v. FBI*, 635 F.3d 1160, 1164 (9th Cir. 2011); *Elec. Frontier Found. v. ODNI*, 595 F.3d 949, 954 (9th Cir. 2010) (granting stay pending appeal to allow Solicitor General opportunity to decide which portions of summary judgment order to appeal), *amended by* 639 F.3d 876 (9th Cir. 2010); *Taylor v. Dep't of the Army*, 684 F.2d 99, 102 (D.C. Cir. 1982); *see also Martin v. IRS*, 857 F.2d 722, 724 (10th Cir. 1988); *Acumenics Research & Technology v. DOJ*, 843 F.2d 800, 803 (4th Cir. 1988); *Coastal States Gas Corp. v. Dep't of Energy*, 644 F.2d 969, 973-74 (3d Cir. 1981); *Providence Journal Co. v. FBI*, 595 F.2d 889, 889-90 (1st Cir. 1979).

EMERGENCY MOTION FOR STAY PENDING APPEAL
No. 22-cv-07182-WHA                    3

**B.    This Appeal Presents Serious Legal Questions, and the Government Can Establish a Probability of Success.**

The Court is familiar with DOL's view regarding application of Exemption 4 to the EEO-1 reports at issue here.  While DOL recognizes that the Court has ruled that the reports at issue are not "commercial in nature," DOL respectfully submits that, at a minimum, there is a substantial basis for the government's views on this important and unsettled issue, which has never been considered by the Ninth Circuit.  Indeed, this Court acknowledged that "there is no clearly defined limit for what is considered 'commercial' within our court of appeals."  Dkt. No. 51 at 5.

The Ninth Circuit has held that the term "commercial" must be given its "ordinary or common" meaning.  *Watkins v. U.S. Bureau of Customs and Border Protection*, 643 F.3d 1189, 1194 (9th Cir. 2011).  This Court recognized that principle, but proceeded to apply an unduly constricted interpretation of the term that engrafted requirements that are neither contained in the statutory language nor consistent with prior case law.  There was no disagreement between the parties that headcount data is "of a commercial nature," even if it is, as Plaintiff argued, "broad and non-specific."  But this Court's Order seems to impose both a specificity and a "competitive impact" requirement on the commerciality analysis, requiring that the information not be simply commercial in nature but that it reveal "commercially valuable information."  Dkt. No. 51 at 6.  That requirement is not contained in the statutory language, is not dictated by the plain meaning of "commercial," and is inconsistent with the Supreme Court's decision in *Argus Leader*.

Second, the Court focused on the specific format and use of the EEO-1 report rather than the inherent nature of the information that it contained to reach its conclusion.  This approach is inconsistent with the commerciality standard, which asks whether the information "serves a 'commercial function' or is of a 'commercial nature'" "in and of itself."  *Citizens for Responsibility & Ethics in Washington v. D.O.J.*, 58 F.4th 1255, 1263 (D.C. Cir. 2023).  It is the nature of the information, not the format of the data or the purpose of its compilation, that is the relevant inquiry. *See CREW*, 58 F.4th at 1265 (citing cases).  Even if the specific format of the EEO-1 report was designed for government reporting purposes, the information contained in that report is commercial in nature.

Third, the Court dismissed the argument that diversity data has inherent commercial

1    significance—a proposition that was conceded by Plaintiffs' expert, who acknowledged that "many

2    firms use diversity data in designing and managing aspects of their internal operations"—without

3    addressing the expert testimony or the objector's attestations of their own use of diversity data. The

4    Court reasoned that "[l]ike names or birthdays, the demographic background of employees does not

5    speak to the commercial contributions of a company's workforce." Dkt. No. 51 at 8. The Court failed to

6    consider the commercial nature of the collective demographic statistics presented in the EEO-1 reports,

7    mistakenly narrowing its focus to the specific demographic background of individual employees.

8            Fourth, the Court never addressed or distinguished the considerable body of case law that has

9    come to the opposite conclusion. *See*, *e.g.*, *Pub. Citizen Found. v. U.S. Dep't of Labor*, No. 18-cv-

10   00117, 2020 WL 9439355, at *7 (D.D.C. June 23, 2020); *Sears, Roebuck & Co. v. Gen. Services

11   Admin.*, 384 F. Supp. 996, 1005 (D.D.C. 1974). Instead, the Court extended the reasoning of *Getman v.

12   NLRB*, 450 F.2d 673 (D.C. Cir. 1971), which is based on the principle that a person's identity, without

13   more, has no commercial value "in and of itself." The workforce demographic information in the EEO-

14   1 reports is substantively different from a bare list of employee names because a person's identity,

15   without more, has no commercial significance "in and of itself."

16           Finally, the Court announced that "Exemption 4 of FOIA and the Trade Secrets Act are no

17   longer co-extensive," without providing any grounds for this assumption apart from the fact that *Argus

18   Leader* did not address the confidentiality standard under the Trade Secrets Act. But *Argus Leader*'s

19   broadening of Exemption 4's confidentiality standard only opens the possibility that the Ninth Circuit's

20   law in this area is no longer settled. *See Synopsys, Inc. v. U.S. Dep't of Labor*, No. 20-16414, 2022 WL

21   1501094, at *4 (9th Cir. May 12, 2022). In a footnote, the *Synopsis* Court noted that the parties had

22   acknowledged the possibility that Exemption 4 may now be broader than the Trade Secrets Act, but it

23   explicitly left the issue open, stating that it "need not decide here whether Exemption 4 is indeed now

24   broader in scope than the Trade Secrets Act." 2022 WL 1501094, at *4 n.3. The Court erred in

25   assuming that the term "confidential" in the Trade Secrets Act is narrower than the ordinary meaning of

26   the term in Exemption 4, without engaging in any analysis of the issue as a textual matter.

27           DOL's appeal raises serious legal issues and is likely to succeed. DOL respectfully requests that

28   the Court stay its order for the duration of this appeal. In the event this Court denies the motion for stay,

EMERGENCY MOTION FOR STAY PENDING APPEAL
No. 22-cv-07182-WHA                        5

1   DOL respectfully requests that the Court extend the disclosure date by seven days, to February 27, 2024,

2   to permit DOL to seek a stay from the Ninth Circuit.

3   DATED:  February 15, 2024                    Respectfully submitted,

4                                                ISMAIL J. RAMSEY
                                                 United States Attorney
5
                                                 */s/ Pamela T. Johann*
6                                                PAMELA T. JOHANN
                                                 Assistant United States Attorney
7
                                                 Attorneys for Defendant
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  ISMAIL J. RAMSEY (CABN 189820)
United States Attorney
2  MICHELLE LO (NYRN 4325163)
Chief, Civil Division
3  PAMELA T. JOHANN (CABN 145558)
Assistant United States Attorney
4
    450 Golden Gate Avenue, Box 36045
5    San Francisco, California 94102
    Telephone: (415) 436-7025
6    Facsimile: (415) 436-7234
    pamela.johann@usdoj.gov
7
Attorneys for Defendant UNITED STATES
8  DEPARTMENT OF LABOR

9

10                    UNITED STATES DISTRICT COURT

11                  NORTHERN DISTRICT OF CALIFORNIA

12                      SAN FRANCISCO DIVISION

13

14  THE CENTER FOR INVESTIGATIVE      ) Case No. 22-cv-07182-WHA
    REPORTING and WILL EVANS,          )
15                                     )
            Plaintiffs,                 ) **DECLARATION OF PAMELA T. JOHANN**
16                                     )
        v.                             )
17                                     )
    UNITED STATES DEPARTMENT OF        )
18  LABOR,                             )
                                       )
19          Defendant.                 )
                                       )
20  _____)

21          I, Pamela T. Johann, declare as follows:

22          1.      I am an Assistant United States Attorney in the United States Attorney's Office for the

23  Northern District of California, and I represent the United States Department of Labor ("DOL") in this

24  matter.  I am licensed to practice law in the State of California and to appear before this Court.  I have

25  personal knowledge of the following facts and if called to testify, I could and would competently testify

26  thereto.

27          2.      I submit this declaration in support of Defendant's Emergency Motion to Stay pursuant to

28  Federal Rule of Civil Procedure 62(d) and Local Civil Rules 7-11 and 6-3.

EMERGENCY MOTION FOR STAY PENDING APPEAL
No. 22-cv-07182-WHA                    1

3.     This motion is filed to stay the December 22, 2023 order requiring the disclosure of documents pending appeal to preserve the government's right to seek appellate judicial review and to preserve the Ninth Circuit's ability to consider the issues presented in this appeal.

4.     On February 15, 2024, DOL filed a notice of appeal of the Court's December 23, 2023 Order. Dkt. No. 57. That order currently requires release on February 20, 2024. February 19, 2024, is a federal holiday. DOL requests that this Court issue a decision on its request for stay by February 16, 2024 so that, in the event a stay is denied, DOL can seek a stay in the Ninth Circuit pursuant to Federal Rule of Appellate Procedure 8(a)(2). In the Court denies a stay pending appeal, DOL requests that the Court continue the release date by seven days so that DOL can file a motion for stay in the Ninth Circuit.

5.     On Tuesday February 13, 2024, I reached out to counsel for Plaintiffs to try to schedule a phone call. By email, counsel indicated that they were too busy to talk that day. By return email, I explained that the disclosure deadline was approaching, the appeal decision was still under consideration, and that DOL was requested a stay pending appeal in the event a notice of appeal was filed. Counsel for Plaintiffs declined, indicated that they were not aware of any genuine exigency or emergency requiring an extension, and to the extent DOL sought an open-ended stay there was "no reason why that request could not have been made" at the time of the original request for an extension.

6.     After filing DOL's notice of appeal, the undersigned emailed counsel for Plaintiffs again to ask that Plaintiffs stipulate to a stay pending appeal, or in the alternative, to an interim continuance of the release deadline to allow the court additional time to consider an emergency motion to stay. I notified Plaintiffs that I intended to ask for the Court for a decision on DOL's motion to stay by tomorrow, February 16, 2024, and requested a response by 4:00 p.m. today.

7.     At 4:20 p.m., counsel for Plaintiffs responded that they were not prepared to stipulate at this time and were continuing to research the matter. They also objected to a decision being made on the motion tomorrow. In response to that email and in an attempt to address Plaintiffs' stated objection, I proposed by email that Plaintiffs stipulate to a short extension of the release deadline to allow the motion to heard on a less abbreviated timeline. Plaintiff's counsel declined that request. A true and correct copy of the email chain with my requests and Plaintiffs' counsel's responses is attached hereto as

1 | Exhibit A.

2 |     I declare under penalty of perjury that the foregoing is true and correct.  Signed this 15th day of

3 | February, 2024, in San Francisco, California.

4 |
_____/s/ Pamela T. Johann_____
PAMELA T. JOHANN

5 |

6 |

7 |

8 |

9 |

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

EMERGENCY MOTION FOR STAY PENDING APPEAL
No. 22-cv-07182-WHA                    3

# Exhibit A

| From: | Therese Y. Cannata |
|---|---|
| To: | Johann, Pamela (USACAN); Aaron R. Field |
| Cc: | Victoria Baranetsky (vbaranetsky@revealnews.org); Zachary E. Colbeth; Danielle Ott |
| Subject: | [EXTERNAL] Re: Stay pending appeal |
| Date: | Thursday, February 15, 2024 4:44:06 PM |
| Attachments: | image002.png |

Dear Pam,

Aaron stepped away for a moment, but I am informed on these issues.  To your question, we have nothing further to add at this time.  We will, of course, review and respond to your moving papers as permitted by the Court.


With regards,

Therese


_____

Therese Y. Cannata
  Attorney at Law



100 Pine Street, Suite 350
San Francisco, California 94111
   CONTACT INFORMATION:
   ■ Reception: 415.409.8900
   ■ Direct Dial: 415.842.2321
   ■ Email: tcannata@cofolaw.com


For further information about our firm and directions to our San Francisco and Walnut Creek offices, please call our office or visit our Firm Website at www.cofolaw.com

This electronic mail transmission is intended only for the addressee(s) shown above. It may contain information that is confidential, or otherwise protected from disclosure as an attorney-client or attorney work-product privileged communication. Any review, dissemination or use of this transmission or its contents by persons other than the addressee(s) is strictly prohibited. If you have received this transmission in error, please notify us immediately by telephone at (415) 409-8900, and destroy this document.

Please consider the environment before printing this e-mail


From: "Johann, Pamela (USACAN)" <Pamela.Johann@usdoj.gov>
Date: Thursday, February 15, 2024 at 4:26 PM

**To:** "Aaron R. Field" <afield@cofolaw.com>
**Cc:** "Victoria Baranetsky (vbaranetsky@revealnews.org)" <vbaranetsky@revealnews.org>,
"Therese Y. Cannata" <tcannata@cofolaw.com>, "Zachary E. Colbeth"
<zcolbeth@cofolaw.com>, Danielle Ott <dott@cofolaw.com>
**Subject:** RE: Stay pending appeal

Aaron,

If the disclosure deadline is not stayed in this case, it will effectively deprive the government of an
opportunity to appeal the order.

If you do not agree to a decision on DOL's emergency motion being made tomorrow, then will you
agree to an extension of the release deadline to allow the motion to be heard within a reasonable
time?  Note that Judge Alsup's posted schedule indicates that he is not available next week.

Please let me know ASAP.  I will need to file my motion in the next 15 minutes.

Thank you,
Pam


Pam Johann
Assistant United States Attorney, Deputy Civil Chief
Northern District of California
T:  415-436-7025

**From:** Aaron R. Field <afield@cofolaw.com>
**Sent:** Thursday, February 15, 2024 4:20 PM
**To:** Johann, Pamela (USACAN) <PJohann@usa.doj.gov>
**Cc:** Victoria Baranetsky (vbaranetsky@revealnews.org) <vbaranetsky@revealnews.org>; Therese Y.
Cannata <tcannata@cofolaw.com>; Zachary E. Colbeth <zcolbeth@cofolaw.com>; Danielle Ott
<dott@cofolaw.com>
**Subject:** [EXTERNAL] Re: Stay pending appeal

Pam,

The cases you have cited do not establish your entitlement to stay and are distinguishable.
 Both involved law enforcement investigations, one of which related to 9/11.  Both involved
questions of law subject to more reasonable dispute than the one here, which has repeatedly
been resolved adversely to your client but your client, the Department of Labor, insisted on
relitigating yet again in this case.  And, importantly, neither stands for the proposition that a
stay is inevitable or that DOL is entitled to a stay as a matter of right.  Both indicate a stay is
available only on a showing that it is consistent with the balance of equities.  We are

continuing to research the matter; however, we are not prepared to stipulate based on distinguishable cases on the timeline in your e-mail.

We also object to a decision being made on your motion tomorrow, because we will not have had a reasonable opportunity to review the matter or respond by that time.

Please include all of our e-mails in this e-mail chain in any submission that you provide to the Court.

Regards,

Aaron

_____

Aaron Field

Attorney at Law



100 Pine Street, Suite 350

San Francisco, California 94111
Telephone (Firm):        415.409.8900

Telephone (Direct):      415.842.2285

Fax:                     415.409.8904

 **Please consider the environment before printing this e-mail**

----------------------------------------------------------------------------------------------------

For further information about our firm or directions to our San Francisco or Walnut Creek offices, please visit our firm website at www.cofolaw.com

----------------------------------------------------------------------------------------------------

This electronic mail transmission is intended only for the addressee(s) shown above. It may contain information that is confidential or otherwise protected from disclosure as an attorney-client or attorney work-product privileged communication. Any review, dissemination, or use of this transmission or its contents by persons other than the addressee(s) is strictly prohibited. If you have received this transmission in error, please notify us immediately by telephone at (415) 409-8900, and destroy this document.

**From:** Johann, Pamela (USACAN) <Pamela.Johann@usdoj.gov>
**Sent:** Thursday, February 15, 2024 2:54 PM

**To:** Aaron R. Field <afield@cofolaw.com>
**Cc:** Victoria Baranetsky (vbaranetsky@revealnews.org) <vbaranetsky@revealnews.org>; Therese Y. Cannata <tcannata@cofolaw.com>; Zachary E. Colbeth <zcolbeth@cofolaw.com>; Danielle Ott <dott@cofolaw.com>
**Subject:** RE: Stay pending appeal

Re-sending the email below to the larger group—I just realized that my earlier email was sent only to Aaron.

Given the imminence of the disclosure date, the need to seek relief in the Ninth Circuit if the district court doesn't grant a stay, and Judge Alsup's unavailability next week, we are planning to file an Emergency Motion **today by 4:30**.  We will request a stay pending appeal, or in the alternative a seven-day continuance to allow us time to make a motion in the Ninth Circuit.  We will ask Judge Alsup for a decision by tomorrow, **February 16**.  We will represent that we sought a stipulation from you but could not get a position before needing to file.

If you are amenable to a stipulation, please let me know by 4 pm today.

Thank you,
Pam


Pam Johann
Assistant United States Attorney, Deputy Civil Chief
Northern District of California
T:  415-436-7025

---

**From:** Johann, Pamela (USACAN)
**Sent:** Thursday, February 15, 2024 12:04 PM
**To:** Aaron R. Field <afield@cofolaw.com>
**Subject:** Stay pending appeal

Aaron,

As you know, DOL has filed a notice of appeal of the district court's ruling.  In light of this, we are requesting that Plaintiffs stipulate to a stay of the disclosure order pending appeal to provide DOL the opportunity for appellate review.  "Stays are routinely granted in FOIA cases." *Ctr. for Nat'l Sec. Studies v. DOJ*, 217 F. Supp. 2d 58, 58 (D.D.C. 2002).  Disclosure would moot the appeal and would result in an irreparable injury to the government. *See John Doe Agency v. John Doe Corp.*, 488 U.S. 1306, 1309 (1989) (Marshall, J., in chambers).  Stay of the disclosure order is therefore necessary to preserve the Government's right to appellate review, which presents a "compelling justification" for the grant of a stay. *Id.*

In the event you do not agree to a stay, we will file an emergency motion for a stay in district court

and, if necessary, in the Court of Appeals.  We will need to ask for an immediate decision by the Court given the current disclosure date.  For that reason, we would request in the alternative that you agree to an interim continuance to allow the court additional time to consider our motion.

Please let me know as soon as possible whether you will stipulate to a stay of the disclosure order.

Thank you,
Pam

Pam Johann
Assistant United States Attorney, Deputy Civil Chief
Northern District of California
T:  415-436-7025

---

**From:** Aaron R. Field <afield@cofolaw.com>
**Sent:** Wednesday, February 14, 2024 9:35 PM
**To:** Johann, Pamela (USACAN) <PJohann@usa.doj.gov>; Victoria Baranetsky <vbaranetsky@revealnews.org>
**Cc:** Therese Y. Cannata <tcannata@cofolaw.com>; Zachary E. Colbeth <zcolbeth@cofolaw.com>; Danielle Ott <dott@cofolaw.com>
**Subject:** Re: [EXTERNAL] Re: Available for a call?

Pam,

With regret, we again respectfully decline.

We generally do our best to be flexible about deadlines, as our prior stipulations in this case show, especially when necessary to address genuine exigencies and emergencies.  However, we are not aware of any genuine exigency or emergency here.  Certainly, DOL has mentioned none.  In December, despite years of pre-lawsuit delays, DOL asked for, we agreed to, and the Court ordered a generous, 32-day extension of DOL's disclosure deadline, more than doubling its time to disclose.  The explicit purpose was to allow DOL to decide whether to appeal.  DOL has not explained how or why the extension it had asked for has suddenly come up short.  Nor has it told us any other reason why it cannot, or should not be expected to, comply with the deadline that it asked for, especially given DOL's last-minute timing.

Further complicating a stipulation, DOL has not yet clearly stated what it plans to ask for in a potential motion.  If DOL plans to seek the kind of open-ended "stay" it proposed yesterday, that is concerning, since there is no reason why that request could not have been made immediately after the order was issued or in place of DOL's initial extension request.

We hope that, instead of continuing to delay disclosure or relitigating the same issues it has for years, DOL will simply comply with the Court's order, which got the "commercial" issue

right.

Regards,

Aaron

_____

Aaron Field

Attorney at Law



100 Pine Street, Suite 350

San Francisco, California 94111

Telephone (Firm):      415.409.8900

Telephone (Direct):    415.842.2285

Fax:                   415.409.8904

 Please consider the environment before printing this e-mail

-------------------------------------------------------------------------------------

For further information about our firm or directions to our San Francisco or Walnut Creek offices, please visit our firm website at www.cofolaw.com

-------------------------------------------------------------------------------------

This electronic mail transmission is intended only for the addressee(s) shown above. It may contain information that is confidential or otherwise protected from disclosure as an attorney-client or attorney work-product privileged communication. Any review, dissemination, or use of this transmission or its contents by persons other than the addressee(s) is strictly prohibited. If you have received this transmission in error, please notify us immediately by telephone at (415) 409-8900, and destroy this document.

---

**From:** Johann, Pamela (USACAN) <Pamela.Johann@usdoj.gov>
**Sent:** Wednesday, February 14, 2024 4:16 PM
**To:** Aaron R. Field <afield@cofolaw.com>; Victoria Baranetsky <vbaranetsky@revealnews.org>
**Cc:** Therese Y. Cannata <tcannata@cofolaw.com>; Zachary E. Colbeth <zcolbeth@cofolaw.com>; Danielle Ott <dott@cofolaw.com>
**Subject:** RE: [EXTERNAL] Re: Available for a call?

Aaron,

As you know, stays pending appeal are routinely granted in FOIA cases because any disclosure would necessarily moot the appeal. In light of your position, we will be filing an emergency motion with the court. Would you be willing to agree to a shorter continuance to allow this motion to be briefed and decided on more than five days? Please get back to me by the end of the day so we can determine how to notice our motion.

Thank you.
Pam

Pam Johann
Assistant United States Attorney, Deputy Civil Chief
Northern District of California
T: 415-436-7025

**From:** Aaron R. Field <afield@cofolaw.com>
**Sent:** Wednesday, February 14, 2024 4:04 PM
**To:** Johann, Pamela (USACAN) <PJohann@usa.doj.gov>; Victoria Baranetsky <vbaranetsky@revealnews.org>
**Cc:** Therese Y. Cannata <tcannata@cofolaw.com>; Zachary E. Colbeth <zcolbeth@cofolaw.com>; Danielle Ott <dott@cofolaw.com>
**Subject:** Re: [EXTERNAL] Re: Available for a call?

Pam,

In cases involving access to public records, prompt access is important and often essential to ensuring that information reaches the public in time to be useful. As the Ninth Circuit recently reaffirmed, "The newsworthiness of a particular story is often fleeting. To delay or postpone disclosure undermines the benefit of public scrutiny and may have the same result as complete suppression." *Courthouse News Serv. v. Planet*, 947 F.3d 581, 594 (9th Cir. 2020) (internal citation and quotation marks omitted).

Given, among other things, the great public interest in access to the information at issue here, the years that DOL took to process CIR's and Mr. Evans's requests prior to this lawsuit, the time that has passed since this lawsuit was filed, the absence of any specific justification for a further extension from your e-mail (let alone for the open-ended stay you propose), our assessment that an appeal by DOL would not succeed on the merits, and CIR's prior stipulation to the generous extension DOL requested last year, we respectfully decline the proposed stipulation.

Regards,

Aaron Field

Aaron Field

Attorney at Law



100 Pine Street, Suite 350

San Francisco, California 94111

Telephone (Firm):        415.409.8900

Telephone (Direct):      415.842.2285

Fax:                               415.409.8904

 Please consider the environment before printing this e-mail

--------------------------------------------------------------------------------

For further information about our firm or directions to our San Francisco or Walnut Creek offices, please visit our firm website at www.cofolaw.com

--------------------------------------------------------------------------------

This electronic mail transmission is intended only for the addressee(s) shown above. It may contain information that is confidential or otherwise protected from disclosure as an attorney-client or attorney work-product privileged communication. Any review, dissemination, or use of this transmission or its contents by persons other than the addressee(s) is strictly prohibited. If you have received this transmission in error, please notify us immediately by telephone at (415) 409-8900, and destroy this document.

---

**From:** Johann, Pamela (USACAN) <Pamela.Johann@usdoj.gov>
**Sent:** Wednesday, February 14, 2024 2:35 PM
**To:** Aaron R. Field <afield@cofolaw.com>; Victoria Baranetsky <vbaranetsky@revealnews.org>
**Cc:** Therese Y. Cannata <tcannata@cofolaw.com>; Zachary E. Colbeth <zcolbeth@cofolaw.com>; Danielle Ott <dott@cofolaw.com>
**Subject:** RE: [EXTERNAL] Re: Available for a call?

Hi Aaron,

Hoping to follow up on this.  Can you let me know if you agree to this stipulation?

Thanks,
Pam


Pam Johann

Assistant United States Attorney, Deputy Civil Chief

Northern District of California

T: 415-436-7025

---

**From:** Johann, Pamela (USACAN)
**Sent:** Tuesday, February 13, 2024 4:10 PM
**To:** Aaron R. Field <afield@cofolaw.com>; Victoria Baranetsky
<vbaranetsky@revealnews.org>
**Cc:** Therese Y. Cannata <tcannata@cofolaw.com>; Zachary E. Colbeth
<zcolbeth@cofolaw.com>; Danielle Ott <dott@cofolaw.com>
**Subject:** RE: [EXTERNAL] Re: Available for a call?


Hi Aaron et al.,


Given your tight schedules, perhaps we can avoid a call altogether.  As you know, we are one week away from the appeal deadline and disclosure deadline.  The decision of whether to appeal is still under consideration by the Solicitor General.  Given this, we are requesting that Plaintiffs agree to stay the disclosure order (1) pending the resolution of an appeal, if a notice of appeal is filed; or (2) in the event a notice of appeal is not filed, 21 days after the deadline for filing a notice of appeal.


Please let me know if this is acceptable to you, and I will prepare a stipulation to submit to the Court.


Thanks,
Pam

Pam Johann

Assistant United States Attorney, Deputy Civil Chief

Northern District of California

T: 415-436-7025

---

**From:** Aaron R. Field <afield@cofolaw.com>
**Sent:** Tuesday, February 13, 2024 12:47 PM
**To:** Victoria Baranetsky <vbaranetsky@revealnews.org>; Johann, Pamela (USACAN)
<PJohann@usa.doj.gov>
**Cc:** Therese Y. Cannata <tcannata@cofolaw.com>; Zachary E. Colbeth
<zcolbeth@cofolaw.com>; Danielle Ott <dott@cofolaw.com>
**Subject:** Re: [EXTERNAL] Re: Available for a call?

Pam,

I am also not available for a call today.  I am flexible tomorrow afternoon. however.   If you
would like to connect, please let me know what you would like to discuss, so that I can
prepare for our call, and when you are available tomorrow afternoon.  If tomorrow afternoon
does not work for you, please let me know, and I will send you some possible times on
Thursday.

As a reminder, please copy me, my law partners Therese and Zach, and our paralegal Danielle,
on all e-mail correspondence in this matter, in addition to Vickie.  Thank you.

Regards,

Aaron Field

---

Aaron Field

Attorney at Law



100 Pine Street, Suite 350

San Francisco, California 94111

Telephone (Firm):      415.409.8900

Telephone (Direct):      415.842.2285

Fax:      415.409.8904

 **Please consider the environment before printing this e-mail**

------------------------------------------------------------------------------------------------------------

For further information about our firm or directions to our San Francisco or Walnut Creek offices, please visit our firm website at www.cofolaw.com

------------------------------------------------------------------------------------------------------------

This electronic mail transmission is intended only for the addressee(s) shown above. It may contain information that is confidential or otherwise protected from disclosure as an attorney-client or attorney work-product privileged communication. Any review, dissemination, or use of this transmission or its contents by persons other than the addressee(s) is strictly prohibited. If you have received this transmission in error, please notify us immediately by telephone at (415) 409-8900, and destroy this document.

---

**From:** Victoria Baranetsky <vbaranetsky@revealnews.org>
**Sent:** Tuesday, February 13, 2024 12:28 PM
**To:** Johann, Pamela (USACAN) <Pamela.Johann@usdoj.gov>; Aaron R. Field <afield@cofolaw.com>
**Subject:** Re: [EXTERNAL] Re: Available for a call?


Hi Pam.


I'm in wall to wall meetings until 5pm today. Can you reach out to Aaron, please.


Vickie


On Tue, Feb 13, 2024 at 11:59 AM Johann, Pamela (USACAN) <Pamela.Johann@usdoj.gov> wrote:

Hi Vickie,

Do you have time this afternoon for a quick chat?

Thanks,
Pam

Pam Johann

Assistant United States Attorney, Deputy Civil Chief

Northern District of California

T:  415-436-7025

D. VICTORIA BARANETSKY (SBN 311892)
THE CENTER FOR INVESTIGATIVE REPORTING
1400 65th Street, Suite 200
Emeryville, CA 94608
Telephone:    (510) 982-2890
Facsimile:    (510) 849-6141
Email:        vbaranetsky@revealnews.org

THERESE Y. CANNATA (SBN 88032)
AARON R. FIELD (SBN 310648)
ZACHARY E. COLBETH (SBN 297419)
CANNATA O'TOOLE & OLSON LLP
100 Pine Street, Suite 350
San Francisco, CA 94111
Telephone:    (415) 409-8900
Facsimile:    (415) 409-8904
Email:        tcannata@cofolaw.com
              afield@cofolaw.com
              zcolbeth@cofolaw.com

Attorneys for Plaintiffs
THE CENTER FOR INVESTIGATIVE
REPORTING and WILL EVANS

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO

| | |
|---|---|
| THE CENTER FOR INVESTIGATIVE REPORTING and WILL EVANS, | Case No. 3:22-cv-07182-WHA |
| Plaintiffs, | **DECLARATION OF D. VICTORIA BARANETSKY IN SUPPORT OF REPLY IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| UNITED STATES DEPARTMENT OF LABOR, | Date:    Dec 14, 2023 |
| | Time:    8:00 a.m. |
| Defendant. | Judge:   Hon. William Alsup |

I, D. VICTORIA BARANETSKY, declare:

1. I am a member in good standing of the State Bars of California, New York and New Jersey and General Counsel at The Center for Investigative Reporting. I am counsel of record for plaintiffs The Center for Investigative Reporting and Will Evans (hereafter "plaintiffs" or "CIR") in this action. I make this declaration of personal knowledge, and if called as a witness I could and would testify competently to the facts stated herein.

2. Attached hereto as **Exhibit A** is a true and correct copy of the Department of Justice's own guidance interpreting *Argus Leader*, which is entitled *Exemption 4 After the Supreme Court's Ruling in* Food Marketing Institute v. Argus Leader Media and which I obtained at https://www.justice.gov/oip/exemption-4-after-supreme-courts-ruling-food-marketing-institute-v-argus-leader-media.

3. Attached hereto as **Exhibit B** is a true and correct copy the Department of Justice's guidance regarding FOIA's Exemption 4, which is entitled *Step-by-Step Guide for Determining if Commercial or Financial Information Obtained from a Person is Confidential Under Exemption 4 of the FOIA* and which I obtained at https://www.justice.gov/oip/step-step-guide-determining-if-commercial-or-financial-information-obtained-person-confidential.

4. Attached hereto as **Exhibit C** is a true and correct copy of *Submitter Notice Response Portal Frequently Asked Questions: 17. Does the agency plan to release a list of companies who objected to the FOIA release of their EEO-1 data?*, published by the Department of Labor and which I obtained at https://www.dol.gov/agencies/ofccp/faqs/submitter-notice-response#g17.

5. Attached hereto as **Exhibit D** is a true and correct copy of an January 4, 2017 news article entitled, *Here are the 52 public companies that make the most money from the federal government* and which I obtained at https://www.cnbc.com/2017/01/04/top-government-contractors-52-public-companies-that-make-the-most.html.

1    I declare under penalty of perjury under the laws of the United States of America that the

2    foregoing is true and correct.

3    Executed in Berkeley, California on December 5, 2023.

4

5    _____

6    D. VICTORIA BARANETSKY

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

# Exemption 4 after the Supreme Court's Ruling in Food Marketing Institute v. Argus Leader Media



**Share** >

**Exemption 4 after the Supreme Court's Ruling
in *Food Marketing Institute v. Argus Leader Media***

On June 24, 2019, the Supreme Court issued an opinion addressing the meaning of the word "confidential" in Exemption 4 of the Freedom of Information Act (FOIA), 5 U.S.C. § 552(b)(4) (2012 & Supp. V 2017), that overturned over forty years of precedent.  *See Food Marketing Institute v. Argus Leader Media*, 139 S. Ct. 2356 (2019).  This guidance will discuss the newly defined contours of Exemption 4 in the wake of the Supreme Court's decision, and will provide agencies with workable rules in applying Exemption 4 going forward.

**Exemption 4 before *Argus Leader***

Exemption 4 protects "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential."  5 U.S.C. § 552(b)(4).  The word "confidential" is not defined in the FOIA and over the years courts have applied various tests to determine whether commercial and financial information provided to an agency fell within the parameters of Exemption 4.  In the early years of the FOIA, courts of appeals defined the term "confidential" based on whether there was an express or implied promise of confidentiality by the government to the submitting party, s*ee GSA v. Benson*, 415 F.2d 878, 881 (9th Cir. 1969), or whether the information was of the type not customarily released to the public by the submitter and which the government "agreed to treat . . . as confidential."  *Sterling Drug, Inc. v. FTC*, 450 F.2d 698, 709 (D.C. Cir. 1971); *see also M.A. Schapiro & Co. v. SEC*, 339 F. Supp. 467, 471 (D.D.C. 1972).

In 1974, however, these earlier tests were superseded by *National Parks & Conservation Association v. Morton,* 498 F.2d 765 (D.C. Cir. 1974), which significantly altered the test for confidentiality under Exemption 4 and became the leading case on the issue until the Supreme Court's recent decision.  In *National Parks,* the Court of Appeals for the District of Columbia Circuit determined that the term confidential should be defined using an objective standard that satisfies the legislative purpose of the exemption.  *See id.* at 767.  Relying on legislative

12/5/23, 5:29 PM    Exemption 4 After the Supreme Court's Ruling in Food Marketing Institute v. Argus Leader Media

history, the D.C. Circuit declared that the term confidential should be read to protect governmental and private interests in accordance with a two-prong test. *Id.* at 770. The court determined that information should be treated as confidential if its disclosure would: 1) impair the government's ability to obtain necessary information in the future, or 2) cause substantial harm to the competitive position of the submitter of the information. *Id.* While establishing this two-prong test, the court expressly reserved the question of whether any other governmental interests might also be embodied in a "third prong." S*ee id.* at 770 n.17. Subsequent courts eventually did adopt a third prong to protect information that would compromise agency program compliance and effectiveness.

Almost two decades after *National Parks*, the D.C. Circuit, sitting en banc, had an opportunity to reexamine the standard for determining confidentiality and reaffirmed the *National Parks* test. *See Critical Mass Energy Project v. NRC*, 975 F.2d 871, 875 (D.C. Cir. 1992). Notably, however, the court's decision in *Critical Mass* was based primarily on the principle of *stare decisis*, a legal doctrine which counsels against the overruling of an established precedent. While the court reaffirmed the *National Parks* test, it also set out to clarify "some misunderstanding as to its scope and application." *Id.* Relying on its understanding of Exemption 4's legislative purpose, the D.C. Circuit confined the application of the *National Parks* test to information that was required to be provided to the government and established a separate standard for determining whether information "voluntarily" submitted to an agency is "confidential." Under *Critical Mass*, commercial or financial information that was "voluntarily" provided to the government was categorically protected as long as it was not customarily disclosed to the public by the submitter. *Id.* at 879. On March 22, 1993, the Supreme Court denied a petition for certiorari to review the decision in *Critical Mass,* leaving it and *National Parks* as the leading cases for defining the term "confidential" under Exemption 4 until the Supreme Court's recent review of the issue in *Argus Leader.*

### *Procedural History Leading to the Supreme Court's Decision*

The records at issue in *Argus Leader* involved the Supplemental Nutrition Assistance Program (SNAP), formerly known as the food-stamp program, maintained by the U.S. Department of Agriculture (USDA). *See Argus Leader Media v. USDA*, 900 F. Supp. 2d 997, 1000 (D.S.D. 2012). The requester sought five years of data that included the names and addresses of all retail stores that participated in the SNAP program, as well as the yearly amount of SNAP benefits each store redeemed. *Id.* USDA released the names and addresses of over 321,000 retailers participating in the SNAP program, but withheld the store-level redemption data under Exemptions 3 and 4 of the FOIA. *Id.* at 1001; *see also* S. Ct. Joint App. 87, *Argus Leader*.

The District Court affirmed USDA's action under Exemption 3, in conjunction with 7 U.S.C. § 2018(c), a statute that protects certain SNAP related data. *Id.* at 1008. The Court of Appeals for the Eighth Circuit reversed and remanded, finding that the withheld redemption data did not fall

within withholding provision of Section 2018(c). *Argus Leader Media v. USDA*, 740 F.3d 1172, 1173 (8th Cir. 2014).

On remand, USDA continued to withhold the data under Exemption 4, arguing that disclosure would likely cause retailers substantial competitive harm. *Argus Leader*, 224 F. Supp. 3d 827, 830 (D.S.D. 2016). The District Court held a two-day bench trial and heard expert testimony from both agency and industry witnesses in order to determine whether the *National Parks* test for confidentiality was met. *Id.* at 830-831. The agency presented testimony from representatives from three retail store chains that participated in the SNAP program and from an officer of an association of retail grocery stores to show that store-level SNAP redemption data was customarily held confidential within the retail-food-store industry. *Id.* at 830. The agency did not proffer specific evidence about the practices of the roughly 321,000 other individual SNAP retailers whose information was sought by the FOIA request. *See id.* The district court ultimately found the competitive harm arguments made by USDA to be speculative and insufficient to meet the standard set by *National Parks. Id.* at 835. Accordingly, the court ordered the release of the redemption data. *Id.*

After being notified that USDA did not plan to appeal, Food Marketing Institute (FMI), a trade group representing grocery retailers, intervened and appealed to the Court of Appeals for the Eighth Circuit. *See Argus Leader Media v. USDA*, 889 F.3d 914, 916 (8th Cir. 2018). Before the Eighth Circuit, FMI argued that the court should disregard the *National Parks* standard and should instead apply the ordinary dictionary definition of the term "confidential" to determine whether Exemption 4 applied. *See id.* at 916 n.4. The court rejected this argument and affirmed the district court's decision that the data did not satisfy the "substantial competitive harm" test. *Id.* at 917.

FMI petitioned the Supreme Court to review the matter, and on January 11, 2019, the Court granted FMI's petition for writ of certiorari. *See Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 915, 202 L. Ed. 2d 641 (2019).

### The Supreme Court's Rejection of the *National Parks* Test

In *Argus Leader* the Supreme Court addressed the question of "when does information provided to a federal agency qualify as 'confidential'" under Exemption 4. *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2360 (2019). Noting that the FOIA itself does not provide a definition of the term "confidential," the Court found that "as usual, [it must] ask what [the] term's 'ordinary, contemporary, common meaning' was when Congress enacted FOIA in 1966." *Id.* at 2362 (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). Citing a version of Webster's New Collegiate Dictionary contemporaneous to the enactment of Exemption 4, the Court found that " [t]he term 'confidential' meant then, as it does now, 'private' or 'secret.'" *Id.* at 2363.

The Supreme Court emphasized that "[n]otably lacking from dictionary definitions, early case law, or any other usual source that might shed light on the statute's ordinary meaning is any mention of the 'substantial competitive harm' requirement" established in *National Parks.  Id.* The Court criticized the *National Parks* standard for expanding the definition of confidential beyond the term's ordinary meaning based on select portions of legislative history.  *Id.* at 2364. The Court explained that it could not approve such "a casual disregard of the rules of statutory interpretation," which focus on "the ordinary meaning and structure of the law itself," when as in this case, that examination provides a clear answer.  *Id.*  In rejecting the *National Parks* test, the Court noted that it "has drawn considerable criticism over the years," and that even the D.C. Circuit had "distanced itself from the opinion" in *Critical Mass.  Id.* at 2365.  In *Critical Mass* the D.C. Circuit had retained the substantial competitive harm test for required submissions, but "adhered to a much more traditional understanding of the statutory term 'confidential'" for voluntary submissions.  *Argus Leader,* 139 S. Ct. at 2365.  That, in and of itself was problematic, though, as the Supreme Court could not "discern a persuasive reason to afford the *same* statutory term two such radically different constructions."  *Id.*

In rejecting *National Parks*, the Court was not persuaded by Argus Leader's attempts "to try to salvage the result, if not the reasoning" of that decision.  *Id.*  First, the Court rejected Argus Leader's "rearranging [of] the text of Exemption 4 to create a phrase that does not appear in the statute:  'confidential commercial information,'" which Argus Leader maintained was a phrase akin to a preexisting common law term of art that covers only information "whose release would lead to substantial competitive harm."  *Id.*  The Court explained that it does not ordinarily "imbue statutory terms of art associated with a specialized common law meaning when Congress hasn't itself invoked the common law terms of art associated with that meaning."  *Id.*

The Court also rejected Argus Leader's argument that Congress effectively ratified the *National Parks* standard by enacting similar phrases in other statutes.  *Id.*  The Court noted that while this "might (or might not) tell us what later Congresses understood those other statutes to mean, it tells us nothing about Congress's understanding of the language it enacted in Exemption 4 in 1966."  *Id.* at 2366.

Finally, the Court also rejected Argus Leader's policy argument that the "substantial competitive harm" requirement from *National Parks* should be maintained because FOIA exemptions should be construed narrowly.  *See id.* at 2366.  The Court explained that it normally has "no license to give [statutory] exemption[s] anything but a fair reading."  *Id.*  The Court opined that "just as [it] cannot properly *expand* Exemption 4 beyond what its terms permit," it likewise "cannot arbitrarily *constrict* it either by adding limitations found nowhere in its terms." *Id.*

## Supreme Court's Definition of "Confidential"
## Based on the Ordinary Meaning of the Term

As noted above, from the outset of its analysis, the Supreme Court found that the term "confidential" under Exemption 4 continues to carry the same meaning today that it did during the FOIA's enactment, which is information that is "private" or "secret." *Id.* at 2363. The Court further held that "[c]ontemporary dictionaries suggest two conditions that might be required for information communicated to another to be considered confidential." *Id.* First, "information communicated to another remains confidential whenever it is customarily kept private, or at least closely held, by the person imparting it." *Id.* Second, "information might be considered confidential only if the party receiving it provides some assurance that it will remain secret." *Id.*

The Court determined that the first condition – that the information customarily be kept private or closely held by the submitter – must be met, because "it is hard to see how information could be deemed confidential if its owner shares it freely." *Id.* The Court determined that this condition had been met in the case because the record reflected that SNAP retailers do not customarily disclose store-level SNAP data. *See id.*; *see also Argus Leader*, 224 F. Supp. 3d at 830 (discussing testimony from agency witnesses).

As to the second condition – whether information must be communicated to the government with some assurance that it will be kept private – the Court found that it did not need to resolve that question, as that condition was clearly satisfied in the case before it. *Argus Leader*, 139 S. Ct. at 2363. USDA had a long history, through its promulgation of regulations, of promising retailers that it would keep the store-level SNAP data confidential. *Id.*; *see, e.g.,* 43 Fed. Reg. 43275 (1978).

In conclusion, the Court held that "at least where commercial or financial information is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy, the information is 'confidential' within the meaning of Exemption 4." *Argus Leader*, 139 S. Ct. at 2366.

The Court's ruling thus leaves two questions open. First, is it necessary for the government to provide some assurance of confidentiality to the submitter of information at the time the information is conveyed to the government so that it does not "*lose* its confidential character," *Id.* at 2363, and if such an assurance is required, can it be implied? The Supreme Court's prior decision in *Department of Justice v. Landano*, which the Court cited in *Argus Leader*, *see* 139 S. Ct. at 2364, provides helpful analysis in answering these questions.

### *Department of Justice v. Landano, 508 U.S. 165 (1993)*

Decades prior to its decision in *Argus Leader*, the Supreme Court had examined the term "confidential" in the context of the protections afforded to confidential sources under Exemption 7(D) of the FOIA. *See Dep't of Justice v. Landano,* 508 U.S. 165 (1993). The requester in *Landano* argued that certain FBI sources could not have reasonably expected confidentiality because they could be called to testify and the FBI might be obliged to reveal their names and

12/5/23, 5:29 PM     Exemption 4 After Supreme Court's Ruling in Food Marketing Institute v. Argus Leader Media

the information they provided under *Brady,* the Jenks Act, or federal discovery rules.  *Id.* at 173. Like the Court in *Argus Leader*, the Court in *Landano* rejected that argument based on the dictionary definition of the term "confidential."  In light of that definition, the Court determined that "[i]n common usage, confidentiality is not limited to complete anonymity or secrecy."  *Id.* The Court explained, "[a] statement can be made 'in confidence' even if the speaker knows the communication will be shared with limited others, as long as the speaker expects that the information will not be published indiscriminately."  *Id.*

Applying this understanding of the term "confidential" to Exemption 7(D), the Court then turned to the government's argument for a presumption that *all* FBI sources who provide information during the course of a criminal investigation should be considered confidential.  The Court rejected this argument, finding that "the communications the FBI receives can range from the extremely sensitive to the routine," and it is therefore not reasonable to infer an implied understanding of confidentiality in all cases.  *Id.* at 176.  At the same time, the Court explained that "[m]ore narrowly defined circumstances," could "provide a basis for inferring confidentiality."  *Id.* at 179.  Using an objective test, the Court explained that factors that could be considered in determining if confidentiality can be inferred in the context of Exemption 7(D) are the "nature of the informant's ongoing relationship with the [government]" and "the character of the crime at issue," as well as "the source's relation to the crime."  *Id.*

As discussed more fully below, the Supreme Court's approach to defining the term "confidential" in *Landano*, including the objective test it provides for determining if confidentiality can be implied, provides a helpful framework for applying the new Exemption 4 standard established in *Argus Leader.*

### Applying the *Argus Leader* Decision in Determining Whether Information Is "Confidential" Under Exemption 4

In light of the Supreme Court's decision in *Argus Leader*, agencies should no longer apply the "substantial competitive harm" test from *National Parks* to determine whether information is "confidential" under Exemption 4.  Rather, as the Supreme Court detailed in its opinion, agencies should apply the ordinary meaning of that term.  That meaning can potentially implicate two conditions, namely, (1) whether the information is "customarily kept private, or at least closely held," by the submitter; and (2) whether the government provides "some assurance" that the information will not be publicly disclosed.  *See Argus Leader*, 139 S. Ct. at 2363.  Although the first condition must normally be established at least with evidence about general industry practices, it is yet unclear whether future judicial precedents governing Exemption 4 will require that both conditions exist.  The Supreme Court did not have occasion to decide that issue in *Argus Leader*, where both were "clearly satisf[ied]."  *Id*.  In light of that current legal uncertainty, agencies should as a matter of sound administrative practice consider both conditions in the process of determining whether to invoke Exemption 4's protection for "confidential" commercial or financial information.  The step-by-step guide being issued

contemporaneously with this guidance should be followed to aid agencies in making that determination.

*First Condition – Submitter's Treatment of the Information*

First, in order to qualify as "confidential," the party imparting the information (*i.e.*, the submitter) should customarily treat the information as private. As the Supreme Court explained, "it is hard to see how information could be deemed confidential if its owner shares it freely." 139 S. Ct. at 2363. Often an agency can determine whether this condition is met based on its own knowledge of the information, the submitter's practices, and/or from the records themselves. Agencies may also seek additional information from the submitter about its practices. And as *Argus Leader* itself demonstrates, industry representatives can provide the necessary information regarding the customary treatment of such information. That option is particularly appropriate in contexts in which a large number of submitters would make it difficult to collect information from each submitter directly.

*Second Condition – Assurance of Confidentiality by Government*

As mentioned above, while the Supreme Court's opinion did not determine to what extent the second condition – an assurance of confidentiality by the government – must also be met, agencies should as a matter of sound administrative practice consider whether the context in which the information was provided to the agency reflects such an assurance.

Such an assurance of confidentiality can be either explicit or implicit. Neither the Court's decision in *Argus Leader* nor any of the authority it cited suggests a requirement of an express (as opposed to implied) assurance of confidentiality by the government. Notably, when discussing "assurances," the Court cited approvingly to the Ninth Circuit's "conclu[sion] that Exemption 4 would 'protect information that a private individual wishes to keep confidential for his own purposes, but reveals to the government under the express or *implied* promise' of confidentiality." *Argus Leader,* 139 S. Ct. at 2363 (quoting *GSA v. Benson*, 415 F.2d 878, 881 (9th Cir. 1969) (emphasis added).

*Express Assurance*

An express assurance of confidentiality can be established in several ways. It can be found in direct communications with the submitter, as well as through general notices on agency websites or, as in *Argus Leader*, through regulations indicating that information will not be publicly disclosed. Where an express assurance of confidential treatment exists, assuming that the submitter also satisfies the first condition, the standards for confidentiality under Exemption 4 are met.

Of course, such notices or communications could also explicitly notify submitters of the agency's intention to *publicly disseminate* the information. In those situations, the information,

12/5/23, 5:29 PM          Case 2:24 Exemption 4 after the Supreme Court's Ruling in Food Marketing Institute v. Argus Leader Media

when objectively viewed in context, would be deemed to have lost its "confidential" character under Exemption 4 upon its submission to the government, given that the submitter was on notice that it would be disclosed.

*Implied Assurance*

In determining whether there was an implied assurance of confidentiality, agencies can be guided by the analytical framework provided in *Landano*.  As noted above, in *Landano*, the Court provided an objective test to assess whether "an implied assurance of confidentiality can be inferred," based on "generic circumstances" surrounding the communication between the informant and the government that would "characteristically support an inference of confidentiality."  508 U.S. at 179.  As *Landano* explained for criminal investigation contexts, factors such as the "nature of the informant's ongoing relationships with the [government]" and "the nature of the crime and the source's relation to it" may help determine whether there was an implied promise of confidentiality under Exemption 7(D).  *Id.*

Similarly, in the context of Exemption 4, agencies can look to the context in which the information was provided to the government to determine if there was an implied assurance of confidentiality.  Factors to consider include the government's treatment of similar information and its broader treatment of information related to the program or initiative to which the information relates.  For example, an agency's long history of protecting certain commercial or financial information can serve as an implied assurance to submitters that the agency will continue treating their records in the same manner.

Conversely, such factors may in some contexts result in the opposite conclusion that the submitter could not have had a reasonable expectation of confidentiality.  For example, absent an express assurance by the agency, a submitter would not normally have a reasonable expectation of confidentiality for records the agency has historically disclosed.  In addition, what the government pays a private entity to supply goods or services to the government reflects the government's own actions and will often undermine a submitter's claim to reasonably expect such information to be kept confidential.

## Submitter-Notice Process

Prior to *Argus Leader,* agencies had a long history of conducting predisclosure notification of submitters, seeking their views on whether a contemplated FOIA disclosure could likely result in substantial competitive harm.

Many agency predisclosure notification regulations have followed the model provided by the Department of Justice, which defines the term "confidential commercial information" more broadly, without reference to competitive harm, and instead refers more generically to material that may be protected under Exemption 4.  In the wake of *Argus Leader*, agencies should now use those predisclosure notification procedures when necessary to seek the submitter's views

on whether the two conditions that agencies should consider in determining whether information is "confidential" for purposes of Exemption 4 of the FOIA, as outlined in this guidance, are met.

## Conclusion

The Supreme Court's decision in *Argus Leader* changed the way agencies should define the word "confidential" for purposes of Exemption 4 of the FOIA.  The "substantial competitive harm" test was found to be inconsistent with the terms of the statute.  Instead, the term confidential is to be afforded its ordinary, common meaning.  Attached to this guidance is a step-by-step guide for agencies to use to determine whether information can be protected as confidential under Exemption 4.  Agency personnel with any questions about applying the new standard are encouraged to contact OIP.

**Step-by-Step Guide for Determining if Commercial or Financial Information Obtained from a Person is Confidential Under Exemption 4 of the FOIA**

*Updated October 4, 2019*

✉ Office of Information Policy (OIP)
U.S. Department of Justice
6th Floor
441 G St. NW
Washington DC 20530

📞 202-514-3642
Email: DOJ.OIP.FOIA@usdoj.gov

The above e-mail address is used for general correspondence and inquiries. To submit a FOIA request or FOIA administrative appeal to OIP, please visit the Submit and Track a Request or Appeal page.

# EXHIBIT B

# Step-by-Step Guide for Determining if Commercial or Financial Information Obtained from a Person is Confidential Under Exemption 4 of the FOIA



Share  >

**Step-by-Step Guide for Determining if
Commercial or Financial Information Obtained from a Person is
Confidential Under Exemption 4 of the FOIA**

In the wake of the Supreme Court's decision in *Argus Leader,* the term "confidential" under Exemption 4 must be given its "ordinary" meaning.  This step-by-step guide can be used by agencies, in conjunction with OIP's guidance, to determine whether commercial or financial information provided by a person is "confidential" under Exemption 4.

**1.  Does the submitter customarily keep the information private or closely-held?  (This inquiry may in appropriate contexts be determined from industry practices concerning the information.)**

- If no, the information is *not* confidential under Exemption 4.

- If yes, answer question 2.

**2.  Did the government provide an express or implied assurance of confidentiality when the information was shared with the government?**

- If no, answer question 3.

- If yes, the information is confidential under Exemption 4 (this is the situation that was present in *Argus Leader*).

**3.  Were there express or implied indications at the time the information was submitted that the government would publicly disclose the information?**

- If no, the information is "confidential" under Exemption 4 (the government has effectively been silent – it hasn't indicated the information would be protected or disclosed – so a

12/5/23, 5:30 PM    Step-by-Step Guide for Determining if Commercial or Financial Information Obtained from a Person i…

submitter's practice of keeping the information private will be sufficient to warrant confidential status).

- If yes, and no other sufficient countervailing factors exist, the submitter could not reasonably expect confidentiality upon submission and so the information is *not* confidential under Exemption 4.

**Agencies should feel free to contact OIP if they have any questions or for assistance in applying this analysis.**

*Updated November 18, 2022*

✉ Office of Information Policy (OIP)
U.S. Department of Justice
6th Floor
441 G St. NW
Washington DC 20530

📞 202-514-3642
Email: DOJ.OIP.FOIA@usdoj.gov

The above e-mail address is used for general correspondence and inquiries. To submit a FOIA request or FOIA administrative appeal to OIP, please visit the Submit and Track a Request or Appeal page.

# EXHIBIT C

12/5/23, 5:32 PM

⊙ **U.S. DEPARTMENT OF LABOR**

**Office of Federal Contract Compliance Programs**

# Submitter Notice Response Portal Frequently Asked Questions

1. [What is the Freedom of Information Act (FOIA)?](#)
2. [Who submitted this FOIA request?](#)
3. [What is the scope of the request?](#)
4. [Will information from this request be made public?](#)
5. [How can contractors receive updates about this FOIA request from OFCCP?](#)
6. [How do contractors find out whether their company filed Type 2 EEO-1 Reports from 2016-2020?](#)
7. [If a company was only a federal contractor for part of the time from 2016-2020, is its EEO-1 data included in this request?](#)
8. [What is FOIA Exemption 4?](#)
9. [Where can contractors find the Federal Register Notice that OFCCP published?](#)
10. [What happens if a contractor does not submit a written objection?](#)
11. [What information should contractors include in a written objection if their company decides to file one?](#)
12. [What will OFCCP do with the written objection once it receives it?](#)
13. [If a contractor submits a written objection and OFCCP, after its review, determines that the company's EEO-1 Report Type 2 data can be withheld from disclosure, what happens then?](#)
14. [If a contractor submits a written objection and OFCCP, after its review, determines that the EEO-1 Report Type 2 data must be disclosed, what happens then?](#)
15. [Does OFFCP have a position on whether the requested data should be disclosed or withheld?](#)
16. [How long after the contractors submit their response will they be notified of the determination?](#)
17. [Does the agency plan to release a list of companies who objected to the FOIA release of their EEO-1 data?](#)
18. [If contractors have additional questions that are not answered by these FAQs, how can they contact OFCCP to ask these questions?](#)

---

## 1. What is the Freedom of Information Act (FOIA)?

The Freedom of Information Act (FOIA) provides that any person has the right to request access to federal agency records or information. Like all federal agencies, the U.S. Department of Labor (DOL) is required to disclose records requested in writing by any person. However, agencies may withhold information pursuant to [nine exemptions and three exclusions](#) contained in the statute. FOIA applies only to federal agencies and does not create a right of access to records held by Congress, the courts, or by state or local government agencies. Read [more about FOIA](#).

[Back to Top](#)

---

## 2. Who submitted this FOIA request?

[Will Evans](#) from the Center for Investigative Reporting (CIR), a non-profit news organization based in Emeryville, California.

[Back to Top](#)

---

## 3. What is the scope of the request?

The request seeks all Type 2 Consolidated EEO-1 Report demographic data (i.e., "Component 1" EEO-1 Reports) submitted by federal contractors and first-tier subcontractors for reporting years 2016-2020. The Type 2 Consolidated EEO-1 Report is one of several different types of reports that are filed by entities with multiple establishments. EEO-1 reports filed by single-establishment contractors (Type 1) and other EEO-1 reports filed by multi-establishment contractors (Types 3, 4, 6, and 8) are not covered by the request. EEO-1 reports containing compensation information (i.e., "Component 2" EEO-1 reports), which were collected by the EEOC, are also not covered by the request. Furthermore, Type 2 data only applies to multijurisdictional establishments and not to contractors with only one establishment. Contractors that only have one establishment are not subject to this request.

For more information on the EEO-1 Report, please refer to our EEO-1 FAQs.

Back to Top

---

## 4. Will information from this request be made public?

Yes. FOIA requires that if agencies receive three or more requests for the same information, it must make all records that have been disclosed in response to those requests available for public inspection in an electronic format 5 U.S.C. 552(a)(2)(D)(ii)(II). OFCCP has received more than three requests for the information requested by CIR. Responses and productions provided to the requester of this FOIA request will be made publicly available in our FOIA library.

Back to Top

---

## 5. How can contractors receive updates about this FOIA request from OFCCP?

We encourage all contractors to subscribe to OFCCP's stakeholder communications to receive updates from OFCCP about this FOIA request and other important OFCCP matters. You can subscribe on the OFCCP webpage and click on **SUBSCRIBE** at the top right of our website to complete our questionnaire. Please remember to add OFCCP@subscriptions.dol.gov and govdelivery.com address on your safe senders list. We remind current federal contractors that they must **register** each establishment and/or functional business unit in **OFCCP's Contractor Portal**, and **annually certify compliance** by accessing the OFCCP Contractor Portal.

If you have questions, please email us at OFCCP-FOIA-EEO1-Questions@dol.gov or contact our helpdesk at 800-397-6251.

Back to Top

---

## 6. How do contractors find out whether their company filed Type 2 EEO-1 Reports from 2016-2020?

If a company has filed EEO-1 Reports in the past, the EEO-1 Component 1 Reports from 2016-2020 are available in the EEO-1 Online Filing System. From the Company Dashboard, click on Historic Data (Prior EEO-1 Reports) to download prior year reports.

Back to Top

---

## 7. If a company was only a federal contractor for part of the time from 2016-2020, is its EEO-1 data included in this request?

Any Type 2 EEO-1 Report filed from 2016-2020 indicating that a company was a federal contractor is included in the request.

Back to Top

---

## 8. What is FOIA Exemption 4?

The Freedom of Information Act (FOIA) is a statute that provides the public the right to request access to records from any federal agency. FOIA also contains some "exemptions" under which agencies may redact, or withhold entirely, certain information that is requested. FOIA Exemption 4 protects from disclosure "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential." 5 U.S.C. § 552(b)(4).

Back to Top

---

## 9. Where can contractors find the Federal Register Notice that OFCCP published?

Here at the Federal Register Notice.

Back to Top

---

## 10. What happens if a contractor does not submit a written objection?

If OFCCP does not receive a written objection, the agency will assume that the company has no objection to disclosure and will begin the process of sending the contractor's Type 2 EEO-1 Report data to the FOIA requester (CIR).

Back to Top

---

## 11. What information should contractors include in a written objection if their company decides to file one?

Contractors should include the first and last name of their company's point of contact (POC), the POC's phone number and email address, the company's name and address, any other entities associated with your company for which contractors are also submitting objections, and the parent company's EEO-1 unit number.

Contractors should also provide as much information as possible addressing why they believe their Type 2 EEO-1 Report data should not be released under FOIA, including whether the information is commercial/financial and confidential. At a minimum, OFCCP suggests that written objections address the following questions:

- Do you consider information from your EEO-1 Report to be a trade secret or commercial information? If yes, please explain why.
- Do you customarily keep the requested information private or closely held? If yes, please explain what steps have been taken to protect data contained in your reports, and to whom it has been disclosed?
- Do you contend that the government provided an express or implied assurance of confidentiality? If yes, please explain. If no, skip to the next question.
- If you answered "no" to the previous question, were there expressed or implied indications at the time the information was submitted that the government would publicly disclose the information? If yes, please explain.
- Do you believe that disclosure of this information could cause harm to an interest protected by Exemption 4 (such as by causing genuine harm to your economic or business interests)? If yes, please explain.

Back to Top

---

## 12. What will OFCCP do with the written objection once it receives it?

For contractors that submitted a timely objection, OFCCP will independently evaluate the objection(s) submitted and make a determination as to whether the information can be properly withheld under FOIA Exemption 4 based on the information provided in the written objection.

Back to Top

---

## 13. If a contractor submits a written objection and OFCCP, after its review, determines that the company's EEO-1 Report Type 2 data can be withheld from disclosure, what happens then?

OFCCP will notify the company and the FOIA requester of our determination to withhold the data.

Back to Top

## 14. If a contractor submits a written objection and OFCCP, after its review, determines that the EEO-1 Report Type 2 data must be disclosed, what happens then?

OFCCP will provide written notice to the contractor of the reasons the disclosure objections were not sustained, a description of the information that will be disclosed, and a specified disclosure date that is a reasonable time after the contractor receives notice of OFCCP's determination.

Back to Top

## 15. Does OFFCP have a position on whether the requested data should be disclosed or withheld?

OFCCP believes the information requested may be protected from disclosure under FOIA Exemption 4, which protects disclosure of confidential commercial information, but has not yet determined whether the requested information is protected from disclosure under that exemption. OFCCP will make a determination about whether a particular contractor's Type 2 EEO-1 data can be withheld under Exemption 4 after evaluating the written objection submitted by that contractor.

Back to Top

## 16. How long after the contractors submit their response will they be notified of the determination?

We cannot give an exact time by when OFCCP will make its determination before we know how many objections we will receive. We intend to issue responses as soon as practicable.

Back to Top

## 17. Does the agency plan to release a list of companies who objected to the FOIA release of their EEO-1 data?

OFCCP is currently processing and cataloguing the submitter objections it has received, and thus it does not yet have a complete, finalized list of federal contractors that have submitted objections. In the course of the ongoing FOIA litigation, CIR has requested a list of contractors that have submitted objections. Under FOIA and relevant interpretive case law, the identities of objecting contractors are not exempt under FOIA Exemption 4. Accordingly, once the processing of the objector list has been completed and the accuracy of the list has been confirmed, OFCCP will provide CIR with the requested list of objecting contractors.

Back to Top

## 18. If contractors have additional questions that are not answered by these FAQs, how can they contact OFCCP to ask these questions?

The best method of contact for specific questions is by emailing us at OFCCP-FOIA-EEO1-Questions@dol.gov. They may also contact our Help Desk number at 1-800-397-6251.

Back to Top

Scroll to Top ⊕

| Agencies | Forms | About Us | News | Contact Us |



**Office of Federal Contract Compliance Programs**

An agency within the U.S. Department of Labor
200 Constitution Ave NW
Washington, DC 20210
<u>1-866-4-USA-DOL</u>
<u>1-866-487-2365</u>
<u>www.dol.gov</u>

**FEDERAL GOVERNMENT** ⊞

White House

Benefits.gov

Coronavirus Resources

Disaster Recovery Assistance

DisasterAssistance.gov

USA.gov

Notification of EEO Violations

No Fear Act Data

U.S. Office of Special Counsel

**LABOR DEPARTMENT** ⊞

About DOL

Guidance Search

Español

Office of Inspector General

Subscribe to the DOL Newsletter

Read the DOL Newsletter

Emergency Accountability Status Link

A to Z Index

**ABOUT THE SITE** ⊞

Disclaimers

Plug-Ins Used on DOL.gov

Accessibility Statement

Connect With DOL



Site Map  |  Important Website Notices  |  Privacy & Security Statement

# EXHIBIT D

12/5/23, 5:34 PM

Here are the 52 public companies that make the most money from the federal government

 CNBC

WATCH LIVE


ORACLE    6 ways to grow your people and business    Read the ebook

  with ERIC CHEMI

# Here are the 52 public companies that make the most money from the federal government

Mark Fahey | Nick Wells | Eric Chemi
Published 9:16 AM ET Wed, 4 Jan 2017 | Updated 10:14 AM ET Wed, 4 Jan 2017

 CNBC



▶ Trump vs. federal contractors
10:13 AM ET Wed, 4 Jan 2017 | 01:24


**Understanding Nas integrity**
Paid Post For Nasdaq

President-elect Donald Trump can influence stock prices and change corporate plans simply by tweeting, and few companies are as dependent on the government as the big contractors.

About 61 entities earned $1 billion or more from federal contracts in the 2015 fiscal year, and 34 of those are publicly traded companies, according to data from the federal procurement data system. As you would expect, the biggest recipients are defense contractors, which already had good reason to watch Trump closely after he was involved in a deal to keep Carrier jobs in Indiana.

Companies like Lockheed Martin may top the list at $36 billion in contractual obligations, but companies across several other

FROM THE WEB    Sponsored Links by Taboola

**American Shoppers Should Think Twice Before Buying from These 2 Stores**
Online Shopping Tools

**Cardiologist: Too Much Belly Fat? Do This Before Bed**
Health & Welfare

**Here Are 23 Of The Coolest Gifts For Christmas 2023**
Best Tech Trend

**This Superconductor Stock Is Set To Skyrocket!**
The Financial Star    Read More



For the energy sector, Exxon Mobil is the biggest contractor with almost $800 million in petroleum contracts, mostly for the Defense Logistics Agency. That may seem like a lot, but it's a negligible fraction of the energy giant's revenue each year. The same is true for the telecom leader, AT&T, and shipping leader FedEx, which each made a little over $600 million from the government in 2015.

The situation is completely different for the leading firm in information technology, SAIC, which depends on government contracts for 78 percent of its revenue. Private prisons firm GEO Group lead the real estate sector, making about 71 percent of its $1.8 billion in sales from government contracts.

In health care, McKesson Corp. made over $8 billion, most of which came from its lucrative relationship with Veteran's Affairs. That's about 4 percent of the pharmaceutical distributor's revenue.

For companies classified as financial firms, Berkshire Hathaway was the largest government contractor. But the company didn't earn that position through its financial businesses — most of its government revenue came from its nonfinancial holdings, including providing metals to the U.S. Mint, mobile homes for FEMA and flight training for the FAA, according to government data.

Not counting state or local spending, the federal government paid almost $240 billion to its top 100 contractors in 2015. Those are big sums, and those companies are going to be noticing everything Trump says.

---



Mark Fahey
Data Journalist



CNBC WATCH LIVE

Eric Chemi

## RELATED SECURITIES

| Symbol | Price | Change | %Change |
|---|---|---|---|
| GEO | --- | | |
| LMT | --- | | |

## MORE FROM CNBC

by Taboola

Americans are 'doom spending' — here's why that's a problem

Return to office is 'dead,' Stanford economist says. Here's why

Trump slams JPMorgan CEO Jamie Dimon for praising Nikki Haley

Trump financial watchdog tells judge about $40 million in previously unreported transfers

IBM to end 401(k) match, offering a hybrid plan. Other firms can't 'pull off this type of change,' expert says

Here's what it would take for the Fed to start slashing interest rates in 2024

CCPA Notice

## FROM THE WEB

Sponsored Links by Taboola

Amazon Hates When Prime Members Do This, But They Can't Stop You

Online Shopping Tools

50-Year Wall Street Legend Issues New Nvidia Warning

Chaikin Analytics

Amazon Hates When You Do This, But They Can't Stop You (It's Genius)

MARKETS CNBC TV WATCHLIST MENU

12/5/23, 5:34 PM    Case 3:22-cv-07182-WHA Document 45-2 Filed 01/12/23 Page 37 of 29







Breakthrough Device Shocks Neuropathy Experts Worldwide

Health Insight Journal

this pillowcase is becoming the most sought after gift in 2023

Blissy

Subscribe to CNBC PRO

Licensing & Reprints

Select Personal Finance

Join the CNBC Panel

Select Shopping

Digital Products

Internships

About CNBC

Site Map

Careers

Contact

Subscribe to Investing Club

CNBC Councils

CNBC on Peacock

Supply Chain Values

Closed Captioning

News Releases

Corrections

Ad Choices

Podcasts

Help

News Tips

Got a confidential news tip? We want to hear from you.

GET IN TOUCH

Advertise With Us

PLEASE CONTACT US

CNBC Newsletters

Sign up for free newsletters and get more CNBC delivered to your inbox

SIGN UP NOW

Get this delivered to your inbox, and more info about our products and services.

12/5/23, 5:34 PM

Top government contractors: 52 public companies that make the most



CA Notice

Terms of Service

© 2023 CNBC LLC. All Rights Reserved. A Division of NBCUniversal

Data is a real-time snapshot *Data is delayed at least 15 minutes. Global Business and Financial News, Stock Quotes, and Market Data and Analysis.

Market Data Terms of Use and Disclaimers

Data also provided by REFINITIV 

SER-75

1

**ATTORNEY ATTESTATION**

2      I, Aaron R. Field, am the ECF User whose ID and password are being used to file this

3   document. In compliance with N.D. Cal. Civil L.R. 5-1(i)(3), I hereby attest that concurrence in

4   the filing of this document has been obtained from the other Signatories.

5

6                                                     */s/ Aaron Field*
                                                     AARON R. FIELD

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CANNATA O' TOOLE & OLSON LLP
ATTORNEYS AT LAW
100 PINE STREET, SUITE 350, SAN FRANCISCO CA, 94111
TEL: 415.409.8900 – FAX: 415.409.8904

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

|  |  |
|---|---|
| THE CENTER FOR INVESTIGATIVE REPORTING and WILL EVANS,<br><br>      Plaintiffs,<br><br>  v.<br><br>UNITED STATES DEPARTMENT OF LABOR,<br><br>      Defendant. | Case No. 22-cv-07182-WHA<br><br>**SUPPLEMENTAL DECLARATION OF PATRICK F. McKAY, Ph.D., IN OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANT'S MOTION** |

I, Patrick F. McKay, Ph.D., state as follows:

1.　　This declaration supplements my initial declaration submitted in support of the Department of Labor's motion for summary judgment and addresses points raised in Plaintiffs' cross-motion for summary judgment and the declarations of Dr. Mark Bendick ("Bendick Declaration") and Jamillah Bowman Williams ("Bowman Williams Declaration") on issues relating to the use and value of EEO-1 data and the potential commercial harms to reporting firms should it be publicly released.

2.　　The Bendick Declaration argues that workforce data and "HR Reports" are not commercially valuable to organizational functioning.  As a human resource management (HRM) scholar, practitioner, and educator for nearly 25 years, I can say that such a characterization of the HRM function in organizations is inaccurate.

3.　　First, the Bendick Declaration speaks generally of "HR reports."  The data in EEO-1 reports contain detailed human resource management ("HRM") data.  HRM involves an organization's effort to acquire, deploy, and retain a qualified workforce, thus allowing a firm to pursue and achieve its strategic objectives. A key component of the HRM system is a company's employee headcount,

1   particularly among those in its core workforce (i.e., employees who are central to a company's

2   production of goods and services such as engineers in an engineering firm), as well as the requisite

3   number of support staff (e.g., administrative personnel, management, etc.) across the occupational

4   categories of its workforce. Employee headcount is a pivotal metric as it represents the human resources

5   a company has at its disposal in pursuing its business objectives (Noe et al., 2022).

6       4.      Failure to monitor the employee headcount effectively can result in employee shortages

7   or surpluses, both of which are damaging to a firm's bottom line (through reduced product

8   generation/service provision and unnecessary labor expenditures, respectively).  For example, a retailer

9   must forecast the number of qualified sales associates it must have deployed on the sales floor to ensure

10  that it provides the requisite quality of customer service, product availability, etc. to sustain the business.

11  Likewise, the retail company must have sufficient headcounts of support staff such as cashiers and

12  product stockers, all needed to build a store workforce that maximizes company revenue, customer

13  service, and repeat business. Companies that have a greater number of qualified workers tend to have

14  higher labor productivity than firms that have a lower number of qualified workers (Della Torre et al.,

15  2018).

16      5.      Moreover, an important function in human resource management is human resource

17  planning, which is undertaken to determine if a company has a sufficient quality and quantity of labor in

18  a year to produce goods and provide services central to an organization's operation. HR planning is part

19  of a firm's overall HRM strategy. Strategic plans consist of short-term (1-2 years) or long-term planning

20  cycles (3-5 years). Consequently, a company's monitoring of employee headcount is not a singular

21  event, but part of a company's overall HRM strategy to ensure that it has the necessary human talent to

22  conduct its business effectively over time. Thus, it is a company imperative, and a central human

23  resource management responsibility, to monitor employee headcounts in terms of sufficient quality and

24  quantity of labor, maintain the optimal ratio of management to labor, and be responsive to needed

25  headcount adjustments to enable a firm to operate effectively, capture market value, and maximum

26  returns to shareholders.

27      6.      The Bendick Declaration states at Paragraph 8 that "To economists, other business

28  analysts, and business managers, commercially-valuable information takes one of three forms:" financial

SUPPLEMENTAL DECLARATION OF PATRICK McKAY
No. 22-cv-07182-WHA                    2

1  information, trade secrets, and "managerial information," which he describes as "internal management

2  of revenue-producing aspects of a firm -- for example, sales, costs, profit margins, resource allocation,

3  and strategic plans for different parts of its operations or different products." Staffing activities involve

4  the allocation of human resources, which falls within "resource allocation," which Dr. Bendick concedes

5  is part of managerial information. And the other parts of "managerial information" that he cites are

6  strongly dependent upon the employee headcounts necessary for a company to function effectively

7  enough to drive revenues, profits, strategic plans for product/business expansion, and other strategic

8  initiatives.

9         7.     In fact, in my business school classes, I teach budding HRM practitioners and managers

10  that company strategic planning is prefaced on product/service demand and the employee headcounts

11  necessary to execute strategic objectives such as meeting desired profit margins, capturing a product

12  market, etc. I teach an HR planning case study that has students compute employee headcount needs

13  (using Markov analysis, a labor need forecasting technique) based upon various forms of employee

14  movements (i.e., promotions, demotions, quitting, etc.) from one year to the next. The employee

15  movements affect the number of employees available to serve in a series of job categories. The

16  identified gaps in employment (e.g., a shortage of 150 sales staff) become hiring targets for the

17  upcoming fiscal year. The assignment aptly demonstrates the commercial importance of managing

18  employee headcount to the effective operation of a business.

19         8.     Dr. Bendick claims that EEO-1 reports do not provide commercially valuable

20  operational, financial, or trade secret information *as commonly understood by economists, other*

21  *business analysts, and business managers*. These professional specialties (and Dr. Bendick's expertise)

22  are outside the area of human resource management. Dr. Bowman Williams, who states that EEO-1 data

23  does not constitute "commercial information," is a lawyer and sociologist with no apparent expertise in

24  HRM. As a human resource management scholar and practitioner, I strongly disagree with Dr. Bowman

25  Williams's assertion and Dr. Bendick's position that EEO-1 reports are not commercially valuable. This

26  is inconsistent with the scholarship and commonly accepted understanding in my field.

27         9.     First, HRM systems are far from irrelevant to business operations as shown by decades of

28  research on the positive linkage between human resource management system functioning and

SUPPLEMENTAL DECLARATION OF PATRICK McKAY
No. 22-cv-07182-WHA         3

1    organizational performance (Combs et al, 2006; Huselid, 1995; Jiang et al., 2012). In response to the

2    impact of HRM on company performance, HRM professionals are no longer viewed as merely support

3    personnel, but key members of the C-suite in most major organizations. On November 8, 2023, Jacqui

4    Canney, Chief People Officer at ServiceNow, authored an article chronicling the "6 Key Realities for

5    HR Leaders in 2024" in ***Human Resource Executive*** (https://hrexecutive.com/6-key-realities-for-hr-

6    leaders-in-2024/). She cited a recent Accenture report which stated that, "89% of CEOs say the CHRO

7    (Chief Human Resource Officer) should play a central role in driving long-term profitable growth."

8    Issues highlighted in the article include HR leaders' responsibilities to (1) drive business growth using

9    talent, (2) confront the growing mental health crisis, (3) teach employees how to leverage generative

10   artificial intelligence capabilities, (4) speed progress on diversity, equity, and inclusion, (5) shift toward

11   skills-based organizations, and (6) learn how to manage in an unpredictable political climate. These

12   broad issues are a far cry from the support functions of administering compensation and benefits plans

13   or hosting onboarding sessions for new employees. More importantly, the responsibilities speak to the

14   central role that effective human resource management plays in the success of a business. In fact, a

15   quick survey of my own LinkedIn professional contacts list includes HRM practitioners who serve as

16   the Senior Vice-President and Chief of Human Capital Management (at WIRB-Copernicus Group),

17   Vice-President of Human Resources (at Regeneron), Senior Director of Human Resources (at Generac

18   Power Systems), Director of Global Talent Management (at Hyster-Yale Group), and Chief People and

19   Diversity Officer (at the AMC television network) to name a few. These officers are among the highest-

20   ranking executives in the companies named. Overall, HRM systems are highly integral to business

21   operations and corporate performance since the achievement of organizational strategic objectives

22   depends upon the successful acquisition and retention of labor that is sufficient in quantity and quality.

23          10.    Second, HRM system effectiveness is directly tied to a company's bottom-line (Huselid,

24   1995; Jiang et al., 2012). EEO-1 reports provide data that can be used as a reasonable indicator of a

25   company's employee headcounts in key roles, as HRM professionals can easily surmise which of the 10

26   occupational categories contains a firm's core workforce. This is valuable information for a competitor

27   trying to determine the effectiveness of a company's HRM system. The potential for commercial

28   damage from the release of EEO-1 reports does not come from the precise accuracy of such data with

SUPPLEMENTAL DECLARATION OF PATRICK McKAY
No. 22-cv-07182-WHA                            4

1  respect to a company's HRM system, but its access alone. The mere presence of the data provides

2  additional information to competing firms trying to decipher how a firm manages its human resources.

3  The 10 occupational categories provide meaningful insight into a company's headcounts for a

4  company's internal divisions. Furthermore, competing firms can pair such data, which is not publicly

5  available, with company information that is available (e.g., Glassdoor surveys, corporate financial

6  performance) to estimate the relationship between workforce occupational composition (from the EEO-1

7  reports) and corporate outcomes. Even if the information does not precisely detail all specific corporate

8  divisions and job titles, providing access to such internal company information provides information that

9  is not otherwise available and potentially undermines fair commercial market competition between

10  firms.

11       11.    Third, EEO-1 reports provide racial-ethnic and gender demographic information that job

12  seekers are likely to interpret as symbolic of a company's stance on diversity. This information has an

13  impact on recruiting efforts, although as I explained in my initial declaration, racial-ethnic and gender

14  demographic information does not predict how strongly a company supports workforce diversity

15  (McKay, Avery, & Morris, 2008). Thus, companies with low racial-ethnic and gender diversity as

16  revealed in their EEO-1 reports may be unfairly disadvantaged in recruiting applicants from these

17  respective demographic subgroups.

18       12.    Some companies, including, for example, smaller companies, or companies without

19  "specialized HR staff," use the EEO-1 reports themselves for business purposes to track their

20  demographic representation, changes, and trends.  Others may use the demographic data contained in

21  those reports but not the reports themselves.  But my point of contention regarding the public release of

22  company EEO-1 reports is not a matter of whether companies utilize them internally for operational

23  purposes. The problem is that competing companies can consult an organization's EEO-1 reports for

24  insight into how a firm distributes its employees across the 10 occupational categories. Any additional

25  information regarding a firm's employee headcount offers incremental information about that

26  company's HRM system. Again, the harm does not depend on accuracy but access, and there is no

27  overriding reason why a company's competitors should have access to how the company's personnel are

28  distributed across occupational categories.

SUPPLEMENTAL DECLARATION OF PATRICK McKAY
No. 22-cv-07182-WHA         5

13. This is especially problematic as the FOIA request involves five years of EEO-1 reports, which offer insights into a company's headcount trends across multiple years. The movement of employees across or out of jobs provides a window into how well (or poorly) a company's HRM system is functioning (Noe et al., 2022). Although Dr. Bendick is correct in noting that employee movement out of job categories does not directly measure an organization's employee turnover rates, the movements can be easily interpreted as a proxy for employee movement out of positions, whether for turnover, downsizing, or other reasons. Employee movements that result in loss of human talent from firms (i.e., turnover and downsizing) have negative financial and operational implications for an organization (Della Torre et al., 2018; Guthrie & Dutta, 2008). This provides information that a competitor would not otherwise have, and that can be used to draw conclusions about a company's HRM effectiveness, both by itself and especially when paired with other data. Thus, I am of the strong opinion that the release of this information could cause competitive harm to companies.

14. Paragraph 13 of the Bendick Declaration states, "A substantial -- and growing -- number of U.S. employers now voluntarily release their EEO-1 report data annually, typically in their corporate annual report, in a separate annual diversity report, or on their website. According to one survey, this was the practice among 11% of the 1,000 largest firms nationwide in 2021, up from 4% the year before." A significant takeaway from the above statement is that even in 2021, following the George Floyd murder and pressure on companies to increase their diversity, the vast majority -- 89% -- of the 1,000 largest firms in the U.S. did not release their EEO-1 form data.

15. For the companies that release their data, Dr. Bendick assumes that they do so willingly rather than as a response to market and/or public or other pressures. The fact that some companies are willing (or pressured) to report EEO-1 workforce demographic information does not mean that they do not consider this information to be sensitive. Also, it does not preclude the potential for commercial harm due to unjustified negative implications for recruiting underrepresented minorities and women, as well as reputational harm, which can directly affect a company's bottom line. The economic impact of "reputation," whether deserved or undeserved, is real. Roberson and Park (2007) reported that companies who were named to Fortune magazine's top-50 list for diversity (a reputational rating) had higher financial performance than Fortune 100 companies who failed to make the Fortune list over a

1   five-year period (1998-2003). In contrast, Wright, Ferris, Hiller, and Kroll (1995) showed when

2   companies lost employment discrimination lawsuits, they suffered subsequent reductions in their stock

3   prices.

4       16.     Contrary to Paragraphs 18-20 of the Bendick Declaration, EEO-1 reports are not as broad

5   and non-specific as he suggests. First, HRM professionals can easily infer the EEO-1 occupational

6   category within which a company's core workforce is classified. For example, it would not require much

7   guesswork to determine that the Vice-President of Human Resources would be classified as EEO-1

8   category "Executive/Senior-Level Officials and Managers." Similarly, for an engineering firm, its

9   engineers would likely be classified within the "Technicians" occupational category, while its

10  manufacturing plant staff would be classified as "Operatives."  Second, many of the categories are quite

11  specific and provide meaningful information. Thus, comparing the EEO-1 categories of "First/Mid-

12  Level Officials and Managers" with others can provide insight into the proportion of direct supervisors

13  relative to core personnel such as engineers or manufacturing employees from the engineering firm

14  example. Third, in many companies, including smaller companies, these categories can be quite

15  revealing. Imagine a 50-person company wherein it would be very informative to know how the

16  employees are distributed across the ten categories. Fourth, the fact that the EEO-1 reports cannot

17  provide all the information that might be useful doesn't mean that it can't provide any useful

18  information to a competitor. In Bendick's specific example, a competitor might not be able to isolate

19  chemical engineers from other types of engineers for a large petrochemical manufacturer, but it would

20  provide other information.  Knowing that a competitor is increasing its engineering headcount would be

21  valuable to a competitor even if it doesn't know the precise type of engineers.  A competing firm would

22  also find it informative to know the relative proportion of engineers to other employees as means of

23  deducing how the firm distributes its core employees to non-core, support employees, especially if the

24  focal firm is highly successful relative to its peers.  It is not uncommon for firms to attempt to mimic the

25  strategy of their successful rivals. Thus, the release of EEO-1 data could offer insights into competitor's

26  workforce profile for other companies to potentially duplicate.

27      17.     Dr. Bendick states that EEO-1 reports are "incomplete as measures of a firm's productive

28  capacity or strategic intentions" because many companies rely on temporary or contract workers in

1   addition to the full- and part-time employees counted in the reports. Dr. Bendick rightfully

2   acknowledges that companies often deploy contingent workers (e.g., contractors, temporary employees,

3   etc.) to fulfill their human resource requirements. However, the bulk of HR planning is undertaken with

4   respect to core personnel who perform the job functions that are central to a company's business (Noe et

5   al., 2022). In fact, short-term employees are often released upon the completion of project-based work,

6   thus suggesting they are not an integral part of a company's central HR planning. Furthermore, high-

7   commitment HR practices such as investments in training and development, advancement opportunities,

8   compensation and benefits are targeted toward core workers instead of temporary personnel. The point

9   of high-commitment HR practices is to retain a long-term, qualified core workforce to ensure that a

10  company has sufficient quality and quantity of workers to provide a company's products and services in

11  support of a company's strategic objectives (Lepak & Snell, 1999).  Therefore, the numbers of actual,

12  full-time employees reported in the EEO-1 reports communicates valuable HRM data in which a

13  competitor would be keenly interested.

14         18.     Thus, Dr. Bendick's point about companies' usage of temporary personnel does not

15  invalidate EEO-1 report data as indicative of a firm's workforce composition. Again, the nature of a

16  firm's business allows an astute HRM professional to infer the occupational category within which its

17  core personnel are classified, thus offering insight (albeit imperfect) into how a firm mobilizes its

18  personnel. Again, the fact that the information may be incomplete—and doesn't provide all the

19  information that could be useful—doesn't mean that it can't provide any useful information to a

20  competitor.  In a commercial market environment, any incremental information that provides this sort of

21  information can be used by competitors for their advantage.  Competing firms should not be allowed

22  public access to such information, particularly across 5 years of EEO-1 data.

23         19.     Dr. Bendick takes issue in Paragraph 30 with my opinion about the use of EEO-1 reports

24  to calculate a firm's turnover rates. The point I am making, however, is not that competing companies

25  could perfectly estimate a firm's turnover rates from EEO-1 data. A firm could estimate the movement

26  of employees out of (or across) the various EEO-1 job categories from 5-years of EEO-1 reports. Again,

27  this movement offers some insight into how employees are being deployed in an organization, with

28  reductions in the proportion of employees in a occupational category signaling (potentially) labor losses.

SUPPLEMENTAL DECLARATION OF PATRICK McKAY
No. 22-cv-07182-WHA                    8

1    This pattern of labor losses is even more telling if it occurs across five years of EEO-1 reports, which

2    indicates a poor-functioning HRM system (and potential loss of company market share).

3        20.    Dr. Bendick's point about EEO-1 retrospective reports being not useful because they are

4    outdated is erroneous. HRM practice guidelines suggest companies' usage of short-term (1-2 years)

5    and/or long-term (3-5 years) HR planning (Noe et al., 2022). Accordingly, a firm that uses longer HR

6    planning horizons may be managing its current employee headcounts based upon retrospective estimates

7    of company HR requirements (i.e., the quality and quality of employees needed to provide company

8    products and services). Thus, the EEO-1 report data for firms that operate according to long-term HR

9    planning may still be relevant despite the retrospective nature of EEO-1 data reporting.

10       21.    Dr. Bowman Williams argues that EEO-1 should be publicly available to protect equal

11   employment opportunity. Whether public dissemination of diversity data might serve this purpose, the

12   research illustrates, starkly, that companies should not be forced to disclose the raw data in their EEO-1

13   reports. Such information must be handled judiciously because it is very easy to overinterpret

14   organizational racial-ethnic and gender demographic information without the requisite context provided.

15   For instance, the exhibits attached to the Baranetsky declaration (see Exhibit Y, Dkt. No. 39-1) offer

16   keen insight into how technology companies' workforce racial-ethnic and gender demographic

17   representation has been wholly overinterpreted as indicative of racial-ethnic and gender bias,

18   respectively. What the exhibits fail to mention is that Blacks, Hispanics, and women are woefully

19   underrepresented in science, technical, engineering, and mathematics (STEM) fields (Porter & Serra,

20   2020; Wynn & Correll, 2018). Yet, the EEO-1 reports are used to lay the burden of racial-ethnic

21   minority and female representation in STEM fields at the feet of employing organizations. Instead, as

22   Jonathan Kozol so eloquently articulated in his 1991 book "Savage Inequalities," racial-ethnic (and

23   likely gender due to gender stereotyping) inequalities in educational quality and opportunities in public

24   schools are huge drivers of minority and female underrepresentation in STEM fields due to academic

25   under-preparation in compulsory K-12 education. In fact, raw data about a company's racial-ethnic and

26   gender diversity has a weak relation to a firm's actual climate for diversity in organizations (Kossek,

27   Zonia, & Young, 2006; McKay, Avery, & Morris, 2008).

28

22.     By contrast, a company with "impressive" diversity numbers may ill-serve the communities that Title VII and EO 11246 were meant to protect. Anecdotally, I am aware of a large manufacturer that contracts with the U.S. government (and with whom I performed employment testing/assessment consulting work). The company engaged in annual 'minority hiring blitzes' to ensure that they had sufficient racial-ethnic diversity in their workforce for federal contractor compliance. Yet, owing to the firm's unfavorable climate for diversity, the turnover rate for its Black personnel was 200%! Such practices explain why McKay and Avery (2005) warned companies that diversity recruitment could backfire to the extent that firms misrepresent their work climates as more supportive of diversity to minority recruits than is the actual case.

23.     Racial-ethnic and gender diversity in organizations is affected by contextual features far outside the control of any focal organization (e.g., underrepresentation of women and minorities in certain occupations, related disparities in educational attainment, etc.), as opposed to seemingly vague inferences of purposeful racial-ethnic and/or gender discrimination in hiring implied by low racial-ethnic and/or gender diversity in a company's workforce. Consequently, requiring organizations to publicly release their EEO-1 reports could undermine their ability to offer equal employment opportunities to historically underrepresented minorities and women, in direct contradiction of the principles upon which EEO-1 reporting is based.

Conclusion

24.     Based upon my research and practice in the human resource management domain, it is my opinion that Dr. Bendick's conclusion that the public release of companies' EEO-1 reports has no potential for commercial harm to reporting firms is incorrect. The reports have the potential for helping competing firms to learn how a firm manages its employee headcounts. This is especially problematic since HRM professionals can easily infer the EEO-1 occupational category within which a company's core workforce is classified. Such data may be paired with publicly available corporate data to assess the relationship between a company's employment profile (across the 10 occupational categories) and corporate performance indicators (e.g., revenues, profits, customer satisfaction metrics, etc.). Furthermore, five-year EEO-1 reports will allow competing firms to estimate the patterns of employee movement in and out of the 10 occupational categories, with reductions in force as indicative of poor

SUPPLEMENTAL DECLARATION OF PATRICK McKAY
No. 22-cv-07182-WHA                         10

1  HRM system functioning—because firms do not reduce their workforces in response to successful

2  corporate performance. Finally, the public release of company EEO-1 reports could unfairly

3  disadvantage companies that possess low racial-ethnic and/or gender diversity. Erroneously, the lay

4  public may infer that companies lacking racial-ethnic and gender diversity as inhospitable to members of

5  these demographic groups. However, research (including my own) and anecdotal company practice

6  examples suggest that workforce diversity is virtually unrelated to how strongly a firm values diversity

7  (McKay et al., 2008). Nonetheless, low-diversity firms may experience difficulties in recruiting women

8  and minorities if EEO-1 reports are made public despite their potential desire to increase its workforce

9  diversity. Ultimately, this undermines the principles upon which EEO-1 reporting is based, ensuring

10  equal employment opportunity regardless of demographic group membership.

11       I declare under penalty of perjury that the foregoing is true and correct.

12  Executed this 13th day of November, 2023, at Kinston, North Carolina.

13  *Patrick F. McKay*

14  PATRICK F. McKAY, PhD.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  D. VICTORIA BARANETSKY (SBN 311892)
   THE CENTER FOR INVESTIGATIVE REPORTING
2  1400 65th Street, Suite 200
   Emeryville, CA 94608
3  Telephone:     (510) 982-2890
   Facsimile:     (510) 849-6141
4  Email:         vbaranetsky@revealnews.org

5  THERESE Y. CANNATA (SBN 88032)
   AARON R. FIELD (SBN 310648)
6  ZACHARY E. COLBETH (SBN 297419)
   CANNATA O'TOOLE & OLSON LLP
7  100 Pine Street, Suite 350
   San Francisco, CA 94111
8  Telephone:     (415) 409-8900
   Facsimile:     (415) 409-8904
9  Email:         tcannata@cofolaw.com
                  afield@cofolaw.com
10                zcolbeth@cofolaw.com

11 Attorneys for Plaintiffs
   THE CENTER FOR INVESTIGATIVE
12 REPORTING and WILL EVANS

13

14              UNITED STATES DISTRICT COURT

15             NORTHERN DISTRICT OF CALIFORNIA

16               SAN FRANCISCO DIVISION

17

18 THE CENTER FOR INVESTIGATIVE          Case No. 3:22-cv-07182-WHA
   REPORTING and WILL EVANS,
19                                       **DECLARATION OF D. VICTORIA
            Plaintiffs,                  BARANETSKY IN SUPPORT OF
20                                       PLAINTIFF'S CROSS-MOTION FOR
      vs.                                SUMMARY JUDGMENT**
21
   UNITED STATES DEPARTMENT OF
22 LABOR,

23          Defendant.

24

25

26

27

28

                              1

I, D. VICTORIA BARANETSKY, declare:

1.      I am a member in good standing of the State Bars of California, New York and New Jersey and General Counsel at The Center for Investigative Reporting. I am counsel of record for plaintiffs The Center for Investigative Reporting and Will Evans (hereafter "plaintiffs" or "CIR") in this action. I make this declaration of personal knowledge, and if called as a witness I could and would testify competently to the facts stated herein.

2.      Plaintiff CIR is a nonprofit, investigative news organization that publishes *Reveal*, an online news site, and has a weekly public radio show with approximately one million listeners per week. CIR and its journalists often make requests for records under the Freedom of Information Act, as well as other open records laws, in the interest of investigating matters of public concern and sharing newsworthy information about those matters with their readers and listeners. CIR made the FOIA requests at issue here to further this institutional goal.

3.      I represented the plaintiffs in *Ctr. for Investigative Reporting v. Dep't of Labor*, Case No. 3:18-cv-02008 (N.D. Cal.). There, as here, the plaintiffs sought access to EEO-1, Type 2 Reports in five FOIA requests sent to DOL's OFCCP on August 9, 2017 through August 25, 2017. In that case, CIR sought EEO-1 Reports pertaining to specific federal contractors, including Reports for Oracle Corp., Hewlett-Packard Co., Salesforce, Splunk, Inc., Dropbox, Inc., Fitbit, Gilead Sciences, Inc., Github, Inc., Pandora Media, Inc, Slack Technologies, Inc., Tesla, VMWare, Synnex, PayPal, and Palantir. CIR did not receive a final response until January 29, 2018, when DOL denied the request by simply reciting, in an attachment, which companies had objected to disclosure, which companies had not objected to disclosure, and which companies had not submitted reports DOL deemed responsive. A true and correct copy of DOL's denial letter in that case is attached hereto as **Exhibit A**. Rather than litigating the case, and despite the objection of some of the submitters, DOL voluntarily disclosed the requested EEO-1 Reports having done an internal review and settled CIR's claim of attorney's fees and costs. A true and correct copy of the stipulation of settlement between CIR and DOL is attached hereto as **Exhibit B**.

4.      I represented the plaintiffs again in a second lawsuit seeking access to EEO-1

2

The Center For Investigative Reporting
1400 65th Street, Suite 200
Emeryville, CA 94608

1  Reports and data, *Ctr. for Investigative Reporting v. Dep't of Labor*, Case No. 4:19-cv-01843-

2  KAW (N.D. Cal.) ("*CIR I*"). There, once again, CIR requested EEO-1, Type 2 Reports from DOL

3  for 2016 regarding around 50 federal contractors. DOL again slow walked the request and failed

4  to provide a determination, instead sending correspondence that delayed any determination and

5  simply identified which contractors' reports it considered responsive, which had objected, and

6  which had not. A true and correct copy of correspondence DOL sent CIR to this effect is attached

7  hereto as **Exhibit C**. CIR then sued, DOL moved for summary judgment, and CIR cross-moved

8  for summary judgment. True and correct copies of DOL's motion for summary judgment, CIR's

9  opposition and cross-motion, DOL's reply and cross-opposition, and CIR's reply are attached

10  hereto as **Exhibit D**. I argued the matter for CIR, and, just as in CIR's briefing, the hearing

11  featured arguments by both sides regarding, among other issues, whether EEO-1, Type 2 Reports

12  contain "commercial" information within the meaning of FOIA Exemption 4, and whether DOL

13  had demonstrated that disclosure would cause foreseeable harm under the FOIA Improvement

14  Act of 2016. In a published decision, CIR's motion was granted, and DOL's motion was denied.

15  Importantly, DOL chose not to appeal. As a result, a third party, Synopsys, Inc., attempted to

16  intervene and appeal, only to have its appeal dismissed by the Ninth Circuit on procedural

17  grounds. Rather than challenging the ruling of another judge of this Court on appeal, DOL

18  accepted the result and disclosed all EEO-1 Reports in that case.

19      5.    Attached hereto as **Exhibit E** is a true and correct copy of one of the EEO-1

20  Reports disclosed by DOL to CIR.

21      6.    Attached hereto as **Exhibit F** is a true and correct copy of OFCCP's 2020 Federal

22  Compliance Contract Manual, which I obtained at https://shorturl.at/fipTU.

23      7.    Attached hereto as **Exhibit G** is a true and correct copy of the U.S. E.E.O.C.'s

24  2021 *EEO-1 Data Collection Instruction Booklet*, which I obtained at https://shorturl.at/wDOP6.

25      8.    Attached hereto as **Exhibit H** is a true and correct copy of a sample Employer

26  Information Report EEO-1 published by DOL's Joint Reporting Committee, which I obtained at

27  https://shorturl.at/qDES2.

28      9.    Attached hereto as **Exhibit I** is a true and correct copy of Freedom of Information

The Center For Investigative Reporting
1400 65th Street, Suite 200
Emeryville, CA 94608

3

1   Act (FOIA) Frequently Asked Questions published by OFCCP in 2017, which I obtained at

2   https://shorturl.at/gnOSW.

3        10.     Attached hereto as **Exhibit J** is a true and correct copy of CIR's January 10, 2019

4   FOIA request to OFCCP. Attached hereto as **Exhibit J-1** is a true and correct copy of OFCCP's

5   initial July 18, 2019 response to the January 10, 2019 request. Attached hereto as **Exhibit J-2** is a

6   true and correct copy of CIR's, through Mr. Evans, August 8, 2019 reply regarding CIR's January

7   10, 2019 request. Attached hereto as **Exhibit K** is a true and correct copy of CIR's March 25,

8   2019 FOIA request to DOL. Attached hereto as **Exhibit L** is a true and correct copy of CIR's

9   September 11, 2020 FOIA request to OFCCP.

10        11.     Attached hereto as **Exhibit M** is a true and correct copy of a consolidated response

11   to Exhibits J-L that DOL sent to CIR on October 2, 2020.

12        12.     Attached hereto as **Exhibit N** is a true and correct copy of CIR's reply to DOL's

13   consolidated response, which CIR sent to DOL on October 30, 2020.

14        13.     Attached hereto as **Exhibit O** is a further reply from DOL to CIR, which DOL

15   sent to CIR on December 18, 2020.  In this correspondence, OFCCP did not provide an update on

16   how it would move forward with processing CIR's requests nor did it provide a timeline on when

17   the submitters would be notified of the requests.

18        14.     In this matter, as in the cases before it, OFCCP failed to respond to CIR's inquiries

19   for months after its December 18, 2020 response. On January 7, 2021, CIR sent another email to

20   DOL requesting additional information on when OFCCP had provided notices to the submitters

21   and how the data would be released for those submitters who had already consented to release or

22   waived their opportunity to object. A true and correct copy of this e-mail is attached hereto as

23   **Exhibit O-1.**

24        15.     On May 10, 2021, CIR supplemented its requests, through Mr. Evans, to include

25   all consolidated Type 2 EEO-1 Reports for all federal contractors for 2017 and 2018, as well as

26   2016.  A true and correct copy of CIR's supplement is attached hereto as **Exhibit P**.

27        16.     On May 11, 2021, OFCCP acknowledged the update to CIR and consolidated all

28   four of CIR's requests.  A true and correct copy of the acknowledgment is attached hereto as

<div style="margin-left:2em; font-style:italic; writing-mode:vertical-rl;">The Center For Investigative Reporting<br>1400 65th Street, Suite 200<br>Emeryville, CA 94608</div>

4

1    **Exhibit Q**.

2       17.    On May 23, 2022, I sent a letter to the Solicitor of Labor and OFCCP Director that

3    called attention to DOL's wrongful withholding of EEO-1 Reports and requested an immediate

4    determination on CIR's FOIA requests. A true and correct copy of the letter is attached hereto as

5    **Exhibit R**.

6       18.    On August 19, 2022, three years after CIR' initial FOIA request in this case,

7    OFCCP published a notice in the Federal Register identifying CIR to all federal contractors and

8    informing them of CIR's requests. DOL required any objections to disclosure by September 19,

9    2022, but then extended that deadline twice, without further regulation, first to October 2022, and

10   then to March 2023.

11      19.    DOL informed CIR that it intended to publish non-objecting contractors' EEO-1

12   Reports and name the objectors, but provided no disclosure date.

13      20.    Having waited several years for DOL to finish processing CIR's FOIA requests

14   and provide a determination on them that was final, let alone disclose the requested records, CIR

15   concluded that a further lawsuit against DOL was needed to obtain the requested records, despite

16   the result of CIR's earlier litigation against DOL. CIR accordingly filed this lawsuit on November

17   15, 2022.

18      21.    At a Case Management Conference in this matter on April 13, 2023, DOL

19   provided an approximate timeline for the release of *some* EEO-1 Reports (from non-objecting

20   contractors) and a tentative schedule for when determinations would be made for objecting

21   contractors. DOL did not provide a list of objecting contractors, however. On April 17, 2023,

22   OFCCP released all EEO-1 Reports for non-objecting federal contractors. This disclosure

23   comprised, by DOL's count, 56,419 EEO-1 Reports from 19,289 federal contractors.

24      22.    CIR published a story with *USAToday* regarding the wealth of data disclosed on

25   April 17, 2023: James Fraser, Nick Penzenstadler, USA TODAY and Will Evans, Reveal, *At*

26   *mega-contractors like Raytheon, Moderna and Lockheed, diversity remains a challenge*, USA

27   TODAY, April 19, 2023, https://shorturl.at/ijkH8. A true and correct copy of the article is

28   attached hereto as **Exhibit T**. I obtained the article from the *USA Today* website. A CIR article

The Center For Investigative Reporting
1400 65th Street, Suite 200
Emeryville, CA 94608

5

1  on the disclosures can be cited as follows: Will Evans, *We Forced the Government to Share*

2  *Corporate Diversity Data. It's Giving Companies an Out Instead*, Reveal.org, Aug. 29, 2022,

3  https://shorturl.at/ovCI7.  A true and correct copy of the CIR article, which I obtained from

4  CIR's website, is attached hereto as **Exhibit S**.

5        23.     To date, a significant number of responsive EEO-1 Reports are withheld (16,905

6  corresponding to 4,796 objecting contractors). OFCCP has stated that it is continuing to

7  withhold data from 16,755 reports, however, under Exemption 4. It has asserted that 621 reports

8  are nonresponsive.

9        24.     A true and correct copy of a 2008 Intel Workforce Demographics publication is

10  attached hereto as **Exhibit U**. The publication is still available online at:

11  http://web.archive.org/web/20081224004419/http:/www.intel.com/intel/diversity/divpractice.htm.

12  A true and correct copy of the article Murrey Jacobson, *Google finally discloses its diversity*

13  *record, and it's not good*, PBS NEWSHOUR, May 28, 2014,

14  https://www.pbs.org/newshour/nation/google-discloses-workforce-diversity-data-good, is

15  attached hereto as **Exhibit V**.  And, a true and correct copy of the article Laura Lorenzetti,

16  *Microsoft releases diversity stats: How the tech giant sizes up*, FORTUNE, Jan. 5, 2015,

17  https://fortune.com/2015/01/05/microsoft-eeo-1-diversity-tech/ is attached hereto as **Exhibit W**.

18  I obtained the article at the web address in the citation.

19        25.     A true and correct copy of the article Rebecca R. Hastings, *Diversity Annual*

20  *Reports Yield Business Benefits*, Soc'y Human Resource Mgmt., Oct. 10, 2012,

21  https://shorturl.at/nKY16 is attached hereto as **Exhibit X**.  A true and correct copy of the article

22  Will Evans & Sinduja Rangarajan, *Hidden figures: How Silicon Valley keeps diversity data*

23  *secret*, REVEALNEWS.ORG, Oct. 19, 2017, https://rb.gy/2d8q0 is attached hereto as **Exhibit Y**.

24  And, a true and correct copy of the article Jessica Guynn, *Apple leadership is more than 80%*

25  *white and male*, USA TODAY, Nov. 9, 2017, https://rb.gy/a6fgw is attached hereto as **Exhibit Z**.

26        26.     A true and correct copy of the article Jessica Guyun, *Barbara Lee calls on Apple,*

27  *tech holdouts to release diversity data*, USA TODAY, Aug. 4, 2015,

28  https://www.usatoday.com/story/tech/2015/08/04/barbara-lee-black-caucus-federal-diversity-

The Center For Investigative Reporting
1400 65ᵗʰ Street, Suite 200
Emeryville, CA 94608

6

1   dataapple/31128479/ is attached hereto as **Exhibit AA**. I obtained the article at the web address in

2   the citation.

3       27.    A true and correct copy of a *Letter from Emanuel Cleaver II, Member of Congress,*

4   *U.S. House of Representatives, to Alexander Acosta*, Secretary, U.S. Department of Labor (Mar.

5   6, 2019) https://cleaver.house.gov/sites/evo-subsites/cleaver-evo.house.gov/files/DOL_FOIA.pdf

6   is attached hereto as **Exhibit AB.** I obtained the article from Congressman Cleaver's website.

7       28.    A true and correct copy of the article Will Evans and Jayme Fraser, *After history of*

8   *discrimination, these federal contractors fought to hide diversity data*, USAToday.com,

9   https://bitly.ws/Uu2M is attached hereto as **Exhibit AC**.  I obtained the article at the web address

10   in the citation.

11       29.    A true and correct copy of DHL's Annual 2022 report, which lists the number of

12   its employees, is attached hereto as **Exhibit AD**.

13       30.    Attached hereto as **Exhibit AE** are true and correct copies of the news articles

14   Julianne Pepitone, *Black, female, and a Silicon Valley 'trade secret'*, CNNMoney, Mar. 18, 2013,

15   https://shorturl.at/ejDPT and Mike Swift, *Five Silicon Valley companies fought release of*

16   *employment data, and won*, SAN JOSE MERCURY NEWS, Feb. 11, 2010,

17   https://shorturl.at/pwyOR.  I obtained each article at the web addresses in its corresponding

18   citation.

19       31.    Attached hereto as **Exhibit AF** is a true and correct copy of the Open Diversity

20   Data website, http://opendiversitydata.org, as of October 18, 2023.

21       32.    Attached hereto as **Exhibit AG** is a true and correct copy of the publication

22   Google, *Getting to work on diversity at Google*, GOOGLE BLOG, May 28, 2014,

23   https://googleblog.blogspot.com/2014/05/getting-to-work-on-diversity-at-google.html.  Attached

24   hereto as **Exhibit AH** is a true and correct copy of Thomas Bourveau, Rachel Flam, Anthony Le,

25   *Behind the EEO-1 Curtain*, July 14, 2023, https://shorturl.at/gzGNQ.  And, attached hereto as

26   **Exhibit AI** is a true and correct copy of the article *20 Best Companies for Diversity and*

27   *Inclusion*, GLASSDOOR BLOGS, Oct. 4, 2018, https://shorturl.at/bjs36.  I obtained each

28   publication at the web address in its corresponding citation.

The Center For Investigative Reporting
1400 65th Street, Suite 200
Emeryville, CA 94608

7

1    I declare under penalty of perjury under the laws of the United States of America that the

2    foregoing is true and correct.

3    Executed in Berkeley, California on October 18, 2023.

4

5

6    _____

7    D. VICTORIA BARANETSKY

8

9

10

11

The Center For Investigative Reporting
1400 65th Street, Suite 200
Emeryville, CA 94608

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

8

# EXHIBIT A

**U.S. Department of Labor**     Office of Federal Contract
Compliance Programs
200 Constitution Avenue, N.W.
Washington, D.C. 20210



JAN 2 9 2018

Will Evans
The Center for Investigative Reporting
1400 65th, Suite 200
Emeryville, CA 94608

RE: Freedom of Information Act Request – Tracking No. 838133

Dear Mr. Evans:

This letter is our final response to your consolidated Freedom of Information Act (FOIA) request. Please refer to the FOIA tracking number 838133 in any future correspondence regarding this FOIA request.

Under FOIA, you requested the EEO-1 report from fifteen (15) companies. We have summarized the results of the consolidated request in Attachment A.

We consider you to be a "news media" type of requestor. As a "news media" requestor, you are charged for photocopying after the first 100 pages in accordance with the U.S. Department of Labor FOIA regulations at 29 CFR § 70.40(c)(4).

We believe we have been responsive to your FOIA request. Should you have questions regarding your request, please contact this office at (202) 693-0101 or by email at OFCCP_NO_FOIA@dol.gov.

If you need any further assistance or would like to discuss any aspect of your request, please do not hesitate to contact this office or the DOL FOIA Public Liaison, Thomas Hicks, at (202) 693-5427. Alternatively, you may contact the Office of Government Information Services within the National Archives and Records Administration (OGIS) to inquire the mediation services they offer. The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road, College Park, MD 20740-6001. You can also reach that office by e-mail at ogis@nara.gov, by phone at (202) 741-5770, by fax at (202) 741-5769, or by calling toll-free at (877) 684-6448.

If you are not satisfied with the response to this request, you may administratively appeal by writing to the Solicitor of Labor within 90 days from the date of this letter. The appeal must state in writing the grounds for the appeal, and it may include any supporting statements or arguments, but such statements are not required. In order to facilitate processing of the appeal,

please include your mailing address and daytime telephone number, as well as a copy of the initial request and copy of this letter. The envelope and letter of the appeal should be clearly marked "Freedom of Information Act Appeal." Any amendment to the appeal must be made in writing and received prior to a decision. The appeal should be addressed to the Solicitor of Labor, Division of Management and Administrative Legal Services, U.S. Department of Labor, 200 Constitution Avenue, NW, Room N2420, Washington, DC 20210. Appeals may also be submitted by email to foiaappeal@dol.gov. Appeals submitted to any other email address will not be accepted.

Sincerely,

D. Lissette Geán
Special Assistant

Attachment A

Companies with no data in OFCCP EEO-1 database

- Fitbit
- Slack Technologies

Companies with no qualifying federal contract during FY 2015

- Dropbox
- Github
- Tesla

Companies that objected to the release of their data on the grounds of FOIA Exemption 4

- Gilead Sciences
- HP
- Oracle
- Palantir
- Pandora Media
- PayPal
- Splunk Inc
- Synnex

Companies that did not object to the release of their data

- salesforce.com, inc.
- VMware

# EXHIBIT B

1  ALEX G. TSE (CABN 152348)
   United States Attorney
2  SARA WINSLOW (DCBN 457643)
   Chief, Civil Division
3  DOUGLAS K. CHANG (HSBN 2922)
   Assistant United States Attorney
4    450 Golden Gate Avenue, Box 36055
     San Francisco, California 94102
5    Telephone: (415) 436-6985
     Facsimile: (415) 436-7169
6    Email: Douglas.Chang@usdoj.gov

7  Attorneys for Defendant
   U.S. Dept. of Labor
8

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11                     SAN FRANCISCO DIVISION

12  THE CENTER FOR                        Case No. 3:18-cv-2008 JCS
    INVESTIGATIVE REPORTING and
13  WILL EVANS,
                                          **STIPULATION OF SETTLEMENT**
14              Plaintiffs,               **AND DISMISSAL WITH PREJUDICE**

15       v.

16  UNITED STATES DEPARTMENT OF
    LABOR,
17

18              Defendant.

19

20       Plaintiffs, The Center for Investigative Reporting ("CIR") and Will Evans, and Defendant,

21  United States Department of Labor ("DOL"), hereby enter into this Stipulation of Settlement and

22  Dismissal With Prejudice ("Stipulation"), and agree to settle and compromise the above-captioned

23  matter under the following terms and conditions:

24       1.      Defendant shall pay $6,500.00 (six thousand five hundred dollars and no cents) to

25  Plaintiffs in full and complete satisfaction of Plaintiffs' claim for attorneys' fees under the Freedom of

26  Information Act ("FOIA"), 5 U.S.C. § 552, as amended, in this case. Plaintiffs and Plaintiffs' counsel

27  agree to cooperate with Defendant's counsel in promptly providing the information needed for

28

Stipulation of Settlement and Dismissal with Prejudice
Case No. 3:18-cv-2008 JCS

                                    1

1  requesting payment and transmission of funds.  This payment shall constitute full and final satisfaction

2  of all of Plaintiffs' claims for attorneys' fees and litigation expenses in this case, and is inclusive of any

3  interest.  Payment of this money will be made by electronic funds transfer after entry of this Stipulation

4  on the Court's docket and receipt of necessary information from Plaintiffs in order to effectuate the

5  payment.

6       2.    Upon the execution of this Stipulation, Plaintiffs, having received the records it

7  requested, hereby releases and forever discharges Defendant, its successors, the United States of

8  America, and any department, agency, or establishment of the United States, and any officers,

9  employees, agents, successors, or assigns of such department, agency, or establishment, from any and all

10  claims and causes of action that Plaintiffs asserts or could have asserted in this case, or which hereafter

11  could be asserted by reason of, or with respect to, or in connection with, or which arise out of, the FOIA

12  request on which this action is based or any other matter alleged in the Complaint, including but not

13  limited to all past, present, or future claims for attorneys' fees, costs, or litigation expenses in connection

14  with the above-captioned matter.

15       3.    Execution of this Stipulation by counsel for Plaintiffs and counsel for Defendant shall

16  constitute dismissal of this case with prejudice pursuant to Federal Rule of Civil Procedure 41(a).

17       4.    The parties acknowledge that this Stipulation is entered into solely for the purpose of

18  settling and compromising any remaining claims in this action without further litigation, and it shall not

19  be construed as evidence or as an admission on the part of Defendant, the United States of America, its

20  agents, servants, or employees regarding any issue of law or fact, or regarding the truth or validity of

21  any allegation or claim raised in this action, or as evidence or as an admission by the Defendant

22  regarding Plaintiffs' entitlement to attorneys' fees or other litigation expenses under FOIA.  This

23  Stipulation shall not be used in any manner to establish liability for fees in any other case or proceeding

24  involving Defendant.

25       5.    This Stipulation is binding upon and inures to the benefit of the parties hereto and their

26  respective successors and assigns.

27

28

Stipulation of Settlement and Dismissal with Prejudice
Case No. 3:18-cv-2008 JCS

2

(103 of 300), Page 103 of 300
Case: 24-880, 07/10/2024, DktEntry: 16.2, Page 103 of 300
Case 3:23-cv-00782-WHA Document 39-23 Filed 10/18/23 Page 16 of 1025

6. If any provision of this Stipulation shall be held invalid, illegal, or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

7. This Stipulation shall constitute the entire agreement between the parties, and it is expressly understood and agreed that this Stipulation has been freely and voluntarily entered into by the parties hereto. The parties further acknowledge that no warranties or representations have been made on any subject other than as set forth in this Stipulation.

8. The persons signing this Stipulation warrant and represent that they possess full authority to bind the persons on whose behalf they are signing to the terms of the Stipulation.

9. This Stipulation may not be altered, modified or otherwise changed in any respect except in writing, duly executed by all of the parties or their authorized representatives.

10. This Stipulation may be executed in counterparts and is effective on the date of signature of the last signatory to the Stipulation. Facsimiles of signatures shall constitute acceptable, binding signatures for purposes of this Stipulation.

SO STIPULATED AND AGREED.

ALEX G. TSE
United States Attorney

Dated: December 19, 2018          By:    /s/  Douglas K. Chang
                                         DOUGLAS K. CHANG
                                         Assistant United Stated Attorney
                                         Attorneys for Defendant


                                         THE CENTER FOR INVESTIGATIVE
                                         REPORTING

Dated: December 19, 2018          By:    /s/  D. Victoria Baranetsky*
                                         D. VICTORIA BARANETSKY, Esq.
                                         Attorney for Plaintiffs

Stipulation of Settlement and Dismissal with Prejudice
Case No. 3:18-cv-2008 JCS

3

1 &ast; I hereby attest that I have obtained the concurrence in the filing of this document from D. Victoria
Baranetsky.

2

3  /s/ Douglas K. Chang
Douglas K. Chang

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT C

**U.S. Department of Labor**     Office of Federal Contract
Compliance Programs
200 Constitution Avenue, N.W.
Washington, D.C. 20210



MAR 1 3 2018

Will Evans
The Center for Investigative Reporting
1400 65th Street, Suite 200
Emeryville, CA 94608

RE: Freedom of Information Act Request – Tracking No. 848514

Dear Mr. Evans:

This letter is a first response to your Freedom of Information Act (FOIA) request submitted to
the Office of Federal Contract Compliance Programs (OFCCP) on January 9, 2018. Please refer
to the above-referenced FOIA tracking number in any future correspondence regarding your
FOIA request.

Under FOIA, you requested copies of 2016 EEO-1 Consolidated Report (Type 2) for fifty-five
companies. We are including the interim results in Attachment A.

We consider you to be a "news media" type of requestor. As a "news media" requestor, we
charge you for photocopying after the first 100 pages in accordance with the U.S. Department of
Labor FOIA regulations at 29 CFR § 70.40(c)(4). We believe we are being responsive to your
FOIA request. Should you have questions regarding your request, please contact this office at
(202) 693-0101 or by email at OFCCP_NO_FOIA@dol.gov.

If you need any further assistance or would like to discuss any aspect of your request please do
not hesitate to contact this office or the DOL FOIA Public Liaison, Thomas Hicks, at (202) 693-
5427. Alternatively, you may contact the Office of Government Information Services within the
National Archives and Records Administration (OGIS) to inquire about the mediation services
they offer. The contact information for OGIS is as follows: Office of Government Information
Services, National Archives and Records Administration, 8601 Adelphi Road, College Park, MD
20740-6001. You can also reach that office by e-mail at ogis@nara.gov, by phone at (202) 741-
5770, by fax at (202) 741-5769, or by calling toll-free at (877) 684-6448.

If you are not satisfied with the response to this request, you may administratively appeal by
writing to the Solicitor of Labor within 90 days from the date of this letter. The appeal must state
in writing the grounds for the appeal, and it may include any supporting statements or arguments,
but such statements are not required. In order to facilitate processing of the appeal, please
include your mailing address and daytime telephone number, as well as a copy of the initial

request and copy of this letter. The envelope and letter of the appeal should be clearly marked "Freedom of Information Act Appeal." Any amendment to the appeal must be made in writing and received prior to a decision. The appeal should be addressed to the Solicitor of Labor, Division of Management and Administrative Legal Services, U.S. Department of Labor, 200 Constitution Avenue, NW, Room N2420, Washington, DC 20210. Appeals may also be submitted by email to foiaappeal@dol.gov. Appeals submitted to any other email address will not be accepted.

Sincerely,

D. Lissette Geán
Special Assistant

Attachment

Attachment A

Companies not identified as federal contractors (19)

Align Technology
Arista Networks
Cloudflare
Dropbox
Eventbrite
Github
Lam Research Corporation
Linear Technology
Netflix
RingCentral
ShoreTel
Stripe Inc.
SurveyMonkey
Symantec
Tesla
TiVo
Twilio
Workday
Yelp

Companies to be discussed in a later response (36)

Advanced Micro Devices
Agilent Technologies
Applied Materials
Bloom Energy
Box Inc.
Cadence Design Systems
Docusign
Equinix
Fair Isaac
Fitbit
Gilead Sciences
Intuitive Surgical
Juniper Networks
KLA-Tencor
Maxim Integrated Products
Oracle Corporation
Palantir Technologies Inc.
Palo Alto Networks
Pandora Media
PayPal, Inc.
Penumbra
ServiceNow
Slack Technologies
SolarCity
Splunk Inc.
Sunpower
Synnex
Synopsys
Trimble Navigation
Varian Medical Systems
Verifone
VMware
WageWorks
Xilinx
Yahoo Inc.
Zendesk

**U.S. Department of Labor**     Office of Federal Contract
Compliance Programs
200 Constitution Avenue, N.W.
Washington, D.C. 20210



APR 18 2018

Will Evans
The Center for Investigative Reporting
1400 65th Street, Suite 200
Emeryville, CA 94608

RE: Freedom of Information Act Request – Tracking No. 848514

Dear Mr. Evans:

This letter is a second response to your Freedom of Information Act (FOIA) request submitted to
the Office of Federal Contract Compliance Programs (OFCCP) on January 9, 2018. Please refer
to the above-referenced FOIA tracking number in any future correspondence regarding your
FOIA request.

Under FOIA, you requested copies of 2016 EEO-1 Consolidated Report (Type 2) for 55
companies. The results so far are found in Attachment A.

We consider you to be a "news media" type of requestor. As a "news media" requestor, we
charge you for photocopying after the first 100 pages in accordance with the U.S. Department of
Labor FOIA regulations at 29 CFR § 70.40(c)(4).

We believe we are being responsive to your FOIA request. Should you have questions regarding
your request, please contact this office at (202) 693-0101 or by email at
OFCCP_NO_FOIA@dol.gov.

If you need any further assistance or would like to discuss any aspect of your request please do
not hesitate to contact this office or the DOL FOIA Public Liaison, Thomas Hicks, at (202) 693-
5427. Alternatively, you may contact the Office of Government Information Services within the
National Archives and Records Administration (OGIS) to inquire about the mediation services
they offer. The contact information for OGIS is as follows: Office of Government Information
Services, National Archives and Records Administration, 8601 Adelphi Road, College Park, MD
20740-6001. You can also reach that office by e-mail at ogis@nara.gov, by phone at (202) 741-
5770, by fax at (202) 741-5769, or by calling toll-free at (877) 684-6448.

If you are not satisfied with the response to this request, you may administratively appeal by writing to the Solicitor of Labor within 90 days from the date of this letter. The appeal must state in writing the grounds for the appeal, and it may include any supporting statements or arguments, but such statements are not required. In order to facilitate processing of the appeal, please include your mailing address and daytime telephone number, as well as a copy of the initial request and copy of this letter. The envelope and letter of the appeal should be clearly marked "Freedom of Information Act Appeal." Any amendment to the appeal must be made in writing and received prior to a decision. The appeal should be addressed to the Solicitor of Labor, Division of Management and Administrative Legal Services, U.S. Department of Labor, 200 Constitution Avenue, NW, Room N2420, Washington, DC 20210. Appeals may also be submitted by email to foiaappeal@dol.gov. Appeals submitted to any other email address will not be accepted.

Sincerely,

D. Lissette Geán
Special Assistant


Attachment

Attachment A

| Companies not identified as federal contractors (19) | Companies that objected to the release of their data on the grounds of FOIA Exemption 4 (14) | Companies to be discussed in a later response (22) |
|---|---|---|
| -------------------------- | -------------------------- | -------------------------- |
| Align Technology | Agilent Technologies | Advanced Micro Devices |
| Arista Networks | Applied Materials | Bloom Energy |
| Cloudflare | Docusign | Box Inc. |
| Dropbox | Fitbit | Cadence Design Systems |
| Eventbrite | Juniper Networks | Equinix |
| Github | Maxim Integrated Products | Fair Isaac |
| Lam Research Corporation | Oracle Corporation | Gilead Sciences |
| Linear Technology | Palantir Technologies Inc. | Intuitive Surgical |
| Netflix | Pandora Media | KLA-Tencor |
| RingCentral | Splunk Inc. | Palo Alto Networks |
| ShoreTel | Synopsys | PayPal, Inc. |
| Stripe Inc. | Verifone | Penumbra |
| SurveyMonkey | Xilinx | ServiceNow |
| Symantec | Zendesk | Slack Technologies |
| Tesla | | SolarCity |
| TiVo | | Sunpower |
| Twilio | | Synnex |
| Workday | | Trimble Navigation |
| Yelp | | Varian Medical Systems |
| | | VMware |
| | | WageWorks |
| | | Yahoo Inc. |

**U.S. Department of Labor**

**AUG 1 4 2018**

Office of Federal Contract
Compliance Programs
200 Constitution Avenue, N.W.
Washington, D.C. 20210



Will Evans
The Center for Investigative Reporting
1400 65th Street, Suite 200
Emeryville, CA 94608

RE: Freedom of Information Act Request – Tracking No. 848514

Dear Mr. Evans:

This letter is a third response to your Freedom of Information Act (FOIA) request submitted to the Office of Federal Contract Compliance Programs (OFCCP) on January 9, 2018. Please refer to the above-referenced FOIA tracking number in any future correspondence regarding your FOIA request.

Under FOIA, you requested copies of 2016 EEO-1 Consolidated Report (Type 2) for 55 companies. Attachment A reflects our results so far. We will email all files released under this FOIA.

We believe we have been responsive to your FOIA request. Should you have questions regarding your request, please contact this office at (202) 693-0101 or by email at OFCCP_NO_FOIA@dol.gov.

If you need any further assistance or would like to discuss any aspect of your request please do not hesitate to contact this office or the DOL FOIA Public Liaison, Thomas Hicks, at (202) 693-5427. Alternatively, you may contact the Office of Government Information Services within the National Archives and Records Administration (OGIS) to inquire about the mediation services they offer. The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road, College Park, MD 20740-6001. You can also reach that office by e-mail at ogis@nara.gov, by phone at (202) 741-5770, by fax at (202) 741-5769, or by calling toll-free at (877) 684-6448.

If you are not satisfied with the response to this request, you may administratively appeal by writing to the Solicitor of Labor within 90 days from the date of this letter. The appeal must state in writing the grounds for the appeal, and it may include any supporting statements or arguments, but such statements are not required. In order to facilitate processing of the appeal, please include your mailing address and daytime telephone number, as well as a copy of the initial request and copy of this letter. The envelope and letter of the appeal should be clearly marked

"Freedom of Information Act Appeal." Any amendment to the appeal must be made in writing and received prior to a decision. The appeal should be addressed to the Solicitor of Labor, Division of Management and Administrative Legal Services, U.S. Department of Labor, 200 Constitution Avenue, NW, Room N2420, Washington, DC 20210. Appeals may also be submitted by email to foiaappeal@dol.gov. Appeals submitted to any other email address will not be accepted.

Sincerely,

D. Lissette Geán
Special Assistant

Attachments

Attachment A

| Companies not identified as federal contractors (19) | Companies that did not object to the release of their data (15) | Companies to be discussed in a later response (20) |
|---|---|---|
| Align Technology | Advanced Micro Devices | Agilent Technologies |
| Arista Networks | Bloom Energy | Applied Materials |
| Cloudflare | Cadence Design Systems | Box Inc. |
| Dropbox | Fair Isaac | Docusign |
| Eventbrite | Palo Alto Networks | Equinix |
| Github | PayPal, Inc.[1] | Gilead Sciences |
| Lam Research Corporation | Penumbra | Fitbit |
| Linear Technology | ServiceNow | Intuitive Surgical |
| Netflix | Slack Technologies | Juniper Networks |
| RingCentral | SolarCity | KLA-Tencor |
| ShoreTel | Synnex | Maxim Integrated Products |
| Stripe Inc. | Varian Medical Systems | Oracle Corporation |
| SurveyMonkey | VMware | Palantir Technologies Inc. |
| Symantec | WageWorks | Pandora Media |
| Tesla | Yahoo Inc. | Splunk Inc. |
| TiVo | | Sunpower |
| Twilio | | Synopsys |
| Workday | | Verifone |
| Yelp | | Xilinx |
| | | Zendesk |

| Companies removed from request (1) |
|---|
| Trimble Navigation |

---

[1] PayPal has released this information publicly on their website.

# EXHIBIT D

1  DAVID L. ANDERSON (CABN 149604)
   United States Attorney
2  SARA WINSLOW (DCBN 457643)
   Chief, Civil Division
3  ELLEN LONDON (CABN 325580)
   Assistant United States Attorney
4      450 Golden Gate Avenue, Box 36055
       San Francisco, California 94102
5      Telephone: (415) 436-7288
       Facsimile: (415) 436-6748
6      E-mail: ellen.london@usdoj.gov

7  Attorneys for Defendant

8

9                  UNITED STATES DISTRICT COURT

10               NORTHERN DISTRICT OF CALIFORNIA

11                       OAKLAND DIVISION

12

13  THE CENTER FOR INVESTIGATIVE      )  NO. 19 CIV. 01843 (KAW)
    REPORTING and WILL EVANS,         )
14                                    )
                                      )
15          Plaintiffs,               )  **MOTION FOR SUMMARY JUDGMENT;**
                                      )  **MEMORANDUM OF POINTS AND**
16      v.                            )  **AUTHORITIES IN SUPPORT OF MOTION**
                                      )
17  UNITED STATES DEPARTMENT OF       )
    LABOR,                            )  Date: November 7, 2019
18                                    )  Time: 1:30 p.m.
            Defendant.                )  Location: To Be Determined
19                                    )
    _____ )

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………...………………………ii

NOTICE OF MOTION AND MOTION ..................................................................................1

RELIEF SOUGHT ...................................................................................................................1

ISSUE TO BE DECIDED ........................................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ..........................................................1

I.      INTRODUCTION ........................................................................................................1

II.     FACTS ..........................................................................................................................3

        A.     The EEO-1 Reports ...........................................................................................3

        B.     FOIA Requests and DOL Response ..................................................................4

III.    ARGUMENT ................................................................................................................6

        A.     Applicable Law .................................................................................................6

               1.     Standard of Review.................................................................................6

               2.     Exemption 4 Standard.............................................................................7

        B.     The Information Is Exempt Under Exemption 4 .............................................10

               1.     The Information is Commercial or Financial........................................10

               2.     The Information Is Customarily and Actually Treated as Private ........11

               3.     The Information Was "Provided to the Government Under An
                      Assurance of Privacy"..........................................................................13

IV.     CONCLUSION............................................................................................................16

# TABLE OF AUTHORITIES

Cases                                                                                                    Page(s)

*Department of Justice v. Landano,*
    508 U.S. 165 (1993) ........................................................................................................ 9

*Food Marketing Institute v. Argus Leader Media,*
    139 S. Ct.  (2019) .................................................................................................... passim

*GSA v. Benson,*
    415 F.2d 878 (9th Cir. 1969) ......................................................................................... 8

*Hamdan v. U.S. Dep't of Justice,*
    797 F.3d 759 (9th Cir. 2015) ......................................................................................... 6

*Hunt v. Central Intelligence Agency,*
    981 F.2d 1116 (9th Cir. 1992) ....................................................................................... 6

*Lahr v. NTSB,*
    569 F.3d 964 (9th Cir. 2009) ......................................................................................... 6

*Lane v. Dep't of the Interior,*
    523 F.3d 1128 (9th Cir. 2008) ....................................................................................... 6

*Lewis v. Internal Revenue Serv.,*
    823 F.2d 375 (9th Cir. 1987) ......................................................................................... 6

*Nat'l Archives & Records Admin. v. Favish,*
    541 U.S. 157 (2004) ........................................................................................................ 6

*Nat'l Parks & Conservation Ass'n v. Morton,*
    498 F.2d 765 (D.C. Cir. 1974) ................................................................................. 7, 8

*Pub. Citizen Health Research Group v. FDA,*
    704 F.2d 1280 (D.C. Cir. 1983) .................................................................................. 10

*U.S. Dep't of State v. Ray,*
    502 U.S. 164 (1991) ........................................................................................................ 6

Statutes

5 U.S.C. § 522 ...................................................................................................................... 5

5 U.S.C. § 551 .................................................................................................................... 10

5 U.S.C. § 552 .................................................................................................................. 1, 7

42 U.S.C. § 2000e-8(c) ...................................................................................................... 3

42 U.S.C. § 2000e-14 ......................................................................................................... 3

Rules

Federal Rule of Civil Procedure 56 ........................................................................................ 1

Regulations

29 C.F.R. § 70 ......................................................................................................................... 6

29 C.F.R. § 1602.7 .................................................................................................................. 3

29 CFR § 70.26 ............................................................................................................ 4, 13, 14

41 C.F.R. § 60-1.7 ................................................................................................................ 3, 5

41 C.F.R. § 60-1.20................................................................................................................ 14

Other Authorities

81 Fed. Reg. 5113 .................................................................................................................... 3

*Fact Sheet for EEO-1 Survey Filers*, https://www.eeoc.gov/employers/eeo1survey/fact_sheet_filers.cfm.
........................................................................................................................................... 3

Memorandum from EEO-1 Joint Reporting Committee, on *Computer Printed EEO-1 Reports- Required
Format (Rev 3/2007)* to Multi-establishment Private Employers (July 2007)
https://www.eeoc.gov/employers/eeo1survey/upload/compfiling-multi.pdf. ...................................... 3

*EEOC, Revision of the Employer Information Report (EEO-1) and Comment Request,* 81 Fed. Reg.
5113, 5114 (Feb. 1, 2016)....................................................................................................... 3

*EEO-1 Instruction Booklet 7; EEOC, Key Terminology and Definitions, "Joint Reporting Committee,"
https://www.eeoc.gov/employers/eeo1survey/terminology.cfm.* ............................................................ 3

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on November 7, 2019, at 1:30 p.m., or as soon thereafter as the matter may be heard at the United States District Courthouse, 1301 Clay Street, Oakland, CA 94612, before the Honorable Kandis A. Westmore, defendant UNITED STATES DEPARTMENT OF LABOR ("DOL"), pursuant to Federal Rule of Civil Procedure 56, will move the Court for an order granting summary judgment in favor of DOL and against plaintiffs The Center For Investigative Reporting and Will Evans (together "Plaintiffs," or "CIR").

This motion is brought on the ground that no material facts are in dispute and the Government is entitled to judgment as a matter of law. The motion is based on this notice, the ensuing points and authorities, the declarations of Tania Barros, Julie Crane, Kelly Kayser, Mirelle King, Sarah Lee, Nancy Lewis-Treolo, Dave Nickerson, Natalie Speno, Victoria Thrasher, Mollie Wong, and D. Lissette Geán filed herewith, the pleadings on file with the Court, any additional evidence the Court may allow, and any argument permitted at the hearing.

## RELIEF SOUGHT

The Government asks that the Court grant summary judgment in its favor and against Plaintiffs.

## ISSUE TO BE DECIDED

1. Did DOL properly withhold the documents at issue under FOIA Exemption 4?

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

This case involves a request by CIR under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and DOL's withholding of commercial or financial information obtained from a person that is confidential. CIR requested the 2016 EEO-1 Consolidated Report (Type 2) for 55 named companies. DOL has produced only those EEO-1 Type 2 reports of the companies that did not object to the release of their reports.

DOL has properly withheld EEO-1 Consolidated Reports (Type 2) for the remaining companies under FOIA's Exemption 4. CIR challenges the agency's withholding of the reports, which contain the total number of each company's employees categorized by race/ethnicity, gender, and job category. DOL asserts that the exempt reports contain confidential commercial information. On June 24, 2019,

MOT. FOR SUMMARY JUDGMENT
C 19-01843-KAW                                        1

1    the Supreme Court decided *Food Marketing Institute v. Argus Leader Media*, 139 S. Ct. 2365 (2019)

2    ("*Argus Leader*"), in which the Court re-assessed the legal standard for Exemption 4. In so doing, the

3    Court noted that "FOIA expressly recognizes that important interests are served by its exemptions, and

4    those exemptions are as much a part of FOIA's purposes and policies as the statute's disclosure

5    requirement." 139 S. Ct. at 2366. The Court rejected the prior standard for Exemption 4, which

6    required a showing of competitive harm or harm to the Government if the information were to be

7    released, and held that "[a]t least where commercial or financial information is both customarily and

8    actually treated as private by its owner and provided to the government under an assurance of privacy,

9    the information is 'confidential' within the meaning of Exemption 4." *Id.* at 2366.

10         DOL has submitted evidence that meets the standard set out in *Argus Leader*. First, the evidence

11   establishes that each company customarily and actually treated as private the information at issue. The

12   companies have submitted testimony describing the efforts taken to keep the information confidential;

13   these efforts include limiting access to the relevant information even within the companies on a "need to

14   know" basis. These efforts appear to have been successful, because there is no evidence that any of the

15   documents at issue are publicly available. Further, to the extent that the Court requires a showing that

16   the companies submitted this information to the Government under an assurance of privacy, DOL

17   satisfies that as well. For example, the EEO-1 web portal expressly notifies submitters that the agencies

18   receiving the information will keep the companies' EEO-1 data confidential to the extent permitted by

19   law. Moreover, DOL has assured the companies that it will notify them of any FOIA requests for that

20   information. Similarly, OFCCP regulations provide that, as a general practice, OFCCP does not release

21   any data of a contractor when that contractor indicates that the data is confidential and sensitive and that

22   the release of data would subject the contractor to commercial harm. The companies have relied on these

23   various forms of assurance that the information will be kept private, in addition to the agency's actions

24   over the years. For all of these reasons, DOL has appropriately withheld the information under

25   Exemption 4, and respectfully requests that the Court grant summary judgment in its favor.

26   //

27   //

28   //

MOT. FOR SUMMARY JUDGMENT
C 19-01843-KAW                              2

**II.      FACTS**

**A.      The EEO-1 Reports**

Companies with 50 or more employees that contract with the federal government must submit annual reports using Standard Form 100, commonly known as "EEO-1 report," to the Joint Reporting Committee, defined below. 41 C.F.R. § 60-1.7(a). Companies that do business at two or more physical addresses (i.e. establishments) must file an EEO-1 Consolidated Report (Type 2) to that web portal. *Fact Sheet for EEO-1 Survey Filers*, https://www.eeoc.gov/employers/eeo1survey/fact_sheet_filers.cfm. EEO-1 Type 2 reports require companies to report the total number of employees across all their establishments by race/ethnicity, gender, and job category. Memorandum from EEO-1 Joint Reporting Committee, on *Computer Printed EEO-1 Reports- Required Format (Rev 3/2007)* to Multi-establishment Private Employers (July 2007) https://www.eeoc.gov/employers/eeo1survey/upload/compfiling-multi.pdf. These reports help OFCCP monitor the contracting companies' compliance with Executive Order No. 11,246 which prohibits employment discrimination by government contractors. Declaration of D. Lissette Geán ("Geán Decl.") at 5.

The Equal Employment Opportunity Commission ("EEOC") collects similar data, through the Joint Reporting Committee ("JRC").[1] 42 U.S.C. § 2000e-8(c) and 29 C.F.R. § 1602.7. To avoid duplication of efforts and reduce the administrative burden on companies, the EEOC and the Office of Federal Contract Compliance Program ("OFCCP") jointly promulgated the EEO-1 Report. *See* 41 C.F.R. § 60-1.7(a)(1) and 42 U.S.C. § 2000e-14. The agencies formed the JRC to administer the EEO-1 reporting system in a manner that establishes a single data collection to meet the statistical needs of both agencies. *See EEOC, Revision of the Employer Information Report (EEO-1) and Comment Request,* 81 Fed. Reg. 5113, 5114 (Feb. 1, 2016) and *EEO-1 Instruction Booklet 7; EEOC, Key Terminology and Definitions, "Joint Reporting Committee,"* https://www.eeoc.gov/employers/eeo1survey/terminology.cfm. While conceptually the EEO-1 data is jointly collected, as a practical manner the JRC web portal is managed by the EEOC. *EEOC, Revision*

---

[1] The EEOC's regulations require employers with 100 or more employees to file the EEO-1 Report with the EEOC. 29 C.F.R. § 1602.7.

MOT. FOR SUMMARY JUDGMENT
C 19-01843-KAW                    3

*of the Employer Information Report (EEO-1) and Comment Request,* 81 Fed. Reg. at 5118. Thus, in

practice, the EEOC collects the data and then refers to OFCCP federal contractor reports subject to

OFCCP's jurisdiction. *Id.*

### B. FOIA Requests and DOL Response

On January 4, 2018, plaintiffs submitted, via electronic mail, a FOIA request to DOL seeking:

"The EEO-1 Consolidated Report (Type 2), for 2016" for a list of 55 companies. Geán Decl. ¶ 13.

Previously, in April 2017, Plaintiffs submitted several FOIA requests seeking 2015 EEO-1 Type

2 reports for several companies including some of those objecting in this case. Geán Decl. ¶ 10. DOL

also initially withheld the information under Exemption 4. Plaintiff sued DOL at that time, and the

parties settled the matter. Geán Decl. ¶ 11. As part of that settlement, DOL agreed to release the 2015

EEO-1 Type 2 reports for six companies, despite the companies' objections, relying on the legal

standard at that time. Geán Decl. ¶ 12. *See The Center for Investigative Reporting and Will Evans v.*

*United States Department of Labor*, 3:18-cv-2008-JCS.

On January 17, 2018, D. Lissette Geán, on behalf of DOL, sent plaintiffs a letter acknowledging

the request at issue in this case and assigning tracking number 848514. Geán Decl. ¶ 17. In that letter,

DOL also notified plaintiffs that when requests for EEO-1 data is made:

> [i]n accordance with 29 CFR § 70.26, OFCCP is required to notify submitters that their business
> information has been requested under the FOIA in order to give them an opportunity to object
> in writing to disclosure of any specified portion of the requested info1mation. We will send a
> final response to your request for EEO-1 data after the deadline expires for the submitters to
> object. Any objections to the release of the requested EEO-1 data will be evaluated by OFCCP
> on a case-by-case basis.

Geán Decl. ¶ 14.

On March 13, 2018, Ms. Geán informed plaintiffs that OFCCP identified only 36 of the named

55 companies as federal contractors subject to OFCCP's jurisdiction. Geán Decl. ¶ 15. On March 14,

2018, Ms. Geán, notified those 36 federal contractors of the plaintiffs' FOIA request for their EEO-1,

Type 2 information. Geán Decl. at ¶ 16. The notice was sent out pursuant to the notice requirement for

confidential commercial information as described in DOL's duly promulgated regulation. 29 C.F.R. §

1   70.26. Geán Decl. at ¶ 16.  The letters informed the submitters that they had 30 days from receipt of the

2   letter to object and provided, in relevant part, that:

3       EEO-1 Reports are filed with the EEO-1 Joint Reporting Committee, which provides EEO-1 data
        to OFCCP. We believe the requested EEO-1 data may be released; however in accordance with
4       the U.S. Department of Labor FOIA regulations at 29 CFR § 70.26, OFCCP is required to notify
        submitters of its intent to release business information. We are therefore giving you the
5       opportunity to present objections to the disclosure of the requested EEO-1 data on grounds that
        specific information contained therein is exempt from mandatory disclosure such as Exemption 4
6       of the FOIA. Exemption 4 of the FOIA at 5 U.S.C. § 522 (b)(4) protects "...trade secrets and
7       commercial or financial information obtained from a person [that is] privileged or confidential."

8   Geán Decl. ¶ 17.

9       The letters further provided that the written objection must include answers to questions posed in

10  the letter.  Geán Decl. at ¶ 18.  As the letters pre-date the Supreme Court's decision in *Argus Leader*, the

11  statements and the questions in the letter related to the FOIA Exemption 4 standard before the decision.

12  Geán Decl. at ¶ 18.  The March 14, 2018 letter also informed submitters that if they fail to provide a

13  written objection within the 30- day period, DOL will release their EEO-1, Type 2 data to the plaintiff-

14  FOIA requesters.  Geán Decl. at ¶ 19.

15      In response to the March 14, 2018 letter, 14 of the 36 companies submitted written objections to

16  OFCCP.  Geán Decl. at ¶ 22.  Thereafter, on April 18, 2018, Ms. Geán sent a second notice to submitters

17  who had not objected by then.  Geán Decl. at ¶ 20. The April 18, 2018 letters referenced the March 14,

18  2018, letters and informed those submitters that if they failed to object by close of business on May 31,

19  2018, their EEO-1 Type 2 data will be released to the plaintiff-requesters.  Geán Decl. at ¶ 21.  Also on

20  April 18, 2018, Ms. Geán separately informed Plaintiffs that as of the date of that letter 14 companies

21  objected to the release of their data on the grounds of FOIA Exemption 4.  Geán Decl. at ¶ 22.

22      By May 31, 2018, a total of 20 of the 36 companies submitted written objections to DOL.  Geán

23  Decl. at ¶ 23.  Subsequently, on April 18, 2018, and on July 15, 2018, DOL sent each of the 20 objecting

24  submitters a letter informing them that DOL "concurred with their assertions that their EEO-1 reports

25  were exempt from mandatory disclosure pursuant to Exemption 4 of FOIA."  Geán Decl. at ¶ 24.  As

26  such, DOL informed these objectors that it would not release their EEO-1 Type 2 data to CIR.  Geán

27  Decl. at ¶ 24.

28

MOT. FOR SUMMARY JUDGMENT
C 19-01843-KAW                                         5

1    On August 14, 2018, Ms. Geán, sent a letter to the Plaintiffs confirming that one of companies in

2  the original FOIA request, Trimble Navigation, had been removed from the request. Geán Decl. ¶ 25.

3  In addition, by the date of the letter, Ms. Geán informed Plaintiffs that 15 submitters had not objected to

4  the release of their EEO-1 Type 2 data. Geán Decl. ¶ 26. Subsequently, on August 16, 2018, via e-mail,

5  OFCCP released the EEO-1 Type 2 data for those 15 submitters who failed to timely object to the

6  release of their EEO-1 data by May 31, 2018. Geán Decl. ¶ 27.

7    On February 22, 2019, OFCCP informed plaintiffs that they would delay issuing a final response

8  to this FOIA pending the outcome of the Supreme Court decision in *Argus Leader*. Geán Decl. ¶ 28.

9    On March 1, 2019, Plaintiffs submitted an administrative appeal pursuant to 29 C.F.R. § 70.

10  Geán Decl. ¶ 29. On March 21, 2019, DOL acknowledged receipt of their appeal. Geán Decl. ¶ 30. On

11  April 9, 2019, plaintiffs filed this action. Geán Decl. ¶ 31. Subsequent to that filing, additional

12  companies decided to release the information. Geán Decl. ¶ 32. This motion is submitted in support of

13  DOL's decision to withhold the EEO-1 Type 2 data for the following companies: Xilinx, Applied

14  Materials, Inc. ("Applied Materials"), Equinix, Gilead Sciences, Inc. ("Gilead"), Synopsys, Inc.

15  ("Synopsys"), Docusign, Inc. ("DocuSign"), Agilent Technologies ("Agilent"), Box, and Oracle

16  America, Inc ("Oracle"), and Fitbit, Inc. ("Fitbit").

17  **III.    ARGUMENT**

18        **A.    Applicable Law**

19              **1.    Standard of Review**

20    In a FOIA case, while the agency invoking an exemption in order to withhold requested records

21  "bears the burden of demonstrating that the exemption properly applies to the documents," *Lahr v.*

22  *NTSB*, 569 F.3d 964, 973 (9th Cir. 2009), the agency meets its burden when it submits declarations that

23  "contain reasonably detailed descriptions of the documents and allege facts sufficient to establish an

24  exemption." *Lane v. Dep't of the Interior*, 523 F.3d 1128, 1135-36 (9th Cir. 2008) (quoting *Lewis v.*

25  *Internal Revenue Serv.*, 823 F.2d 375, 378 (9th Cir. 1987). Declarations submitted by an agency to

26  demonstrate the adequacy of its FOIA response are entitled to a presumption of good faith. *See, e.g.*,

27  *Hamdan v. U.S. Dep't of Justice*, 797 F.3d 759, 772 (9th Cir. 2015) ("Affidavits submitted by an agency

28  to demonstrate the adequacy of its FOIA response are presumed to be in good faith.") (citation omitted);

MOT. FOR SUMMARY JUDGMENT
C 19-01843-KAW                                    6

*see also Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2004) ("there is a presumption of legitimacy accorded to the Government's official conduct") (citing *U.S. Dep't of State v. Ray*, 502 U.S. 164 (1991)). Thus, where declarations give reasonably detailed justifications for withholding and appear to be in good faith, "the inquiry ends and the nondisclosure is upheld." *Hamdan*, 797 F.3d at 773 (citing *Hunt v. Central Intelligence Agency*, 981 F.2d 1116, 1119 (9th Cir. 1992)).

### 2. Exemption 4 Standard

"FOIA expressly recognizes that important interests are served by its exemptions, and those exemptions are as much a part of FOIA's purposes and policies as the statute's disclosure requirement." *Argus Leader*, 139 S. Ct. 2356, 2366 (2019) (internal citations, quotation marks and brackets omitted). One of those exemptions is set forth in 5 U.S.C. § 552(b)(4) (Exemption 4).

"Exemption 4 shields from mandatory disclosure 'commercial or financial information obtained from a person and privileged or confidential.'" *Id.* at 2362 (quoting 5 U.S.C. § 552(b)(4)). When Congress enacted FOIA in 1966, "[t]he term 'confidential' meant then, as it does now, 'private' or 'secret.'" *Id.* at 2363 (quoting Webster's Seventh New Collegiate Dictionary 174 (1963)). In *Argus Leader*, the Supreme Court explained that the term "confidential" has two meanings. "In one sense, information communicated to another remains confidential whenever it is customarily kept private, or at least closely held, by the person imparting it." *Id.* (citations omitted). "In another sense, information might be considered confidential only if the party receiving it provides some assurance that it will remain secret. *Id.* (quoting 1 Oxford Universal Dictionary Illustrated 367 (3d ed. 1961) ("spoken or written in confidence"); Webster's New World Dictionary 158 (1960) ("told in confidence")).

The central issue in *Argus Leader* was whether the "so-called 'competitive harm' test"—which the Eighth Circuit and "several other courts of appeals . . . [have] engrafted onto Exemption 4"—was appropriate. *Id.* at 2360. The Court held it was not, finding it "inconsistent with the terms of the [FOIA]," *id*, and the result of a "casual disregard of the rules of statutory interpretation" and "selective tour through the legislative history" by the D.C. Circuit in *National Parks*, which a number of courts of appeals eventually adopted "[w]ithout much independent analysis." *Id.* at 2364 (citing *Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 767 (D.C. Cir. 1974). The Court found that the "*National Parks*' . . . approach is a relic from a bygone era of statutory construction"; that "[u]nsurprisingly,

MOT. FOR SUMMARY JUDGMENT
C 19-01843-KAW                    7

1    *National Parks* has drawn considerable criticism over the years"; and that "[e]ven the D.C. Circuit has

2    distanced itself from the decision." *Id.* (internal quotation marks and citations omitted). The Supreme

3    Court concluded that the dissent's argument that "it would be a good idea to require a showing of *some*

4    harm" finds no support in the statutory text, and instead "boils down to a policy argument about the

5    benefits of broad disclosure." *Id.* at 2366 (emphasis in original). Because Congress already made this

6    policy determination when it enacted FOIA and sought a "workable balance" between disclosure and

7    privacy, *id.*, it was not for the courts to reconsider. The Court emphasized that exemptions that seek to

8    ensure this privacy, including Exemption 4, "are as much a part of FOIA's purposes and policies as the

9    statute's disclosure requirement." *Id.*

10        Rejecting the competitive harm test, the Court instead held that Exemption 4 requires that the

11    information in question have been kept confidential by the entity submitting it. The Court noted that

12    "there's no need to resolve" whether Exemption 4 also requires the government to have given an

13    assurance that the information would be maintained in confidence—*i.e.*, whether "privately held

14    information *lose[s]* its confidential character for purposes of Exemption 4 if it's communicated to the

15    government without assurances that the government will keep it private"—because the assurance was

16    not in dispute. *Id.* (emphasis in original). Accordingly, the Court held that "[a]t least where commercial

17    or financial information is both customarily and actually treated as private by its owner and provided to

18    the government under an assurance of privacy, the information is 'confidential' within the meaning of

19    Exemption 4." *Id.* at 2366.

20        The Supreme Court in *Argus Leader* expressly did not decide whether Exemption 4 requires the

21    government to give an assurance that it will maintain the information in confidence. Even assuming that

22    Exemption 4 requires such an assurance, however, neither *Argus Leader* nor the authority it cites

23    requires an express (as opposed to implied) promise of confidentiality by the government. To the extent

24    the Supreme Court in *Argus Leader* discussed the "assurance" question, it quoted approvingly the Ninth

25    Circuit's "conclu[sion] that Exemption 4 would 'protect information that a private individual wishes to

26    keep confidential for his own purposes, but reveals to the government under the express *or implied*

27    promise' of confidentiality." *Argus Leader*, 139 S. Ct. at 2363 (citing *GSA v. Benson*, 415 F.2d 878, 881

28    (9th Cir. 1969)) (emphasis added).

MOT. FOR SUMMARY JUDGMENT
C 19-01843-KAW

1    Although the Court's opinion in *Argus Leader* did not elaborate on what circumstances would

2    indicate an "'implied promise' of confidentiality" when applying Exemption 4, *see* 139 S. Ct. at 2363,

3    the Court's jurisprudence in the Exemption 7(D) context provides a useful analytical framework.  In

4    *Department of Justice v. Landano*, the Court provided for an objective test to assess whether "an implied

5    assurance of confidentiality fairly can be inferred," based on "generic circumstances" surrounding the

6    communication between the informant and the government that would "characteristically support an

7    inference of confidentiality."  508 U.S. 165, 177, 179 (1993).

8    When analyzing Exemption 4's protections, looking to objective factors reflecting how the

9    information is customarily treated outside of the government should guide the analysis of the company's

10    expectations of continued confidentiality once that information is shared with the government (assuming

11    such separate analysis is necessary).  Just as "the nature of the crime and the source's relationship to it"

12    provides an objective indication of whether an informant would assume confidentiality when relaying

13    information touching on those subjects to the government, *see Landano*, 508 U.S. at 179, the question of

14    whether a company typically holds information in confidence or secret is likewise an objective factor in

15    determining whether the company would assume confidentiality when sharing that information with the

16    government.

17    The submission of such confidential information to the government does not automatically strip

18    it of its confidential status because, "[i]n common usage, confidentiality is not limited to complete

19    anonymity or secrecy."  *Landano*, 508 U.S. at 173.  So long as the context in which the information is

20    provided does not indicate that the government would act any differently than the party from whom it

21    obtained the information by publicly disseminating it, the information remains confidential under

22    Exemption 4.  That ordinary understanding of the term is reflected in the committee reports on FOIA as

23    enacted in 1966.  These reports emphasize that Exemption 4 protects "the confidentiality of information

24    obtained by the Government" when it "would not customarily be made public by the person from whom

25    it was obtained."  H.R. Rep. No. 1497, 89th Cong., 2d Sess. 10 (1966) ("House Report"); *accord* S. Rep.

26    No. 813, 89th Cong., 1st Sess. 9 (1965).

27    If a person provides information to the government in the context of government statements or

28    actions that are reasonably understood to show that the government will not publicly disclose it, such

MOT. FOR SUMMARY JUDGMENT
C 19-01843-KAW         9

1    information is "communicated in confidence" and thus "confidential."  Exemption 4's protective scope

2    therefore "include[s] information which is *given to an agency in confidence*," and embodies the fairness-

3    based principle that "where the Government has obligated itself in good faith not to disclose documents

4    or information which it receives, it should be able to honor such obligations."  House Report at 10

5    (emphasis added).

6         As discussed below, assuming Exemption 4 requires the government to show that the withheld

7    information was both confidential and submitted with an assurance it would be kept confidential, the

8    information withheld in this case—as in *Argus Leader*—satisfies both conditions.

9    **B.    The Information Is Exempt Under Exemption 4**

10        For information to be covered by Exemption 4, it must be "(1) commercial or financial, (2)

11   obtained from a person, and (3) privileged or confidential."  *See Pub. Citizen Health Research Group v.*

12   *FDA*, 704 F.2d 1280, 1291 (D.C. Cir. 1983).  FOIA defines a person to include an "individual,

13   partnership, corporation, association, or public or private organization other than an agency."  5 U.S.C.

14   § 551(2).  This second requirement is not likely to be disputed, and the first and third requirements are

15   satisfied in this case.

16        **1.    The Information is Commercial or Financial**

17        Courts define "commercial" broadly and consider information to be commercial if it relates to

18   business or trade and the submitter has a commercial interest in the data.  *See Pub. Citizen Health*

19   *Research Group*, 704 F.2d at 1290.  The declarations for each of the companies show that the EEO-1

20   reports relate to the business of the companies and are treated as commercial information that if

21   released, could cause financial harm to the companies.  For example, Julie Crane from Applied

22   Materials explains that the "information contains valuable and confidential business information

23   concerning its labor strategy, demographics, recruiting, and allocation of resources across its segments."

24   Declaration of Julie Crane ("Crane Decl.") ¶ 6.  For this reason, Ms. Crane explains, "Applied Materials

25   considers this information confidential commercial information, and has not customarily disclosed that

26   data to the public in any way."  *Id.* ¶ 6.  Kelly Kayser from Equinix elaborates that disclosure of the

27   information would "provide [the company's] competitors insights into its strategy, operations,

28   recruiting, and labor costs"; these insights would be increasingly problematic "if EEO-1 information

MOT. FOR SUMMARY JUDGMENT
C 19-01843-KAW                                    10

1   were regularly released, as it would allow competitors to discern shifts and strategies for the business

2   going forward, in a highly competitive field."  Declaration of Kelly Kayser ("Kayser Decl.") ¶ 6.  The

3   declarants from the other companies make similar statements.  *See* Declaration of Tania Barros ("Barros

4   Decl.") ¶ 4; Declaration of Mirelle King ("King Decl.") ¶ 4 (the information "ties directly into Gilead's

5   business strategy"); Declaration of Nancy Lewis-Treolo ("Lewis-Treolo Decl.") ¶ 6 ("The report also

6   includes crucial information about the diversity of DocuSign's workforce, which competitors could use

7   to target the Company's talent."); Declaration of Dave Nickerson ("Nickerson Decl.") ¶ 6; Declaration

8   of Natalie Speno ("Speno Decl.") ¶ 6; Declaration of Victoria Thrasher ("Thrasher Decl.") ¶ 5 (the

9   reports "communicate Oracle's experience and expertise in the field of how to structure the workforce to

10  have a well-run, profitable, and efficient company"); Declaration of Mollie Wong ("Wong Decl") ¶ 7

11  ("Fitbit considers its EEO-1 reports to be commercial information because they contain information

12  regarding its workforce patterns and workforce profiles . . .").  The information may also be used for

13  diversity initiatives, further demonstrating the business purpose of the data.  *See* Declaration of Sarah

14  Lee ("Lee Decl.") ¶ 9 (explaining that the data is "made available internally within the company on a

15  limited basis to Human Resources employees, designated Legal Department employees, senior level

16  management and employees who work on our diversity initiatives").

17      It would not make sense for the companies to undertake the extensive efforts described below to

18  maintain the confidentiality of the reports if these companies did not believe that the data was directly

19  related to various aspects of their business.  The testimony described above and in the declarations

20  satisfies the broad definition of "commercial information."

21              **2.      The Information Is Customarily and Actually Treated as Private**

22      *Argus Leader* holds that information is exempt from disclosure under Exemption 4 if it was

23  "customarily and actually treated as private by its owner."  *Argus Leader*, 139 S. Ct. at 2366.  In *Argus*

24  *Leader*, this standard was met because the owners of the information "customarily do not disclose" the

25  information "or make it publicly available 'in any way," and "[e]ven within a company, . . . only small

26  groups of employees usually have access to it."  *Id.* at 2363.  The evidence shows that same treatment of

27  the EEO-1 reports in this case.

28

The declarants, who are human resources professionals, have testified in detail as to the fact that the information at issue is not only kept confidential, but that the companies take significant steps to ensure that it remains so. For example:

> Oracle maintains its employees' confidential information in a secure database. Oracle has detailed policies regarding access to confidential information. Access to the database is granted on a strict need-to-know basis. In addition, Oracle regularly reviews who has been granted access to the database to ensure those individuals have a continuing need for such access. If the individual no longer requires access to the database, Oracle will remove that access. Oracle does this to limit access to this information due to confidentiality concerns and to ensure that other Oracle employees and managers do have access to the EEO survey data.

Thrasher Decl. ¶ 9. Most of the companies limit the number of people even within their own business who can access this information. For example, at DocuSign, only 17 of 3,500 employees have access to the data, and 13 of the 17 "received additional training on the need to control access and maintain confidentiality over this sensitive data." Lewis-Treolo Decl. ¶ 8; *see also* Crane Decl. ¶ 5 ("The vast majority of Applied Materials employees do not have access to this information."); King Decl. ¶ 5; Kayser Decl. ¶ 5; Lee Decl. ¶ 9; Nickerson Decl. ¶ 6 11; Speno Decl. ¶ 5; Wong Decl. ¶ 5. One company notes that it "requires employees to sign confidentiality and non-disclosure agreements, which precludes public disclosure of personnel information contained within EEO-1 reports." Barros Decl. ¶ 5. And one company noted that it has denied requests from the company's shareholders for the information. King Decl. ¶ 5.

Part of why the confidentiality of the reports is taken so seriously is because when the companies collect the demographic information from potential employees in order to obtain the relevant data for the reports, they provide assurances to these individuals that the information will be held in confidence; the companies do not want to breach the trust with their employees. *See* Lee Decl. ¶¶ 5-8; *id.* at ¶ 6 ("Synopsys treats its employees' self-identification as voluntary and confidential. Synopsys informs all of its employees that their self-identification data will be maintained in confidence, and Synopsys makes good on this commitment."). The companies also keep the information confidential because of a concern that competitors will be able to use the information against them. *See* Barros Decl. ¶ 4; Crane Decl. ¶ 6; Kayser ¶ 6; King ¶ 4; Lewis-Treolo Decl. ¶ 6; Nickerson Decl. ¶ 6; Speno Decl. ¶ 9; Thrasher

MOT. FOR SUMMARY JUDGMENT
C 19-01843-KAW

12

Decl. ¶¶ 4-5; Wong Decl. ¶¶ 7-9.  DOL is not required to show a likelihood of substantial competitive

harm under Exemption 4 as a result of *Argus Leader*; however, the witnesses' testimony that they

remain concerned about this issue is relevant to illustrate the importance of the confidentiality that is

being protected by Exemption 4.  In addition, one of the companies expressed a concern as to potential

harm to individual privacy if the information were to be released.  *See* Lee Decl. ¶ 8.  Finally, another

company mentioned a concern regarding reputational harm from the release of the information.  *See*

Nickerson Decl. ¶ 21 ("Data in Agilent's EEO-1 Report may be mischaracterized to damage Agilent's

reputation.").

In sum, there is no question that each of the companies at issue is invested in keeping the

information confidential, for a variety of reasons.  And, as shown above and in the declarations, the

numerous steps taken to assure that it is and remains confidential have been effective because the reports

at issue are not in fact publicly available.  The evidence meets the standard set out in *Argus Leader* that

the information be customarily and actually kept confidential.

### 3. The Information Was "Provided to the Government Under An Assurance of Privacy"

To the extent that the Court considers whether the commercial or financial information was

"provided to the government under an assurance of privacy," *Argus Leader*, 139 S. Ct. at 2366, the

record demonstrates that it was.

EEO-1 submitters with federal contracts are assured that their reports will be treated as

confidential commercial information to the maximum extent permitted by law.  Geán Decl. at ¶ 34.

Submitters are repeatedly notified of this assurance on the JRC website.  Geán Decl. at ¶ 35.  The JRC

website states that "OFCCP will notify contractors of any Freedom of Information Act (FOIA) requests

that are made to obtain any of the data provided on the EEO-1 report, and will protect the confidentiality

of EEO-1 data to the maximum extent possible consistent with FOIA and the Trade Secrets Act."  *EEO-1 Joint Reporting Committee, EEO-1, Frequently Asked Questions and Answers, (About the EEO-1 Survey, Question No. 2)*, *available at* https://www.eeoc.gov/employers/eeo1survey/faq.cfm; *EEO-1 Joint Reporting Committee, EEO-1 Instruction Booklet 1, Page 4.*

https://www.eeoc.gov/employers/eeo1survey/upload/instructions_form.pdf.  The statement "will protect

MOT. FOR SUMMARY JUDGMENT
C 19-01843-KAW                                13

1   the confidentiality of the EEO-1 data to the maximum extent possible consistent with FOIA" is a clear

2   expression of an assurance; indeed, it is hard to imagine what more an agency could say on this front.

3   And federal agencies are only required to follow the notification process when they believe that a FOIA

4   request is seeking confidential commercial information. *Exec. Order No. 12,600*, 52 FR 23781 § 2(a)

5   (June 23, 1987) and 29 C.F.R. § 70.26. In accordance with Executive Order 12,600, DOL's duly

6   promulgated regulations describe the notice procedures DOL departments must take when they receive a

7   FOIA request for potentially confidential commercial information. 29 C.F.R. § 70.26. OFCCP

8   determined that EEO-1 reports including the multi-establishment Type 2 reports should be treated as

9   confidential commercial information such that companies that complete these reports are entitled to

10   notice of a FOIA request for their report and provided a right to object to the release of their report under

11   FOIA Exemption 4. 29 C.F.R. § 70.26. Geán Decl. at ¶ 33. In this case, OFCCP followed the

12   submitter notice requirements under 29 C.F.R. § 70.26 when it received the plaintiffs' FOIA request for

13   EEO-1 Type 2 data. Geán Decl. at ¶ 16.

14        The companies at issue relied on DOL's statements when submitting their information to the

15   government. As Ms. Crane explains, "Applied Materials is aware of and relies on the instruction

16   booklet concerning the EEO-1 Reports published by the [EEOC]," and specifically "relies on the

17   instruction booklet's assurance that the government 'will protect the confidentiality of EEO-1 data to the

18   maximum extent possible,' both when asking its employees to disclose sensitive information about their

19   identity, and when submitting the data to the government.'" Crane Decl. ¶¶ 8, 10; *see also* Barros Decl.

20   ¶ 7; Kayser Decl. ¶¶ 8-10; King Decl. ¶ 7; Lee Decl. ¶ 10; Lewis-Treolo ¶¶ 13-14; Nickerson Decl. ¶¶

21   14-15; Speno Decl. ¶ 11; Thrasher Decl. ¶ 10; Wong Decl. ¶ 12. They also relied on the notice

22   procedures for confidential commercial information contained in the regulations and in the EEO-1

23   instructional booklet. *See* Barros Decl. ¶ 8; Crane Decl. ¶¶ 8-9; Kayser Decl. ¶ 11; King Decl. ¶ 7; Lee

24   Decl. ¶ 11; Lewis-Treolo ¶ 15; Nickerson Decl. ¶ 16; Speno Decl. ¶ 11; Thrasher Decl. ¶¶ 10-11; Wong

25   Decl. ¶ 13. Contractors are also assured that even when they are subject to a compliance evaluation,

26   OFCCP will protect their confidential data from public disclosure as much as possible. *See* 41 C.F.R.

27   § 60-1.20(g); Geán Decl. at ¶ 36.

28

1    In addition, there was an implied assurance of privacy arising from the overall history of the

2  agency maintaining the records as confidential.  This takes several forms.  First, certain companies have

3  had prior experiences with FOIA requests in which the agency withheld the same EEO-1 data at issue

4  here pursuant to Exemption 4.  King Decl. ¶ 9.  Second, several of the declarants noted the many years

5  during which they have observed that the information has been kept confidential.  For example, Ms.

6  Crane explained, "Applied Materials has been submitting EEO-1 forms to the government for at least 25

7  years, including all years I have been at the company.  I am not aware of and do not believe that any of

8  those reports have become public or been released through a FOIA request.  This longtime practice

9  reflects that the information is confidential and is a form of government assurance that such information

10  will remain generally confidential."  Crane Decl. ¶ 7; *see also* Kayser Decl. ¶ 7 (14 years of submitting

11  reports).  Third, some of the declarants describe being aware of publicly available information as to the

12  agency's practice of seeking to maintain the information as confidential.  *See* King Decl. ¶ 8 ("Gilead

13  also is aware of OFCCP's past practices of withholding confidential EEO-1 data in response to FOIA

14  requests.  For example, Gilead has been aware of publicity, like the article in the *San Jose Mercury*

15  *News* on February 11, 2010, that the OFCCP has not released confidential EEO-1 reports in response to

16  FOIA requests."); Nickerson Decl. ¶¶ 17-18; Speno Decl. ¶ 12; *see also* Barros Decl. ¶¶ 9-12

17  (describing the same article as well as other instances of publicity regarding requests for these reports).

18  The fact that documents were released last year as part of a settlement of litigation does not change this

19  long-running practice, both because it was one example in many years and because it was based on the

20  prior legal standard in place.

21    The evidence submitted by the companies supports the conclusion that the reports were

22  submitted with both explicit and implicit assurances of confidentiality.  That, combined with the

23  substantial evidence demonstrating that the information customarily and actually was maintained as

24  confidential, justifies a finding that the agency is properly withholding the information under Exemption

25  4.

26  //

27  //

28  //

MOT. FOR SUMMARY JUDGMENT
C 19-01843-KAW                                    15

**IV. CONCLUSION**

For all of the aforementioned reasons, Defendant respectfully requests that the Court grant summary judgment in its favor.

Respectfully submitted,

DAVID L. ANDERSON
United States Attorney

Dated: August 23, 2019

   /s/ *Ellen London*      .
ELLEN LONDON
Assistant United States Attorney
Counsel for Defendant

MOT. FOR SUMMARY JUDGMENT
C 19-01843-KAW

16

1   D. Victoria Baranetsky (Cal. Bar No. 311892)
2   THE CENTER FOR INVESTIGATIVE
    REPORTING
3   1400 65th St., Suite 200
    Emeryville, CA 94608
4   vbaranetsky@revealnews.org
5   Telephone: (510) 982-2890

6   Attorney for Plaintiffs

7

8

9               UNITED STATES DISTRICT COURT

10        FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                    OAKLAND DIVISION

12  THE CENTER FOR INVESTIGATIVE       )   Case No. 4:19-cv-01843-KAW
    REPORTING and WILL EVANS,          )
13                                     )   OPPOSITION TO DEFENDANT'S
                          Plaintiffs,  )   MOTION FOR SUMMARY JUDGMENT
14                                     )   AND
          v.                           )
15                                     )   NOTICE OF CROSS MOTION AND
    UNITED STATES DEPARTMENT OF        )   CROSS MOTION FOR SUMMARY
16  LABOR,                             )   JUDGMENT; MEMORANDUM OF
                                       )   POINTS AND AUTHORITIES IN
17                        Defendant.   )   SUPPORT OF CROSS MOTION FOR
                                       )   SUMMARY JUDGMENT
18                                     )
19                                     )
                                       )   Date:  November 21, 2019
20                                     )   Time: 1:30 p.m.
                                       )
21                                     )
                                       )
22                                     )
                                       )
23                                     )
                                       )
24                                     )

25  _____

26

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..........................................................................................................iii

NOTICE OF MOTION AND MOTION .......................................................................................viii

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................. 1

I.     INTRODUCTION .............................................................................................................. 1

II.    STATEMENT OF FACTS................................................................................................. 3

    A.    DOL Requires Federal Contractors to Submit Diversity Reports to Ensure
    Compliance with Anti-Discrimination Laws............................................................... 3

    B.    Diversity Reports Are Not Confidential. ..................................................................... 4

        1.    OFCCP makes Diversity Reports available to the public. ........................................ 4

        2.    OFCCP previously released nearly identical records from a different calendar year
        to CIR. .......................................................................................................................... 5

        3.    Publishing Diversity Reports is a growing industry custom. ..................................... 6

    C.    The Public Has a Strong Interest in Diversity Reports................................................ 7

    D.    CIR's FOIA Request and Administrative Appeal ....................................................... 9

III.    ARGUMENT ................................................................................................................... 11

    A.    The Freedom of Information Act and the Standard of Review .................................. 11

    B.    CIR is Entitled to Summary Judgment Because the Government Has Improperly
    Withheld Agency Records Under Exemption 4 .......................................................... 11

        1.    Diversity Reports are improperly withheld under Exemption 4 because they are not
        commercial. ................................................................................................................ 12

        2.    Diversity Reports are improperly withheld under Exemption 4 because they are not
        confidential. ............................................................................................................... 15

            (a)    Diversity Reports are not confidential because they are customarily published.. 15

            (b)    Diversity Reports are not confidential because companies actually treat them as
            public information....................................................................................................... 17

            (c)    Diversity Reports are identified as confidential as a pretense, impermissible
            under Exemption 4. ..................................................................................................... 19

            (d)    OFCCP gives no assurance of confidentiality because Diversity Reports are
            federally required........................................................................................................ 20

    C.    CIR is Entitled to Summary Judgment Because the Government Has Failed to Meet
    the Foreseeable Harm Standard................................................................................. 22

        1.    Even if Exemption 4 applies in this case, the government has not shown that
        Exemption 4's protected interests will be harmed by the disclosure............................ 23

        2.    Even if protected interests could be harmed by disclosure, such a harm is not
        "reasonably foreseeable." ........................................................................................... 24

    D.    It Is Unclear Whether OFCCP Conducted A Proper Search for Records................... 25

IV.    CONCLUSION................................................................................................................ 25

-ii -

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

SER-137

# TABLE OF AUTHORITIES

**CASES**

*Ali v. Gilead Sciences, Inc.*, No. 5:18-cv-00677 (N.D. Cal. Jan 31, 2018)..................................21

*CIR v. DOL, (OFCCP)*, No. 3:18-cv-1008-JCS (N.D. Cal. 2018)............................................5

*Citizens Comm'n on Human Rights v. Food & Drug Admin., Eli Lilly & Co.*, No. 92-CV-5313, 1993 WL 1610471 (C.D. Cal. May 10, 1993)..............................................................12

*Dep't of the Air Force v. Rose*, 425 U.S. 352 (1976) ....................................................11

*Food Marketing Inst. v. Argus Leader Media*, 139 S. Ct. 2365 (2019)....................2, 15, 19, 21, 23

*Food Marketing Inst. v. Argus Leader Media*, 889 F.3d 914 (9th Cir. 2019), *cert granted*, 2019 WL 166877 (U.S. Jan. 11, 2019) (No. 18-841) ..............................................................10

*Frazier v. Agilent Tech., Inc.*, No. 5:16-cv-05729 (N.D. Cal. Oct 06, 2016) ................................20

*GC Micro Corp. v. Defense Logistics Agency*, 33 F.3d 1109 (9th Cir. 1994) ................................15

*Gen. Elec. Co. v. U.S. Nuclear Regulatory Comm'n*, 750 F.2d 1394 (7th Cir. 1984)....................20

*Hoffman v. Agilent Technologies, Inc.*, No. 2:11-cv-03303 (E.D. Pa. May 20, 2011)...................20

*Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 375 F. Supp. 3d 93 (D.D.C. 2019) ...................23

*Kentucky v. King*, 563 U.S. 452 (2011) ............................................................24

*Lahr v. NTSB*, 569 F.3d 964 (9th Cir. 2009)........................................................11

*Lane v. Dep't of the Interior*, 523 F.3d 1128 (9th Cir. 2008) ........................................11

*Machado Amadis v. Dep't of Justice*, 388 F. Supp. 3d 1 (D.D.C. 2019)....................................23

*Martech USA, Inc. v. Reich*, No. C-93-4137 EFL, 1993 WL 1483700 (N.D. Cal. Nov. 24, 1993). 20

*Merit Energy Co. v. U.S. Dep't of Interior*, 180 F.Supp.2d 1184 (D. Colo. 2001)........................13

*Nat'l Res. Def. Council v. U.S. Dep't of Def.*, 388 F. Supp. 2d 1086 (C.D. Cal. 2005)...................25

*Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26 (D.C. Cir. 2002)....................................13

*Nat'l Bus. Aviation Ass'n, Inc. v. FAA*, 686 F.Supp.2d 80 (D.D.C. 2010) ..............................13, 14

*Nat'l Parks & Conservation Ass'n v. Kleppe*, 547 F.2d 673 (D.C. Cir. 1976) ..............................15

*Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765 (D.C. Cir. 1974)............................12

-iii-

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

SER-138

*New Hampshire Right to Life v. U.S. Dep't of Health & Human Servs.*, 778 F.3d 43 (1st Cir. 2015) .................................................................................................................13, 14

*People for the Ethical Treatment of Animals v. United States Dep't of Health & Human Servs.*, 901 F.3d 343 (D.C. Cir. 2018) ................................................................... 4

*Pub. Citizen Health Research Grp. v. Food & Drug Admin.*, 704 F.2d 1280 (D.C. Cir. 1983). .... 11, 12, 14, 23

*Pub. Citizen v. United States Dep't of Health & Human Servs.*, 975 F. Supp. 2d 81 (D.D.C. 2013) .................................................................................................................... 13

*Reed v. Agilent Techs., Inc.*, 174 F. Supp. 2d 176 (D. Del. 2001)................................................. 20

*Rosenberg v. U.S. Dep't of Def.*, 342 F. Supp. 3d 62, 78 (D.D.C. 2018) ..................................23, 24

*Sakamoto v. Envtl. Prot. Agency*, 443 F. Supp. 2d 1182 (N.D. Cal. 2006) .................................. 25

*Schmid v. Gilead Sciences, Inc.*, No. 2:15-cv-01547 (W.D. Pa. Nov 24, 2015) ........................... 21

*Sears Roebuck & Co. v. Gen. Servs. Admin.*, 509 F.2d 527 (D.C. Cir. 1974) ................................ 5

*Skybridge Spectrum Found. v. Fed. Commc'ns Comm'n*, No. 10-01496, 2012 WL 336160 (D.D.C. 2012) .................................................................................................................... 13

*Thompson v. Agilent Technologies*, Inc., No. 1:14-cv-00737 (W.D. Tex. Aug 07, 2014) .............. 20

*United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557 (D.C. Cir. 2010) ................................... 20

*Watkins v. U.S. Bureau of Customs & Border Prot.*, 643 F.3d 1189 (9th Cir. 2011) .......... 11, 12, 13

**STATUTES**

5 U.S.C. § 552 ........................................................................ viii, 1, 3, 10, 12, 22, 23

**REGULATIONS**

41 C.F.R. § 60-1.26................................................................................................... 4

41 C.F.R. § 60-1.7 .................................................................................................... 3

-iv -
OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

SER-139

1    **OTHER AUTHORITIES**

2    Alexa Liautaud, *Fitbit Counts on Women as Customers Just Not Board Members*, BLOOMBERG
3       NEWS, June 18, 2015, https://www.bloomberg.com/news/articles/2015-06-18/fitbit-counts-on-
        women-as-device-buyers-just-not-board-members ................................................................. 20

4    Applied Materials, *Applied Materials Diversity and Inclusion Report 2017*, 5,
5       http://www.appliedmaterials.com/files/diversity_inclusion_report_2017_final.pdf ................... 18

6    Brief for AI Now Inst. et. al. as Amici Curiae Supporting Respondents, Food Marketing Inst. v.
7       Argus Leader Media, 139 S. Ct. 2356 (2019) (No. 18-481) ..................................................... 15

8    Brief for Reporters' Comm. for Freedom of the Press & 36 Media Organizations as Amici Curiae
        Supporting Plaintiff-Appellant, Machado Amadis v. Dep't of Justice, 388 F. Supp 3d 1 (D.D.C.
9       2019) (No. 1:16-cv-2230) ......................................................................................................... 24

10   Dan Schulman, *Our Commitment to Diversity and Inclusion at PayPal*, PAYPAL STORIES (blog),
        Oct. 11, 2017, https://www.paypal.com/stories/us/our-commitment-to-diversity-and-inclusion-
11      at-paypal (updated April 28, 2018) ............................................................................................ 17

12   EEOC, *EEO-1 Frequently Asked Questions*,
13      https://www1.eeoc.gov/employers/eeo1survey/faq.cfm?renderforprint=1 [https://bit.ly/2Z0FSo1]
        ................................................................................................................................................. 3

14   EEOC, *EEO-1 Instruction Booklet* (2018), http://bit.ly/2ySvqzB........................................................ 4

15   Email from Ellen London, Assistant U.S. Attorney, to Victoria Baranetsky, General Counsel, CIR
16      (June 18, 2019, 10:04 AM PST)................................................................................................ 17

17   Email from OFCCP FOIA Team, to Will Evans, Reporter, CIR (Sep. 6, 2019, 10:09 PM PST) 6, 10

18   Emily Moore, *20 Best Companies for Diversity and Inclusion*, GLASSDOOR BLOGS, Oct. 4, 2018,
19      https://www.glassdoor.com/blog/20-best-companies-for-diversity-inclusion ............................ 19

20   Equinix, *2018 Corporate Sustainability Report*,
        https://www.equinix.com/resources/infopapers/corporate-sustainability-report/ ....................... 18

21   Glass Ceiling Comm'n, *A Solid Investment: Making Full Use of the Nation's Human Capital*, 42,
22      Nov. 1, 1995,
        https://digitalcommons.ilr.cornell.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&article=1117
23      &context=key_workplace) ......................................................................................................... 8

24   Google, *Getting to work on diversity at Google*, GOOGLE BLOG, May 28, 2014,
25      https://googleblog.blogspot.com/2014/05/getting-to-work-on-diversity-at-google.html ........... 16

26   Intel, *Workforce Demographics*, 2008,
        http://web.archive.org/web/20081224004419/http://www.intel.com/intel/diversity/divpractice.ht
27      m ............................................................................................................................................. 6

28

-v -

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

SER-140

(141 of 300), Page 141 of 300
Case: 24-880, 07/10/2024, DktEntry: 16.2, Page 141 of 300
Case 3:22-cv-01824-VC Document 35-25 Filed 10/18/23 Page 54 of 105

Jessica Guynn, *Apple leadership is more than 80% white and male*, USA TODAY, Nov. 9, 2017,
  https://www.usatoday.com/story/tech/2017/11/09/apple-leadership-more-than-80-white-and-
  male/850206001/ .................................................................................................................. 8

Jessica Guyun, *Barbara Lee calls on Apple, tech holdouts to release diversity data*, USA TODAY,
  Aug. 4, 2015, https://www.usatoday.com/story/tech/2015/08/04/barbara-lee-black-caucus-
  federal-diversity-data-apple/31128479/ ............................................................................. 9

Jonathan Eisen, *Agilent – where men are thought leaders*, DR. JONATHAN EISEN'S LAB (blog), July
  8, 2016, https://phylogenomics.me/2016/07/08/agilent-where-men-are-thought-leaders/ ......... 20

Julianne Pepitone, *Black, female, and a Silicon Valley 'trade secret'*, CNNMONEY, Mar. 18, 2013,
  https://money.cnn.com/2013/03/17/technology/diversity-silicon-valley/index.html .............. 5, 22

Juniper Networks, *2017 Employer Information Report Consolidated Report Type 2*,
  https://www.juniper.net/assets/us/en/local/pdf/additional-resources/2017-eeo-1-report.pdf ........ 7

Laura Lorenzetti, *Microsoft releases diversity stats: How the tech giant sizes up*, FORTUNE, Jan. 5,
  2015, https://fortune.com/2015/01/05/microsoft-eeo-1-diversity-tech/ ....................................... 7

Letter from Emanuel Cleaver II, Member of Congress, U.S. House of Representatives, to
  Alexander Acosta, Secretary, U.S. Department of Labor, Mar. 6, 2019,
  https://cleaver.house.gov/sites/cleaver.house.gov/files/DOL_FOIA.pdf ...................................... 9

Letter from Jason Glenn, Legal Director – Employment, PayPal Holdings, Inc., to Bruce G.
  Anderson, National Office FOIA Coordinator, OFCCP, U.S. Department of Labor (Jan. 29,
  2018) ............................................................................................................................... 17

Mike Swift, *Five Silicon Valley companies fought release of employment data, and won*, SAN JOSE
  MERCURY NEWS, Feb. 11, 2010, https://www.mercurynews.com/2010/02/11/five-silicon-valley-
  companies-fought-release-of-employment-data-and-won/ ................................................... 5, 22

Murrey Jacobson, *Google finally discloses its diversity record, and it's not good*, PBS NEWSHOUR,
  May 28, 2014, https://www.pbs.org/newshour/nation/google-discloses-workforce-diversity-data-
  good ...................................................................................................................................... 7

New York City Office of the Comptroller, *2017 Shareholder Initiatives: Postseason Report*, at 12,
  https://comptroller.nyc.gov/wp-
  content/uploads/documents/2017_Shareowner_Initiatives_Postseason_Report.pdf.................... 17

OFCCP, *About Us*, https://www.dol.gov/ofccp/aboutof.html.......................................................... 4

OFCCP, *Federal Contract Compliance Manual* Oct. 2014),
  https://www.dol.gov/ofccp/regs/compliance/fccm/FCCM_FINAL_508c.pdf
  [https://bit.ly/2Z3lkeI]......................................................................................................... 3

OFCCP, *Freedom of Information Act (FOIA) Frequently Asked Questions*,
  https://www.dol.gov/ofccp/regs/compliance/faqs/foiafaqs.htm ................................................. 5

-vi -

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

SER-141

OPEN DIVERSITY DATA, http://opendiversitydata.org (last accessed Sept. 12, 2019)............7, 16, 19

Pandora, *2017 Employer Information Report Consolidated Report Type 2*,
    https://pandora.com/static/careers/Pandora_EE0-1_2017.pdf ...................................... 7

Rebecca R. Hastings, *Diversity Annual Reports Yield Business Benefits*, SOC'Y HUMAN RESOURCE
    MGMT, Oct. 10, 2012, https://www.shrm.org/resourcesandtools/hr-topics/behavioral-
    competencies/global-and-cultural-effectiveness/pages/diversity-annual-reports-yield-business-
    benefits.aspx ............................................................................................................................. 8

Salvador Rodiguez, *Jesse Jackson Gives Uber a Diversity Deadline*, INC.COM, Jan. 5, 2017,
    https://www.inc.com/salvador-rodriguez-uber-diversity-jesse-jackson.html............................... 9

Scott Pham, Sinduja Rangarajan, Bethney Bonilla & Will Evans, *Silicon Valley diversity data:
    Who released theirs, who didn't*, REVEALNEWS.ORG, June 25, 2018,
    https://apps.revealnews.org/silicon-valley-diversity-list/ (last accessed Sept. 12, 2019)............ 16

Splunk, *2017 Employer Information Report Consolidated Report Type 2*,
    https://www.splunk.com/pdfs/fact-sheets/eeo-1-splunk17.pdf ...................................... 7

Symantec, *2015 Corporate Responsibility Report*,
    https://www.symantec.com/content/en/us/about/media/pdfs/2015-corporate-responsibility-
    report-en-us.pdf ............................................................................................................................. 18

Trillium Asset Management, *Xilinx, Inc. – Workplace Diversity (2019)*,
    https://trilliuminvest.com/shareholder-proposal/xilinx-inc-workplace-diversity-2019/.............. 18

Will Evans & Sinduja Rangarajan, *Hidden figures: How Silicon Valley keeps diversity data secret*,
    REVEALNEWS.ORG, Oct. 19, 2017, https://www.revealnews.org/article/hidden-figures-how-
    silicon-valley-keeps-diversity-data-secret/................................................................................... 8

-vii -

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

SER-142

(143 of 300), Page 143 of 300
Case: 24-880, 07/10/2024, DktEntry: 16.2, Page 143 of 300
Case 3:22-cv-01182-VHA Document 39-15 Filed 10/18/23 Page 56 of 1025

**NOTICE OF MOTION AND MOTION**

TO DEFENDANT AND ITS COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on November 21, 2019, at 1:30 p.m., or as soon thereafter as the matter may be heard at United States District Court for the Northern District of California, 1301 Clay Street, Oakland, CA 94612 before the Honorable Kandis A. Westmore, the plaintiffs The Center for Investigative Reporting and Will Evans (together "Plaintiffs" or "CIR") will, and hereby do, cross move the Court for an order granting summary judgment in Plaintiffs' favor and against Defendant United States Department of Labor ("DOL"), Office of Federal Contract Compliance Programs ("OFCCP").

Pursuant to Federal Rule of Civil Procedure 56, CIR respectfully asks that this Court issue an order requiring the government to release all records, including any necessary redactions, improperly withheld from the public under the Freedom of Information Act ("FOIA") and which is explicitly allowed under the relevant statute defendant cites for exemption pursuant to 5 U.S.C. § 552(b)(4). This cross motion is based on this notice of cross motion and motion, the memorandum of points and authorities in support of this cross motion, the Declaration of D. Victoria Baranetsky ("Baranetsky Decl.") and attached exhibits, the Declaration of Reverend Jesse Jackson ("Jackson Decl."), the Declaration of Matthew W. Patsky ("Patsky Decl."), the Declaration of Jamillah Bowman Williams ("Williams Decl."), all papers and records on file with the Clerk or which may be submitted prior to or at the time of the hearing, and any further evidence which may be offered.

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

SER-143

**RELIEF SOUGHT BY PLAINTIFF**

Plaintiffs seek an order summarily dismissing Defendant's claims and granting summary judgment in Plaintiffs' favor.

**ISSUES TO BE DETERMINED**

Did Defendant improperly withhold government records under FOIA Exemption 4?

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

This is an action under the Freedom of Information Act, 5 U.S.C. § 552, seeking disclosure of (55) fifty-five EEO-1 Type 2 Consolidated Reports ("Diversity Reports") from 2016 calendar year, which contain compulsory employment diversity statistics from 55 federal contractors based in Silicon Valley. To date, CIR has received (26) twenty-six Diversity Reports as a result of this lawsuit. Government's Brief at 6, Dkt. No. 24 ("Gov. Br."). Defendant withholds (9) nine Diversity Reports for federal contractors that continue to object to the release and (19) nineteen Diversity Reports for companies that are purportedly not federal contractors. OFCCP has moved for summary judgment, asking the Court to approve its decision to withhold the remainder of the material withheld pursuant to 5 U.S.C. § 552(b)(4).

OFCCP unjustifiably withholds the government records from public view by claiming that the Diversity Reports contain confidential business information which is exempt under FOIA Exemption 4. Exemption 4 is inapplicable for four reasons. As a threshold issue, Diversity Reports—in nature and in practice—do not meet the definition of commercial or financial business records. The Diversity Reports simply contain the "total number of each company's employees categorized by race/ethnicity, gender, and job category." Gov. Br. at 1. The information is

-1-
Opp. to Def's Mot. Summ. J.; Not. of Cross Mot. and Cross Mot.
Summ. J.; Mem. in Supp. of Cross Mot. Summ. J.

SER-144

1   anonymized and does not contain more granular business data.  Unlike financial plans or business

2   accounting records, these documents cannot genuinely be described as "commercial" under FOIA.

3       Second, Diversity Reports are not confidential because they are not customarily or actually

4   treated as private by these companies and most companies at large.  OFCCP relies on the Supreme

5   Court's recent decision in *Food Marketing Inst. v. Argus Leader Media*, 139 S. Ct. 2365

6   (2019) ("*Argus Leader*") which held that information was "confidential" under Exemption 4

7   "where commercial or financial information is *both* customarily and actually treated as private by

8   its owner and provided to the government under an assurance of privacy." *Id.* at 2366 (emphasis

9   added).  Withholding Diversity Reports is unjustified even under *Argus Leader*'s relaxed

10  Exemption 4 standard because it is a growing industry custom to publish Diversity Reports.  All

11  but one of the companies that objects to disclosure publish most or at least *some* diversity data

12  contained in the Diversity Reports online.  The records are not actually confidential because they

13  contain no high-level business data or personally identifying information.  And companies do not

14  elect to provide Diversity Reports to the government under an assurance of privacy, instead they

15  are required by law to provide this information.

16      Third, Exemption 4 is inapplicable where it is used as a pretext to shield embarrassing

17  information.  Rather than legitimately withholding the Diversity Reports to shield proprietary

18  information, these documents appear to be withheld from the public to protect private actors from

19  possible embarrassment, incrimination, or exposure to further litigation.  But those reasons do not

20  justify withholding under Exemption 4.

21      Lastly, Diversity Reports must be disclosed as their withholding does not meet the

22  "foreseeable harm" requirement.  In 2016 Congress included in the OPEN FOIA Amendment an

23  additional requirement that agencies seeking to withhold records under FOIA must fulfill, even

24  where an exemption otherwise applies.  Under this "foreseeable harm" standard, an agency must

- 2 -
OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

SER-145

show disclosure of the documents would result in "foreseeable harm" to an interest the relevant

exemption seeks to protect, or that "disclosure is [otherwise] prohibited by law." 5 U.S.C. § 552

(a)(8)(A). Disclosure of the Diversity Reports would not harm Exemption 4's intended interest in

protecting confidential business information nor is the disclosure otherwise prohibited by law.

Instead, disclosure would be beneficial to industry and the public interest.

Because the DOL has failed to meet its burden and show 5 U.S.C. § 552(b)(4) applies, this

Court should deny the government's motion for summary judgment and grant CIR's cross motion

for summary judgment. CIR respectfully requests entry of an order compelling the DOL to

disclose the improperly withheld records.

## II.    STATEMENT OF FACTS

### A.    DOL Requires Federal Contractors to Submit Diversity Reports to Ensure Compliance with Anti-Discrimination Laws.

Each year, all large companies who qualify as federal contractors under DOL regulations

are required to submit two forms to DOL containing their employees' demographic information.

41 C.F.R. § 60-1.7. These companies are required by law to submit both forms, including a more

granular report for each of their worksites, called the EEO-1 Report, as well as the more simplified

EEO-1 Type 2 Consolidated Report (the Diversity Report). *See* OFCCP, *Federal Contract*

*Compliance Manual: October 2014*,

https://www.dol.gov/ofccp/regs/compliance/fccm/FCCM_FINAL_508c.pdf [https://bit.ly/2Z3lkeI]

(Baranetsky Decl. Ex. 1); the Equal Employment Opportunity Commission ("EEOC"), *EEO-1*

*Frequently Asked Questions*,

https://www1.eeoc.gov/employers/eeo1survey/faq.cfm?renderforprint=1 [https://bit.ly/2Z0FSo1]

(Baranetsky Decl. Ex. 2).

-3-

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

SER-146

The Diversity Report is a one-page form that anonymously tallies employees across all worksites categorized by race, gender and job category. *Id.* Diversity Reports do not contain any sensitive information, such as wage data. *Cf. People for the Ethical Treatment of Animals v. United States Dep't of Health & Human Servs.*, 901 F.3d 343, 354 (D.C. Cir. 2018) (allowing withholding of granular supply chain data under Exemption 4 since competitors "could easily use this information to target and disrupt"). Diversity Reports also do not disclose more particularized data, such as the office-by-office demographics that are reported on more granular EEO-1 Reports.

The Diversity Report must be filed with *both* the EEOC and OFCCP in order to ensure that federal contractors comply with anti-discrimination laws. *Id.*; *see also* EEOC, *EEO-1 Instruction Booklet* (2018), https://www.eeoc.gov/employers/eeo1survey/2007instructions.cfm [http://bit.ly/2ySvqzB] (Baranetsky Decl. Ex. 3). OFCCP is the component of DOL that is responsible for enforcing nondiscrimination and affirmative action requirements imposed on federal contractors under Executive Order 11246, the Vietnam Era Veterans' Readjustment Assistance Act of 1974, and Section 503 of the Rehabilitation Act. OFCCP, *About Us*, https://www.dol.gov/ofccp/aboutof.html (Baranetsky Decl. Ex. 4) (stating OFCCP's mission is to "protect workers" and "promote diversity"). OFCCP uses Diversity Reports to fulfill its mission by ensuring that federal contractors "comply[] with the legal requirement to take affirmative action and not discriminate." *Id.* OFCPP may initiate enforcement proceedings against federal contractors who refuse to provide either report. 41 C.F.R. § 60-1.26.

**B.** **Diversity Reports Are Not Confidential.**

**1.** **OFCCP makes Diversity Reports available to the public.**

Diversity Reports are not treated as confidential business information by OFCCP. Unlike the EEOC, OFCCP is permitted to disclose Diversity Reports under Title VII of the Civil Rights Act of

-4-

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT. SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

SER-147

1964. As OFCCP explains on its website: "[C]ourts have ruled that the Title VII prohibition against disclosure does not apply to OFCCP's collection of EEO-1 data." OFCCP, *Freedom of Information Act (FOIA) Frequently Asked Questions ( "OFCCP FOIA FAQ"),* https://www.dol.gov/ofccp/regs/compliance/faqs/foiafaqs.htm (citing *Sears Roebuck & Co. v. Gen. Servs. Admin.*, 509 F.2d 527, 529 (D.C. Cir. 1974) as one such ruling) (Baranetsky Decl. Ex. 5).

Individuals may submit a FOIA request to OFCCP to obtain copies of Diversity Reports. OFCCP, *FOIA FAQ.* Once a request is submitted, OFCCP contacts federal contractors, in accordance with agency guidelines, to notify them of the request for disclosure, and OFCCP is required to make a separate determination as to whether any Exemptions apply. *Id.* (stating "OFCCP engages in a case specific analysis when determining whether or not to release information that a company asserts is protected by Exemption 4 of the FOIA."). OFCCP has previously released Diversity Reports in response to FOIA requests to CIR and other media outlets, including CNN and the *San Jose Mercury News.* *See* Julianne Pepitone, *Black, female, and a Silicon Valley 'trade secret'*, CNNMONEY, Mar. 18, 2013, https://money.cnn.com/2013/03/17/technology/diversity-silicon-valley/index.html (Baranetsky Decl. Ex. 6); Mike Swift, *Five Silicon Valley companies fought release of employment data, and won*, SAN JOSE MERCURY NEWS, Feb. 11, 2010, https://www.mercurynews.com/2010/02/11/five-silicon-valley-companies-fought-release-of-employment-data-and-won/ (Baranetsky Decl. Ex. 7).

## 2. OFCCP previously released nearly identical records from a different calendar year to CIR.

Last year, OFCCP disclosed Diversity Reports for the 2015 calendar year to Plaintiffs for some of the companies included in the Request at issue here. *See CIR v. DOL, (OFCCP)*, No. 3:18-cv-1008-JCS (N.D. Cal. 2018). On November 29, 2018, after Plaintiffs filed a FOIA lawsuit

-5-

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT. SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

SER-148

for 2015 Diversity Reports, OFCCP released records for at least six of the employers whose 2016 reports were sought herein.[1] Dkt. No. 1-4. In that case, as here, OFCCP initially cited Exemption 4 as justification for withholding Diversity Reports, but reversed position after "supplemental review" and disclosed the records over company objections.[2] *Id.* Only *after* OFCCP released Diversity Reports did CIR settle the lawsuit because CIR possessed the requested records and so summary judgment motion practice was moot. *Id.* Similarly, in response to the present FOIA Request, OFCCP released Diversity Reports for the 2016 calendar year for sixteen of the fifty-five employers,[3] Dkt. No. 1-3, and subsequently released Diversity Reports for ten additional employers after the commencement of these proceedings.[4] Email from OFCCP FOIA Team, to Will Evans, Reporter, CIR (Sep. 6, 2019, 10:09 PM PST) (Baranetsky Decl., Ex. 8).

**3.      Publishing Diversity Reports is a growing industry custom.**

Publishing Diversity Reports and duplicative diversity data on company websites is a growing standard among businesses, particularly within the technology industry. Intel proactively began posting Diversity Reports online in 2008. Intel, *Workforce Demographics*, 2008, http://web.archive.org/web/20081224004419/http:/www.intel.com/intel/diversity/divpractice.htm (Baranetsky Decl., Ex. 8). Google began posting its data in 2014 after a similar FOIA lawsuit, and Microsoft followed suit in 2015. *See* Murrey Jacobson, *Google finally discloses its diversity record, and it's not good*, PBS NEWSHOUR, May 28, 2014,

---

[1] These employers are: Gilead Sciences, Oracle, Pandora Media, Palantir Technologies, Splunk, Inc., and Synnex.
[2] Synnex dropped its initial objection and OFCCP subsequently released its Consolidated Type 2 Report for 2015.
[3] These employers are: Advanced Micro Devices, Bloom Energy, Cadence Design Systems, Fair Isaac, Palo Alto Networks, PayPal, Penumbra, ServiceNow, Slack Technologies, SolarCity, Synnex, Varian Medical Systems, Verifone, VMware, WageWorks, and Yahoo Inc. Trimble sent its Diversity Report to CIR directly, and CIR thus requested that it be removed from the Request.
[4] These employers are: Intuitive Surgical, Juniper Networks, KLA-Tencor, Maxim Integrated Products, Palantir Technologies, Pandora Media, Splunk, Inc., and Sunpower.

-6 –
OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

SER-149

https://www.pbs.org/newshour/nation/google-discloses-workforce-diversity-data-good (Baranetsky

Decl., Ex. 10); Laura Lorenzetti, *Microsoft releases diversity stats: How the tech giant sizes up*,

FORTUNE, Jan. 5, 2015, https://fortune.com/2015/01/05/microsoft-eeo-1-diversity-tech/

(Baranetsky Decl., Ex. 11).

Because publishing this information promotes diversity and transparency, numerous

companies publish some form of diversity statistics, including many of the companies that continue

to object to disclosure in this case. *See infra* Section III.B.2(b). Additionally, companies are

increasingly publicly posting their Diversity Reports in full. *See* OPEN DIVERSITY DATA,

http://opendiversitydata.org (last accessed Sept. 27, 2019) (listing companies that have released

EEO-1 and other diversity data, including Github and Oracle) (Baranetsky Decl., Ex. 12). Even

employers whose reports requested herein were initially objected to under Exemption 4—Juniper

Networks, Pandora Media, and Splunk—have subsequently posted their Diversity Reports online

in full. *See* Juniper Networks, *2017 Employer Information Report Consolidated Report Type 2*,

https://www.juniper.net/assets/us/en/local/pdf/additional-resources/2017-eeo-1-report.pdf

(Baranetsky Decl., Ex. 13); Pandora, *2017 Employer Information Report Consolidated Report Type

2*, https://pandora.com/static/careers/Pandora_EE0-1_2017.pdf (Baranetsky Decl., Ex. 14); Splunk,

*2017 Employer Information Report Consolidated Report Type 2*,

https://www.splunk.com/pdfs/fact-sheets/eeo-1-splunk17.pdf (Baranetsky Decl., Ex. 15).

**C.     The Public Has a Strong Interest in Diversity Reports.**

Disclosure of Diversity Reports has beneficial results for building trust between companies

and the public and ensuring a diverse workforce. *See, e.g.*, Rebecca R. Hastings, *Diversity Annual

Reports   Yield   Business   Benefits*, SOC'Y HUMAN RESOURCE MGMT., Oct.   10,   2012,

https://www.shrm.org/resourcesandtools/hr-topics/behavioral-competencies/global-and-cultural-

effectiveness/pages/diversity-annual-reports-yield-business-benefits.aspx (Baranetsky Decl., Ex.

-7 -
OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

SER-150

(151 of 300), Page 151 of 300
Case: 24-880, 07/10/2024, DktEntry: 18.2, Page 151 of 300
Case 3:22-cv-07084-WHA Document 352-1 Filed 10/18/23 Page 64 of 3025

16) (quoting expert who found that publishing diversity reports "provides useful information, conveys commitment and business purpose, and helps build the organization's reputation."); Williams Decl. ¶¶ 26-28 (listing benefits to disclosure including "positive reputational effects" and "ensuring compliance with anti-discrimination laws").    Shareholders of large companies are increasingly demanding access to this diversity data to create corporate trust.  Patsky Decl. ¶ 27. Various news outlets, including CIR, have used these reports as the foundation for numerous news articles that have informed the public about lack of diversity in Silicon Valley and the technology industry overall.  *See, e.g.*, Will Evans & Sinduja Rangarajan, *Hidden figures: How Silicon Valley keeps diversity data secret*, REVEALNEWS.ORG, Oct. 19, 2017, https://www.revealnews.org/article/hidden-figures-how-silicon-valley-keeps-diversity-data-secret/ (Baranetsky Decl., Ex. 17); Jessica Guynn, *Apple leadership is more than 80% white and male*, USA TODAY, Nov. 9, 2017, https://www.usatoday.com/story/tech/2017/11/09/apple-leadership-more-than-80-white-and-male/850206001/ (Baranetsky Decl., Ex. 18).

Various public advocates and members of Congress have also called for public access to Diversity Reports.  The Federal Glass Ceiling Commission, created by the Civil Rights Act of 1991, stated in its 1995 report that the government should "explore the possibility of mandating public release of EEO-1 forms for Federal contractors and publicly-traded corporations."  Glass Ceiling Comm'n, *A Solid Investment: Making Full Use of the Nation's Human Capital*, 42, Nov. 1, 1995, https://digitalcommons.ilr.cornell.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&article=1117&context=key_workplace (Baranetsky Decl., Ex. 19).  In recent years, civil rights activist Rev. Jesse Jackson has called on companies in the industry "to release diversity statistics, including . . . EEO-1 reports," and many companies have responded positively.  Jackson Decl. ¶¶ 9-10; *see also* Salvador Rodriguez, *Jesse Jackson Gives Uber a Diversity Deadline*, INC.COM, Jan. 5, 2017, https://www.inc.com/salvador-rodriguez/uber-diversity-jesse-jackson.html (Baranetsky Decl., Ex.

-8 -

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

SER-151

20).   Members of Congress have called for greater access to Diversity Reports, via companies' proactive disclosures and via OFCCP's disclosures under FOIA.  *See, e.g.*, Jessica Guyun, *Barbara Lee calls on Apple, tech holdouts to release diversity data*, USA TODAY, Aug. 4, 2015, https://www.usatoday.com/story/tech/2015/08/04/barbara-lee-black-caucus-federal-diversity-data-apple/31128479/ (Baranetsky Decl., Ex. 21).  In March 2019, a member of Congress wrote to the DOL stating that Diversity Reports should not be withheld under Exemption 4, as they "enumerate the diversity of firms accepting the taxpayer money."  Letter from Emanuel Cleaver II, Member of Congress, U.S. House of Representatives, to Alexander Acosta, Secretary, U.S. Department of Labor (Mar. 6, 2019) https://cleaver.house.gov/sites/cleaver.house.gov/files/DOL_FOIA.pdf (Baranetsky Decl., Ex. 22).

### D.  CIR's FOIA Request and Administrative Appeal

On January 4, 2018, Mr. Evans, on behalf of CIR, submitted a FOIA request to OFCCP (hereinafter "the Request") for 2016 Diversity Reports for 55 companies.  Dkt. 1-1.  On January 9, 2018 the agency acknowledged the request.  *Id.*  On March 13, 2018, April 18, 2018, and August 14, 2018, the agency sent interim responses and agreed to release Diversity Reports for 15 companies in its August response.  Dkt. 1-3.  For several months, the agency provided no further response.

On November 29, 2018, OFCCP released Diversity Reports for the 2015 calendar year in response to CIR's separate FOIA lawsuit.  Dkt. 1-4.  CIR settled that lawsuit because OFCCP disclosed the requested records, but the agency continued to assert Exemption 4 as to this Request.  *Id.*  In January 2019, Mr. Evans contacted the OFCCP FOIA officer by email for an update on this Request, given the disclosure of nearly identical records.  Dkt. 1-2.  In a subsequent phone call with CIR's counsel, OFCCP officials represented that the agency would be sending a final correspondence within a week, but CIR received no response for several weeks.  *Id.*

-9 -
OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

SER-152

On February 22, 2019, CIR notified OFCCP by phone that it would be filing a lawsuit, after which OFCCP represented that it would be putting a stay on the request to await the Supreme Court decision in *Food Marketing Inst. v. Argus Leader Media*, 889 F.3d 914 (9th Cir. 2019), *cert granted*, 2019 WL 166877 (U.S. Jan. 11, 2019) (No. 18-841) regarding Exemption 4. Dkt 1-5. That same day, DOL issued an interim response amounting to a constructive denial of the Request (hereinafter "the Denial"). *Id.* The Denial reiterated that the OFCCP was putting a stay on the request pending the decision in *Argus Leader*, which it stated "include[d] the appropriate definition of 'confidential' in the Freedom of Information Act's Exemption 4," and "whether the 'substantial competitive' harm test …will be retained or altered.'" *Id.* The Denial did not explain why Exemption 4 or the questions at issue in *Argus Leader* applied. *Id.*

On March 1, 2019, CIR sent an administrative appeal letter to OFCCP. Dkt. 1-6. CIR asserted that the Diversity Reports cannot be withheld under Exemption 4, regardless of the outcome of *Argus Leader*. *Id.* It explained that Diversity Reports do not contain trade secrets or commercial information and are not confidential, argued that the agency made no separate determination from the companies because it failed to disclose all segregable portions, and emphasized the public interest in disclosure. *Id.* OFCCP failed to make a final determination as to the Request and the administrative appeal within 20 working days, as required under 5 U.S.C. § 552(a)(6)(A)(ii). Having exhausted all administrative remedies, Plaintiffs filed suit on April 5, 2019 seeking the immediate processing and release of all records responsive to its FOIA request. Dkt. 1.

On September 6, 2019, OFCCP released nine additional companies' Diversity Reports to CIR, Email from OFCCP FOIA Team, to Will Evans, Reporter, CIR (Sep. 6, 2019, 10:09 PM PST) (Baranetsky Decl., Ex. 8), only *after* did CIR learn from the Government's brief that these companies were no longer objecting. Gov. Br. at 6. The government remains silent as to whether it searched for the Diversity Reports for the nineteen companies claimed not to be federal contractors. DOL

-10 -
OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

SER-153

1  only argues in favor of withholding the remaining ten companies that continue to object to disclosure

2  (Agilent Technologies, Applied Materials, Box Inc., DocuSign, Equinix, Fitbit, Gilead Sciences,

3  Oracle, Synopsys, and Xilinx). *Id.* By stipulation dated March 29, 2018, the parties agreed to submit

4  their dispute regarding this issue to the Court for resolution. Dkt. No. 20.

5

6  **III.    ARGUMENT**

7

8  **A.    The Freedom of Information Act and the Standard of Review**

9  FOIA's "basic purpose reflect[s] a general philosophy of full agency disclosure unless

10  information is exempted under clearly delineated statutory language." *Dep't of the Air Force v.*

11  *Rose*, 425 U.S. 352, 360-61 (1976) (internal citations and quotation marks omitted). In a FOIA

12  case, the agency invoking an exemption in order to withhold requested records "bears the burden of

13  demonstrating that the exemption properly applies to the documents," *Lahr v. NTSB*, 569 F.3d 964,

14  973 (9th Cir. 2009). While the agency may meet its burden with declarations that "contain

15  reasonably detailed descriptions of the documents and allege facts sufficient to establish an

16  exemption." *Lane v. Dep't of the Interior*, 523 F.3d 1128, 1135-36 (9th Cir. 2008) (quotation

17  omitted), "conclusory and generalized allegations . . . are unacceptable and cannot support an

18  agency's decision to withhold requested documents.'" *Pub. Citizen Health Research Grp. v. Food*

19  *& Drug Admin.*, 704 F.2d 1280, 1291 (D.C. Cir. 1983) ("*Pub Citizen*"); *see also Watkins v. U.S.*

20  *Bureau of Customs & Border Prot.*, 643 F.3d 1189, 1195 (9th Cir. 2011).

21

22  **B.    CIR is Entitled to Summary Judgment Because the Government Has**
       **Improperly Withheld Agency Records Under Exemption 4**

23

24  Under FOIA Exemption 4, an agency may only withhold information if it proves disclosure

25  would release (1) trade secrets or commercial or financial information that is (2) obtained from a

26  person and (3) is privileged or confidential. 5 U.S.C. § 552(b)(4). The purpose of this exemption

27

28

-11 -

Opp. to Def's Mot. Summ. J.; Not. of Cross Mot. and Cross Mot.
Summ. J.; Mem. in Supp. of Cross Mot. Summ. J.

SER-154

is to "balance the strong public interest in favor of disclosure against the right of private businesses to protect sensitive information." *Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 768-69 (D.C. Cir. 1974). OFCCP cannot meet its burden here.[5] Diversity Reports are not commercial or financial information and they are not privileged or confidential[6]—even under the more lenient *Argus Leader* standard.

> **1.** **Diversity Reports are improperly withheld under Exemption 4 because they are not commercial.**

Diversity Reports cannot justly be described as commercial or financial records. Courts "have consistently held that the terms 'commercial' and 'financial' in the exemption [4 context] should be given their ordinary meanings." *Pub. Citizen*, 704 F.2d at 1290; *accord Watkins*, 643 F.3d at 1194. In the context of FOIA Exemption 4, "financial" applies to information related to an organization's finances, such as "actual sales data," *Argus Leader*, 139 S. Ct. at 2361, whereas "commercial" only applies to information that is actually "of a commercial nature" or "serves a commercial function." *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 38 (D.C. Cir. 2002), and not simply any information *related to* a business. *Cf.* Gov. Br. at 10. The government argues only that this information is "commercial," and not "financial." *See generally* Gov. Br.

Courts have held records are "of a commercial nature" only where they are related to the commercial activity of a business. For instance, in *Watkins*, the Ninth Circuit found information

---

[5] CIR does not contest the second part of the test - that the records were obtained from a person.
[6] The government concedes that Diversity Reports are not trade secrets because DOL does not address this point in its brief. *See generally* Gov. Br. To the extent the government does still asserts this position assertion, EEO-1 reports cannot qualify as trade secrets because they cannot legitimately be described as revealing a valuable plan, formula, process or device; they merely describe diversity statistics of the company. Courts have limited the definition of trade secrets under FOIA. *Pub. Citizen*, 704 F.2d at 1289 (stating records must be related to "the productive process itself"); *see also Citizens Comm'n on Human Rights v. Food & Drug Admin., Eli Lilly & Co.*, No. 92-CV-5313, 1993 WL 1610471 at *7 (C.D. Cal. May 10, 1993), *aff'd in part and remanded in part on other grounds*, 45 F.3d 1325 (9th Cir. 1995).

-12-

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

SER-155

1   about the importation process of counterfeit goods was "commercial" because it was directly

2   connected to the *commercial activity* of importing goods. *Watkins*, 643 F.3d at 1194.  In contrast,

3   records that simply describe the work force or extraneous fact about a company are not commercial

4   in in nature. *See, e.g.*, *Pub. Citizen v. United States Dep't of Health & Human Servs.*, 975 F. Supp.

5   2d 81, 103 (D.D.C. 2013) (information provided by pharmaceutical companies to the HHS,

6   consisting of name, title, and responsibilities of any person determined to be ineligible person, is

7   not commercial in nature).  In such cases, while the records could be used to gain "insight into the

8   nature of a company's business dealings," the courts find that does not "not convert the [records]

9   into commercial information."  *Nat'l Bus. Aviation Ass'n, Inc. v. FAA*, 686 F.Supp.2d 80, 86-7

10  (D.D.C. 2010).

11      Documents that "serve a commercial function" are even more limited, as courts find they

12  only relate to records documenting the finances of a company.  Courts have held that information

13  about revenue, service pricing, and checking accounts are commercial because these records serve

14  a commercial function. *See, e.g.*, *Skybridge Spectrum Found. v. Fed. Commc'ns Comm'n*, No. 10-

15  01496, 2012 WL 336160 at \*12 (D.D.C. 2012); *Merit Energy Co. v. U.S. Dep't of Interior*, 180

16  F.Supp.2d 1184, 1188 (D. Colo. 2001); *New Hampshire Right to Life v. U.S. Dep't of Health &*

17  *Human Servs.*, 778 F.3d 43, 47 (1st Cir. 2015).  Generally, information about personnel and

18  employees does not serve a sufficiently commercial function to qualify as commercial. *See, e.g.*,

19  *id.* (holding that an organization's personnel policies are not commercial in nature.).

20      The government has failed to show how Diversity Reports qualify as commercial under

21  either category. Cf. *Watkins*, 64 F. 3d at 1194; *Skybridge*, 2012 WL 336160 at \*12.  The

22  government provides declarations with only conclusory statements recounting how Diversity

23  Reports are somehow related to the companies' businesses, but without explaining or describing

24  how Diversity Reports reveal anything about the companies' actual commercial activities.  The

-13 -

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

SER-156

1   declarations are mute as to how Diversity Reports reveal the companies' financial information like

2   payment data or serve *any* commercial function. *See* Declaration of Dave Nickerson ¶¶ 38-39, Dkt.

3   No. 24-7 ("Nickerson Decl.") (stating in no specific terms that disclosing Diversity Reports "would

4   reveal strategic planning and compromise Agilent's competitive advantage in recruiting"). Instead,

5   it appears these records merely exist to serve a government function—ensuring the demographics

6   of the workforce comply with the law. And to the extent that Diversity Reports even offer mere

7   "insight into the nature of a company's business dealings," that is not enough. *Nat'l Bus. Aviation*

8   *Ass'n*, 686 F.Supp.2d at 86-7. Ultimately, DOL cannot overcome the fact that records describing a

9   workforce are insufficient to qualify as "commercial." *New Hampshire Right to Life.*, 778 F.3d at

10  49.

11      Lastly, employing DOL's expansive definition of "commercial" would undermine FOIA.

12  DOL argues that the definition of "commercial" is generally held to be "broad[]" by citing to *Pub.*

13  *Citizen*, 704 F.2d at 1290 (dealing with clearly commercial records, including "sales statistics" and

14  "profits and losses."). To employ this definition and render Diversity Reports as "commercial"

15  risks bloating the term in a way that could swallow much of FOIA, as an increasing number of

16  government activities are executed by federal contractors. Because *any* business records can

17  technically "relate to" a company, this definition would place far too many government records out

18  of the public's view for accountability.[7]

---

[7] *See* Brief for AI Now Inst. et. al. as Amici Curiae Supporting Respondents, Food Marketing Inst. v. Argus Leader Media, 139 S. Ct. 2356 (2019) (No. 18-481), 2 ("Because the government so often relies on private vendors or contractors to carry out core governmental functions, it is impossible to adopt an expansive interpretation of Exemption 4 without doing violence to FOIA's core purpose.") (Baranetsky Decl., Ex. 23)

-14-

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

SER-157

**2. Diversity Reports are improperly withheld under Exemption 4 because they are not confidential.**

Previously, courts held information was "confidential" if disclosure of the information would likely cause substantial harm to the competitive position of the company from which the information was obtained. *GC Micro Corp. v. Defense Logistics Agency*, 33 F.3d 1109, 1112 (9th Cir. 1994). In *Argus Leader*, the Supreme Court simplified the Exemption 4 test and held that "where commercial or financial information is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy, the information is 'confidential' within the meaning of Exemption 4." 139 S. Ct. at 2366.[8] Despite the more lenient standard, an agency may still not simply offer the court "conclusory and generalized allegations" to obfuscate reality. *Nat'l Parks & Conservation Ass'n v. Kleppe*, 547 F.2d 673, 681 (D.C. Cir. 1976). Instead, it must provide "specific factual or evidentiary material to support [its] claim." *Id.* at 679. Here, the government cannot meet its burden to show that the information is confidential.

**(a) Diversity Reports are not confidential because they are customarily published.**

Diversity Reports are not "customarily" treated confidential, as various companies have repeatedly published these records—indeed, it is becoming industry standard to post Diversity Reports on company websites. *See supra* Section II.B.3. Multiple companies that objected to release of the Diversity Reports in years prior have since released Diversity Reports online, and have even attested to the benefits of disclosure. For example, Google, which opposed release of its Diversity Reports to the *San Jose Mercury News* in 2008, later published its data in 2014 along with an explanation of the benefits of doing so: "We now realize we were wrong, and that it's time to be candid about the issues . . . . [I]t's hard to address these kinds of challenges if you're not

---

[8] While no court has interpreted this language, it is not clear from the Court's decision whether all factors must be satisfied for the material to qualify as confidential.

-15-

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT. SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

SER-158

1  prepared to discuss them openly, and with the facts."  Google, *Getting to work on diversity at*

2  *Google*, GOOGLE BLOG, May 28, 2014, https://googleblog.blogspot.com/2014/05/getting-to-work-

3  on-diversity-at-google.html (Baranetsky Decl., Ex. 24).  To date, over thirty major technology

4  companies have published their forms online to promote diversity, including but not limited to

5  Adobe, Airbnb, Amazon, Apple, Cisco Systems, Dell, eBay, Facebook, Google, Hewlett Packard,

6  Microsoft, Facebook, Intel, LinkedIn, Lyft, Palo Alto Networks, PayPal, Pinterest, Twitter, Uber,

7  Yahoo, and Yelp.  If anything, it appears publishing Diversity Reports is the growing custom.  *See*

8  *supra* Section II.B.3; *see also* Patsky Decl. ¶ 16; OPEN DIVERSITY DATA, (Baranetsky Decl., Ex.

9  11); Scott Pham, Sinduja Rangarajan, Bethney Bonilla & Will Evans, *Silicon Valley diversity data:*

10  *Who released theirs, who didn't*, REVEALNEWS.ORG, June 25, 2018,

11  https://apps.revealnews.org/silicon-valley-diversity-list/ (last accessed Sept. 27, 2019) (Baranetsky

12  Decl., Ex. 25).

13     Several companies that initially opposed OFCCP disclosing their Diversity Reports to

14  Plaintiffs in this litigation have since withdrawn their objections and have published their reports

15  online, also undermining any claim that these records are customarily held secret.  PayPal, for

16  instance, which in January 2018, in response to Plaintiffs' prior FOIA for Diversity Reports from

17  2015, wrote to OFCCP that disclosing this data "would cause substantial competitive harm

18  to PayPal," Letter from Jason Glenn, Legal Director – Employment, PayPal Holdings, Inc., to

19  Bruce G. Anderson, National Office FOIA Coordinator, OFCCP, U.S. Department of Labor (Jan.

20  29, 2018) (Baranetsky Decl., Ex. 26), posted three years of Diversity Reports online just three

21  months later. Dan Schulman, *Our Commitment to Diversity and Inclusion at PayPal*, PAYPAL

22  STORIES (blog), Oct. 11, 2017, https://www.paypal.com/stories/us/our-commitment-to-diversity-

23  and-inclusion-at-paypal (updated April 26, 2018) (Baranetsky Decl., Ex. 27).  Similarly, at least

24  three companies that previously objected to disclosure of their data *in this case*—Juniper Networks,

-16-

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

SER-159

Splunk, and Pandora Media—have now posted their Diversity Reports online. *See supra* Section

II.B.3. In total, ten of the twenty companies that initially objected to disclosure at the time

Plaintiffs filed this litigation have since removed their opposition.[9]

### (b)    Diversity Reports are not confidential because companies actually treat them as public information.

Diversity Reports are not actually treated as confidential. Nine of the ten federal

contractors that continue to object to disclosure in this case have published content contained in the

Diversity Reports or other diversity statistics on their own websites. Gilead, for example,

published its 2016 Diversity Report data—the very data requested here—in an annual report

online. *See* Gilead, *Year in Review: 2016*, 24 http://investors.gilead.com/static-files/33588c5a-

7f81-437a-b35a-379514d49eff[10] (Baranetsky Decl., Ex. 28). Symantec began posting similar data

in 2015. Symantec, *2015 Corporate Responsibility Report*,

https://www.symantec.com/content/en/us/about/media/pdfs/2015-corporate-responsibility-report-

en-us.pdf (posting report including EEO-1 data) (Baranetsky Decl., Ex. 29). Equinix, Agilent, and

Applied Materials, have also published detailed workforce diversity statistics for the past several

years. *See, e.g.*, Equinix, *2018 Corporate Sustainability Report*, 13-16,

---

[9] These companies are: Verifone (which released its data to Plaintiffs in June 2019 (Email from Ellen London, Assistant U.S. Attorney, to Victoria Baranetsky, General Counsel, CIR (June 18, 2019, 10:04 AM PST)) (Baranetsky Decl., Ex. 32), Intuitive Surgical, Juniper Networks, KLA-Tencor, Maxim Integrated Products, Palantir, Pandora Media, Splunk Inc, Sunpower, and Zendesk. *See also* Gov. Br. at 6 ("Subsequent to that filing, additional companies decided to release the information.")

[10] Defendant indicates that Gilead "has denied requests from the company's shareholders for the information." Govt Br. at 12. But Gilead began including such detailed EEO-1 data in its annual reports in response to a shareholder resolution in 2017. *See* New York City Office of the Comptroller, *2017 Shareholder Initiatives: Postseason Report*, at 12, https://comptroller.nyc.gov/wp-content/uploads/documents/2017_Shareowner_Initiatives_Postseason_Report.pdf (Baranetsky Decl., Ex. 33) ("Following engagement on the NYC Funds' shareowner proposals, Gilead Sciences agreed to provide more comprehensive EEO-1 data than the diversity data it was previously disclosing").

-17-

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT. SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

SER-160

https://www.equinix.com/resources/infopapers/corporate-sustainability-report/ (Baranetsky Decl.,

Ex. 30); Agilent, *2016 Corporate Citizenship Report*, 15, 56,

https://www.agilent.com/cs/library/periodicals/public/5991-7988EN.pdf (providing detailed

statistics about workers' sex, contract type, and level of seniority) (Baranetsky Decl., Ex. 31);

Applied Materials, *Applied Materials Diversity and Inclusion Report 2017*, 5,

http://www.appliedmaterials.com/files/diversity_inclusion_report_2017_final.pdf (providing

detailed statistics about workers' ethnicity across three fiscal years) (Baranetsky Decl., Ex. 34).[11]

Xilinx, responding to calls from shareholders to be more transparent about diversity, has agreed to

publish "comprehensive workforce composition data by gender and EEO race/ethnicity categories"

in its annual report for 2019.  Trillium Asset Management, *Xilinx, Inc.: Workplace Diversity

(2019)*, https://trilliuminvest.com/shareholder-proposal/xilinx-inc-workplace-diversity-2019/

(Baranetsky Decl., Ex. 35).  Indeed, shareholders are increasingly demanding this data be made

public.  *See* Patsky Decl. ¶¶ 27-28 ("Trillium is part of a quickly growing group of . . . investors

that call on companies to be transparent regarding this kind of data.").  While the government

makes general conclusory remarks about the confidentiality of Diversity Reports, that companies

are *actually* posting this information online wholly undermines any argument that these records are

confidential.

Still, DOJ argues these companies actually treat Diversity Reports as confidential because

they are stored in encrypted servers and only select employees can access them.  *See* Gov. Br. at 12

---

[11] In a subsequent SEC filing, Applied Materials wrote that shareholder feedback to this report "was universally positive, with the view that the report demonstrated our commitment to diversity and inclusion, transparency in disclosing data and accountability in working towards our goals. Shareholders also expressed appreciation of our continuing efforts to explore the disclosure of additional data regarding the diversity of our workforce." *See* Applied Materials, *2019 Proxy Statement*, 14, https://www.sec.gov/Archives/edgar/data/6951/000119312519015977/d681918ddef14a.htm (Baranetsky Decl. 36)

-18 -

Opp. to Def's Mot. Summ. J.; Not. of Cross Mot. and Cross Mot.
Summ. J.; Mem. in Supp. of Cross Mot. Summ. J.

SER-161

(citing company declarations stating records are "sensitive data"). But these companies admittedly only hold the Diversity Reports under secure measures because they store them with personally identifying employee information, as stated in the company declarations. *See, e.g.*, Declaration of Sarah Lee ¶ 6, Dkt. No. 24-5 (stating "Synopsys informs all of its employees that their self-identification data will be maintained in confidence.") Diversity Reports themselves do not contain any identifying information, let alone employees' "self-identification data." *Id.* Nothing about Diversity Reports is secret or confidential. Any claim to the contrary is undermined by the fact that nearly all of these companies post some form of diversity data online. *Cf. Argus Leader*, 139 S. Ct. 2356, 2363 (2019) (stating that "the Institute's retailers customarily do not disclose store-level SNAP data or make it publicly available 'in any way'" and "[e]ven within a company . . . only small groups of employees usually have access to it"). Moreover, the public can turn to sites like Open Diversity Data or Glassdoor.com where employees post about the diversity of various companies is discussed. *See* OPEN DIVERSITY DATA; Emily Moore, *20 Best Companies for Diversity and Inclusion*, GLASSDOOR BLOGS, Oct. 4, 2018, https://www.glassdoor.com/blog/20-best-companies-for-diversity-and-inclusion (Baranetsky Decl., Ex. 37).

### (c) Diversity Reports are identified as confidential as a pretense, impermissible under Exemption 4.

Given that Diversity Reports are not actually treated as confidential, it appears that any remaining objections to disclosure used are a pretense to avoid embarrassment. As multiple Circuits and this Court have previously agreed "Exemption 4 does not guard against mere embarrassment in the marketplace or reputational injury." *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 564 (D.C. Cir. 2010); *Gen. Elec. Co. v. U.S. Nuclear Regulatory Comm'n*, 750 F.2d 1394, 1402-03 (7th Cir. 1984) ("[T]he competitive harm that attends any embarrassing disclosure is not the sort of thing that triggers exemption 4."); *Martech USA, Inc. v. Reich*, No. C-93-4137 EFL, 1993 WL 1483700, at *2 (N.D. Cal. Nov. 24, 1993) (although "information could

-19 -

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT. SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

SER-162

damage plaintiff's reputation, this is not the type of competitive harm protected by the confidential

commercial information exemption to FOIA.").

Agilent indicated, for example, that part of its objection stemmed from desire to avoid

potential "damage [to] Agilent's reputation." Nickerson Decl. ¶ 21. Some of objecting companies

have also endured public criticisms over lack of diversity. Fitbit, for instance, has faced withering

critiques over its paucity of female leadership. *See, e.g.*, Alexa Liautaud, *Fitbit Counts on Women*

*as Customers Just Not Board Members*, BLOOMBERG NEWS, June 18, 2015,

https://www.bloomberg.com/news/articles/2015-06-18/fitbit-counts-on-women-as-device-buyers-

just-not-board-members (Baranetsky Decl., Ex. 38). Agilent too has been criticized on the basis of

the lopsided demographics of its "Thought Leaders" program. *See* Jonathan Eisen, *Agilent—where*

*men are thought leaders*, DR. JONATHAN EISEN'S LAB (blog), July 8,

2016, https://phylogenomics.me/2016/07/08/agilent-where-men-are-thought-leaders/ (estimating

that 90 percent of invited grantees for Agilent's 'Thought Leaders Program were male) (Baranetsky

Decl., Ex. 39). Indeed, employees have sued these companies for alleged lack of diversity or

discrimination.[12] But Exemption 4 does not apply where injury "might flow from…the

embarrassing publicity." *Pub. Citizen*, 704 F.2d at 1291.

> **(d)     OFCCP gives no assurance of confidentiality because Diversity Reports are federally required.**

The only other justification DOL asserts for withholding the Reports as confidential is that

they were submitted under the government's assurance of privacy. *See Argus Leader*, 139 S. Ct. at

---

[12] *See generally Reed v. Agilent Techs., Inc.*, 174 F. Supp. 2d 176 (D. Del. 2001) (employee sued for alleged racial discrimination); *Frazier v. Agilent Tech., Inc.*, No. 5:16-cv-05729 (N.D. Cal. Oct 06, 2016) (employee sued over alleged ADA discrimination); *Thompson v. Agilent Technologies*, Inc., No. 1:14-cv-00737 (W.D. Tex. Aug 7, 2014) (employee sued for alleged age discrimination); *Hoffman v. Agilent Technologies, Inc.*, No. 2:11-cv-03303 (E.D. Pa. May 20, 2011) (employee sued over alleged sex discrimination and harassment); *Ali v. Gilead Sciences, Inc.*, No. 5:18-cv-00677 (N.D. Cal. Jan 31, 2018) (racial and disability discrimination claim); *Schmid v. Gilead Sciences, INC.*, No. 2:15-cv-01547 (W.D. Pa. Nov 24, 2015) (age discrimination claim).

-20 -

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

SER-163

2366 (stating proprietary information *could* be withheld under Exemption 4 if the government

provides an assurance of privacy). DOL cleverly states that federal contractors submitting

diversity data "are assured that their reports will be treated as confidential information *to the*

*maximum extent permitted by law*." Gov. Br. at 13 (emphasis added). But the law does not permit

Diversity Reports be treated as confidential and more importantly, OFCCP gives no assurance of

privacy. While the EEOC is prohibited from disclosing EEO-1 Reports under Title VII of the Civil

Rights Act of 1964, this restriction explicitly does not apply to OFCCP. *See supra* Section II.B.1.

OFCCP and EEOC clearly state that records may be released on their websites and in EEO-1

material. *Id.*

This lack of assurance is further supported by the agency's actual practice. OFCCP has

previously overruled objections by companies and released nearly identical Diversity Reports in

response to FOIA requests. First, OFCCP released Diversity Reports for 2015 to Plaintiffs for

many of the employers at issue here as recently as last year. Dkt. No. 1-4. OFCCP has also

released Diversity Reports to other media outlets in recent years, including CNN and the *San Jose*

*Mercury News*. *See* Julianne Pepitone, *Black, female, and a Silicon Valley 'trade secret'*,

CNNMONEY, Mar. 18, 2013, https://money.cnn.com/2013/03/17/technology/diversity-silicon-

valley/index.html (Baranetsky Decl., Ex. 6); Mike Swift, *Five Silicon Valley companies fought*

*release of employment data, and won*, SAN JOSE MERCURY NEWS, Feb. 11, 2010,

https://www.mercurynews.com/2010/02/11/five-silicon-valley-companies-fought-release-of-

employment-data-and-won/ (Baranetsky Decl., Ex. 7). Thus, while the objecting companies state

in their declarations that they rely on the OFCCP's assurance that it will protect Diversity Reports

to the "maximum extent possible," Gov. Br. at 13, any such reliance is not reasonable given there

is no promise explicit or implied. Even in this case, OFCCP has wavered, quickly agreeing with

-21 -
OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

SER-164

*all* of the companies that chose to disclose *as well as* all of the companies that chose to withhold the information.

Unlike circumstances where companies file information with the government under an assurance of privacy in order to obtain something in return, here, the Diversity Reports are required. Federal contractors cannot opt-out. Because there is no assurance of confidentiality and the government has actually released records in the past, companies were not reasonable to rely on any purported assurance.

### C. CIR is Entitled to Summary Judgment Because the Government Has Failed to Meet the Foreseeable Harm Standard

In 2016, the OPEN FOIA Amendment added an additional and independent hurdle that heightens the requirements for withholding under FOIA called the "foreseeable harm" test.[13] Under this test, an agency may withhold information only if "the agency reasonably foresees that disclosure would harm an interest protected by an exemption . . . or disclosure is prohibited by law." 5 U.S.C. § 552(a)(8)(A). The agency bears "the burden of justifying any withholding" under the foreseeable harm standard, *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 375 F. Supp. 3d 93, 98 (D.D.C. 2019), a burden which the government cannot meet in this case. In addition to its failure to meet the requirements of the foreseeable harm standard, OFCCP's position is undermined by the fact that news media outlets, including CIR, previously acquired and published Diversity Reports from OFCCP, and no harm resulted. Moreover, many federal contractors willingly publish Diversity Reports or other similar statistics, *see supra* Section III.B.2(b), without foreseeable harm to the companies, and even yielding benefits. *See* Jackson Decl. ¶¶ 17-19 (summarizing research

---

[13] The government stays mute on this requirement, but the foreseeable harm standard, "codif[ies] a presumption of openness for agencies to follow when they respond to FOIA requests." 114 Cong. Rec. S1494 (Mar. 15, 2016), https://www.congress.gov/114/crec/2016/03/15/CREC-2016-03-15-senate.pdf [https://perma.cc/KQW7-655R] (statement of Sen. Grassley) (Baranetsky Decl., Ex. 40).

-22-

Opp. to Def's Mot. Summ. J.; Not. of Cross Mot. and Cross Mot. Summ. J.; Mem. in Supp. of Cross Mot. Summ. J.

SER-165

suggesting there are benefits to companies disclosing EEO-1 data); Williams Decl. ¶¶ 26-28

(listing reputational benefits of disclosure of diversity data).

      **1.**    **Even if Exemption 4 applies in this case, the government has not shown that Exemption 4's protected interests will be harmed by the disclosure.**

      The foreseeable harm standard can only be met with a showing that a specific harm a

particular exemption seeks to prevent will result from the disclosure. *Machado Amadis v. Dep't of*

*Justice*, 388 F. Supp. 3d 1, 20 (D.D.C. 2019). Because Exemption 4 seeks to protects "trade

secrets and commercial or financial information" that is "privileged or confidential," 5 U.S.C. §

552(b)(4), as well as "assurances about the treatment of . . . proprietary" information, *Argus*

*Leader*, 139 S. Ct. at 2366, the foreseeable harm standard requires OFCCP to show a foreseeable

harm to proprietary confidential information will occur by disclosing Diversity Reports. It also

requires the agency to do so in a concrete, particularized manner. *Rosenberg v. U.S. Dep't of Def.*,

342 F. Supp. 3d 62, 78 (D.D.C. 2018).

      Here, no Exemption 4 interests would be harmed by disclosure. First, there are no

proprietary interests in the requested records. Diversity Reports cannot be characterized as

"proprietary information," nor are they commercial or financial in nature. *See supra* Section

III.B.1. Unlike "sales statistics" or "profits and losses," *Pub. Citizen*, 704 F.2d at 1290, the

diversity statistics at issue do not deal with the companies' commercial activities, but with the

general composition of the workforce. In this case, OFCCP has alleged that there may be

"potential harm to individual privacy" or "reputational harm" to the companies who have protested

the release of their Diversity Reports. Gov. Br. at 17. *See also* Nickerson Decl. ¶¶ 41-42. As

previously discussed, it is impossible for anonymous aggregate data to create individual harms.

*See supra* Section III.B.2(b). Moreover, these are not the commercial and proprietary interests

Exemption 4 seeks to protect, therefore the government has not met its burden under the

foreseeable harm standard.

-23 -

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

SER-166

OFCCP has also failed to allege any harm in a concrete manner, alleging only vague

potential harms.  Gov. Br. at 17.  The declarations offered by OFCCP similarly discuss speculative

harms: one contractor stated that "disclosing the EEO-1 information would provide its competitors

insight into its strategy, operations, recruiting, and labor costs[.]"  Declaration of Kelly Kaiser ¶ 21,

Dkt. No. 24-3.  But an agency may not "perfunctorily state" that disclosure would cause

foreseeable harm, and must "explain the foreseeable harm." *Rosenberg*, 342 F. Supp. 3d at 78-79.

### 2. Even if protected interests could be harmed by disclosure, such a harm is not "reasonably foreseeable."

The statutory phrase "reasonably foreseeable" in the FIA indicates that harm resulting from

disclosure of otherwise exempt information must be foreseeable from an *objective* standpoint.

Brief for Reporters' Comm. for Freedom of the Press & 36 Media Orgs. as Amici Curiae

Supporting Plaintiff-Appellant, Machado Amadis v. Dep't of Justice, 388 F. Supp 3d 1 (D.D.C.

2019) (No. 1:16-cv-2230) (Baranetsky Decl., Ex. 41); *see also Kentucky v. King*, 563 U.S. 452, 464

(2011) ("Legal tests based on reasonableness are generally objective[.]").  Therefore, in order to

withhold the EEO-1 reports, OFCCP would need to also show that resultant harm is objectively

foreseeable.

Even if OFCCP had alleged the abovementioned harms in a more concrete manner, and

even if they were the type of harms Exemption 4 sought to guard against, such harms are not

objectively foreseeable.  The increasing willingness of various companies to make their own

Diversity Reports public, *see supra* Section II.B.3, suggests any harm is not be objectively

foreseeable.  While Declarations offered by OFCCP suggest other harms, such as impact on

"managerial control," Declaration of Mirelle King ¶¶ 21-23, Dkt. No. 24-4, and revealing the

"expertise in the field of how to structure the work-force to have a well-run, profitable, and

efficient company," Declaration of Victoria Thrasher ¶¶ 26-27, Dkt. No. 24-9, it is not clear how

diversity data would provide insight on these matters.

**D. It Is Unclear Whether OFCCP Conducted A Proper Search for Records.**

An agency is required to perform a reasonably adequate search for records, and the burden

is on the agency to establish that the search was adequate. *Nat'l Res. Def. Council v. U.S. Dep't of*

*Def.*, 388 F. Supp. 2d 1086, 1089 (C.D. Cal. 2005); *Sakamoto v. Envtl. Prot. Agency*, 443 F. Supp.

2d 1182, 1198 (N.D. Cal. 2006). Ninth Circuit courts have held that an agency must "explain[] the

process and specifics of the searches it conducted." *McCash v Cent. Intelligence Agency*, No.

5:15-CV-02308-EJD, 2016 WL 6650389, at *5 (N.D. Cal. Nov. 10, 2016). Searches are found to

be inadequate when an agency fails to "provide sufficiently detailed, nonconclusory statements,

which . . . would allow the Court to assess whether the documents were properly withheld." *Nat'l*

*Res. Def. Council*, 388 F. Supp. 2d at 1089. Here, it is unclear whether OFCCP fulfilled its

obligation. OFCCP stated that 19 of the 55 companies were not federal contractors, but did not

clarify why it did not consider them to be federal contractors, whether and how it conducted a

search for those records, and whether those records exist despite any federal contractor

categorization. Having failed to provide "detailed, nonconclusory statements" as to the search, *id.*,

OFCCP has failed to meet its burden to establish that an adequate search was conducted.

## IV. CONCLUSION

For the foregoing reasons, the government's motion for summary judgment should be

denied, and CIR's cross motion for summary judgment should be granted.

-25 -
Opp. to Def's Mot. Summ. J.; Not. of Cross Mot. and Cross Mot.
Summ. J.; Mem. in Supp. of Cross Mot. Summ. J.

SER-168

DATED: September 30, 2019

Respectfully submitted,

D. Victoria Baranetsky
THE CENTER FOR INVESTIGATIVE REPORTING
1400 65th St., Suite 200
Emeryville, CA 94608
vbaranetsky@revealnews.org
Telephone: (510) 982-2890

-26 -

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

1  DAVID L. ANDERSON (CABN 149604)
   United States Attorney
2  SARA WINSLOW (DCBN 457643)
   Chief, Civil Division
3  ELLEN LONDON (CABN 325580)
   Assistant United States Attorney
4      450 Golden Gate Avenue, Box 36055
       San Francisco, California 94102
5      Telephone: (415) 436-7288
       Facsimile: (415) 436-6748
6      E-mail: ellen.london@usdoj.gov
7
   Attorneys for Defendant
8
9                    UNITED STATES DISTRICT COURT
10                  NORTHERN DISTRICT OF CALIFORNIA
11                         OAKLAND DIVISION
12
13  THE CENTER FOR INVESTIGATIVE          )  NO. 19 CIV. 01843 (KAW)
    REPORTING and WILL EVANS,             )
14                                        )
                                          )
15         Plaintiffs,                    )  **OPPOSITION TO CROSS-MOTION FOR**
                                          )  **SUMMARY JUDGMENT; REPLY IN SUPPORT**
16     v.                                 )  **OF MOTION FOR SUMMARY JUDGMENT**
                                          )
17  UNITED STATES DEPARTMENT OF           )
    LABOR,                                )  Date: November 21, 2019
18                                        )  Time: 1:30 p.m.
           Defendant.                     )  Location: To Be Determined
19  _____)
20
21
22
23
24
25
26
27
28
   OPP'N TO CROSS-MOT. FOR SUMM. JUDGMENT; REPLY IN SUPPORT OF MOT. FOR SUMM. JUDGMENT
   C 19-01843-KAW

## I.     INTRODUCTION

This case involves a request by CIR under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and DOL's withholding of nine EEO-1, Type 2 Consolidated Reports.  Plaintiffs have opposed DOL's request for summary judgment as to the propriety of withholding the reports pursuant to Exemption 4 of the FOIA, and have cross-moved for summary judgment.  However, the evidence submitted demonstrates that the information falls within the broad category of documents covered by Exemption 4, as recently re-defined by the United States Supreme Court in *Food Marketing Institute v. Argus Leader Media*, 139 S. Ct. 2365 (2019) ("*Argus Leader*").

Plaintiffs offer several arguments in their cross motion, none of which justify their request for the Court to grant summary judgment in their favor.  First, the documents meet the broad definition of "commercial" in the context of Exemption 4.  While Plaintiffs seek to narrow the scope of what is covered, the declarations show that the data being withheld is more than a mere listing of personnel but is in fact a reflection of business strategy.  Second, Plaintiffs' arguments that the documents are not kept confidential are based on the fact that other companies release the reports and that certain of the companies release certain subsets of similar diversity statistics; however, these arguments do not change the fact that the companies in this matter keep the reports at issue here confidential.  Nor are Plaintiffs correct that there was no assurance of privacy by the government, given the clear language on which the submitters relied and the agency's history of treating the reports as confidential.  The *Argus Leader* standard is satisfied in this case.  Next, Plaintiffs argue that there is no foreseeable harm that could arise from the release of the reports, but this argument also fails in light of the testimony offered by the companies about the concerns that they have about such a release.  Finally, it is unclear if Plaintiffs are asserting an argument as to the adequacy of the agency's search, but any such argument should be rejected in light of the fact that Plaintiffs have never raised this argument before and because the search was adequate.  Accordingly, the Court should hold that DOL has properly withheld the reports.

## II.     ARGUMENT

### A.     The Information is Exempt Under Exemption 4

"Exemption 4 shields from mandatory disclosure 'commercial or financial information obtained from a person and privileged or confidential.'"  *Argus Leader*, 139 S. Ct. at 2366.  The evidence

1  submitted by the Government satisfies what Plaintiffs describe as "*Argus Leader*'s relaxed Exemption 4

2  standard," Pls.' Mot. at 2, and indeed, *Argus Leader* sets forth an entirely new analysis for Exemption 4.

3  Plaintiffs' arguments as to why that standard is not met here, discussed below, are without merit because

4  there is unrebutted testimony as to how the documents were treated by the submitters and by the

5  government.

<div align="center">

**1.    The Information is Commercial**

</div>

7  Plaintiffs assert that the documents are not commercial, but this assertion is based on an overly

8  narrow reading of the case law and the evidence that has been submitted.  The declarations from the

9  submitters explain that the information in the reports is not limited to a mere listing of personnel, but

10  also that it reveals the broader categories of strategy, recruiting, allocation of resources, diversity

11  initiatives.  *See* Defs.' Mot. at 10-11 (describing the evidence).  Such information relates to the

12  submitters' ability to be competitive in the market and necessarily to their commercial interests.

13  Plaintiffs appear to assert that the definition of a commercial interest under Exemption 4 is so

14  narrow as to only apply to information regarding revenue and net worth or income.  Pls.' Mot. at 13.

15  Courts have specifically rejected such a narrow interpretation of the term commercial, finding instead

16  that information is covered where the submitter has a commercial interest in it.  *See Pub. Citizen Health*

17  *Research Grp. v. Food & Drug Admin.*, 704 F.2d 1280, 1290 (D.C. Cir. 1983) (rejecting the notion that

18  commercial information is limited to only information that directly reveals commercial operations).

19  Information that is instrumental to a commercial interest is sufficiently commercial for the purpose of

20  Exemption 4.  *See 100Reporters LLC v. United States Dep't of Justice*, 248 F. Supp. 3d 115, 137

21  (D.D.C. 2017) (discussing the broad scope of the term "commercial," and holding, *inter alia*, that

22  compliance materials are commercial because they "include information that is instrumental to [the

23  company's] operations").  The various job categories as well as the number of people hired in each

24  category contained in the EEO-1, Type 2 reports is instrumental to each submitter's ability to carry out

25  its commercial interests.  Businesses cannot engage in commerce without the sufficient personnel in

26  specified job categories, which is thus related to the businesses' commercial enterprise.

27  Plaintiffs incorrectly claim that information can only be commercial if it is directly connected to

28  commercial activity.  Pls.' Mot. at 12.  In support of this claim, Plaintiffs rely on *Watkins v. U.S. Bureau*

OPP'N TO CROSS-MOT. FOR SUMM. JUDGMENT; REPLY IN SUPPORT OF MOT. FOR SUMM. JUDGMENT
C 19-01843-KAW                              2

*of Customs & Border Prot.* 643 F.3d 1189, 1195 (9th Cir. 2011).  Pls.' Mot. at 12-13.  *Watkins* involved

a FOIA request for the Notices of Seizure of Infringing Merchandise issued by the U.S. Bureau of

Customs and Board Protection.  However, the court directly rejected such a narrow definition, finding

that the information withheld was "plainly commercial" because it disclosed intimate aspects of the

business.  *Watkins* 643 F.3d at 1195 (9th Cir. 2011) (finding that Notices of Seizure contain commercial

information because they reveal information about a business' supply chains and fluctuations of demand

for merchandise).  Similarly, EEO-1, Type 2 reports contain information that reveal details about the

types of jobs at each of the companies, and the number of employees in each of the job categories, even

if they are further broken down by race, gender or ethnicity.  Over time, the reports provide insight into

the submitters' business strategy, as well as the fluctuations in demand for their services or merchandise.

*See also Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*, 742 F. Supp. 2d 76, 81 (D.D.C.

2010) (holding that information about lump-sum bonuses and salary increases based on individual, unit,

and corporate performance indicators devised by the Postal Service constituted commercial information

in the context of another statute and within the "common understanding of the word" because it reflected

the agency's efforts to "improve customer service, generate revenue, manage costs and enhance a

performance-based culture").  Thus, the information contained in EEO-1, Type 2 reports falls well

within the definition of commercial information, subject to Exemption 4.[1]

## 2.    The Information is Customarily and Actually Kept Confidential

The Government has provided testimony from representatives of each of the companies as to the

steps taken to maintain the confidentiality of the reports within the companies, as well as the fact that

these reports are not made public.  Defs.' Mot. at 11-13.  Plaintiffs do not actually dispute this testimony

---

[1] The following cases cited by the Plaintiffs either contradict or fail to support Plaintiffs' assertions that the definition of commercial information that be construed narrowly.  *Skybridge Spectrum Found. v. Fed Commc'ns Comm'n*, No. 10-01496, 2012 WL 336160, at *12 (D.D.C. 2012) (holding that commercial information should be defined more broadly than just records that reveal basic commercial operations but should include information that serves a "commercial function"), *citing Nat'l Ass'n of Home Builders v. Norton,* 309 F.3d 26, 38 (D.C.Cir.2002); *Merit Energy Co. v. US. Dep't of Interior*, 180 F.Supp.2d 1184, 1188 (D. Colo. 2001) ("For the purposes of FOIA, characterizing information as 'commercial'…does not require the invocation of a shibboleth—the words should be given their ordinary meanings."), *citing Pub. Citizen Health Research Group*, 704 F.2d at 1290; and *New Hampshire Right to Life v. U.S. Dep't of Health & Human Servs.*, 778 F.3d 43, 49–50 (1st Cir. 2015) (finding that a non-profit can own commercial information but not otherwise addressing the definition of "commercial").

1   (nor could they), but rather argue that in spite of these facts the Court should nonetheless conclude that

2   the information is not kept confidential. The Court should decline to do so.

3       First, Plaintiffs argue that the reports are not customarily kept confidential because other

4   companies have released the reports. Pls.' Mot. at 15-17. Yet the standard articulated in *Argus Leader*

5   was specific to the party to whom the information belongs. *See Argus Leader*, 139 S. Ct. at 2363, 2366

6   ("In one sense, information communicated to another remains confidential whenever it is customarily

7   kept private, or at least closely held, *by the person imparting it*."; "it is hard to see how information

8   could be deemed confidential if *its owner* shares it freely"; "At least where commercial or financial

9   information is both customarily and actually treated as private *by its owner* and provided to the

10   government under an assurance of privacy, the information is 'confidential' within the meaning of

11   Exemption 4.") (emphases added). This makes sense, because different companies may treat the same

12   information differently, based on a variety of unique factors. The Court should reject Plaintiffs' request

13   that it add to the Exemption 4 standard the requirement that companies be viewed in the context of a

14   purported industry standard.

15       To the extent that Plaintiffs are arguing that the fact that some of the companies at issue in this

16   case disclosed the reports in the previous litigation is dispositive of the issue of confidentiality, that

17   argument also should be rejected. *See* Pls.' Mot. at 5-6 (stating, "Last year, OFCCP disclosed Diversity

18   Reports for the 2015 calendar year to Plaintiffs for some of the companies included in the Request at

19   issue here," under the section heading "Diversity Reports Are Not Confidential"). It would not be fair to

20   use compliance with the previous stricter standard as an indication that the companies are not in

21   compliance with the standard set out in *Argus Leader*.

22       Second, Plaintiffs assert that the companies have not kept the reports confidential because

23   "nearly all of these companies post some form of diversity online." Pls.' Mot. at 19. This does not

24   change the fact (supported by unrebutted testimony) that the reports that are themselves at issue are

25   actually kept confidential. *See Seife v. FDA*, No. 17-CV-3960 (JMF), 2019 WL 1382724, at *2

26   (S.D.N.Y. Mar. 27, 2019) (explaining that in order for "the exception to Exemption 4 for publicly

27   available information" to apply, "[t]he publicly available information must be 'identical.'"). Plaintiffs

28   assert that "Gilead, for example, published its 2016 Diversity Report data—the very data requested

OPP'N TO CROSS-MOT. FOR SUMM. JUDGMENT; REPLY IN SUPPORT OF MOT. FOR SUMM. JUDGMENT
C 19-01843-KAW

4

1  here—in an annual report online." Pls.' Mot. at 17. In fact, what Gilead posted was just a sliver of the

2  information contained in the full EEO-1, Type 2 report. The EEO-1, Type 2 report contains

3  approximately 200 data points with the numbers broken down by gender within each racial classification

4  while the annual report provides only 28 data points for three job categories with no breakdown of the

5  gender numbers by racial classification. Supplemental Declaration of D. Lissette Geán ("Supp. Geán

6  Decl.") at ¶¶ 14-15. Accordingly, the exact data has not been made public and the exemption applies.

7  ### 3.    The Information Was "Provided to the Government Under An Assurance of Privacy"

8
9  Plaintiffs contend that there was no assurance of confidentiality because the language that

10  constituted part of the government's assurance stated that the reports would be kept confidential "to the

11  maximum extent of the law," implying that this is merely a clever ploy to manufacture an assurance.

12  Pls.' Mot. at 21. That is not correct. As an initial matter, the government cannot make assurances

13  beyond what the law allows, and it is unclear why Plaintiffs would critique the government for noting

14  that it would comply with the law when providing an assurance to private companies. As the Supreme

15  Court has explained in the context of FOIA Exemption 7, which is a helpful framework for the *Argus

16  Leader* test,[2] "[i]n common usage, confidentiality is not limited to complete anonymity or secrecy."

17  *Dep't of Justice v. Landano*, 508 U.S. 165, 173 (1993). The Court elaborated, "[a] statement can be

18  made 'in confidence' even if the speaker knows the communication will be shared with limited others,

19  as long as the speaker expects that the information will not be published indiscriminately." *Id.* Here,

20  DOL submitted testimony from each of the submitters that they relied on this language, and there is thus

21  unrebutted evidence of an assurance of privacy. Defs.' Mot. at 14-15.

22  An assurance need not be explicit, and there is ample evidence of an implied assurance in this

23  case. *See Argus Leader*, 139 S. Ct. at 2363 (noting that an interpretation of Exemption 4 recognizing

24  express or implied promises is "consistent" with the definition of confidentiality); *see also* OIP

25  Guidance. The agency's actual practice—as experienced by the submitters per their sworn testimony—

26  was to maintain the records as confidential. Defs. Mot. at 15. While Plaintiffs argue that there is no

27
28  _____
    [2] *See* Office of Info. Policy, Exemption 4 after the Supreme Court's Ruling in *Food Marketing Institute v. Argus Leader Media* (Oct. 4, 2019), *available at* https://www.justice.gov/oip/exemption-4-after-supreme-courts-ruling-food-marketing-institute-v-argus-leader-media

OPP'N TO CROSS-MOT. FOR SUMM. JUDGMENT; REPLY IN SUPPORT OF MOT. FOR SUMM. JUDGMENT
C 19-01843-KAW                    5

1     pattern of the agency maintaining confidentiality, they point to the prior release of the 2015 reports,

2     which was done pursuant to the prior Exemption 4 standard before the *Argus Leader* decision.  Pls.'

3     Mot. at 21 ("OFCCP released Diversity Reports for 2015 to Plaintiffs for many of the employers at issue

4     here as recently as last year.").  Plaintiffs also cite to two news articles for the proposition that "OFCCP

5     has also released Diversity Reports to other media outlets in recent years," Pls.' Mot. at 21; however,

6     these news articles in fact show that the government has been consistent in withholding the records for

7     those companies that assert that release would cause harm.  *See* Baranetsky Decl., Ex. 6 (describing

8     contractors that "successfully petition[ed] the Department of Labor for their data to be excluded on the

9     basis that doing so would cause 'competitive harm'"); Ex. 7 ("[T]he Labor Department accepted

10     arguments filed by lawyers for Google, Apple, Oracle and Applied Materials that release of the

11     information would cause commercial harm.").

12     Finally, Plaintiffs note that the agency "quickly agree[d] with *all* of the companies that chose to

13     disclose *as well as* all of the companies that chose to withhold the information."  Pls.' Mot. at 21-22

14     (emphases in original).  But this shows nothing more than that different companies take different

15     approaches to confidentiality and have different views perspectives regarding the harm from release.  As

16     Plaintiffs themselves assert, it would not be proper for the government to withhold documents when the

17     submitter does not foresee any harm from release, Pls.' Mot. at 22-25, and the agency should not be

18     penalized for appropriately considering this issue.

19              **4.      The Government is Not Withholding the Reports to Avoid Embarrassment**

20     Plaintiffs claim that "it appears that any remaining objections to disclosure used are a pretense to

21     avoid embarrassment," relying solely on a single line from one of the declarations (from Agilent) and

22     the fact that some of the companies have faced public criticism over their lack of diversity.  Pls.' Mot. at

23     19-20.  This accusation is not supported in the record.  Even as to Agilent, the statement described a

24     concern about the company's reputation, which could include a concern that the report could be taken

25     out of context in a way that would be damaging.  *See* Declaration of Dave Nickerson ("Nickerson

26     Decl.") at ¶ 21 ("Data in Agilent's EEO-1 Report may be mischaracterized to damage Agilent's

27     reputation.").  Moreover, the Agilent declaration listed other reasons why it objects to the release.  *Id.* at

28     ¶ 20 ("Disclosure of the EEO-1 Report would reveal confidential strategic planning and compromise

OPP'N TO CROSS-MOT. FOR SUMM. JUDGMENT; REPLY IN SUPPORT OF MOT. FOR SUMM. JUDGMENT
C 19-01843-KAW        6

1 Agilent's competitive advantage in recruiting, as well as provide competitors with insight into Agilent's

2 operations and financial status."). Accordingly, Plaintiffs' request that the Court assign an

3 impermissible motive to the government should be rejected.

4            **5.**       **The Foreseeable Harm Standard is Satisfied**

5       Plaintiffs appear to be seeking to re-impose a competitive-harm or other significant harm

6 requirement under Exemption 4 through the FOIA Improvement Act of 2016 ("FIA"). That argument is

7 without merit and would render *Argus Leader* meaningless; nor has the government been "mute" on this

8 requirement, Pls.' Mot. at 22 n.13, as explained below. The FIA, as relevant, merely requires agencies

9 to release records that are covered by a FOIA exemption if release would not "reasonably harm an

10 exemption-protected interest." *Rosenberg v. Dep't of Defense*, 342 F. Supp. 3d 62, 73 (D.D.C. 2018).

11 In other words, a purely technical application of the exemption may not be sufficient to justify

12 withholding. *Judicial Watch, Inc. v. Dep't of Commerce*, 375 F. Supp. 3d 93, 101 (D.D.C. 2019).

13       *Argus Leader* redefined the scope of Exemption 4, which the FIA did not change. *See Seife*,

14 2019 WL 1382724, at *1 n.1 (reserving decision in light of Argus Leader in spite of the fact that the

15 information in *Argus Leader* was not covered by the FIA because of the "similarity of the FOIA statute

16 pre- and post-amendment"); *Cause of Action Inst. v. DOJ*, 330 F. Supp. 3d 336, 355 (D.D.C. 2018)

17 (noting the Government's assertion that the FIA "does not alter the scope of the information covered by

18 the exemption").

19       To establish the harm to the exemption-protected interest resulting from disclosure, the

20 Government may address the information categorically, as long as it is not done in a perfunctory

21 fashion. *See Rosenberg*, 342 F. Supp. 3d at 79; *see also Sorin v. DOJ*, 758 Fed. App'x 28, 33 (2d Cir.

22 2018) (rejecting an argument that the agency failed to comply with the FIA because the agency provided

23 "sound reasons for withholding" the information). Moreover, the Government may rely on declarations

24 to show the exemption-protected harm. *See Judicial Watch*, 375 F. Supp. 3d at 101; *Cause of Action*,

25 330 F. Supp. 3d at 355; *Sorin v. DOJ*, 280 F. Supp. 3d 550, 566-67 (S.D.N.Y. 2017), *aff'd*, 758 Fed.

26 App'x 28. Here, there is a sufficient showing on the record before the Court that release of the relevant

27 information would harm several interests of the submitters. *See* Defs.' Mot. at 12-13 (describing

28

concerns about competitors using the information against them, harm to individual privacy, and, as
discussed above, potential reputational harm).

### B. The Search Was Adequate

An agency's search for records is "adequate" if it used "methods which can be reasonably
expected to produce the information requested." *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C.
Cir. 1990); *Lahr v. Nat'l Transportation Safety Board*, 569 F.3d 964, 986 (9th Cir. 2009). The issue "is
not whether there might exist any other documents possibly responsive to the request, but rather whether
the search for those documents was adequate." *Citizens Comm'n on Human Rights v. Food & Drug
Admin.*, 45 F.3d 1325, 1328 (9th Cir. 1995) (quoting *Zemansky v. EPA*, 767 F.2d 569, 571 (9th Cir.
1985)). The agency need not conduct an exhaustive search of every record system, but it must make a
good faith, reasonable search of those systems of records likely to possess the requested records.
*Oglesby*, 920 F.2d at 68.

An agency can establish the adequacy of its search by submitting a reasonably detailed, non-
conclusory affidavit describing its efforts, setting forth the search procedures. *Zemansky*, 767 F.2d at
573. "Agency affidavits enjoy a presumption of good faith" that a plaintiff must rebut. *See Ground
Saucer Watch v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981). An agency's "failure to turn up a particular
document, or mere speculation that as yet uncovered documents might exist, does not undermine the
determination that the agency conducted an adequate search for requested records." *Wilbur v. CIA*, 355
F.3d 675, 678 (D.C. Cir. 2004) (per curiam). An agency is entitled to summary judgment if it
"demonstrates that it has conducted a reasonable search for relevant documents." *Garcia v. U.S. Dep't
of Justice*, 181 F. Supp. 2d 356, 366 (S.D.N.Y. 2002).

In this case, after receiving Plaintiffs' request, OFCCP determined that it was appropriate for it
to search for the EEO-1 reports of federal contractors, because OFCCP's jurisdiction is limited to federal
contractors. Supp. Geán Decl. at ¶ 7. Over the course of a year, OFCCP informed Plaintiffs of this
decision in three letters, after which Plaintiffs never challenged OFCCP's search in response to the
FOIA request. Supp. Geán Decl. at ¶¶ 8-11. Nor did Plaintiffs raise this issue in its administrative
appeal. Supp. Geán Decl. at ¶ 12. Given the agency's reasonable response to the request, and Plaintiffs'
failure to alert the agency at any earlier point of any concerns, the Court should not now order the

OPP'N TO CROSS-MOT. FOR SUMM. JUDGMENT; REPLY IN SUPPORT OF MOT. FOR SUMM. JUDGMENT
C 19-01843-KAW                                                     8

1 | government to conduct further searches.

2 | **III.    CONCLUSION**

3 |         For all of the aforementioned reasons, Defendant respectfully requests that the Court grant

4 | summary judgment in its favor.

5 |

6 |                                         Respectfully submitted,

7 |                                         DAVID L. ANDERSON
                                            United States Attorney

8 |

9 | Dated: October 28, 2019

                                            /s/ *Ellen London*                    .
10 |                                        ELLEN LONDON
                                            Assistant United States Attorney
11 |                                        Counsel for Defendant

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

OPP'N TO CROSS-MOT. FOR SUMM. JUDGMENT; REPLY IN SUPPORT OF MOT. FOR SUMM. JUDGMENT
C 19-01843-KAW                                 9

(180 of 300), Page 180 of 300
Case: 24-880, 07/10/2024, DktEntry: 16.2, Page 180 of 300
Case 3:22-cv-07182-WHA Document 89-15 Filed 10/18/23 Page 93 of 105

D. Victoria Baranetsky (Cal. Bar No. 311892)
THE CENTER FOR INVESTIGATIVE
REPORTING
1400 65th St., Suite 200
Emeryville, CA 94608
vbaranetsky@revealnews.org
Telephone: (510) 982-2890

Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

|  |  |
|---|---|
| THE CENTER FOR INVESTIGATIVE REPORTING and WILL EVANS, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF LABOR, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | Case No. 4:19-cv-01843-KAW <br><br> **SURREPLY TO DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** <br><br> **AND REPLY IN SUPPORT OF CROSS MOTION FOR SUMMARY JUDGMENT** <br><br> Date: December 5, 2019 <br> Time: 1:30 p.m. |

(181 of 300), Page 181 of 300
Case: 24-880, 07/10/2024, DktEntry: 16.2, Page 181 of 300
Case 3:22-cv-01482-WHA Document 65-35 Filed 10/18/23 Page 94 of 1025

# TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................................... 1

II.   ARGUMENT ...................................................................................................... 3

  A.  Diversity Reports Are Not Exempt from Disclosure Under Exemption 4. ........... 3

    1.  Diversity Reports Are Not Commercial. ........................................................ 3

    2.  Diversity Reports Are Not Confidential. ........................................................ 6

    3.  Diversity Reports Are Withheld to Avoid Embarrassment. ......................... 12

  B.  The Foreseeable Harm Standard is Not Satisfied ................................................ 13

  C.  It Is Unclear Whether Defendant Conducted A Proper Search for Records. ....................... 14

III.   CONCLUSION ................................................................................................. 15

-ii -
Opp. to Def's Mot. Summ. J.; Rep. in Supp. of Cross Mot. Summ. J.

SER-181

**TABLE OF AUTHORITIES**

**CASES**

*Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*, 742 F. Supp. 2d 76 (D.D.C. 2010) ...... 5

*Am. Small Bus. League v. U.S. Dep't of Defense*, C 18-01979 WHA, 2019 WL 4416613 (N.D. Cal. Sept. 15, 2019) .................................................................................................................. 8, 13

*Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504 (D.C. Cir. 2011) .................. 14

*Army Times Pub. Co. v. U.S. Dep't of Air Force*, 998 F.2d 1067 (D.C. Cir. 1993) ......................... 7

*Cause of Action Inst. v. U.S. Dep't of Justice*, 330 F. Supp. 3d 336 (D.D.C. 2018) ...................... 14

*CIR v. U.S. Dep't of Labor (OFCCP)*, No. 3:18-cv-1008-JCS (N.D. Cal. 2018) ...................... 7, 15

*Citizens Comm'n on Human Rights v. Food & Drug Admin.*, 45 F.3d 1325 (9th Cir. 1995) .......... 14

*CNA Fin. Corp. v. Donovan*, 830 F.2d 1132 (D.C. Cir. 1987) ....................................................... 10

*Davin v. U.S. Dep't of Justice*, 60 F.3d 1043 (3d Cir. 1995) ........................................................... 5

*Food Marketing Inst. v. Argus Leader Media*, 139 S. Ct. 2356 (2019) ................................... passim

*Hamdan v. U.S. Dep't of Justice*, 797 F.3d 759 (9th Cir. 2015) .................................................... 15

*Inner City Press/Community on the Move v. Bd. of Governors of Fed. Reserve Sys.*, 463 F.3d 239 (2d Cir. 2006) .......................................................................................................................... 10

*Lahr v. Nat'l Transp. Safety Bd.*, 569 F.3d 964 (9th Cir. 2009) .................................................... 12

*Machado Amadis v. U.S. Dep't of Justice*, 388 F. Supp. 3d 1 (D.D.C. 2019) ................................ 13

*Martech USA, Inc. v. Reich*, No. C-93-4137 EFL, 1993 WL 1483700 (N.D. Cal. Nov. 24, 1993). 13

*Mokhiber v. U.S. Dep't of Treasury*, 335 F. Supp. 2d 65 (D.D.C. 2004) ........................................ 7

*N.H. Right to Life v. U.S. Dep't of Health & Human Servs.*, 976 F. Supp. 2d 43 (D.N.H. 2013) . 4, 5

*N.H. Right to Life v. U.S. Dep't of Health and Human Servs.*, 778 F.3d 43 (1st Cir. 2015) ............. 5

*News Grp. Boston, Inc. v. Nat'l R.R. Passenger Corp.*, 799 F. Supp. 1264 (D. Mass. 1992) ........... 5

*Oglesby v. U.S. Dep't of Army*, 920 F.2d 57 (D.C. Cir. 1990) ....................................................... 14

*Pub. Citizen Health Research Grp. v. Dep't of Health, Ed. & Welfare*, 477 F. Supp. 595 (D.D.C. 1979) ....................................................................................................................................... 6

*Seife v. FDA*, No. 17-CV-3960 (JMF), 2019 WL 1382724 (S.D.N.Y Mar. 27, 2019) ............... 10, 14

-iii -

OPP. TO DEF'S MOT. SUMM. J.; REP. IN SUPP. OF CROSS MOT. SUMM. J.

SER-182

(183 of 300), Page 183 of 300
Case: 24-880, 07/10/2024, DktEntry: 16.2, Page 183 of 300
Case 3:22-cv-01824-WHA Document 39-15 Filed 10/18/23 Page 96 of 125

*Steinberg v. U.S. Dep't of Justice*, 23 F.3d 548 (D.C. Cir. 1994) ................................... 15

*U.S. Dep't of State v. Ray*, 502 U.S. 164 (1991) ........................................................... 12

*Watkins v. U.S. Bureau of Customs & Border Prot.*, 643 F.3d 1189 (9th Cir. 2011) ................. 4, 10

*Yonemoto v. Dep't of Veterans Affairs*, 686 F.3d 681 (9th Cir. 2012). .......................................... 15

*Zemansky v. EPA*, 767 F.2d 569 (9th Cir. 1985) .................................................................... 14, 15


**STATUTES**

5 U.S.C. § 552(a)(3)(C) ............................................................................................ 14

5 U.S.C. § 552(a)(4)(B) ............................................................................................ 12

5 U.S.C. § 552(a)(8)(A) ......................................................................................... 2, 13, 14

5 U.S.C. § 552(b)(4) ................................................................................................. 3


**OTHER AUTHORITIES**

Dep't of Justice, *Exemption 4 After the Supreme Court's Ruling in* Food Marketing Institute v.
Argus Leader Media, https://www.justice.gov/oip/exemption-4-after-supreme-courts-ruling-
food-marketing-institute-v-argus-leader-media ........................................................................ 8, 9

Dep't of Justice, *Step-by-Step Guide for Determining if Commercial or Financial Information
Obtained from a Person is Confidential Under Exemption 4 of the FOIA*,
https://www.justice.gov/oip/step-step-guide-determining-if-commercial-or-financial-
information-obtained-person-confidential ......................................................................... 9

EEOC, *EEO-1 Instruction Booklet*,
https://www.eeoc.gov/employers/eeo1survey/2007instructions.cfm ......................................... 11

Megan Rose Dickey, *The Future of Diversity and Inclusion in Tech*, TECHCRUNCH, June 17, 2019,
https://techcrunch.com/2019/06/17/the-future-of-diversity-and-inclusion-in-tech/ ................... 13

OFCCP, *Freedom of Information Act (FOIA) Frequently Asked Questions*,
https://www.dol.gov/ofccp/regs/compliance/faqs/foiafaqs.htm ........................................... 11, 12

OPEN DIVERSITY DATA, http://opendiversitydata.org ......................................................... 9

Will Evans & Sinduja Rangarajan, *Oracle and Palantir Said Diversity Figures Were Trade
Secrets. The Real Secret: Embarrassing Numbers*, REVEAL, Jan. 7, 2019,
https://www.revealnews.org/article/oracle-and-palantir-said-diversity-figures-were-trade-secrets-
the-real-secret-embarrassing-numbers/ ....................................................................... 12

-iv -
OPP. TO DEF'S MOT. SUMM. J.; REP. IN SUPP. OF CROSS MOT. SUMM. J.

SER-183

1

2 **REGULATIONS**

3 29 C.F.R. § 70.2(g)(5) .................................................................................................... 7

4 Exec. Order No. 12,600, 3 C.F.R. § 1987 ....................................................................... 7

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

-v -
OPP. TO DEF'S MOT. SUMM. J.; REP. IN SUPP. OF CROSS MOT. SUMM. J.

SER-184

(185 of 300), Page 185 of 300
Case: 24-880, 07/10/2024, DktEntry: 16.2, Page 185 of 300
Case 3:22-cv-01832-VHA Document 39-15 Filed 10/18/23 Page 98 of 1025

## I.    INTRODUCTION

This case involves a request under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA") for EEO-1, Type 2 Consolidated Reports ("Diversity Reports") submitted by Plaintiffs, The Center for Investigative Reporting and its reporter, Will Evans ("CIR"). Defendant, the Department of Labor ("DOL"), withholds these reports pursuant to 5 U.S.C. § 552(b)(4) ("Exemption 4") by asserting the Diversity Reports are confidential business information. Plaintiffs submitted a cross motion explaining how Diversity Reports are neither commercial nor secret, and therefore that the FOIA exemption does not apply.

In its response to Plaintiffs' Cross-Motion, Defendant exaggerates its already hyperbolic claim that Diversity Reports are "confidential commercial information" by claiming they reflect secret "business strateg[ies]." Government's Reply Brief, Dkt. No. 34 ("Gov. Reply Br."), at 1. That assertion is not only far-fetched, but completely untethered from the law. Diversity Reports are standard forms submitted to the government to account for a company's compliance with federal anti-discrimination laws. This aggregate demographic information does not qualify as "commercial" or "confidential" according to well-established FOIA law. Still, DOL pushes the bounds of reason by hiding behind repeated citations to *Food Marketing Inst. v. Argus Leader Media*, 139 S. Ct. 2356 (2019) ("*Argus Leader*") without sufficient accompanying analysis. Even the broad new Supreme Court ruling does not support a holding that would find Diversity Reports reveal secret corporate strategies properly withheld under Exemption 4.

DOL's claim that Diversity Reports are commercial is undermined by the fact that none of the records reveal *any* information about commercial aspects of the companies at issue. Nothing is disclosed about the companies' products, production, finances, bottom lines, economic efficiency or anything else that could fairly be defined as "commercial." To expand Exemption 4 beyond what *Argus Leader* holds, and characterize information pertaining to employee demographics (submitted to the government on standardized forms) as "commercial" threatens to expand the term so far as to render it meaningless. Under DOL's bloated definition, ostensibly *any* records related to a corporation would be "commercial," hiding many important public records from public view.

- 1 -
OPP. TO DEF'S MOT. SUMM. J.; REP. IN SUPP. OF CROSS MOT. SUMM. J.

SER-185

1      The claim that Diversity Reports are "confidential" is even more astounding.  Previously,

2  DOL has disclosed nearly identical records to CIR and other FOIA requesters.  In response to this

3  very request, days before DOL submitted its opening brief, DOL's Office of Federal Contract

4  Compliance Programs ("OFCCP") released additional companies' Diversity Reports to CIR.

5  Moreover, all but one of the companies that continue to object to disclosure of the records *already*

6  *publish* much of the information contained within Diversity Reports on their company websites.

   Together, and even separately, these facts are fatal to Defendant's claim that the records are secret.

7      Additionally, Defendant fails to meet the foreseeable harm requirement introduced in the

8  2016 FOIA Improvement Act, 5 U.S.C. § 552(a)(8)(A) ("FIA").  DOL lists no exemption-protected

9  harm or injury that would result from disclosure, because it cannot.  Through this FOIA suit, CIR

10  seeks records that would not only not cause a foreseeable harm, but would provide immense public

11  benefit.  Academics, members of Congress, and other officials have attested to the public benefit

12  that would result from disclosure of the Diversity Reports, and have called for greater public access

    to these records.  *See* Plaintiffs' Opening Brief, Dk. No. 29 ("Pls. Br.") at 16-17.

13      Defendant further fails to offer anything new to support its claim that the government

14  performed a sufficient search for all of the requested Diversity Reports.  Despite Defendant's

15  production of a supplemental declaration, the additional declaration only reiterates that some of the

16  companies for which Diversity Reports were requested are not federal contractors.  This

17  declaration altogether fails to remark on what search was conducted or whether the documents

18  exist.  While agencies are not required to do extensive searches, they are required at a bare

19  minimum to provide affidavits demonstrating that a reasonable search was conducted, usually by

    describing the scope of the search as well as terms used.  Here, none of these were provided.

20      Overall, Defendant's declarations are replete with generalizations, conclusory statements,

21  and circular logic.  Because Defendant has failed to meet its burden under FOIA, the Court should

22  deny its Motion for Summary Judgment and grant CIR's Cross-Motion.  If the Court has any

23  questions about the withholdings, CIR respectfully requests that the Court review all disputed

24  material *in camera* and order Defendant to immediately disclose all improperly withheld records.

25

26

-2 -
OPP. TO DEF'S MOT. SUMM. J.; REP. IN SUPP. OF CROSS MOT. SUMM. J.

SER-186

**II.    ARGUMENT**

      **A.  Diversity Reports Are Not Exempt from Disclosure Under Exemption 4.**

     Here, the government has failed to meet its burden to show Diversity Reports are exempt, even under the modified *Argus Leader* standard.  139 S. Ct. at 2366.  The reports are not commercial.  The reports are neither "customarily" nor "actually" treated as confidential.  They are also not provided to the government under an assurance of privacy, and seem to be withheld at least in part due to concerns about corporate embarrassment (impermissible under Exemption 4).  While even one of these factors would be fatal, altogether they make clear that Diversity Reports should be disclosed.  *Cf.* 5 U.S.C. § 552(b)(4) (stating "commercial or financial information" provided to the government may be withheld if "privileged or confidential").

      **1.  Diversity Reports Are Not Commercial.**

     DOL fails to provide the requisite specificity to show Diversity Reports are commercial.  In the opening statement of its Reply Brief, Defendant asserts that it has fulfilled its burden by claiming the records reveal "business strateg[ies]."  Gov. Reply Br. at 2.  However, the proffered declarations do not state that the records reflect business strategies.  Only one declaration claims that the records "*tie[] directly into* Gilead's business strategy."  Declaration of Mirelle King, Dkt. No. 24-4, ¶ 4 (emphasis added).  But tying into a business strategy is not the same as reflecting or revealing a business strategy.  In any event, the declarations do not show or explain how or in what way the material is a business strategy or otherwise show that Diversity Reports qualify as "commercial" with the requisite specificity.  Instead, the declarations use broad and conclusory language.  *See, e.g.*, Government's Opening Brief, Dkt. No. 24, at 11 (citing Declaration of Julie Crane, Dkt. No. 24-2, ¶ 6 (simply stating "Applied Materials considers this information confidential commercial information"); Declaration of Mollie Wong, Dkt. No. 24-10, ¶ 7 ("Fitbit considers its EEO-1 reports to be commercial information because they contain

-3 -

OPP. TO DEF'S MOT. SUMM. J.; REP. IN SUPP. OF CROSS MOT. SUMM. J.

SER-187

1   information regarding its workforce patterns and workforce profiles")).  Stating records are

2   commercial in order to prove they are commercial is unsatisfactory circular logic, insufficient to

3   fulfill the government's burden.

4       DOL's inability to demonstrate that these records are commercial stems from the fact that

5   this task is Sisyphean.  It is impossible to prove EEO-1, Type 2 reports are commercial, where the

6   standardized government forms are single page grids containing categories of jobs, genders, and

7   race to prove compliance with federal anti-discrimination laws.  *Cf. Argus Leader,* 139 S. Ct. at

8   2361 (withholding "actual sales data").  The subject headings that are allegedly "categories of

9   strategy," Gov. Reply Br. at 2, are simply columns that have demographic subject headings like

10  "Male" or "Female," as well as "White," "Asian," and "Black or African American."  *See* Juniper

11  Networks, *2017 Employer Information Report Consolidated Report Type 2*,

12  http://www.juniper.net/assets/us/en/local/pdf/additional-resources/2017-eeo-1-report.pdf (Dkt. No.

13  29-5, Ex. 13, at 71).  The headings the Defendant alleges reveal "recruiting" strategies are

14  categories of generic job titles, such as "Executive/Sr. Officials & Mgrs," "Sales Workers,"

15  "Laborers & Helpers."  *Id.*  Nothing about any of these categories alone or in combination reveals a

16  commercial strategy or economic efficiency at the company.  Rather, the form is a tally of

17  employee demographics in terms of race and gender, listed by generic job title that reveals only the

18  diversity of a company's workforce, as Diversity Reports were intended to do.  *See, e.g.*, *N.H.*

19  *Right to Life v. Dep't of Health & Human Servs.*, 976 F. Supp. 2d 43, 57 (D.N.H. 2013) (personnel

20  policies which identify "disciplinary, improvement and termination issues" are not commercial).

21      In addition to the bare facts, DOL fails on the law.  DOL tries to rely on *Watkins v. U.S.*

22  *Bureau of Customs & Border Prot.*, 643 F.3d 1189, 1195 (9th Cir. 2011), but that case weighs in

23  Plaintiffs' favor.  There, the Court found that CBP's "Notices of Seizure" contained commercial

24  information only because they revealed information about a business's *product supply chains* and

25

26
-4 -
OPP. TO DEF'S MOT. SUMM. J.; REP. IN SUPP. OF CROSS MOT. SUMM. J.

SER-188

fluctuations in demand for *merchandise*. *Id.* Essentially, in *Watkins* the court found information

was commercial because it related to the company's merchandise. *Id.* But here, the information

relates to the demographics of *employees*, which is entirely divorced from the companies' products.

DOL also attempts to rely on *Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*, 742 F.

Supp. 2d 76, 81 (D.D.C. 2010) (holding that information about lump-sum bonuses and salary

increases constituted commercial information). However, once again, that case leans in Plaintiffs'

favor. The information at issue in that case was commercial only insofar as it related to the

company's finances by revealing salaries and was only incidentally related to the employees,

unlike non-commercial information such as an employee's race or gender. The government cannot

earnestly say these cases support its argument, since Diversity Reports have nothing to do with the

*products* or the *finances* of the companies. *See Davin v. U.S. Dep't of Justice*, 60 F.3d 1043, 1050

(3d Cir. 1995) (requiring the government to demonstrating a "logical connection" between the

information and the claimed exemption).

Other case law the government fails to mention even more strongly support Plaintiffs'

position, given that in many cases courts have found limits to the bounds of what qualifies as

"commercial" under FOIA, and the records in those cases are more analogous to Diversity Reports.

*See, e.g.*, *N.H. Right to Life v. U.S. Dep't of Health & Human Servs.*, 976 F. Supp. 2d 43, 57

(D.N.H. 2013)[1] (personnel policies which "identify hours of work, compensation and benefit rates,

benefit eligibility criteria, employee orientation, insurance policy limits, and disciplinary,

improvement and termination issues" are not commercial); *News Grp. Boston, Inc. v. Nat'l R.R.*

*Passenger Corp.*, 799 F. Supp. 1264, 1269 (D. Mass. 1992) (Amtrak salary information is not

---

[1] While the government mentions the appellate case, *N.H. Right to Life v. U.S. Dep't of Health and Human Servs.*, 778 F.3d 43, 49-50 (1st Cir. 2015), which affirmed the district court decision, Gov. Reply Br. at 4, n.1, it does not address the facts more comprehensively laid out in the district court decision.

-5 -
OPP. TO DEF'S MOT. SUMM. J.; REP. IN SUPP. OF CROSS MOT. SUMM. J.

SER-189

1   commercial); *Pub. Citizen Health Research Grp. v. U.S. Dep't of Health, Ed. & Welfare*, 477 F.

2   Supp. 595, 605 (D.D.C. 1979) (health-related studies are not commercial).

3         **2.  Diversity Reports Are Not Confidential.**

4        DOL has also failed to meet its burden to show that Diversity Reports are confidential

5   under *Argus Leader*, as it is unable to show that the records are customarily *or* actually treated as

6   confidential.  *See* 139 S. Ct. at 2366 (requiring government to show "*both* customarily and

7   actually") (emphasis added).  DOL argues that because the objecting companies do not post the

8   reports in full and "take steps to maintain the confidentiality of the reports within the companies,"

9   Gov. Reply Br. at 3, that the records are confidential under *Argus Leader*.  But the consistent and

10  repeated disclosure of Diversity Reports and identical data by the government, the objecting

11  companies, and the industry as a whole entirely undercut this claim.

12        **a.  Diversity Reports are not customarily treated as confidential.**

13       Diversity Reports are not "customarily" treated as confidential by any entity, including the

14  objecting companies, the government, or other industries.  While the government would like to

15  delimit the "customarily" inquiry to what the objecting companies attest to be their own custom,

16  Gov. Reply Br. at 5, that narrow interpretation is not aligned with the common meaning of the

17  word "custom" nor is it the enumeration of the actual test.  *Argus Leader*, agency guidelines, and

18  the Department of Justice's own guidance all direct courts to consider the surrounding

19  circumstances, including the government's actions and industry standards, to determine "custom."

20  Accordingly, Diversity Reports cannot be deemed "customarily" confidential.  But even if the

21  Court were to follow the government's more cramped understanding, the companies' own

22  disclosures are fatal to the finding the Diversity Reports are customarily treated as confidential.

23       First, under FOIA, the government's actions are strongly probative to determining what is

24  "customarily" considered as confidential.  The statute and agency guidelines both underscore that

25

26

-6 -

OPP. TO DEF'S MOT. SUMM. J.; REP. IN SUPP. OF CROSS MOT. SUMM. J.

SER-190

the *government* ultimately wields the power to withhold information and also bears the burden to

show that the requested documents are customarily withheld in accordance with the law.  *See*

*generally Mokhiber v. U.S. Dep't of Treasury*, 335 F. Supp. 2d 65, 69 (D.D.C. 2004) (citing *Army*

*Times Pub. Co. v. U.S. Dep't of Air Force*, 998 F.2d 1067, 1068 (D.C. Cir. 1993)); Exec. Order No.

12,600, 3 C.F.R. § 1987 (requiring that the agency make its own independent determination about

whether the information can be withheld under Exemption 4, which can override a company's

objection, requiring only that an agency provide notice to the company); 29 C.F.R. § 70.2(g)(5)

(DOL guidelines stating the same).  For years, the government has disclosed Diversity Reports.

Just last year, OFCCP disclosed Diversity Reports to CIR.  *See CIR v. U.S. Dep't of Labor*

*(OFCCP)*, No. 3:18-cv-1008-JCS (N.D. Cal. 2018).  Similarly, in response to the present action,

OFCCP released Diversity Reports for sixteen of the fifty-five employers,[2] Dkt. No. 1-3, and

subsequently released Diversity Reports for ten additional employers after the commencement of

these proceedings.  Dkt. No. 29-5, Ex. 8, at 51.  These repeated releases strongly lean in favor of

the court finding Diversity Reports are not customarily treated as secret.

Second, and most importantly, all but one of the objecting companies discloses data within

the Diversity Reports, which is fatal to finding the records are "customarily" treated as

confidential, according to *Argus Leader*.  *See* 139 S. Ct. at 2363 (stating that "the Institute's

retailers customarily do not disclose store-level SNAP data or make it publicly available 'in *any*

way'" and "[e]ven within a company . . . only small groups of employees usually have access to

it") (emphasis added).  Indeed, this Court, in one of the only cases applying the *Argus Leader*

standard, found that information was not "customarily" kept confidential because a company had

---

[2] These employers are: Advanced Micro Devices, Bloom Energy, Cadence Design Systems, Fair Isaac, Palo Alto Networks, PayPal, Penumbra, ServiceNow, Slack Technologies, SolarCity, Synnex, Varian Medical Systems, Verifone, VMware, WageWorks, and Yahoo Inc.  Trimble sent its Diversity Report to CIR directly, and CIR thus requested that it be removed from the Request.

-7-
OPP. TO DEF'S MOT. SUMM. J.; REP. IN SUPP. OF CROSS MOT. SUMM. J.

SER-191

1    made repeated selective disclosures of this *type* of information in the past. *Am. Small Bus. League*

2    *v. U.S. Dep't of Defense*, C 18-01979 WHA, 2019 WL 4416613, at *3 (N.D. Cal. Sept. 15, 2019).

3    Similarly, here, the objecting federal contractors have, by the Government's own admission, made

4    "selective disclosures of supposed confidential information" by regularly publicly posting this type

5    of data (*i.e.* workforce diversity data). *Id.* Rather than not disclosing *any* material in *any way*, *cf.*

6    *Argus Leader*, 139 S. Ct. at 2363, here not only the same *type* but portions of *identical* data have

7    been publicly posted on company websites. So even if the "customarily" inquiry required a court

8    to focus on the practices of the particular company, as DOL suggests, the government cannot meet

9    its burden.

10          Courts must also look to industry standards to determine what qualifies as "customarily"

11   confidential. In *Argus Leader*, the majority concluded that the information at issue was

12   "customarily kept private" because, on an industry-wide level, FMI's "retailers customarily d[id]

13   not disclose store-level SNAP data." 139 S. Ct. at 2363. In examining retail stores participating in

14   SNAP *as a whole*, the Court indicated that an industry-wide inquiry is appropriate. *Id.* Indeed,

15   despite its position in this case, the Department of Justice has explained (in its own guidance

16   interpreting *Argus Leader*) that industry standards are probative evidence of whether information is

17   customarily treated as confidential. *See* Dep't of Justice, *Exemption 4 After the Supreme Court's*

18   *Ruling in* Food Marketing Institute v. Argus Leader Media,

19   https://www.justice.gov/oip/exemption-4-after-supreme-courts-ruling-food-marketing-institute-v-

20   argus-leader-media ("as *Argus Leader* itself demonstrates, industry representatives can provide the

21   *necessary* information regarding the customary treatment of such information") (emphasis added)

22   (Declaration of D. Victoria Baranetsky ("Baranetsky Decl."), Ex. 1); *see also* Dep't of Justice,

23   *Step-by-Step Guide for Determining if Commercial or Financial Information Obtained from a*

24   *Person is Confidential Under Exemption 4 of the FOIA*, https://www.justice.gov/oip/step-step-

25

26
-8 -
OPP. TO DEF'S MOT. SUMM. J.; REP. IN SUPP. OF CROSS MOT. SUMM. J.

SER-192

1   guide-determining-if-commercial-or-financial-information-obtained-person-confidential (stating

2   that whether "the submitter customarily keep[s] the information private . . . . may in appropriate

3   contexts be determined from industry practices concerning the information.") (Baranetsky Decl.,

4   Ex. 2).

5         Here, it is undisputed that posting Diversity Reports is a growing industry standard, which

6   is likely why the government tries to downplay its importance. To date, over thirty major

7   technology companies have published their forms online to promote diversity. *See* Pls. Br. at 15

8   (citing OPEN DIVERSITY DATA, http://opendiversitydata.org (Dkt. 29-5, Ex. 12, at 66-69)). CIR has

9   also offered unrebutted testimony from an "industry representative" who offered evidence that

10  posting Diversity Reports is an industry custom, Declaration of Matthew Patsky, Dkt. No. 29-3, ¶¶

11  5, 16, evidence that comports with DOJ's own guidance about determining whether information is

12  "customarily" kept confidential. Dep't of Justice, *Exemption 4 After the Supreme Court's Ruling in*

13  Food Marketing Institute v. Argus Leader Media (Baranetsky Decl., Ex. 1). As such, Plaintiffs do

14  not ask the Court to "add to the Exemption 4 standard" as the government alleges, Gov. Reply Br.

15  at 5, but merely ask it to apply the test set forth in *Argus Leader*, which would find Diversity

16  Reports are not customarily confidential according to industry standards, let alone the companies'

17  own customs and other relevant factors like the government's past disclosures.

18        **b. Diversity Reports are not actually treated as confidential.**

19        Similarly, Diversity Reports are not *actually* treated as confidential by the companies at

20  issue. Nine of the ten federal contractors who continue to object to disclosure post some of the

21  identical diversity statistics on their company websites. DOL tries to diminish the significance of

22  these disclosures by detailing how one company's public diversity report contains only "28 data

23  points," Supplemental Declaration of D. Lissette Geán, Dkt. No. 34-1 ("Supp. Geán Decl."), at ¶

24  15, compared to the "more than 200 data points" found in its Diversity Report. *Id.* at ¶ 14. While

25

26

-9 -
OPP. TO DEF'S MOT. SUMM. J.; REP. IN SUPP. OF CROSS MOT. SUMM. J.

SER-193

1    it is true that not *every data point* has been made public, Gov. Reply Br. at 5, most have been—and

2    even this partial disclosure (of facts that are observable to all employees within the companies) is

3    enough to show Diversity Reports do not contain *actual* secrets according to *Argus Leader*.

4          *Argus Leader* is clear that records in that case were secret because the retailers "d[id] not

5    disclose store-level SNAP data" or "make it publicly available 'in any way'" and "[e]ven within a

6    company . . . only small groups of employees usually ha[d] access to it."  139 S. Ct. at 2363.

7    Similarly, courts have repeatedly held in other FOIA cases that when *some* information contained

8    in requested records is made public, the information should not be withheld under FOIA.  *See Inner*

9    *City Press/Community on the Move v. Bd. of Governors of Fed. Reserve Sys.*, 463 F.3d 239, 248

10   (2d Cir. 2006); *CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1154 (D.C. Cir. 1987) ("To the extent

11   that any data requested under FOIA are in the public domain, the submitter is unable to make any

12   claim to confidentiality"); *Watkins v. U.S. Bureau of Cust. & Border Protec.*, 643 F.3d 1189, 1196

13   (9th Cir. 2011) (same, quoting *CNA Fin. Corp.*).  While DOL tries to claim the publicly available

14   information must be "identical" to all the information contained in the withheld records for the

15   records to be disclosed under Exemption 4, Gov. Reply Br. at 4 (citing *Seife v. FDA*, No. 17-CV-

16   3960 (JMF), 2019 WL 1382724 (S.D.N.Y Mar. 27, 2019)), that claim is incorrect.[3]

17         Applying the *Argus Leader* principle to this case, it is clear that DOL should disclose the

18   withheld records.  *Argus Leader* makes clear once retailers disclose *any* information, or make it

19   "publicly available in 'any way,'" a company cannot argue that it actually treats the records as

20   confidential.  139 S. Ct. at 2362.  Given that all but one of these companies make available a

21   variety of the data points on their public websites, much of which is duplicative in the withheld

22

23   [3] In fact, *Seife v. FDA* supports Plaintiffs' position.  There, the court found that the FDA's
     redactions were overly broad, where the objecting company "conceded that over half of the sample
24   pages . . . contained improper redactions[,]" *id*. at *2, and thus ordered the FDA and objecting
     company to "re-review" and "re-redact," since *some* of the information in the documents was
25   publicly available and therefore could not be withheld under Exemption 4.  *Id*.

     -10 -
26   OPP. TO DEF'S MOT. SUMM. J.; REP. IN SUPP. OF CROSS MOT. SUMM. J.

SER-194

Diversity Reports, these records are not actually treated as secret, and so must be disclosed.

Additionally, unlike data that is stamped as confidential, or accessible to only a small subset of

employees, this information can be observed in real time by many at the company and is available

to all members of the public through public company websites. To withhold in full data that has

*actually been published* by these companies and is not "actually" confidential, Gov. Reply. Br. at

2, would defy the law as well as reason.

### c. Diversity Reports are not provided to the government under an assurance of secrecy.

DOL asserts that "there is ample evidence of an implied assurance of confidentiality in this

case," by pointing to declarations in which company representatives state they relied on a statement

made by the government that the information would be kept confidential "to the maximum extent

of the law." Gov. Reply Br. at 6. But that statement purportedly creating reliance is posted on the

EEOC's, and not the OFCCP's, website. EEOC, *EEO-1 Instruction Booklet*,

https://www.eeoc.gov/employers/eeo1survey/2007instructions.cfm (Dkt. No. 29-5, Ex. 3, at 24).

In addition to the fact that this statement was not made by the relevant agency, OFCCP clearly

states on its website and elsewhere that disclosure of Diversity Reports by OFCCP is possible, so

once again FOIA does not permit withholding.

While the EEOC is forbidden from disclosing Diversity Reports in response to FOIA

requests under Title VII of the Civil Rights Act of 1964, *see id.*, this restriction does not apply to

OFCCP. Instead, OFCCP's website clearly states that the records are subject to FOIA. OFCCP,

*Freedom of Information Act (FOIA) Frequently Asked Questions*,

https://www.dol.gov/ofccp/regs/compliance/faqs/foiafaqs.htm (stating records may be disclosed)

(Dkt. No. 29-5, Ex. 5, at 39-40). While the government is correct in noting that, under *Argus

Leader*, "an assurance need not be explicit," Gov. Reply Br. at 5, OFCCP cannot justifiably claim

that any assurance exists, even an implicit one, where OFCCP's website *explicitly* states that it

-11 -

OPP. TO DEF'S MOT. SUMM. J.; REP. IN SUPP. OF CROSS MOT. SUMM. J.

SER-195

1  cannot as a policy withhold Diversity Reports in response to FOIA requests.  OFCCP, *FOIA*

2  *Frequently Asked Questions* (stating OFCCP "engages in a case specific analysis when determining

3  whether or not to release information that a company asserts is protected by Exemption 4 of the

4  FOIA.") (Dkt. No. 29-1, Ex. 5, at 40).

5       The government further tries to sidestep the fact that OFCCP provides no assurance where

6  it reversed course and agreed with all companies that assented to disclosure.  It states that this

7  about-face "shows nothing more than that different companies take different approaches to

8  confidentiality and have different views [and] perspectives regarding the harm from release."  Gov.

9  Reply Br. at 6.  But this explanation ignores the fact that the agency is tasked with making

10  determinations as to whether information can properly be withheld under a FOIA exemption.  5

11  U.S.C. § 552(a)(4)(B); *see also Lahr v. Nat'l Transp. Safety Bd.*, 569 F.3d 964, 973 (9th Cir. 2009)

12  (quoting *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991)), and here the agency repeatedly

13  chose to disclose Diversity Reports.  While it is unclear whether OFCCP engaged in the required

14  "case-specific analysis" in this case, OFCCP, *FOIA Frequently Asked Questions*, it is patently

15  obvious that the agency has made no assurances of confidentiality—implied or express.

16              **3.  Diversity Reports Are Withheld to Avoid Embarrassment.**

17       Given Diversity Reports are neither commercial, nor are they actually or customarily

18  confidential, and no assurance of confidentiality exists, Plaintiffs questioned why else records may

19  be withheld.  The declarations and revelations from the public domain show that the disclosure

20  may likely lead to public embarrassment for the objecting companies.  *See* Pls. Br. at 28; *see also*

21  Will Evans & Sinduja Rangarajan, *Oracle and Palantir Said Diversity Figures Were Trade*

22  *Secrets. The Real Secret: Embarrassing Numbers*, REVEAL, Jan. 7, 2019,

23  https://www.revealnews.org/article/oracle-and-palantir-said-diversity-figures-were-trade-secrets-

24  the-real-secret-embarrassing-numbers/ (stating that Synnex also expressed concerns about "public

25

26  <div align="center">-12 -</div>

OPP. TO DEF'S MOT. SUMM. J.; REP. IN SUPP. OF CROSS MOT. SUMM. J.

SER-196

1  relations harms" if their Diversity Reports were disclosed) (Baranetsky Decl., Ex. 3); Megan Rose

2  Dickey, *The Future of Diversity and Inclusion in Tech*, TECHCRUNCH, June 17, 2019,

3  https://techcrunch.com/2019/06/17/the-future-of-diversity-and-inclusion-in-tech/ (describing

4  diversity scandals at technology companies and noting "[c]ompanies are treating it as a PR crisis")

5  (Baranetsky Decl., Ex. 4).

6        Defendant does not address these points and merely counters that Plaintiffs rely on only one

7  company's declaration for this proposition.  Gov. Reply Br. at 6.  But the public domain is replete

8  with insight suggesting the objecting companies are solely concerned with reputational damage.

9  This Court has disapproved of attempts to use Exemption 4 to withhold documents because they

10  will subject a company to embarrassment, *Martech USA, Inc. v. Reich*, No. C-93-4137 EFL, 1993

11  WL 1483700, at *2 (N.D. Cal. Nov. 24, 1993), and has recently expressed wariness of disclosures

12  "only when it ma[kes] [a company] look good."  *Am. Small Bus. League v. U.S. Dep't of Def.*, C

13  18-01979 WHA, 2019 WL 4416613, at *2 (N.D. Cal. Sept. 15, 2019).

14  ### B.  The Foreseeable Harm Standard is Not Satisfied

15        DOL has failed to show that foreseeable harm is satisfied in this case, as is required by the

16  FIA.  *Machado Amadis v. U.S. Dep't of Justice*, 388 F. Supp. 3d 1, 20 (D.D.C. 2019).  The

17  government does not mention a single commercial or proprietary interest that would be harmed by

18  disclosure, Gov. Reply Br. at 7-8, but nonetheless says it has established the requisite particularity

19  to meet the foreseeable harm standard.  *Rosenberg v. U.S. Dep't of Def.*, 342 F. Supp. 3d 62, 78

20  (D.D.C. 2018).  Instead, DOL restates other harms alleged by the companies, such as "harm to

21  individual privacy," improbable in this case since Diversity Reports contain no personally

22  identifiable information, and "potential reputational harm," a harm Exemption 4 is not intended to

23  guard against.  *See supra* Section II.A.3.  Because the alleged harms will not relate in any way to

24  exemption-protected interests in this case, DOL has failed to meet the its burden under FIA.

25

26

-13 -
OPP. TO DEF'S MOT. SUMM. J.; REP. IN SUPP. OF CROSS MOT. SUMM. J.

SER-197

1    The government tries to avoid its obligation under the foreseeable harm standard by

2  contending that the FIA did not alter "the scope of Exemption 4," Gov. Reply Br. at 7, but the

3  cases it cites for this novel proposition do not support its claim.  In *Seife v. FDA*, the court deemed

4  it "prudent" to await the decision in *Argus Leader* before making its determination on FIA and

5  Exemption 4 issues.  2019 WL 1382724, at *1 n.1.  In staying the proceedings, the court in that

6  case simply allowed for the *possibility* that *Argus Leader* could impact its analysis, but it did not

7  hold that FIA would not apply in Exemption 4 cases.  Moreover, *Argus Leader* ultimately did not

8  impact the FIA standard, because that case concerned a pre-FIA request.[4]  The case law cited by

9  the government does not support its position, and the government fails to meet the requirements of

10  FIA by failing to provide any cognizable harm, an independent and additional burden an agency

11  must meet where an Exemption applies.

12    **C.  It Is Unclear Whether Defendant Conducted A Proper Search for Records.**

13    The government has failed to satisfy its burden to show it conducted an adequate search for

14  the requested records.  FOIA requires an agency responding to a request to "demonstrate that it has

15  conducted a search reasonably calculated to uncover all relevant documents."  *Zemansky v. EPA*,

16  767 F.2d 569, 571 (9th Cir. 1985); *see* 5 U.S.C. § 552(a)(3)(C).  The adequacy of the agency's

17  search is "judged by a standard of reasonableness."  *Citizens Comm'n on Human Rights v. Food &*

18  *Drug Admin.*, 45 F.3d 1325, 1328 (9th Cir. 1995).  While there is "no requirement that an

19  agency search every record system," the agency must conduct a good faith search of those systems

20  likely to possess requested records.  *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir.

21  1990); *see also Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 514 (D.C. Cir.

22  2011) ("An agency is required to perform more than a perfunctory search…").  To that end, the

23  ───────────────

[4] Similarly, DOL cites an additional case in which the government agency argued that the FIA
24  "does not alter the scope of the information covered by . . . exemption [4]," but the court in that
case did not accept the government's argument, resolving the matter on other grounds.  *Cause of*
25  *Action Inst. v. Dep't of Justice*, 330 F. Supp. 3d 336, 355 (D.D.C. 2018).

-14 -
26  OPP. TO DEF'S MOT. SUMM. J.; REP. IN SUPP. OF CROSS MOT. SUMM. J.

SER-198

responding agency typically submits affidavits that describe the scope and methods employed; these showings must be "'reasonably detailed, nonconclusory affidavits submitted in good faith.'" *Zemansky*, 767 F.2d at 571.

Here, no declaration shows that DOL performed an adequate search, let alone a reasonable one. The new declaration merely states that the companies "were not federal contractors in 2016." Supp. Geán Decl. ¶ 8. While a perfect search is not required, here, it seems the government did not even perform a perfunctory one for the companies it claims are not contractors. *Cf. Hamdan v. U.S. Dep't of Justice*, 797 F.3d 759, 772 (9th Cir. 2015) ("the Plaintiffs were entitled to a reasonable search for records, not a perfect one. *And a reasonable search is what they got*") (emphasis added). Courts find that an agency's failure "to describe in *any* detail what records were searched, by whom, and through what process[]" is fatal to its request for summary judgment. *Steinberg v. U.S. Dep't of Justice*, 23 F.3d 548, 552 (D.C. Cir. 1994) (same). Moreover, the lack of records for these "non-contractors" is surprising, considering that the OFCCP previously disclosed Diversity Reports for some of these companies for other calendar years. *See CIR v. U.S. Dep't of Labor (OFCCP)*, No. 3:18-cv-1008-JCS (N.D. Cal. 2018).

While Defendant tries to evade its burden by stating that Plaintiffs waived their argument as to the search, here Plaintiffs did not have full opportunity to do so, as the Defendant's responses were all preliminary, not final determinations. *See* Dkt. Nos. 1-3, 1-4, 1-5. Regardless, courts are generally unwilling to grant these, particularly where all arguments were brought before the district court. *Yonemoto v. U.S. Dep't of Veterans Affairs*, 686 F.3d 681, 692 (9th Cir. 2012).

### III.    CONCLUSION

For the foregoing reasons, the government's motion for summary judgment should be denied, and CIR's cross motion for summary judgment should be granted.

-15 -
OPP. TO DEF'S MOT. SUMM. J.; REP. IN SUPP. OF CROSS MOT. SUMM. J.

SER-199

DATED: November 12, 2019                    Respectfully submitted,

D. Victoria Baranetsky
THE CENTER FOR INVESTIGATIVE REPORTING
1400 65th St., Suite 200
Emeryville, CA 94608
vbaranetsky@revealnews.org
Telephone: (510) 982-2890

-16 -
Opp. to Def's Mot. Summ. J.; Rep. in Supp. of Cross Mot. Summ. J.

SER-200

# EXHIBIT E

CO= ES43564
u= ES43564

# EQUAL EMPLOYMENT OPPORTUNITY
## 2017 EMPLOYER INFORMATION REPORT
## CONSOLIDATED REPORT - TYPE 2

**SECTION B - COMPANY IDENTIFICATION**

1. PANDORA MEDIA INC
2100 FRANKLIN STREET
SUITE 700
OAKLAND, CA 94612

c. Y

2.a. PANDORA MEDIA INC
2100 FRANKLIN STREET
SUITE 700
OAKLAND, CA 94612
ALAMEDA COUNTY

**SECTION C - TEST FOR FILING REQUIREMENT**

1-Y 2-N 3-Y DUNS NO.:131637105 EIN :943352630

**SECTION E - ESTABLISHMENT INFORMATION**

**SECTION D - EMPLOYMENT DATA**

| JOB CATEGORIES | HISPANIC OR LATINO Male | HISPANIC OR LATINO Female | NOT-HISPANIC OR LATINO MALE White | Black or African American | Native Hawaiian or Pacific Islander | Asian | American Indian or Alaskan Native | Two or More Races | NOT-HISPANIC OR LATINO FEMALE White | Black or African American | Native Hawaiian or Pacific Islander | Asian | American Indian or Alaskan Native | Two or More Races | OVERALL TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EXECUTIVE/SR. OFFICIALS & MGRS | 1 | 1 | 23 | 0 | 1 | 3 | 0 | 0 | 9 | 0 | 0 | 0 | 0 | 0 | 38 |
| FIRST/MID OFFICIALS & MGRS | 16 | 4 | 177 | 6 | 0 | 36 | 1 | 11 | 132 | 9 | 1 | 30 | 1 | 6 | 430 |
| PROFESSIONALS | 43 | 45 | 346 | 28 | 1 | 132 | 0 | 36 | 306 | 33 | 6 | 99 | 0 | 25 | 1101 |
| TECHNICIANS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SALES WORKERS | 10 | 13 | 83 | 4 | 0 | 6 | 1 | 3 | 16 | 6 | 1 | 2 | 0 | 1 | 68 |
| ADMINISTRATIVE SUPPORT | 7 | 11 | 10 | 2 | 0 | 7 | 0 | 0 | 161 | 7 | 0 | 7 | 0 | 11 | 301 |
| CRAFT WORKERS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| OPERATIVES | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| LABORERS & HELPERS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SERVICE WORKERS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 77 | 74 | 639 | 40 | 2 | 184 | 2 | 50 | 624 | 55 | 8 | 138 | 2 | 43 | 1938 |
| PREVIOUS REPORT TOTAL | 95 | 83 | 793 | 55 | 2 | 205 | 1 | 60 | 724 | 47 | 8 | 165 | 3 | 60 | 2301 |

**SECTION F - REMARKS**

DATES OF PAYROLL PERIOD: 11/20/2017 THRU 12/03/2017

**SECTION G - CERTIFICATION**

CERTIFYING OFFICIAL:
ADELMISE WARNER
Milly McInnis

TITLE: LEAD COUNSEL EMPLOYMENT

EEO-1 REPORT CONTACT PERSON:
EMAIL: mmcinnis@pandora.com

TITLE: Sr People operations manager
TELEPHONE NO: 5107420432

CERTIFIED DATE/EST1:02/26/2018 11:56 PM

# EXHIBIT F



# Federal Contract Compliance Manual (FCCM)



**www.dol.gov/agencies/ofccp**

Federal Contract Compliance Manual (FCCM)

## TABLE OF CONTENTS

INTRODUCTION ...........................................................................................1

**CHAPTER 1 DESK AUDIT** .............................................................................**3**

1A      INTRODUCTION ...................................................................................3
        1A00   TYPES OF COMPLIANCE EVALUATIONS .......................................3
        1A01   CONTENTS OF CHAPTER ..........................................................5
        1A02   PURPOSE OF THE DESK AUDIT ...............................................5
        1A03   PRINCIPLES AND FOCUS OF DESK AUDITS ..............................5
        1A04   USE OF THE STANDARD COMPLIANCE EVALUATION REPORT .............6
        1A05   CASE MANAGEMENT SYSTEM ..................................................7
        1A06   CONFIDENTIALITY OF INFORMATION .......................................8
        1A07   NOVEL ISSUES ......................................................................8
        1A08   CORPORATE MANAGEMENT COMPLIANCE EVALUATIONS .................9
        1A09   FUNCTIONAL AFFIRMATIVE ACTION PROGRAMS ..........................9
        1A10   PREAWARD COMPLIANCE EVALUATIONS ....................................9
        1A11   EDUCATIONAL INSTITUTION EVALUATIONS ................................9

1B      PRE-DESK AUDIT ACTIONS ................................................................11
        1B00   INITIAL CONTACT WITH THE CONTRACTOR ..............................11
        1B01   PREPARATION AND MAINTENANCE OF THE CASE CHRONOLOGY
               LOG .................................................................................12
        1B02   CREATION AND MAINTENANCE OF THE CASE FILE ......................13
        1B03   SENDING THE SCHEDULING LETTER AND ITEMIZED LISTING ...........16
        1B04   FOLLOW-UP CONTACT WITH CONTRACTOR AND JURISDICTION
               CHALLENGES ......................................................................16
        1B05   CONTACTING EEOC, VETS AND OTHER AGENCIES ......................17
        1B06   INFORMATION ON COMPLAINTS FILED WITH OR BY OTHER
               AGENCIES .........................................................................18
        1B07   RELATIONSHIP OF OFCCP COMPLIANCE ACTIVITIES TO LITIGATION
               OR COURT ORDERS ..............................................................19
        1B08   REVIEW OF COMMUNITY RESOURCE FILES ...............................19
        1B09   REVIEW OF PREVIOUS COMPLIANCE ACTIONS ...........................19

1C      RECEIPT OF AAPs AND ITEMIZED LISTING DATA FOR DESK AUDIT ...............20
        1C00   NONRECEIPT OF AAPs ..........................................................20
        1C01   NONRECEIPT OF ITEMIZED LISTING DATA .................................20
        1C02   REGULATORY CITATIONS FOR RECORDKEEPING .........................21
        1C03   EVALUATION PERIOD ...........................................................23
        1C04   ADDITIONAL DATA REQUESTS ................................................23

1D      REVIEW OF AAPs: OVERVIEW .............................................................24

Federal Contract Compliance Manual (FCCM)

1E    REVIEW OF ALL AAPs AND ITEMIZED LISTING DATA TO ENSURE
      SUBMISSIONS INCLUDE REQUIRED CONTENT ........................................25
      1E00   ACTION WHEN AAP IS NOT CURRENT ........................................25
      1E01   INCLUSION ........................................................................25
      1E02   MISSING AAP ELEMENTS ..................................................25
      1E03   MISSING ITEMIZED LISTING DATA ......................................28

1F    REVIEW OF AN EXECUTIVE ORDER AAP AND ITEMIZED LISTING
      DATA FOR ACCEPTABILITY ..............................................................28
      1F00   ORGANIZATIONAL PROFILE ..............................................29
      1F01   JOB GROUPS ....................................................................30
      1F02   EXECUTIVE ORDER UTILIZATION ANALYSIS ........................32
      1F03   PLACEMENT GOALS ..........................................................34
      1F04   ADDITIONAL REQUIRED ELEMENTS OF AN EXECUTIVE
             ORDER AAP ....................................................................34
      1F05   REVIEW OF EXECUTIVE ORDER ITEMIZED LISTING DATA FOR
             ACCEPTABILITY ..............................................................36

1G    REVIEW OF A SECTION 503 AAP AND ITEMIZED LISTING DATA FOR
      ACCEPTABILITY ..............................................................................40
      1G00   ITEMS INCLUDED ............................................................40
      1G01   POLICY STATEMENT ........................................................40
      1G02   CONTRACTOR REVIEW OF PERSONNEL PROCESSES ..............41
      1G03   CONTRACTOR REVIEW OF PHYSICAL AND MENTAL
             QUALIFICATIONS ............................................................41
      1G04   REASONABLE ACCOMMODATION TO PHYSICAL AND MENTAL
             LIMITATIONS ..................................................................42
      1G05   HARASSMENT ..................................................................43
      1G06   EXTERNAL DISSEMINATION OF EEO POLICY ........................43
      1G07   OUTREACH AND POSITIVE RECRUITMENT ............................43
      1G08   INTERNAL DISSEMINATION OF EEO POLICY ........................44
      1G09   AUDIT AND REPORTING SYSTEM ......................................44
      1G10   OFFICIAL RESPONSIBLE FOR AAP IMPLEMENTATION ............44
      1G11   TRAINING TO ENSURE AAP IMPLEMENTATION ......................45
      1G12   DATA COLLECTION ANALYSIS ..........................................45
      1G13   UTILIZATION GOAL ANALYSIS FOR INDIVIDUALS WITH
             DISABILITIES ................................................................45

1H    REVIEW OF A VEVRAA AAP AND ITEMIZED LISTING DATA FOR
      ACCEPTABILITY ..............................................................................46
      1H00   ITEMS INCLUDED ............................................................46
      1H01   POLICY STATEMENT ........................................................46
      1H02   CONTRACTOR REVIEW OF PERSONNEL PROCESSES ..............47
      1H03   CONTRACTOR REVIEW OF PHYSICAL AND MENTAL
             QUALIFICATIONS ............................................................48
      1H04   REASONABLE ACCOMMODATION TO PHYSICAL AND MENTAL
             LIMITATIONS ..................................................................48

Federal Contract Compliance Manual (FCCM)

1H05   HARASSMENT ...................................................................49
1H06   EXTERNAL DISSEMINATION OF EEO POLICY ...........................49
1H07   OUTREACH AND POSITIVE RECRUITMENT ..............................49
1H08   INTERNAL DISSEMINATION OF EEO POLICY ...........................50
1H09   AUDIT AND REPORTING SYSTEM .......................................50
1H10   OFFICIAL RESPONSIBLE FOR AAP IMPLEMENTATION...............50
1H11   TRAINING TO ENSURE AAP IMPLEMENTATION.......................51
1H12   DATA COLLECTION ANALYSIS..........................................51
1H13   VEVRAA HIRING BENCHMARK .........................................51

1I      SUMMARY OF ACCEPTABILITY PROBLEMS WITH AAPs AND
        ITEMIZED LISTING DATA ...............................................53

1J      ANALYSIS OF SECTION 503 AAP: REVIEW OF ONLINE APPLICATION
        PROCESS ..................................................................53

1K      ANALYSIS OF AN EXECUTIVE ORDER 11246 AAP: OVERVIEW OF
        ITEMIZED LISTING DATA, EEO TRENDS, WORKFORCE STRUCTURE
        AND PERSONNEL PRACTICES ............................................54
        1K00   EEO-1 TREND ANALYSIS .........................................54
        1K01   WORKFORCE STRUCTURE AND PERSONNEL PRACTICES.............55

1L      ANALYSIS OF AN EXECUTIVE ORDER 11246 AAP:  GOALS PROGRESS
        AND GOOD FAITH EFFORTS ..............................................56
        1L00   ANALYSIS OF GOALS PROGRESS .................................56
        1L01   EVALUATION OF GOOD FAITH EFFORTS ..........................57
        1L02   PLAN FOR EVALUATION OF GOOD FAITH EFFORTS...............57

1M      BASIS FOR POTENTIAL DISCRIMINATION ANALYSES ...................58

1N      ANALYSIS OF AN EXECUTIVE ORDER 11246 AAP: AUDIT OF
        ORGANIZATIONAL PROFILE...............................................58
        1N00   UNDERREPRESENTATIONS AND CONCENTRATIONS...............59
        1N01   DETERMINING THE RELEVANT WORKFORCE SECTOR AND JOB
               AREAS .......................................................59
        1N02   ANALYSIS BASED ON A PARTICULAR RACE OR ETHNICITY ............61

1O      ANALYSIS OF EXECUTIVE ORDER 11246 EMPLOYMENT ACTIVITY
        DATA ......................................................................62
        1O00   CONDUCTING STATISTICAL ANALYSES OF EXECUTIVE
               ORDER 11246 EMPLOYMENT ACTIVITY DATA ....................62
        1O01   SPECIFIC RACE AND ETHNIC GROUP ANALYSIS ..................63
        1O02   PROPER USE OF PRELIMINARY STATISTICAL RESULTS..............63
        1O03   STATISTICAL ANALYSIS SUMMARY ...............................63

1P      COMPENSATION ANALYSIS ................................................65
        1P00   GENERAL PRINCIPLES OF COMPENSATION DATA ANALYSIS .............66
        1P01   ITEMIZED LISTING DATA ON COMPENSATION......................67
        1P02   DESCRIPTIVE ANALYSIS OF COMPENSATION.......................67

Federal Contract Compliance Manual (FCCM)

      1P03   SYSTEMIC STATISTICAL ANALYSIS OF COMPENSATION AT DESK AUDIT ..................................................................................................68

      1P04   CONCLUDING DESK AUDIT COMPENSATION ANALYSIS ......................69

1Q    SCER SUMMARY OF POTENTIAL DISCRIMINATION AREAS AND ONSITE INVESTIGATIVE PLAN (ALL LAWS)............................................69

1R    CONCLUSION OF THE DESK AUDIT .................................................................70

      1R00   DOCUMENTS FOR CLOSING COMPLIANCE EVALUATION AFTER THE DESK AUDIT ....................................................................................70

      1R01   REASONS TO PROCEED WITH ON-SITE REVIEW ......................................71

      1R02   COMPLETING APPROPRIATE SCER PAGES ................................................71

**CHAPTER 2 ON-SITE REVIEW ..........................................................................................72**

2A    INTRODUCTION ........................................................................................................72

2B    DETERMINING THE NEED FOR AN ON-SITE REVIEW.........................................73

2C    ON-SITE REVIEW PREPARATION.......................................................................74

      2C00   PROHIBITION AGAINST RETALIATION.......................................................74

      2C01   USE OF THE STANDARD COMPLIANCE EVALUATION REPORT AND INFORMATION MANAGEMENT ..................................................................75

      2C02   HISTORICAL DATA AND COMPLAINT HISTORY .....................................76

      2C03   ON-SITE PLAN.................................................................................................77

      2C04   NOTICE OF THE ON-SITE DATE AND REQUESTS FOR ADDITIONAL INFORMATION.................................................................................................77

2D    ON-SITE PROCESS..................................................................................................78

      2D00   ENTRANCE CONFERENCE ..........................................................................78

      2D01   FACILITY INSPECTION ................................................................................79

      2D02   COLLECTING INFORMATION: ACCESS TO CONTRACTOR RECORDS ..80

      2D03   MANAGEMENT AND NONMANAGEMENT INTERVIEWS ........................81

      2D04   EXIT CONFERENCE ......................................................................................82

      2D05   RETURN ON-SITE REVIEW AND DENIAL OF ACCESS..............................82

2E    COLLECTING INFORMATION FOR ANALYSIS .................................................82

      2E00   TYPES OF EVIDENCE ...................................................................................83

      2E01   PERSONNEL ACTIVITY AND SELECTION PROCESS................................84

      2E02   SELECTION PROCEDURES AND TESTING .................................................85

      2E03   COMPENSATION ............................................................................................86

2F    INTERVIEWS ...........................................................................................................89

      2F00   GENERAL INTERVIEW PRINCIPLES AND PROCEDURES ........................89

      2F01   MANAGEMENT INTERVIEWS .....................................................................93

      2F02   EMPLOYEE INTERVIEWS.............................................................................93

      2F03   ISSUES THAT ARISE DURING THE ON-SITE REVIEW.............................94

2G    EXECUTIVE ORDER 11246 AAP REQUIREMENTS.................................................94

Federal Contract Compliance Manual (FCCM)

2G00   EXECUTIVE ORDER 11246 AAP AND ITEMIZED LISTING DATA
PROBLEMS ............................................................................94
2G01   DESIGNATION OF RESPONSIBILITY FOR THE AAP.............................95
2G02   IDENTIFICATION OF PROBLEM AREAS: WHERE IMPEDIMENTS TO
EQUAL EMPLOYMENT OPPORTUNITY EXIST ...........................95
2G03   ACTION-ORIENTED PROGRAMS TO CORRECT PROBLEM AREAS ........96
2G04   EVALUATION OF GOOD FAITH EFFORTS......................................96
2G05   INTERNAL AUDIT AND REPORTING SYSTEM TO MEASURE
EFFECTIVENESS OF TOTAL AFFIRMATIVE ACTION PROGRAM...........99

2H   SECTION 503 AAP AND ADDITIONAL REQUIREMENTS ........................99
2H00   SECTION 503 AAP AND ITEMIZED LISTING DATA SUBMISSIONS .......100
2H01   AVAILABILITY OF AAP FOR INSPECTION................................104
2H02   INVITATION TO SELF-IDENTIFY AS AN INDIVIDUAL WITH A
DISABILITY ........................................................................104
2H03   DISABILITY-RELATED INQUIRIES, MEDICAL EXAMS, AND
CONFIDENTIALITY OF DISABILITY INFORMATION ..............................106

2I   VEVRAA AAP AND ADDITIONAL REQUIREMENTS ...........................107
2I00   VEVRAA AAP AND ITEMIZED LISTING DATA SUBMISSIONS ..............108
2I01   AVAILABILITY OF AAP FOR INSPECTION................................112
2I02   INVITATION TO SELF-IDENTIFY AS A PROTECTED VETERAN ...........112

2J   RELIGION AND NATIONAL ORIGIN REQUIREMENTS .........................114
2J00   CONTRACTOR POLICY AND IMPLEMENTATION...........................114
2J01   RELIGIOUS ACCOMMODATION .............................................114
2J02   POTENTIAL HARASSMENT AND DISCRIMINATION .....................115
2J03   COMMUNITY CONTACTS ....................................................116

2K   COMPLIANCE WITH SEX DISCRIMINATION REGULATIONS ...........116
2K00   DISCRIMINATION ON THE BASIS OF PREGNANCY ................117
2K01   REVIEW OF CONTRACTOR POLICIES AND
IMPLEMENTATION..........................................................117
2K02   LEAVE AND FRINGE BENEFITS.............................................119
2K03   SEXUAL HARASSMENT......................................................121

2L   EQUAL OPPORTUNITY CLAUSES AND OTHER REQUIREMENTS...............121
2L00   EQUAL OPPORTUNITY CLAUSES AND OTHER REQUIREMENTS OF
EXECUTIVE ORDER 11246, VEVRAA AND SECTION 503 .......122
2L01   EXECUTIVE ORDER 13496 REQUIREMENTS.............................125
2L02   RECORDKEEPING ..............................................................126

2M   EMPLOYMENT ACTIVITY DATA REQUIREMENTS............................126
2M00   ANALYZING THE SELECTION PROCESS .................................127
2M01   DISTINGUISHING OBJECTIVE FROM SUBJECTIVE SELECTION
CRITERIA .........................................................................128
2M02   ANALYSIS OF OBJECTIVE CRITERIA.......................................129
2M03   ANALYSIS OF OBJECTIVE CRITERIA FOR ADVERSE IMPACT.............130

Federal Contract Compliance Manual (FCCM)

2M04 ANALYSIS OF SUBJECTIVE CRITERIA AND DETERMINATION OF ADVERSE IMPACT ...................................................................130
2M05 JUSTIFICATION OF SELECTION PROCEDURES WHEN ADVERSE IMPACT IS IDENTIFIED..................................................................131

2N LINKAGE AGREEMENTS........................................................................132
2N00 LINKAGE OBJECTIVES ........................................................132
2N01 LINKAGE REQUIREMENTS...................................................132
2N02 IMPLEMENTATION UNDER EXECUTIVE ORDER 11246 ........................132
2N03 WHERE LINKAGE AGREEMENTS ARE NOT REQUIRED (EXECUTIVE ORDER 11246 Only) ..........................................133
2N04 LINKAGE AGREEEMENTS FOR INDIVIDUALS WITH DISABILITIES AND PROTECTED VETERANS ................................................133
2N05 CONFIRMATION OF LINKAGE AGREEMENT ...........................134

2O ON-SITE REVIEW SUMMARY OR REPORT WRITING...........................................134
2O00 SUMMARY OF FINDINGS ......................................................134

**CHAPTER 3 CONSTRUCTION INDUSTRY COMPLIANCE PROGRAM.....................136**

3A INTRODUCTION ........................................................................................136

3B COVERAGE AND CONTRACT CLAUSES................................................136
3B00 REGULATIONS APPLICABLE TO CONSTRUCTION CONTRACTORS....137
3B01 REQUIRED BID SOLICITATION NOTICE AND CONTRACT SPECIFICATIONS FOR CONSTRUCTION CONTRACTS ...........................137
3B02 REQUIRED EQUAL OPPORTUNITY CONTRACT CLAUSES FOR CONSTRUCTION CONTRACTS.................................................138
3B03 SUPPORT FROM OTHER AGENCIES RELATED TO CONSTRUCTION CONTRACTORS ......................................................139
3B04 MEGA CONSTRUCTION PROJECTS..............................................140

3C GENERAL PRINCIPLES APPLICABLE TO THE CONSTRUCTION INDUSTRY ........................................................................................141
3C00 EXECUTIVE ORDER GOALS ................................................141
3C01 PRECONSTRUCTION CONFERENCES.........................................142
3C02 NOTICE OF SUBCONTRACT AWARDS ......................................142

3D THE COMPLIANCE REVIEW PROCESS ................................................143

3E PRE-REVIEW PREPARATION: SCHEDULING AND COORDINATION WITH OTHER AGENCIES ...................................................................144
3E00 INITIAL CONTACT WITH THE CONTRACTOR AND SCHEDULING ......144
3E01 PREPARATION AND MAINTENANCE OF THE CASE CHRONOLOGY LOG ...........................................................144
3E02 CREATION AND MAINTENANCE OF THE CASE FILE............................145
3E03 CONTACTING EEOC, VETS AND OTHER AGENCIES ..........................146
3E04 INFORMATION ON EEO COMPLAINTS FILED WITH OR BY OTHER AGENCIES..........................................................................147

Federal Contract Compliance Manual (FCCM)

  3E05 REVIEW OF COMMUNITY RESOURCE FILES ..........................148
  3E06 REVIEW OF OFCCP COMPLIANCE ACTIONS.............................148
  3E07 INTERAGENCY COORDINATION FHWA....................................148

3F  ON-SITE REVIEW PROCESS OVERVIEW ..................................................149

3G  ENTRANCE CONFERENCE ........................................................................149

3H  EXECUTIVE ORDER 11246 REVIEW OF RECORDS ..............................150
  3H00 PAYROLL RECORDS....................................................................150
  3H01 EMPLOYMENT ACTIVITY RECORDS ..........................................151
  3H02 COLLECTIVE BARGAINING AGREEMENT ..................................151
  3H03 INCLUSION OF THE EQUAL OPPORTUNITY CLAUSE IN
     SUBCONTRACTS ........................................................................151
  3H04 REVIEW OF PERSONNEL POLICIES FOR SEX DISCRIMINATION..........152

3I  EVALUATION OF IMPLEMENTATION OF AFFIRMATIVE ACTION STEPS
  SET FORTH IN 41 CFR 60-4.3(a) PARAGRAPH 7......................................153
  3I00 EVALUATION OF RECRUITMENT PRACTICES ..........................154
  3I01 EVALUATION OF TRAINING ......................................................156
  3I02 EVALUATION OF EEO POLICY IMPLEMENTATION ................157
  3I03 EVALUATION OF PERSONNEL OPERATIONS ..........................160
  3I04 EVALUATION OF CONTRACTING ACTIVITY ..........................162

3J  INTERVIEWS ...............................................................................................163

3K  PHYSICAL INSPECTION OF CONTRACTOR WORKSITES...................163
  3K00 INVESTIGATION OF COMPLIANCE..........................................164
  3K01 COMPLIANCE WITH EXECUTIVE ORDER 13496 ....................164

3L  COMPLIANCE WITH SEX DISCRIMINATION REGULATIONS ...........165

3M  COMPLIANCE WITH RELIGION AND NATIONAL ORIGIN GUIDELINES .........165

3N  COMPLIANCE WITH VEVRAA AND SECTION 503 ..............................165

3O  IDENTIFICATION AND RESOLUTION OF EMPLOYMENT
  DISCRIMINATION ......................................................................................167

3P  EXIT CONFERENCE ....................................................................................167

3Q  STANDARD CONSTRUCTION COMPLIANCE EVALUATION REPORT ............167
  3Q00 PURPOSE AND CONTENT OF THE SCER................................167
  3Q01 SUMMARY OF FINDINGS ..........................................................169

3R  NOTIFICATION OF COMPLIANCE REVIEW RESULTS AND RESOLUTION
  OF VIOLATIONS ........................................................................................170

3S  EXAMPLES OF COMMON VIOLATIONS.................................................170

Federal Contract Compliance Manual (FCCM)

3T      REVIEW COMPLETION LETTER ..........................................................................172

3U      REFERRAL FOR ENFORCEMENT........................................................................172

**CHAPTER 4 CORPORATE MANAGEMENT COMPLIANCE EVALUATIONS ..........173**

4A      INTRODUCTION .................................................................................................173
        4A00   PURPOSE OF CMCEs.................................................................................173
        4A01   SCOPE OF CMCE........................................................................................174
        4A02   CONFIDENTIALITY..................................................................................175

4B      PRE-DESK AUDIT ACTIONS..............................................................................176
        4B00   FOLLOW-UP CONTACT WITH CONTRACTOR ...................................176
        4B01   CORPORATION BACKGROUND RESEARCH .............................................176
        4B02   SEARCH FOR PUBLISHED REPORTS ....................................................176
        4B03   RETRIEVAL OF "FORM 10-K" REPORTS.....................................................177
        4B04   RETRIEVAL OF EEO-1 REPORTS..............................................................177
        4B05   OFCCP COMPLIANCE HISTORY REPORTS ..........................................179
        4B06   CONTACTING EEOC, VETS AND OTHER AGENCIES ..............................179
        4B07   FOLLOW-UP AND USE OF INFORMATION ON COMPLAINTS FILED
               WITH OR BY OTHER AGENCIES................................................................179
        4B08   RELATIONSHIP OF OFCCP COMPLIANCE ACTIVITIES TO EEO
               LITIGATION OR COURT ORDERS..............................................................180
        4B09   REVIEW OF COMMUNITY RESOURCE FILES.........................................180
        4B10   REVIEW OF PAST OFCCP COMPLIANCE ACTIONS ...................................180
        4B11   EVALUATION AND ANALYSIS OF CORPORATE INFORMATION .........181
        4B12   EVALUATION OF EEO-1 REPORTS..............................................................183

4C      RELATIONSHIP TO THE STANDARD DESK AUDIT ...........................................183

4D      DESK AUDIT – REVIEW OF THE ORGANIZATIONAL PROFILE, JOB
        GROUP ANALYSIS AND UTILIZATION ANALYSIS ...........................................184
        4D00   ANALYSIS OF NONFAVORED GROUPS' MANAGEMENT LEVEL
               PARTICIPATION ........................................................................................184
        4D01   ANALYSIS OF FUNCTIONAL AREAS ........................................................186

4E      DESK AUDIT: AAP AND EMPLOYMENT ACTIVITY INFORMATION
        DURING A REVIEW OF SELECTION PROCESSES AND
        DEVELOPMENTAL PROGRAMS..............................................................................188

4F      NOTICE OF ON-SITE REVIEW AND FOLLOW-UP DATA REQUESTS.................189

4G      ON-SITE REVIEW ....................................................................................................190
        4G00   ENTRANCE CONFERENCE ........................................................................190
        4G01   CORPORATE CULTURE ..............................................................................191
        4G02   INTERVIEWS ................................................................................................192

4H      ON-SITE: FILLING OF MANAGEMENT JOBS .........................................................193
        4H00   GENERAL QUALIFICATION STANDARDS................................................193

Federal Contract Compliance Manual (FCCM)

4H01  EXTERNAL HIRES ........................................................................195
4H02  SOURCES OF APPLICANTS AND CANDIDATES ....................................195
4H03  SAMPLE QUESTIONS AND ANALYSIS FOR VARIOUS SEARCH
      SOURCES ..........................................................................................196
4H04  INTERNAL DEVELOPMENT ............................................................198
4H05  MANAGEMENT TRAINING AND EXECUTIVE DEVELOPMENT ............209
4H06  MENTORING AND NETWORKING ....................................................210

4I    ON-SITE: RETENTION ....................................................................212
4I00  OVERVIEW OF TOTAL COMPENSATION PACKAGES ...........................212
4I01  RECOGNITION:  AWARDS AND HONORS ...................................216

4J    ON-SITE: TERMINATIONS ..............................................................217

4K    COMPLETION OF COMPLIANCE EVALUATION: EXIT CONFERENCE,
      REPORT WRITING AND NOTICE OF EVALUATION ...........................217
4K00  NOTICE OF EVALUATION COMPLETION ...................................217

**CHAPTER 5 FUNCTIONAL AFFIRMATIVE ACTION PROGRAM
COMPLIANCE EVALUATIONS ..................................................................219**

5A    INTRODUCTION ............................................................................219
5A00  APPLICABILITY OF CHAPTER ........................................................219
5A01  PURPOSE OF THE FAAP ...............................................................219
5A02  THE FAAP AGREEMENT ...............................................................219
5A03  FAAP COMPLIANCE EVALUATIONS ...............................................220
5A04  COMPLETING THE SCER ..............................................................220
5A05  OFCCP PARTICIPANTS IN FAAP COMPLIANCE EVALUATIONS ...........220

5B    PRE-DESK AUDIT ACTIONS ...........................................................221
5B00  CREATION AND MAINTENANCE OF THE CASE FILE............................221
5B01  SENDING THE SCHEDULING LETTER AND ITEMIZED LISTING...........221
5B02  FOLLOW-UP CONTACT WITH CONTRACTOR ...................................222
5B03  OFCCP COMPLIANCE HISTORY REPORTS ......................................222
5B04  CONTACTING EEOC, VETS AND OTHER AGENCIES .........................222

5C    DESK AUDIT ................................................................................223
5C00  REVIEW OF SECTION 503 AND VEVRAA AAPs .........................224

5D    ON-SITE ....................................................................................224

5E    COMPLIANCE EVALUATION COMPLETION ...................................225

**CHAPTER 6 COMPLAINT INVESTIGATION ..................................................226**

6A    INTRODUCTION ...........................................................................226

6B    BASES OF COMPLAINT ALLEGATIONS............................................226
6B01  EXECUTIVE ORDER 11246 ALLEGATIONS.......................................226
6B02  VEVRAA AND SECTION 503 ALLEGATIONS............................227

Federal Contract Compliance Manual (FCCM)

| | 6B03 | RETALIATION, INTIMIDATION, AND INTERFERENCE ALLEGATIONS | 228 |
| | 6B04 | EXECUTIVE ORDER 13496 INVESTIGATIONS | 229 |
| 6C | | COMPLAINT RECEIPT AND PERFECTION | 229 |
| | 6C00 | RECEIPT OF COMPLAINTS | 229 |
| | 6C01 | WHO MAY FILE A COMPLAINT | 229 |
| | 6C02 | PROVIDING CONTRACTOR THE 10-DAY NOTICE LETTER | 230 |
| | 6C03 | COMPLAINT PERFECTION | 230 |
| 6D | | INVESTIGATING THE COMPLAINT | 232 |
| | 6D01 | TIMELY COMPLETION OF INVESTIGATION | 232 |
| | 6D02 | CORRESPONDENCE | 232 |
| | 6D03 | NOTIFYING THE CONTRACTOR AND COMPLAINANT THAT OFCCP WILL INVESTIGATE THE COMPLAINT | 233 |
| | 6D04 | COUNSEL OR OTHER REPRESENTATION | 233 |
| | 6D05 | CASE FILE | 234 |
| | 6D06 | OFCCP CMS | 237 |
| 6E | | TYPES OF COMPLAINT ALLEGATIONS | 237 |
| | 6E00 | APPROACH TO INVESTIGATING COMPLAINT ALLEGATIONS | 237 |
| | 6E01 | INVESTIGATIVE FRAMEWORK | 238 |
| | 6E02 | SYSTEMIC ALLEGATIONS | 238 |
| | 6E03 | HARASSMENT | 239 |
| | 6E04 | RETALIATION AND INTERFERENCE | 239 |
| | 6E05 | ALLEGATIONS SPECIFIC TO EXECUTIVE ORDER 11246 | 240 |
| | 6E06 | ALLEGATIONS SPECIFIC TO DISABILITY COMPLAINTS | 240 |
| | 6E07 | ALLEGATIONS SPECIFIC TO VEVRAA (NONDISABILITY) COMPLAINTS | 244 |
| | 6E08 | EQUAL OPPORTUNITY CLAUSE AND RECORDKEEPING REQUIREMENTS | 245 |
| | 6E09 | NOVEL ISSUES | 245 |
| 6F | | INVESTIGATIVE PLAN | 246 |
| 6G | | INTERVIEWING THE COMPLAINANT BEFORE ON-SITE INVESTIGATION | 246 |
| 6H | | OBTAINING DOCUMENTARY EVIDENCE AND RECORDS PRIOR TO ON-SITE INVESTIGATION | 247 |
| | 6H00 | HISTORICAL DOCUMENTATION | 248 |
| | 6H01 | POLICIES AND PRACTICES | 248 |
| | 6H02 | OTHER DOCUMENTS RELEVANT TO THE COMPLAINT ALLEGATIONS | 248 |
| 6I | | ON-SITE INVESTIGATIONS | 249 |
| | 6I00 | NOTIFYING THE CONTRACTOR OF THE ON-SITE INVESTIGATION | 249 |
| | 6I01 | ON-SITE INVESTIGATION: ROAD MAP | 249 |

Federal Contract Compliance Manual (FCCM)

6I02    INTERVIEW PROCEDURES ........................................................251
6I03    GATHERING RELEVANT DATA AND CONDUCTING INTERVIEWS .....254
6I04    REVIEW OF RECORDS .................................................................265

6J    CONDUCTING ANALYSES AND THE INVESTIGATIVE REPORT .......................265

6K    USE OF A NOTIFICATION OF RESULTS OF INVESTIGATION ...........................266
6K00    SIGNATURES AND PROCEDURES ...............................................266
6K01    NOTICE TO LABOR UNION OF A VIOLATION FINDING........................266

6L    RESOLUTION OF THE COMPLAINT .....................................................266
6L00    SETTLEMENT BEFORE COMPLETION OF INVESTIGATION..................267
6L01    PRIOR TO ISSUING A NO VIOLATION NORI ................................267
6L02    CLOSURE OF COMPLAINT WITH NO VIOLATION NORI........................268
6L03    CLOSURE OF COMPLAINT AND ISSUANCE OF "NOTICE OF
            RIGHT-TO-SUE" UPON REQUEST ..........................................268
6L04    NOTICE ISSUED UPON ADMINISTRATIVE CLOSURE ...........................269
6L05    CLOSURE OF COMPLAINT WITH VIOLATION NORI AND
            CONCILIATION ..............................................................269

6M    ENFORCEMENT ...............................................................................271

**CHAPTER 7 EMPLOYMENT DISCRIMINATION REMEDIES.....................................272**

7A    INTRODUCTION ...............................................................................272
7A00    APPLICABILITY...............................................................272
7A01    LIABILITY PHASE............................................................272
7A02    PROCESS FOR REMEDY......................................................272
7A03    APPLICABLE LAW............................................................272

7B    TIMELINESS AND CONTINUING VIOLATION ......................................273
7B00    CONTINUING VIOLATION ...................................................273

7C    TYPES OF REMEDIES .......................................................................274
7C00    DESIGNING THE REMEDY ..................................................275
7C01    CORRECTIVE REMEDIES ...................................................275
7C02    MAKE-WHOLE RELIEF .....................................................275
7C03    FRONT PAY ....................................................................276
7C04    RETROACTIVE SENIORITY...................................................276
7C05    OTHER REMEDIES AFFECTING A UNION AGREEMENT.........................278
7C06    BACK PAY ......................................................................278
7C07    TIME LIMITS FOR RELIEF ..................................................280
7C08    CALCULATION OF BACK PAY IN INDIVIDUAL OR NONSYSTEMIC
            CASES ..........................................................................281
7C09    CALCULATION OF REMEDIES IN SYSTEMIC DISCRIMINATION
            CASES ..........................................................................282
7C10    CALCULATING VICTIM-SPECIFIC REMEDIES ...............................282
7C11    CALCULATING FORMULA RELIEF ...........................................283
7C12    NONMONETARY RELIEF.....................................................284

7D NOTIFICATION TO CLASS MEMBERS ...........................................................285

7E LIABILITY OF SUCCESSOR EMPLOYER....................................................285

**CHAPTER 8 RESOLUTION OF NONCOMPLIANCE ......................................287**

8A      INTRODUCTION ...........................................................................................287
          8A00   APPLICABILITY.................................................................................287
          8A01   REMEDIES............................................................................................287
          8A02   PREPARATION OF DOCUMENTS ...................................................287
          8A03   COMPUTATION OF TIME.................................................................288
          8A04   ORGANIZATION OF THIS CHAPTER............................................288

8B      OVERVIEW OF RESOLUTION AND ENFORCEMENT PROCEDURES AND
      DOCUMENTS.................................................................................................288
          8B00   GENERAL USE OF AN SCN..............................................................289
          8B01   USE OF AN SCN AT THE DESK AUDIT ........................................289
          8B02   DOCUMENTS USED IN THE ON-SITE AND OFF-SITE PHASES OF
                  COMPLIANCE EVALUATIONS (Supply & Service and Construction)..........292
          8B03   DOCUMENTS USED IN COMPLAINT INVESTIGATIONS........................296
          8B04   DOCUMENTS USED IN MONITORING CAs ..................................300

8C      NOTICE TO THE LABOR UNION OF A PROPOSED REMEDY ..............................302
          8C00   WHEN TO USE A NOTICE TO THE LABOR UNION...................302
          8C01   CONTENTS OF THE LABOR UNION NOTICE..............................302
          8C02   WHO RECEIVES THE LABOR UNION NOTICE ...........................303
          8C03   SIGNATURE AUTHORITY................................................................303
          8C04   UNION'S RESPONSE TO THE NOTICE .........................................303

8D      SHOW CAUSE NOTICE ................................................................................303
          8D00   APPLICABILITY.................................................................................304
          8D01   WHEN AN SCN IS REQUIRED ........................................................304
          8D02   CIRCUMSTANCES WHEN AN SCN IS NOT REQUIRED ...........305
          8D03   CONTENTS OF AN SCN ....................................................................305
          8D04   WHEN TO USE AN AMENDED SHOW CAUSE NOTICE ...........305
          8D05   WHO RECEIVES AN SCN OR ASCN ..............................................306
          8D06   SIGNATURE AUTHORITY................................................................306
          8D07   CONTRACTOR'S RESPONSE...........................................................306
          8D08   RESCISSION OF AN SCN ..................................................................307

8E      PREDETERMINATION NOTICE ................................................................307
          8E00   USE OF A PDN....................................................................................308
          8E01   CONTENTS OF A PDN.......................................................................308
          8E02   WHO RECEIVES A PDN ....................................................................309
          8E03   SIGNATURE AUTHORITY................................................................309
          8E04   CONTRACTOR'S RESPONSE TO A PDN........................................309

8F      NOTICE OF VIOLATION ............................................................................310
          8F00   WHEN TO USE AN NOV ...................................................................310

Federal Contract Compliance Manual (FCCM)

8F01   CONTENTS OF AN NOV ...................................................................310
8F02   WHO RECEIVES THE NOV ..............................................................311
8F03   SIGNATURE AUTHORITY ...............................................................311
8F04   CONTRACTOR'S RESPONSE TO AN NOV ...................................311

8G   CONCILIATION .........................................................................................311
8G00   BACKGROUND ...............................................................................312
8G01   GENERAL .........................................................................................312

8H   CONCILIATION AGREEMENTS ...........................................................312
8H00   WHEN TO USE A CA .......................................................................312
8H01   CONTENTS OF A CA .......................................................................313
8H02   TERMINATION DATE ......................................................................314
8H03   SIGNATURE AUTHORITY ...............................................................314

8I   POST CA ACTIONS ...................................................................................314
8I00   RETENTION OF EVIDENCE OF VIOLATIONS............................315
8I01   EVALUATION OF PROGRESS REPORTS ....................................315
8I02   VIOLATION OF A CA .......................................................................316

8J   THE 15-DAY NOTICE ................................................................................317
8J00   WHEN TO USE A 15-DAY NOTICE ...............................................317
8J01   PROCEDURES WHERE NO IRREPARABLE INJURY EXISTS ..................317
8J02   PROCEDURE WHERE IRREPARABLE INJURY EXISTS ..........................317
8J03   WHO RECEIVES THE 15-DAY NOTICE ......................................318
8J04   SIGNATURE AUTHORITY ...............................................................318
8J05   CONTRACTOR'S RESPONSE TO THE 15-DAY NOTICE ...........................318

8K   ENFORCEMENT RECOMMENDATIONS ............................................318
8K00   WHEN TO MAKE OR SEEK APPROVAL OF AN ENFORCMENT
         RECOMMENDATION .......................................................................319
8K01   CONTENTS OF A COMPLIANCE EVALUATION FILE ..............319
8K02   CONTENTS IN A COMPLAINT INVESTIGATION ......................320
8K03   WHO RECEIVES THE ENFORCEMENT RECOMMENDATIONS..............320
8K04   SIGNATURE AUTHORITY ...............................................................321

8L   PRE AND POST REFERRAL ISSUES RESULTING IN ENFORCEMENT
      PROCEEDINGS ..........................................................................................321
8L00   PRE-REFERRAL TO RSOL...............................................................321
8L01   POST-REFERRAL TO RSOL .............................................................321

8M   TYPES OF ENFORCEMENT PROCEEDINGS ....................................322
8M00   ADMINISTRATIVE ENFORCEMENT PROCEEDINGS ..............322
8M01   JUDICIAL ENFORCEMENT PROCEEDINGS .............................322

KEY WORDS AND PHRASES....................................................................323

GLOSSARY OF ABBREVIATIONS ..........................................................365

Federal Contract Compliance Manual (FCCM)

APPENDICES A-1 – A-13......................................................................................369
  APPENDIX A-1: U.S. DEPARTMENT OF LABOR OFFICE OF FEDERAL
      CONTRACT COMPLIANCE PROGRAMS SUPPLY AND
      SERVICE STANDARD COMPLIANCE EVALUATION
      REPORT (SCER).........................................................................370
  APPENDIX A-2: STANDARD COMPLIANCE EVALUATION REPORT
      (SCER) INSTRUCTIONS ...........................................................394
  APPENDIX A-3: INDEX FOR A SUPPLY AND SERVICE REVIEW....................401
  APPENDIX A-4: SAMPLE ON-SITE REVIEW PLAN ...........................................403
  APPENDIX A-5: INDEX FOR A CONSTRUCTION REVIEW ..............................404
  APPENDIX A-6: STANDARD COMPLIANCE EVALUATION  REPORT
      (CONSTRUCTION) .....................................................................405
  APPENDIX A-7: SPECIAL REMEDIAL CONSIDERATIONS APPLICABLE
      TO STOCK .................................................................................406
  APPENDIX A-8: INDEX FOR A COMPLAINT FILE...............................................408
  APPENDIX A-9: RETALIATION AND INTERFERENCE: COMPLAINT
      PROCESSING OUTLINE AND CHECKLIST ............................410
  APPENDIX A-10: INVESTIGATIVE REPORT..........................................................414
  APPENDIX A-11: INFORMATION RELATED TO FILING SUIT UNDER
      TITLE VII OF THE CIVIL RIGHTS ACT, TITLE I OF THE
      ADA AND THE EQUAL PAY ACT............................................415
  APPENDIX A-12: "MACMILLAN" FACTORS CONCERNING SUCCESSOR
      EMPLOYER LIABILITY .............................................................417
  APPENDIX A-13: TRANSMITTAL MEMORANDUM FOR AN
      ENFORCEMENT RECOMMENDATION...................................418

FIGURES 1 – 6.....................................................................................................423
  FIGURE F-1: COMPLIANCE CHECK CONTROL SHEET................................424
  FIGURE F-2: CASE CHRONOLOGY LOG (CC-53)..........................................426
  FIGURE F-3: COMBINED SCHEDULING LETTER AND ITEMIZED
      LISTING ....................................................................................427
  FIGURE F-4: SCHEDULING LETTER AND ITEMIZED LISTING FOR
      SECTION 503 FOCUSED REVIEW ..................................................434
  FIGURE F-5: FORM FOR COMPLAINT INVOLVING EMPLOYMENT
      DISCRIMINATION BY FEDERAL GOVERNMENT
      CONTRACTORS OR SUBCONTRACTORS................................437
  FIGURE F-6: STANDARD TEXT FOR CONCILIATION AGREEMENT ..........438

LETTERS L-1 – L-41 ..........................................................................................439
  LETTER L-1: SAMPLE ADMINISTRATIVE CLOSURE LETTER  FOR
      SUPPLY & SERVICE AND CONSTRUCTION
      COMPLIANCE EVALUATIONS ..................................................441
  LETTER L-2: SAMPLE INQUIRY LETTER FOR REQUESTING
      COMPLAINT DATA FROM EEOC AND STATE AND
      LOCAL FEPS .............................................................................442

Federal Contract Compliance Manual (FCCM)

LETTER L-3: SAMPLE LETTER FOR REQUESTING JOB LISTING FROM EMPLOYMENT SERVICE DELIVERY SYSTEMS (INCLUDING AMERICAN JOB CENTERS) ..................................443

LETTER L-4: SAMPLE INQUIRY LETTER FOR REQUESTING INFORMATION ON PENDING REVIEW FROM VETERANS EMPLOYMENT AND TRAINING SERVICE ................................444

LETTER L-5: NOTICE OF CLOSING: COMPLIANCE EVALUATION (NO VIOLATIONS FOUND) ..........................................................445

LETTER L-6: NOTICE OF CLOSING: VIOLATIONS FOUND AND RESOLVED ............................................................................446

LETTER L-7: SUPPLY & SERVICE ON-SITE CONFIRMATION LETTER .......447

LETTER L-8: SAMPLE LINKAGE LETTER ........................................................449

LETTER L-9: CONSTRUCTION COMPLIANCE EVALUATION NOTICE .......451

LETTER L-10: CONSTRUCTION OUTREACH LETTER FOR NEW PROJECTS ......................................................................................455

LETTER L-11: 10-DAY NOTICE TO EMPLOYER/CONTRACTOR ....................457

LETTER L-12: 10-DAY NOTICE TO COMPLAINANT ........................................459

LETTER L-13: LETTER TO EEOC (FULL OR PARTIAL TRANSFER OF COMPLAINT) ..........................................................................461

LETTER L-14: AUTHORIZATION FOR RELEASE OF MEDICAL INFORMATION ..........................................................................462

LETTER L-15: LETTER NOTIFYING CONTRACTOR OF INVESTIGATION ..........................................................................463

LETTER L-16: LETTER NOTIFYING COMPLAINANT OF INVESTIGATION ..........................................................................465

LETTER L-17: INQUIRY LETTER TO U.S. DEPARTMENT OF JUSTICE OR THE U.S. DEPARTMENT OF STATE ..........................................466

LETTER L-18: CONFIRMATION OF SCHEDULING OF ON-SITE INVESTIGATION ..........................................................................467

LETTER L-19: LETTER TO CONTRACTOR CONFIRMING COMPLAINT RESOLUTION ..............................................................................468

LETTER L-20: LETTER TO COMPLAINANT CONFIRMING COMPLAINT RESOLUTION ..............................................................................469

LETTER L-21: NOTIFICATION OF RESULTS OF INVESTIGATION: NO VIOLATION ..............................................................................470

LETTER L-22: NOTIFICATION OF RESULTS OF INVESTIGATION AND NOTICE OF RIGHT-TO-SUE UNDER TITLE I OF THE ADA OR TITLE VII OF THE CIVIL RIGHTS ACT OF 1964: NO VIOLATION (Dual filed) ..................................................................472

LETTER L-22A: ENCLOSURE: NOTICE OF RIGHT-TO-SUE UNDER TITLE I OF THE ADA OR TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 ......................................................................474

LETTER L-23: NOTICE OF RIGHT-TO-SUE UNDER TITLE I OF THE ADA OR TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (Issued Upon Request) ....................................................................475

Federal Contract Compliance Manual (FCCM)

LETTER L-24:    NOTICE OF RIGHT-TO-SUE UNDER TITLE I OF THE
                ADA OR TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
                (Administrative Closure) ..................................................................477
LETTER L-25:    NOTIFICATION OF RESULTS OF INVESTIGATION:
                VIOLATION......................................................................................479
LETTER L-26:    SHOW CAUSE NOTICE: FAILURE TO SUBMIT EXECUTIVE
                ORDER 11246, SECTION 503 OR VEVRAA AAP(S)..................481
LETTER L-27:    SHOW CAUSE NOTICE: FAILURE TO SUBMIT
                ACCEPTABLE EXECUTIVE ORDER 11246, SECTION 503
                OR VEVRAA AAP(S) .......................................................................483
LETTER L-27A:   SAMPLE ENCLOSURE TO LETTER L-27 ...................................485
LETTER L-28:    SHOW CAUSE NOTICE: FAILURE TO SUBMIT
                EMPLOYMENT ACTIVITY OR COMPENSATION DATA
                FOR DESK AUDIT............................................................................486
LETTER L-29:    SHOW CAUSE NOTICE: FAILURE TO SUBMIT
                CORRECTED EMPLOYMENT ACTIVITY AND/OR
                COMPENSATION DATA ..................................................................488
LETTER L-30:    SHOW CAUSE NOTICE: UNRESOLVED VIOLATIONS ............490
LETTER L-30A:   SAMPLE ENCLOSURE TO LETTER L-30............................................492
LETTER L-31:    SHOW CAUSE NOTICE: UNRESOLVED VIOLATIONS............494
LETTER L-32:    AMENDED SHOW CAUSE NOTICE FOR UNRESOLVED
                VIOLATIONS ....................................................................................495
LETTER L-33:    SHOW CAUSE NOTICE FOR DENIAL OF ACCESS ..................497
LETTER L-34:    RESCISSION OF AN ERRONEOUSLY ISSUED SHOW
                CAUSE NOTICE................................................................................499
LETTER L-35:    PREDETERMINATION NOTICE ...................................................500
LETTER L-36:    NOTICE OF VIOLATION................................................................502
LETTER L-37:    15-DAY NOTICE: VIOLATION OF A CONCILIATION
                AGREEMENT....................................................................................504
LETTER L-37A:   SAMPLE ENCLOSURE TO LETTER L-37 ...................................505
LETTER L-38:    RESCISSION OF THE 15-DAY NOTICE ......................................506
LETTER L-39:    PROGRESS REPORT RESPONSE LETTER ..................................507
LETTER L-40:    CLOSURE LETTER FOR SUBSTANTIVE VIOLATIONS ...........509
LETTER L-41:    CLOSURE LETTER FOR SUBSTANTIVE VIOLATIONS ..........510

Table of Contents | xvi

Federal Contract Compliance Manual (FCCM)

## INTRODUCTION

At the Office of Federal Contract Compliance Programs (OFCCP), we protect workers, promote diversity through equal opportunity and enforce the law. We hold those who do business with the federal government – contractors and subcontractors – to the fair and reasonable standard that they take affirmative action and do not discriminate based on race, color, religion, sex, sexual orientation, gender identity, national origin, disability or status as a protected veteran. Additionally, we ensure that contractors and subcontractors do not discriminate against applicants or employees for inquiring about, discussing or disclosing their compensation or, in certain circumstances, the compensation of others.

Among the ways OFCCP protects employees of companies doing business with the federal government, and educates these companies about their rights and obligations, is conducting quality compliance evaluations and complaint investigations.

The Federal Contract Compliance Manual (hereafter referred to as the "FCCM" or the "Manual") does not establish substantive agency policy. Therefore, if there is an inconsistency between material in the Manual and OFCCP's policies and its implementing regulations, the latter two are controlling. OFCCP continues to use directives and other issuances to communicate substantive policy guidance, procedures and agency enforcement priorities to its compliance officers (COs) and covered contractors and subcontractors. This Manual is subject to change without public notice. The FCCM does not create new legal rights or requirements, or change current legal rights or requirements for federal contractors. The official sources for contractors' compliance obligations remain Executive Order 11246, as amended; Section 503 of the Rehabilitation Act of 1973 (Section 503), as amended; the Vietnam Era Veterans' Readjustment Assistance Act (VEVRAA) of 1974, as amended; OFCCP's regulations at 41 Code of Federal Regulations (CFR) Chapter 60; and applicable case law.

This revised FCCM provides new and experienced COs with the procedural framework for executing quality and timely compliance evaluations and complaint investigations. It provides procedural and technical guidance on compliance issues based on current agency procedures and processes, and improves efficiency and consistency across the agency's regional and field offices. It may also provide covered contractors and subcontractors more transparency, certainty, and clarity about basic OFCCP procedures and processes. That said, there might be slight differences between regions and offices because some discretion remains with COs and their supervisors as to the best way to manage individual compliance evaluations and investigations within the framework created by the Manual. Remember, these differences should be minor and should occur infrequently because one of the goals of the Manual is standardization. All references to the terms "compliance officer" and CO in this Chapter and throughout the Manual include any OFCCP employee that is responsible for the tasks or activities described.

The Manual has eight chapters, a list of key words and phrases, a glossary and several attachments, including sample forms and letters. The chapters cover how OFCCP's COs, and others responsible for conducting the activities covered in the Manual, conduct a desk audit, an on-site review, a construction industry compliance evaluation, a corporate management compliance evaluation and a complaint investigation. It also covers the agency's functional affirmative action program (FAAP), the various types of discrimination remedies and ways to resolve noncompliance issues.

SER-221

Federal Contract Compliance Manual (FCCM)

The national office wishes to acknowledge the contributions of our regional and field staff during the development of this revised Manual.  Their insight and experience greatly enriched this Manual.  The agency is dedicated to providing its COs with ongoing support and training because we believe that a well-trained workforce is an effective workforce.  We will continue supplementing the processes and procedures in this Manual with uniform staff training and by providing other appropriate resources.

Federal Contract Compliance Manual (FCCM)

# CHAPTER 1
# DESK AUDIT

## 1A    INTRODUCTION

The regulations implementing Executive Order 11246, as amended, authorize OFCCP to conduct compliance evaluations of federal contractors.[1] Compliance evaluations determine whether federal contractors maintain nondiscriminatory hiring and employment practices.  OFCCP also uses them to determine whether contractors are taking affirmative action to ensure that applicants and employees are treated without regard to race, color, religion, sex, sexual orientation, gender identity or national origin.  These evaluations also enable OFCCP to assess whether contractors treat applicants and employees in a manner that does not discriminate against them for asking about, talking about, or sharing information about pay with other employees or applicants.  Other regulations permitting OFCCP to conduct compliance evaluations are 41 CFR 60-300.60 implementing provisions of VEVRAA, as amended, 38 U.S.C. 4212; and the regulations at 41 CFR 60-741.60 implementing Section 503, as amended, 29 U.S.C. 793.  These evaluations are to determine whether federal contractors are complying with their obligations to ensure nondiscrimination.  They also determine whether contractors are taking affirmative action to employ, promote, train, retain and provide reasonable accommodation to certain protected veterans and individuals with disabilities, respectively.

## 1A00   TYPES OF COMPLIANCE EVALUATIONS

OFCCP may conduct a compliance evaluation that consists of one, or any combination of, the following investigative procedures:

- Compliance review;

- Off-site review of records;

- Compliance check; and

- Focused review.

Each of the investigative procedures is discussed in this chapter;[2] the first is compliance review procedures.  A compliance review is a comprehensive analysis and evaluation of the employment practices of the contractor, including the contractor's written affirmative action program (AAP), and the results of the contractor's affirmative action efforts.  A compliance review may proceed in three stages:

- Desk audit;

---

[1]  41 CFR 60-1.20.  The term "contractor" as used in the Manual includes "subcontractors" unless otherwise noted.
[2]  The investigative procedures discussed in this chapter may apply to both construction and supply and service contractors.

Desk Audit | 3

Federal Contract Compliance Manual (FCCM)

- On-site review; and

- Off-site analysis.

However, the regulations do not require an on-site review or off-site analysis in all cases. Depending on the circumstances or the results of the desk audit, a compliance review may:

- Close after the desk audit;

- Continue with an on-site review; or

- Continue with an off-site analysis of the information gathered during or pursuant to the on-site review.

An off-site review of records is an analysis and evaluation of all or some portion of the contractor's AAPs and supporting documentation, and other documents related to the contractor's personnel policies and employment actions that may be relevant to a determination of whether the contractor complied with the requirements of Executive Order 11246, Section 503 and/or VEVRAA, as appropriate. COs must use the desk audit procedures outlined in this chapter when conducting an off-site review of records.

A compliance check is an examination to determine whether a contractor maintained certain records as required by the regulations at 41 CFR 60-1.12, 41 CFR 60-300.80, and 41 CFR 60-741.80. The contractor has the option of providing the documents either on-site or off-site. Therefore, COs[3] must contact the contractor to determine whether the requested records will be provided on-site or off-site. COs will also need to contact the contractor during the review if they need specific issues clarified. A compliance check need not include an on-site review. If a contractor provides records off-site, but a CO finds that it may be appropriate to conduct a physical, on-site inspection, the CO must discuss the matter with his or her supervisor.[4]

Finally, a focused review is an on-site review focused on one or more components of the contractor's organization, or one or more aspects of the contractor's employment practices. OFCCP may conduct a focused review to determine the contractor's compliance with a particular legal authority or may conduct a focused review of a particular employment practice under all of the laws OFCCP enforces.[5] For example, in a Section 503 focused review, the CO would review policies and practices of the contractor related solely to Section 503 compliance. OFCCP will identify the subject of the focused review and inform the contractor before the start of the review.

---

[3]  All references to the terms "compliance officer" and CO in this Chapter and throughout the Manual include any OFCCP employee that is responsible for the tasks or activities described.

[4]  See Chapter 2 – On-Site Review. That chapter covers on-site review procedures, including any required supervisory approvals.

[5]  See Directive 2018-04, "Focused reviews of contractor compliance with Executive Order 11246 (E.O.), as amended; Section 503 of the Rehabilitation Act of 1973 (Section 503), as amended; and Vietnam Era Veterans' Readjustment Assistance Act of 1974 (VEVRAA), as amended." In the focused reviews anticipated by this Directive, OFCCP would go on-site and conduct a comprehensive review of the particular authority or employment practice at issue.

Federal Contract Compliance Manual (FCCM)

## 1A01   CONTENTS OF CHAPTER

This chapter outlines the procedures COs use to conduct a desk audit during a compliance evaluation, whether it is conducted in the office or on-site.  The elements of this chapter also apply when COs are conducting compliance evaluations using the investigative procedures for the off-site review of records.  Additionally, this chapter references the relevant sections of the Standard Compliance Evaluation Report (SCER) that COs must complete during the desk audit stage of compliance evaluations.

## 1A02   PURPOSE OF THE DESK AUDIT

By conducting a desk audit of the contractor's AAPs and supporting documentation provided by contractors, a CO begins to determine whether a contractor is complying with all relevant provisions of 41 CFR Chapter 60, specifically:

- Applicable nondiscrimination provisions; and

- Applicable affirmative action provisions.

## 1A03   PRINCIPLES AND FOCUS OF DESK AUDITS

A desk audit typically enables COs to review a contractor's compliance with its affirmative action and equal opportunity obligations at a particular establishment.  COs must conduct desk audits following these general principles:

a.  *Equal Employment Opportunity (EEO)*.  A contractor's personnel policies and practices must not have the purpose or effect of discriminating because of race, color, religion, sex, sexual orientation, gender identity, national origin, disability or status as a protected veteran, or because they discussed, inquired about, or disclosed their pay or, in certain circumstances, the pay of other employees.  Contractors must eliminate and remedy discrimination that, for example, limits a job applicant's or an employee's ability to engage in open and fair competition for a job or position, or that results in paying employees differently based on race, sex or membership in other protected classes.

b.  *Affirmative Action Program*.  An AAP is a management tool.  The written AAP includes diagnostic and self-monitoring components as well as a set of specific and result-oriented policies and procedures designed to achieve EEO.

c.  *Inclusion and Acceptability*.  An AAP is assessed for "inclusion" and "acceptability."  This chapter discusses these concepts more fully in sections 1E – 1H of this chapter.

When conducting the desk audit, COs focus on a review of the following areas:

a.  *Workforce Structure, Personnel Policies and Procedures*.  COs examine a contractor's personnel policies and procedures to determine if they warrant in-depth investigation, such as an on-site review.  Likewise, an examination of a contractor's basic organizational or workforce structure may reveal irregularities that merit investigating.

Desk Audit | 5

Federal Contract Compliance Manual (FCCM)

b. *Problem Areas and Action-Oriented Programs.* COs examine whether a contractor identified any problem areas, and, if so, whether the contractor developed and executed action-oriented programs designed to correct the problem areas. In doing so, COs should seek to determine at least these specific things:

- Whether there are any areas with a lack of progress toward established goals;

- Whether further information is needed in any area; and

- Whether an on-site visit is needed to evaluate the contractor's efforts to develop and implement AAPs designed to improve opportunities for minorities, women, people with disabilities and protected veterans.

c. *Potential Discrimination.* COs must be aware of the signs of potential discrimination. Being aware of and alert to these signs allows a CO to assess when further investigation is required. Below are examples of signs of potential discrimination.

- Individuals in a particular race, sex, or ethnicity are significantly overrepresented or underrepresented in a particular area of the workforce.

- Indications exist that an employment practice or procedure has adversely affected individuals based on their race, sex, or ethnicity.

- Compensation practices of a contractor result in differences in pay that appear to be based on race, sex, or ethnicity.

- Indications exist that leave for family caregiving is applied differently for men and women.

- The contractor has policies that could adversely affect employees with disabilities, such as a "no leave" policy or a policy requiring 100% recovery before allowing an employee to return to work.

## 1A04   USE OF THE STANDARD COMPLIANCE EVALUATION REPORT

The SCER is a tool used by COs to conduct and document desk audits. The SCER and its instructions, found in Appendices A-1 and A-2, establish a framework for conducting the desk audit and assisting in the development and implementation of the on-site investigative plan. COs use the SCER, either in whole or in part, when conducting a compliance evaluation using the compliance review, off-site review of records or focused review investigative procedures discussed in subsection 1A00 of this chapter. Compliance checks require the completion of the Compliance Check Control Sheet, rather than the SCER.[6]

The SCER begins with a Contractor Information section in which the CO records basic information about the contractor, including address, company contacts, type of industry, contract coverage, and workforce composition. After the Contractor Information section, there is a Case Summary and

---

[6]   See Figure F-1 – Compliance Check Control Sheet.

Federal Contract Compliance Manual (FCCM)

Recommendations section that serves as the final assessment of the compliance evaluation, listing all findings. These two sections are then followed by three main parts.[7]

a. *Part A: Preparation*. Part A includes general information gathered by the CO during the preparatory stages of a compliance evaluation, such as the contractor's problems in prior compliance evaluations, information on known complaints or enforcement proceedings, and any collaboration with or referrals to other agencies during the compliance evaluation.

b. *Part B: Desk Audit.* Part B records the results of the CO's desk audit. It documents the CO's initial review of the contractor's AAPs and Itemized Listing data for inclusion and acceptability, and summarizes any problems the CO finds regarding the acceptability of the AAPs and Itemized Listing data, and provides resolutions for those problems. Part B also provides for analysis of Executive Order 11246 affirmative action progress and identifies any areas where a CO needs additional information to determine the extent of a contractor's good faith efforts. This Part also includes an assessment of a contractor's Section 503 utilization analysis and outreach assessment, as well as the VEVRAA outreach assessment. The CO also records results of the analyses performed on the employment activity provided by the contractor (*e.g.,* terminations, compensation) and notes any other problems for an on-site investigation. For any problem unresolved at the conclusion of the desk audit, the SCER requires the development of an On-Site Plan.[8]

c. *Part C: On-Site Review*. Part C records the results of an on-site review. It provides for the CO to document verification of the contractor's implementation of certain equal opportunity clause requirements (*e.g.,* posting current required EEO notices), implementation of the regulations prohibiting discrimination on the basis of sex, and implementation of the guidelines on discrimination based on national origin and religion. The CO also records the on-site review findings for any potential systemic or individual discrimination that was identified during the desk audit or discovered during the on-site review. These findings include a discussion of the nature of the problem(s), relevant evidence collected and reviewed, actions (if any) taken to resolve the problem, and whether and how the problem was resolved.

## 1A05   CASE MANAGEMENT SYSTEM

The Case Management System (CMS) is the data collection component of the OFCCP Information System (OFIS) COs use to record basic information about the contractor, to track major events encountered throughout the evaluation, and to summarize any violations found and remedies obtained. COs must ensure that all relevant dates, information, and occurrences are promptly entered into CMS, beginning with the initial scheduling of the compliance evaluation and ending with the closure of the review, including the Conciliation Agreement (CA) monitoring period, if applicable. COs should refer to the CMS Manual for further instruction on how and when to enter case status information. The reporting component of OFIS is the Executive Information System (EIS), used by COs in combination with historical records to research past OFCCP compliance evaluations.

---

[7]   The SCER also has another part (Part D) used only when a CO conducts a Corporate Management Compliance Evaluation.  See Chapter 4 for more on this type of compliance evaluation.
[8]   FCCM 2C03 – On-Site Plan.

Federal Contract Compliance Manual (FCCM)

## 1A06   CONFIDENTIALITY OF INFORMATION

Under current law and regulations, OFCCP is required to comply with the Freedom of Information Act (FOIA), 5 U.S.C. 552; the Trade Secrets Act, 18 U.S.C. 1905; the Privacy Act, 5 U.S.C. 552a; and Executive Order 12600.[9]  These laws govern the disclosure of confidential information, as well as sensitive information, such as personnel records, medical information and salary data.  During a compliance evaluation, a CO will handle contractor information that is not available to the general public and that may be sensitive (*e.g.,* social security number, date of birth, employee-level salary data) or nonsensitive (*e.g.,* first and last name, business address, email address) in nature.  The CO must treat all information obtained during a compliance evaluation as confidential and protect the security of records to avoid any unauthorized disclosure.  The CO is also responsible for the proper handling of Personally Identifiable Information (PII) under the U.S. Department of Labor's 9 DLMS 1200 (Safeguarding Sensitive Data Including Personally Identifiable Information).

Under FOIA, members of the public may request the release of agency records.  If a CO receives a request for disclosure of any records obtained from a contractor, the CO must immediately refer the request to OFCCP's designated regional or national FOIA coordinator, as appropriate.  The FOIA coordinator must evaluate the request to determine whether any exemptions from disclosure apply or if the agency is required to release records that OFCCP received from a federal contractor.  Before releasing any records provided by the contractor, the FOIA coordinator will notify the contractor of its opportunity to object to a release of records.

For instance, OFCCP will notify contractors of any FOIA request for their EEO-1 data.  If a contractor objects to disclosure, then OFCCP will not disclose the records if OFCCP determines that the contractor's objection is valid.  FOIA exemption 4 recognizes the confidentiality of this data and, in combination with FOIA exemption 3 and the Trade Secrets Act, provides the necessary tools to protect it from public disclosure, if appropriate.

## 1A07   NOVEL ISSUES

Novel issues are those that are unfamiliar, unique or fall outside the norm.  Periodically, the national office will identify certain novel issues and develop specific procedures to address them.  COs may encounter novel issues in a compliance evaluation.  When this occurs, they must, in coordination with their supervisor and regional office, contact the Division of Program Operations (DPO) in the national office to determine the approach to use, data to obtain and analyses to conduct before recommending a finding of compliance or noncompliance.  Novel issues include those not routinely addressed, like a publicly announced contractor preference in employment to Indians and Native Americans living on or near an Indian or Native American Reservation.[10]  Novel issues could also include compliance evaluations that involve coordination with the Expert Services Branch in DPO on issues like testing, multi-establishment contractors, and complex or unusual compensation issues.  Chapter 6 of this Manual includes a brief discussion of novel issues in the context of complaint investigations.

---

[9]   See 41 CFR 60-1.20(g), 60-300.81, 60-741.81.
[10]   In this instance, the CO and supervisor would coordinate with the Director of OFCCP's Indian and Native American Employment Rights Program (INAERP) to address the impact of the contractor's use of a publicly announced preference in employment to Indians and Native Americans.

Federal Contract Compliance Manual (FCCM)

## 1A08   CORPORATE MANAGEMENT COMPLIANCE EVALUATIONS

Under the regulations at 41 CFR 60-2.30 on corporate management compliance evaluations (CMCEs), COs may conduct a CMCE to ascertain whether individuals are encountering artificial barriers to advancement into mid-level and senior corporate management.  The desk audit procedures outlined in this chapter apply to CMCEs.  We discuss CMCEs in Chapter 4 of this Manual.

## 1A09   FUNCTIONAL AFFIRMATIVE ACTION PROGRAMS

Under the regulations at 41 CFR 60-2.1(d)(4), a contractor can seek the agency's agreement to develop and use an AAP that is based on a functional or business unit instead of an establishment. This type of AAP is called a functional AAP or FAAP.  The desk audit procedures outlined in this chapter apply to both traditional and functional AAPs.  We discuss FAAPs in Chapter 5 of this Manual.

## 1A10   PREAWARD COMPLIANCE EVALUATIONS

Under the regulations at 41 CFR 60-1.20(d), 60-1.29, 60-300.60(d), and 60-741.60(c) on preaward compliance evaluations, an agency is required to notify OFCCP and request a preaward evaluation before a nonconstruction contract or first tier subcontract of $10 million or more is awarded. Within 15 calendar days of the notice, OFCCP will inform the awarding agency of its intent to conduct a preaward compliance evaluation.  If OFCCP informs the agency of its intent to conduct a preaward evaluation, OFCCP is allowed an additional 20 calendar days after that date to provide a conclusion relative to the contractor's compliance.

## 1A11   EDUCATIONAL INSTITUTION EVALUATIONS

If an educational institution holds a federal contract, it may be scheduled for a compliance evaluation.  While the desk audit procedures and principles in this chapter apply to educational institution evaluations, the CO should consider the unique nature of these contractors.  Educational institutions have the same obligation as other contractors to prepare and maintain AAPs and submit them along with Itemized Listing data when scheduled for a compliance evaluation.  However, the data submitted by an educational institution may be structured differently and include identification of employment practices that are unique to them.  Despite any differences in the nature of educational institutions compared to other contractors, the CO will evaluate the contractor's compliance with all applicable regulations and conduct required analyses, such as impact ratio, compensation, selection process, and selection criteria analyses.

a.   *Institution type and organizational structure.*  When evaluating an educational institution, the CO should identify the institution type and its organizational structure, identifying autonomous components and individuals who have the authority to make personnel decisions.  Educational institutions fall generally into four types: universities, senior colleges, vocational colleges and junior/community colleges.  The structure varies not only based on the type and size of the institution but also on whether it is a public or private entity.  This may impact how personnel data is grouped and how employment practices are analyzed.

b.   *Employment data and workforce composition.*  In educational institution evaluations, the CO will examine data regarding the educational institution's workforce composition, tenure

Desk Audit | 9

Federal Contract Compliance Manual (FCCM)

requirements, and practices on hiring, promotion, termination, and compensation. Unlike other contractors, the labor force of educational institutions is tracked through a reporting system called the Integrated Postsecondary Education Data System (IPEDS).[11] The CO may start with the IPEDS categories to identify similarly situated employee groups but if they are too broad, the CO will narrow down the categories to more appropriate job groups to conduct meaningful analyses. Educational institution workforces generally include instructional staff and noninstructional staff.[12] The instructional staff workforce includes nontenure track, tenure track, and tenured instructional staff while the noninstructional staff workforce includes executive, administrative, professional, technical, clerical, and all other nonteaching services at the institution. Whereas instructional staff are typically grouped by department or school, noninstructional staff may overlap or spread across the educational institution.

c. *Hiring, terminations and promotion practices*. Evaluating employment practices applicable to noninstructional staff is similar to that conducted in other compliance evaluations. However, evaluating employment practices concerning instructional staff may present a unique challenge requiring the CO to tailor inquiries, data requests and the required analyses. For example, instructional staff vacancies may be filled by departmental committees that are formed to recruit and screen for a vacant position. Candidates deemed qualified by the committees are submitted to the Dean or Provost for selection. Academic policies and procedures regulate who will be on the committees, where to advertise and the organizations from which to solicit candidates; and procedures and criteria to follow in instructional staff selection.

In addition to the hiring, termination and promotion practices, the granting of tenure to instructional staff and applicable tenure requirements and data should be examined by the CO. Tenure is protected academic status intended to grant instructional staff permanent appointments. Promotion for tenure track instructional staff usually follows a line of progression such as assistant professor, to associate professor, to professor. Comparable to hiring, the decision to grant tenure to an instructional staff member is made by a departmental committee. Some of the common criteria considered for granting tenure include: teaching ability and effectiveness; research and publications; professional services; and services to the institution or community. Not granting tenure or revoking tenure is an adverse employment action that may further result in the termination of the instructional staff member. As with hiring, termination, and promotion practices, it may be necessary to request data on tenure decisions.

d. *Compensation*. Educational institutions typically operate separate pay systems for each workforce, *e.g.*, instructional staff and noninstructional staff. There are also different pay systems to reflect the different workforces when the educational institution is a public institution. The CO must obtain written policies and procedures on employee compensation, including policies on determining base salary, pay incentives, pay increases, bonuses and other

---

[11] IPEDS is a system of interrelated surveys conducted annually, which gathers information from every college, university, and technical and vocational institution in the United States and other jurisdictions (such as Puerto Rico) that participates in the federal student financial aid programs.

[12] OFCCP will use the terms instructional staff and noninstructional staff to distinguish between the two workforces. Instructional staff refers to faculty members and others in a teaching capacity. Noninstructional staff refers to all other employees who are not in a teaching capacity.

Federal Contract Compliance Manual (FCCM)

factors impacting compensation such as union status and payment for additional responsibilities at the institution. In addition to base salary and bonuses, the CO should gather data on factors that may affect compensation such as the national ranking of the educational institution, field of study, scholarship, research, publications, honors and awards.

# 1B    PRE-DESK AUDIT ACTIONS

This section discusses the various steps and actions that COs must take before starting a compliance evaluation of a contractor establishment. These steps include:

- Contacting the contractor;

- Setting up appropriate case files and logs; and

- Obtaining relevant information about the contractor from other EEO and U.S. Department of Labor (DOL) enforcement agencies.

## 1B00   INITIAL CONTACT WITH THE CONTRACTOR

This subsection covers information that COs gather through their initial contact with the contractor, including contact information for the contractor and the contractor's representative, and any information that may preclude the evaluation (*e.g.,* establishment is closed, the establishment is part of an approved FAAP agreement, or OFCCP has completed a review of the establishment in the past 24 months). If the contractor contests OFCCP's jurisdiction or provides any information that may preclude the evaluation, the CO would follow the process outlined in subsection 1B04 below.

a. *Contractor Information.* Before issuing a Scheduling Letter and Itemized Listing, COs must verify the following information:

- The name of the highest-ranking management official at the establishment;

- The legal name of the company;

- The name and email of the person responsible for the preparation and implementation of the contractor's AAPs; and

- The correct mailing address for the establishment.

If an establishment is part of a larger entity, the CO must obtain the name of the corporate chief executive officer (CEO), the name of the corporate person responsible for EEO and affirmative action matters and the correct corporate mailing address. COs enter this basic identifying information in the Contractor Information section of the SCER.

b. *Representation.* A contractor's statement about representation can come during the initial contact or at some later point. When a contractor indicates that it is or will be represented by counsel or a consultant company, a CO must ask the contractor to provide written confirmation of the representation, including:

Federal Contract Compliance Manual (FCCM)

- The contact information for the representative that includes the representative's name, address, email, and phone number; and

- The scope of the representative's authority, including whether the authority granted to the representative extends to negotiating a settlement, if necessary, on behalf of the contractor.

A CO must also ask the contractor to clarify in writing as a part of the representation confirmation whether:

- All contacts, including routine ones to make appointments or to clarify data or other information, should be made through the representative; and

- All correspondence should be provided only to the representative or if a copy is to be provided to the contractor.

The CO obtains the same written confirmation if a person indicates to the CO or another representative of OFCCP that he or she represents the contractor. After receiving written confirmation of representation, a CO must handle contacts and correspondence according to its terms for the duration of the evaluation. The handling of contacts and correspondence will change if the contractor specifies a different period or subsequently alters its instructions. Alterations of representation instructions must be in writing.

COs provide the contractor's highest-ranking management officials copies of all substantive documents that they mail. For these purposes, we define substantive documents as documents that this Manual requires a CO to mail. This would include, for example, any Predetermination Notice (PDN), Notice of Violation (NOV), Show Cause Notice (SCN), and CA.

## 1B01  PREPARATION AND MAINTENANCE OF THE CASE CHRONOLOGY LOG

COs must prepare and maintain a Case Chronology Log for each compliance evaluation. This log is an integral part of the case file and is an invaluable tool in tracking the progress and the status of the case.[13] It is, therefore, important that COs keep the Case Chronology Log current. A Case Chronology Log includes:

- Event summaries that begin with the initial contact with the contractor and continue through to the approval of case closing documents.

- Documentation of all telephone conversations, emails, correspondence and meetings associated with the evaluation, indicating the date, nature of the contact, person contacted, a summary of discussion or actions taken, and the CO's name.

Records of telephone calls in the log should include the time of the call. All meetings must include the date, location, and names of the people in attendance. In addition, COs must record in the log all requests for data and records, and the dates the CO received these items. COs must record all events and actions as they occur.

---

[13]  Figure F-2 – Case Chronology Log (CC-53).

Federal Contract Compliance Manual (FCCM)

Many COs print a hardcopy of the Case Chronology Log to facilitate their ability to write in the day-to-day events and activities as they occur. This practice is acceptable as long as the final Case Chronology Log included in the case file is typed, legible and maintained electronically.

## 1B02   CREATION AND MAINTENANCE OF THE CASE FILE

COs must create and maintain a case file for each scheduled compliance evaluation. The case file generally consists of various folders. To set up a case file, COs must create individual folders using the below headings.[14]

- Folder 1: Standard Compliance Evaluation Report (SCER) and Data Pertaining to SCER Findings

- Folder 2: Case Chronology Log, Correspondence and Meeting Notes

- Folder 3: Collective Bargaining and Other Agreements, and Miscellaneous Items

- Folder 4: Solicitor of Labor (SOL) Opinions, Joint Review Committee (JRC)[15] Memoranda and Post-SCER Update

- Folder 5: Progress Reports

- Folder 6: Historical Review Results

- Folder 7: AAP and Itemized Listing Data

COs must add information and documents to the appropriate folder throughout the compliance evaluation. If enforcement becomes necessary, COs provide the compliance evaluation case file to the Solicitor's Office for further action. It is critically important that all information obtained, observed or reported be part of the case file and remain there through case closure.

Once again, maintaining these files is crucial. This maintenance includes labeling the folder and any additional folders or subfolders needed (*e.g.,* Folder 1A, 1B). Labeling is especially useful when the material in a folder is voluminous. COs must arrange the documents in each folder by date, with the most recent document on top unless directed otherwise. COs are required to attach certain documents in each folder to the left or right side of the folder, as indicated below. When there are 10 or more separate documents in a folder, the CO must prepare an index and place it in the front of that folder.

A complete and thorough case file is critically important, especially if enforcement becomes necessary. Therefore, COs must be sure that the case file contains all documents obtained or generated during the compliance evaluation, not just the material that supports the conclusions

---

[14]  Though the case file folder numbers and titles do not change, the case file contents may vary based upon the investigative procedures used in the compliance evaluation, and the availability and existence of specific documents.

[15]  The Joint Review Committee (JRC) is a committee – consisting of district office staff members working on the complaint, regional office staff members and representative(s) of the Solicitor's Office – that discusses the complaint investigation and findings. National office staff may also participate in these discussions.

Federal Contract Compliance Manual (FCCM)

reached.  For example, the file should include both evidence that supports the CO's violation findings, as well as evidence that supports the contractor's rebuttal.  The case file must contain all contractor records and unaltered copies of all email correspondences in paper or electronic format.  Drafts of OFCCP memoranda are not included in the case file.  COs retain only final versions of agency memoranda.

If a CO is submitting a case for enforcement, a Transmittal Memorandum, as discussed in Chapter 8 of this Manual on the resolution of noncompliance, must accompany the case file.  A complete copy of at least one contract or subcontract establishing coverage during the entire period at issue is also required, continuing to the present, if available.  Additionally, the enforcement submission must include copies of all relevant analyses, properly labeled, in electronic format.  Remember to keep a copy of all files submitted for enforcement in the appropriate field office.   Below is a list of the folders and their content.[16]

*Folder 1: Standard Compliance Evaluation Report (SCER) and Data Pertaining to SCER Findings*.  This folder contains the SCER and data pertaining to SCER findings, such as:

- CO notes, worksheets and analyses, including any regression analyses;

- Witness statements that are appropriately labeled;

- Contractor records; and

- Other information and records pertinent to the issues investigated.

COs should organize the material according to the relevant SCER issue, and tabs and labels them accordingly.  Documents must cross-reference other folders, as appropriate.  For example, if a SCER document in Folder 1 also involves or is relevant to a union contract matter, the document in Folder 1 will refer to the union contract placed in Folder 3.  COs are required to attach certain documents to the left side of this folder.  The CMS Form CC-100A should be placed on top and the following items should be placed underneath:

- Any contract coverage information provided by DPO or copies of contracts;

- CMS forms associated with the review;

- EEO-1 reports;

- Contractor extension requests for the AAPs and OFCCP responses, including extensions of time frames in a consent decree; and

- Preaward Clearance Request letter and other related materials.

*Folder 2: Case Chronology Log, Correspondence and Meeting Notes*.  This folder contains all emails and other correspondence, both internal and external, as well as meeting notes associated

---

[16]  See Appendix A-3 – Index for a Supply and Service Review.

Federal Contract Compliance Manual (FCCM)

with the review.  File these items chronologically.  COs must preserve all communications related to the compliance evaluation or complaint investigation in this folder, including data and record submissions, information gathering and interviews, and any material resulting from contacts with third parties such as other government agencies or local interest groups.

For ease of reference, the folder must have a tab for the closure document.  One closure document is a CA.  This document is the written agreement entered into by the contractor and OFCCP that identifies the violations found by the agency and what actions the contractor will undertake to resolve them or prevent the violations from recurring.  In the absence of violations, a closure letter is the closure document.  Place a copy of the closure document in Folder 6, Historical Review Results.

COs must attach a typed copy of the Case Chronology Log to the left side of this folder.

*Folder 3: Collective Bargaining and Other Agreements, and Miscellaneous Items*.  This folder contains a copy of any collective bargaining agreements, fringe benefits and leave policy booklets, employee handbooks, apprenticeship or training agreements and any other similar contractor documents relevant to the establishment reviewed.  COs place into this folder relevant documents that do not fit the description of documents contained in other folders.

*Folder 4: SOL Opinions, JRC Memoranda and Post-SCER Update*.  This folder contains Solicitor's Opinions and JRC memoranda associated with the review.  It also contains any material, other than progress reports, generated after a CO submits the review report such as transmittal memoranda and additional conciliation efforts.  For example, a record of any later conciliation efforts by the district office, regional office and national office, as appropriate, along with the results of those efforts, would be filed in this folder.

*Folder 5: Progress Reports*.  This folder contains progress reports the contractor submitted under a CA, along with OFCCP's evaluation of those reports.  COs enter the results of these evaluations on the "Summary of Progress Reports" form.  After entering the last report, COs place a copy of the referenced summary in Folder 6, Historical Review Results.  COs also log all progress reports in the Case Chronology Log and include consent decrees or other court orders.

*Folder 6: Historical Review Results*.  This folder contains a copy of closure letters and documents, including any previous CAs generated by any past reviews of this establishment, as well as a copy of the closure letter and document for the current review.  If a contractor must file progress reports under a current CA, when the CO evaluates the last report, the CO will add a copy of the "Summary of Progress Reports" to this folder on top of the CA for the current review.

It is important that the field office retains the historical folder consistent with OFCCP's records management schedule.  If OFCCP schedules another review of this establishment before this case file is retired and archived, the field office will pull the historical folder from the old case file and move it to the new one.

*Folder 7: AAP and Itemized Listing Data.*  This folder contains the contractor's AAPs and Itemized Listing data evaluated in this review.  Place this material at the end only because it is often the most voluminous.

Federal Contract Compliance Manual (FCCM)

## 1B03   SENDING THE SCHEDULING LETTER AND ITEMIZED LISTING

OFCCP uses the Scheduling Letter and Itemized Listing to schedule a compliance evaluation and request AAPs and Itemized Listing data from the contractor.[17]  The Scheduling Letter and Itemized Listing are reauthorized for the agency's use every three years by the Office of Management and Budget (OMB) if not earlier, should the agency seek it.  Therefore, COs must review the most recently authorized Scheduling Letter and Itemized Listing to ensure that they are familiar with the documents and information requested from the contractor.

COs will use a separate version of the Scheduling Letter and Itemized Listing for a focused review.  For example, the Scheduling Letter and Itemized Listing for Section 503 focused reviews is in Figure F-4.

The most recently OMB-approved Scheduling Letter and Itemized Listing is sent by certified mail, return receipt requested, to the highest ranking official at the contractor's establishment or functional unit, with a copy to the CEO at the contractor's corporate headquarters unless the establishment and corporate headquarters are the same.  The appropriate field office official signs the Scheduling Letter.  The letter must include the name and telephone number of the CO who will receive the AAPs, and Itemized Listing data or the CO's appropriate supervisor.

## 1B04   FOLLOW-UP CONTACT WITH CONTRACTOR AND JURISDICTION CHALLENGES

COs must contact the contractor within 15 calendar days after sending the Scheduling Letter and Itemized Listing to ensure that the contractor or the contractor's representative, or both, fully understand the requests contained in the letter.  If the contractor has questions, COs will provide technical assistance to clarify the contractor's obligations and the compliance evaluation process.  The CO should establish himself or herself as the primary point of contact for the compliance evaluation, provide an overview of what to expect during the evaluation, and explain the allowable one-time 30-day extension for submission of Itemized Listing[18] information as well as the SCN process for failure to meet deadlines for submitting the AAPs and Itemized Listing information.

The contractor may challenge OFCCP's authority to schedule it for a compliance evaluation.  For instance, the contractor could assert that the establishment is closed, the establishment is part of an approved FAAP agreement, or it does not have a large enough federal contract or the requisite number of employees to trigger OFCCP's AAP requirements.  The contractor might also inform the CO that it has been less than 24 months since it received a closure letter from OFCCP for a prior compliance evaluation or since the end of the monitoring period for a CA or consent decree it entered with OFCCP to remedy violations uncovered during a prior evaluation.

---

[17]  See Figure F-3 – Scheduling Letter and Itemized Listing.
[18]  See Directive 2018-08, "Transparency in OFCCP Compliance Activities."  OFCCP will provide a 30-day extension for contractors to provide supporting data related to the Executive Order 11246, VEVRAA and Section 503 AAPs, provided that: 1) the contractor requests the extension any time before the initial 30-day due date for the AAPs and 2) the contractor timely submits the basic Executive Order 11246, Section 503 and VEVRAA AAPs within the initial 30-day period after receiving the Scheduling Letter and Itemized Listing.

SER-236

Federal Contract Compliance Manual (FCCM)

If the contractor challenges the agency's jurisdiction for any reason, the CO must elevate the issue to the attention of DPO, in coordination with his or her supervisor and regional office. DPO will use a number of resources, including the System for Award Management (SAM),[19] to verify whether OFCCP has jurisdiction over the scheduled contractor. If jurisdiction is then established, yet the contractor continues to dispute OFCCP's jurisdiction, the CO will recommend issuance of an SCN. Chapter 8, Section D explains the use of SCNs. If jurisdiction is not established, then the CO would administratively close the compliance evaluation.[20]

SAM includes information on whether a contractor has declared that it maintains AAPs for all of its establishments. The information is under Representations and Certifications; Affirmative Action Compliance (Federal Acquisition Regulation 52.222-25). COs may find it beneficial to check SAM to determine whether the contractor made this declaration in SAM before making the 15-day call.

If a region schedules a compliance evaluation of an establishment that is covered by a functional or business unit, the regional office and CO must contact the FAAP branch to verify if the establishment is covered within an approved functional or business unit. The FAAP branch will advise the regional office and CO whether to administratively close the evaluation.

## 1B05   CONTACTING EEOC, VETS AND OTHER AGENCIES

Simultaneous with the mailing of the Scheduling Letter, COs will seek information regarding the employment policies and practices of the contractor being scheduled from the Equal Employment Opportunity Commission (EEOC), Veterans Employment and Training Service (VETS), and other EEO and labor law enforcement agencies. Such information provides a better understanding of the contractor's workforce and operations, and may indicate potential problem areas.

a.  *EEOC and State and Local Fair Employment Practices (FEP) Agencies*. The CO sends an inquiry letter simultaneous with the mailing of the Scheduling Letter.[21] The inquiry letter goes to the appropriate district office of the EEOC, and to the appropriate state and local FEP agencies. It requests information on discrimination complaints filed against the contractor and any other information that may be pertinent to assessing the contractor's EEO posture. After 15 calendar days, COs must follow up by telephone with any agency that failed to respond or from which additional information is needed.

   OFCCP has a Memorandum of Understanding (MOU) with EEOC that includes provisions about information sharing, complaint referrals, coordination and consultation. COs are urged to become familiar with the provisions of this MOU.

b.  *Veterans Employment and Training Service, Employment Service Delivery System and DOL Enforcement Agencies*. COs must contact the VETS regional office and local employment service delivery systems (ESDS) in writing to request any information that could be pertinent to the pending review, including information regarding the contractor's compliance with the mandatory job listing requirements of the equal opportunity clause at 41 CFR 60-300.5(a), and

---

[19]  The System for Award Management is located at *https://www.sam.gov/* (last accessed August 2019). For OFCCP's current jurisdictional thresholds, see *https://www.dol.gov/ofccp/taguides/jurisdiction.htm* (last accessed August 2019).
[20]  Letter L-1 – Sample Administrative Closure Letter.
[21]  Letter L-2 – Sample Inquiry Letter for Requesting Complaint Data from EEOC and State and Local FEPs.

Federal Contract Compliance Manual (FCCM)

complaints.[22]  When conducting compliance evaluations and complaint investigations, COs must query the VETS-4212 database online to verify that a federal contractor completed the annual reporting requirements for the appropriate reporting year.  COs must then record the results of these inquiries in Part B.I of the SCER.  Moreover, the information in this database, in combination with data provided under 41 CFR 60-300.44(k), may be useful when analyzing an employer's recruitment and hiring practices.  OFCCP provides a periodic report to VETS of contractors who have not filed the VETS-4212.[23]

Additionally, COs should check the DOL Enforcement Database at https://enforcedata.dol.gov/ for closed complaints and compliance evaluations of the contractor's establishment, and may reach out to other DOL agencies such as the Wage and Hour Division (WHD) or the Occupational Safety and Health Administration (OSHA) for information on the compliance history of the establishment.  For example, the WHD may have filed Family and Medical Leave Act (FMLA) violations related to the contractor that is the subject of a compliance evaluation.

## 1B06   INFORMATION ON COMPLAINTS FILED WITH OR BY OTHER AGENCIES

COs must carefully examine all information regarding EEO complaints against a contractor that they receive from federal, state, and local agencies in response to a letter of inquiry.  COs enter basic information about these complaints in Part A of the SCER, including:

- The agency with which the complaint was filed;

- The jurisdictional or legal basis (*e.g.,* race, sex) of the complaint;

- The current status of the complaint; and

- The area of the contractor's workforce involved in the complaint.

COs will note any patterns in the types of complaints filed and any discrimination findings made on them.  For example, there may be a clustering of complaints filed by employees in certain job areas, or by applicants or employees from a particular race, religion, ethnic group or sex; by covered veterans; or by individuals with disabilities.  As the review progresses, COs must cross-reference complaints to any potential problem areas they identify.  There may be, for example, indications of a lack of good faith efforts, statistical indicators of discrimination, or concentration or underrepresentation in areas where complaints were filed.

When appropriate, COs will contact the appropriate EEOC office or state or local FEP agency to arrange the review of relevant discrimination complaint files as part of the compliance evaluation.  This review can be particularly useful when, based on the result of the desk audit, a CO identifies potential systemic problems in complaint areas.

---

[22]  Sample letters are in this Manual, including Letter L-3, Sample Letter For Requesting Job Listing From Employment Service Delivery Systems, and L-4, Sample Inquiry Letter for Requesting Information on Pending Review from Veterans Employment and Training Service.
[23]  41 CFR 60-300.60(c).

Federal Contract Compliance Manual (FCCM)

Upon receipt of the AAPs and Itemized Listing data, COs must compare any information a contractor provides concerning current or past complaints to the information received from other agencies. COs will note discrepancies and information not provided by the contractor for possible further investigation during the review, and will seek an explanation and additional information from the contractor.

## 1B07   RELATIONSHIP OF OFCCP COMPLIANCE ACTIVITIES TO LITIGATION OR COURT ORDERS

If, during the conduct of a compliance evaluation, a CO finds that the contractor is involved in litigation or is under a court order on EEO matters, then the CO must identify:

- The EEO issues involved;

- The court and the parties; and

- The case name and number.

The CO must bring the matter to the attention of his or her supervisor. The field office, in consultation with the regional Solicitor of Labor (RSOL), will determine whether the litigation or court order imposes limitations on the compliance evaluation.

## 1B08   REVIEW OF COMMUNITY RESOURCE FILES

Each field office must maintain resource files on the communities within its geographic area. For each community, these files should identify local organizations that represent or provide services to protected groups. These entities would include groups and organizations representing or servicing women, racial and ethnic minorities, veterans, individuals with disabilities, and individuals who identify as lesbian, gay, bisexual, or transgender. Some COs may not be knowledgeable about the local organizations in the area. In these instances, the COs must review the resource files and introduce themselves to representatives from the various organizations. The Communications Team in the national office and Regional Office Outreach Coordinators (ROCs) may also be useful resources.

If a contractor is located near an Indian and Native American Reservation with a Tribal Employment Rights Organization (TERO) or other employment organization on the reservation, COs must contact these organizations. Chapter 2 of this Manual discusses the importance of linkages and how a CO can establish relationships with local organizations representing covered group members.

## 1B09   REVIEW OF PREVIOUS COMPLIANCE ACTIONS

COs must determine whether another OFCCP office recently reviewed or is reviewing the same contractor when scheduling contractor establishments for compliance evaluations. If another OFCCP office is currently reviewing a contractor proposed for an evaluation, the CO or the supervisor must contact the supervisor of the other OFCCP office to discuss what issues, if any, are present in their ongoing case. This is particularly important for detecting company-wide practices

Desk Audit | 19

(240 of 300), Page 240 of 300 Case: 24-880, 07/10/2024, DktEntry: 16.2, Page 240 of 300
Case 3:22-cv-07182-WHA   Document 39-1   Filed 10/18/23   Page 153 of 1025

Federal Contract Compliance Manual (FCCM)

that result in discrimination. An example of this issue may be a test that is not validated and has an adverse impact on specific groups.

COs may also examine closed case files or OFIS to identify issues relevant to the current evaluation. COs should also note the terms of any CA or consent decree, including back pay, hires and other remedial measures contained in the CA or consent decree. In addition, COs must determine whether a contractor has been subject to an OFCCP complaint investigation and, if so, review the complaint file for any violations or problems identified.[24] Any violations found in these past compliance actions must be recorded in Part A of the SCER. While the existence of a past problem is not considered evidence of the existence of present problems, COs must be alert to any indications that past problems remain unresolved, have recurred or that similar problems have arisen.

## 1C    RECEIPT OF AAPs AND ITEMIZED LISTING DATA FOR DESK AUDIT

The desk audit begins with receipt of the AAP(s). The appropriate field office should receive copies of a contractor's current Executive Order 11246 AAP within 30 calendar days of the contractor's receipt of the Scheduling Letter and Itemized Listing. The office should also receive separate or combined AAPs for Section 503 and VEVRAA within this same timeframe.[25] If the field office does not receive the current AAPs or Itemized Listing information within this timeframe, the CO must call the contractor to determine the status.

### 1C00   NONRECEIPT OF AAPs

If the contractor fails to request an extension, if the request is denied, or if the contractor fails to submit any of the AAPs it is required to maintain within the established timeframe, the CO must recommend issuance of an SCN. The CO's supervisor has the discretion only under extraordinary circumstances to grant the contractor a reasonable extension if the contractor does not submit the AAPs on time. This discretion should be exercised within the parameters set by the national office.[26] Additionally, the regulations at 41 CFR 60-1.26(b)(1), 60-300.65, and 60-741.65 give the director of OFCCP the discretion to immediately refer the matter to the Solicitor for administrative enforcement when a contractor refuses to submit an AAP and efforts to conciliate the matter are unsuccessful.

### 1C01   NONRECEIPT OF ITEMIZED LISTING DATA

If, in response to the Scheduling Letter and Itemized Listing, a contractor does not meet its deadline to submit all the Itemized Listing records requested, including employment activity data, the CO must immediately begin the process to issue an SCN.[27] This process also applies to contractors who receive the one-time, 30-day extension for submitting Itemized Listing information explained in 1B04. Examples of incomplete information include not submitting data for one or more personnel

---

[24]  See subsection 1B06 – Information on EEO Complaints Filed with or by Other Agencies.
[25]  The contractor has the option to prepare a combined Section 503 and VEVRAA AAP or to prepare separate Section 503 and VEVRAA AAPs.
[26]  See Directive 2018-08, "Transparency in OFCCP Compliance Activities."
[27]  Procedures for issuing an SCN are in Chapter 8 – Resolution of Noncompliance.

SER-240

Federal Contract Compliance Manual (FCCM)

activity elements, such as applicant flow, hires, compensation, promotions or terminations.  As with all correspondence, conversations, emails, or other communication, this contact must be meticulously recorded in the Case Chronology Log, in the event OFCCP goes to litigation.

## 1C02   REGULATORY CITATIONS FOR RECORDKEEPING

If a contractor fails to submit data because it did not maintain appropriate records, one or more of the following regulatory sections may be applicable for COs to cite in the SCN or other closure document.

- Executive Order 11246 Recordkeeping and Related Requirements, 41 CFR 60-1.12 and 60-2.17(b) and 60-2.17(d).  These two sections set forth requirements that necessitate recordkeeping of employment and personnel records.

  o Section 60-1.12 sets forth the required document retention periods and identification requirements for all employment and personnel records and AAPs.  Generally, a contractor must retain these records for two years unless it has less than 150 employees or does not have a federal contract of at least $150,000, in which case the period is one year.

  o Section 60-2.17(b) requires that an AAP identify problem areas and Section 60-2.17(d) requires that an AAP include internal audit and reporting systems.  COs may cite these requirements in conjunction with recordkeeping violations because they cannot be appropriately implemented without maintaining and analyzing basic data on employment activity as required by 41 CFR 60-3.4 and 60-3.15.

  o General Data Requirements under the Uniform Guidelines on Employee Selection Procedures (UGESP), 41 CFR Part 60-3.  These guidelines were designed to provide a framework for determining the proper use of tests and other selection procedures used as a basis for employment decisions.  Section 60-3.4 requires contractors to maintain records that show the impact such selection procedures have on the employment opportunities of persons by identifiable race, sex, and ethnic groups.  The race and ethnic groups are defined by 41 CFR 60-3.4B as Black, Hispanic, Asian, American Indian, and White other than Hispanic.  However, OFCCP also permits contractors to keep their records concerning impact by using the race and ethnic categories on the Equal Employment Opportunity Standard Form 100, Employer Information Report EEO-1 series (EEO-1 report).

    i. *Recordkeeping Requirements under UGESP for Contractors with 100 or More Employees*.  41 CFR 60-3.15A(2) requires contractors with 100 or more employees to maintain and have available records or other information for each job showing whether the total selection process for that job has an adverse impact based on race, sex, or ethnic group as defined by 41 CFR 3.5B, described above.  Contractors must have records on adverse impact determinations for each protected group that constitutes at least 2% of the labor force in the relevant labor area or 2% of the applicable workforce.  Where the total selection process has an adverse impact, the CO may request validity evidence for each component of that process which has an

Federal Contract Compliance Manual (FCCM)

adverse impact. Different types of validity evidence that may be maintained by contractors are explained in 41 CFR 60-3.15A(3).

ii. *Recordkeeping Requirements under UGESP for Contractors with less than 100 Employees*. 41 CFR 60-3.15 A(1) requires contractors with less than 100 employees to maintain and have available records for each job on all applicants, hires, promotions, terminations and any other selection decisions by sex and, where appropriate, by race and national origin. Contractors should maintain these records for any race or national origin group constituting more than 2% of the labor force in the relevant labor area. However, it is not necessary to maintain records by race and national origin if one race or national origin group in the relevant labor area constitutes more than 98% of the labor force in that area. If a CO has reason to believe a contractor's selection procedure has an adverse impact, the CO may request evidence of validity for that procedure.

- Section 503 Recordkeeping Requirements, 41 CFR 60-741.80, 60-741.44(f)(4) and 60-741.44(k). Section 60-741.80 provides the general recordkeeping requirements for Section 503 while Sections 60-741.44 (f)(4) and (k) explain the retention requirements for the assessment of external outreach and recruitment efforts, and the data collection analysis, respectively.

  o Section 60-741.80 sets forth the required document retention periods and identification requirements for all employment and personnel records, including, but not limited to, hires, requests for reasonable accommodation, terminations, the results of any physical examination, post-offer invitations to self-identify and any subsequent invitations to employees to self-identify. Generally, a contractor must retain these records for two years, unless it has fewer than 150 employees or does not have a federal contract of at least $150,000, in which case the period is one year.

  o Sections 60-741.44(f)(4) and (k) require contractors to maintain certain records for three years. Such records include documentation of all activities contractors undertake to disseminate their affirmative action policies externally, and to conduct and assess outreach and positive recruitment. The three-year retention period also applies to documentation of the computations and comparisons performed by contractors to analyze applicant and hire data for individuals with disabilities.

- VEVRAA Recordkeeping Requirements, 41 CFR 60-300.80, 60-300.44(f)(4), 60-300.44(k), and 60-300.45(c). Section 60-300.80 provides the general recordkeeping requirements for VEVRAA while Sections 60-300.44(f)(4) and (k) explain requirements for external outreach and recruitment efforts, and the data collection analysis, respectively. Finally, Section 60-300.45(c) provides the requirement for documenting the annual VEVRAA hiring benchmark.

  o Section 60-300.80 sets forth the required document retention periods and identification requirements for all employment and personnel records, including, but not limited to, hires, requests for reasonable accommodation, terminations, results of any physical examination, and post-offer invitations to self-identify. Generally, a contractor must

Federal Contract Compliance Manual (FCCM)

retain these records for two years unless it has fewer than 150 employees or does not have a federal contract of at least $150,000, in which case the period is one year.

o Sections 60-300.44(f)(4) and (k) require contractors to maintain certain records for three years. Such records include documentation of all activities contractors undertake to disseminate their affirmative action policies externally and to conduct and assess outreach and positive recruitment. The three-year retention period also applies to documentation of the computations and comparisons performed by contractors to analyze applicant and hire data on protected veterans, including data gathered from invitations to self-identify for applicants and those applicants who have been hired.

o Section 60-300.45(c) requires contractors to document the hiring benchmark that they establish each year, along with the factors they considered and their relative significance, and to retain the documentation for three years. In reviewing this documentation, the CO must determine whether the contractor used the five-factor method for establishing the VEVRAA hiring benchmark or if the contractor set its benchmark to equal the national percentage of veterans in the civilian labor force. If the contractor used the five-factor method, the CO must examine the relative significance of each factor considered by the contractor in setting its benchmark.

## 1C03  EVALUATION PERIOD

COs must evaluate the contractor's AAPs and Itemized Listing data for at least the last full AAP year. COs must also examine the current year data if the contractor is six months or more into its current AAP year. For current year data of six months or more, the CO must examine the underlying records if the contractor cannot or has not yet computed the data. For example, if the contractor establishes its AAPs on a calendar year basis (January – December) and the compliance evaluation is scheduled in August, a CO would evaluate the contractor's data from January through December of the prior year. In addition, the CO would examine the data or underlying records at least from January through June of the current year.

## 1C04  ADDITIONAL DATA REQUESTS

A CO should not request any supplemental data during the desk audit after the contractor has responded to the Scheduling Letter and Itemized Listing underline unless:

- The contractor's submission is incomplete; or

- The CO needs to clarify information provided by the contractor for the desk audit.

If the contractor does not make a complete submission in response to the Scheduling Letter and Itemized Listing,[28] then the CO must follow the procedures in 1C00 or 1C01, as appropriate.

The CO may find an indicator of discrimination at desk audit and need to request additional data to perform refined analysis before going on-site. This supplemental records request must include the

---

[28] FCCM 1E discusses what must be included in the contractor's submission. FCCM 1F, 1G and 1H explain how to evaluate whether the content submitted is acceptable.

Desk Audit | 23

Federal Contract Compliance Manual (FCCM)

basis for the request, be reasonably tailored to the areas of concern, and allow for a reasonable time to respond.

Special circumstances or exceptions may also exist that warrant a CO extending the analysis of a contractor's AAPs, personnel activity, policy implementation and supporting documentation to cover a period beginning two years before the date the contractor received the Scheduling Letter. The appearance of potential discrimination and missing records are examples of such special circumstances or exceptions. To fully investigate and understand the scope of potential violations, the CO may also need to examine records created after the date of the Scheduling Letter to determine, for example, if indicators of these potential violations appear or whether the situation or factors resulting in the indicators have been remedied. This assumes, however, that the CO, in conjunction with DPO, can establish coverage for the entire period. If the CO believes it is necessary to request information related to periods after the date of the Scheduling Letter, the CO must discuss the issue with his or her supervisors. The CO will request data relevant to the potential discrimination issues identified at the desk audit to determine how far into the evaluation period the violation extends and whether the violation continues to the present day. This information is necessary to ensure that any discriminatory practices have ended and to ensure that all victims of discrimination receive appropriate remedies.

## 1D   REVIEW OF AAPs: OVERVIEW

After receiving a contractor's AAPs and Itemized Listing data, COs must ensure that they are complete and acceptable. There are three types of determinations that a CO must make: inclusion, missing items, and acceptability; each is described below.

- *Inclusion*. Immediately review the material to ensure that the contractor provided all of the materials identified in the Scheduling Letter and accompanying Itemized Listing. Figure F-3 contains the current Scheduling Letter and Itemized Listing.

- *Missing Items*. Create an inventory list of every document that the contractor provided, including the date requested, if any, and date received. Also record on the list the items requested but not provided by the contractor.

- *Acceptability*. Determine whether the AAPs and Itemized Listing data are current, complete and acceptable.

The results of this initial review for inclusion and acceptability, as outlined below in sections 1E through 1H, are documented on Part B.I of the SCER. Each specific problem a CO identifies is described in Part B.II of the SCER, along with the corrective actions the CO plans to take to resolve them. To minimize duplication of work as well as the time it takes to complete a desk audit, COs should begin to analyze supporting data only after determining that the AAPs and supporting data are complete and acceptable.

SER-244

(245 of 300), Page 245 of 300
Case: 24-880, 07/10/2024, DktEntry: 16.2, Page 245 of 300
Case 3:22-cv-07182-WHA   Document 39-1   Filed 10/18/23   Page 158 of 1025

Federal Contract Compliance Manual (FCCM)

## 1E    REVIEW OF ALL AAPs AND ITEMIZED LISTING DATA TO ENSURE SUBMISSIONS INCLUDE REQUIRED CONTENT

This Section covers CO actions and responses when AAPs and Itemized Listing submissions are not current or are missing information requested in the Scheduling Letter and Itemized Listing. The first subsection, 1E00, is devoted to AAPs that are not current while 1E01 and 1E02 cover the issue of inclusion and the actions that can be taken when AAP submissions are missing data. Subsection 1E03 discusses the review of Itemized Listing data to ensure all required data is included in the contractor's submission.

### 1E00   ACTION WHEN AAP IS NOT CURRENT

After receiving the desk audit submission, a CO first determines whether the AAP is current, that is, whether the AAP was effective as of the date of the Scheduling Letter. If it is not, the CO will contact the contractor and request immediate submission of the current AAP. If the contractor fails to submit the AAP, the CO must recommend the issuance of an SCN.[29]

### 1E01   INCLUSION

If the contractor's AAPs are current, the CO will review the AAPs and Itemized Listing data to determine whether the contractor's submissions include all requested information. To do so, the CO must first determine whether the contractor submitted all materials requested in the Scheduling Letter and Itemized Listing. Next, the CO must determine if the AAPs contain all the elements required by the regulations.

The elements of the required Executive Order AAP are listed in 41 CFR 60-2.10(b) while the required contents of Section 503 and VEVRAA AAPs are found in 41 CFR 60-741.44 and 60-300.44, respectively.

### 1E02   MISSING AAP ELEMENTS

Actions that must be taken when an AAP is missing or inadequate under the legal authorities enforced by OFCCP are discussed in this subsection. First is the discussion of the Executive Order AAP, followed by AAPs under Section 503 and VEVRAA.

a. *Executive Order AAP.* If one or more of the below listed Executive Order AAP elements is missing, COs must automatically consider the submission unacceptable.

- Organizational Profile (workforce analysis or organizational display);

- Job group analysis, including a list of the job titles that compose each job group;

- The percentage of minorities and the percentage of women employed in each job group;

---

[29] See Chapter 8, Section D.

Federal Contract Compliance Manual (FCCM)

- Utilization analysis, including its component parts of job group formation, availability estimates and, as appropriate, identification of underutilization;

- Comparison of incumbency to availability;

- Placement goals at least equal to the availability figure derived for women or minorities, as appropriate for job groups where the number of minorities or women employed is less than would be reasonably expected, given their availability;

- Designation of a responsible official;

- Identification of problem areas;

- Action-oriented programs designed to correct any problem areas; or

- Internal audit and reporting system.

A CO must contact the contractor and request that it immediately provide the information. The CO should also provide the contractor with compliance assistance, if needed. If the contractor does not comply, the CO must suspend the desk audit and recommend the issuance of an SCN. If the contractor includes all of these elements, the CO will then evaluate them for acceptability.

b. *Section 503 AAP and Utilization Goal.* If one or more of the below listed Section 503 AAP and utilization goal elements is missing, COs must automatically consider the submission unacceptable.

- Equal employment opportunity policy statement;

- Review of personnel processes to ensure careful, thorough and systematic consideration of individuals with disabilities for job vacancies, promotion and training opportunities;

- Schedule for the periodic assessment of physical and mental job qualifications, to the extent they screen out individuals with disabilities, to ensure they are job-related and consistent with business necessity;

- Reasonable accommodation to physical and mental limitations, including copies of any reasonable accommodation policies, and documentation of any accommodation requests received and their resolution;

- Procedures to ensure that employees are not harassed on the basis of disability;

- External dissemination of the contractor's EEO policy;

- Description of outreach and positive recruitment efforts, and annual assessment from the evaluation of the effectiveness of those efforts;

- Internal dissemination of the contractor's EEO policy;

Federal Contract Compliance Manual (FCCM)

- Description of the contractor's audit and reporting system, including documentation of all actions taken to comply with the audit and reporting system requirements;

- Designation of responsible official;

- Policy to train all personnel involved in the recruitment, screening, selection, promotion, disciplinary and related processes to ensure that the commitments in the contractor's AAP are implemented;

- Data collection on applicants and hires, including documentation of the computations or comparisons of applicant and hire data;

- Analysis of contractor's utilization of individuals with disabilities;

- Identification of problem areas; or

- Action-oriented programs designed to correct any problem areas.

A CO must contact the contractor and request that it immediately provides the missing information. The CO may provide the contractor with compliance assistance, if needed. If the contractor does not comply, the CO must suspend the desk audit and recommend the issuance of an SCN. If the contractor includes all of these elements, the CO will then evaluate them for acceptability.

c. *VEVRAA AAP and Hiring Benchmark.* If one or more of the below listed VEVRAA AAP and hiring benchmark elements is missing, COs must automatically consider the submission unacceptable.

- Equal employment opportunity policy statement;

- Review of personnel processes to ensure careful, thorough and systematic consideration of protected veterans for job vacancies, promotion and training opportunities;

- Schedule for the periodic review of physical and mental job qualifications to ensure they are job-related and consistent with business necessity;

- Reasonable accommodation to physical and mental limitations;

- Procedures to ensure that employees are not harassed because of their status as a protected veteran;

- External dissemination of the contractor's EEO policy;

- Description of outreach and positive recruitment efforts, and results from the evaluation of the effectiveness of those efforts;

- Internal dissemination of the contractor's EEO policy;

Federal Contract Compliance Manual (FCCM)

- Description of the contractor's audit and reporting system, including documentation of all actions taken to comply with the audit and reporting system requirements;

- Designation of responsible official;

- Policy to train all personnel involved in the recruitment, screening, selection, promotion, disciplinary and related processes to ensure that the commitments in the contractor's AAP are implemented;

- Data collection on applicants and hires, including documentation of the computations or comparisons of applicant and hire data; or

- Documentation of the annual hiring benchmark established by the contractor.

A CO must contact the contractor to request that the contractor provide any missing elements immediately. The CO should provide the contractor with compliance assistance, if needed. If the contractor does not comply, the CO must suspend the desk audit and recommend issuance of an SCN. If the contractor included all of these elements, the CO will then evaluate them for acceptability.

## 1E03   MISSING ITEMIZED LISTING DATA

The Itemized Listing requests various data related to all three of OFCCP's legal authorities with varying time parameters. For instance, contractors are required to submit the last three years of their Employer Information Reports (EEO-1 reports). For employment activity data, including employee-level compensation data, they are required to submit the data only for the immediately preceding AAP year unless they are at least six months or more into their current AAP year, in which case they would submit the current AAP year data or the underlying records if the contractor cannot or has not computed the current year data as well. The Itemized Listing must be reauthorized by OMB at least every three years, so it is subject to change. Figure F-3 contains the current Itemized Listing.

As explained in subsection 1C01, the CO must recommend the issuance of an SCN if the contractor fails to submit Itemized Listing data. After confirming receipt of the Itemized Listing data, the CO must ensure that the submission is complete. If one or more of the items is missing, the CO considers the submission incomplete. A CO must contact the contractor to request any missing items immediately and should provide the contractor with compliance assistance if needed. If the contractor does not comply, the CO must suspend the desk audit and recommend the issuance of an SCN. If the contractor included all of the items, the CO will then evaluate them for acceptability.

## 1F   REVIEW OF AN EXECUTIVE ORDER AAP AND ITEMIZED LISTING DATA FOR ACCEPTABILITY

The next three sections discuss a CO's review of a contractor's AAPs for acceptability. Because the requirements for acceptability are not the same under all of the laws that OFCCP enforces, the acceptability requirements for the Executive Order AAP, Section 503 AAP and VEVRAA AAP are reviewed separately. FCCM section 1F reviews the acceptability requirements for the Executive

Federal Contract Compliance Manual (FCCM)

Order AAP and Itemized Listing data. Section 1G discusses the acceptability requirements for the Section 503 AAP and Itemized Listing data, and section 1H discusses the acceptability requirements for the VEVRAA AAP and Itemized Listing data.

The regulations at 41 CFR 60-2.10 through 60-2.17 list the required elements of an Executive Order AAP and specify what a contractor must include in a written AAP. Once a CO determines that the contractor's submission includes the elements necessary to proceed with the desk audit, the desk audit proceeds with an evaluation of the acceptability of each required element. Specifically, the CO examines the AAP to determine if the information the contractor provided in each element is sufficient to satisfy the regulatory requirements. The determination of the *acceptability* of the items listed in Part B.II of the SCER is limited to the evaluation that the CO can conduct during the desk audit. The CO may identify items in the part of the SCER that need further review on-site. This process is different from an evaluation of a contractor's *implementation* of its AAP and regulatory requirements which, in most instances, the CO cannot determine without further investigation on-site. On-site reviews are discussed in Chapter 2.

We address the acceptability assessment of each required element below.

## 1F00   ORGANIZATIONAL PROFILE

An organizational profile is a depiction of the staffing pattern within an establishment. Contractors must use either a workforce analysis or an organizational display as its organizational profile.

*a.   Workforce Analysis*. Under 41 CFR 60-2.11(c), a workforce analysis is acceptable if it:

- Contains a listing of each job title as it appears in applicable collective bargaining agreements or payroll records within each department or other similar organizational unit including the unit supervisor, ranked from the lowest-paid to highest-paid (or highest to lowest); and

- Provides a separate listing for each work unit or line of progression including the unit supervisor when there are separate work units or lines of progression within the department or organizational unit.

In addition, the workforce analysis must include information by job title, wage rate, department and/or organizational unit and lines of progression. Below is a description of each of these elements.

- *Information by Job Title*. Each job title listed shows the total number of people in the job title, the total number of men and women, and the total number of men and women in each of the races and ethnic groups identified in 41 CFR 60-2.11 or in the current EEO-1 report.[30] The list must include all job titles, including managerial job titles. Upper management positions located in the establishment must be included in an establishment's workforce

---

[30]   See OFCCP Directive 2008-02, "Federal contractors' obligation to maintain and analyze the race and ethnicity data of applicants and employees in Affirmative Action Programs prepared under Executive Order 11246, as amended." This guidance indicates that OFCCP will accept AAPs and supporting records that reflect the race, ethnicity and job categories outlined in either 41 CFR Part 60-2 or the current EEO-1 Report. Also, for purposes of complying with OFCCP requirements, contractors choosing to follow the current EEO-1 categories may count applicants and employees identifying as "two or more races" as minorities.

Federal Contract Compliance Manual (FCCM)

analysis, even though the managers may have been chosen by those outside the establishment and included for goal-setting purposes in a corporate or mid-level AAP.[31]

- *Wage Rate.* The wage rate or salary range for each job title must be provided, although this information may be coded. Titles must be listed from the lowest-paid to highest-paid. Contractors must provide the key to wage rate or salary range codes if they are used. The codes must be consistent across department or unit lines. For example, a job with a salary code 1157 in Department A pays the same as one coded 1157 in Department B. The codes must also be consistent in wage rate or salary range order within each department or other similar organization unit. Finally, the contractor's submission should include a list of the codes used in wage and salary order with the lowest and highest codes labeled appropriately.

- *Departments or Organizational Units.* The departments or organizational units, or both, used in the workforce analysis must be identifiable and should reflect the contractor's organizational structure. If the contractor provides an organizational chart as part of the supporting documentation, the CO will compare it to and match it with the units used in the workforce analysis.

- *Lines of Progression.* Lines of progression or usual promotional sequences show the order of jobs in the line through which an employee moves to reach the top of the line. Lines of progression or promotional sequences can be identified from collective bargaining agreements, as well as from organizational charts. If the CO determines that lines of progression exist but adequate information is not provided at the desk audit, the CO will contact the contractor to request a prompt submission of the information.

b. *Organizational Display.* An acceptable organizational display is one that meets the requirements of 41 CFR 60-2.11(b). It must contain the following elements for each unit:

- Name of the unit;

- Job title, gender, race and ethnicity of the unit supervisor (if the unit has a supervisor);

- Total number of male and female employees in the unit; and

- Total number of male and female employees by racial or ethnic groups.

## 1F01  JOB GROUPS

A job group analysis is acceptable if it meets the requirements of 41 CFR 60-2.12. Each job group must be a group of jobs and/or job titles within a particular establishment having similar content, wage rates and opportunities.

a. *List of Titles in Each Group.* In order for COs to assess job group acceptability, the AAP must include, for each job group, a listing of the job titles that make up that group. If a contractor did

---

[31]  41 CFR 60-2.11(c)(4).

Federal Contract Compliance Manual (FCCM)

not provide the lists, the CO must immediately contact the contractor and request that the lists be promptly provided for the desk audit.

b. *Criteria for Acceptability.*  The following criteria are to be used in assessing the acceptability of job groups:

- *Similar Work Content.*  Similarity of work "content" refers to the duties and responsibilities of the job titles that make up the job group.

  - *Appropriate EEO Category.*  The CO will review the establishment's job titles that make up each of the job groups to verify they are within the proper EEO-1[32] job categories. Job titles in each job group must, as a general rule, be within the same EEO-1 job category.[33]

  - *Use of Occupational Information Network (O\*NET).*  The CO may refer to the U.S. Department of Labor's Employment and Training Administration's O\*NET database, as well as collective bargaining agreements, organizational charts and other data provided by the contractor to evaluate how the contractor formulated its job groups.  O\*NET lists standard job titles for most positions and codes them based on their duties, requirements and other factors.  O\*NET also gives descriptions of job duties and commonly required qualifications.

- *Similar Rates of Pay.*  COs must review pay rates in conjunction with job content.  Large apparent differences in pay among job titles within a job group or different locations within an organization, or both, suggest an unacceptable job grouping.  They may also indicate areas where compensation or job assignment practices need further review.

- *Similar Opportunities.*  "Opportunity" refers to the ability to take advantage of training opportunities, transfers, promotions, mobility to desirable wage or salary situations and other employment benefits.  Most often, it refers to upward mobility.  Ideally, each job within a job group should offer the same opportunities as any other job within that job group.

  - *Jobs in Separate Unions.*  Jobs groups should not group together jobs from separate unions or jobs from different departments where interdepartmental mobility is not available.  For example, job groups should not normally group together nonunion clerical jobs and clerical jobs that are covered by a collective bargaining agreement.

  - *Jobs in Lines of Progression.*  Contractors should separate jobs that are in lines of progression from those that are not.  When transferring or hiring into jobs above entry level is rare, COs must analyze each line of progression separately.  When there are lines of progression governed by strict seniority, the contractor should consider the job titles in the progression as a single job group.

---

[32]  Higher education institutions are required to submit the IPEDS.

[33]  Contractors that employ fewer than 150 employees are permitted to use the job categories listed in OFCCP's regulations or the current EEO-1 job categories which subdivide the Officials and Managers category into two categories: Executive/Senior Level Officials & Managers, and First/Mid-Level Officials & Managers.

Desk Audit | 31

Federal Contract Compliance Manual (FCCM)

c. *Job Groups Must Not Obscure Underutilization*. Job groups that combine jobs with different content, wages or opportunities may obscure underutilization and OFCCP does not accept them.

d. *Effect of Size of Contractor's Workforce*. While assessing the acceptability of a contractor's job groups, COs must remember that the size of the contractor's workforce is a major factor in determining how well the contractor meets the three criteria for the acceptability of job groups.

- *Job Groups Must Permit Meaningful Analyses*. Job groups should have enough incumbents to permit meaningful utilization analyses and goal setting. Optimally, when COs identify underutilization in a job group, the job group should be large enough so that a goal of at least one whole person can be established. No minimum size is established for this purpose because the goal is dependent on the size of the job group, and the percentage and the number of minorities or women already in the job group.

- *Job Groups Should Not Normally Cross EEO-1 Job Categories*. A contractor's job groups should not ordinarily cross EEO-1 job categories. This means, for example, that a job group should not consist of a mixture of job titles from the "Professional" category and the "Technicians" category. COs should note that larger contractor establishments may have multiple job groups that fall into the same EEO-1 job category. Also, COs should note that smaller establishments (fewer than 150 employees) may use the EEO-1 job categories as their job groups.

e. Relationship Between Job Groups and Availability. The organization of jobs into groups should allow contractors to tie specific jobs to availability statistics to assess the degree to which their workforce representation approximates availability.

## 1F02 EXECUTIVE ORDER UTILIZATION ANALYSIS

The utilization analysis is a series of separate but interrelated analyses COs use to identify whether a contractor employs minorities or women in the workforce at a rate that would be expected based upon their availability for employment. Contractors must perform a utilization analysis that includes the placement of the contractor's employees into job groups, the determination of the availability for the employment of minorities and women, and a comparison of their incumbency in the job groups to their availability. If a contractor's utilization analysis reveals the underutilization of minorities or women, or both, in any of the job groups, the contractor must establish placement goals designed to cure the underutilization.

a. *Placement of Incumbents in Job Groups*. Having combined the job titles for the job group analysis, the contractor must separately state the percentage of minorities and the percentage of women employed in each job group.

b. *Determining Availability*. After aggregating individual job titles into job groups, the contractor must determine the availability of women and minorities for those job groups. "Availability" is a percentage estimate of the women and minorities in the reasonable recruitment area who have the skills required to perform the jobs within the job groups compared to all. When determining availability, the contractor must separately determine the availability of minorities and women for each job group, and consider at least the following factors:

Desk Audit | 32

Federal Contract Compliance Manual (FCCM)

- The percentage of minorities and women with the requisite skills in the "reasonable recruitment area," sometimes referred to by COs as "external availability." We define "reasonable recruitment area" as the geographical area from which the contractor usually seeks, or reasonably could seek, workers to fill the positions in question. When selecting the reasonable recruitment area, the contractor must not select an area in such a way that it would exclude minorities or women. For each job group, the contractor must identify and provide a brief explanation of the rationale for the selection of that recruitment area.

- The contractor should utilize the most current and discrete statistical information available to derive availability figures (such as census data, data from local job service offices, colleges and other training institutions). When evaluating the contractor's availability information, COs must utilize the most recent EEO Tabulation (EEO Tab).[34]

- The percentage of minorities and women among those promotable, transferable or trainable within the contractor's organization, is sometimes referred to by COs as "internal availability." The contractor must not define the pool of promotable, transferable and trainable employees in such a way as to exclude minorities or women. For each job group, the contractor must identify the pool of promotable, transferable and trainable employees, and provide a brief explanation of the reason for the selection of that pool.

- Though not required, some contractors assign a percentage or "weight" for availability rates of employees recruited into the job group. For example, if there are several job titles in the job group, and the job titles have differing availability rates, the contractor may weight each job title differently when determining the availability for the job group as a whole. In that instance, the sum of the weighted availability estimates for all job titles in the job group must be the composite availability for the job group.[35] A contractor may also choose to determine availability by weighing the internal and external availability for a particular job group. In that example, the availability would be a sum of the external availability and internal availability rates.

c. *Comparing Incumbency to Availability*. The contractor must compare the utilization of minorities and women in each job group with their estimated availability, and identify job groups where the percentage employed is less than would be reasonably expected, given their availability.

We use the term "underutilization" to refer to the presence of fewer minorities or women in a particular job group than would reasonably be expected, given their availability. Contractors use a number of methods to determine whether the representation rates of minorities and women are lower than would reasonably be expected. Some contractors declare underutilization when

---

[34] The EEO Tab is a custom tabulation of demographic data about the civilian workforce compiled every five to 10 years by the U.S. Census Bureau. It is sponsored by a consortium of federal agencies consisting of OFCCP, the EEOC, the Department of Justice and the Office of Personnel Management. The EEO Tab is derived from American Community Survey (ACS) data, and includes information about the race, sex, ethnicity, age, educational attainment, earnings and citizenship status of individuals in the civilian workforce, by geography, occupation and industry. The current EEO Tab may be accessed on OFCCP's website, at *https://www.dol.gov/ofccp/regs/compliance/Census.html* (last accessed Oct. 2019).
[35] 41 CFR 60-2.14(g).

there is any difference between the availability percentage and the utilization percentage, while others conclude that underutilization exists when the number of minority or women incumbents in a particular job group is at least one whole person lower than the number predicted by the availability percentages.  Other contractors use a general "80%" rule and declare underutilization only when the representation of minorities or women is less than 80%of availability (which is the expected representation).  Still others test whether the difference between the actual and expected representation of minorities and women is statistically significant.

While contractors may choose any of these methods for comparing incumbency and availability, they must uniformly apply the same standard to all job groups, as appropriate.  Occasionally, a different method may be more appropriate to determine underutilization.  For example, in some instances it may not be reasonable for contractors to use the two standard deviation method.  No matter the method used, the contractor should be able to explain why it selected that method. Contractors should not use more than one method so as to mask underutilization.

The contractor must establish a placement goal if the percentage of women or minorities, or both, employed in a specific job group is less than would be reasonably expected, given their availability percentage in that particular job group.

## 1F03   PLACEMENT GOALS

Regardless of the method employed to determine underutilization, the contractor must establish a placement goal for each job group where minorities or women, or both, are underutilized.[36]  The placement goal established must be at least equal to the availability percentage of the underutilized minorities and women for the specific job group.[37]  The contractor may establish a goal higher than required under the Executive Order.  Placement goals are not rigid and are not quotas.

Contractors are generally required to set a single goal for all minorities when minorities as a whole are underutilized.  However, in the event of a substantial disparity in the utilization of a particular minority group, or the utilization of men or women of a particular minority group, the contractor may be required to establish separate goals for those groups.[38]

## 1F04   ADDITIONAL REQUIRED ELEMENTS OF AN EXECUTIVE ORDER AAP

This subsection, focusing on 41 CFR 60-2.17, covers the designation of responsibility for the AAP, identification of problem areas, creation of action-oriented programs, reporting system and internal audit, and reviewing the results of the report.

*a.  Designation of Responsibility*.  Under 41 CFR 60-2.17(a), contractors must provide for the implementation of EEO obligations and the AAP by assigning responsibility and accountability to an official of the organization.  These officials must have sufficient authority and resources, and must also have the support of, and access to, top management to ensure the effective implementation of the contractor's EEO obligations and AAP.  To be acceptable, the AAP

---

[36]   41 CFR 60-2.15.
[37]   41 CFR 60-2.16(b).
[38]   41 CFR 60-2.16(d).

Federal Contract Compliance Manual (FCCM)

should contain, at a minimum, a narrative description of the positions or job titles, or both, that the contractor designates to direct or manage its AAP and a description of the incumbent's duties.

b. *Identification of Problem Areas*.  41 CFR 60-2.17(b) requires that contractors perform an in-depth analysis of their total employment process to determine whether or where impediments to EEO exist.  They must evaluate the following.

- *Organizational Structure*.  The contractor must examine its workforce by organizational unit and job group to determine whether there are problems of minority or female utilization, or of minority or female distribution.

- *Personnel Activity*.  The contractor must examine applicant flow, hires, recruitment, referral, terminations, promotions, transfers and other personnel activities to determine whether there are selection and termination disparities.

- *Compensation*.  The contractor must determine whether there are gender, race or ethnicity disparities in its compensation system.

- *Personnel Procedures*.  The contractor must determine whether its selection, recruitment, referral, and other procedures result in disparities in the employment or advancement of minorities or women and their resulting pay.

- *Other Areas*.  The contractor must evaluate any other areas that might affect the success of the AAP.  Examples include seniority practices, leave policies, time off policies, policies regarding part-time work, the conduct of company-sponsored social events, apprenticeship program practices, workforce environment, and compliance with posting and union notification requirements.

c. *Action-Oriented Programs*.  41 CFR 60-2.17(c) requires that contractors develop and execute action-oriented programs designed to correct problem areas and to attain established goals and objectives.  To be effective, contractors must ensure that their action-oriented programs consist of more than following the same procedures that previously produced inadequate results.  Action-oriented programs should be "specific" and "result-oriented."

By "specific," OFCCP requires that the programs describe in some detail what action the contractor will take, who is responsible for taking the action and when the action will be accomplished.  "Result-oriented" programs are those where proper execution of the program will likely lead to an increase in minority or female participation, or both, in the department, job group, training program or other identified problem area.  The action-oriented programs must be sufficient, if successfully implemented, to achieve their stated objectives.  Contractors must describe these programs in the AAP.

For example, if a contractor identifies a lack of women in a job as a problem area, the contractor should also identify the reasons for the absence of women.  The reasons identified could include the rigid work hours, the impact or application of leave policies, the lack of recruitment, the lack of training, the absence of a career path or ladder leading to the job, a working environment hostile to women or hiring discrimination.  To remedy an identified problem area, the contractor

Desk Audit | 35

Federal Contract Compliance Manual (FCCM)

should establish action-oriented programs to eliminate or minimize the reasons women are adversely affected. The action-oriented programs, when fully implemented, should result in an increase in the representation of women in the job identified as a problem area.

d. *Internal Audit and Reporting System*. 41 CFR 60-2.17(d) requires contractors to design and implement an internal auditing system that periodically measures the effectiveness of its total AAP. This system must be detailed in the AAP, and the internal audit and reporting system must:

- *Monitor Records*. The internal audit and reporting system must monitor records of all personnel activity, including referrals, placements, transfers, promotions, terminations and compensation, at all levels.

- *Require Internal Reporting*. The contractor produces an internal report on the effectiveness of the AAPs on a regularly scheduled basis. While the regulations do not specify a particular time period, the reports must be produced on a scheduled basis.

- *Review Report Results*. Top management is advised of the program's effectiveness and any deficiencies, and management at all levels reviews the results of these reports.

The AAP should contain a narrative description of every aspect of the internal audit and reporting system. This description should specify the frequency of reports and audits. It should also state that, as problems are discovered, the contractor is taking the necessary corrective actions. The description should also designate the contractor officials responsible for taking these corrective actions. Lastly, the contractor should state how and when it reviews program results and effectiveness with management at all levels of the company.

## 1F05   REVIEW OF EXECUTIVE ORDER ITEMIZED LISTING DATA FOR ACCEPTABILITY

Contractors must submit data and information on the results of their immediately preceding AAP, as well as submit data and information on their current year AAP if they are six months or more into the current year by the time they receive their Scheduling Letter.[39]

COs request the AAP data and information using the Itemized Listing that accompanies the Scheduling Letter. Several items on the Itemized Listing specify that if the contractor is six months or more into its current AAP year when the listing is received the contractor will provide OFCCP with updated data for the current AAP year. For each of these items, the contractor should provide OFCCP with as much current AAP year data as it has. This means, for example, that if the contractor is six months into its current AAP year, it should provide six months of additional data; if the contractor is seven months into its current AAP, it should provide seven months of data; and if the contractor is 10 months into its current AAP, it should provide 10 months of data.

The Itemized Listing requests data and information indicating the numerical and other results of contractors' affirmative action goals for each job group for the current and preceding AAP years, as well as employment activity data (*i.e.*, applicants, hires, promotions and terminations) and employee-

---

[39]   41 CFR 60-1.12(b).

Federal Contract Compliance Manual (FCCM)

level compensation data. It also requests copies of the contractor's EEO-1 reports for the last three years and a copy of the contractor's collective bargaining agreement, if applicable, including documents that implement, explain or otherwise elaborate on the provisions of the collective bargaining agreement.

a.  *Data on Affirmative Action Goals.*  As noted above, the contractor must provide information indicating the numerical results of affirmative action goals set for each job group in their immediately preceding AAP and, where applicable, results on goals set for their current AAP. For each goal not attained, or not currently being attained, contractors must describe the good faith efforts they have undertaken to achieve the goal. Provided they make good faith efforts, contractors will not be held in violation for failure to achieve the goal. Contractors should always submit goal data for the immediately preceding AAP unless they were not federal contractors covered by 41 CFR Part 60-2 during the preceding AAP year.

   *   *Information on Job Groups with Goals.*  COs, in order to measure the results of goals, must first know whether a contractor established goals for its job groups and what the goals are. The contractor's current AAP submitted for desk audit will have this information for the current year. The contractor's report on whether it attained the goals set in the immediately preceding AAP should specifically state the goals for that prior year; however, when it does not, the CO must request a copy of the goals section of the contractor's immediately preceding AAP.

   *   *Information on Placements into Job Groups with Goals.*  Since contractors establish annual goals in terms of a percentage placement rate, evaluation of progress toward the goals requires knowledge of the total number of placements into the job groups (hires, promotions and transfers) and the number of minority and female placements, as appropriate. If a contractor's progress report does not include this information or if it includes incomplete information (*e.g.,* the number of minorities and females but not total placements), the CO will determine if the missing information can be obtained from the contractor's submission of personnel activity data. If the information cannot be obtained from the personnel activity data, the CO must ask the contractor to forward a copy of the report on the progress made toward its goals as prepared under its internal audit and reporting system.[40] If the contractor employs 100 or more people, a copy of the underlying data it used for its adverse impact determinations on hires, promotions and any other placements into job titles within the job group should be requested.[41]

   *   *Good Faith Efforts.*  When a contractor's goals report does not describe its good faith efforts to achieve the goals that it failed to meet, or does not describe those efforts in sufficient detail for a CO to evaluate their adequacy, the CO must request additional information to review during the desk audit.[42] The CO must also include this request for more information in the On-Site Plan for evaluation of good faith efforts. Even if the contractor corrects the

---

[40]  FCCM 1F04(d) – Additional Required Elements of AAPs: Internal Audit and Reporting System.
[41]  FCCM 1F05 – Review of Executive Order Itemized Listing Data for Acceptability.
[42]  Record findings on Part B.IV of the SCER.

Federal Contract Compliance Manual (FCCM)

goals report, the closure letter may identify the incorrect or incomplete report as a technical violation that was corrected during the review.[43]

b. *Review of Employment Activity Data for Acceptability*

- *Data Format*. To be acceptable for the desk audit, the contractor must present Itemized Listing data either by job group or by job title. For example, data by total workforce is not acceptable; nor is data by EEO-1 job category, unless a category legitimately constitutes a job group at the particular establishment or the contractor has fewer than 150 employees.

- *Information Included*. For each job group or job title, Itemized Listing data in each major personnel activity area (*e.g.,* applicant flow, hires, promotions and terminations) must at least include the total number of actions, the total number of actions for women and the total number of actions for minorities. For example, applicant flow for a job group or job title must include at least the total applicants, total female applicants and total minority applicants; hires for a job group or job title must include at least the total hires, total female hires and total minority hires.

- *Evaluation Period Covered*. It is generally better to have the longest possible period because the data are more likely to reflect the contractor's usual way of operating. At a minimum, however, the Itemized Listing data must cover the immediately preceding AAP year and, if the contractor is six months or more into its current AAP year when it receives the Scheduling Letter, the current AAP year. If there are indicators of a violation, the evaluation period will extend to cover the two years before the contractor's receipt of the Scheduling Letter, as long as the contractor was covered by 41 CFR Part 60-2 during that period. To fully investigate and understand the scope of potential violations, the CO may need to examine information relating to periods after the date of the Scheduling Letter to determine, for example, if violations are continuing or have been remedied. If the CO believes it is necessary to request information for periods after the date of the Scheduling Letter, the CO must discuss the issue with his or her supervisor.

- *Source of Applicant Data*. COs must determine if a contractor used the internet to recruit for any job group(s). When the AAP does not readily specify the applicant pool for job groups in which individuals applied through the internet, the CO must contact the contractor to request the criteria used by the contractor in defining applicants for the job position(s) in question. The contractor's submission should address the following four questions:

  o Did the individual express an interest in employment through the internet or related electronic data technologies?

  o Did the contractor consider the individual for employment in a particular position?

  o Did the individual's expression of interest indicate that the individual possesses the basic qualifications for the position?

---

[43] Letter L-5 – Notice of Closing: Compliance Evaluation (Violations Found and Resolved).

Federal Contract Compliance Manual (FCCM)

o Did the individual at any point in the contractor's selection process, before receiving an offer of employment from the contractor, remove him or herself from further consideration or otherwise indicate that he or she was no longer interested in the position?

To be acceptable, the contractor must identify the electronic data technologies used to collect expressions of interest, the specific job positions for which the contractor considered applications through the internet and the basic qualifications for these positions. COs will note unacceptable submissions in Part B.II of the SCER, and investigate during the on-site review.

c. *Review of Employee-Level Compensation Data.* The Itemized Listing requests data regarding the contractor's compensation, including employee-level compensation information and policies related to compensation practices.

- *Data Format.* The contractor should electronically submit all of the compensation data requested, if the data is computerized. The data must also be contained within a single file.

- *Information Included.* The CO must review the data to ensure it includes compensation, gender, and race/ethnicity information, and hire date for each employee, as well as job title, EEO-1 category and job group. Compensation includes base salary and/or wage rate, and hours worked in a typical workweek. Other compensation or adjustments to salary such as bonuses, incentives, commissions, merit increases, locality pay or overtime should be identified separately for each employee. Data should be present for all employees, including full-time, part-time, contract, per diem or day labor, and temporary employees, as of the date of the workforce analysis in the contractor's AAP.

  Additional data that may be included are data on factors used to determine employee compensation such as education, experience, duty location, performance ratings, department or function, and salary level/band/range/grade. Documentation and policies related to compensation practices of the contractor should also be included in the submission, particularly those that explain the factors and reasoning used to determine compensation.

- *Time Period of Data.* The CO must verify that the "snapshot date" for employee-level compensation data is the same as the date for the organizational display or workforce analysis submitted by the contractor.

d. *Action When Data Are Unacceptable.* If employment activity or compensation data are submitted but not acceptable, COs must call the contractor and request that the appropriate changes are promptly made and the data resubmitted within the timeframe specified by the OFCCP field office. If, at the end of the allotted timeframe, the data are not received in an acceptable form, COs will recommend issuing an SCN specifying the regulatory sections the contractor violated.

Examples of unacceptable data submissions include, but are not limited to, instances where the data are in aggregations larger than job group or are not provided by sex, or by racial or ethnic category.

Federal Contract Compliance Manual (FCCM)

## 1G    REVIEW OF A SECTION 503 AAP AND ITEMIZED LISTING DATA FOR ACCEPTABILITY

As with the Executive Order AAP, the determination of the *acceptability* of items listed in Part B.I of the SCER for the Section 503 AAP is limited to an evaluation conducted at the desk audit.  This is different from an evaluation of the contractor's *implementation* of these items, which usually is reviewed on-site if it is determined during the desk audit that an on-site is needed.  Additionally, the Section 503 regulations require the contractor to take a number of actions, even though the contractor does not address them in the AAP.  Part C.I of the SCER covers the additional requirements that are reviewed on-site.

### 1G00   ITEMS INCLUDED

To be acceptable, a contractor's Section 503 AAP must include the items listed in 41 CFR 60-741.44 and 41 CFR 60-741.45.[44]  It is the responsibility of COs to determine whether the contractor included all of the required items in the contractor's Section 503 AAP.  Those items are listed in section 1E02 of the FCCM, and the acceptability assessment of each item is described below.

### 1G01   POLICY STATEMENT

Contractors are required to take affirmative action to employ and advance in employment qualified individuals with disabilities.  The contractor must affirm its commitment to this affirmative action requirement by incorporating it in a policy statement included in its AAP.[45]  The contractor must also post this policy statement on company bulletin boards.  Applicants and employees with disabilities must be provided the policy statement in a format that is accessible and understandable such as Braille or large print versions of the notice.

At a minimum, to be acceptable, the policy statement must include:

- A statement indicating the top United States executive's support for the EEO policy;

- A statement identifying the EEO official responsible for the implementation of the AAP;

- A statement that the contractor hires, recruits, trains and promotes without regard to disability;

- A statement providing for an audit and reporting system;

---

[44]  The final two sections of Subpart C of the Section 503 regulations, 41 CFR 60-741.46 and 60-741.47, do not address elements that need to be included in every AAP.  Section 60-741.46 states that contractors have the option of voluntarily developing and implementing training or employment programs focused on the specific needs of people with certain disabilities and that, if a contractor implements such a program, it must include it in its AAP.  Section 60-741.47 explains that a contract with a sheltered workshop is not a form of affirmative action that replaces the employment and advancement of qualified individuals with disabilities in the contractor's own workforce.  The regulation provides that the contractor may include a contract with a sheltered workshop in its AAP if the sheltered workshop trains employees who must be hired by the contractor at full compensation once they become "qualified individuals with disabilities."

[45]  See 41 CFR 741.44(a).

Desk Audit | 40

Federal Contract Compliance Manual (FCCM)

- • A statement that the contractor will ensure that all employment decisions are based only on valid job requirements; and

- • A statement that employees and applicants will not be subjected to harassment, intimidation, threats, coercion or discrimination because they engaged or may engage in filing a complaint, or assisted in a review, investigation or hearing related to any federal, state or local law requiring EEO for individuals with disabilities; or because they opposed any act deemed unlawful by any of the above-referenced laws; or because they exercised any other right under Section 503.

## 1G02   CONTRACTOR REVIEW OF PERSONNEL PROCESSES

An AAP, to be acceptable, must affirm that the contractor reviews its personnel processes periodically.  These processes must provide for the careful, thorough and systematic consideration of the job qualifications of applicants and employees with known disabilities for job vacancies filled either by hiring or promotion, and for all training opportunities offered or available.  A contractor's AAP must describe the review, include the date the review was performed, and describe actions taken or changes made as a result of the review.[46]

a.  *Adequacy of Present Procedures.*  Contractors may assert that their present personnel procedures are adequate and indicate that modifications to the procedures are unnecessary.  COs must determine whether the information received during the desk audit supports that assertion to determine acceptability.  COs must request additional information during the desk audit or on-site review if they are unable to make an acceptability determination.

b.  *Adverse Stereotyping.*  Part of the contractor's review must be to ensure that its personnel processes are not stereotyping individuals with disabilities in a manner that limits their access to jobs for which they are qualified.

c.  *Access to Personnel Processes.*  The contractor must also ensure that applicants and employees with disabilities have equal access to personnel processes, including those implemented through information and communication technologies.  Ensuring equal access to personnel processes includes providing any necessary reasonable accommodation to ensure that qualified applicants and employees with disabilities are able to apply, and are fully considered, for vacancies, promotions, and training opportunities.  Appendix A to 41 CFR Part 60-741 provides guidelines for contractors on their duty to provide reasonable accommodations.  With respect to the application process, an example of appropriate accommodation could be the provision of information on vacancies in a form accessible to those with vision or hearing impairments who have requested an accommodation.  Though Section 503 and its implementing regulations do not require contractors to make their information and communication technology publicly "accessible," contractors are encouraged to do so.

## 1G03   CONTRACTOR REVIEW OF PHYSICAL AND MENTAL QUALIFICATIONS

An AAP must contain the contractor's schedule for the periodic review of all physical and mental job qualification standards to ensure that, to the extent they tend to screen out qualified individuals

---

[46]   This information is requested in the Itemized Listing, under 41 CFR 741.44(b).

Federal Contract Compliance Manual (FCCM)

with disabilities, they are job-related and consistent with business necessity. To be acceptable, the AAP must affirm that the contractor completed a review of the physical and mental job qualification standards. Also, the contractor's desk audit submission must contain the most recent assessment including the date the assessment was performed, and any actions taken or changes made as a result of the assessment.[47] If the CO is evaluating a newly covered contractor, the AAP must provide a specific and reasonable time by which the contractor will review the physical and mental job qualifications.

The contractor must ensure that any inquiries or medical examinations regarding an applicant's or employee's medical condition made by, or at the behest of, the contractor are conducted following relevant laws, including the regulation at 41 CFR 60-741.23. All medical information the contractor obtains as a result of such inquiries or exams must be treated as confidential and maintained on separate forms and medical files, except as otherwise provided for in 41 CFR 60-741.23(d). The CO may consult the EEOC's *Enforcement Guide: Preemployment Disability-Related Questions and Medical Examinations* (https://www.eeoc.gov/policy/docs/preemp.html) for more information on pre-employment medical examinations and inquiries.

## 1G04   REASONABLE ACCOMMODATION TO PHYSICAL AND MENTAL LIMITATIONS

As a matter of nondiscrimination, contractors must make reasonable accommodation to physical and mental limitations when requested by qualified individuals with disabilities unless contractors can demonstrate that such accommodation would impose an undue hardship. In assessing undue hardship, contractors may consider factors such as financial costs and interference with the ability of other employees to do their jobs. As a matter of affirmative action, if an employee with a known disability is having significant difficulty performing his or her job and it is reasonable to conclude that the performance problem may be related to the disability, then the contractor must confidentially notify the employee of the performance problem and inquire whether it is related to the employee's disability. If the answer is yes, the contractor must also confidentially inquire whether the employee needs a reasonable accommodation.

At the desk audit stage, the CO must review copies of reasonable accommodation policies, and documentation of any accommodation requests received and their resolution, if any.[48] Here are three examples of areas in which reasonable accommodations may be necessary: (1) accommodations in the application process; (2) accommodations that enable employees with disabilities to perform the essential functions of the position held or desired; and (3) accommodations that enable employees with disabilities to enjoy equal benefits and privileges of employment as are enjoyed by employees without disabilities.

Once an individual with a disability has requested a reasonable accommodation, the employer must determine the appropriate accommodation. Sometimes the appropriate accommodation will be obvious or included in the accommodation request, *e.g.,* a request for a sign language interpreter. When it is not, the contractor should use a problem-solving approach to determine the appropriate accommodation. This approach may include initiating an interactive process with the

---

[47]   This information is requested in the Itemized Listing, under 41 CFR 741.44(c).
[48]   This information is requested in the Itemized Listing. Note that contractors are encouraged but not required to have written procedures for processing requests for reasonable accommodations. See 41 CFR 60-741.44(d)(2).

Federal Contract Compliance Manual (FCCM)

accommodation requester that may entail: 1) analyzing the particular job involved and determining its purpose and essential functions; (2) consulting with the individual with a disability to ascertain the precise job-related limitations imposed by the individual's disability and how those limitations could be overcome with a reasonable accommodation; (3) identifying potential accommodations and assessing the effectiveness each would have in enabling the individual to perform the essential functions of the position; and (4) considering the preference of the individual to be accommodated, and selecting and implementing the accommodation that is most appropriate for both the employee and the employer.

Appendix A to the Section 503 regulations at 41 CFR Part 60-741, *Guidelines on a Contractor's Duty to Provide Reasonable Accommodation*, provides additional information about the scope of the "undue hardship" defense and examples of reasonable accommodations, among other things. Though not required, OFCCP encourages contractors to develop and use written procedures to process requests for reasonable accommodations. Guidance on how to develop written procedures is in Appendix B to the Section 503 regulations at Part 60-741, *Developing Reasonable Accommodation Procedures*.

## 1G05  HARASSMENT

Contractors must develop and implement procedures to ensure that their employees are not harassed because of their disability status. A contractor should include a copy of these procedures in the AAP. This statement may be part of a broader anti-harassment policy that also prohibits harassment on other bases such as race and sex.

## 1G06  EXTERNAL DISSEMINATION OF EEO POLICY

Under 41 CFR 60-741.44(f), the contractor must send written notification of the company policy related to its affirmative action efforts to all subcontractors, including subcontracting vendors and suppliers, requesting appropriate action on their part. COs should look for a description of the company's process for sending these notifications in the AAP and verify that the contractor sent the notifications if an on-site review is conducted.

## 1G07  OUTREACH AND POSITIVE RECRUITMENT

An acceptable AAP must affirm that the contractor engages in outreach and recruitment efforts reasonably designed to effectively recruit qualified individuals with disabilities. The contractor may engage in activities such as job fairs, recruitment activities with educational institutions and organizations that focus on job training and development for persons with disabilities, and posting of job opportunities with specialized organizations.[49] Contractors may also develop their own outreach programs. The scope of the contractor's efforts will depend upon circumstances, including the contractor's size and resources, and the extent to which existing employment practices are adequate.

The AAP must include documentation of the contractor's assessment of its outreach and recruitment efforts that it made over the previous 12 months. This assessment is two-fold in that the contractor must evaluate the effectiveness of each effort and it must conclude whether the totality of its efforts

---

[49]  See 41 CFR 60-741.44(f)(2) for more examples of outreach and recruitment activities in which a contractor may engage.

Federal Contract Compliance Manual (FCCM)

has been effective in identifying and recruiting individuals with disabilities. When evaluating the effectiveness of each effort, the contractor must document its determination and, at a minimum, it must include the criteria used to make the determination. One of the criteria that must be included is the data collected under 41 CFR 60-741.44(k) discussed below in subsection 1G11. If, when looking at the totality of its efforts, the contractor concludes that outreach and recruitment efforts were not effective, it must identify alternative efforts that it will implement to fulfill its affirmative action obligations. COs must also ensure that the conclusion is reasonable for the AAP to be acceptable. COs must record results in Part B.V of the SCER.

## 1G08   INTERNAL DISSEMINATION OF EEO POLICY

An acceptable AAP must address the contractor's procedures to disseminate its EEO policy internally. The policy must be included in the contractor's policy manual or otherwise made available to employees. Also, if the contractor is a party to a collective bargaining agreement, it must provide notice to union officials and/or employee representatives of the EEO policy and request their cooperation. The procedures must be designed to foster understanding, acceptance and support among the contractor's employees, and to encourage employees to take actions to aid the contractor in meeting this obligation. The regulations at 41 CFR 60-741.44(g)(3) provide examples of the types of activities contractors may undertake to enhance their efforts to employ and to advance in employment individuals with disabilities. For example, contractors may schedule periodic employee meetings to discuss the policy or conduct meetings with executive, managerial and supervisory personnel to explain the intent of the policy, and to delineate individual responsibility for its implementation.

## 1G09   AUDIT AND REPORTING SYSTEM

An acceptable AAP contains a narrative description of the contractor's internal audit and reporting system. The system must be designed to perform and document the following actions:

- Measure the overall effectiveness of the AAP;

- Indicate any need for remedial action;

- Determine the degree to which the contractor's objectives have been attained;

- Determine whether known individuals with disabilities have had the opportunity to participate in all company-sponsored educational, training, recreational, and social activities; and

- Measure the contractor's compliance with the AAP's specific obligations.

Documentation of these actions must be retained as employment records and submitted in response to the Scheduling Letter. An acceptable AAP will also specify the frequency of reports and audits, and describe the actions taken to address deficiencies identified by the audit and reporting system.

## 1G10   OFFICIAL RESPONSIBLE FOR AAP IMPLEMENTATION

An acceptable AAP must identify the official assigned responsibility for implementing the contractor's affirmative action activities for individuals with disabilities, and describe that official's

Federal Contract Compliance Manual (FCCM)

responsibilities.  The contractor must give this official the necessary senior management support and staff to manage the implementation of the program.  The AAP should also describe the responsibilities of line management in carrying out the program.

## 1G11   TRAINING TO ENSURE AAP IMPLEMENTATION

Contractors are required to train their personnel involved in recruitment, screening, selection, promotion, disciplinary and related processes about the company's EEO obligations and, if appropriate, about the contractor's affirmative action commitments under Section 503.  This section of the AAP should document that these personnel have been trained to ensure that the commitments in the AAP are implemented.

## 1G12   DATA COLLECTION ANALYSIS

Contractors are required to document the below information on an annual basis as part of their AAP, maintaining the data for three years, under 41 CFR 60-741.44(k).

- The total number of job openings and total number of jobs filled.  Job openings include those that may be externally and internally filled;

- The total number of applicants for all jobs;

- The number of applicants who self-identified as individuals with disabilities or who are otherwise known to be individuals with disabilities;

- The total number of applicants hired; and

- The total number of applicants with disabilities hired.

When reviewing the AAP for acceptability, the CO must verify that the contractor provided documentation of computations or comparisons of the above information, as requested in the Itemized Listing.  These computations or comparisons are criteria used to evaluate the effectiveness of the contractor's outreach and positive recruitment efforts.  The data may also be used to analyze applicant trends to inform the contractor's review of personnel practices and self-audit.

## 1G13   UTILIZATION GOAL ANALYSIS FOR INDIVIDUALS WITH DISABILITIES

The Section 503 AAP regulation at 41 CFR 60-741.45 requires that contractors annually analyze their utilization of individuals with disabilities against the 7% aspirational goal established by OFCCP.  This goal serves as an equal opportunity objective that should be attainable by taking the affirmative actions required in the Section 503 regulations.  For an AAP to be considered acceptable, it must include the annual utilization goal analysis.

In the utilization analysis, contractors with more than 100 employees must evaluate the representation of individuals with disabilities within each job group of their workforce.  For this analysis, contractors must use the same job groups that they use to evaluate utilization under Executive Order 11246.  Like the Executive Order job group analysis, contractors with a total workforce of fewer than 150 employees may use the EEO-1 categories as job groups.  A contractor

Federal Contract Compliance Manual (FCCM)

with 100 or fewer employees has the option to measure the representation of individuals with disabilities in its entire workforce.

If the percentage of individuals with disabilities in one or more job groups, or a contractor's entire workforce for smaller companies, is less than the 7% utilization goal, the contractor must determine whether and where barriers to EEO exist. To identify any such problems, contractors must assess personnel processes, the effectiveness of its outreach and recruitment efforts, the results of its AAP self-audit, and any other areas that might influence the success of the AAP. When a contractor finds problem(s), it must develop and implement action-oriented programs to correct them such as modifying personnel processes or taking a different approach for outreach and recruitment. For example, if the contractor finds the totality of its outreach and recruitment efforts was not effective in identifying and recruiting qualified individuals with disabilities for employment, the contractor should take action to identify recruitment sources that are not working and search for sources that yield better results, or introduce new outreach measures to increase the number of qualified applicants with disabilities. Several examples of outreach and recruitment activities are listed at 41 CFR 741.44(f)(2).

When reviewing the AAP for acceptability, the CO must closely examine the contractor's AAP to ensure it describes the utilization goal analysis, identifies any barriers to equal opportunity employment, and includes a description of action-oriented programs that the contractor has designed to address any barriers identified. If a contractor is six months or more into its current AAP year when it receives the Scheduling Letter and Itemized Listing, it must also submit the information that shows its current year progress toward meeting the utilization goal. Record results in Part B.V of the SCER.

## 1H     REVIEW OF A VEVRAA AAP AND ITEMIZED LISTING DATA FOR ACCEPTABILITY

As with Executive Order and Section 503 AAPs, the determination of the *acceptability* of items listed in Part B.I of the SCER for the VEVRAA AAP is limited to an evaluation conducted at the desk audit. This is different from an evaluation of the contractor's *implementation* of these items, which usually is reviewed on-site if it is determined during the desk audit that an on-site is needed. Additionally, the VEVRAA regulations require the contractor to take a number of actions even though the contractor does not address them in the AAP. Part C.I of the SCER covers the additional requirements, which are reviewed on-site.

### 1H00   ITEMS INCLUDED

To be acceptable, a contractor's VEVRAA AAP must include the below items listed in 41 CFR 60-300.44 and 41 CFR 60-300.45. It is the responsibility of COs to determine whether the contractor included all of the required items in the contractor's VEVRAA AAP. Those items are listed in Section 1E02 of the FCCM, and the acceptability assessment of each item is described below.

### 1H01   POLICY STATEMENT

Contractors are required to take affirmative action to employ and advance in employment qualified protected veterans. The contractor must affirm its commitment to this affirmative action

SER-266

Federal Contract Compliance Manual (FCCM)

requirement by incorporating it in a policy statement included in its AAP.[50]  The contractor must also post this policy statement on company bulletin boards.  Applicants and employees who are disabled veterans must be provided the policy statement in a format that is accessible and understandable such as Braille or large print versions of the notice.

At a minimum, to be acceptable, the policy statement must include:

- A statement indicating the top United States executive's support for the EEO policy;

- A statement identifying the EEO official responsible for the implementation of the AAP;

- A statement that the contractor hires, recruits, trains and promotes without discrimination on the basis of status as a protected veteran;

- A statement providing for an audit and reporting system;

- A statement that the contractor will ensure that all employment decisions are based only on valid job requirements; and

- A statement that employees and applicants will not be subjected to harassment, intimidation, threats, coercion or discrimination because they engaged or may engage in filing a complaint, or assisted in a review, investigation or hearing related to any federal, state or local law requiring EEO for protected veterans; or because they opposed any act deemed unlawful by any of the above referenced laws; or because they exercised any other right under VEVRAA.

## 1H02   CONTRACTOR REVIEW OF PERSONNEL PROCESSES

An AAP, to be acceptable, must affirm that the contractor reviews its personnel processes periodically.  These processes must provide for the careful, thorough and systematic consideration of the job qualifications of applicants and employees who are known protected veterans for job vacancies either filled by hiring or promotion, and for all training opportunities offered or available.  A contractor's AAP must describe the review, include the date the review was performed, and describe actions taken or changes made as a result of the review.[51]

a.   *Use of Appendix C.*  Though not required, contractors may utilize the procedures described in Appendix C to 41 CFR Part 60-300 to fulfill this requirement.  These procedures describe how contractors annotate applications or personnel forms of protected veterans when considering them for employment opportunities.

b.   *Adequacy of Present Procedures.*  Contractors may assert that their present personnel procedures are adequate and indicate that modifications to the procedures are unnecessary.  COs must determine whether the information received during the desk audit supports that assertion to

---

[50]   See 41 CFR 300.44(a).
[51]   This information is requested in the Itemized Listing, under 41 CFR 60-300.44(b).

Desk Audit | 47

Federal Contract Compliance Manual (FCCM)

determine acceptability.  COs must request additional information during the desk audit or on-site review if they are unable to make an acceptability determination.

c.  *Relevancy of Military Records*.  Contractors must rely only on the portion of a protected veteran's military record that is relevant to the requirements of the opportunity for which the veteran is being considered.  The contractor should confirm compliance with this requirement in the AAP.

d.  *Adverse Stereotyping*.  Part of the contractor's review must be to ensure that its personnel processes are not stereotyping protected veterans in a manner that limits their access to jobs for which they are qualified.

## 1H03   CONTRACTOR REVIEW OF PHYSICAL AND MENTAL QUALIFICATIONS

An AAP must contain the contractor's schedule for the review of all physical and mental job qualification standards to ensure that, to the extent they tend to screen out qualified disabled veterans, they are job-related and consistent with business necessity.  To be acceptable, the AAP must affirm that the contractor completed a review of the physical and mental job qualification standards.  The contractor's desk audit submission must also contain the most recent assessment, including the date the assessment was performed, and any actions taken or changes made as a result of the assessment.[52]  If the CO is evaluating a newly covered contractor, the AAP must provide a specific and reasonable time by which the contractor will review the physical and mental job qualifications.

The contractor must ensure that any inquiries or medical examinations regarding an applicant's or employee's medical condition made by, or at the behest of, the contractor are conducted following relevant laws, including 41 CFR 60-300.23.  All medical information the contractor obtains as a result of such inquiries or exams must be treated as confidential and maintained on separate forms and medical files, except as otherwise provided for in 41 CFR 60-300.23(d).  The CO may also consult the EEOC's *Enforcement Guide: Preemployment Disability-Related Questions and Medical Examinations* (https://www.eeoc.gov/policy/docs/preemp.html) for more information on pre-employment medical examinations and inquiries.[53]

## 1H04   REASONABLE ACCOMMODATION TO PHYSICAL AND MENTAL LIMITATIONS

As a matter of nondiscrimination, contractors must make reasonable accommodation to the physical and mental limitations when requested by qualified disabled veterans unless they can demonstrate that such accommodation would impose an undue hardship.  In assessing undue hardship, contractors may consider factors such as financial costs and interference with the ability of other employees to do their jobs.  As a matter of affirmative action, if an employee who is a known disabled veteran is having significant difficulty performing his or her job and it is reasonable to conclude that the performance problem may be related to the disability, then the contractor must confidentially notify the employee of the performance problem and inquire whether it is related to

---

[52]  This information is requested in the Itemized Listing, under 41 CFR 300.44(c).
[53]  See also 41 CFR 60-300.23(d).

Federal Contract Compliance Manual (FCCM)

the employee's disability.  If the answer is yes, the contractor must also confidentially inquire whether the employee needs a reasonable accommodation.

Appendix A to the VEVRAA regulations at 41 CFR Part 60-300, *Guidelines on a Contractor's Duty to Provide Reasonable Accommodation,* provides additional information about the scope of the "undue hardship" defense and examples of reasonable accommodations, among other things. Though not required, COs should encourage contractors to develop and use written procedures to process requests for reasonable accommodations.  For more on reasonable accommodation, please refer to Section 1G04 of the FCCM.

## 1H05  HARASSMENT

Contractors must develop and implement procedures to ensure that employees are not harassed because of their status as a protected veteran.  A contractor should include a copy of these procedures in the AAP.  This statement may be part of a broader anti-harassment policy that also prohibits harassment on other bases such as race and sex.

## 1H06  EXTERNAL DISSEMINATION OF EEO POLICY

Under 41 CFR 60-300.44(f), the contractor must send written notification of the company policy related to its affirmative action efforts to all subcontractors, including subcontracting vendors and suppliers, requesting appropriate action on their part.  COs should look for a description of the company's process for sending these notifications in the AAP and verify that the contractor sent the notifications if an on-site review is conducted.

## 1H07  OUTREACH AND POSITIVE RECRUITMENT

An acceptable AAP must affirm that the contractor engages in outreach and recruitment efforts reasonably designed to effectively recruit qualified protected veterans.  The contractor may engage in activities such as job fairs, recruitment activities with educational institutions and organizations that focus on job training and development for veterans, and posting of job opportunities with specialized organizations.[54]  Contractors may also develop their own outreach program.  The scope of the contractor's efforts will depend upon circumstances including the contractor's size and resources, and the extent to which existing employment practices are adequate.

The AAP must include documentation of the contractor's assessment of its outreach and recruitment efforts that the contractor made over the previous 12 months.  This assessment is two-fold in that the contractor must evaluate the effectiveness of each effort, and conclude whether the totality of its efforts has been effective in identifying and recruiting individuals with disabilities. When evaluating the effectiveness of each effort, the contractor must document its determination and, at a minimum, include the criteria used to make the determination.  One of the criteria that must be included is the data collected under 41 CFR 60-300.44(k) discussed below in subsection 1H12.  If, when looking at the totality of its efforts, the contractor concludes that outreach and recruitment efforts were not effective, it must identify alternative efforts that it will implement to

---

[54]   See 41 CFR 60-300.44(f)(2) for more examples of outreach and recruitment activities in which a contractor may engage.

Federal Contract Compliance Manual (FCCM)

fulfill its affirmative action obligations.  COs must also ensure that the conclusion is reasonable for the AAP to be acceptable.  Record results in Part B.VI of the SCER.

## 1H08   INTERNAL DISSEMINATION OF EEO POLICY

An acceptable AAP must address the contractor's procedures to disseminate its EEO policy internally.  The policy must be included in the contractor's policy manual or otherwise made available to employees.  Also, if the contractor is a party to a collective bargaining agreement, the contractor must provide notice to union officials and/or employee representatives of the EEO policy and request their cooperation.  The procedures must be designed to foster understanding, acceptance and support among the contractor's employees, and to encourage employees to take actions to aid the contractor in meeting this obligation.  The regulations at 41 CFR 60-300.44(g)(3) provide examples of the types of activities contractors may undertake to enhance their efforts to employ protected veterans and to advance them in employment.  For example, contractors may schedule periodic employee meetings to discuss the policy or conduct meetings with executive, managerial and supervisory personnel to explain the intent of the policy, and to delineate individual responsibility for its implementation.

## 1H09   AUDIT AND REPORTING SYSTEM

An acceptable AAP contains a narrative description of the contractor's internal audit and reporting system.  The system must be designed to perform and document the following actions:

- Measure the overall effectiveness of the AAP;

- Indicate any need for remedial action;

- Determine the degree to which the contractor's objectives have been attained;

- Determine whether known protected veterans have had the opportunity to participate in all company-sponsored educational, training, recreational, and social activities; and

- Measure the contractor's compliance with the AAP's specific obligations.

Documentation of these actions must be retained as employment records and submitted in response to the Scheduling Letter.  An acceptable AAP will also specify the frequency of reports and audits, and describe the actions taken to address deficiencies identified by the audit and reporting system.

## 1H10   OFFICIAL RESPONSIBLE FOR AAP IMPLEMENTATION

An acceptable AAP must identify the person assigned responsibility for implementing the contractor's affirmative action activities for protected veterans and describe his or her responsibilities.  The contractor must give this official the necessary senior management support and staff to manage the implementation of the program.  The AAP should also describe the responsibilities of line management in carrying out the program.

Federal Contract Compliance Manual (FCCM)

## 1H11   TRAINING TO ENSURE AAP IMPLEMENTATION

Contractors are required to train their personnel involved in recruitment, screening, selection, promotion, disciplinary and related processes about the company's EEO obligations and, if appropriate, about the contractor's affirmative action commitments under VEVRAA.  This section of the AAP should contain documentation that these personnel have been trained to ensure that the commitments in the AAP are implemented.

## 1H12   DATA COLLECTION ANALYSIS

Contractors are required to document the below information on an annual basis as part of their AAP, and maintain the data for three years under 41 CFR 60-300.44(k).

- The total number of job openings and total number of jobs filled.  Job openings include those that may be externally and internally filled;

- The total number of applicants for all jobs;

- The number of applicants who self-identified as protected veterans or who are otherwise known as protected veterans;

-  The total number of applicants hired; and

- The total number of protected veteran applicants hired.

When reviewing the AAP for acceptability, the CO must verify that the contractor provided documentation of computations or comparisons of the above information, as requested in the Itemized Listing.  These computations or comparisons are criteria used to evaluate the effectiveness of the contractor's outreach and positive recruitment efforts.  The data may also be used to analyze applicant trends to inform the contractor's review of personnel practices and self-audit.

## 1H13   VEVRAA HIRING BENCHMARK

The VEVRAA regulations at 41 CFR 60-300.45 require contractors to establish a hiring benchmark every year to use for measuring their progress toward achieving EEO for protected veterans.  The regulation also includes recordkeeping requirements related to documenting the hiring benchmark.

Contractors must use one of two methods to establish their benchmarks.  Contractors may choose to establish a benchmark equal to the national percentage of veterans in the civilian labor force which is published and annually updated on OFCCP's website.[55]  Alternatively, as described in 41 CFR 60-300.45(b)(2) and discussed below, contractors may establish their benchmarks by taking into account certain data from the Bureau of Labor Statistics (BLS) and Veterans' Employment and Training Service/Employment and Training Administration (VETS/ETA) that is also

---

[55]   See "Annual VEVRAA Benchmark Effective Dates," at
  http://www.dol.gov/ofccp/regs/compliance/AnnualVEVRAABenchmarkEffectiveDates.htm
  (last accessed September 2019).

Federal Contract Compliance Manual (FCCM)

published on the OFCCP website, as well other factors that reflect the contractor's own data and unique hiring circumstances.[56]

When reviewing an AAP for acceptability, COs must first review documentation provided by the contractor to determine which method the contractor used to establish a hiring benchmark. If the contractor used the five factors described in 41 CFR 60-300.45(b)(2), then the CO must review the methodology used by the contractor to adopt its hiring benchmark. The benchmark represents the percentage of protected veterans that the contractor seeks to hire during the AAP year.[57] The CO must assess whether the contractor met its hiring benchmark using the hiring data submitted by the contractor.

To set a benchmark using the five-factor method, contractors must consider all of the five factors listed below.

- The average percentage of veterans in the civilian labor force for the state where the establishment is located for the previous three years. The DOL, BLS, calculates this information regarding the general availability of veterans for employment for each state. This data is provided in two different formats on OFCCP's website. One format displays annual data for every state, by year. While the other format shows three years of data for each individual state, by state. (Note: This data is not available for Puerto Rico, the U.S. Virgin Islands, American Samoa, the Northern Mariana Islands, Wake Island or Guam. Contractors in Puerto Rico or the U.S. Virgin Islands should select Florida data. Contractors in American Samoa, the Northern Mariana Islands, Wake Island and Guam should select Hawaii data.)

- The number of veterans who participated in the ESDS in the State where the establishment is located over the previous four quarters. The U.S. DOL's VETS tabulates this data regarding the number of veterans seeking jobs. This data is provided on OFCCP's website for the most recent four quarters, as well as for previous periods. (Note: This data is not available for American Samoa, the Northern Mariana Islands, Wake Island or Guam. Contractors in those locations should select Hawaii data.)

- The applicant ratio and hiring ratio for the establishment for the previous year. To make these computations, contractors use the data they have collected to comply with 41 CFR 60-300.44(k), which should also be included in the AAP. To calculate the applicant ratio, compare the number of protected veteran applicants to the total number of applicants. To calculate the hiring ratio, compare the number of protected veterans hired to the total number of hires.

- The most recent assessment of the effectiveness of the contractor's outreach and recruitment efforts. This information is included in the AAP.

---

[56] See "VEVRAA Benchmark Database," at *https://ofccp.dol-esa.gov/errd/VEVRAA.jsp* (last accessed September 2019).

[57] The VEVRAA regulations do not require the contractor to conduct a hiring benchmark analysis. However, a contractor may conduct such an analysis using data it has collected. Also, the VEVRAA hiring benchmark may be used by contractors as one of the criteria to measure the effectiveness of their outreach and recruitment efforts.

Federal Contract Compliance Manual (FCCM)

- Any other factor, such as the nature of the job openings or the facility's location, which would tend to affect the availability of qualified protected veterans. This factor provides contractors with the flexibility to consider any other pertinent factors about your establishment or the nature of your business that might affect the availability of qualified protected veterans as part of the process of establishing the hiring benchmark.

Contractors using this individualized method have the discretion to weigh the various factors in a manner that is reasonable in light of their unique circumstances. However, they must document each factor considered and explain the methodology and rationale used to arrive at the benchmark selected.

Contractors with multiple establishments that choose the five-factor option may establish individualized benchmarks for each of their establishments or may choose, instead, to adopt the national percentage of veterans in the civilian labor force as the benchmark for one or more of their establishments. Contractors with multiple establishments may utilize only one benchmark option per establishment.

## 1I     SUMMARY OF ACCEPTABILITY PROBLEMS WITH AAPs AND ITEMIZED LISTING DATA

COs identify problems with the completeness and acceptability of a contractor's AAPs under Executive Order 11246, Section 503 and VEVRAA, and Itemized Listing data in Part B.II of the SCER. For each problem, COs must use Part B.II of the SCER to describe the specific problems and actions taken at the desk audit to resolve them, and actions planned for an on-site review. Any findings from on-site reviews are also recorded in this part of the SCER.

A CO may resolve some problems with the AAPs and Itemized Listing data at the desk audit after additional contact with the contractor. For example, if the CO cannot evaluate job group acceptability because there is no information on what job titles are in each group, that CO may be able to resolve the problem by obtaining the missing information from the contractor. The CO will note this follow-up contact and receipt of the additional information on the SCER. Such a notation could be written like this: "Called J. Smith May 1, 2011 and asked him to send a list of titles in each group. List received May 8, 2011."

If a CO determines that an Executive Order, Section 503, or VEVRAA AAP does not meet one or more of the standards for acceptability as discussed previously in this chapter, the CO must recommend suspension of the desk audit and issuance of an SCN, as appropriate.

## 1J     ANALYSIS OF SECTION 503 AAP: REVIEW OF ONLINE APPLICATION PROCESS

The contractor is required to provide necessary reasonable accommodation to ensure applicants and employees with disabilities receive equal opportunity in the operation of personnel processes, including an equal opportunity to apply and be considered for employment. Therefore, in addition to reviewing a contractor's Section 503 AAP as part of the desk audit, COs must review the contractor's online application system (electronic or web-based) to ensure that it provides a means for contacting the contractor, other than through the online system, to request a reasonable

Federal Contract Compliance Manual (FCCM)

accommodation to apply for the job. Applicants may need this contact information if they cannot use the online application system because of a disability. At a minimum, this information must include the name and phone number or email address of the person (or office) to whom a request for an accommodation should be made. The contact information need not mention the words "reasonable accommodation," though it is a best practice to do so. COs will document the results of this analysis in the Case Summary and Recommendations section of the SCER. Contractors are also encouraged to make their information and communication technologies generally accessible. This is so even in the absence of a reasonable accommodation request. Doing so will minimize, but may not eliminate, the need to make individual reasonable accommodations.

## 1K    ANALYSIS OF AN EXECUTIVE ORDER 11246 AAP: OVERVIEW OF ITEMIZED LISTING DATA, EEO TRENDS, WORKFORCE STRUCTURE AND PERSONNEL PRACTICES

The review of the personnel activity data such as hires, promotions and terminations provides a broad framework for the detailed review by job group of affirmative action progress or placement goals, and the assessment of any potential discrimination in employment activity. COs will review personnel activity data to gain an understanding of the specific kinds of employment activity that took place during the contractor's current and immediately preceding AAP years. COs must use Part B of the SCER to describe the specific problems and actions taken at the desk audit to resolve issues with the contractor's Itemized Listing data.

### 1K00  EEO-1 TREND ANALYSIS

COs must make an initial assessment of a contractor's workforce and utilization trends by reviewing the contractor's EEO-1 reports in Part B.III of the SCER.

a. *Long-Term and Short-Term Trends*. A CO must compare data from the contractor's most recent EEO-1 Report to data from its earlier EEO-1 reports. For example, if the contractor provides EEO-1 reports for 2015, 2016 and 2017, then the CO compares the 2017 data to the 2015 data to look at the long-term trends, and compares the 2017 and 2016 data for short-term trends. This information provides an overview of:

- The distribution of jobs within the contractor's workforce (white-collar, blue-collar, predominant EEO job categories);

- The direction of change in the total workforce and particular workforce categories (expanding, contracting, stable); and

- The increases and decreases in minority and female representation in various areas.

b. *Changes Due to Reclassifications.* If a CO observes significant changes in the size of EEO-1 job categories with little or no corresponding personnel activity, the CO must investigate further to determine if the changes are due to the reclassification of jobs with concentrations of minorities or women from one EEO-1 job category to another. For example, suppose the total number of positions in the Craft category increases from one year to the next and indicates an increase in the number of women. Over the same period, however, both the total number of

Federal Contract Compliance Manual (FCCM)

Operative positions and the total number of women listed as Operatives decreases by nearly the same amount.  The CO may then infer that the increase in Crafts may have resulted from the contractor changing the EEO-1 job category of the women's jobs, rather than from genuine hires or promotions.

c.  *EEO Category Patterns*.  EEO trend analysis allows COs to identify broad areas where minorities and women have been persistently underrepresented or concentrated, setting a framework for the detailed review of the workforce analysis for potential discrimination problems and the review of the contractor's goals progress by job group.

d.  *Particular Minority Group*.  This analysis permits the CO to identify any substantial disparity in the representation of a particular race or ethnic group when compared with the distribution of those same groups in the contractor's labor area and possible internal feeder categories.  The disparity may exist in the contractor's workforce as a whole or certain categories.  When a CO identifies such a disparity, the CO must plan to conduct an Impact Ratio Analysis (IRA) of the particular group, at least in those workforce areas where the disparity exists and for the type of activity most likely to have created the disparity.

For example, if Hispanics are well represented in the labor area but have historically been absent from the contractor's workforce, the CO will plan to conduct hiring IRAs separately for Hispanics.  If Blacks have historically been concentrated in the Laborers category, but poorly represented in Operatives and Crafts, the CO's review of the workforce analysis should focus on the types of jobs held by Blacks and any structural impediments to upward mobility from those jobs.  In addition, the CO's IRA of blue-collar job groups, particularly for promotions and hires into jobs above Laborers, should be conducted separately for blacks.  Section 1O of the FCCM further discusses separate employment activity data analyses for particular groups.  The CO will also note if the investigation of such a disparity does not show discrimination.  The CO will consider whether goals and/or specific affirmative action steps for the particular group are warranted.

## 1K01  WORKFORCE STRUCTURE AND PERSONNEL PRACTICES

In the initial review of the AAP and Itemized Listing data, COs evaluate the organizational display or workforce analysis for acceptability.  As a result, they have a basic understanding of the contractor's organization and operations.  For example, a workforce analysis should show:

- Whether the contractor organizes the facility by department or other unit (*e.g.,* division);

- Whether lines of progression exist; and

- How the contractor structures pay and other characteristics that may prove useful for subsequent analyses of both affirmative action and potential discrimination issues.

Other Itemized Listing data that the contractor may provide with the AAP, such as copies of labor agreements, should contain additional information such as pay rates, work performed, organizational structure and rules for internal mobility.  COs must enter this information, to the extent that it is available during the desk audit, in Part B.VIII of the SCER.

Federal Contract Compliance Manual (FCCM)

## 1L ANALYSIS OF AN EXECUTIVE ORDER 11246 AAP: GOALS PROGRESS AND GOOD FAITH EFFORTS

The effectiveness of a contractor's overall AAP is not measured by whether the contractor met all its goals, but rather by whether the contractor made good faith efforts to do so. Generally, if the contractor met properly determined goals in a job group, further examination of good faith efforts for that job group is unnecessary. Determining whether a contractor demonstrated good faith efforts to meet its affirmative action obligations is separate from the determination of whether the contractor discriminated. Therefore, to focus the investigation on good faith efforts, COs must take the following steps:

- Measure the degree of progress in job groups where the contractor established goals and opportunities occurred;

- Evaluate the contractor's resulting overall goals performance; and

- Identify areas where specific additional information is needed to evaluate good faith efforts.

COs will evaluate both prior year and current year, if applicable, and address any goal issues in Part B.IV of the SCER.

### 1L00 ANALYSIS OF GOALS PROGRESS

As noted earlier, to be acceptable, AAP Itemized Listing data must include a report of progress on immediately preceding AAP year goals. In addition, the contractor should include a report of progress on current goals if the contractor is at least six months into its current AAP year when it receives the Scheduling Letter. COs will use this progress report to analyze goals progress.

a. *Data Needed*. To conduct this analysis, COs must first identify the job groups for which the contractor established goals at the beginning of the period under review. Second, COs must determine the percentage placement goal for each job group and the protected class to which it applies. Third, for each such job group, the number of total placements including hires and promotions, and the number of minority and/or female placements must be determined. If a contractor does not submit this information at the desk audit, COs will conduct the analysis below at whatever point in the review they obtain sufficient information.

b. *Analysis*. The analysis takes into consideration the number of opportunities the contractor provided in relation to the goal. More specifically, to determine how many minorities or women the contractor would have placed if the goal were met, COs multiply the percentage placement goal by the number of placements that occurred. The CO then compares this result with the number of minorities or women placed.

If a contractor established a goal for a particular race or ethnicity, or men or women of a particular race or ethnicity, then the CO evaluates progress on that goal in the same fashion as in the above example.

Federal Contract Compliance Manual (FCCM)

## 1L01   EVALUATION OF GOOD FAITH EFFORTS

An evaluation of good faith efforts includes a review of the contractor's overall performance toward goals, the identification of areas requiring additional examination, and ensuring that adequate information is available to determine good faith.  Each is discussed in this subsection.

a.  *Overall Performance*.  In evaluating a contractor's good faith efforts, COs must first make an overall assessment of the contactor's goals and affirmative action performance, and record results in Part B.IV of the SCER.  For example, were there areas where goals were established but not met?  This evaluation should also take into account the fulfillment of AAP commitments and the quality of those commitments in terms of creative problem-solving to remove any impediments to minority and female utilization.

b.  *Goal Areas Needing Further Examination for Good Faith Efforts*.  COs must identify goal areas needing further evaluation for good faith efforts.  For each such goal area, the COs will review any contractor description of good faith efforts pertinent to the area.  This should be included as part of the contractor's report on goals.  COs will also use the AAP and Itemized Listing data to identify the reasons for lack of progress and the type of AAP action items that would be pertinent.  Below are some examples of the types of inquires a CO could pursue.

- Do the Itemized Listing data on employment activity show that the jobs were filled predominantly by hires or by promotions?  If by hires, was there low applicant flow?

- What AAP commitments did the contractor make about recruitment efforts?  Is there any evidence they were fulfilled?

- Was there an adequate representation of minorities and women in probable feeder groups if the contractor filled jobs primarily by promotion?

- What AAP commitments did the contractor make concerning the promotion process (*e.g.,* job posting, encouraging bidding, training)?  Is there any evidence the contractor fulfilled these commitments?

## 1L02   PLAN FOR EVALUATION OF GOOD FAITH EFFORTS

For each goal area without sufficient information to determine good faith efforts, the CO will list the additional information needed on SCER Part B.IV.  For example, the contractor did not meet its goal for minorities in the Clerical I job group.  However, in reviewing the data, it appears that low applicant flow is the cause.  The AAP may state that the contractor will use a particular agency with a significant minority clientele to aid in the recruitment of minority applicants for the Clerical 1 job group.  The additional information needed here may include contact with the agency to confirm its use by the contractor, as well as other actions such as identifying additional recruitment sources while on-site.

Federal Contract Compliance Manual (FCCM)

## 1M BASIS FOR POTENTIAL DISCRIMINATION ANALYSES

It is OFCCP's policy, in conducting analyses of potential discrimination under the Executive Order, to follow the principles of Title VII of the Civil Rights Act of 1964 (Title VII), as amended, which the EEOC enforces.

In general, when COs observe a disparity in the representation of a particular race or ethnic group, they conduct standard desk audit potential discrimination analyses for that group.[58]

a. *Guidelines on Discrimination Because of Religion or National Origin*. These Guidelines, at 41 CFR Part 60-50, are not a required AAP element under 41 CFR 60-2.10. Therefore, COs must evaluate the contractor's implementation of them on-site. Chapter 2, Section 2J provides detailed guidance on conducting this aspect of the on-site review.

b. *Sex Discrimination Regulations*. These regulations, at 41 CFR Part 60-20, are not a required AAP element under 41 CFR 60-2.10. The contractor's implementation of them, therefore, must be evaluated on-site. Chapter 2, Section 2K provides detailed guidance on conducting this aspect of the on-site review.

c. *Desk Audit Observation*. While the implementation of these regulations and guidelines can only be evaluated on-site, COs must pay particular attention to any problem area identified during the desk audit for women, or religious or national origin minorities. Additional information should be gathered on-site and directed to issues that are not addressed elsewhere in the regulations; for example, leave for religious purposes and maternity leave.

## 1N ANALYSIS OF AN EXECUTIVE ORDER 11246 AAP: AUDIT OF ORGANIZATIONAL PROFILE

The organizational profile depicts the contractor's staffing pattern to assist contractors in identifying organizational units where women or minorities are underrepresented or concentrated. Contractors have the option to use either an organizational display or a workforce analysis to satisfy the regulatory requirement for having an organizational profile in their Executive Order AAP. The organizational display is a detailed graphic or tabular chart, text, spreadsheet or similar presentation of the contractor's organizational structure, whereas the workforce analysis is a listing of each job title from lowest to highest-paid within each department or organizational unit, including supervisors. The organizational profile must identify the makeup of each unit by gender, race, and ethnicity. If a workforce analysis is used, the wage rate or salary range for all job titles must be given.[59]

COs must closely examine patterns of minority and female employment in each department or work unit to identify disparities for further investigation on-site. One example of a disparity that may warrant further investigation is departments or job titles where women or minorities are either significantly overrepresented or underrepresented based on their representation in the overall

---

[58] FCCM 1O01 – Specific Race/Ethnic Group Analysis.
[59] See 41 CFR 60-2.11 for more details about the differences between the requirements for an organizational display versus a workforce analysis.

SER-278

Federal Contract Compliance Manual (FCCM)

workforce.  COs must pay particular attention to departments and work units where minorities or women are absent or make up nearly the entire department or unit, and look for indicators of job steering or other discriminatory placement practices.

## 1N00  UNDERREPRESENTATIONS AND CONCENTRATIONS

When examining the organizational profile, COs look for evidence of concentration and underrepresentation, as such evidence could indicate that women, for instance, are steered into lower-paying positions.

*a.  Concentration.*  The term *concentration* refers to any job titles where there are significantly higher representations of a minority group or women than would be expected in consideration of their overall representation in the contractor's workforce or in a relevant unit of that workforce.

*b.  Underrepresentation.*  The term *underrepresentation* is the opposite of "concentration."  It exists when a minority group or women are found in a particular department, job group or job title in numbers significantly lower than would be expected in light of their overall representation in the contractor's workforce or in a relevant unit of that workforce.

It is important to note that the identification of a concentration or underrepresentation does not mean that there is discrimination.  It is only an indicator that further investigation is warranted.  COs must document areas of underrepresentation and concentration on Part B.VIII of the SCER and investigate further.

## 1N01  DETERMINING THE RELEVANT WORKFORCE SECTOR AND JOB AREAS

COs must review a contractor's organizational profile to identify the concentration and underrepresentation of minorities and women.  Under certain conditions, COs may reasonably expect that the contractor would evenly employ minorities or females throughout a particular job area.  A "job area" is a sub-unit (*e.g.,* department, job group, line of progression) of the blue-collar or white-collar sectors of the contractor's workforce.  The conditions for such a "reasonable expectation" are that:

- The jobs in the area have similar entry-level qualification requirements; and

- The jobs above entry-level are filled primarily by promotion.

Where these conditions exist, COs may use the Job Area Acceptance Range (JAAR) analysis to measure job area distribution patterns.  The JAAR assesses the representation of minorities and women in a particular job area in comparison with the relevant base workforce sector.  A workforce sector is the total workforce of a particular job area.  For example, if a contractor has 1,000 employees at an establishment and its production division is composed of four departments with a total workforce of 400 employees, then the production division is the job area and 400 employees is the workforce sector.  In order for COs to conduct this analysis appropriately, they must determine the relevant workforce sectors or job areas to analyze.

*a.  Relevance of Other Information*.  To determine the relevant workforce sector and job areas for the JAAR, COs are guided by the findings of the desk audit.  For example, the information a CO

Federal Contract Compliance Manual (FCCM)

obtains from the earlier analysis of EEO-1 trends may show persistent minority or female representation above or below comparable availability; or a CO may identify a substantial disparity in the representation of a particular minority group. Information the CO derives from the review of the organization of the contractor's workforce and personnel practices (*e.g.*, internal mobility, pay structure) informs the CO's analysis of workforce sector and job areas.

The CO must also conduct analyses on the employment activity and compensation data provided by race, ethnicity, and gender, as is discussed in Sections 1O and 1P.

b. *Workforce Sector and Job Area*. When conducting a JAAR, COs must determine the appropriate sector of the contractor's workforce with which to compare minority group and female representation in the particular job(s) being examined (*e.g.,* blue-collar, white-collar, clerical, the entire workforce, job group). To do so, COs must remember that there is a reasonable expectation that, absent discrimination, minorities and women will be more or less evenly distributed among the job areas within the sector. This expectation is highest when;

- Entry-level jobs in the sector require similar qualifications; and

- The contractor primarily fills jobs above entry-level in the sector by promotion.

The expectation may be lower if entry-level jobs in the sector are more differentiated in skill requirements. In this case, it may become more likely that minority or female availability will differ, or the contractor fills jobs above entry-level predominantly by hires.

c. *Applying the JAAR to a Particular Contractor*. An appropriate definition of the workforce sector depends on the particular contractor's structure, and legitimate skill needs and personnel practices. In general, a JAAR that focuses on where minorities and women are located organizationally,[60] and a JAAR that focuses on the level at which minorities and women are employed,[61] tend to identify potential promotion problems. Such promotion problems may be related to placement. Examples of how to use the JAAR to identify problems in placement, concentration or underrepresentation of employees include the following.

- *Comparing Workforce Representation to Departmental Representation*. When there are departments or organizational units with largely similar qualifications for entry-level positions (*e.g.,* unskilled and, to a more limited extent, semi-skilled, in blue-collar; undifferentiated trainee jobs in white-collar), COs must compare the representation of women and minorities in each department with representation in the total workforce of all such departments.

- *Comparing Workforce Representation to Representation in Lines of Progression*. When there are lines of progression or usual promotional sequences that cut across department lines and have similar entry-level requirements, COs may compare the representation of minorities and women in each line of progression with representation in the total workforce of all lines of progression.

---

[60] Examples include which departments, units or lines of progression tend to identify potential placement problems.
[61] Examples include concentrations in lowest level jobs within a line of progression department.

Federal Contract Compliance Manual (FCCM)

- *Comparing Departmental Representation to Representation in Lines of Progression within the Department.*  When there are separate lines of progression and/or usual promotional sequences within a department or similar organizational unit, COs may compare representation in each line of progression with the representation in the department as a whole.

- *Comparing Department to Jobs within the Department.*  In the absence of lines of progression or usual promotional sequences, and where jobs within a department are usually filled by promotion from within or might reasonably be filled in such a manner based on the nature of the jobs and the training the contractor could reasonably be expected to offer, COs may compare representation in particular jobs within that department with representation in the department as a whole.

- *Comparing EEO-1 Job Category to Type of Job or Job Title.*  It can be useful to compare representation in an EEO-1 job category or job group to the distribution within specific titles in that category or group, or both.  For example, in an Office and Clerical category, women may be concentrated in General Clerical positions, but underrepresented in Production and Material Control clerical jobs.

- *Comparing Lines of Progression to Jobs in Lines of Progression.*  The CO may also treat a line of progression or usual promotional sequence, particularly one with a large number of incumbents, as a comparative workforce sector.  Minority or female, or both, representation in the line of progression can be compared with their representation in jobs at different levels in the line of progression.

- *Comparing Job Title to Job Title within Department(s).*  When a job title, particularly one with a large number of total incumbents, appears in several departments, COs can compare representation in the title as a whole with representation in the title in each department.

d. *Applicability to Both White-Collar and Blue-Collar Jobs.*  COs can apply these analyses to white-collar and blue-collar situations.  In all cases, COs must ensure that the sector of the contractor's workforce that they use as a basis for comparison with a particular job area is, in fact, relevant. Particularly in the white-collar area, differences concerning factors such as the need for specialized education or skills may make establishing a basis for comparison difficult.

e. *Determining Whether the Concentration or Underrepresentation is "Substantial."*  Once COs select the job area and the relevant workforce sector, the next step is to perform the analysis and identify those job areas which have "substantially" more or fewer minorities and women than would reasonably be expected by their representation in the workforce sector selected.  The COs will investigate these job areas in addition to any other indicators identified, statistical or otherwise, on-site.

## 1N02   ANALYSIS BASED ON A PARTICULAR RACE OR ETHNICITY

If a CO's review of the contractor's EEO-1 job category data shows substantial disparities in the representation of a particular race or ethnic group in the workforce as a whole, or in their distribution among job categories, the review of the workforce analysis should include a focus on that race or ethnic group especially in those job areas where a CO observed disparity.

SER-281

Federal Contract Compliance Manual (FCCM)

For example, if category data show that whites and Hispanics were concentrated in the Laborers category, poorly represented in Operatives and absent in Crafts, the CO's review of the workforce analysis must:

- Specifically identify the types of blue-collar jobs in which whites and Hispanics are employed; and

- Determine whether these jobs fall into lines of progression, or departments or units, or both, that tend to inhibit progression to Operatives and Crafts, etc.

Even when a CO does not observe these disparities in the initial category screen, the CO must be alert for indications of potential problems in the distribution of the particular racial or ethnic groups while reviewing the organizational profile. This diligence is especially necessary if the labor area has high representation of more than one race or ethnic group, or the general employment patterns in the industry involved differ among specific race or ethnic groups. It is worth noting that both situations may exist simultaneously and could give rise to indicators of a potential problem.

## 1O   ANALYSIS OF EXECUTIVE ORDER 11246 EMPLOYMENT ACTIVITY DATA

During the desk audit, a CO will analyze the employment activity data the contractor provides in response to the Scheduling Letter and Itemized Listing[62] to determine whether there are any statistical indicators that the contractor's selection practices are not neutral. In particular, the CO will examine hiring, promotion, termination, and placement practices to conduct various analyses permitted by UGESP,[63] including the IRA and standard deviation analysis.

### 1O00   CONDUCTING STATISTICAL ANALYSES OF EXECUTIVE ORDER 11246 EMPLOYMENT ACTIVITY DATA

COs must ensure that contractors submit employment activity data as specified in the Itemized Listing of the Scheduling Letter to conduct statistical analyses to identify any potential indicators of discrimination.

Generally, statistical analysis assists the CO in identifying the number of individuals selected from different groups (*e.g.,* men versus women) compared to the number expected to be selected for each group, based on each group's proportion in the relevant applicant or employee pool. In a hiring analysis, the relevant pool is usually based on applicants for each job group or job title. If, for example, the hires are significantly less than the expected hires for women based on an IRA, standard deviation analysis[64] or any other analysis permitted by the UGESP, the CO has an indicator that the contractor's selection practice may be having an adverse impact on women. At a minimum, further analyses would be warranted. This analysis could include requesting additional

---

[62] This data is described in subsection 1F05.
[63] 41 CFR Part 60-3.
[64] The standard deviation represents the distribution of the responses or data around the mean, and is often used to measure the amount of confidence in statistical conclusions. COs may run standard deviation analyses to determine whether and what types of additional information they may need to establish potential discrimination.

Federal Contract Compliance Manual (FCCM)

data at desk audit or on-site from the contractor about its selection practices and policies, refining data for further statistical analysis based on information obtained from the contractor, and consulting with statistical experts in the DPO.

## 1O01   SPECIFIC RACE AND ETHNIC GROUP ANALYSIS

In testing the contractor data on selection practices to determine whether they are race-neutral, COs must analyze the data by individual racial or ethnic categories.  Usually, COs analyze the categories specified in the EEO-1 report or the racial and ethnic categories specified at 41 CFR 60-3.4.  However, if the contractor provides more detailed data, the CO may conduct an analysis based on that case-specific grouping.  As explained above, the CO must examine the availability of racial and ethnic groups in the geographic area or applicant pools and use statistical analysis to compare the selection rates of racial and ethnic groups to the rates that would be expected if the selection practices were neutral.  COs must consider whether selection rates or identified shortfalls for each individual racial or ethnic group indicate discrimination, based on statistical or other analysis, or any other case-specific evidence.

If, during the desk audit or at a later point in the evaluation, the CO determines that multiple groups are affected by the same discriminatory policy or practice, or that multiple groups are favored by selection practices, the CO must consider whether to combine individual groups to determine the affected class or comparators.  However, a CO must never combine racial and ethnic groups when the effect is to dilute the statistical indicator of discrimination for a particular racial or ethnic group.  COs must also consult with their RSOL and DPO before determining whether to combine groups to ensure that doing so is consistent with applicable legal standards and best practices for statistical analysis.

## 1O02   PROPER USE OF PRELIMINARY STATISTICAL RESULTS

It is important to remember that statistical results that identify preliminary indicators of a potential discrimination problem do not themselves prove discrimination or the existence of an affected class.  For example, a CO may compute an adverse IRA in a job group using an insufficiently refined candidate pool.  Further statistical analysis and further investigation on-site can determine whether discrimination has occurred.

## 1O03   STATISTICAL ANALYSIS SUMMARY

When COs identify evidence of disparity against members of a protected group, they must request additional data from the contractor for further analysis.  If the analysis confirms that the statistical disparities exist and further investigation is needed, COs must describe the problem on SCER Part B.VII and indicate that the matter needs further investigation on-site to determine whether there is discrimination.

*a.  Contractor Adverse Impact Determinations (Contractors with 100 or More Employees).*

- *Maintenance of Records.*  As noted earlier in the discussion of the recordkeeping requirements in 1C02, the UGESP requires contractors with more than 100 employees to maintain specific records by job title that are sufficient to disclose whether their selection

Federal Contract Compliance Manual (FCCM)

procedures have an adverse impact on the employment opportunities of each sex, and each race or ethnic group, or both.[65]

- *Analysis of Impact.* The UGESP also requires that contractors with more than 100 employees analyze this data annually to determine whether the total selection process for each job is having any adverse impact. These determinations are required by sex and for each race and ethnic group that constitutes 2% or more of the labor force in the relevant labor area, or 2% or more of the applicable workforce for jobs filled internally.

b. *Requesting Contractor Determinations.* When a CO identifies a job group with evidence of adverse impact and the contractor employs more than 100 people, the CO will ask the contractor to furnish the adverse impact determinations prepared during the review period as a part of its in-depth analyses for the job titles that fall within the job group. This assumes, of course, that the contractor has not already provided this information. For example, if the CO finds an adverse IRA for female hires into a Professionals job group, the contractor should submit its adverse impact determinations for the hiring of women in each title within the Professionals group. This action will assist the CO in determining whether the IRA and other statistical analyses need to be refined before investigating further. A CO may also request the contractor's adverse impact analyses in other areas. For example, a review of the workforce analysis showed a concentration or underrepresentation suggesting a potential placement problem. The contractor provided personnel activity data by job group and it does not show placements into the titles of concern. In response, a CO must request the contractor's adverse impact analyses for hires, promotions and transfers into the job titles at issue. When appropriate, the CO may also ask to review the contractor's adverse impact analyses and/or may ask the contractor to identify those jobs where its analyses showed an adverse impact.

c. *Need for Information about the Selection Process.* When the hiring, promotion or termination analysis for a job group or job title indicates that further investigation is needed, the CO must ask the contractor to provide a description of how the employment selections are made for positions in the job group or job title at issue. The description should include the steps in the process. The contractor should provide the following data for each selection step: the decision-makers, the criteria used, a description of how the criteria are used, and the records maintained. In addition, when a job group is under investigation, the CO should ask whether the selection process, as a whole or individual steps, applies to all of the job titles in the job group, and whether the process was the same throughout the entire duration of the review period. It is also helpful for the CO to know whether the process applies to other job groups or titles in addition to the group or title at issue. Steps may include, for example, review of application forms by the human resources representative, written tests, formal or informal interviews, physical examinations and on-the-job tests. The CO will plan to verify the contractor's statements through review of records, interviews with applicants and employees, and, if possible, observation of the process by which applicants are screened and selected.

d. *Multi-Component Selection Processes - Contractor Obligations.*

---

[65] The racial and ethnic groups are defined by 41 CFR 60-3.4B as Black, Hispanic, Asian, American Indian, and white other than Hispanic. However, OFCCP also permits contractors to keep their records concerning impact by using the racial and ethnic categories on the EEO-1 report.

Federal Contract Compliance Manual (FCCM)

- *Adverse Impact in Total Selection Process*.  When the contractor submits its adverse impact analyses for desk audit and if the analyses shows an adverse impact in the total selection process for a job group or job title, the UGESP requires the contractor to evaluate the individual components of the total selection process for an adverse impact.  Therefore, in a multi-step and/or multi-criterion selection process with an adverse impact, the CO must plan to request the contractor's records showing at what step(s) and/or by what criteria members of the nonfavored race, ethnic group or sex the contractor is disproportionately screening out, as well as any validity studies the contractor conducted of its selection procedures.

- *No Adverse Impact in Total Selection Process*.  Generally, if the total selection process for a job does not have an adverse impact, a contractor will not usually be expected to evaluate the individual components for an adverse impact or to validate those individual components, and enforcement action will not usually be warranted based on a component.

There are, however, several exceptions: when enforcement appears warranted and with individual complaints of discrimination.

- *Exception 1: When Enforcement May Be Warranted.*  In some circumstances, even though there is no adverse impact in the total selection process, further investigation and, possibly, enforcement action may nonetheless be appropriate when an individual component has an adverse impact (*e.g.,* height and weight requirements or criminal background checks), and its use is not justified as job-related and consistent with business necessity.

- *Exception 2: Individual Complaints of Discrimination.*  The "bottom line" standard – that a contractor need not evaluate the individual components of a selection process if the process as a whole does not result in adverse impact – does not preclude the investigation of complaints alleging race, ethnicity or sex discrimination caused by a component of a selection process.[66]

## 1P    COMPENSATION ANALYSIS

Under Executive Order 11246 and its implementing regulations, contractors may not discriminate in rates of pay or other forms of compensation, and must review, evaluate, and monitor their compensation systems to determine whether there are disparities based on sex, race, or ethnicity.[67]  OFCCP enforces the ban on compensation discrimination using a flexible, fact-specific approach to proof.  This approach involves factual investigation, and data and legal analyses which allow OFCCP to identify and remedy all forms of compensation discrimination.  The CO should tailor the compensation investigation and analytical procedures to the facts of the case.

---

[66]  See Questions and Answers Nos. 25 and 26 in Adoption of Questions and Answers to Clarify and Provide a Common Interpretation of the Uniform Guidelines on Employee Selection Procedures, available at *https://www.eeoc.gov/policy/docs/qanda_clarify_procedures.html* (last accessed August 10, 2019).

[67]  41 CFR 60-1.4; 41 CFR 60-2.17(b)(3).  Contractors are also prohibited from discriminating against employees and applicants in rates of pay or any other form of compensation based on disability or status as a protected veteran under Section 503 and VEVRAA, respectively, and their implementing regulations.  See 41 CFR 60-741.20(c) and 41 CFR 60-300.20(c).

SER-285

Federal Contract Compliance Manual (FCCM)

At the desk audit stage, the CO must analyze the contractor's compensation data.[68]  The CO must also review whether the AAP indicates that the contractor conducted the required evaluation of compensation to identify disparities based on sex, race or ethnicity; developed action-oriented programs to address any identified pay disparities or barriers to pay equity; and reported results to management.[69]

In addition to identifying potential discrimination at the desk audit stage, the CO must review the AAP and other submitted documents to ensure that the contractor does not have a policy to discharge or otherwise discriminate against applicants or employees for inquiring about, discussing, or disclosing their own compensation or the compensation of other employees.

### 1P00  GENERAL PRINCIPLES OF COMPENSATION DATA ANALYSIS

Compensation is defined as any payments made to, or on behalf of, an employee or offered to an applicant as remuneration for employment, including, but not limited to, salary, wages, overtime pay, shift differentials, bonuses, commissions, vacation and holiday pay, allowances, insurance and other benefits, stock options and awards, profit sharing, and retirement.[70]  As stated, the definition is not exhaustive and can include other forms of compensation, such as paid family leave.  OFCCP can investigate and seek remedies for discrimination in any form of compensation.  In every review of potential compensation discrimination, there are three key questions to be addressed:

- Is there a measurable difference in compensation on the basis of sex, race or ethnicity?

- Are the differently compensated groups of employees comparable under the contractor's wage or salary system?

- Is there a legitimate, nondiscriminatory explanation for the difference?

  o *Measurable difference.*  When statistical analysis is used, a measurable difference generally means a statistically significant difference - two or more standard deviations - consistent with Title VII principles.  When nonsystemic comparisons of small groups are conducted, there must be a measurable difference in compensation plus sufficient other evidence (often in the form of anecdotal evidence).

  o *Comparable employees.*  OFCCP follows the Title VII standard of comparing similarly situated workers to establish a case of compensation discrimination.  The definition of "similarly situated" is a case-specific legal standard.  In the compensation discrimination context, "similarly situated" means that employees are similar in all the ways that are relevant in the contractor's compensation system.  Relevant factors in determining similarity may include tasks performed, skills, effort, level of responsibility, working conditions, job difficulty, minimum qualifications, and other objective factors.  Employees may be similarly situated where they are comparable on the factors relevant to the investigation, even if they are not comparable on others.

---

[68]  OFCCP Directive 2018-05, "Analysis of Contractor Compensation Practices During a Compliance Evaluation."
[69]  41 CFR 60-2.17(b)(3); 41 CFR 60-2.17(d).
[70]  41 CFR 60-1.3.

Federal Contract Compliance Manual (FCCM)

o *Legitimate, nondiscriminatory explanation for the difference.* OFCCP considers all relevant factors offered by the contractor on a case-by-case basis to determine whether the factors are implemented fairly and consistently applied, whether they should be incorporated into a statistical analysis, and whether, as a whole, they provide a legitimate explanation for any pay disparities.

During a compliance review, the CO must examine all employment practices that appear to lead to compensation disparities. For example, there may be differences in employee access to opportunities affecting compensation such as higher-paying positions, job classifications, work assignments, training, preferred or higher-paid shift work, and other opportunities. The CO should also examine policies and practices that unfairly limit a group's opportunity to earn higher pay, such as "glass ceiling" issues, and access to overtime hours, pay increases, incentive compensation, and higher commission or desired sales territories. The CO may investigate any observed differences in pay, other earnings or benefits, job assignment/placement, training/advancement opportunities, differences in opportunities to increase compensation, or other unexplained differences.

## 1P01   ITEMIZED LISTING DATA ON COMPENSATION

The Itemized Listing requires a contractor to submit employee-level (*i.e.*, individual) data on compensation. Upon receipt of a contractor's AAP and supporting compensation data, the CO must review the submitted compensation data to ensure that it satisfies all of the requirements from the Itemized Listing, as explained above.[71] If the CO determines that the submission does not satisfy the requirements of the Itemized Listing data request, the CO must contact the contractor to discuss the discrepancies. Additionally, the CO must send a written request to the contractor seeking production of the compensation data within seven business days of receipt of the letter. The CO must recommend the issuance of an SCN if the contractor fails to comply.[72]

## 1P02   DESCRIPTIVE ANALYSIS OF COMPENSATION

The CO may begin the desk audit analysis of compensation once the contractor's compensation data submission is complete and acceptable. What constitutes an acceptable submission is discussed in Section 1F05. Analysis should begin with an examination of the descriptive statistics related to the data. Descriptive statistics are fact-based statistics such as mean, median, modes, or other distributional measures. The CO may use preliminary tools, tests, or broad indicators of potential compensation issues at the desk audit to identify pay practices or issues needing further review. In most cases, it is insightful to use nonsystemic comparative analysis to compare the treatment of similarly situated individuals or small groups of employees. In familiarizing themselves with the data, the CO should ascertain whether groupings, ratings, rankings, labels, and other employer-assigned attributes are differentially distributed by gender, race, or national origin. As with the systemic analysis of compensation, the CO must ensure that similarly situated employees are being compared and must assess whether any explanatory factors the contractor offers are implemented fairly, consistently applied, and relevant to the contractor's compensation system. This data exploration stage also includes an assessment of the pay analysis groups for reasonableness and statistical sufficiency. Considering these questions in consultation with supervisors, RSOL and

---

[71]   FCCM 1C01 and 1F05.
[72]   See Chapter 8: Resolution of Noncompliance.

Federal Contract Compliance Manual (FCCM)

Branch of Expert Services (BES) will allow the CO to determine whether initial indicators warrant further systemic analysis and on-site investigation.

## 1P03   SYSTEMIC STATISTICAL ANALYSIS OF COMPENSATION AT DESK AUDIT

Regression analysis is the statistical method of analysis most often used by OFCCP to analyze systemic patterns in compensation.  Regression analysis builds upon descriptive statistics and anecdotal evidence by further isolating the comparability of the workers at issue.  OFCCP compares similarly situated employees by forming pay analysis groups and controlling for relevant factors influencing their pay.

   a.  *Similarly Situated Employee Group (SSEG).*  A similarly situated employee group (SSEG), is a group of employees who are comparable for purposes of analyzing a contractor's pay practices.  Note that OFCCP also uses the term "pay analysis group" and views the SSEG and pay analysis group, or PAG, as equivalent terms.  An SSEG may be limited to a single job or title, and regression analysis may be performed separately on distinct units or categories of workers.  Alternatively, an SSEG may aggregate employees from multiple job titles, units, categories and/or job groups to perform a regression analysis, with statistical controls added as necessary to ensure workers are similarly situated.  For example, an SSEG could cover an entire unit or division of the organization but control for job title or pay grade to ensure that the analysis compares similarly situated workers.  Statistical testing for practices that impact pay such as job assignment may require a different analytic grouping than testing for pay differences within a single job.

   At the desk audit stage, the CO forms preliminary SSEGs by considering the industry, the types of jobs and compensation at issue, the contractor's actual compensation practices and the available data.  If a contractor provides its compensation hierarchy and job structure with its Itemized Listing submission, the CO must attempt to design its pay analysis based on that structure.  In the absence of information about a contractor's compensation system, the CO should conduct its desk audit analysis using AAP job groups as SSEGs, provided they are reasonable,[73] meet the requirements of 41 CFR 60-2.12, and are of a sufficient size to conduct a meaningful systemic statistical analysis.  If those conditions are not met, the CO should use EEO-1 job categories as SSEGs.  Salary structures and levels or stacking lines of progression (*e.g.,* Accountant 1, Accountant 2, etc.) may also be viable options for SSEGs.  Working with BES, the CO must control further for sub-job groupings, functions, units, or titles, as appropriate.  During the desk audit analysis, OFCCP will also control for tenure and full-time status as well as other factors, as appropriate.

   b.  *Statistically Controlling for Factors.*  In a statistical analysis of compensation, using controls is a way of ensuring comparison of similarly situated workers and accounting for potential explanations of pay differences.  Controlling for education, for instance, accounts for the effect of education on any differences in pay.  OFCCP can control for observable employee factors such as education, tenure or performance, as well as institutional factors such as department or job title.  It is only appropriate to control for factors in a statistical model if they

---

[73]  FCCM 1F01.

Federal Contract Compliance Manual (FCCM)

have been implemented fairly and consistently applied and are relevant to the contractor's compensation practices. At the desk audit stage, the CO should utilize a variety of desk audit tools and consult with the regional BES expert to decide on which factors to include in the preliminary analytical model.

For example, if a contractor awards bonuses based on performance, employees may be similarly situated if their performances are assessed according to the same process and criteria, and if they have similar performance ratings. Considering these facts, a statistical analysis of bonuses could compare similarly situated employees by grouping together all employees who are subject to the same performance evaluation process into one pay analysis group, and then statistically controlling for individual differences in performance ratings, as well as any other relevant factors. In some instances, the pay analysis group appropriate for an analysis of bonus pay may differ from the pay analysis group used to assess base pay.

## 1P04   CONCLUDING DESK AUDIT COMPENSATION ANALYSIS

At the conclusion of the desk audit, the CO must notify the contractor in writing of the general nature of any preliminary compensation disparities that warrant further information requests or on-site review. For example:

- Compensation issues for women in the Engineers and Project Architects SSEGs.

- Compensation policies and practices for the Engineers SSEG for Blacks and Hispanics, and the Technicians SSEG for females.

When conducting further review of a contractor's compensation practices, the CO must seek additional information to understand the contractor's compensation system, the elements that drive compensation decisions, and the job structure/hierarchy. Based on these facts, the CO may broaden or narrow the SSEGs and subsequent data requests to conform the analysis closely to the contractor's compensation system and practices, where appropriate. Chapter 2 contains information on conducting a further review of potential compensation discrimination.[74]

## 1Q    SCER SUMMARY OF POTENTIAL DISCRIMINATION AREAS AND ONSITE INVESTIGATIVE PLAN (ALL LAWS)

All potential discrimination problems that a CO identifies during the desk audit must be summarized, as appropriate, in Part A (Preparation), Part B.VII (Employment Activity Data Analyses), and Part B.VIII (Other Problems Identified for On-site Investigation) of the SCER. These summaries must include any problems the CO identifies while reviewing compliance history, the contractor's AAPs, and any problems the CO identifies during the review and analyses of Itemized Listing data.

---

[74]   See Directive 2018-05 for compensation modeling guidance beyond the desk audit.

Federal Contract Compliance Manual (FCCM)

For each potential discrimination problem a CO identifies, an on-site investigative plan must be developed. If the CO finds indicators of what appears to be a single potential discrimination problem through more than one analysis, such as an area of minority concentration with statistical indicators of discrimination for minority promotions out of the area, the CO only needs to describe the problem once in the On-Site Plan. The On-Site Plan should be as specific as possible and will set priorities for the documents to be gathered.[75]

# 1R    CONCLUSION OF THE DESK AUDIT

If a CO completes the desk audit and finds no problem areas, no outstanding questions and no violations, then the evaluation is closed at the desk audit stage. If the CO found nonsubstantive problems such as an unacceptable AAP element, the CO may close the compliance evaluation after all the identified problems are adequately resolved.

To close the compliance evaluation after the desk audit, the CO must ensure that no outstanding substantive issues exist. As previously noted, the CO may need to request additional materials from the contractor for review during the desk audit.

When the contractor submits the AAP with the support data, the desk audit should generally be completed in 45 days from receipt of the requested information. If, however, OFCCP provides an additional 30 days for the contractor to submit the support data using the one-time, 30-day extension for Itemized Listing information, the desk audit should be completed in 75 days.

## 1R00   DOCUMENTS FOR CLOSING COMPLIANCE EVALUATION AFTER THE DESK AUDIT

When closing a compliance evaluation after a desk audit, the CO will use one of the following closure documents:

*a.*   A finding of no violations leads to the issuance of a closure letter;[76] or

*b.*   A finding of violations, but no indicators of potential discrimination, leads to the issuance of either a closure letter that references any violations and their resolutions[77] or the issuance of an NOV.[78]

Whether to issue a closure notice that lists remedied violations or an NOV to be remedied by a CA is made on a case-by-case basis depending on the type and severity of the violation. Potential discrimination must be investigated further.

The appropriate supervisor must sign the closure document (*e.g.,* District Director or designee) and send the letter to the contractor by first-class mail.

---

[75]  FCCM 2C03 – On-Site Plan.
[76]  Letter L-5 – Notice of Closing Compliance Evaluation: No Violations Found.
[77]  Letter L-6 – Notice of Closing: Violations Found and Resolved. This letter is used if an NOV is not being issued.
[78]  See Chapter 8, Resolution of Noncompliance for procedures on issuing an NOV.

Federal Contract Compliance Manual (FCCM)

## 1R01   REASONS TO PROCEED WITH ON-SITE REVIEW

When appropriate, the CO should promote early and efficient corporate-wide compliance by examining whether it is possible to resolve indicators of discrimination and other material violations uncovered at the desk audit before proceeding to an on-site investigation.[79]  If early resolution is not possible, the CO must proceed with an on-site review if:

- The contractor provided insufficient data to conclude the review at the desk audit stage;

- There are indicators of potential discrimination, failure to provide a completed AAP, complaints or problems that merit an on-site review; or

- The contractor has been identified for a complete compliance review following OFCCP selection procedures.

In instances where problems are resolved through a document submission during the desk audit, the CO's on-site review may consist of technical assistance to ensure that the contractor is aware of its obligations.[80]

## 1R02   COMPLETING APPROPRIATE SCER PAGES

COs must complete as much of the SCER as possible for every compliance evaluation.  The CO must also sign the SCER.  The stage at which the compliance evaluation is closed and the type of investigative procedures used in the compliance evaluation will determine which sections of the SCER COs must complete.

---

[79]   See Directive 2019-02, "Early Resolution Procedures."
[80]   FCCM 2L – Equal Opportunity Clause and Other Requirements.

Federal Contract Compliance Manual (FCCM)

# CHAPTER 2
# ON-SITE REVIEW

## 2A    INTRODUCTION

This chapter describes the procedures COs follow when conducting the on-site review of a compliance evaluation for a supply and service contractor.  During an on-site review, COs gather data and information from the contractors, employees, applicants and others to better assess the contractor's compliance with the regulations implementing Executive Order 11246, VEVRAA and Section 503,[81] and with any other appropriate mandates.[82]  This chapter provides guidance to COs on how to prepare for, conduct and conclude an on-site review.

The nature and scope of the on-site review in each instance will vary depending on the type of compliance evaluation a CO is conducting and whether the CO has already identified potential problems.  As noted in Chapter 1, Desk Audit, a compliance evaluation may consist of any one or any combination of the following investigative procedures.[83]

- Compliance Review.  A comprehensive analysis and evaluation of the hiring and employment practices of the contractor, the written AAP, and the results of their affirmative action efforts.  This procedure may proceed in three stages: desk audit, on-site review, and off-site analysis.

- Off-Site Review of Records.  An analysis and evaluation of the AAP, or any part thereof, and supporting documentation.

- Compliance Check.  A determination of whether the contractor maintained appropriate records consistent with 41 CFR 60-1.12, 41 CFR 60-300.80 and 41 CFR 60-741.80.  At the contractor's option, the contractor may provide the documents on-site or off-site.

- Focused Review.  An on-site review that is restricted to one or more components of the contractor's organization, or one or more aspects of the contractor's employment practices.

Of the four options, the compliance review is the most common and is typically the most comprehensive.  For this reason, this chapter focuses on the specific procedures COs follow when conducting an on-site review as a part of a compliance review.[84]  There are generally four major tasks in an on-site review:

---

[81]  The regulations implementing Executive Order 11246 applicable to supply and service contractors are at 41 CFR Part 60-1, Obligations of Contractors and Subcontractors; 41 CFR Part 60-2, Affirmative Action Programs; and 41 CFR Part 60-3, Uniform Guidelines on Employee Selection Procedures.  Part 60-20 contains the regulations specifically covering Discrimination on the Basis of Sex; and Part 60-50 contains the Guidelines on Discrimination Because of Religion or National Origin.  VEVRAA implementing regulations are at 41 CFR Part 60-300, and the regulations implementing Section 503 are at 41 CFR Part 60-741.

[82]  When on-site, OFCCP is responsible for assessing a contractor's compliance with Executive Order 13496, if applicable.

[83]  41 CFR 60-1.20, 41 CFR 60-300.60 and 41 CFR 60-741.60.

[84]  In light of their more limited scope, focused reviews and compliance checks may not always include all of the elements discussed in this chapter.

On-site Review | 72

Federal Contract Compliance Manual (FCCM)

- Investigating potential problem areas the CO identified at a desk audit;

- Verifying the contractor's implementation of its AAP(s) or its assertions regarding its personnel activity and employment practices, or both;

- Investigating matters that cannot be fully examined at the desk audit; and

- Initiating resolution of identified violations.

The on-site review principles discussed in this chapter also provide guidance for performing an on-site review as part of other types of reviews. If the compliance evaluation is of a contractor that maintains a FAAP, then the evaluation will essentially be the same as the other processes. A possible addition is on-site visits to more than one location to address all of the components of the FAAP. Chapter 5 discusses FAAP reviews in more detail.

A preaward compliance evaluation covers the contractor's compliance with Executive Order 11246, Section 503, and VEVRAA, and occurs primarily on-site unless it is converted to a postaward review.[85] The purpose of a preaward compliance evaluation is to determine whether a prospective prime contractor or known first-tier subcontractor will be able to comply with the provisions of the equal opportunity clauses for Executive Order 11246, Section 503, and VEVRAA. For preaward reviews, the desk audit is normally part of the on-site review at the contractor's establishment. COs conduct a postaward review in the same manner as a compliance review under 41 CFR 60-1.20(a)(1), 41 CFR 60-300.60(a)(1) and 41 CFR 60-741.60(a)(1), and they must cover a contractor's compliance with Executive Order 11246, Section 503 and VEVRAA.

Complaint investigations include an on-site review that responds to the specific allegations raised in the complaint unless OFCCP converts a complaint into a full compliance review. Complaint investigations are discussed in detail in Chapter 6, Complaint Investigations.

## 2B    DETERMINING THE NEED FOR AN ON-SITE REVIEW

When OFCCP schedules a contractor for a compliance evaluation, the compliance evaluation may consist of one or a combination of investigative procedures, including a compliance review, an off-site review of records, a focused review or a compliance check. Though the majority of compliance reviews do not involve going on site, on-site reviews are a part of each full compliance review and each focused review. COs determine whether to conduct an on-site review in conjunction with an off-site review of records or a compliance check, based on the circumstances of the evaluation and the outcome of the initial review.

Typically, the CO may determine to conduct an on-site review if the desk audit reveals indicators of discrimination. However, even if a desk audit initially reveals discrimination indicators, an on-site review may not be necessary. In a portion of compliance evaluations, potential discrimination

---

[85]    A preaward compliance evaluation is subject to specific timeframes and is conducted before the award of a nonconstruction contract of $10 million or more. See 41 CFR 60-1.20(d), 41 CFR 60-300.60(d) and 41 CFR 60-741.60(c). The preaward review requirement applies to prospective contractors and their known first-tier subcontractors with subcontracts of $10 million or more.

Federal Contract Compliance Manual (FCCM)

indicators will be resolved after the desk audit concludes but before OFCCP conducts an on-site review, during the "pre-on-site." One example of this is when the desk audit findings show that the required AAPs are acceptable, and then the contractor provides sufficient supplemental data during the pre-on-site stage to resolve desk audit discrimination indicators. In those cases, the CO may conclude the compliance evaluation after the desk audit with the approval of a supervisor. When sufficient explanation of any such disparities is not provided by the contractor, the CO must coordinate with the supervisor to prepare for an on-site review.

## 2C    ON-SITE REVIEW PREPARATION

When conducting an on-site review, COs are neutral fact-finders and official representatives of the federal government. Consequently, COs must be unbiased in the identification and examination of all data and information that contributes to the full understanding of the contractor's employment practices and affirmative action efforts. COs must attempt to verify assertions made by the contractor regarding its affirmative action efforts, employment activity data and employment practices.

Before going on-site, COs must review a contractor's compliance evaluation and complaint history, develop an On-Site Plan, and provide advance notice of the on-site review to the contractor. A part of a CO's preparation includes sound information management and an awareness of employee concerns surrounding retaliation. The subsections below discuss these and other preparatory steps.

### 2C00   PROHIBITION AGAINST RETALIATION

COs must be concerned with gaining information that makes the on-site review useful to answering the question of whether the contractor complied with its obligations. If employees are afraid of cooperating for fear of retaliation, the on-site review could be compromised. COs should, therefore, take specific actions to notify and protect employees.

COs, when on-site, must inform the contractor's managers, employees and applicants that individuals exercising their rights under OFCCP's laws have protections from retaliation. Specifically, the regulations implementing Executive Order 11246, Section 503 and VEVRAA prohibit interference and intimidation of any individual exercising his or her rights under OFCCP's laws. The CO must give this notice to the contractor at the entrance and exit conferences, and include it as a part of any interview conducted during the on-site review.

The prohibition against interference and intimidation includes threats, coercion, harassment and discrimination. Retaliation may take the form of adverse employment actions such as termination, demotion, failure to hire and harassment. As with interference and intimidation, contractors may not retaliate against an individual for exercising his or her rights under the laws enforced by OFCCP. Specific activities protected from contractor interference, intimidation and retaliation include:

- Filing a complaint;

- Assisting or participating in an investigation, compliance evaluation, hearing, or any other activity related to the administration of the Executive Order 11246, Section 503 and VEVRAA or other EEO laws;

Case 3:22-cv-07182-WHA   Document 39-1   Filed 10/18/23   Page 208 of 1025

Federal Contract Compliance Manual (FCCM)

- Opposing any act or practice that violates any of these EEO laws; and

- Exercising any other right afforded them by these laws.

## 2C01   USE OF THE STANDARD COMPLIANCE EVALUATION REPORT AND INFORMATION MANAGEMENT

a. *The Standard Compliance Evaluation Report*.  The SCER documents the scope, progress and results of an on-site review.[86]  It also includes notes confirming that a contractor met its obligations or describing any problem areas the CO identified during the desk audit, on-site review, and off-site analysis.  A CO may not be able to complete the desk audit portion of the SCER because the quality of the desk audit data is inadequate or was insufficient.  In that situation, the CO's initial task during the on-site review is to complete the desk audit portion of the SCER.  You will find a copy of the SCER and instructions for completing it in Appendices A-1 SCER and A-2 SCER Instructions.

With a full understanding of the contractor's employment practices and affirmative action efforts, a CO may identify new problems or find that the contractor resolved previously identified problems.  COs must describe problems identified during the on-site review and record any recommendations for corrective actions to resolve problems.

b. *Obtaining and Maintaining Records*.  All communications and information COs gather during the compliance evaluation must remain in the case file.  Examples of information or data a CO might gather are data and record submissions by the contractor; information gathered from other sources such as applicants and employees; and interviews with contractor officials, employees and others.  This includes all information obtained during the on-site review.  In addition, COs must document their activities and communications in connection with the on-site review in the compliance evaluation or Case Chronology Log.[87]

These are several of the general principles for properly maintaining records:

- Every document collected during the review, even if it does not support the ultimate finding, is included in the case file.  These documents include those in both paper and electronic formats.

- All email and other written communications must be dated, identify the individuals participating in the communication, and accurately reflect any agreed commitments.  For example, the emails in a CO and contractor email exchange discussing possible dates for the on-site review would reflect the CO's name and position, the name and position of the

---

[86] COs will not use all the pages of the SCER in every evaluation. Rather, which sections of the SCER are appropriate to each review will depend on the type of compliance evaluation.  However, COs must complete all relevant SCER pages and sections.

[87] See FCCM 1B01 – Preparation and Maintenance of the Case Chronology Log; 1B02 – Creation and Maintenance of the Case File and Figure F-2 Case Chronology Log for additional information regarding the case file and Case Chronology Log.

Federal Contract Compliance Manual (FCCM)

contractor's representative, the dates proposed and the dates for the on-site review that were agreed upon.

- Original documents submitted by contractors or otherwise obtained by COs must not be altered. Alterations, including notes made by a CO, should be made on working copies.

- Interview statements, whether obtained by a CO in person or by telephone, must remain in the case file. These statements must include the name and position of the person conducting the interview, the name of the person interviewed and his or her title or position, the date and time of the interview, and the location of the interview. COs must also note if other people were present during the interview such as the legal counsel or a personal representative. Interviewees should review and sign the CO's interview notes and typed statement indicating that they are accurate. Section 2M of this chapter provides specific information on interviews.

- Information obtained during interviews and a CO's observations must be reduced to writing as soon as feasible. The CO must type handwritten notes, using MS Word, before placing them in the case file.

- Supporting evidence must be in a clearly labeled section of the case file. Supporting evidence may include the CO's notes, worksheets, contractor data and any other material related to specific problem areas identified by the CO.

## 2C02  HISTORICAL DATA AND COMPLAINT HISTORY

At desk audit, COs check the electronic CMS and the EIS to obtain a list of prior compliance evaluations of the establishment and identify any issues found in the previous OFCCP reviews. This information must be updated and reviewed when determining what to include in an On-Site Plan. As an example, if OFCCP obtained a CA in a prior review, the CO must use the on-site visit to confirm that the contractor took and maintained the required corrective actions. If the purpose of the on-site review is to address questions that arose as part of the monitoring of a CA, the CO must develop an Investigative Plan that addresses those specific questions.

If COs do not have current information regarding discrimination complaints filed against the contractor with other agencies, they must contact the EEOC and the appropriate state or local FEP agencies to ascertain the existence, nature, scope and status of any complaints. COs must include the replies or information obtained from these agencies in the case file and incorporate them, as appropriate, into the On-Site Plan.[88] In addition, COs should check the DOL's Enforcement Database[89] or reach out to other DOL agencies, such as the WHD or OSHA, for information on the compliance history of the establishment.

---

[88] See Letters L-2 for a sample letter requesting complaint data from EEOC and state and local FEPS.
[89] See *https://enforcedata.dol.gov/* (last accessed September 10, 2019). FCCM 1B05 and 1B06 also include discussions on gathering information from the EEOC and other agencies.

On-site Review | 76

Federal Contract Compliance Manual (FCCM)

## 2C03   ON-SITE PLAN

An On-Site Plan is an important step and COs must develop one before each on-site review. Although the scope of the on-site review may change as a result of the on-site observations and evidence, the On-Site Plan serves as the initial outline or "road map" for conducting the on-site review.  In some cases, it may be helpful to involve staff from the regional solicitor and DPO in devising the On-Site Plan.  For contractors with complex compensation systems (such as education, information technology, finance, or healthcare sectors), attorneys and DPO statistical experts may help ensure that appropriate information, documents and data are obtained.[90]

The On-Site Plan must include each problem area identified during a desk audit and described on the SCER in Part B.  For each problem area, the On-Site Plan must identify or describe the data and records the CO will obtain and review, interviews that the CO will conduct, and any other known relevant materials the CO will review while on-site.  For example, additional information may include materials related to the desk audit findings such as personnel records, payroll records, applications and resumes, and materials not included in the original submission such as employment advertisements and position descriptions.  In addition to individuals who are interviewed as a routine matter (for example, the human resources manager), interviewees should include individuals relevant to the investigation of any indicators of discrimination identified at the desk audit stage (for example, selection officials, employees and applicants).

The On-Site Plan must also include a list of technical items, such as the posting of the *Equal Employment Opportunity Is the Law* poster ("EEO is the Law" poster) and the required supplement, that the CO will verify while on-site.  Additionally, the plan must identify field office staff who will participate in the on-site review, and their roles and responsibilities.  The On-Site Plan must also include the projected dates for the on-site review, as discussed with the contractor.

If a CO is going on-site as part of a focused review, the On-Site Plan will reflect the more limited scope of this type of review.  Similarly, if a CO is going on-site to conduct a compliance check, the On-Site Plan will be narrower because the plan will not encompass all of the elements of an On-Site Plan that the CO would develop for a comprehensive compliance review.  When going on-site for a compliance check, COs must use the Compliance Check Control Sheet to record whether the contractor maintained the appropriate records or whether the contractor needs to provide additional information and documentation.[91]

## 2C04   NOTICE OF THE ON-SITE DATE AND REQUESTS FOR ADDITIONAL INFORMATION

In preparation for the on-site review, the CO must contact the contractor, or the contractor's representative, to schedule the on-site review.  The CO must make any additional data requests beyond what the contractor provided at the desk audit during this pre-on-site stage, to refine indicators and prepare for a potential on-site visit.  Supplemental information requests must include the basis for the request, be reasonably tailored to the areas of concern, and allow for a reasonable time to respond.

---

[90]   See Appendix A-4 for a sample On-Site Plan.
[91]   See Figure F-1 – Compliance Check Control Sheet.

Federal Contract Compliance Manual (FCCM)

Receipt of supplemental data may result in resolving the indicator(s) of potential violation(s) and, as such, no further investigation may be warranted. If problem areas remain, the CO will identify the contractor officials who will need to be available during the on-site review. The CO must also inform the contractor that he or she may need additional information and interviews related to identified problem areas as the on-site review progresses. Having such a discussion before the on-site visit provides the contractor with time to locate and make available requested information and interviewees.

The CO must provide the contractor with written confirmation of the on-site date(s) and time(s) at least three business days before the on-site visit.[92] This confirmation must also include a summary of the preliminary indicators of potential violations, requests for access to interviewees, as well as data and information that the CO is aware of needing at that time. The confirmation is sent to the contractor by certified mail, return receipt requested; however, a courtesy copy may be sent by email or facsimile.[93]

## 2D    ON-SITE PROCESS

The on-site review typically progresses in several phases, including entrance conference, facility inspection, collecting contractor records, interviews, and exit conference. COs should make every effort to gather all necessary records and conduct all personnel interviews during the on-site review. However, it may be possible to conduct a return on-site visit if the CO identifies some change in the facts or circumstances that supports collecting additional data or conducting personnel interviews. One example of a change is when a contractor submits new information in response to a PDN, NOV, SCN, or during conciliation, and the CO needs to explore the new information further on-site.

Each phase of the on-site process has its unique challenges for COs and an overview of the phases is provided in the following subsections. Collecting contractor records and interviews are also discussed in more detail in sections 2E and 2F. After completing the on-site review and any needed return on-site visit, COs will analyze the information obtained on-site and record findings using the SCER.[94]

### 2D00   ENTRANCE CONFERENCE

The on-site review typically begins with an entrance conference with the CEO or highest ranking official in charge of the facility, his or her representative and senior officials who are responsible for implementing the AAP(s). The entrance conference will provide general information to the CEO and explain the purposes of the compliance evaluation. During this conference, a CO will, at a minimum, provide:

- A summary of the contractor's obligations under the programs administered by OFCCP;

---

[92]   However, OFCCP reserves the right to waive the three-day advance notice if providing it could result in irreparable injury to the employment rights of affected employees or applicants.
[93]   See L-7, Supply & Service On-Site Confirmation Letter.
[94]   FCCM 2O, Investigation Summary or Report Writing.

Federal Contract Compliance Manual (FCCM)

- A description of the scope of the on-site review and the length of time that the CO anticipates being on-site; and

- A description of the information needed while on-site.

A CO must advise the contractor of the need to conduct confidential employee interviews. This includes informing the contractor that it does not have the right to have its representative present during an employee interview as either an observer or the employee's representative. It is possible that an employee could request the presence of the contractor's representative during the interview. Should this happen, the CO must determine whether the request is freely made and is not the result of a threat or coercion. The CO makes this determination based on speaking privately with the employee outside of the presence of the contractor's representative.

A CO may want to interview a management employee in some capacity other than as a manager for the contractor, for example, as a potential complainant or victim. This management employee is not required to have the contractor's representative present for the interview if he or she is not speaking on behalf of the contractor. The CO must make it clear to the contractor that nothing said by the management employee will be binding on the contractor. The determination of whether the management employee is a potential complainant or victim and whether the contractor's representative can be present is fact-specific. Therefore, COs should consult with the RSOL and the national office before engaging in these types of interviews.

During the conference, the CO will inform the CEO of the need to meet again to discuss tentative findings of the investigation, and any outstanding requests for data and information.[95]

## 2D01   FACILITY INSPECTION

The facility inspection is an opportunity for COs to observe and evaluate the working conditions in departments or other organizational units of a contractor's establishment. It is also an opportunity to observe the composition and concentration of groups by sex, race, ethnicity, and disability. COs also use the inspection process to observe work performed in different job titles, and to conduct brief focused interviews with supervisors and employees to obtain information about the facility and the work performed there. The CO will also conduct more formal interviews of supervisors, employees and the top union official, as appropriate, during the on-site visit.

By observing how employees complete their work, particularly in any job titles identified as problem areas, COs develop a better understanding of the functions and conditions of the job positions. This understanding contributes to a CO's ability to make decisions and assess matters such as the relationship of certain job criteria for selecting individuals for certain jobs. For example, if females are underrepresented in a particular job title for which "the ability to lift 50 pounds" is a selection criterion, a CO may observe that the job is done with mechanical equipment doing the lifting rather than the employee. Further, the CO may observe that employees rarely lift 50 pounds without assistance from another employee. This observation allows the CO to question the contractor regarding:

---

[95] See also 2C00 – Prohibition Against Retaliation.

Case 3:22-cv-07182-WHA   Document 39-1   Filed 10/18/23   Page 213 of 1025

Federal Contract Compliance Manual (FCCM)

- The timing and nature of the development of the selection criterion;

- The assessment that the criterion is job-related and consistent with business necessity;

- The changes in the selection process since the criterion's development;

- The point in the selection process when the selection criterion is applied; and

- The contractor's assessment of the validity of the selection criterion as a measure of whether an applicant can perform the job.

A facility inspection also allows COs to make observations regarding possible physical accessibility issues for employees with known disabilities. The presence of physical barriers does not mean that disability discrimination exists. Rather, a CO may use this opportunity to provide compliance assistance on providing reasonable accommodation to individuals with disabilities, including disabled veterans. The CO may also ask about the contractor's process for receiving and handling requests for accommodation.

During the inspection, COs must visually confirm the display of EEO posters and AAP policy statements required under Section 503 and VEVRAA. Contractors are required to conspicuously display the "EEO is the Law" poster, the required supplement and the notice of employee rights under the National Labor Relations Act (NLRA) required by Executive Order 13496.[96] Additionally, COs must observe and question, as appropriate, how the contractor provides notice to employees of the location and hours of availability of VEVRAA and Section 503 AAPs.[97] A CO must take notes during the inspection to record his or her observations, or record the observations immediately following the inspection. The CO must type handwritten notes, using MS Word, before placing them in the case file. During the inspection or during off-site analysis, the CO may verify electronic postings. The CO should document his or her observations and findings in the SCER.

In appropriate circumstances, COs may also take photographs. However, if a contractor objects to the CO taking photographs, the CO must stop taking photographs and notify the district office of the contractor's concern.

## 2D02   COLLECTING INFORMATION: ACCESS TO CONTRACTOR RECORDS

The agency's regulations require contractors to provide COs access to the contractor's books, records and accounts to determine the contractor's compliance with the laws administered by OFCCP.[98] When a CO knows that he or she will likely need to obtain copies of materials, the CO must initiate a discussion with the contractor regarding the need to obtain copies of materials before the on-site review. Working out the logistics for obtaining copies of requested materials before the on-site review may help the CO avoid conflicts. This may also be useful when scheduling the time

---

[96]  FCCM 2L – Equal Opportunity Clauses and Other Requirements.
[97]  41 CFR 60-300.41 and 41 CFR 60-741.41.
[98]  For a fuller discussion of the types of information that a CO might collect during an on-site review, see FCCM 2E – Collecting Information for Analysis