**Case No. 24-880**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

CENTER FOR INVESTIGATIVE REPORTING AND WILL EVANS

*Plaintiffs-Appellees,*

v.

UNITED STATES DEPARTMENT OF LABOR

*Defendant-Appellant.*

---

Appeal from the United States District Court for the Northern District of California, No. 22-cv-07182-WHA (Hon. William Alsup)

---

### BRIEF OF *AMICI CURIAE* KNOWLEDGE ECOLOGY INTERNATIONAL, UNIVERSITIES ALLIED FOR ESSENTIAL MEDICINES, DR. CHRISTOPHER MORTEN, AND DR. RESHMA RAMACHANDRAN IN SUPPORT OF APPELLEES CENTER FOR INVESTIGATIVE REPORTING AND WILL EVANS AND AFFIRMANCE

---

Mason A. Kortz
HARVARD CYBERLAW CLINIC
1557 Massachusetts Ave., 4th Floor
Cambridge, MA 02138
617-495-2845
mkortz@law.harvard.edu

Counsel for *Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* Knowledge Ecology International states it does not have a parent corporation, nor does any publicly held corporation own ten percent or more of its stock.

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* Universities Allied for Essential Medicines states it does not have a parent corporation, nor does any publicly held corporation own ten percent or more of its stock.

Dated: July 17, 2024

/s/ Mason A. Kortz

Mason A. Kortz

# **TABLE OF CONTENTS**

Table of Authorities ........................................................................... iii

Statement of Interest of *Amici Curiae* ...................................................1

Summary of Argument ........................................................................3

Argument.............................................................................................4

    I.  A broad reading of Exemption 4 would reduce government transparency and accountability and obstruct valuable research into the relationships between public and private entities. ..........................................................6

        A.  The federal government's dealings with private actors, including with respect to procurement and oversight of regulated industries, are matters of significant public importance and interest.........................7

        B.  Access to records regarding public-private relationships enables research that promotes government accountability. ..........................11

            i.  Research by *amici* UAEM, Dr. Morten, and Dr. Ramachandran led to improvements in FDA clinical trial reporting. .........................12

            ii.  Research by *amici* KEI and Dr. Ramachandran informed legislation on transparency for government spending....................................14

            iii.  Other researchers use FOIA to access information on important government functions. ................................................................16

   II.  EEO-1 reports do not fall under Exemption 4 because they are not commercial or confidential, and their disclosure does not present a foreseeable harm.......................................................................................18

        A.  Exemption 4 applies only to intrinsically valuable commercial information that reveals intimate aspects of a company's activities. 19

        B.  Should this Court reach the issue of confidentiality, it should provide guidance on the limits of Exemption 4. .............................................22

        C.  The DOL has not established foreseeable harm from disclosing the EEO-1 reports, as required by the FOIA Improvement Act..............24

Conclusion ........................................................................................29

## TABLE OF AUTHORITIES

**Cases**

*Animal Legal Def. Fund v. United States Food & Drug Admin.*, No. 12-CV-04376-KAW, 2021 WL 3270666 (N.D. Cal. July 30, 2021) ..........................23

*Besson v. United States Dep't of Com.*, 480 F. Supp. 3d 105 (D.D.C. 2020)..........22

*Carlson v. U.S. Postal Serv.*, 504 F.3d 1123 (9th Cir. 2007) .......................... 19, 20

*Citizens for Resp. & Ethics in Washington v. United States Dep't of Just.*, 58 F.4th 1255 (D.C. Cir. 2023) ........................................................... 19, 20, 28

*CNA Fin. Corp. v. Donovan*, 830 F.2d 1132 (D.C. Cir. 1987)......................... 24, 26

*Ctr. for Investigative Reporting v. United States Dep't of Lab.*, No. 3:22-CV-07182-WHA, 2023 WL 8879244 (N.D. Cal. Dec. 22, 2023) ........................................22

*Dep't of Air Force v. Rose*, 425 U.S. 352 (1976).......................................... 4, 6, 18

*Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427 (2019) ................. 22, 23, 26

*Gen. Elec. Co. v. U.S. Nuclear Regul. Comm'n*, 750 F.2d 1394 (7th Cir. 1984) ....20

*Nat. Res. Def. Council v. United States Env't Prot. Agency*, 19 F.4th 177 (2d Cir. 2021)...................................................................................................5

*Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157 (2004) ........................28

*Nat'l Bus. Aviation Ass'n, Inc. v. F.A.A.*, 686 F. Supp. 2d 80 (D.D.C. 2010)..........21

*New York Pub. Int. Rsch. Grp. v. U.S. E.P.A.*, 249 F. Supp. 2d 327 (S.D.N.Y. 2003) .............................................................................................. 20, 21

*Pub. Citizen Health Rsch. Grp. v. Food & Drug Admin.*, 704 F.2d 1280 (D.C. Cir. 1983).................................................................................................. 20, 28

*Reps. Comm. for Freedom of the Press v. Fed. Bureau of Investigation*, 3 F.4th 350 (D.C. Cir. 2021) .................................................................................27

*Seife v. U.S. Food & Drug Admin.*, 43 F.4th 231 (2d Cir. 2022) ...........................27

*Synopsys, Inc. v. U.S. Dep't of Lab.*, No. 20-16414, 2022 WL 1501094 (9th Cir. May 12, 2022) ...........................................................................................26

*U.S. Dep't of Just. v. Tax Analysts*, 492 U.S. 136 (1989) .......................................4

*U.S. Dep't of State v. Ray*, 502 U.S. 164 (1991) .............................................. 19, 29

*Watkins v. U.S. Bureau of Customs & Border Prot.*, 643 F.3d 1189 (9th Cir. 2011) ............................................................................................................20

**Statutes**

5 U.S.C. § 552 ................................................................................................ passim

FOIA Improvement Act of 2016, Pub. L. No. 114-185, 130 Stat. 538 ........... 19, 24

TRACKS Act, H.R. 3766, 118th Cong. (2023) .....................................................15

**Other Authorities**

*A Snapshot of Government-Wide Contracting for FY 2023 (Interactive Dashboard)*, U.S. GOVERNMENT ACCOUNTABILITY OFFICE (June 25, 2024) ........................6, 8

*About NASS: Agency Overview*, U.S. DEPARTMENT OF AGRICULTURE ...................11

*Civil and Cleanup Enforcement Cases and Settlements*, ENVIRONMENTAL PROTECTION AGENCY ....................................................................................10

*Contracts*, U.S. DEPARTMENT OF DEFENSE ................................................................9

*COVID-19 Contracts*, KNOWLEDGE ECOLOGY INTERNATIONAL ........................8, 14

*Development & Approval Process Drugs*, U.S. FOOD & DRUG ADMINISTRATION (Aug. 8, 2022) ...............................................................................................10

Ed Silverman, *In response to criticism, FDA publishes new database of wayward clinical trial sponsors*, STAT (Dec. 14, 2023) ...................................................14

*Enforcement and Compliance History*, ENVIRONMENTAL PROTECTION AGENCY ...10

*Examples of Wasteful Government Spending Exposed by FOIA*, THE NATIONAL SECURITY ARCHIVE ..........................................................................................11

iv

*Exposing Pay-to-Play Scheme Enacted by the GEO Group*, CAMPAIGN LEGAL CENTER ........................................................................................................11

*False Reporting by Contractor on Alternatives to Detention Activities*, TRAC (Mar. 7, 2023) ...............................................................................................28

*Food and Drug Administration Takes First-Ever Enforcement Action To Ensure Clinical Trial Transparency*, THE ENGELBERG CENTER ON INNOVATION LAW & POLICY (June 30, 2021) ....................................................................................13

H.R. Rep. 94-880 (1976)................................................................... 24, 25

*Hearing on "The Path Forward on COVID-19 Immunizations"*, Hearing Before the Health Subcomm., 117th Cong. (2020) .............................................15

James Love, *KEI Receives Seven New Contracts for COVID 19 Research From BARDA and DOD, Including Five Using "Other Transactions Authority" That Weaken or Eliminate Bayh-Dole and FAR Safeguards*, KEI BLOG (July 1, 2020) ..................................................................................................................14

James Love, *Unreasonable Pricing and the "Coronavirus Preparedness And Response Supplemental Appropriations Act, 2020"*, KEI BLOG (Mar. 5, 2020) 15

KEI Staff, *KEI Letter to Speaker Pelosi Regarding Use of "Other Transaction Authority" (OTA) in Coronavirus Bill to Escape Bayh-Dole Public Interest Safeguards*, KEI BLOG (Mar. 23, 2020)..............................................15

Megan Curtin et al., *Transforming Clinical Trial Results Reporting in the United States*, UNIVERSITIES ALLIED FOR ESSENTIAL MEDICINES (2024).......... 12, 13, 14

Nick Schwellenbach and René Kladzyk, *How Lax EPA Oversight Enabled Jackson's Water Crisis*, PROJECT ON GOVERNMENT OVERSIGHT (May 23, 2024) ..................................................................................................................16

*ORA FOIA Electronic Reading Room*, U.S. FOOD & DRUG ADMINISTRATION .......17

Patrick Wingrove, *US FDA finds control lapses at Moderna manufacturing plant*, REUTERS (Dec. 15, 2023) ..................................................................17

Paul C. Light, *The True Size of Government*, THE VOLCKER ALLIANCE (Sept. 29, 2017)...................................................................................................8

Peter Loftus, *FDA Finds Poor Conditions at Contractor's Plant for Making J&J's Covid-19 Vaccine*, THE WALL STREET JOURNAL (Apr. 22, 2021).......................17

S. Rep. No. 114-4 (2016) ................................................................................ 26, 27

*Summary of Criminal Prosecutions*, ENVIRONMENTAL PROTECTION AGENCY........10

U.S. Department of Energy, *Agency Financial Report: Fiscal Year 2023*, DOE/CF-0201 (2023) ..........................................................................................................9

*USDA, Meatpacking Industry Collaborated to Undermine COVID-19 Response, FOIA Docs Show*, PUBLIC CITIZEN (Sept. 15, 2020) ..........................................16

## STATEMENT OF INTEREST OF *AMICI CURIAE**

**Knowledge Ecology International (KEI)** is a nonprofit organization that searches for better outcomes regarding the management of knowledge resources. KEI undertakes and publishes research and new ideas, engages in global public interest advocacy, provides technical advice to governments, NGOs, and firms, enhances transparency of policy making, monitors actions of key actors, and provides forums for interested persons to discuss and debate Knowledge Ecology topics. KEI is particularly drawn to areas where current business models and practices by businesses, governments, or other actors fail to address social needs, and where there are opportunities for sustainable improvements. *Amici* are concerned this case will impact transparency and accountability of government records and actions and by extension, access to knowledge resources and the affordability of medical inventions.

**Universities Allied for Essential Medicines (UAEM)**, led by executive director Justin Mendoza, MPH, is a nonprofit student-driven public interest organization focused on making medicines discovered on university campuses

---

\* Pursuant to Fed. R. App. P. 29(a)(2), *amici curiae* certify that all parties have consented to the filing of this brief. Pursuant to Fed. R. App. P. 29(a)(4)(E), *amici curiae* certify that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund the preparation or submission of this brief; and no person—other than the amici curiae or their counsel—contributed money that was intended to fund the preparation or submission of this brief.

1

affordable for those who need them most. UAEM's work includes filing FOIA requests at universities, with federal agencies, and with state agencies while monitoring compliance with clinical trial and intellectual property-focused laws.

**Christopher J. Morten, JD, PhD,** is an associate clinical professor of law at Columbia Law School and founding director of Columbia Law School's Science, Health & Information Clinic. The Clinic provides pro bono legal services to activists and organizers, scientific and medical researchers, patient and consumer groups, nonprofit organizations, and other clients. Dr. Morten regularly files and pursues FOIA requests on behalf of the Clinic's clients. In addition, Dr. Morten regularly uses FOIA requests to obtain information used in his academic research.

**Reshma Ramachandran, MD, MPP, MHS,** is an assistant professor of medicine at Yale School of Medicine and co-director of the Yale Collaboration for Regulatory Rigor, Integrity, and Transparency (CRRIT). Through Yale CRRIT, Dr. Ramachandran and her colleagues research drug and medical device regulatory review, approval, and coverage to advance policies that improve patient outcomes. They routinely utilize data obtained through FOIA requests to conduct academic research. Dr. Ramachandran has also regularly filed FOIA requests to obtain data for research studies.

## SUMMARY OF ARGUMENT

At issue in this case is Exemption 4 of the Freedom of Information Act ("FOIA"), which allows agencies to withhold commercial or financial information obtained from a person by the government that is also privileged or confidential. 5 U.S.C. § 552(b)(4). The broad reading of this exemption advanced by the Department of Labor ("DOL") would be catastrophic for researchers who rely on FOIA to carry on their work. Since many government agencies oversee private industries, and many administrative programs contract with private partners, researchers studying government activity must be able to access information about these non-governmental actors. *See* Part I.A. Cutting off this avenue of research would limit the public's understanding of—and the government's accountability for—critical issues such as overspending, regulatory capture, and corporate malfeasance. *See* Part I.B.

Fortunately for the American public, the DOL's position is not supported, much less required, by the relevant statutory language, judicial precedent, or legislative history. First, as this Court and others have held, information is "commercial" only if bears on the intimate aspects of a business. The *de minimis* relation to commercial activity here is not sufficient to trigger Exemption 4. *See* Part II.A. Second, while the district court did not need to reach confidentiality, should this Court choose to remand for further proceedings on confidentiality, it should do

3

so with guidance. Specifically, the Court should make clear that a finding of confidentiality requires showing that the information is not available elsewhere and at least a plausible assurance that the information will be kept private. *See* Part II.B. Finally, the Court should reject the DOL's attempt to put the cart before the horse and apply the Trade Secrets Act to these records before determining whether they are exempt under the current version of FOIA. *See* Part II.C.

This Court should not allow agencies to withhold records from journalists, researchers, or the public without showing that they are intrinsically commercial, actually confidential, and that disclosure would cause foreseeable harm to a protected interest. A lax reading of Exemption 4 would impede valuable public research and provide a significant barrier to *amici*'s work, negating the Congressional intent behind FOIA as a tool for government transparency. *See U.S. Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 142 (1989) ("Congress believed that [FOIA] . . . would ensure an informed citizenry, vital to the functioning of a democratic society.") (quotations omitted).

## ARGUMENT

From its earliest conception, the Freedom of Information Act has "reflected 'a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language.'" *Dep't of Air Force v. Rose*, 425 U.S. 352, 360–61 (1976) (quoting S. Rep. No. 813, 89th Cong., 1st Sess., 3 (1965)).

Amendments, including the recent FOIA Improvement Act ("FIA") have only strengthened the Act's commitment to openness. *See Nat. Res. Def. Council v. United States Env't Prot. Agency*, 19 F.4th 177, 194 (2d Cir. 2021) (quoting S. Rep. No. 4, 114th Cong., 1st Sess. 2 (2015)) (explaining that FIA was adopted "out of concern that 'some agencies [were] overusing FOIA exemptions'"). Relying on this philosophy of disclosure, *amici* have brought critical information about public-private dealings to light, leading to tangible change.

The DOL's position, if adopted by this Court, would severely hamper this virtuous cycle of disclosure, research, and reform. Here, the Center for Investigative Reporting and Will Evans ("CIR") has requested EEO-1 reports that contain high-level information about private contractors and their employees. The DOL cannot show that these reports meet the specific requirements of Exemption 4—commerciality and confidentiality—or the general requirement that disclosure would cause foreseeable harm. Instead, it argues for lax interpretations of these requirements that run contrary to the letter of the law, the precedent in this Circuit and others, and the consistent legislative intent behind FOIA and its amendments. As such, *amici* urge the Court to affirm the district court's decision ordering the release of the EEO-1 reports.

I.     **A BROAD READING OF EXEMPTION 4 WOULD REDUCE GOVERNMENT TRANSPARENCY AND ACCOUNTABILITY AND OBSTRUCT VALUABLE RESEARCH INTO THE RELATIONSHIPS BETWEEN PUBLIC AND PRIVATE ENTITIES.**

FOIA exists "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Rose v. Dep't of Air Force*, 495 F.2d 261, 263 (2d Cir. 1974), *aff'd*, 425 U.S. 352 (1976). This scrutiny takes many forms, from investigative reporting to individual citizen activism. It can also take the form of data-driven research. FOIA-based research, including that conducted by *amici*, enables public understanding of broader trends in government functioning, spending, and accountability.

The records at issue in this case shed light on a particularly important aspect of government: its relationship with the private sector. Public-private interactions are increasingly common at the federal level. *See, e.g.*, *A Snapshot of Government-Wide Contracting for FY 2023 (Interactive Dashboard)*, U.S. GOVERNMENT ACCOUNTABILITY OFFICE (June 25, 2024).[1] These interactions include the hiring of contractors, procurement of goods and services, and oversight of numerous private industries, to name a few. The efficiency and integrity of these interactions is, therefore, an issue of major public interest. As demonstrated by the work of *amici* and others, public records can be an incredibly valuable source of data on public-

---

[1] https://www.gao.gov/blog/snapshot-government-wide-contracting-fy-2023-interactive-dashboard [https://perma.cc/HKU7-JSC2]

private interactions. Lowering the standard for private objectors to block disclosure of government records, as the DOL urges, would significantly impede such research and frustrate the purpose of FOIA.

###### A.    The federal government's dealings with private actors, including with respect to procurement and oversight of regulated industries, are matters of significant public importance and interest.

The modern federal government is constantly and deeply engaged with private, often for-profit, entities. Private contractors perform fundamental governmental roles, while private vendors supply everything from desk chairs to armed drones. At the same time, administrative agencies ensure that private actors comply with the law, including several dozens of closely regulated industries. Each of these interactions generates records. The information in these records is essential to researchers studying the operations of various government programs. Some such information may be available through agency reports or one-time research agreements. In many cases, though, researchers rely on FOIA to access crucial data on which their analysis depends, and ultimately, to help hold the government accountable.

The EEO-1 reports at issue in this case are a prime example of valuable information about the government's relationship with private actors. Appellees Br. at 37. Records related to federal contractors can show who is hired, for what roles, and at what expense, all of which are matters of increasingly significant public

interest. In fiscal year 2023, the federal government committed approximately $759 billion to contracts, an increase of about $33 billion from fiscal year 2022. *See Snapshot*, U.S. GOVERNMENT ACCOUNTABILITY OFFICE, *supra*. Of this, about $478 billion, or 63%, was spent on contracts for services. *Id.* Civil administrative agencies were responsible for approximately $303.2 billion in contractor spending, while the Department of Defense ("DOD") spent a staggering $456 billion. *Id.* One analysis concluded that, as of 2015, forty percent of the federal workforce was composed of contract employees. *See* Paul C. Light, *The True Size of Government*, THE VOLCKER ALLIANCE (Sept. 29, 2017).

The federal government relies on private contractors to operate some of the government's most essential services and infrastructure, making access to relevant data all the more important for researchers interested in accountability. For example, during the COVID-19 pandemic, federal agencies such as the Department of Health & Human Services ("HHS") entered into hundreds of contracts with private companies to develop tests, vaccines, and treatments—the terms of which are now public thanks to FOIA and the efforts of researchers including *amici. See COVID-19 Contracts*, KNOWLEDGE ECOLOGY INTERNATIONAL.[2] The Department of Energy ("DOE") spends approximately 90% of its budget on contracts for essential activities such as "maintaining nuclear weapons stockpiles, cleaning up radioactive and

---

[2] https://www.keionline.org/covid-contracts [https://perma.cc/A3VM-URDB]

hazardous waste resulting from the legacy of the Manhattan Project, and conducting the world's most sophisticated basic and applied energy and scientific research activities." U.S. Department of Energy, *Agency Financial Report: Fiscal Year 2023*, DOE/CF-0201, at 58 (2023).[3] The DOD enters into enough agreements with private entities to justify a daily blog post announcing new contracts. *See Contracts*, U.S. DEPARTMENT OF DEFENSE.[4] Given the massive scope of the federal government's contracting activities, it is essential that the public know who is receiving this money, and why.

The EEO-1 reports at issue are also relevant to another form of public-private interaction: federal oversight of regulated businesses. Through Congress, federal agencies are tasked with significant oversight and regulatory responsibilities with respect to private sector activities. To execute these statutory mandates, agencies must correspond with and collect information from private entities about their workforce, operations, products, and more. Transparency surrounding this data is crucial for the public to trust that these agencies are fulfilling their oversight functions and that private partners are fully accountable for their actions. Illustratively, EEO-1 reports assure the public that federal dollars are being spent on

---

[3] https://www.energy.gov/sites/default/files/2023-11/fy-2023-doe-agency-financial-report_0.pdf [https://perma.cc/3ZMA-W79X]
[4] https://www.defense.gov/News/Contracts [https://perma.cc/WVM6-37N6]

contractors that adhere to the Civil Rights Act—or alert the public that they are not. Appellees Br. at 1-2.

The DOL is far from the only agency that regularly receives information from the private sector. To enact their missions, federal agencies across all industries must proactively collect and analyze information from private, often commercial, actors. The Environmental Protection Agency ("EPA") collects and publishes data from on-site inspections, *see Enforcement and Compliance History*, ENVIRONMENTAL PROTECTION AGENCY[5], which it uses to conduct civil and criminal investigations into noncompliant parties, *see Civil and Cleanup Enforcement Cases and Settlements*, ENVIRONMENTAL PROTECTION AGENCY[6]; *Summary of Criminal Prosecutions*, ENVIRONMENTAL PROTECTION AGENCY.[7] The Food & Drug Administration ("FDA") evaluates the safety and efficacy of new drugs by collecting evidence submitted by pharmaceutical companies. *See Development & Approval Process Drugs*, U.S. FOOD & DRUG ADMINISTRATION (Aug. 8, 2022).[8] The United States Department of Agriculture ("USDA") collects data on the "[p]roduction and supplies of food and fiber, prices paid and received by farmers, farm labor and wages, farm finances,

---

[5] https://echo.epa.gov [https://perma.cc/74J6-EF7P]
[6] https://www.epa.gov/enforcement/civil-and-cleanup-enforcement-cases-and-settlements [https://perma.cc/XE6V-FCWK]
[7] https://www.epa.gov/enforcement/summary-criminal-prosecutions [https://perma.cc/F6QG-JBDW]
[8] https://www.fda.gov/drugs/development-approval-process-drugs [https://perma.cc/8UK9-D5ZV]

chemical use, and changes in the demographics of U.S. producers," and more. *About NASS: Agency Overview*, U.S. DEPARTMENT OF AGRICULTURE.[9]  These are just a few examples where records of public-private interactions shed light not just on agencies' fiscal responsibility and efficiency, but also the health and safety of the American public.

### B.     Access to records regarding public-private relationships enables research that promotes government accountability.

Given the scope and importance of the federal government's dealings with private actors, it is unsurprising that numerous organizations spend a great deal of effort reviewing records of these relationships. Records related to service and procurement contracts can reveal important details about excessive government spending on contracts with private entities. *See, e.g.*, *Examples of Wasteful Government Spending Exposed by FOIA*, THE NATIONAL SECURITY ARCHIVE.[10] Records concerning the federal oversight of private entities provide insight on issues ranging from regulatory capture to corporate maleficence. *See, e.g.*, *Exposing Pay-to-Play Scheme Enacted by the GEO Group*, CAMPAIGN LEGAL CENTER.[11] And, as

---

[9] https://www.nass.usda.gov/About_NASS/index.php [https://perma.cc/B3MY-5Y57]

[10] https://nsarchive2.gwu.edu/news/20070703/Gov-spending.pdf [https://perma.cc/SD89-BBLR]

[11] https://campaignlegal.org/cases-actions/exposing-pay-play-scheme-enacted-geo-group [https://perma.cc/3236-55EP]

research conducted by *amici* and others demonstrates, shedding light on these issues can lead to tangible improvements.

>    i.   *Research by* amici *UAEM, Dr. Morten, and Dr. Ramachandran led to improvements in FDA clinical trial reporting.*

One research project conducted by *amici* UAEM, Dr. Morten, and Dr. Ramachandran led to improved clinical trial reporting on ClinicalTrials.gov, a public database overseen by the FDA and the National Institutes of Health ("NIH"). *See* Megan Curtin et al., *Transforming Clinical Trial Results Reporting in the United States*, UNIVERSITIES ALLIED FOR ESSENTIAL MEDICINES (2024).[12] *Amici* undertook an expansive investigation into clinical trial reporting beginning in 2021. *Id.* at 13. As part of their investigation, *amici* filed FOIA requests to obtain all records documenting the FDA's investigation and communication with noncompliant parties responsible for clinical trials. *See id.*

This investigation revealed widespread underenforcement of clinical trial results reporting. *See id.* at 4. For example, *amici* found extended delays between missed results submission deadlines and the issuance of notices of noncompliance from the FDA. *See id.* However, after the FDA sent notices of noncompliance, more than 90% of recipients reported missing information. *See id.* at 13. Additionally, using information obtained through a FOIA request, *amici* obtained a report that

---

[12] https://www.uaem.org/s/Final_Clinical_Trials_WP-1-d2dx.pdf [https://perma.cc/BT7D-7P2V]

detailed NIH's knowledge of the prevalence of late or unaccounted for trial results. *See id.* at 14.

This work—investigating the FDA and NIH via FOIA and publicizing the results—appears to have prompted the FDA to increase its enforcement efforts. In 2021, shortly after *amici* began their FOIA investigation, the FDA issued its first-ever Notice of Noncompliance to a noncompliant party responsible for a clinical trial with results missing from ClinicalTrials.gov. *See Food and Drug Administration Takes First-Ever Enforcement Action To Ensure Clinical Trial Transparency*, THE ENGELBERG CENTER ON INNOVATION LAW & POLICY (June 30, 2021).[13]

Acting upon their FOIA discoveries, UAEM, represented by Dr. Morten's law school clinic, also filed a citizen petition to the FDA. *See* Megan Curtin et al., *Transforming Clinical Trial Results Reporting in the United States* 22 (2024). The petition, which was based on the reporting deficiencies uncovered through FOIA investigation, provided evidence-based recommendations that prioritized patient health and safety. *See id.* Following receipt of the citizen petition, the FDA implemented one of *amici*'s recommendations, launching the first publicly available dashboard for notices of noncompliance. *See id.* at 23; *see also* Ed Silverman, *In response to criticism, FDA publishes new database of wayward clinical trial*

---

[13] https://www.nyuengelberg.org/news/food-and-drug-administration-takes-first-ever-enforcement-action-to-ensure-clinical-trial-transparency [https://perma.cc/X3ZD-9845]

13

sponsors, STAT (Dec. 14, 2023)[14]. This dashboard, which increased reporting transparency and will likely result in less missing clinical data, would likely not have been created without the disclosure of communication between the FDA and noncompliant parties.

> ii.     *Research by* amici *KEI and Dr. Ramachandran informed legislation on transparency for government spending.*

Other impactful FOIA-based research took place during the COVID-19 pandemic, when several non-profit research organizations, including *amici* KEI and Dr. Ramachandran, submitted FOIA requests to the DOD and HHS for their contracts with companies for COVID-19 vaccines, drugs, and diagnostics. *See COVID-19 Contracts*, KNOWLEDGE ECOLOGY INTERNATIONAL.[15] These contracts were instrumental in understanding what stipulations and flexibilities federal agencies employed in allocating billions of dollars in taxpayer funding to companies to incentivize the development of urgently needed health technologies. *See, e.g.*, James Love, *KEI Receives Seven New Contracts for COVID 19 Research From BARDA and DOD, Including Five Using "Other Transactions Authority" That Weaken or Eliminate Bayh-Dole and FAR Safeguards*, KEI BLOG (July 1, 2020).[16]

---

[14] https://www.statnews.com/pharmalot/2023/12/14/fda-nih-clinical-trial-transparency/ [https://perma.cc/4AJL-B3S6]
[15] https://www.keionline.org/covid-contracts [https://perma.cc/K52J-HM9J]
[16] https://www.keionline.org/covid19-ota-contracts [https://perma.cc/FR84-R86C]

*Amici*'s research revealed that despite significant public investment, the federal government rarely required affordable pricing for drugs, vaccines, or diagnostics. *See* James Love, *Unreasonable Pricing and the "Coronavirus Preparedness And Response Supplemental Appropriations Act, 2020"*, KEI BLOG (Mar. 5, 2020).[17] Additionally, *amici* also detailed how COVID-19 funding exempted manufacturers from procurement regulations and other statutory provisions. In some instances, this included exemption from the requirements in the Bayh-Dole Act, which protect public investments in biomedical research and development. *See* KEI Staff, *KEI Letter to Speaker Pelosi Regarding Use of "Other Transaction Authority" (OTA) in Coronavirus Bill to Escape Bayh-Dole Public Interest Safeguards*, KEI BLOG (Mar. 23, 2020).[18]

This research has informed recent legislative developments, including the introduction of the TRACKS Act. TRACKS Act, H.R. 3766, 118th Cong. (2023). KEI's findings also supported congressional testimony from *amicus* Dr. Reshma Ramachandran calling for the transparency of COVID-19 public funding allotments and procurement records in order to protect public investment and ensure access and affordability. *See Hearing on "The Path Forward on COVID-19 Immunizations"*, Hearing Before the Health Subcomm., 117th Cong. (2020) (testimony of Reshma

---

[17] https://www.keionline.org/32308 [https://perma.cc/XA4X-BU3N]
[18] https://www.keionline.org/32530 [https://perma.cc/LJK2-VJH7]

Ramachandran).[19] This outcome would likely not have been possible in a world where government dealings with private companies were exempt from disclosure.

     iii.   *Other researchers use FOIA to access information on important government functions.*

*Amici* are not alone in their efforts. Across the country, researchers are using FOIA to investigate various government programs. For example, the Project on Government Oversight recently published a report in which it used FOIA to reveal that the EPA's lax oversight of Mississippi's water infrastructure led to a public health crisis, culminating in a July 29, 2022, boil water notice. *See* Nick Schwellenbach and René Kladzyk, *How Lax EPA Oversight Enabled Jackson's Water Crisis*, PROJECT ON GOVERNMENT OVERSIGHT (May 23, 2024).[20] In 2020, Public Citizen and American Oversight used FOIA requests to uncover how the USDA and the meatpacking industry downplayed risks to workers' health during the pandemic. *See USDA, Meatpacking Industry Collaborated to Undermine COVID-19 Response, FOIA Docs Show*, PUBLIC CITIZEN (Sept. 15, 2020).[21]

---

[19] https://democrats-waysandmeans.house.gov/sites/evo-subsites/democrats-waysandmeans.house.gov/files/documents/RamachandranTestimony.pdf [https://perma.cc/QDJ6-82KM]

[20] https://www.pogo.org/investigations/how-lax-epa-oversight-enabled-jacksons-water-crisis [https://perma.cc/9NAN-GPEA]

[21] https://www.citizen.org/news/usda-meatpacking-industry-collaborated-to-undermine-covid-19-response-foia-docs-show [https://perma.cc/6PXG-78Q7]

These discoveries would not have been possible had the EPA and USDA withheld records. To the contrary, both the EPA and USDA proactively engage with FOIA; these agencies—along with many others—maintain electronic reading rooms that house frequently requested records. The FDA maintains a similar electronic reading room where it publishes Form FDA 483s. *See ORA FOIA Electronic Reading Room*, U.S. FOOD & DRUG ADMINISTRATION.[22] During the pandemic, these forms revealed unsanitary conditions at COVID-19 vaccine manufacturing plants. *See* Peter Loftus, *FDA Finds Poor Conditions at Contractor's Plant for Making J&J's Covid-19 Vaccine*, THE WALL STREET JOURNAL (Apr. 22, 2021)[23]; *see also* Patrick Wingrove, *US FDA finds control lapses at Moderna manufacturing plant*, REUTERS (Dec. 15, 2023).[24] If Exemption 4 had permitted the FDA to withhold these forms, the news media, health workers, patients, investors, and the broader public would have all paid the price.

Under the status quo, agencies disclose information related to private commercial actors, either proactively through reading rooms or reactively in response to requests. This information, in turn, supports beneficial research. The

---

[22] https://www.fda.gov/about-fda/office-regulatory-affairs/ora-foia-electronic-reading-room [https://perma.cc/986D-BW7S]

[23] https://www.wsj.com/articles/fda-finds-poor-conditions-at-contractors-plant-for-making-j-js-covid-19-vaccine-11619013558 [https://perma.cc/7BYD-K63C]

[24] https://www.reuters.com/business/healthcare-pharmaceuticals/us-fda-finds-control-lapses-moderna-manufacturing-plant-2023-12-15/ [https://perma.cc/P7ZC-VY6K]

broad reading of Exemption 4 advanced by the DOL would threaten this approach, as private actors would have increased ability to preempt access to such information. As such, the Court's ruling in this case will have consequences for information far beyond EEO-1 data; it will determine the availability of data on a wide variety of government functions—data that often forms the basis for public interest research. Investigative journalism groups like CIR, researchers like *amici*, and every member of the public rely on public records to understand the government's procurement and oversight decisions. It is essential that this Court consider the full impact of the DOL's attempt to hand control over public information to private actors.

## II. EEO-1 REPORTS DO NOT FALL UNDER EXEMPTION 4 BECAUSE THEY ARE NOT COMMERCIAL OR CONFIDENTIAL, AND THEIR DISCLOSURE DOES NOT PRESENT A FORESEEABLE HARM.

The research conducted by *amici* and others is representative of the core purpose of FOIA: to promote and protect government transparency and accountability. *See Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976) (explaining that "disclosure, not secrecy, is the dominant objective of the [Freedom of Information] Act"). Consistent with this purpose, exemptions to FOIA are "limited" and must be "narrowly construed." *Id.* Exemption 4 has three requirements, all of which must be met to justify withholding information from the public: the information must be commercial, it must be obtained from a person, and it must be confidential. *Citizens for Resp. & Ethics in Washington v. United States Dep't of*

*Just.*, 58 F.4th 1255, 1262 (D.C. Cir. 2023) Moreover, the agency must demonstrate that there is a foreseeable harm in releasing the requested information. *See* FOIA Improvement Act of 2016, Pub. L. No. 114-185, 130 Stat. 538.

Despite the "strong presumption in favor of disclosure," *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991), the DOL argues for a broad reading of Exemption 4 that would give private actors significant power to block disclosure. *See* Appellant Br. at 13-17. Specifically, the Department proposes lax standards for two prongs of the Exemption 4 test—commerciality and confidentiality—and tries to avoid the foreseeable harm requirement entirely. *See id.* However, contrary to the Department's assertions, the text of the law, relevant precedent, and legislative history of FOIA and its many amendments all support robust application of all three requirements.

### A.    Exemption 4 applies only to intrinsically valuable commercial information that reveals intimate aspects of a company's activities.

The first requirement for withholding records under Exemption 4 is that the information must be commercial. *See* 5 U.S.C. § 552(b)(4). The Ninth Circuit has interpreted the term "commercial" in various contexts, holding that "'[i]nformation is commercial if it relates to commerce, trade, or profit.'" *Carlson v. U.S. Postal Serv.*, 504 F.3d 1123, 1129 (9th Cir. 2007) (quoting *McClellan Ecological Seepage Situation v. Carlucci,* 835 F.2d 1282, 1285 (9th Cir. 1987)). However, the degree of

19

connection with commerce matters; the requested information must reach a threshold of commercial importance to warrant withholding. *See id.* (rejecting as overbroad government's definition of commercial as "hav[ing] value"). As such, "not every bit of information submitted to the government by a commercial entity qualifies for protection under Exemption 4." *Pub. Citizen Health Rsch. Grp. v. Food & Drug Admin.*, 704 F.2d 1280, 1290 (D.C. Cir. 1983).

To determine if the requisite threshold has been met, this Court has considered whether the requested information discloses "intimate aspects" of the company's activities. *Watkins v. U.S. Bureau of Customs & Border Prot.*, 643 F.3d 1189, 1195 (9th Cir. 2011) (finding records to be commercial where they revealed "supply chains and fluctuations of demand for merchandise"). Other courts have articulated similar tests. *See Citizens for Resp. & Ethics*, 58 F.4th at 1263-64 (D.C. Cir. 2023) (requiring agency to show that records are "intrinsically valuable" and not merely that disclosure could have "commercial or financial repercussions"); *New York Pub. Int. Rsch. Grp. v. U.S. E.P.A.*, 249 F. Supp. 2d 327, 333 (S.D.N.Y. 2003) (requiring agency to show that records are "commercial or financial in nature or use").

These threshold tests exist for good reason: if Exemption 4 was read literally to apply to any record related to commerce, it "would shield virtually every document that a company chose not to make public." *Gen. Elec. Co. v. U.S. Nuclear Regul. Comm'n*, 750 F.2d 1394, 1398 (7th Cir. 1984). However, such documents

20

frequently "shed light on agency decision-making, the heart of the policy underlying FOIA." *New York Pub. Int. Rsch. Grp.*, 249 F. Supp. 2d at 334 (holding that withholding documents merely because company had "financial stake" in government action "would contradict FOIA's strong policy in favor of disclosure"). Accordingly, the mere fact that records "might be used for insight into the nature of a company's business dealings does not convert [those records] into commercial information." *Nat'l Bus. Aviation Ass'n, Inc. v. F.A.A.*, 686 F. Supp. 2d 80, 87 (D.D.C. 2010).

*Amici* stress this last point—as researchers, they are in the business of making inferences from data, including data about public-private relationships. In the DOL's view, such data could be considered "commercial" under Exemption 4, allowing agencies to withhold almost any record that could be traced to a commercial entity. *See* Appellant Br. at 20-28 (arguing that records are exempt because they "tend to" relate to capacity or "reflect" broad trends in growth). This would paralyze valuable research, including that of *amici*, by preventing researchers from accessing information that pertains to public-private interactions. Such a broad reading of the commerciality prong would allow private and public actors alike to conceal unflattering records, ultimately undermining the goal of ensuring government accountability through public scrutiny.

**B.    Should this Court reach the issue of confidentiality, it should provide guidance on the limits of Exemption 4.**

The second requirement for Exemption 4 is that the records be confidential. 5 U.S.C. § 552(b)(4). Because the records at issue are not commercial, the court below did not reach the issue of confidentiality. *See Ctr. for Investigative Reporting v. United States Dep't of Lab.*, No. 3:22-CV-07182-WHA, 2023 WL 8879244, at *5 (N.D. Cal. Dec. 22, 2023). For the same reason, this Court need not reach it today. Nevertheless, should this Court choose to remand for further proceedings on confidentiality, *amici* offer some brief observations.

First, if this Court addresses the issue of confidentiality, it should distinguish between the privacy and availability of the EEO-1 reports themselves and that of the underlying data. In *Argus Leader*, the Supreme Court found that for information to be confidential it must be customarily and actually treated as private by its owner. *See Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 428 (2019). To determine whether information is customarily and actually treated as private, courts consider the specific steps taken by the owner to keep the information private as well as the availability of the information to others. *See Besson v. United States Dep't of Com.*, 480 F. Supp. 3d 105, 114 (D.D.C. 2020). Notably, this analysis turns on information, not documents. *See id.* at 114-15 (holding that, although requested record was treated as private, some information in the record was publicly available and not subject to Exemption 4); *see also Animal Legal Def. Fund v. United States*

22

*Food & Drug Admin.*, No. 12-CV-04376-KAW, 2021 WL 3270666 at *6 (N.D. Cal. July 30, 2021) (holding that, even if owner treated records as private, Exemption 4 did not apply where employees, suppliers, and servicers were free to disclose similar information).

Second, the Court in *Argus Leader* left open the question of whether an express guarantee of privacy by the government is required for information to be confidential under Exemption 4. *Argus Leader*, 588 U.S. at 434-35. There, "the government [had] long promised [retailers] that it will keep their information private." *Id.* at 435. Conversely, the DOL has promised contractors only that EEO-1 reports "will be kept confidential *to the maximum extent permitted by law*." Appellant Br. at 8 (emphasis added). However, in a FOIA case brought by CIR in 2018 and decided in 2019, the DOL was ordered to disclose EEO-1 reports. *See* Appellees Br. at 3, n.4. As such, confidentiality "to the maximum extent permitted by law" falls well short of the unqualified assurance given to retailers in *Argus Leader*. Contractors should be aware that the DOL's ability to keep EEO-1 reports confidential was, and is, circumscribed by the law—FOIA first and foremost.

These issues are particularly relevant to *amici*'s work. Sometimes partial data on public-private interactions can be pieced together from sources other than government records. Yet even if doing so is possible, it is time-consuming and prone to errors. Accordingly, many researchers turn to FOIA for official, reliable data. And

while CIR's dedication to repeatedly litigating this issue is admirable, many researchers do not have the time or resources to take agencies to court. At the very least, when data has been previously released under FOIA, a requester's expectation that the data will continue to be public is more legitimate than any "assurance" that the data is confidential. The purpose of Exemption 4 is to protect business interests in the intimate, closely protected aspects of a company's operations, not to make researchers, journalists, and the public engage in unnecessary litigation.

### C. The DOL has not established foreseeable harm from disclosing the EEO-1 reports, as required by the FOIA Improvement Act.

Finally, even if the EEO-1 records at issue here were both commercial and confidential, the DOL would still need to show that disclosure of the records would result in foreseeable harm—specifically, harm to an economic or business interest. *See* FOIA Improvement Act of 2016, Pub. L. No. 114-185, 130 Stat. 538. It cannot.

The DOL argues that it need not demonstrate foreseeable harm because the requested records are protected by the Trade Secrets Act ("TSA"). *See* Appellant Br. at 38-43. The DOL's position seems to be rooted in a selective reading of the legislative history of the 1976 FOIA amendments.[25] *See* H.R. Rep. 94-880 (1976).

---

[25] Specifically, the D.C. Circuit cited the 1976 congressional record to support its holding that "the Trade Secrets Act will bar a discretionary release" of records absent an overriding rule. *CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1142 (D.C. Cir. 1987). This position was subsequently incorporated into the Department of Justice's FOIA Guide, U.S. Department of Justice, *Guide to the Freedom of*

24

There, Congress stated that the TSA would not apply to *required* disclosures under FOIA, *id.* at 10, but would have some bearing on records that fell under Exemption 4 and, thus, were subject to *discretionary* disclosure, *id.* at 23. As CIR points out, the plain language of the TSA and the FIA require a different outcome. *See* Appellees Br. at 49-50.

After the FIA, agencies do not have discretion to withhold records unless they first demonstrate foreseeable harm. *See* 5 U.S.C. § 552(a)(8)(A)(i)(I) ("An agency shall withhold information under this section only if the agency reasonably foresees that disclosure would harm an interest protected by an exemption . . ."). If there is no such harm, the disclosure is required and, as such, the TSA is not relevant. *See* H.R. Rep. 94-880 at 23 (explaining that the TSA "would not permit the withholding of information otherwise required to be disclosed by the Freedom of Information Act, since the disclosure is there authorized by law"). Putting the TSA analysis before a finding of foreseeable harm would effectively elevate the TSA to an Exemption 3 statute—a position that contradicts long-standing law, *see CNA Fin.*

---

*Information Act*, 2009 Edition, at 687-689 (2009), which was in turn cited in the legislative history of the FIA, S. Rep. No. 114-4, at 8 & n.11 (2015). The DOL cites the 2015 legislative record but leaves out the fact that the Committee was specifically referring to discretionary disclosure. *See* Appellant's Br. at 38.

*Corp. v. Donovan*, 830 F.2d 1132, 1138-40 (D.C. Cir. 1987), and which, in any event, neither party supports, *see* Appellant Br. at 39; Appellees Br. at 48-50.[26]

Moreover, the legislative history of the FOIA Improvement Act confirms that the foreseeable harm standard applies "to those FOIA exemptions under which discretionary disclosures can be made." S. Rep. No. 114-4, 8 (2016). When *Argus Leader* expanded Exemption 4, it unambiguously decoupled the exemption from the TSA. *See Synopsys, Inc. v. U.S. Dep't of Lab.*, No. 20-16414, 2022 WL 1501094, at *4, n.3 (9th Cir. May 12, 2022). In doing so, the Supreme Court confirmed Exemption 4 as an exemption under which discretionary disclosures can be made. *See Argus Leader*, 588 U.S. at 433 (noting that a ruling favorable to the government would "restore the government's discretion to withhold the requested data under Exemption 4"). Per the very legislative history the DOL cites, this means Exemption 4 withholdings require a finding of foreseeable harm.

The question for this Court, then, is whether the DOL "reasonably [foresaw]" that the release of the EEO-1 reports would "harm an interest protected by [Exemption 4]." *See* 5 U.S.C. § 552(a)(8)(A)(i)(I). In answering this question, the Court should pay close attention to two strictures of the foreseeable harm test. First,

---

[26] Requiring the DOL to prove foreseeable harm would not render any part of the FIA superfluous. Where disclosure is absolutely prohibited by law, a finding of foreseeable harm would not be required. *See* 5 U.S.C. § 552(a)(8)(A)(i)(II). But where disclosure is only *conditionally* prohibited, as is the case here, the condition should be met before the information can be considered "prohibited by law." *Id.*

not all harms are considered—the agency must identify a harm relevant to the exemption at issue. *See Seife v. United States Food & Drug Admin.*, 43 F.4th 231, 238–39 (2d Cir. 2022). Second, the foreseeable harm standard is meant to be a "meaningful burden" on agencies. *Reps. Comm. for Freedom of the Press v. Fed. Bureau of Investigation*, 3 F.4th 350, 369 (D.C. Cir. 2021) (quotations omitted). Accordingly, "agencies must concretely explain how disclosure 'would'—not 'could'—adversely" affect the protected interest. *Id.* (citing *Machado Amadis v. United States Dep't of State*, 971 F.3d 364, 371 (D.C. Cir. 2020)).

The specific interests protected by Exemption 4 are the submitter's "commercial or financial interests." *Seife*, 43 F.4th at 240. As CIR exhaustively explains, there is no reasonably foreseeable harm to the bellwether objectors' business or financial interests that would result from the release of the EEO-1 reports. *See* Appellees Br. at 42-46. *Amici* agree and emphasize the following: accountability in public-private interactions is not a cognizable harm under Exemption 4—or any other exemption.

The FIA was enacted, in part, to ensure that "information may not be withheld 'merely because public officials might be embarrassed by disclosure, because errors and failures might be revealed, or because of speculative or abstract fears.'" S. Rep. No. 114-4 at 4 (quoting President Barack Obama, *Memorandum for the Heads of Executive Departments and Agencies, Subject: Freedom of Information Act* (Jan. 21,

2009)). Accordingly, under foreseeable harm standard, Exemption 4 "does not directly protect against asserted harm to the government as a result of public scrutiny following disclosure." *Citizens for Resp. & Ethics*, 58 F.4th at 1264.

Courts have long held that private companies that do business with the federal government, such as the bellwether objectors here, should be held to the same standard. *See Pub. Citizen*, 704 F.2d at 1291, n.30 (emphasizing that Exemption 4 was not intended to prevent "the embarrassing publicity attendant upon public revelations concerning, for example, illegal or unethical payments to government officials or violations of civil rights, environmental or safety laws"). Records of public-private interactions may reveal mistakes, cut corners, unnecessary expenses, or even intentional misconduct. *See, e.g.*, *False Reporting by Contractor on Alternatives to Detention Activities*, TRAC (Mar. 7, 2023) (finding, via FOIA disclosures, that ankle-GPS vendor overreported usage to ICE).[27] Those revelations may, in some cases, hurt companies' bottom line. *See id.* (explaining that reporting errors result in 31% overpayment).

Access to knowledge is "a structural necessity in a real democracy." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004). This is no less true when the knowledge in question relates to the government's interactions with private parties. The public has a strong interest in knowing whether federal contractors are

---

[27] https://trac.syr.edu/reports/710/ [https://perma.cc/YU55-G4BN]

conforming to the employment standards set out by Congress, just as it has an interest in knowing about the FDA's review of noncompliant clinical trials or the terms attached to COVID-19 funding. The DOL's interpretation of Exemption 4 would prevent access to such information, even without foreseeable harm, so long as there is some minimal relation to commercial interests. Moreover, it would give agencies an easy way to keep embarrassing disclosures from the public—just have a private, commercially-motivated entity express an interest in doing so. Such a result would be antithetical to FOIA's "basic policy of opening 'agency action to the light of public scrutiny.'" *Ray*, 502 U.S. at 175 (quoting *Rose*, 425 U.S. at 361).

## CONCLUSION

The records CIR seeks, just like the records underlying *amici*'s research, contain data on issues of public interest. This data may well shed light on the successes and failures of the DOL's regulatory mission, which in turn may lead to tangible change for contractors. However, that does not make the records inherently commercial or confidential, nor does it suggest that disclosure would harm the type of interests protected by Exemption 4. Accordingly, *amici* respectfully urge the Court to affirm the holding of the District Court.

Dated: July 17, 2024

Respectfully submitted,

/s/ Mason A. Kortz

Mason A. Kortz

29

HARVARD CYBERLAW CLINIC
1557 Massachusetts Ave., 4th Floor
Cambridge, MA 02138
617-495-2845
mkortz@law.harvard.edu

Counsel for *Amici Curiae*[*]

---

[*] *Amici curiae* would like to thank Cyberlaw Clinic summer interns Eve Zelickson and Morgan McMillan for their invaluable contributions to this brief.

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to the Fed. R. App. P. 29(a)(4)(G), I hereby certify that:

This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) and 32(a)(7)(b) and Ninth Circuit Rule 32-1(a) because it contains 6,313 words as calculated by the word count feature of Microsoft Word 365, exclusive of the sections exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5)(A) and the typestyle requirement of Fed. R. App. P. 32(a)(6) because it uses 14-point proportionally spaced Times New Roman font.

Dated: July 17, 2024              Respectfully submitted,

/s/ Mason A. Kortz

Mason A. Kortz
HARVARD CYBERLAW CLINIC
1557 Massachusetts Ave., 4th Floor
Cambridge, MA 02138
617-495-2845
mkortz@law.harvard.edu