No. 24-880

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

CENTER FOR INVESTIGATIVE REPORTING and
WILL EVANS,

*Plaintiffs-Appellees*,

v.

UNITED STATES DEPARTMENT OF LABOR,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the Northern District of California
Case No. 3:22-cv-07182-WHA, Hon. William Alsup

_____

## BRIEF OF *AMICI CURIAE* THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND THE FIRST AMENDMENT COALITION IN SUPPORT OF APPELLEES

_____

Katie Townsend
  *Attorney of record*
Bruce D. Brown
Mara Gassmann*
Adam Marshall*
Mayeesha Galiba*
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
  ktownsend@rcfp.org

*Of counsel

## CORPORATE DISCLOSURE STATEMENTS

Pursuant to Federal Rule of Appellate Procedure 26.1(a), the Reporters Committee for Freedom of the Press states that it is an unincorporated association of reporters and editors with no parent corporation and no stock.

First Amendment Coalition is a nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

Dated: July 17, 2024                        *s/ Katie Townsend*
                                            ――――――――――――――
                                            Katie Townsend

# TABLE OF CONTENTS

**Page:**

CORPORATE DISCLOSURE STATEMENTS ........................................................ i

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE ............... v

SOURCE OF AUTHORITY TO FILE .................................................. viii

FED. R. APP. P. 29(a)(4)(E) STATEMENT........................................... viii

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................... 1

ARGUMENT ................................................................................. 3

I.    The EEO-1 Reports must be disclosed because—in addition to not being "commercial"—they are not "confidential." .................................................. 3

II.   No reasonably foreseeable harm to an interest protected by Exemption 4 would flow from disclosure. ........................................................... 8

CONCLUSION ............................................................................. 15

CERTIFICATE OF COMPLIANCE ....................................................... 17

CERTIFICATE OF SERVICE ............................................................ 18

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*,
    58 F.4th 1255 (D.C. Cir. 2023)...................................................... 4, 12

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
    802 F. App'x 309 (9th Cir. 2020).......................................................... 4

*Ctr. for Investigative Reporting v. U.S. Dep't of Lab.*,
    No. 3:22-CV-07182-WHA, 2023 WL 8879244 (N.D. Cal. Dec. 22, 2023)......... 1

*Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*,
    436 F. Supp. 3d 90 (D.D.C. 2019)...................................................... 10

*Food Mktg. Inst. v. Argus Leader Media*,
    588 U.S. 427 (2019).................................................................*passim*

*Leopold v. U.S. Dep't of Just.*,
    94 F.4th 33 (D.C. Cir. 2024)......................................................... 2, 8, 9

*Nat'l Parks & Conservation Ass'n v. Morton*,
    498 F.2d 765 (D.C. Cir. 1974)........................................................... 10

*Reps. Comm. for Freedom of the Press v. Fed. Bureau of Investigation*,
    3 F.4th 350 (D.C. Cir. 2021)..................................................... 9, 10, 12

*Seife v. U.S. Food & Drug Admin.*,
    43 F.4th 231 (2d Cir. 2022) .......................................................*passim*

*U.S. Dep't of Just. v. Reps. Comm. for Freedom of the Press*,
    489 U.S. 749 (1989)........................................................................ 14

**Statutes:**

5 U.S.C. § 552............................................................................*passim*

FOIA Improvement Act of 2016,
    Pub. L. No. 114–185, 130 Stat. 538 (2016) ........................................ 8

**Other Authorities:**

*A Solid Investment: Making Full Use of the Nation's Human Capital*, The
     Glass Ceiling Commission (Nov. 1, 1995) .......................................... 14

Ani Huang, *Over Half of S&P 500 Now Publish EEO-1 Reports*, HR Pol'y
     Assoc. (Feb. 1, 2024) ........................................................................... 7

*Employment Information Reports*, U.S. Dep't of Lab. ............................. 6

Evan P. Apfelbaum & Eileen Y. Suh, *Transparency About Lagging
     Diversity Numbers Signals Genuine Progress*, J. of Experimental
     Psychology: General (Aug. 7. 2023) .................................................. 13

H.R. REP. No. 391 ...................................................................................... 9

Jessica Guynn, *George Floyd and Corporate America: 34 Companies to
     Release Government Workforce Diversity Data*, USA Today (Sept. 29,
     2020) ................................................................................................... 14

Matthew Nestler et. al., *Companies Disclosing the Gold Standard of
     Workforce Diversity Data – the EEO-1 Report or Similar Intersectional
     Data – More Than Tripled between 2021 and 2022*, Just Capital ....... 7

Maya Balakrishnan et. al., *Differentiating on Diversity: How Disclosing
     Workforce Diversity Influences Consumer Choice*, Harv. Bus. Sch. (Aug.
     29, 2022) ............................................................................................. 13

Ruth Umoh, *154 Fortune 500 Companies Released Diversity Data Last
     Year. Here's What They Reveal About the State of DEI*, Yahoo! Finance
     (Mar. 13, 2024) .................................................................................... 7

S. Rep. No. 114–4 .............................................................................. 10, 12

Stephanie Rivers, *Data Transparency Key to Improving Diversity, Equity
     and Inclusion in the Workplace*, ProxyPreview (Mar. 16, 2022) ...... 14

*Workplace Diversity and Financial Performance: An Analysis of Equal
     Employment Opportunity (EEO-1) Data*, As You Sow (2022) ........... 6

## STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE

Amici curiae are the Reporters Committee for Freedom of the Press ("Reporters Committee") and the First Amendment Coalition ("FAC") (together, "amici").

The Reporters Committee is an unincorporated nonprofit association. The Reporters Committee was founded by leading journalists and media lawyers in 1970 when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources. Today, its attorneys provide *pro bono* legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists.

FAC is a nonprofit public interest organization dedicated to defending free speech, free press and open government rights in order to make government, at all levels, more accountable to the people. Its mission assumes that government transparency and an informed electorate are essential to a self-governing democracy. FAC advances this purpose by working to improve governmental compliance with state and federal open government laws. FAC's activities include free legal consultations on access to public records and First Amendment issues, educational programs, legislative oversight of California bills affecting access to government records and free speech, and public advocacy, including extensive

litigation and appellate work.  FAC's members are news organizations, law firms, libraries, civic organizations, academics, freelance journalists, bloggers, activists, and ordinary citizens.

As organizations that defend the newsgathering rights of the press, amici have a strong interest in ensuring that the exemptions to disclosure found in the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA" or the "Act") are interpreted narrowly, consistent with the Act's plain language and Congressional intent. Because this Court's interpretation and application of FOIA Exemption 4 have far-reaching implications for the press, amici have a strong interest in the Court's resolution of this appeal.

## SOURCE OF AUTHORITY TO FILE

Amici have obtained consent to file this brief from the parties and therefore may file it pursuant to Federal Rule of Appellate Procedure 29(a)(2).

## FED. R. APP. P. 29(a)(4)(E) STATEMENT

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), amici state that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting this brief; and no person, other than amici, its members or counsel, contributed money intended to fund the preparation or submission of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Access to workforce diversity data held by the federal government not only enables journalists to keep the public informed about the makeup of the nation's workforce, but also ensures that government representations about its oversight of private industry are accurate, and that the government is accountable to the public with respect to how it allocates federal contracts and resources.

This appeal arises out of a request made by Plaintiffs-Appellees Center for Investigative Reporting and its reporter Will Evans (collectively, "CIR") for such data under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA" or the "Act").

Amici agree with CIR and the District Court below that EEO-1 Reports submitted by government contractors to Defendant-Appellant Department of Labor ("DOL") do not fall within the scope of FOIA Exemption 4. Because the questions presented in this case are of broad importance to the press's ability to gather news and report on matters of public concern, Amici write to highlight that there are multiple, independent grounds to affirm the sound conclusion reached by the District Court.

The District Court correctly held that EEO-1 Reports submitted to DOL are not "commercial" and thus cannot be withheld under Exemption 4. *See Ctr. for Investigative Reporting v. U.S. Dep't of Lab.*, No. 3:22-CV-07182-WHA, 2023 WL 8879244 (N.D. Cal. Dec. 22, 2023) ("Order"). In addition, separate and apart from

whether the records are "commercial," they also cannot be withheld under Exemption 4 because they are not "confidential." Only "'where commercial . . . information is both customarily and actually treated as private by its owner" is it "confidential" for purposes of Exemption 4. *E.g.*, *Seife v. U.S. Food & Drug Admin.*, 43 F.4th 231, 238 n.6 (2d Cir. 2022) (quoting *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 440 (2019) [hereinafter, "*Argus Leader*"]). Because the workforce diversity data at issue is neither customarily nor actually treated as confidential, Exemption 4 does not apply.

In addition, even if Exemption 4 did apply to the records at issue, their disclosure still would be required under the Act because DOL cannot satisfy the separate, "sequential inquiry" required by FOIA's foreseeable harm provision. 5 U.S.C. § 552(a)(8)(A)(i); *Leopold v. U.S. Dep't of Just.*, 94 F.4th 33, 38 (D.C. Cir. 2024). The purported harm that DOL asserts might befall government contractors that object to release of their EEO-1 Reports—that those contractors may be subject to "unfounded" or "unwarranted" criticism, *see* Appellant's Br. at 16, 36—is not a cognizable one under FOIA. Because criticism (of any kind) is not a "harm" that Exemption 4 is intended to protect against, it is not a legitimate basis to withhold records under the Act. Moreover, the conclusions drawn from publicly available studies, the practices of an ever-growing number of private companies, and the fact that the majority of contractors at issue here did not object to disclosure of their

2

workplace diversity data, all belie DOL's claim that it is reasonably foreseeable that disclosure would cause any harm, whatsoever.

The implications of the theory urged by DOL extend beyond the specific records at issue in this case. Journalists and news organizations frequently rely on FOIA to obtain records to inform the public about workplace diversity in the private sector including, especially, at companies that contract with the federal government. To permit the withholding of EEO-1 Reports reflecting such data on the basis of a speculative fear that public scrutiny may spur criticism would hamper newsgathering and government accountability.

For the reasons herein, amici urge the Court to affirm.

## ARGUMENT

### I.      The EEO-1 Reports must be disclosed because—in addition to not being "commercial"—they are not "confidential."

Exemption 4 applies only to agency records that are *both* "commercial" *and* "confidential."  5 U.S.C. § 552(b)(4) (exempting from disclosure "trade secrets and commercial or financial information" that is "obtained from a person and privileged or confidential"); *accord Argus Leader*, 588 U.S. at 435.  For the reasons set forth in the Order (pp. 4–8) and CIR's brief (pp. 22–35), this Court can and should affirm the District Court's Order on the ground that the information at issue in the EEO-1 Reports is not "commercial" for purposes of Exemption 4.

3

In addition, this Court also can affirm on the separate ground that the information DOL seeks to withhold is not "confidential." To be "confidential" for purposes of Exemption 4, information must be "both customarily and actually treated as private by its owner." *Argus Leader*, 588 U.S. at 440. Courts look to the ordinary meaning of "confidential" when considering whether information is "customarily held private," and, as the Supreme Court has observed, information cannot "be deemed confidential if its owner shares it freely." *See id.*, 588 U.S. at 434.[1] Moreover, "to meet its burden to justify withholding," the government must point to "'detailed and specific information'" that demonstrates that the particular information at issue is kept confidential, and "[i]t cannot rely on 'conclusory,' 'vague,' or 'sweeping' assertions'" to meet that burden. *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 58 F.4th 1255, 1271 (D.C. Cir. 2023).

In *Argus Leader*, a newspaper submitted a FOIA request to the U.S. Department of Agriculture ("USDA") seeking information that the agency had collected about its Supplemental Nutrition Assistance Program ("SNAP"), including

---

[1] The Second Circuit has held that "'where commercial or financial information is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy, the information is confidential'" for purposes of Exemption 4. *Seife*, 43 F.4th at 238 n.6 (quoting *Argus Leader*, 588 U.S. at 440). While the requirement that information be provided pursuant to an assurance of privacy was suggested by the Supreme Court in *Argus Leader*, this Court has yet to expressly hold that an agency must show that information was submitted pursuant to such an assurance. *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 802 F. App'x 309, 310 (9th Cir. 2020).

4

names and addresses of participating retail stores, and each of the store's redemption data from 2005 to 2010.  The USDA withheld the store redemption data pursuant to Exemption 4.  *See* 588 U.S. at 431.

In assessing whether that information was "confidential" within the meaning of Exemption 4, the Supreme Court considered the customs and practices of the relevant industry, *id.* at 440, and determined that store-level SNAP benefit data was customarily treated as closely held confidential business information.  *Id*. at 434 (finding that custom within the industry was to not make the data at issue available "in any way").  In fact, the government had "long promised" that it would keep such information private.  *Id.*

Here, in contrast, DOL could not assure federal contractors that their workplace diversity data would be kept strictly confidential.  Instead, it advised contractors only that it would maintain the privacy of the records only to the extent provided under the law.  Appellant's Br. at 7.  Specifically, it alerted contractors that their EEO-1 Reports could be released pursuant to the Act.  *Id.*  Moreover, DOL advises that with respect to documents possessed by DOL's Office of Federal Contract Compliance Programs ("OFCCP"), disclosure is presumed and that "without an objection to release, OFCCP has no legal basis to withhold disclosure under FOIA."  *Employment Information Reports*, U.S. Dep't of Lab. (last visited 7/16/2024), https://perma.cc/Y5BN-TYXT.

5

But even setting aside the lack of any assurances of confidentiality from DOL, unlike the information at issue in *Argus Leader*, it is not customary for private companies to treat their workforce diversity data as confidential. Indeed, here, a full three-fourths of the federal contractors (19,289 out of 24,355) whose data is at issue did not object to disclosure of their EEO-1 Reports when given the opportunity to do so. *See* Decl. of Victoria Baranetsky ¶ 17 ("Baranetsky Decl.") (ECF No. 39-1). And even before DOL gave companies the opportunity to object to the release of their EEO-1 Reports, some companies affirmatively agreed to disclosure of their reports. *Id.* ¶ 23; *see also* Decl. of Marc Bendick ¶ 13 ("Bendick Decl.") (ECF No. 39-2).

Such voluntary transparency on the part of private companies themselves reflects a growing trend across industries in favor of voluntary disclosure of workforce diversity data. EEO-1 Reports are the recognized gold standard for workforce demographic data and an increasing number of companies are voluntarily making their EEO-1 Reports public. The number of S&P 100 companies releasing their EEO-1 Reports publicly more than quadrupled from August 2020 to October 2022. *See Workplace Diversity and Financial Performance: An Analysis of Equal Employment Opportunity (EEO-1) Data*, As You Sow (2022), https://perma.cc/7Q5L-SUG4. A similar trend can be seen among S&P 500

6

companies, where the share of those releasing EEO-1 Reports publicly jumped from 33% in 2021 to more than half in 2023.  *See* Ani Huang, *Over Half of S&P 500 Now Publish EEO-1 Reports*, HR Pol'y Assoc. (Feb. 1, 2024), https://perma.cc/N63X-YT83.  The trend toward greater transparency when it comes to workplace diversity data is further underlined by the level of detail companies are now providing.  Instead of combining, for example, U.S. gender and racial representation into a single category of "diverse" employees or contractors—as most companies once did—about 88% of companies now separate those categories to provide greater insight and understanding of demographic trends.  *See id.*

Other data confirms a growing trend toward companies affirmatively releasing workplace diversity data like that included in EEO-1 Reports.  For example, nearly three-fourths of the Russell 1000 companies ranked by Just Capital voluntarily disclose some form of workforce demographic data.  *See* Matthew Nestler et. al., *Companies Disclosing the Gold Standard of Workforce Diversity Data – the EEO-1 Report or Similar Intersectional Data – More Than Tripled between 2021 and 2022*, Just Capital, https://perma.cc/J6HF-P88R.  In 2023, 154 Fortune 500 companies—up from 79 the prior year—voluntarily released diversity data.  *See* Ruth Umoh, *154 Fortune 500 Companies Released Diversity Data Last Year. Here's What They Reveal About the State of DEI*, Yahoo! Finance (Mar. 13, 2024), https://perma.cc/9DN7-YZLT.  Indeed, even some of the federal contractors

7

who objected to disclosure of their workforce diversity data to CIR have not treated this information as confidential, disclosing similar data on their own volition. *See* CIR's Mot. Summ. J. 17. According to materials in the record, DHL, for example, publishes information about the makeup of its workforce in its annual report, and other large companies such as Lockheed Martin that objected to DOL's release have disclosed their own EEO-1 Reports. *Id.*; Baranetsky Decl., Exs. AC, AD.

In sum, even if some federal contractors have objected to the disclosure of the workplace diversity data in their EEO-1 Reports to CIR, this Court should look to industry practice overall to determine whether such data is "customarily" treated as confidential. *Argus Leader,* 588 U.S. at 440. Because a (growing) majority of companies are not "customarily" or "actually" keeping their workplace diversity data, including the same workplace diversity data reflected in EEO-1 Reports, "confidential," Exemption 4 does not apply. *See id.*

## II.     No reasonably foreseeable harm to an interest protected by Exemption 4 would flow from disclosure.

Even if the workplace diversity data reflected in the requested EEO-1 Reports was both "commercial" and "confidential" (it is not), the analysis does not end there. *Leopold*, 94 F.4th at 37. Under the Act, even assuming Exemption 4 applies, DOL also must show that it "reasonably foresees that disclosure" of the information it seeks to withhold "would harm an interest protected by" Exemption 4. 5 U.S.C. § 552(a)(8)(A)(i)(I); *see also* FOIA Improvement Act of 2016, Pub. L.

8

No. 114–185, 130 Stat. 538, 539 (2016) (amending FOIA to add reasonably foreseeable harm requirement).  As the D.C. Circuit recently explained, "whether a requested record falls within an exemption and whether the disclosure of that record would foreseeably harm an interest protected by the exemption are distinct, consecutive inquiries." *Leopold*, 94 F.4th at 37; *see also Seife*, 43 F.4th at 235 ("Applicability of a FOIA exemption is still necessary—but no longer sufficient— for an agency to withhold the requested information.").

 "[T]he foreseeable harm requirement 'impose[s] an independent and meaningful burden on agencies.'" *Leopold,* 94 F.4th at 37 (quoting *Reps. Comm. for Freedom of the Press v. Fed. Bureau of Investigation*, 3 F.4th 350, 369 (D.C. Cir. 2021)).  "Congress added" it to the Act in 2016 in order "to foreclose the withholding of material unless the agency can 'articulate *both the nature of the harm* [that would flow from disclosure] *and the link between the specified harm and specific information* contained in the material withheld.'" *Reps. Comm. for Freedom of the Press*, 3 F.4th at 369 (quoting H.R. REP. No. 391 at 9). Accordingly, to carry its burden to justify withholding, an agency must "provide 'a focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impede' the interests protected by a FOIA exemption." *Leopold*, 94 F.4th at 37 (internal citations omitted).  And, as the plain language of the Act's foreseeable

harm provision makes clear, potential or speculative harm will not suffice.  5

U.S.C. § 552(a)(8)(A) (agency must demonstrate that it is reasonably foreseeable

that disclosure "would" harm an interest protected by a FOIA exemption); *see also*

*Reps. Comm. for Freedom of the Press v. Fed. Bureau of Investigation*, 3 F.4th at

369 ("Agencies cannot rely on 'mere speculative or abstract fears. . . .'" (citing to

S. Rep. No. 114–4, at 8)).

　　　In the context of Exemption 4, the Act's foreseeable harm provision requires

an agency to demonstrate that it reasonably foresees that disclosure of the material

at issue will harm the "submitter's commercial or financial interests in information

that is of a type held in confidence and not disclosed to any member of the public

by the person to whom it belongs."  *Seife*, 43 F.4th at 240–41; *see also Ctr. for

Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 113

(D.D.C. 2019) (holding that the interests protected by Exemption 4 are "the

submitter's economic or business interests" (alteration omitted)).[2]

---

[2] Prior to *Argus Leader*, some courts applying Exemption 4, notably the D.C. Circuit, considered whether disclosure would result in competitive harm.  *See Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 770–71 (D.C. Cir. 1974). While the Supreme Court in *Argus Leader* held that commercial information could be deemed confidential under Exemption 4 absent a showing of competitive harm, 588 U.S. at 440, that decision did not address the application of the Act's foreseeable harm provision in the context of Exemption 4 because the FOIA request at issue in *Argus Leader* pre-dated the 2016 amendments to FOIA.

In *Seife*, the Second Circuit considered whether it was reasonably foreseeable that the disclosure of certain information provided to the Food & Drug Administration ("FDA") by a pharmaceutical company regarding a particular drug would result in a harm cognizable under the Act. 43 F.4th at 243. The Second Circuit explained that Exemption 4 "protects only certain confidential information, namely, confidential information that is commercial or financial in nature" and, accordingly, that in the context of Exemption 4, the Act's foreseeable harm provision "contemplates harm specifically to commercial or financial interests." *Id.* at 240. Thus, in view of "both the structure of the statute and common sense," the Second Circuit concluded that the FDA had to demonstrate not only that Exemption 4 applied, but also that it reasonably foresaw that disclosure would harm the pharmaceutical company's commercial or financial interests. *Id.* at 241. While the FDA in *Seife* was able to carry that burden,[3] DOL falls far short of satisfying it here.

---

[3] In *Seife,* there was no dispute that the information at issue—the pharmaceutical companies' internal case studies concerning new drug products it was testing—was closely held confidential commercial information. 43 F.4th at 243. The sole question for the Second Circuit was whether release of the data from the company's tests would result in foreseeable harm, and the Court of Appeals found that the concrete allegations of harm, vis-à-vis competitor pharmaceutical companies, satisfied the standard. *Id.* The facts in *Seife* stand in stark contrast to those here.

11

DOL argues that if their workplace diversity data is disclosed, federal contractors might be subjected to "unwarranted and unfounded criticism." Appellant's Br. at 36; *see also id.* at 16 (fearing "reputational harm" for companies).  This argument must be rejected.  "Criticism"—"unwarranted" or not—is not a "harm" that Exemption 4 is intended to protect against and, accordingly, it is not a legally cognizable harm for purposes of FOIA's foreseeable harm provision.  *See Citizens for Resp. & Ethics in Wash.*, 58 F.4th at 1264 ("Just as Exemption 4 does not protect against any and all commercial harm, it does not directly protect against asserted harm to the government as a result of public scrutiny following disclosure."); *Reps. Comm. for Freedom of the Press*, 3 F.4th at 369 (explaining "'fear of embarrassment'" is not a basis for withholding information) (citing S. Rep. No. 114–4, at 8).    Exemption 4 is intended to protect companies' commercial or financial interests—not to shield them from public criticism, news reporting, or commentary.  *Id.*

There is nothing to suggest that disclosure of the workplace diversity data at issue here would harm any commercial or financial interest of the federal contractors who submitted the relevant EEO-1 Reports to DOL.  On the contrary, as noted above, many companies already voluntarily disclose such information publicly.  DOL claims, for example, that "competitors or other critics could use DHL's EEO-1 Reports to infer or accuse DHL of not engaging in sufficient

affirmative action and diversity, equity and inclusion ('DEI') efforts by referencing certain job categories that may—on their face—lack diversity…." *See* Appellant's Br. at 36. But, even if that were a cognizable harm under the Act, research belies DOL's speculative claim.

Even if a company's diversity numbers are "lagging," according to Boston University study published by the American Psychological Association, transparency about diversity outcomes (even unfavorable ones) signals to the public that an organization is genuine about its commitment to diversity, which in turn "increases perceptions of progress and trustworthiness." *See* Evan P. Apfelbaum & Eileen Y. Suh, *Transparency About Lagging Diversity Numbers Signals Genuine Progress*, J. of Experimental Psychology: General at 1 (Aug. 7. 2023), https://perma.cc/H7SQ-WMBP. Indeed, the study found no evidence "that it is advantageous to withhold versus disclose unfavorable workforce diversity data, even when these data are effectively kept under wraps." *Id.* at 12. Similarly, a Harvard Business School study found no evidence that disclosure of diversity metrics has a negative impact on consumer perceptions of companies; it determined, instead, that disclosure can positively affect a consumer's perception of a company. *See* Maya Balakrishnan et. al., *Differentiating on Diversity: How Disclosing Workforce Diversity Influences Consumer Choice*, Harv. Bus. Sch., at 1 (Aug. 29, 2022), https://perma.cc/62S9-9J39. And this was true even for

companies that had not succeed as much as others in diversifying their workforces. *Id.*[4]

Not only is disclosure of such data not resulting in any harm to companies' competitive positions, but also it has contributed meaningfully to public knowledge and informed public policy choices.  For example, state legislatures across the country have relied on workplace diversity data to identify and implement efforts to combat employment discrimination.  *See A Solid Investment: Making Full Use of the Nation's Human Capital*, The Glass Ceiling Commission, at 42 (Nov. 1, 1995), https://perma.cc/YZ9S-2LYB (discussing how data led to greater knowledge about employment diversity, which prompted legal changes across country).  Access to this type of data also has allowed media organizations, academics, and analysts to identify trends, which have led to a better understanding of the ways that companies have effectively diversified their workforce, and areas where diversity has lagged.  *See, e.g.,* Stephanie Rivers, *Data Transparency Key to Improving Diversity, Equity and Inclusion in the Workplace*, ProxyPreview (Mar. 16, 2022), https://perma.cc/38AB-X33F; Jessica Guynn, *George Floyd and Corporate America: 34 Companies to Release Government Workforce Diversity*

---

[4]  Even if "unfounded" or "unwarranted" criticism were a cognizable harm under FOIA, DOL does not explain how or why it believes disclosure would result in criticism that is either, Appellant's Br. at 36, given that the data in the EEO-1 Reports is provided by the companies themselves and thus is presumably accurate.

*Data*, USA Today (Sept. 29, 2020), https://perma.cc/7THP-YZZC. And, finally, given the federal government's outsized impact on diversity in the workforce (through, for example, regulation and the allocation of federal contracts), access to EEO-1 Reports help ensure that the public knows "what their government is up to." *U.S. Dep't of Just. v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989). A regime in which the federal government is permitted to withhold workplace diversity data about firms that it contracts with would hamper, ultimately, government accountability.

For all these reasons, DOL has not and cannot satisfy the Act's foreseeable harm requirement with respect to the data at issue here.

## CONCLUSION

For the foregoing reasons, amici respectfully urge the Court to affirm the District Court's Order releasing the EEO-1 Reports improperly withheld by the DOL.

Dated:  July 17, 2024                    Respectfully submitted,

               <u>s/   Katie Townsend</u>

KATIE TOWNSEND
   *Counsel of record for amici curiae*
BRUCE D. BROWN
MARA GASSMANN*
ADAM MARSHALL*
MAYEESHA GALIBA*
REPORTERS COMMITTEE FOR
   FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310
ktownsend@rcfp.org

      *\*Of counsel*

## CERTIFICATE OF COMPLIANCE

I certify that pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rules 29(a)(3) and 32-1(a), the foregoing Brief of Reporters Committee for Freedom of the Press and First Amendment Coalition as *Amici Curiae* is proportionately spaced, has a typeface of 14 points, and contains 3,482 words excluding the portions excepted by Fed. R. App. P. 32(a)(7)(B)(iii), according to the word count feature of Microsoft Word used to generate this brief.

Dated: July 17, 2024                    *s/ Katie Townsend*
                                        _____
                                        Katie Townsend

## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2024, I filed the foregoing *Amici Curiae* Brief of Reporters Committee for Freedom of the Press and First Amendment Coalition with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit using the Court's CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: July 17, 2024                    *s/ Katie Townsend*
                                        Katie Townsend