No. 24-880

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

CENTER FOR INVESTIGATIVE REPORTING and WILL EVANS,
*Plaintiffs-Appellees,*
v.
UNITED STATES DEPARTMENT OF LABOR,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
No. 3:22-cv-07182-WHA
Hon. William Alsup

---

BRIEF OF *AMICI CURIAE* AMERICAN CIVIL LIBERTIES UNION OF
NORTHERN CALIFORNIA, AMERICAN CIVIL LIBERTIES UNION OF
SOUTHERN CALIFORNIA AND AMERICAN CIVIL LIBERTIES UNION
OF SAN DIEGO-IMPERIAL COUNTIES IN SUPPORT OF PLAINTIFFS-
APPELLEES

---

Larissa R. Grijalva
Angelica Salceda
Grayce S. Zelphin
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
(415) 621-2493
*lgrijalva@aclunc.org*
*asalceda@aclunc.org*
*gzelphin@aclunc.org*

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1(a) and 29(a)(4)(A), *amici curiae* state that they do not have a parent corporation and that no publicly held corporation owns 10 percent or more of their stock. Pursuant to Federal Rules of Appellate Procedure Rule 29(a)(4)(E), *amici curiae* also certify that no person or entity, other than *amici curiae*, their members, or their counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part.

Date: July 17, 2024          */s/ Larissa R. Grijalva*

Larissa R. Grijalva
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA

*Counsel for Amici Curiae*

i

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................... i

TABLE OF CONTENTS ................................................................................ ii

TABLE OF AUTHORITIES.............................................................................. iii

INTEREST OF AMICI CURIAE ...................................................................1

INTRODUCTION ..........................................................................................2

ARGUMENT ..................................................................................................3

I.　The United States Has a Painful History of Racial and Gender Discrimination. ........................................................................3

II.　The United States Adopted Data Reporting Requirements to take Affirmative Action Against Workplace Discrimination.......................4

III.　EEO-1 Reports Are Tools of Accountability for Anti-Discrimination Efforts. ........................................................................6

IV.　Data from EEO-1 Reports Reveal Ongoing Racial and Gender Disparities in the Workforce..................................................7

V.　Public Access to Demographic Workforce Data is Crucial for Public Accountability. ...................................................................10

a.　Government-only access to demographic data allows government contractors to evade public accountability............10

b.　Public access to demographic data is essential to challenge systemic racial and gender discrimination...............................13

CONCLUSION .................................................................................................15

CERTIFICATE OF COMPLIANCE ....................................................................16

## TABLE OF AUTHORITIES

**Cases**

*ACLU v. U.S. Dep't of Justice*,
  418 F.Supp.3d 466 (N.D. Cal. Nov. 18, 2019)......................................................1

*ACLU of Northern California v. U.S. Dep't of Justice*,
  No. C 04-4447 PJH, 2005 WL 588354 (N.D. Cal. Mar. 11, 2005) .......................1

*ACLU of Southern California v. U.S Immigr. and Customs Enf't*,
  No. 2:22-CV-04760-SB-AFM2023, WL 8539484 (C.D. Cal. Dec. 8, 2023)........1

*Albemarle Paper Co. v. Moody*,
  422 U.S. 405 (1975)..............................................................................................7

*Alexander v. Gardner-Denver Co.*,
  415 U.S. 36 (1974)................................................................................................4

*Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Kahn*,
  618 F.2d 784 (D.C. Cir. 1979)..............................................................................5

*Griggs v. Duke Power Co.*,
  401 U.S. 424 (1971)..............................................................................................4

*Hazelwood Sch. Dist. v. United States*,
  433 U.S. 299 (1977)............................................................................................14

*Hemmings v. Tidyman's Inc.*,
  285 F.3d 1174 (9th Cir. 2002) ............................................................................15

*Int'l Bhd. of Teamsters v. United States*,
  431 U.S. 324 (1977)............................................................................................14

*Johnson v. Ry. Express Agency, Inc.*,
  421 U.S. 454 (1975)..............................................................................................4

*McDonnell Douglas Corp. v. Green*,
  411 U.S. 792 (1973)..............................................................................................4

*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012) ..............................................................................14

iii

*Sears Roebuck & Co. v. Gen. Servs. Admin.*,
    509 F.2d 527 (D.C. Cir. 1974)..............................................................8

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
    600 U.S. 181 (2023)........................................................................3, 4

*Traylor v. Safeway Stores, Inc.*,
    402 F.Supp. 871 (N.D. Cal. 1975) ..................................................5

*United States v. Ironworkers Loc. 86*,
    443 F.2d 544 (9th Cir. 1971)...........................................................14

*United States v. N. L. Indus., Inc.*,
    479 F.2d 354 (8th Cir. 1973)...........................................................7

*United Techs. Corp., Pratt & Whitney Aircraft Grp. v. Marshall*,
    464 F.Supp. 845 (D. Conn. 1979) ..................................................8

**Rules**

Fed. R. App. P. 26.1.............................................................................. i

Fed. R. App. P. 29............................................................................ i, 1, 16

Fed. R. App. P. 32................................................................................16

**Regulations**

30 C.F.R. § 12319 (1965)....................................................................5

41 C.F.R. § 60 (2014)........................................................................5, 6

**Other Authorities**

142 Cong. Rec. H10588-94 (1996)....................................................5

Intention Not To Request, Accept, or Use Employer Information Report (EEO-1) Component 2 Data, 84 Fed. Reg. 64932 (Nov. 25, 2019) ....................................13

*EEOC History:1964-1969*, U.S. Equal Emp.Opportunity Comm'n .......................8

*FY 2021 Congressional Budget Justification*, Dep't. of Labor ...............................11

*FY 2025 Congressional Budget Justification*, Dep't. of Labor .........................10, 11

iv

*Indicators (2013) With a look at EEO-1 data for the 50th Anniversary*, U.S. Equal Emp. Opportunity Comm'n ............................................................................8

Jessica Guynn et al., *People of Color Were Promised Equal Opportunity. Federal Contractors Are Failing,* Reveal, Apr. 28, 2023 ....................................9

Justine Coleman, *Federal litigator files complaint alleging Labor secretary abused his authority*, The Hill, Aug. 13, 2020 ..................................................13

Karla Walter et al., *Federal Contractors Are Violating Workers' Rights and Harming the U.S. Government*, Am. Progress Action, Jan. 21, 2022.................11

Proposed Rule Implementing Legal Requirements Regarding the Equal Opportunity Clause's Religious Exemption, 84 Fed. Reg. 41677 (proposed Aug. 15, 2019) ..........................................................................................13

U.S. Dep't of Labor, Federal Contract Compliance Manual, Chapter 1 Desk Audit, 1A Introduction .......................................................................6, 7

U.S. Equal Emp. Opportunity Comm'n, 2023 EEO-1 Component 1 Data Collection Instruction Booklet ...........................................................6, 7

Will Evans & Jayme Fraser, *After History of Discrimination, These Federal Contractors Fought to Hide Diversity Data*, Reveal, May 5, 2023 .................7, 9

## INTEREST OF AMICI CURIAE[1]

The American Civil Liberties Union ("ACLU") is a nationwide, non-partisan, non-profit organization with approximately 1.1 million members and supporters dedicated to the principles of liberty and equality embodied in the Constitution and our nation's civil rights laws. The ACLU of Northern California, ACLU of Southern California, and ACLU of San Diego and Imperial Counties ("ACLU CA affiliates" or "amici") are regional affiliates of the ACLU. The ACLU and its affiliates have appeared as party and party counsel in many cases seeking access to government records, including *ACLU of Southern California v. U.S Immigr. and Customs Enf't*, No. 2:22-CV-04760-SB-AFM, 2023 WL 8539484 (C.D. Cal. Dec. 8, 2023) (access to government records); *ACLU v. U.S. Dep't of Justice*, 418 F.Supp.3d 466 (N.D. Cal. Nov. 18, 2019) (access to government records); *ACLU of Northern California v. U.S. Dep't of Justice*, No. C 04-4447 PJH, 2005 WL 588354 (N.D. Cal. Mar. 11, 2005) (access to government records). The ACLU and its affiliates also regularly rely on data obtained through Freedom of Information Act ("FOIA") requests to disseminate information to the public and to enforce civil rights laws through litigation and policy advocacy. As an organization dedicated to advancing government transparency and public access to

---

[1] *Amici curiae* sought consent from counsel for all parties and none oppose the filing of this brief. *See* Fed. R. App. P. 29(a)(2).

1

records, ACLU CA affiliates have a strong interest in ensuring that the public has access to the demographic workforce data of federal contractors.

## INTRODUCTION

Demographic data revealing disparities traceable to the United States' historic discrimination against racial minorities, Indigenous persons, and women is essential to pursuing our country's promise of economic opportunity for all. The United States has a troubling history of denying some of its citizens economic and professional opportunities because of their race or gender. Fortunately, intentional discrimination is now unlawful, and policies have been adopted to erode persisting racism and sexism in the workplace. One crucial policy the government adopted to root out discrimination is its collection of demographic data from employers, including from certain government contractors, through EEO-1 Type 2 Consolidated Reports (hereinafter "EEO-1 reports"). This data has been valuable in measuring progress and guiding efforts to root out persistent discrimination. While this data is not published, the data that has been made public reveals that many federal contractors continue to discriminate based on race and gender. To assure that progress toward racial and gender equity in the workplace continues, more access to such telling demographic data is necessary.

The federal government and the public have a responsibility to ensure that federal contractors abide by our country's civil rights laws. And when the

2

government's limited resources and shifting interests create opportunities for federal contractors to evade the consequences of perpetuating discriminatory practices, it is the public that steps in to demand transparency and accountability. The public does so by utilizing information such as workforce demographic data to highlight hiring and promotion disparities, and by bringing civil rights litigation to combat systemic workplace discrimination. Thus, public access to EEO-1 data is essential to hold the government and federal contractors accountable and to advance the public's interest in discrimination-free workplaces.

**ARGUMENT**

## I.    The United States Has a Painful History of Racial and Gender Discrimination.

The United States has a profound and enduring legacy of racism that is deeply rooted in its harrowing history of race-based chattel slavery. This painful legacy is compounded by a history of sexism that long excluded women and non-binary individuals from political participation and the workforce. "History speaks. In some form, it can be heard forever." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 393 (2023) (Jackson, J., dissenting). The history of racism and sexism has proven "stubborn and pernicious," and while progress has been made toward the goals of racial and gender equity, "those improvements have only been made possible because

3

institutions . . . have been willing to grapple forthrightly with the burdens of history." *Id.* at 404.

## II. The United States Adopted Data Reporting Requirements to take Affirmative Action Against Workplace Discrimination.

In 1964, Congress enacted Title VII of the Civil Rights Act ("Title VII") "to assure equality of employment opportunities by eliminating those practices and devices that discriminate on the basis of race, color, religion, sex, or national origin." *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 457–58 (1975) (quoting *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44 (1974)). Congress was motivated by a singular goal when it enacted Title VII: prohibiting "discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800 (1973); *see also Griggs v. Duke Power Co.*, 401 U.S. 424, 429–30 (1971) ("The objective of Congress in the enactment of Title VII is plain from the language of the statute. It was to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees.").

In 1965, following the enactment of Title VII, President Lyndon B. Johnson issued Executive Order 11246, requiring federal contractors to file written affirmative action plans and allowing the Office of Federal Contract Compliance Programs ("OFCCP") access to federal contractor's books, records, and accounts

4

for purposes of monitoring compliance with the Executive Order. No. 11246, 30 C.F.R. § 12319 (1965). Executive Order 11246 also aimed to safeguard consumers by ensuring that government suppliers did not "over the long run increas[e] its costs and delay[] its programs by excluding from the labor pool available minority workmen." *Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Kahn*, 618 F.2d 784, 792 (D.C. Cir. 1979). Executive Order 11246 reflected that prohibiting future discrimination was not enough to achieve equal employment opportunity— affirmative measures were necessary to undo or compensate for the effects of past discrimination. 142 Cong. Rec. H10588-94 (1996). Accordingly, Executive Order 11246 and its implementing regulations imposed "nondiscrimination and affirmative action" requirements as a condition of doing business with the Federal Government.[2] *Traylor v. Safeway Stores, Inc.*, 402 F.Supp. 871, 877 (N.D. Cal. 1975). These provisions remain effective today, and "require the contractor to agree both not to discriminate against any employee or applicant for employment on the basis of race, color, religion, sex, or national origin and also to take affirmative action to ensure that the selection and treatment of employees is not based on those impermissible factors." *Id.*

---

[2] *See also* Exec. Order No. 13672, 41 C.F.R. § 60 (2014) (amending Executive Order 11246 to "take further steps to promote economy and efficiency in Federal Government procurement by prohibiting discrimination based on sexual orientation and gender identity").

5

### III.    EEO-1 Reports Are Tools of Accountability for Anti-Discrimination Efforts.

To ensure compliance with Title VII and Executive Order 11246, the federal government mandates that contactors with fifty or more employees and federal contracts totaling $50,000 or more file an EEO-1 report. 41 C.F.R. § 60-1.7(a). EEO-1 reports call for three categories of workforce data: race and ethnicity, gender, and job category.[3] Federal contractors submit these reports to the EEO-1 Joint Reporting Committee, which is comprised of two Department of Labor ("DOL") sub-agencies—the OFCCP and the Equal Employment Opportunity Commission ("EEOC"). *Id*. As part of their mandate, the EEOC and OFCCP use EEO-1 report data for compliance monitoring and investigations.[4] Compliance officers analyze these reports to track long-term and short-term trends among contractors, looking for evidence of concentration and underrepresentation of certain individuals in the workforce. They pay "particular attention to departments and work units where minorities or women are absent or make up nearly the entire

---

[3] U.S. EQUAL EMP. OPPORTUNITY COMM'N, 2023 EEO-1 COMPONENT 1 DATA COLLECTION INSTRUCTION BOOKLET, 15-17, https://www.eeocdata.org/pdfs/2023_EEO_1_Component_1_Instruction_Booklet.pdf (last visited Jul. 16, 2024).
[4] *See generally* U.S. DEP'T OF LABOR, Federal Contract Compliance Manual, Chapter 1 Desk Audit, 1A Introduction, https://www.dol.gov/agencies/ofccp/manual/fccm/chapter-1-desk-audit/1a-introduction (last visited Jul. 16, 2024).

department or unit, and look for indicators of job steering or other discriminatory placement practices."[5]

These reporting directives also serve as self-evaluation tools for federal contractors to assess "their employment practices and to endeavor to eliminate, so far as possible, the last vestiges of an unfortunate and ignominious page in this country's history." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975) (quoting *United States v. N. L. Indus., Inc.*, 479 F.2d 354, 361 (8th Cir. 1973)). These directives encourage federal contractors to identify and address any disparities that may exist within their workforce. Unfortunately, not all contractors take this encouragement, and some bad actors instead seek to hide EEO-1 report data indicating disparities.[6]

### IV. Data from EEO-1 Reports Reveal Ongoing Racial and Gender Disparities in the Workforce.

The DOL does not proactively disclose EEO-1 reports.[7] But when it has

---

[5] *Id*. at 1N Analysis of an Executive Order 11246 AAP: Audit of Organizational Profile.

[6] Will Evans & Jayme Fraser, *After History of Discrimination, These Federal Contractors Fought to Hide Diversity Data*, Reveal, May 5, 2023, http://revealnews.org/article/diversity-data-contractor-discrimination/.

[7] The EEOC and OFCCP are subject to different authorities regarding the collection and use of EEO1-reports. According to the EEOC, "[t]he confidentiality requirements allow the EEOC to publish only aggregated data" while "OFCCP obtains EEO-1 data for contractors under its own E.O. 11246 authority." As such, "some courts have ruled that the Title VII prohibition against disclosure does not apply to OFCCP's collection of EEO-1 data." *See* U.S. EQUAL EMP. OPPORTUNITY

7

revealed federal contractors' workforce demographic data, the revelations have been striking in revealing racial and gender disparities.

In 1966, when EEO-1 data first became available, the EEOC used the data to document the scope and intensity of workforce discrimination.[8] This data revealed that only about 11.4 percent of the private sector employees documented through the EEO-1 reports were Black or African American, Hispanic or Latino, Asian American, or American Indian.[9] Additionally, women constituted 31.5 percent of the persons employed by employers filing EEO-1 reports, but only 9.4 percent of officials and managers.[10] These figures presented stark disparities and troubling underrepresentation of women and minorities in government contractor positions, underlining the importance of data collection and confirming the need for continued efforts to achieve equality.

Contemporary EEO-1 report data indicates that while racial and gender discrepancies have significantly improved, disparities persist. EEO-1 report data indicates that federal contractors are failing to live up to the promise of equal

---

COMM'N, *supra* note 3 at 7 (citing *United Techs. Corp., Pratt & Whitney Aircraft Grp. v. Marshall*, 464 F.Supp. 845, 851–52 (D. Conn. 1979); *Sears Roebuck & Co. v. Gen. Servs. Admin.*, 509 F.2d 527, 529 (D.C. Cir. 1974)).
[8] *EEOC History: 1964-1969*, U.S. Equal Emp. Opportunity Comm'n, https://www.eeoc.gov/history/eeoc-history-1964-1969 (last visited Jul. 16, 2024).
[9] *Indicators (2013) With a look at EEO-1 data for the 50th Anniversary*, U.S. Equal Emp. Opportunity Comm'n, https://www.eeoc.gov/data/indicators-2013with-look-eeo-1-data-50th-anniversary (last visited Jul. 16, 2024).
[10] *Id.*

8

opportunity, with employees of color and women largely missing from the top positions, and white men dominating the executive ranks.[11] Based on demographic information on 19,000 federal contractors, *USA Today* reported that white men occupy 59% of executive positions, while Black women hold 1.7%, Latina women hold 1.5% and Asian women 2%.[12] Furthermore, white men "are the only demographic group that holds a higher proportion of top positions than of all other jobs" in a company.[13] Almost as troubling as the persistent disparities are some government contractors' efforts to conceal this information from the public, including "at least a dozen companies – collectively reaping more than $100 billion [of taxpayer dollars] – that paid to settle Labor Department findings of job discrimination over the last decade."[14]

The value of EEO-1 reports is immense. They provide necessary data to measure progress toward racial and gender equity and identify areas needing further intervention. While some federal contractors voluntarily disclose their EEO-1 reports by posting them on their websites, others opt for secrecy.[15] These

---

[11] Evans & Fraser, *supra* note 6.
[12] *See* Jessica Guynn et al., *People of Color Were Promised Equal Opportunity. Federal Contractors Are Failing,* Reveal, Apr. 28, 2023, https://revealnews.org/article/diversity-data-top-federal-jobs.
[13] *Id.*
[14] Evans & Fraser, *supra* note 6.
[15] *Id.*

9

gaps in workforce data hinder efforts to address systemic inequities, and potentially reverse hard-earned progress.

## V. Public Access to Demographic Workforce Data is Crucial for Public Accountability.

### a. Government-only access to demographic data allows government contractors to evade public accountability.

Given the United States' history of discrimination against Black people, women, and other racial and gender minorities, the value of demographic data is significantly undermined if it remains accessible only to the government and not the public. It is widely recognized that the government uses demographic data gleaned from EEO-1 reports to uncover racial and gender biases and enforce anti-discrimination laws. While governmental enforcement of anti-discrimination efforts is laudable and important, limiting the disclosure of demographic data *only* to government entities evades *public* accountability.

When federal contractors submit EEO-1 forms to the DOL, the government's ability to enforce anti-discrimination efforts is constrained by its resource limitations and priorities. As discussed above, government officials rely on EEO-1 reports to enforce Title VII claims, monitor national employment trends, and scrutinize individual employers' hiring and employment practices.[16]  However,

---

[16] *FY 2025 Congressional Budget Justification*, DEP'T. OF LABOR, 10, https://www.dol.gov/sites/dolgov/files/general/budget/2025/CBJ-2025-V2-10.pdf (last visited Jul. 16, 2024).

with OFCCP overseeing approximately 25,000 firms with 120,000 contractor establishments, employing more than 20% of the American workforce, the sheer scale makes it impossible for the government to hold every one of its contractors accountable.[17] The government cannot audit and review all demographic data or detect and act upon all new or lingering discriminatory patterns. Instead, OFCCP reviews one to three percent of federal contractor establishments annually,[18] and compliance evaluation processing times can linger to 369 days.[19] Without *public* accountability and oversight, governmental contractors—who reap the benefits of taxpayer dollars—can evade or delay accountability simply because the government has funding shortages or inadequate staffing levels.[20] Limitations on the government's resources are just one reason that numerous government studies have found that federal contractors are frequently among the worst violators of federal workplace laws but face few consequences.[21]

---

[17] *Id.* at 26.
[18] *FY 2021 Congressional Budget Justification*, DEP'T. OF LABOR, 13 n. 3, https://www.dol.gov/sites/dolgov/files/general/budget/2021/CBJ-2021-V2-10.pdf (last visited Jul. 16, 2024).
[19] *FY 2025 Congressional Budget Justification*, *supra* note 16, at 26.
[20] *Id.* (noting "inadequate staffing" as one factor which caused OFCCP to fall significantly below its 250 target on the timeliness measure for median days to process compliance evaluations without discrimination violations at 369 days).
[21] Karla Walter et al., *Federal Contractors Are Violating Workers' Rights and Harming the U.S. Government*, Am. Progress Action, Jan. 21, 2022, https://www.americanprogressaction.org/article/federal-contractors-violating-workers-rights-harming-u-s-government/.

Further, the government and public's interests are often at odds when determining the importance of demographic data or the actions that should be taken based on such data. Lawsuits filed against the federal government highlight this divergence of interests. For example, in 2017, the National Women's Law Center, Democracy Forward, and Labor Council for Latin American Advancement filed a lawsuit against the Office of Management and Budget and the EEOC for illegally rolling back critical pay transparency requirements intended to root out discrimination and close the wage gap.[22] The government's enforcement of anti-discrimination vacillates based on the current administration's ideology, and without public disclosure of data, the government can curtail enforcement even where data indicates discrimination.

A prime example is the OFCCP's 2017 complaint against Oracle (during the Obama administration), alleging "gross disparities in pay"[23] and a "pattern and practice of hiring discrimination against qualified White, Hispanic, and African American applicants in favor of Asian applicants," with a claim for $400 million in backpay.[24] The government's position on this complaint shifted during the Trump

---

[22] *See generally* Complaint, *Nat'l Women's L. Ctr. v. Off. of Mgmt. & Budget*, No. 17-CV-02458 (D.D.C. Nov. 15, 2017), *available at* https://nwlc.org/wp-content/uploads/2017/11/1-Complaint.pdf.
[23] Complaint, *OFCCP v. Oracle Am., Inc.*, OFCCP No. R00192699, 1 (Dep't of Labor Jan. 17, 2017), *available at* https://www.dol.gov/sites/dolgov/files/legacy-files/newsroom/newsreleases/OFCCP20170071.pdf.
[24] *Id.* at 4.

administration, and a whistleblower complaint alleged that the OFCCP's lead attorney in the lawsuit was pressured by the Secretary of Labor to settle for less.[25] Further, in 2019 (also during the Trump administration), OFCCP announced it would ignore EEO-1 pay data in its enforcement activities[26] and expand religious exemptions from discrimination protections which would allow federal contractors to use their religious beliefs to discriminate and engage in otherwise unlawful behavior.[27] While these policy changes served the political motives of the Trump administration, they undercut public accountability of government contractors.

In short, while providing workforce demographic data to the government is necessary for enforcing anti-discrimination laws, it is imperative that this data also be available to the taxpaying public. Public disclosure of demographic data, free from the constraints of government resources and insulated from governmental interests and politics, is crucial for accountability.

### b. Public access to demographic data is essential to challenge systemic racial and gender discrimination.

Since the passage of Title VII, courts have frequently relied upon statistical

---

[25] Justine Coleman, *Federal litigator files complaint alleging Labor secretary abused his authority*, The Hill, Aug. 13, 2020, https://tinyurl.com/mr4drkmm.

[26] Intention Not To Request, Accept, or Use Employer Information Report (EEO-1) Component 2 Data, 84 Fed. Reg. 64932 (Nov. 25, 2019), *available at* https://tinyurl.com/2wjdhm7p.

[27] Proposed Rule Implementing Legal Requirements Regarding the Equal Opportunity Clause's Religious Exemption, 84 Fed. Reg. 41677 (proposed Aug. 15, 2019), *available at* https://tinyurl.com/2hkbrbbm.

evidence to find legal violations. In fact, broad demographic data, whittled down to persuasive statistics, is often the only evidence that plaintiffs can use to prove systemic discrimination.  *See, e.g.*, *United States v. Ironworkers Loc. 86*, 443 F.2d 544, 551 (9th Cir. 1971) ("In many cases the only available avenue of proof is the use of racial statistics to uncover clandestine and covert discrimination by the employer or union involved."). Unlike a lawsuit based on discrimination against an individual, proving systematic discrimination by a defendant requires proof that the defendant engaged in a "pattern or practice" of discrimination. *See, e.g.*, *Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) (class action alleging pattern or practice of racial profiling by law enforcement agency in violation of Title VI and the Fourth and Fourteenth Amendments); *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977) (holding that a company and union had a "pattern or practice" of discriminatory hiring, assignment, and promotion policies against Black people and people with Spanish surnames). "Pattern or practice" cases require evidence that a defendant "regularly and purposefully" discriminated against a particular group over some amount of time. *Id.* at 325. Plaintiffs can, and often do, make a prima facie case of systemic discrimination using data because "statistics showing racial or ethnic imbalance are probative … [and] imbalance is often a telltale sign of purposeful discrimination." *Id.* at 339 n.20; *see also Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307–08 (1977) ("Where gross statistical disparities

14

can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination."); *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1184 (9th Cir. 2002) ("Courts have long recognized that statistical evidence may be used to establish a prima facie case of disparate impact discrimination."). Denying plaintiffs access to robust data would hamstring efforts to challenge systemic discrimination in the courtroom.

The need for public accountability, and the strong public interest in working toward a more equitable society, is precisely why EEO-1 reports and the data contained therein should be considered public resources.

## CONCLUSION

Based on the foregoing, we respectfully request this Court affirm the judgment of the district court.

Date: July 17, 2024          */s/ Larissa R. Grijalva*[28]

                             Larissa R. Grijalva
                             AMERICAN CIVIL LIBERTIES UNION
                             FOUNDATION OF NORTHERN CALIFORNIA

                             *Counsel for Amici Curiae*

---

[28] Significant contributions to this brief were made by Yana Gagloeva and Ramya Sinha, students at the University of San Francisco School of Law and summer 2024 legal interns for the ACLU of Northern California.

15

## CERTIFICATE OF COMPLIANCE

I certify that this brief contains 3,243 words, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6). I further certify that this brief is an amici brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

Date: July 17, 2024          */s/ Larissa R. Grijalva*

Larissa R. Grijalva
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA

*Counsel for Amici Curiae*

16